## HEALTH SERVICES AND DEVELOPMENT AGENCY MEETING
### JUNE 26, 2013
### APPLICATION SUMMARY

| | |
|---|---|
| NAME OF PROJECT: | Tri-Cities Holdings, LLC d/b/a Trex Treatment Center |
| PROJECT NUMBER: | CN1302-005 |
| ADDRESS: | 4 Wesley Court<br>Johnson City (Washington County), Tennessee 37601 |
| LEGAL OWNER: | Tri-Cities Holdings, LLC<br>6555 Sugarloaf Parkway, Suite 307-137<br>Duluth (Gwinnett County), Georgia 30097 |
| OPERATING ENTITY: | Not Applicable |
| CONTACT PERSON: | Steven W. Kester<br>(404) 664-2616 |
| DATE FILED: | March 8, 2013 |
| PROJECT COST: | $670,000.00 |
| FINANCING: | Cash Reserves of Kester L.P. |
| PURPOSE OF REVIEW: | Establishment of a nonresidential substitution-based treatment center for opiate addiction and the initiation of opiate addiction treatment |

### DESCRIPTION:

Trex Treatment Center is seeking approval to establish a nonresidential substitution-based treatment center that provides opiate addiction treatment (referred to as OTP for opiate treatment program throughout the remainder of the report). The OTP will provide individual counseling and group therapy and will offer methadone and buprenorphine to prevent symptoms of withdrawal. The service area includes Carter, Cocke, Greene, Hamblen, Hawkins, Johnson, Sullivan, Unicoi and Washington counties. The OTP will operate as a private, for-profit clinic under all applicable licensure requirements of the Tennessee

Case 2:14-cv-00233-JRG-MCLC Document 15-2 Filed 06/09/14 Page 1 of 158 PageID #: 148

Department of Mental Health and Substance Abuse Services (TDMHSAS). No state, federal, or local funding will be sought.

## SERVICE SPECIFIC CRITERIA AND STANDARD REVIEW:
## NON-RESIDENTIAL METHADONE TREATMENT FACILITES (NRMTF)*

A non-residential narcotic treatment facility should provide adequate medical, counseling, vocational, educational, mental health assessment, and social services to patients enrolled in the opioid treatment program with the goal of the individual becoming free of opioid dependency.

> *The applicant reports that patients will receive continuous and intensive counseling, services, and mental health assessments aimed at helping the patient become free of opioid dependency. This includes educational services delivered through counseling staff and referrals to vocational services. Patients will be supervised by a Board-Certified physician experienced in opioid dependency per TDMHSAS Rules. The applicant projects 530 patients in Year 1 while employing twelve (12) substance abuse counselors. The applicant indicates the industry standards dictate a client-to-counselor ratio of 50 to 1.*

> *The TDMHSAS Report (page 17) indicates the application does not have enough information to determine whether staffing requirements will be met and if staff will have the appropriate certifications.*

> *It is <u>unknown whether this criterion has been met.</u>*

Need

The need for non-residential narcotic treatment facilities should be based on information prepared by the applicant for a certificate of need, which acknowledges the importance of considering the demand for services along with need and addressing and analyzing service problems as well.

The assessment should cover the proposed service area and include the utilization of existing service providers, scope of services provided, patient origin, and patient mix.

The assessment should consider that the users of opiate drugs are the clients at non-residential narcotic treatment facilities, and because of the illegal nature of opiate drug use, data will be based on estimates, actual counts, arrests for drug use, and hospital admittance for drug abuse.

Tri-Cities Holdings, Inc.<br>
CN1302-005<br>
June 26, 2013<br>
PAGE 2

The assessment should also include:

1. **A description of the geographic area to be served by the program;**

*The applicant proposes to serve eligible individuals residing in a nine county service area, which includes Carter, Cocke, Greene, Hamblen, Hawkins, Johnson, Sullivan, Unicoi, and Washington counties. The applicant further defined the service area by using a 2002 report\*\* that included Methadone Service Areas (MSA). This information is included on pages 118-121 of the 1st (March 25, 2013) supplemental application.*

*It appears that this criterion has been <u>met.</u>*

2. **Population of area to be served;**

*The population of the proposed service area in 2013 was 600,895.*

**The estimated number of persons, in the described area, addicted to heroin or other opioid drugs and an explanation of the basis of the estimate;**

*The applicant estimates there are between 12,000 and 24,000 adults who are addicted to opiates (heroin and prescription pain pills) in the proposed nine (9) county service area. The applicant calculated the estimates from SAMSHA (Substance Abuse and Mental Health Services Administration) and TDMHSAS reports.*

*The TDMHSAS Report questions the applicant's need methodology and indicates it has resulted in a misrepresentation.*

*It appears that this criterion <u>has not been met.</u>*

3. **The estimated number of persons, in the described area, addicted to heroin or other opioid drugs presently under treatment in methadone and other treatment programs;**

*TDMHSAS Central Registry data related to opioid treatment is no longer available to the Health Services and Development Agency. According to a representative of the TDMHSAS, the sole function of a central registry is to prevent multiple enrollments of individuals receiving methadone treatment. Further, any information disclosed to a central registry may not be used for any other purpose than the prevention of multiple enrollments, unless directed by a court order. TDMHSAS concluded that this language prevents the contents of the Central Registry being used to obtain utilization data.*

*Since current data is not available, the applicant based its estimates on*

*previously released 2008 Central Registry data, and a telephone survey.*

*The 2008 Central Registry data indicated 175 patients in the nine county service area received treatment from a Tennessee-based methadone maintenance provider. The applicant calculated that 866 patients in the proposed service area now need treatment by applying 2008 Central Registry data to population data (see page 19 of the 1st supplemental).*

*The applicant estimated 950-1,500 people receive treatment for opioid dependency from clinics in Knoxville, Tennessee and Asheville and Boone, North Carolina. The methodology for the estimate is based on telephone interviews and the Applicant's "own data and extrapolation." The methodology is detailed on pages 19 and 20 of the March 25, 2013 supplemental application.*

*The TDMHSAS Report questions the applicant's need methodology.*

*Since current data is not available, staff contacted the Virginia and North Carolina Methadone Authorities in early June 2013. Virginia estimated as many as 50 Tennessee residents were crossing the state line into Virginia for treatment. North Carolina has indicated it will respond prior to the June 26 Agency meeting.*

*While this criterion does require the applicant to "estimate the number of persons addicted to heroin or other opioid drugs presently under treatment...." this estimate relies on 2008 Tennessee Department of Mental Health Registry data and on secondary sources which have not been verified.*

*It is <u>unknown whether this criterion has been met</u>.*

4. **Projected rate of intake and factors controlling intake;**

   *The applicant projects the rate of intake will be 50 patients per week.*

5. **Compare estimated need to existing capacity.**

   *There are 77 SAMSHA certified buprenorphine (suboxone) outpatient providers in the proposed service area. There are no existing OTPs in the service area.*

**Also, consideration should be given to the reality that existing facilities can expand or reduce their capacity to maintain or treat patients without large changes in overhead**.

   *There are no existing OTPs in the service area. Migration data of patients who travel outside of the proposed service area is not available.*

   *It appears that this criterion is <u>not</u> applicable.*

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 4

Service Area

The geographic service area should be reasonable and based on an optimal balance between population density and service proximity.

> *There are no OTPs in the applicant's proposed service area.*

> *It appears that this criterion has been met.*

The relationship of the socio-demographics of the service area and the projected population to receive services should be considered. The proposal's sensitivity to and the responsiveness to the special needs of the service area should be considered including accessibility to consumers, particularly women, racial and ethnic minorities, and low-income groups.

> *The applicant states a U.S. Center for Disease Control (CDC) report states opioid abuse and overdose cuts across all genders, age groups, race, and economics. The TDMHSAS report (page 9) indicates the cited CDC reference cannot be confirmed.*

> *The applicant references the Appalachian Commission Report of 2008. The TDMHSAS Report (page 11) questions whether this study can be appropriately applied to the proposed service area.*

> *The program will be accessible to a few people in the low-income group. Charity care will be provided at the rate of approximately 2.0% of total gross revenue in Years 1 and 2 ($35,643 or approximately 11 patients and $78,074 or 21 patients, respectively).*

> *Since a small percentage of charity care will be provided, it appears that the program may be accessible to a few people in the low-income group. It appears that this criterion may be partially met.*

Relationship to Existing Applicable Plans

The proposals' estimate of the number of patients to be treated, anticipated revenue from the proposed project, and the program funding source with description of the organizational structure of the program delineating the person(s) responsible for the program, should be considered.

> *The applicant proposes to provide services to 530 patients in 2014 generating gross operating revenues of $1,782,144. Treatment is self-funded by the patient. The applicant has provided an organizational structure of the*

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 5 of 158   PageID #: 152

*program and person responsible for the program.*

*According to the SAMSHA Alcohol and Drug Services Study (ADSS) titled "The National Treatment System: Outpatient Methadone Facilities", March 2004, Private for-profit outpatient methadone facilities were much less dependent on public revenue than other facilities. Seventy-nine percent of private for-profit facilities received less than half of their revenue from public sources.*

*It appears that this criterion has been met.*

**The proposals' relationship to policy as formulated in local and national plans, including need methodologies, should be considered.**

*There appears to be no local or national plans that include needs methodologies.*

*It appears that this criterion is not applicable.*

**The proposals' relationship to underserved geographic areas and underserved population groups, as identified in local plans and other documents, should be a significant consideration.**

*In June 1999, the Washington County Health Council developed plans to address priority health concerns. Adult Alcohol/Drug Abuse was ranked as the 3rd highest area of concern for Washington County as based on the following: (a) the size of population impacted, (b) the seriousness of health concern both present and future, and (c) the effectiveness of potential interventions. Source: The Washington County Health Council Report 1999.*

*The report did not specifically address nonresidential substitution-based opioid treatment programs.*

*It appears this criterion is not applicable.*

**The impact of the proposal on similar services supported by state appropriations should be assessed and considered.**

*The applicant plans to utilize self-pay programs and does not plan to participate in State and Federal programs such as TennCare or Medicare.*

*It appears that this criterion is not applicable*

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 6

The degree of projected financial participation in the Medicare and TennCare programs should be considered.

> *The applicant plans to utilize self-pay programs and does not plan to participate in State and Federal programs such as TennCare or Medicare.*

> *It appears that this criterion is <u>not</u> applicable*

\* *Note to Agency Members: The criteria and standards for certificate of need have not been updated to reflect the change in nomenclature to nonresidential substitution-based treatment center for opiate addiction. The Non-Residential Methadone Treatment Facilities (NRMTF) standards were included in the 2000 Edition of the Guidelines for Growth. The Division of Health Planning has had preliminary discussions with TDMHSAS regarding the development of new standards and criteria.*

\*\**The applicant is referring to a report generated in response to Public Chapter 363 of the Acts of the 2001. The legislation directed the Commissioner of Health to study issues relating to the need for and location of non-residential methadone treatment facilities in the Certificate of Need process. The legislation directed the Commissioner to consult with the Health Facilities Commission and the Board for Licensing Health Care Facilities to design precise guidelines concerning the location of new non-residential methadone treatment facilities and the need for any additional regulation of non-residential methadone treatment facilities. The legislation also directed the Commissioner to report recommendations to the house health and human resources committee and the senate general welfare, health and human resources committee on or before January 1, 2002. The Commissioner assembled a task force, which proposed recommendations for changes to the rules of the Board for Licensing Health Care Facilities that govern methadone treatment facilities as well as modifications to the Guidelines for Growth. The goal was to provide assistance in making decisions about the need for and location of methadone facilities in the state. Information from the state's Central Registry of methadone patients in treatment was compiled, analyzed, and studied by the task force.*

*The report designated 23 distinct Methadone Service Areas (MSA) within the state to assure reasonable patient access to a methadone program. MSA was defined as a county or constellation of contiguous counties in the state that comprise a sufficient general population making it likely that a minimum number of opiate dependent persons reside in the MSA who seek treatment could support a program. The minimum population foundation was balanced with the need to establish geographic boundaries such that patients living within the MSA would reside within an hour drive one-way to a treatment program if the program were established in the heart of the MSA.*

*A copy of the Report is attached to this summary.*

*Staff could find no evidence that the General Assembly or any state agency adopted any of the findings. TDH did revise rules related Non-Residential Narcotic*

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 7

*Treatment Facilities, effective May 4, 2003. There were no changes to the Guidelines for Growth. Executive Order 44, dated February 23, 2007, transferred the regulation of all Alcohol & Drug facilities back to the Department of Mental Health.*

SUMMARY:

Tri-Cities Holdings, LLC d/b/a Trex Treatment Center is an active limited liability company registered with the Tennessee Secretary of State. It was formed on January 11, 2013 with two members holding 50% membership each: Steve Kester and Leigh B. Dunlap. Steve Kester serves as the Chief Executive Officer.

A brief summary of the management biographies of the owners (March 25, 2013 supplemental/page 49) follows: Steve Kester is the co-founder of Treatment Centers HoldCo d/b/a Crossroads Treatment Centers. He is currently a minority shareholder of Treatment Centers HoldCo and is not active in the management of the company. Treatment Centers HoldCo operates 3 methadone treatment centers in North Carolina, 3 in South Carolina, 2 in Georgia and 1 in Virginia. Leigh B. Dunlap has no healthcare experience. She is identified as a "unit holder" and has no management position in the company.

The proposed facility will be located on 1.66 acres in an 8,260 square feet facility at 4 Wesley Court, Johnson City (Washington County). This location is an industrial area zoned for medical services. The applicant holds an Option to Lease agreement with an initial term of 5 years with an option to renew for two additional 5-year terms (for a total of 10 additional years). The monthly lease is $5,440. The applicant indicates the size of the facility and accompanying parking can accommodate 1,000 patients with a one-shift operation.

The applicant provided a copy of the Johnson City Zoning Regulations specific to methadone clinics in the March 25, 2013 (page 109) supplemental response. The applicant does not comply with zoning regulation 6.13.3.4, items E. and F. (below), has requested a zoning variance, and has challenged the denial by Johnson City in Federal Court (such litigation is ongoing).

6.13.3.4 Methadone Treatment Clinic provided:

E. The hours of operation shall be between 7:00 am and 8:00 p.m.

*The applicant plans to operate from 5:00 A.M. until noon seven days a week. The applicant states a majority of the traffic at the proposed facility is expected between 5:00 A.M. and 7:00 A.M. so patients can get to work and school.*

**Tri-Cities Holdings, Inc.**
CN1302-005
June 26, 2013
PAGE 8

*Note to Agency Members: The TDMHSAS Map of the 12 existing Tennessee Statewide Opioid Treatment Centers indicate 5 centers open at 5:00 A.M., 5 at 5:30 A.M., 1 at 5:45 A.M., and 1 at 6:00 A.M.*

F. The facility shall be located on and the primary access shall be from an arterial street.

*The applicant states the facility is located on a cul-de-sac with industrial and commercial customers nearby (construction supply company, a construction company, and an empty lot).*

The total population of the nine county primary service area (PSA) is estimated at 600,895 residents in calendar year (CY) 2013 increasing by approximately 1.7% to 610,962 residents in CY 2017. The applicant states the proposed service area represents Washington, Carter, Johnson and Unicoi counties in Methadone Service Area #1, Sullivan and Hawkins counties in MSA #2, and Greene, Cocke and Hamblen counties in MSA #3.

There are currently no other licensed facilities in the proposed service area. If approved, Tri-Cities Holdings, Inc. will be the 13th OTP in the state (note: a map of all licensed and proposed OTPs is provided with this summary). The closest treatment facilities in the state are located in Knoxville (Knox County), TN.

Behavioral Health Group (BHG) based in Dallas, Texas currently owns a majority of the existing methadone clinics (nine of the twelve) in Tennessee. BHG owns clinics in Knoxville (2), Nashville (1), Memphis (3), Jackson (1), Paris (1), and Columbia (1). BHG also owns 29 other facilities in Colorado, Kansas, Kentucky, Louisiana, and Texas.

Since TDMHSAS Central Registry Opioid Treatment data is no longer available, staff has attempted to pull together historical information for Agency members.

Paris Professional Associates, CN0903-014A, reviewed in 2009, was the last methadone application that included methadone registry data. The applicant provided a copy of the 2008 Methadone Registry that indicates consumers by county of residence and clinic. A copy of the 2008 registry is located on the March 25, 2013 supplemental pages 110B-110G. This registry captured only the Tennessee facilities where methadone patients receive services. The methadone registries of adjoining states were not available.

The following table displays the 2008 service area out-migration for the nine-county service area to Tennessee OTPs:

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 9

2008 Methadone Registry
Proposed Service Area Out-Migration

| County | Treatment Facility | | | | Total |
|---|---|---|---|---|---|
| | Davidson County- MidSouth TX Ctr. | Hamilton County- Volunteer TX Ctr. | Knox DRD Knoxville- Location #1 | Knox DRD Knoxville,- Location #2 | |
| Carter | | 4 | 2 | 1 | 7 |
| Cocke | | 1 | 10 | 12 | 23 |
| Greene | | | 2 | 8 | 10 |
| Hamblen | | 14 | 38 | 31 | 83 |
| Hawkins | 1 | 2 | 5 | 15 | 23 |
| Johnson | 1 | | 1 | | 2 |
| Sullivan | 1 | | 10 | 8 | 19 |
| Unicoi | | 1 | | 1 | 2 |
| Washington | | | 4 | 2 | 6 |
| Total | 3 | 22 | 72 | 78 | 175 |

*Source: CN1302-005*

According to the TDMHSAS Tennessee Opioid Treatment Clinics Map, the hours of operation of Knoxville clinics are Mon-Sat, 5:30 A.M.-2:30 P.M. with dosing hours between 5:30 A.M.-11:00 A.M. and Saturday between 6:00 A.M. to 9:00 A.M.
*Source: http://www.tennessee.gov/mental/A&D/A_D_docs/methadonelabeledclinics.pdf*

The applicant states patients must attend every day (seven days a week) for the first 45 days of treatment before being permitted to take the drugs off-site.

The 2001 Methadone Task Report indicated the number of people seeking treatment for opiate addiction was directly proportional to the distance traveled to receive treatment. The Task Force report also noted the number of patients diminish greatly when the distance lived from the clinic exceeds 60 miles. The following is a table of driving distances and driving time for methadone services from larger cities in the proposed service area to the proposed clinic in Johnson City, TN and the nearest existing clinics located in Knoxville, TN and Weaverville, NC.

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 10 of 158   PageID #: 157

The closest Tennessee OTP is located in Knoxville (Knox County), Tennessee which is located over 100 miles away or approximately 1 hour and 45 minute drive time from the cities of Johnson City, Bristol, and Kingsport in the proposed service area. The closest out of state OTP is located in Weaverville, NC with a traveling distance of 52 miles/56 minutes for residents of Johnson City, TN.

| Methadone Provider | Johnson City, TN (Washington Co.) | Kingsport, TN (Sullivan Co.) | Bristol, TN (Sullivan Co.) |
|---|---|---|---|
| Proposed Tri-Cities Holdings, Inc., Johnson City, TN | 0 | 21 miles/28 min. | 22 miles/36 min. |
| Crossroads of Weaverville, Weaverville, NC | 52 miles/56 min. | 74 miles/1 hr. 23 min. min. | 76 miles/1hr.32 min. |
| DRD Knoxville Medical Clinic-2 locations, Knoxville, TN | 106.5 miles/1 hr. 43 min. | 102 miles/1 hr. 42 min. | 112 miles/1 hr. 47 min. |

Source: MapQuest

The applicant proposes to serve 530 clients in Year 1 increasing to 1,056 clients in Year 2. Of the 530 patients served during the first year, the applicant projects to serve 387 methadone patients or 73%, 133 buprenorphine-based treatment patients or 25%, and 10 or 2% abstinence-based treatment patients.

The fee schedule is on page 37 of the March 25, 2013 supplemental information. A failed drug screen results in a charge of $25.00. The applicant indicates the buprenorphine daily dosage fee for TennCare members would be adjusted if TennCare pays for the prescription.

The applicant reports methadone maintenance treatment (MMT) was developed in 1964 and is the most common and established form of opioid addiction treatment. In October 2002, the applicant notes the Food and Drug Administration (FDA) approved buprenorphine, subutex, and suboxone for use in opioid addiction treatment. The applicant states the greatest difference between the two is that buprenorphine is a partial opiate agonist but methadone is a full opiate agonist. The applicant indicates private physicians rarely offer counseling in conjunction to buprenorphine treatment and states getting buprenorphine from a physician's office is termed "dose and dash" because of the lack of counseling, drug testing, diversion monitoring and care planning. The applicant notes the following differences between buprenorphine and methadone:

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 11

- Buprenorphine is harder to abuse so patients are allowed to take it home. Methadone can be more easily abused, when patients first start treatment they need to travel to a clinic each day to take their dosage. At later stages of treatment, patients are allowed take-home doses of methadone.
- For people with heavy opiate habits and serious addiction, buprenorphine cannot provide effective relief from withdrawal symptoms. Methadone works better for such individuals.
- Buprenorphine is generally less addictive than methadone.
- Withdrawal symptoms of a buprenorphine detox are generally less severe than methadone detox, and
- The risk of fatal overdose on buprenorphine is less than the methadone.

The applicant states the OTP plans to utilize self-pay programs and does not plan to participate in Medicare or TennCare. Effective August 1, 2005 TennCare no longer provided coverage for methadone maintenance services for adult TennCare enrollees. According to the TennCare Quick Guide dated May 2013, Methadone Maintenance Treatment is covered as medically necessary for children under age 21. TennCare also covers generic buprenorphine, Subutex and Suboxone for opiate addiction. The applicant reports conducting a telephonic survey on March 25, 2013 of all 12 OTPs and finding that none accepted TennCare. The applicant indicated TennCare participants (ages 21 and under) may submit claims to TennCare for reimbursement for services received from out-of-network methadone maintenance providers.

*Note to Agency Members: The Addiction Treatment Act of 2000 allows qualifying physicians to receive a waiver from the special registration requirements in the Controlled Substances Act for the provision of medication-assisted opioid therapy. This waiver allows qualifying physicians to practice medication-assisted opioid addiction therapy with Schedule III, IV, or V narcotic medications specifically approved by the Food and Drug Administration (FDA). On October 8, 2002 Subutex® (buprenorphine hydrochloride) and Suboxone® tablets (buprenorphine hydrochloride and naloxone hydrochloride) received FDA approval for the treatment of opioid addiction. The physician has the capacity to refer addiction therapy patients for appropriate counseling and other non-pharmacologic therapies, and that the physician will not have more than 30 patients on addiction therapy at any one time for the first year. (Note: the number of a physician's practice locations does not affect the 30-patient limit. One year after the date on which the physician submitted the initial notification, the physician will be able to submit a second notification stating the need and intent to treat up to 100 patients.) Source: http://buprenorphine.samhsa.gov/waiver_qualifications.html*

The following chart reflects the TennCare top five (5) drugs by payment amount for the first quarters of 2011 and 2012. Buprenorphine/Naloxone was ranked number #4 in payment amount ($3,668,218 ) in the 1st quarter of 2011 and #5 in

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 12 of 158   PageID #: 159

2012 ($2,211,589). There appears to be a 65.8% decrease in the dollar amount of Buprenorophine/Naloxone reimbursed by TennCare from the 1st quarter of 2011 to the 1st quarter of 2012. If the 2012 first quarter amount of $2,211,589 were annualized, the amount for 2012 reimbursed by TennCare statewide for Buprenorphine/Naloxone would be $8,846,356.

### TennCare
### Top 5 Drugs by Payment Amount for Adults
### First Qtr.2011 & 2012

| Rank | Drug 1st Qtr. 2012 | Payment 1 Qtr. 12 | Rank 2011 | Payment 1 Qtr. 2011 |
|---|---|---|---|---|
| 1 | Aripiprazale | $4,765,688 | 2 | $4,147,591 |
| 2 | Dexlansoprazole | $3,483,676 | 5 | $2,878,886 |
| 3 | Olanzapine | $2,877,449 | 3 | $3,973,118 |
| 4 | Teleprevir | $2,574,011 | - | $382,965 |
| 5 | **Buprenorphine/Naloxone** | $2,211,589 | 4 | $3,668,218 |

*Source: TennCare Drug Utilization Review Advisory board, September 11, 2012*
*https://tnm.providerportal.sxc.com/rxclaim/TNM/DUR%20Presentation%2009112012.pdf*

The SAMSHA (Substance Abuse and Mental Health Services Administration) physician and treatment locator for physicians certified for Buprenorphine Treatment indicates there are 77 certified physicians and one (1) facility (Indian Path Medical Center) in the proposed 9 county service area. According SAMSHA, there are 17 physician providers certified for Buprenorphine Treatment in Bristol, 2 in Blountville, 16 in Kingsport, 29 in Johnson City, 2 in Gray, 3 in Mountain Home, 4 in Morristown, 3 in Elizabethton and 1 in Unicoi.

HSDA staff analysis of the current SAMSHA buprenorphine certified providers practicing in the State of Tennessee revealed the following:

- There are 298 unduplicated SAMSHA buprenorphine certified providers statewide
- The proposed nine county service area has 77 unduplicated SAMSHA certified buprenorphine providers
- The proposed service area represents 600,895, or **9.4%** of the State of Tennessee 2013 population of 6,414,297, but has **25.8%** of the statewide buprenorphine certified providers
  *Source: http://buprenorphine.samhsa.gov/bwns_locator/*

The applicant's proposed direct patient care staffing includes 1 contract Medical Director, 1 FTE Program Director, 1 FTE Charge Counselor, 1 FTE Charge Nurse,

Case 2:14-cv-00233-JRG-MCLC Document 15-2 Filed 06/09/14 Page 13 of 158 PageID #: 160

2 FTE LPN Dosing Nurse and 12 FTE Substance Abuse Counselors. The applicant notes the clinical staff will satisfy State Minimum Staffing Qualification Program Requirements for an OTP. The applicant states the industry guidelines are 50 patients per counselor. The applicant does not have current plans to hire a security guard but will do so if the need arises.

The applicant projects $1,782,144 in total gross revenue on 530 clients during the first year of operation increasing to $3,903,715 on 1,056 clients in Year 2 (approximately $3,362 to $3,697 per client, respectively). Net Operating Income less Capital Expenditures will equal $7,638 in Year 1 increasing to $565,578 in Year 2.

The applicant will provide charity care at the rate of approximately 2.0% of total gross revenue in Years 1 and 2 ($35,643 or approximately 11 clients increasing to approximately $78,074 or 21 clients). For comparative purposes, in June 2009 the Agency reviewed Upper Cumberland Private Clinic (CN0903-013D) which was proposed to be located in Spencer, Tennessee. Charity Care was proposed at the rate of approximately 10% of total gross revenue in Year 1 increasing to approximately $393,357.00 or 13.3% of total gross revenue in Year 2 of operations.

The applicant states the facility will require no structural modifications and has sufficient parking. The interior structure will require renovation. The renovated cost is $160,000 or $20.00 per square foot. The renovation will include:

- Partitioning large rooms to create offices for counselors, doctors and the Executive director
- Partitioning large rooms and adding plumbing to build examination and lab rooms
- Constructing dosing rooms and associated dosing windows
- Constructing a room for the pharmacy and associated medicine vault
- Constructing a check-in booth
- The addition of electrical, cabling, video and communications.

After completion, the interior structure will include 1 large waiting area, 1 exam room, 1 pharmacy (dosing equipment and vault), 13 counseling rooms, 2 dosing rooms, 1 group room, American with Disabilities (ADA) compliant restrooms, an unfinished small storage area, and 1 employee break room. The applicant states the lobby area will accommodate 153 people at one time.

The total estimated project cost is $670,000.00 which includes $25,000.00 for Architectural and Engineering Fees, $30,000.00 for Legal, Administrative, and Consultant Costs, $160,000.00 for Site Preparation Costs, $23,500 for Moveable

Equipment, $20,000 for Office Equipment, $320,000 for Lease Expense, $8,500 for Patient Software, $80,000 for Operating Loss Costs, and $3,000 for CON filing fees.

The project will be financed by cash reserves of Kester L.P. A March 27, 2013 letter from Mike Fenton, Senior Vice President of Maxim Group, which is investment banking, securities and investment management firm, attests to the availability of cash in the amount of $762,888.60 to finance the proposed project.

The applicant indicates the Commission on Accreditation of Rehabilitation Facilities (CARF) will accredit the facility.

The applicant provided documentation of its required statutory notices to state, county and local area government officials, including State Senator Rusty Crowe, State Representative James (Micah) Van Huss, Washington County Mayor Dan Eldridge, and City of Johnson City Mayor Jeff Banyas.

Public Hearing
*Tennessee Health Services and Planning Act*, 68-11-1608 (b), states "upon request by interested parties or at the direction of the executive director, the staff of the agency shall conduct a fact-finding public hearing on the application in the area in which the project is to be located". A public hearing was requested for this application. The hearing was held on May 28, 2013 in the Jones Meeting Center, Johnson City Public Library, 100 W. Millard Street, Johnson City (Washington County), Tennessee. A copy of the minutes and transcript are attached behind the application.

*The applicant has submitted the required corporate and real estate lease documentation. HSDA staff reviewed these documents. A copy will be available for member reference at the meeting. Copies are also available for review at the Health Services and Development Agency office.*

Should the Agency vote to approve this project, the CON would expire in **two** years.

## CERTIFICATE OF NEED INFORMATION FOR THE APPLICANT:

There are no other Letters of Intent, pending applications, denied applications, or outstanding Certificates of Need for this applicant.

## CERTIFICATE OF NEED INFORMATION FOR OTHER PROVIDERS IN THE SERVICE AREA:

Tri-Cities Holdings, Inc.
CN1302-005
June 26, 2013
PAGE 15

There are no letters of intent, denied or pending applications, or outstanding Certificates of Need for other health care organizations in the service area proposing this type of service.

**PLEASE REFER TO THE REPORT BY THE DEPARTMENT OF MENTAL HEALTH AND SUBSTANCES ABUSE SERVICES FOR A DETAILED ANALYSIS OF THE STATUTORY CRITERIA OF NEED, ECONOMIC FEASIBILITY, AND CONTRIBUTION TO THE ORDERLY DEVELOPMENT OF HEALTH CARE IN THE AREA FOR THIS PROJECT. THAT REPORT IS ATTACHED TO THIS SUMMARY IMMEDIATELY FOLLOWING THE COLOR DIVIDER PAGE.**

PME
06/19/2013

# LETTER OF INTENT



## LETTER OF INTENT
## TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY

The Publication of Intent is to be published in the **Johnson City Press** which is a newspaper

*(Name of Newspaper)*

of general circulation in **Washington** , Tennessee, on or before **March 7** , 20**13**

*(County)* *(Month / day)* *(Year)*

for one day.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is to provide official notice to the Health Services and Development Agency and all interested parties, in accordance with T.C.A. § 68-11-1601 *et seq.,* and the Rules of the Health Services and Development Agency,

**Tri-Cities Holdings LLC d/b/a Trex Treatment Center**     **NA**

*(Name of Applicant)* *(Facility Type-Existing)*

owned by: **Tri-Cities Holdings LLC** with an ownership type of **Limited Liability Company**

and to be managed by: **Manager Steve Kester** intends to file an application for a Certificate of Need

for [PROJECT DESCRIPTION BEGINS HERE]:

Establishment of a nonresidential substitution-based treatment center for opiate addiction offering methadone and buprenorphine which is designed to treat opiate addiction by preventing symptoms of withdrawal. In addition, we will offer individual counseling services and group therapy to help break the cycle of addiction and provide patients the life skills and resources to serve as productive members of their communities, families and employers.. The location of the proposed project is 5 Wesley Court, Johnson City, Tennessee 37601. The project cost is estimated to be $670,000.

The anticipated date of filing the application is: **March 7** , 20**13**

The contact person for this project is **Steve Kester**     **Manager**

*(Contact Name)* *(Title)*

who may be reached at: **Tri-Cities Holdings LLC**     **6555 Sugarloaf Parkway Suite 307-137**

*(Company Name)* *(Address)*

| Duluth | Georgia | 30097 | 404-664-2616 |
|---|---|---|---|
| *(City)* | *(State)* | *(Zip Code)* | *(Area Code / Phone Number)* |

**SF W. IC**     **March 1, 2013**     **swkester@gmail.com**

*(Signature)* *(Date)* *(E-mail Address)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Letter of Intent must be **filed in triplicate** and **received between the first and the tenth day of the month.** If the last day for filing is a Saturday, Sunday or State Holiday, filing must occur on the preceding business day. File this form at the following address:

**Health Services and Development Agency**
**The Frost Building, Third Floor**
**161 Rosa L. Parks Boulevard**
**Nashville, Tennessee 37243**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The published Letter of Intent must contain the following statement pursuant to T.C.A. § 68-11-1607(c)(1). (A) Any health care institution wishing to oppose a Certificate of Need application must file a written notice with the Health Services and Development Agency no later than fifteen (15) days before the regularly scheduled Health Services and Development Agency meeting at which the application is originally scheduled; and (B) Any other person wishing to oppose the application must file written objection with the Health Services and Development Agency at or prior to the consideration of the application by the Agency.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HF51 (Revised 01/09/2013 – all forms prior to this date are obsolete)

# Copy

## Supplemental #2

# Tri-Cities Holdings, LLC

# CN1302-005

2013 MAR 25 PM 12 05

COPY

## Application for

# CERTIFICATE OF NEED

### Filed with the

# Tennessee Health Services and Development Agency

## CN1303-005

### Filed by:
**Tri-Cities Holdings LLC**
d/b/a Trex Treatment Center
6555 Sugarloaf Parkway Suite 307-137
Duluth, GA 30097

## March 22, 2013

# Table of Contents

SECTION A.  APPLICANT PROFILE        1

SECTION B: PROJECT DESCRIPTION

    I.     Executive Summary      4

    II.     Project Narrative      6

    III. A. Plot Plan      10

    III. B. Transportation      14

    IV. Floor Plan      15

SECTION C.  GENERAL CRITERIA FOR CERTIFICATE OF NEED

    Need      17

    Economic Feasibility      29

    Orderly Development      42

    Proof of Publication      46

    Development Schedule      49

1. **_Name of Facility, Agency, or Institution_**

Tri-Cities Holdings LLC dba Trex Treatment Center
_____
Name
4 Wesley Court                                        Washington
_____
Street or Route                                        County
Johnson City                        TN                37601
_____
City                                State              Zip Code

2. **_Contact Person Available for Responses to Questions_**

Steven W. Kester                                     Managing Member
_____
Name                                                 Title
Tri Cities Holdings LLC                              swkester@gmail.com
Company Name                                         Email address
6555 Sugarloaf Parkway, Suite 307-137   Duluth      GA      30097
Street or Route                         City        State   Zip Code
Same                                 404-664-2616   404-537-3780
Association with Owner               Phone Number   Fax Number

3. **_Owner of the Facility, Agency or Institution_**

Tri-Cities Holdings LLC                              404-664-2616
_____
Name                                                 Phone Number
6555 Sugarloaf Parkway, Suite 307-137               Gwinnett
_____
Street or Route                                      County
Duluth                              GA                30097
_____
City                                State            Zip Code

4. **_Type of Ownership of Control (Check One)_**

A.  Sole Proprietorship                 F.  Government (State of TN or
B.  Partnership                             Political Subdivision)
C.  Limited Partnership                 G.  Joint Venture
D.  Corporation (For Profit)            H.  Limited Liability Company    ✓
E.  Corporation (Not-for-Profit)        I.  Other (Specify)_____

PUT ALL ATTACHMENTS AT THE BACK OF THE APPLICATION IN ORDER AND
REFERENCE THE APPLICABLE ITEM NUMBER ON ALL ATTACHMENTS.

**5.** **Name of Management/Operating Entity (If Applicable)**

N/A (see added Attachment A-5 for bios and affiliatiations)
Name

---

Street or Route                                                                County

---

City                                                    State                    Zip Code

PUT ALL ATTACHMENTS AT THE END OF THE APPLICATION IN ORDER AND
REFERENCE THE APPLICABLE ITEM NUMBER ON ALL ATTACHMENTS.

---

**6.** **Legal Interest in the Site of the Institution (Check One)**

A. Ownership                    [ ]        D. Option to Lease           [✓]
B. Option to Purchase           [ ]        E. Other (Specify) _____   [ ]
C. Lease of _____ Years         [ ]

PUT ALL ATTACHMENTS AT THE BACK OF THE APPLICATION IN ORDER AND
REFERENCE THE APPLICABLE ITEM NUMBER ON ALL ATTACHMENTS.

---

**7.** **Type of Institution** *(Check as appropriate--more than one response may apply)*

A. Hospital (Specify)_____ [ ]      I. Nursing Home                    [ ]
B. Ambulatory Surgical Treatment         J. Outpatient Diagnostic Center    [ ]
   Center (ASTC), Multi–Specialty [ ]    K. Recuperation Center             [ ]
C. ASTC, Single Specialty       [ ]      L. Rehabilitation Facility         [ ]
D. Home Health Agency           [ ]      M. Residential Hospice             [ ]
E. Hospice                      [ ]      N. Non-Residential Methadone
F. Mental Health Hospital       [ ]         Facility                        [✓]
G. Mental Health Residential             O. Birthing Center                 [ ]
   Treatment Facility           [ ]      P. Other Outpatient Facility
H. Mental Retardation Institutional         (Specify)_____
   Habilitation Facility (ICF/MR) [ ]    Q. Other (Specify) _____         [ ]

---

**8.** **Purpose of Review** *(Check) as appropriate--more than one response may apply)*

A. New Institution              [✓]      G. Change in Bed Complement
B. Replacement/Existing Facility [ ]        [Please note the type of change
C. Modification/Existing Facility [ ]       by underlining the appropriate
D. Initiation of Health Care                response: Increase, Decrease,
   Service as defined in TCA §              Designation, Distribution,
   68-11-1607(4)                            Conversion, Relocation]        [ ]
   (Specify)_____          [ ]      H. Change of Location
E. Discontinuance of OB Services [ ]     I. Other (Specify)_____      [ ]
F. Acquisition of Equipment     [ ]

9. **Bed Complement Data**
   *Please indicate current and proposed distribution and certification of facility beds.*

| | | Current Beds Licensed | *CON | Staffed Beds | Beds Proposed | TOTAL Beds at Completion |
|---|---|---|---|---|---|---|
| A. | Medical | | | | | |
| B. | Surgical | | | | | |
| C. | Long-Term Care Hospital | | | | | |
| D. | Obstetrical | | | | | |
| E. | ICU/CCU | | | | | |
| F. | Neonatal | | | | | |
| G. | Pediatric | | | | | |
| H. | Adult Psychiatric | | | | | |
| I. | Geriatric Psychiatric | | | | | |
| J. | Child/Adolescent Psychiatric | | | | | |
| K. | Rehabilitation | | | | | |
| L. | Nursing Facility (non-Medicaid Certified) | | | | | |
| M. | Nursing Facility Level 1 (Medicaid only) | | | | | |
| N. | Nursing Facility Level 2 (Medicare only) | | | | | |
| O. | Nursing Facility Level 2 (dually certified Medicaid/Medicare) | | | | | |
| P. | ICF/MR | | | | | |
| Q. | Adult Chemical Dependency | | | | | |
| R. | Child and Adolescent Chemical Dependency | | | | | |
| S. | Swing Beds | | | | | |
| T. | Mental Health Residential Treatment | | | | | |
| U. | Residential Hospice | | | | | |
| | **TOTAL** | 0 | 0 | 0 | 0 | 0 |

*CON-Beds approved but not yet in service

---

10. **Medicare Provider Number**    N/A

     **Certification Type**

---

11. **Medicaid Provider Number**    N/A

     **Certification Type**

---

12. **If this is a new facility, will certification be sought for Medicare and/or Medicaid?** No

---

13. *Identify all TennCare Managed Care Organizations/Behavioral Health Organizations (MCOs/BHOs) operating in the proposed service area.* **Will this project involve the treatment of TennCare participants?** No    If the response to this item is yes, please identify all MCOs/BHOs with which the applicant has contracted *or plans to contract.*

*Discuss any out-of-network relationships in place with MCOs/BHOs in the area.*

I.  **Provide a brief executive summary of the project not to exceed two pages. Topics to be included in the executive summary are a brief description of proposed services and equipment, ownership structure, service area, need, existing resources, project cost, funding, financial feasibility and staffing.**

Proposed Services -- We seek to establish an outpatient opiate treatment program ("OTP") in Johnson City, Tennessee. We anticipate using buprenorphine, methadone and abstinence-based treatment for those suffering from opiate addiction. We will offer individual counseling services and group therapy to help break the cycle of addiction and provide patients the life skills and resources to serve as productive members of their communities, families and employers. We understand the concern of trading one addiction for another in perpetuity. Our commitment will be to give patients their independence back as soon as medically, morally and ethically possible.

Equipment--The only equipment used in treatment are the dispensing devices used to correctly administer medication doses.

Ownership Structure--The ownership of the facilities management and administration will be Tri-Cities Holdings LLC, a Duluth, Georgia-based company.

Service Area--The proposed service area will be the nine most northeastern counties of Tennessee that have convenient access from and to Interstate 81: Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi and Johnson. This covers 100% of the population of Tennessee's Methadone Service Area #1, 97% of #2, and 70% of #3.

Need and Existing Resources -- The applicant can demonstrate the need for a non-residential treatment program for the Northeast Tennessee area. First and foremost, the abuse of prescription pain medication is an epidemic in the United States.[1] The rate of abuse is higher in the region we intend to serve.[2] Methadone maintenance treatment is the most effective treatment for opiate addiction according to the Center for Disease Control,[3] the U.S. National Institute on Drug Abuse,[4] the Center for Substance Abuse Treatment, the Institute of Medicine,[5] the National Institute of Health,[6] and the World Health Organization. There are no existing SAMHSA-designated methadone maintenance treatment programs in our proposed service area.

1. The nearest clinics are far away yet still get numerous patients from the proposed service area. No local option exists for the comprehensive medication management and counseling services that we will offer. A SAMHSA list of buprenorphine providers and in-patient treatment program in the proposed service area and it is included as Attachment B1.

   a. The applicant's manager is the co-founder and part owner of nine treatment programs, including two in the Asheville area, 49 and 70 miles from the proposed location respectively (Crossroads Treatment Centers of Weaverville, NC and Asheville). Approximately 600 patients make the commune from Northeast Tennessee areas to the applicant's Asheville facilities.

   b. There are three other OTPs in Asheville and two other OTP's in Boone, NC that report between 20-40% of patients being from northeast Tennessee (Western Carolina, CRC and Mountain Area Recovery Center in Asheville and Stepping Stone and McLeod in Boone).

   c. Nearest Tennessee OTPs are in Knoxville, 104 miles away, owned by Behavioral Health Group ("BHG"). An admissions counselor on 2/25/2013 indicated BHG had nearly 400 patients from Northeast Tennessee area in their

---

[1] http://www.cdc.gov/homeandrecreationalsafety/rxbrief/.

[2] An Analysis of Mental Health and Substance Abuse Disparities & Access to Treatment Services in the Appalachian Region, 2008, ARC.

[3] http://www.cdc.gov/idu/facts/methadonefin.pdf.

[4] http://international.drugabuse.gov.

[5] Institute of Medicine, 1995. "Development of Medications for the Treatment of Opiate and Cocaine Addictions."

[6] NIH Consensus Conference. Effective Medical Treatment of Opiate Addiction. JAMA 1998: 280:1936–1943.

programs.

2. Several other providers have tried to site clinics in the Northeast Tennessee area in 2012, 2010 and twice in 2003. The only company to go through the CON process had their application approved, only to be overturned on a technicality. The other companies stopped the application process because of zoning issues, for which our company has a plan to address. Since opiate addiction is significantly higher in 2013 than it was in 2003[7], when a Johnson City CON was approved, the need is greater now.

3. The patients from Northeast Tennessee who travel many miles to the nearest OTP will also highlight the need in other ways. If a Johnson City patient travels 200 miles round trip to Knoxville, he or she will also consume approximately $30 in gas and over three hours of drive time. That is a real hardship for patients, especially new patients who must come seven days per week. Under current rules, new patients from the Northeast Tennessee area driving to Knoxville (the closest clinic in TN) must drive up to 9,000 extra miles in the first 45 days of treatment. Of the barriers to access to healthcare, geographic distance is the top of the list, even higher than access to healthcare insurance[8]. For every patient that makes the commute, several are most likely foregoing treatment because they can't afford the time, money or energy.

4. In 2003, a CON was granted for a OTP in Johnson City, but was overturned on a technicality.[9] Since this time, the CDC has declared prescription medication abuse an epidemic, and SAMHSA has noted a 300% increase in emergency room visits for opiate-related cases.[10]

5. The Tennessee Depart of Health clearly recognizes this problem. The Safety Subcabinet Working Group issued a report in 2012 titled "Prescription Drug Abuse in Tennessee"[11] that has significant data to highlight the problem (drug overdoses going up by 250% over 10 years overtaking motor vehicle deaths, suicides and homicides, a quarter million Tennesseans abusing opiates, the high cost associated with those who abuse to the State, etc.). The Report listed 3 recommendations, one of which was more treatment options. The last CON approved for a treatment center was in 2009.

**Financial Feasibility**--Tri-Cities Holdings (TCH) has all of the necessary resources to execute this project. Steve Kester is the leader of TCH and has successfully opened 9 OTPs in four states in five years. Each facility has received full accreditation and the facilities' need have been well-justified and financially feasible. In addition to leadership and experience, the company has the financial resources to see this project through fruition. We are planning to be supported through self-payment from patients and not seek revenue through programs such as TennCare or Medicare.

This center is projected to have more than 500 patients when fully operational. Mr. Kester is co-founder and part owner of 9 OTP clinics, which serve approximately 4,000 patients and knows first-hand that clinics of this size are financially healthy. The financial pro forma and various scenarios show a financially healthy firm.

**Project Cost**--The project's costs are expected to be approximately $670,000 including lease costs, construction build-out/renovation, operating carry loss and other project-related costs.

**Funding**--This project will be funded personally by Steve Kester, Managing Member of TCH. Mr. Kester has the monies in reserve and committed to more than cover the project costs and start-up operating loss.

**Staffing**--Staffing of the center would include: Center Executive Director, Medical Director, Nurses, Counselors, Intake Specialist, Administrator/Receptionist, Accounting, Human Resources, and Legal Support Staff.

[Note: responses to supplemental questions related to this section are included in Attachment B1 – Supplemental Questions in order to keep the length in compliance.]

---

[7] SAMHSA (2009), see Office of National Drug Control Policy,: http://www.whitehouse.gov/ondcp/prescription-drug-abuse.
[8] Veterans Affairs on Rural Health, (2011).
[9] http://www.mapinc.org/drugnews/v03/n702/a01.html
[10] http://www.samhsa.gov/data/DAWN.aspx
[11] http://tn.gov/mental/policy/presc_drug_abuse.shtml

**SUPPLEMENTAL- # 1**

March 25, 2013
12:15pm

II.   Provide a detailed narrative of the project by addressing the following items as they relate to the proposal.

A.   Describe the construction, modification and/or renovation of the facility (exclusive of major medical equipment covered by T.C.A. § 68-11-1601 et seq.) including square footage, major operational areas, room configuration, etc. Applicants with hospital projects (construction cost in excess of $5 million) and other facility projects (construction cost in excess of $2 million) should complete the Square Footage and Cost per Square Footage Chart. Utilizing the attached Chart, applicants with hospital projects should complete Parts A.-E. by identifying as applicable nursing units, ancillary areas, and support areas affected by this project. Provide the location of the unit/service within the existing facility along with current square footage, where, if any, the unit/service will relocate temporarily during construction and renovation, and then the location of the unit/service with proposed square footage. The total cost per square foot should provide a breakout between new construction and renovation cost per square foot. Other facility projects need only complete Parts B.-E. Please also discuss and justify the cost per square foot for this project. If the project involves none of the above, describe the development of the proposal.

We have chosen a facility that will require no structural modifications and has ample parking. The current structure includes a large lobby (which will be re-purposed as a waiting area), several large conference rooms, ample ADA bathrooms for men and women, and an unfinished storage area.

The renovation construction involved will include:

- Partitioning large rooms to create offices for counselors, doctors and the Executive Director
- Partitioning large rooms and adding plumbing to build examination and lab rooms
- Constructing dosing rooms and associated dosing windows
- Constructing a room for the pharmacy and associated medicine vault
- Constructing a check-in booth
- Adding the electrical, cabling, video and telephony for the above rooms

# SQUARE FOOTAGE AND COST PER SQUARE FOOTAGE CHART

| A. Unit / Department | Existing Location | Existing SF | Temporary Location | Proposed Final Location | Proposed Final Square Footage | | | Proposed Final Cost/ SF | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Renovated | New | Total | Renovated | New | Total |
| Lobby | | | | | 1,230 | | 1,230 | $10 | | |
| Counselors offices | | | | | 3,200 | | 3,200 | $24.30 | | |
| Medical/Lab | | | | | 300 | | 300 | $24.30 | | |
| Dosing | | | | | 400 | | 400 | $24.30 | | |
| Administration | | | | | 250 | | 250 | $24.30 | | |
| Meeting | | | | | 420 | | 420 | $10 | | |
| Common | | | | | 1,408 | | 1,408 | $10 | | |
| Pharmacy | | | | | 300 | | 300 | $30 | | |
| Maint./storage | | | | | 150 | | 150 | $10 | | |
| Bathrooms | | | | | 300 | | 300 | $40 | | |
| Breakroom | | | | | 250 | | 250 | $24.30 | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| B. Unit/Depart. GSF Sub-Total | | | | | 8,208 | | 8,208 | $20 | | |
| | | | | | | | | | | |
| C. Mechanical/ Electrical GSF | | | | | | | | | | |
| D. Circulation /Structure GSF | | | | | | | | | | |
| E. Total GSF | | | | | 8,208 | | 8,208 | $20 | | |

SUPPLEMENTAL- # 1
March 25, 2013
12:15pm

B.      Identify the number and type of beds increased, decreased, converted, relocated, designated, and/or redistributed by this application. Describe the reasons for change in bed allocations and describe the impact the bed change will have on the existing services.

This is strictly an outpatient facility and will require no beds.

C.      As the applicant, describe your need to provide the following health care services (if applicable to this application):

1. Adult Psychiatric Services

2. Alcohol and Drug Treatment for Adolescents (exceeding 28 days)

3. Birthing Center

4. Burn Units

5. Cardiac Catheterization Services

6. Child and Adolescent Psychiatric Services

7. Extracorporeal Lithotripsy

8. Home Health Services

9. Hospice Services

10. Residential Hospice

11. ICF/MR Services

12. Long-term Care Services

13. Magnetic Resonance Imaging (MRI)

14. Mental Health Residential Treatment

15. Neonatal Intensive Care Unit

16. Non-Residential Methadone Treatment Centers

17. Open Heart Surgery

18. Positron Emission Tomography

19. Radiation Therapy/Linear Accelerator

20. Rehabilitation Services

21. Swing Beds.

This is a proposed non-residential methadone treatment facility and intends to serve the Northeast Tennessee area, which includes Johnson City, Kingsport, Bristol and the surrounding communities. According to the 2011 US Census, the 9 most northeastern counties of Tennessee had a population of 600,084, a growth of over 2,431 from 2010.

The Tennessee Health Services and Development Agency has recognized the need for a NRMTC 10 years ago when it granted a CON for a Johnson-City based program. Since that time, the population has grown and, according to the CDC, the prescription-pain medication abuse has

reached "epidemic levels" in the country. Further, in 2008 the Appalachian Regional Commission, a Federal-State partnership, concluded that the prescription medication abuse was higher in the southern Appalachian region, which includes northeastern Tennessee, than the rest of the U.S. and part of the problem is lack of available treatment programs[12]. In fact, this 228-page report's academic partner was East Tennessee State University, located in Johnson City, Tennessee.

In summary, the abuse of prescription pain medication is an epidemic in the U.S.; it's higher in the region we intend to site; there are no NRMTF treatment programs; and lack of treatment programs is part of the problem. We have much work to do.

We are not the first provider to recognize this need. At least four others have formally tried through the CON or local permitting process, and TCH believe nearly every major provider has informally researched the idea.

D.    Describe the need to change location or replace an existing facility.

Not Applicable (NA). This will be a new facility.

E.    Describe the acquisition of any item of major medical equipment (as defined by the Agency Rules and the Statute) which exceeds a cost of $1.5 million; and/or is a magnetic resonance imaging (MRI) scanner, positron emission tomography (PET) scanner, extracorporeal lithotripter and/or linear accelerator by responding to the following:

1. For fixed-site major medical equipment (not replacing existing equipment):

a. Describe the new equipment, including:

1. Total cost ;(As defined by Agency Rule).

2. Expected useful life;

3. List of clinical applications to be provided; and

4. Documentation of FDA approval.

b. Provide current and proposed schedules of operations.

2. For mobile major medical equipment:

a. List all sites that will be served;

b. Provide current and/or proposed schedule of operations;

c. Provide the lease or contract cost.

d. Provide the fair market value of the equipment; and

e. List the owner for the equipment.

3. Indicate applicant's legal interest in equipment (i.e., purchase, lease, etc.) In the case of equipment purchase include a quote and/or proposal from an equipment vendor, or in the case of an equipment lease provide a draft lease or contract that at least includes the term of

---

[12] An Analysis of Mental Health and Substance Abuse Disparities & Access to Treatment Services in the Appalachian Region, 2008, ARC

**SUPPLEMENTAL- # 1**

March 25, 2013
12:15pm

**the lease and the anticipated lease payments.**

Not Applicable (NA). The most expensive equipment in the facility will be a methadone dispensing system and a vault for safe storage of medicine. Both items cost less than $10,000.


**III.     (A) Attach a copy of the plot plan of the site on an 8 1/2" x 11" sheet of white paper which must include:**

       1.  **Size of site (in acres);**

       2.  **Location of structure on the site; and**

       3.  **Location of the proposed construction.**

       4.  **Names of streets, roads or highway that cross or border the site.**

Our proposed location is at 4 Wesley Court, in Johnson City, Tennessee. This location is a freestanding building in an industrial area, and is zoned for medical services by Johnson City. The location is 0.2 mile from Quillen Rehabilitation Hospital.

The location is situated on 1.66 acres, and the square footage of the facility is 8,260 square feet. The facility has parking on all four sides plus an adjacent side lot. Street parking is permitted. The capacity of the facility and street parking is 1,00 spaces. This size of a facility and accompanying parking can accommodate 1,000 patients with a one-shift operation and more if afternoon and evening programs are offered. 2,000 patients in treatment requires approximately 100 parking spaces because of take-home policies (where patients do not have to come every day), carpooling, public transportation, multiple shifts, and staggering of arrival times.

The facility is on a cul-de-sac with industrial and commercial customers as neighbors: a construction supply company, a construction company, and an empty lot. Most of the traffic at our facility is expected between 5AM and 7 AM so patients can get to work or school. This traffic will occur before the neighboring businesses are open. The traffic on the street is very light given the limited number, hours of operation and nature of the businesses.

Johnson City has strict zoning regulations regarding locations of NRMTFs. The applicant has spent significant time finding a location that best meets the City's zoning requirements. The site is well outside all limits that the city has schools, daycare, parks or locations that sell alcoholic beverages:

| Place | Minimum Requirements | Closest Location | Actual distance[13] | Site Reference on map below |
|---|---|---|---|---|
| Our proposed site | | | | A |
| School | 200 feet | Fairmont Elementary School 1405 Lester Harris Rd<br><br>Johnson City, TN | 6,135 feet | B |
| Day care | 200 feet | Princeton Prep, 504 Princeton Rd, Johnson City, TN 37601 | 1,336 feet | C |
| Park | 200 feet | Massengill Memorial. 2801 State Highway 36. Johnson City, TN | 3,199 feet | D |
| Alcohol | 200 feet | Cootie Brown's<br><br>2715 N Roan St, Johnson City, TN | 3,183 feet | E |

Map of Above Locations

---

[13] Shortest distance between property lines, "as the crow flies", using Google maps and freemaptools.com.

(B) 1. Describe the relationship of the site to public transportation routes, if any, and to any highway or major road developments in the area. Describe the accessibility of the proposed site to patients/clients.

Our proposed site is less than a quarter mile to transit stops on Johnson City's Transit System Blue Route. Drop offs and pickups are on the hour, starting at 6:26 in the morning.

Nearby access to public transportation



The proposed location is less than one mile to I26, a major interstate and a 20-minute drive from Kingsport. The other major city is Bristol, which is 22 miles away. Both of these distances represent a major improvement of the driving distances patients currently go for treatment, as shown below:

| Patient's Domiciled City | Closest treatment center: Weaverville, NC (miles) | Closest treatment center in Knoxville, Tennessee (miles) | Distance to our proposed center (miles) | Round-trip savings (miles) |
|---|---|---|---|---|
| Johnson City | 45 | 104 | 0 | 90 - 208 |
| Kingsport | 67 | 99 | 22 | 90 - 154 |
| Bristol | 70 | 113 | 22 | 96 - 182 |

Since close to 1,000 patients from the Northeast Tennessee area make this commute to clinics in Knoxville and North Carolina[14]--often in dangerous winter conditions--the accessibilities of the proposed facility is a major improvement over the nearest alternatives.

---

[14] TCH estimate based on clinics owned by TCH principal in North Carolina and discussion with Knoxville clinics.

**SUPPLEMENTAL- # 1**

March 25, 2013
12:15pm

IV. Attach a floor plan drawing for the facility which includes legible labeling of patient care rooms (noting private or semi-private), ancillary areas, equipment areas, etc. on an 8 1/2" x 11" sheet of white paper.

   <u>NOTE: DO NOT SUBMIT BLUEPRINTS.</u> Simple line drawings should be submitted and need not be drawn to scale.

   The lobby area could accommodate 153 seats, more than enough for the maximum number of patients at one time plus guests they may bring. Overflow seating, should we need it, would be in the common area on the left side of the building, shown on the diagram. The inside of the facility will be non-smoking. Smoking for patients will be accommodated in the grassy area in front of the building; there is an awning during inclement weather. Smoking for staff will be accommodated outside the rear exit of the building.



All counseling and exam rooms are private

Our proposed services will also include comprehensive referral services to patients in order to equip them with the resources for independence outside of our treatment. A list of these services and referrals is provided in Attachment B4 – Referral Sources.

V. For a Home Health Agency or Hospice, identify:

1. **Existing service area by County;**

2. **Proposed service area by County;**

3. **A parent or primary service provider;**

4. **Existing branches; and**

5. **Proposed branches.**

Not Applicable (NA).

QUESTIONS

### NEED

**1. Describe the relationship of this proposal toward the implementation of the State Health Plan and Tennessee's Health: Guidelines for Growth.**

**a. Please provide a response to each criterion and standard in Certificate of Need Categories that are applicable to the proposed project. Do not provide responses to General Criteria and Standards (pages 6-9) here.**

[Note: The criterion wording from Tennessee's Health: Guidelines for Growth for NON-RESIDENTIAL METHADONE TREATMENT FACILITIES (NRMTF) are stated below in **bold italics**. Our response follows in normal font.]

### *NEED*

*A non-residential narcotic treatment facility should provide adequate medical, counseling, vocational, educational, mental health assessment, and social services to patients enrolled in the opioid treatment program with the goal of the individual becoming free of opioid dependency.*

Applicant will comply with TDMHDD rules for qualifications and training of all staff. As required by State rules, Applicant will be medically supervised by a Board-certified physician who has expertise in opioid dependency. Applicant will provide continuous and intensive counseling, services, and mental health assessments aimed at helping the patient become free of opioid dependency as soon as possible, and to manage life successfully on methadone maintenance, until that time. This will include educational services delivered through the counseling staff and referral to vocational services.

*The need for non-residential narcotic treatment facilities should be based on information prepared by the applicant for a certificate of need which acknowledges the importance of considering the demand for services along with need and addressing and analyzing service problems as well.*

*The assessment should cover the proposed service area and include the utilization of existing service providers, scope of services provided, patient origin, and patient mix.*

*The assessment should consider that the users of opiate drugs are the clients at non-residential narcotic treatment facilities, and because of the illegal nature of opiate drug use, data will be based on estimates, actual counts, arrests for drug use, and hospital admittance for drug abuse.*

The Applicant acknowledges this and is in compliance. The need is summarized below:

| Area | Prescription Drug Addiction Problem | Source And Statistics/Quote | Opiate Treatment Programs (Otps) | OTP's Per 1,000,000 Residents |
|---|---|---|---|---|
| United States | "Epidemic" | **Centers For Disease Control[15]**<br><br>• Just under 10 percent of the US population abuses opiates at some point in their lifetime<br><br>• Drug overdose death rates in the United States have more than tripled since 1990 and have never been higher. | 1,077 | 3.42 |
| Tennessee | Worst than above | **Tennessee Safety Subcabinet Working Group[16]**<br><br>• In 2008, Tennessee's drug overdose rate was 25% high than the overall U.S. Tennessee's rate climbed 11% two years later; 242% from 2000 – 2010<br><br>• Drug overdose has become the leading cause of accidental death in Tennessee | 12 | 1.86 |
| Proposed Service Area | Worse than above | **Appalachian Regional Commission[17]**<br><br>• The opiate addiction rate of the southern Appalachian Region (included proposed service area) is 8% higher than non-Appalachian areas<br><br>• A Johnson City Professor wrote a 2010 report titled *"Prescription Drug Abuse and the Pill Pipeline in Appalachia"[18]* | 0 | 0 |

*[The assessment should also include:] A description of the geographic area to be served by the program;*

---

[15] *"Policy Impact: Prescription Painkiller Overdoses",*

http://www.cdc.gov/homeandrecreationalsafety/rxbrief/

[16] *"Prescription Drug Abuse in Tennessee",*
http://tn.gov/mental/policy/persc_drug_docs/Prescription%20Drug%20Use%20in%20TN_2%203%202012_R2.pdf

[17] *"Disproportionately High Rates of Substance Abuse in Appalachia",*
http://www.arc.gov/news/article.asp?ARTICLE_ID=113

[18] http://www.etsu.edu/cph/NewsEventsDocuments/Alarmingly_High_by_Robert_P._Pack.pdf

Complies. The proposed service area for this facility would be the nine most northeastern counties of Tennessee. These counties include (in order of size): Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi and Johnson.

### [The assessment should also include:] Population of area to be served;

Complies. Based on the 2011 US Census, the population of the proposed serve area was 600,084, or just under 10% of Tennessee's population. The largest city in this service area is also the proposed site of our project: Johnson City, population 63,800.

### [The assessment should also include:] The estimated number of persons, in the described area, addicted to heroin or other opioid drugs and an explanation of the basis of the estimate;

Complies. We estimate that there are approximately between 12,000 and 24,000 adults who are addicted to opiates (heroin and prescription pain pills) in the proposed service area. This range is derived using the following methods:

- SAMHSA (Substance Abuse and Mental Health Services Administration - U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES) reports that heroin use was 0.3% in 2011 and prescription pain medication abuse was 1.7%[19]. Combined, this would yield 12,000 opiate abusers or opiate dependents from the proposed service area.

- In Tennessee's Department of Mental Health and Substance Abuse Services report, "Prescription Drug Abuse In Tennessee" by the Safety Subcabinet Working Group, reported that almost 250,000 Tennesseans older than 12 reported abusing prescription opioids in 2009. Tennessee's population was approximately 6.3 million in 2009, yielding an incidence rate of 3.9%. This alone would yield approximately 23,800 opiate abusers or opiate dependents from the proposed service area.

### [The assessment should also include:] The estimated number of persons, in the described area, addicted to heroin or other opioid drugs presently under treatment in methadone and other treatment programs;

Complies. We estimate that the number of individuals in methadone treatment from the proposed service area is between 950 and 1,500.

- Applicant attempted to get Registry Data of NRMTF enrollment by county from the Tennessee Department of Mental Health and Substance Abuse Services, but the Department does not release this data publically. This is a policy change from prior NRMTF CONs where the data was provided. However, the most recent release of Registry Data was for CY2008 (Attachment C, Need, 1a.), which showed that 8,889 Tennessee-domiciled patients were enrolled in Tennessee opiate treatment programs (not including Tennessee residents in out-of-state programs) and the State's population was 6,156,719, or a rate of 144.4 patients per 100,000 residents. Applying this rate to Applicant's proposed service area, would yield 866 patients, which is low because of a) the epidemic growth of opiate abuse since 2008, and b) the number of residents going to out-of-state programs, such as in Applicant's proposed service area.

- We instead relied on data from the closest NRMTFs in the Asheville area, Knoxville, and Boone, NC. The applicant's manager is a co-founder and partial owner of two Asheville-area

---

[19] http://www.samhsa.gov/data/nsduh/2k11results/nsduhresults2011.htm#Ch2

clinics and was able to get actual data of patients attending treatment at these clinics who also live in the proposed service area. Some other clinics participated in a telephone survey about patients attending those clinics who lived in the proposed service area. Finally, for non-participating clinics, extrapolations were done, based on the other clinics' responses. Based on the methodology described above, the we estimate that the number of patients from the proposed service area attend clinics in the following locations:

- o Knoxville:   300 – 400,   based on telephone interviews
- o Asheville:   600 – 900,   based on Applicant's owned data and extrapolation
- o Boone:      50 – 100,   based on telephone interviews
- o Total:      950 – 1,500

Also important is the consideration of the number of addicts that forego treatment because of distance. The U.S. Department of Veteran affairs did a study of this, and their findings were sobering. Substance abuse patients who traveled 10 miles or less were 2.6 times more likely to obtain aftercare than those who traveled more than 50 miles[20]. This says that there may be 2,470 – 3,900 opiate addicts in the area that would seek treatment if it were closer.

The economic and social costs of untreated patients who would seek treatment if it were closer are significant. Medicaid-paid medical, mental health, and long-term care costs are significantly lower for persons addicted to opiates who participate in methadone treatment, compared to opiate addicts who remain untreated[21]. The study, based out of the Washington state, concurs with what Tennessee has found. In the 2010 report "Prescription Drug Abuse In Tennessee" the State found that, "Abuse of prescription opioids is the number one drug problem for Tennesseans receiving state-funded treatment services."

The Applicant estimates the economic savings to the State to be $765 per patient per month based on the Washington and Tennessee studies. When applied to the estimated untreated population that would seek treatment in the proposed service are equates to $22.7 - $35.8 million State-funded savings per year. Further, the study found that patients that stay in methadone treatment for more than a year are 61% less likely to be re-arrested and 83% less likely to commit a felony than those left untreated.

*[The assessment should also include:] Projected rate of intake and factors controlling intake;*

Complies. Applicant projects that the rate of intake will be 50 patients per week or less. The factors controlling intake will include the mix of transfers patients versus new patients (new patients

---

[20] Center for Health Care Evaluation and Health Economics Resource Center, Veterans Affairs, Palo Alto Health Care System, Palo Alto, CA, USA. *"The influence of distance on utilization of outpatient mental health aftercare following inpatient substance abuse treatment."*

[21] Washington State Department of Social & Health Services, *"Methadone Treatment For Opiate Addiction Lowers Health Care Costs And Reduces Arrests And Convictions"*

require more time to admit), the number of staffing hours we can secure from our medical doctor(s), and the rate at which new patients will learn of our clinic.

*[The assessment should also include:] Compare estimated need to existing capacity.*

*Also, consideration should be given to the reality that existing facilities can expand or reduce their capacity to maintain or treat patients without large changes in overhead*

Complies. Currently there are no NRMTFs in this service area. We expect that the overwhelming percentage of patients who will use our proposed location would live in the proposed service area. According to phone screens and Applicant's knowledge of data at owned clinics, patient census has grown significantly in recent years with the growing problem of opiate addiction in the U.S., Tennessee, and surrounding areas.

Applicant contacted the Tennessee Department of Mental Health and Substance Abuse Services to obtain central registry data to accurately quantify the number of patients enrolled in Tennessee NRMTFs from the proposed service area. This data has been supplied by the Department of Mental Health for prior CONs. However, Applicant was informed that the Department changed its policy regarding releasing the data for such requests, and Applicants request was denied.

To estimate the number of patients from the proposed service area enrolled in opiate treatment programs, the Applicant relied on data from the clinics he has a partial ownership interest in (Asheville and Weaverville, NC), and telephone surveyed clinics in non-owned clinics in Knoxville, Asheville, and Boone, NC.

[Note: The Applicant also reviewed the Five Principles for Achieving Better Health that are contained in Tennessee's full State Health Plan. The Five Principles are listed below in *bold italics*, followed immediate by Applicant response in normal font.]

1. *The purpose of the State Health Plan is to improve the health of Tennesseans;*

   Complies. The Centers For Disease controls describes methadone treatment as "*needed, life-saving services*". The benefits cited include reduced or stopped use of injection drugs; reduce risk of acquiring or transmitting HIV, hepatitis B or C or bacterial infections; reduce mortality; reduced criminal activity; improved family stability; and improved pregnancy outcomes[22].

2. *Every citizen should have reasonable access to health care;*

   Complies. This proposed facility provides needed access where a demonstrated need exists. The proposed service area is consistent with the State's Methadone Service Areas that balance population and access.

3. *The state's health care resources should be developed to address the needs of Tennesseans while encouraging competitive markets, economic efficiencies, and the continued development of the state's health care system;*

   Complies. This project seeks no public funding, would compete in an open market, and provides treatment consistent with the State's Methadone Service Areas.

_____

[22] http://www.cdc.gov/idu/facts/methadonefin.pdf

**4. Every citizen should have confidence that the quality of health care is continually monitored and standards are adhered to by health care providers; and**

Complies. The Applicant recognizes and accepts the critical role that State and Federal regulating and licensing agencies play to ensure quality care.

**5. The state should support the development, recruitment, and retention of a sufficient and quality health care workforce.**

Complies. The Applicant looks forward to working with State and local officials to create, recruit and retain 20-40 highly-paid and trained healthcare jobs.

### Service Area

**The geographic service area should be reasonable and based on an optimal balance between population density and service proximity.**

Complies. The Applicant's proposed service area is comprised of 100% of the "Methadone Service Area #1" defined by the State in 2002; 97% of "Methadone Service Area #2" and 70% of "Methadone Service Area #3". These Methadone Service Areas, or MSA were specifically addressed to balance population with proximity to care. Attachment C 3, "Tennessee Methadone Service Areas", details the areas. Basically, where the State said there should be three facilities in 2002, there are none today, and the need has become materially more pronounced since that time.

**The relationship of the socio-demographics of the service area and the projected population to receive services should be considered. The proposal's sensitivity to and the responsiveness to the special needs of the service area should be considered including accessibility to consumers, particularly women, racial and ethnic minorities, and low-income groups.**

Complies. Opioid dependency is prevalent in every adult age group and race in the United States. The CDC notes that opioid overdoses have increased over 400% in the decade from 1999 - 2009[23]. This report also clearly shows that opioid abuse and overdose cuts across genders, age groups, race, metropolitan status and economics. Further, the report shows that Tennessee is among the 12 states with the highest per-capita overdose rates in the nation.

**b. Applications that include a Change of Site for a health care institution, provide a response to General Criterion and Standards (4)(a-c).**

Not applicable

---

[23] http://www.fda.gov/downloads/Drugs/NewsEvents/UCM300859.pdf

**2. Describe the relationship of this project to the applicant facility's long-range development plans, if any.**

We estimate that the facility would eventually serve approximately 1,100 – 1,200 patients at a given time. The biggest demands on a NRMTF are parking spaces and counselors' offices. 1,200 patients would require 24 counselors (50 patients per counselor per industry guidelines) and approximately 120 peak parking spaces in a one-shift operation. After the facility treated 800 patients, we would anticipate running a morning and an afternoon program, where the morning would take approximately 60% of the demand and the afternoon would take approximately 40% of the demand. In this scenario, we would need 15 counselor offices for the morning program and 72 parking spaces. The proposed facility can meet the peak needs of the anticipated patient population.

**3. Identify the proposed service area and justify the reasonableness of that proposed area. Submit a county level map including the State of Tennessee clearly marked to reflect the service area. Please submit the map on 8 1/2" x 11" sheet of white paper marked only with ink detectable by a standard photocopier (i.e., no highlighters, pencils, etc.).**

Our proposed service area is shown in the darkened areas of the map below and also more *clearly* in Attachment C-3 Proposed Service Area. The nine counties comprising our proposed serve area are: Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi, and Johnson. The map below and in Attachment C-3 shows the nine most northeastern counties of Tennessee. Currently, there are no NRMTFs in this service area.

# Proposed Service Area



Proposed Service Area includes the counties that are those boxed above, including Sullivan, Washington, Greene, Hamblen, Carter, Hawkins, Cocke, Unicoi and Johnson. Washington, Carter, Johnson and Unicoi counties form Methadone Service Area #1, Sullivan and Hawkins county are in MSA #2, and Green, Cocke and Hamblen counties are in MSA #3.

Distance is a long-recognized barrier to treatment.[24] Studies show that treatments rates fall

---

[24] K. Beardsley, E. D. Wish, D. B. Fitzelle, K. O'Grady, and A. M. Arria, "Distance traveled to outpatient drug treatment and client retention," Journal of Substance Abuse Treatment, vol. 25, no. 4, pp. 279–285, 2003, cited in "Distance Traveled and Cross-State Commuting to Opioid Treatment Programs in the United States," *Journal of Environmental and Public Health*, Volume 2011, Article ID 948789 (additional citations therein).

substantially as commute distances increase beyond 25 miles.[25] The U.S. Department of Veterans affairs did a study of this, and their findings were sobering. Substance abuse patients who traveled 10 miles or less were 2.6 times more likely to obtain aftercare than those who traveled more than 50 miles[26]. Tennessee Department of Health produced similar results in 2001 a report concluded "[t]*he closer one lives to a treatment program, the greater likelihood of participation. The current rate of participation is nearly twice as high for persons living in or close to one of the five counties (Shelby, Davidson, Knox, Hamilton and Madison) that house programs, 59.0/100,000 than the rate for those that live 60 miles or more from a program, 32.2/100,000.*"[27]

The proposed location is located in the largest city in this service area (Johnson City). It is within 25 minutes or less of the next two largest cities in this area: Kingsport, and Bristol. Today, people from this area suffering from opiate addiction drive hundreds of miles round trip for treatment. Patients are most vulnerable to relapse when they first enter treatment. Patients must attend every day (seven days a week) for the first 45 days of treatment. This places an undue hardship on those seeking treatment. Moreover, for every patient that does travel the distance, several may forego treatment.

The effects of untreated heroin abuse are well documented. According to the New York Academy of Medicine, the lifetime Medicaid cost for each injecting drug user with AIDS is about $109,000. In contrast, one year of methadone treatment costs about $5,000 per patient, and is private pay with no drain on public coffers. According to the Tennessee Department of Health, nearly 1,000 new HIV cases are reported each year in the State[28].

Untreated addicts commit more crime, are more susceptible to HIV, abandon their families, have higher unemployment and absenteeism, and neglect their overall health significantly more than addicts in treatment. Between 2004 and 2010, opioid- and heroin-related emergency room visits went up three-fold[29].

Every dollar invested in opioid dependence treatment may yield a return of between $4 and $7 in reduced drug related crime, criminal justice costs, and theft alone. When savings related to health care costs are included, the ratio can equal 12:1 for every dollar invested[30]. Further, since our program will rely on self-payment, the State will receive the benefits without having to make any financial investment.

Our proposed site removes this barrier to treatment for patients who do not seek treatment and makes it easier for patients in treatment to stay in treatment. This will greatly benefit the Northeast Tennessee Area and the State of Tennessee.

---

[25].Id.

[26] Center for Health Care Evaluation and Health Economics Resource Center, Veterans Affairs, Palo Alto Health Care System, Palo Alto, CA, USA. *"The influence of distance on utilization of outpatient mental health aftercare following inpatient substance abuse treatment."*

[27] http://health.state.tn.us/Downloads/g6022004.pdf

[28] http://health.state.tn.us/statistics/std.htm

[29] SAMHSA

[30] Institute of Addiction Medicine.

### 4. A. Describe the demographics of the population to be served by this proposal.

The nine-county demographic summary:

| Demographic | Johnson | Carter | Sullivan | Washington | Unicoi | Hawkins | Greene | Hamblen | Cocke | Total for service area | Tennessee |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Population, 2011 estimate | 18,231 | 57,135 | 157,419 | 124,353 | 18,280 | 56,871 | 60,339 | 63,082 | 35,544 | 600,084 | 6,399,787 |
| Population, 2010 (April 1) estimates base | 18,244 | 57,424 | 156,823 | 122,979 | 18,313 | 56,833 | 68,831 | 62,544 | 35,662 | 597,653 | 6,346,113 |
| Population, percent change, April 1, 2010 to July 1, 2011 | -0.1% | -0.4% | 0.4% | 1.1% | -0.2% | -0.3% | 0.7% | 0.8% | -0.3% | 0.4% | 0.8% |
| Persons under 5 years, percent, 2011 | 4.7% | 5.2% | 6.1% | 6.4% | 4.8% | 5.3% | 5.3% | 6.3% | 5.5% | 5.3% | 6.3% |
| Persons under 18 years, percent, 2011 | 18.1% | 19.5% | 20.3% | 19.0% | 20.0% | 21.0% | 21.0% | 23.5% | 21.1% | 20.7% | 23.3% |
| Persons 65 years and over, percent, 2011 | 18.8% | 17.4% | 19.0% | 15.7% | 19.9% | 17.1% | 18.0% | 16.2% | 17.4% | 17.5% | 13.7% |
| Female persons, percent, 2011 | 46.3% | 51.1% | 51.6% | 51.1% | 51.1% | 51.0% | 51.0% | 51.2% | 51.6% | 51.1% | 51.3% |
| White persons, percent, 2011 (a) | 96.4% | 96.7% | 95.4% | 92.6% | 98.1% | 96.8% | 95.0% | 91.9% | 95.4% | 94.8% | 79.5% |
| Black persons, percent, 2011 (a) | 2.2% | 1.6% | 2.4% | 4.2% | 0.4% | 1.6% | 2.2% | 4.6% | 2.2% | 2.8% | 16.9% |
| American Indian and Alaska Native persons, percent, 2011 (a) | 0.2% | 0.2% | 0.3% | 0.4% | 0.4% | 0.3% | 0.3% | 0.7% | 0.5% | 0.4% | 0.4% |
| Asian persons, percent, 2011 (a) | 0.2% | 0.3% | 0.6% | 1.2% | 0.2% | 0.6% | 0.4% | 0.8% | 0.3% | 0.6% | 1.5% |
| Native Hawaiian and Other Pacific Islander persons, percent, 2011 (a) | Z | Z | Z | Z | Z | Z | 0.1% | 0.1% | 0.1% | Z | 0.1% |
| Persons reporting two or more races, percent, 2011 | 0.9% | 1.2% | 1.2% | 1.5% | 1.0% | 1.0% | 1.0% | 1.7% | 1.5% | 1.3% | 1.6% |
| Persons of Hispanic or Latino Origin, percent, 2011 (b) | 1.6% | 1.5% | 1.6% | 3.0% | 4.1% | 1.3% | 2.6% | 11.0% | 1.9% | 3.1% | 4.7% |
| White persons not Hispanic, percent, 2011 | 95.0% | 95.2% | 94.1% | 90.0% | 94.2% | 95.5% | 93.6% | 82.4% | 93.9% | 92.2% | 75.4% |
| Living in same house 1 year & over, percent, 2007-2011 | 89.5% | 88.3% | 85.8% | 82.9% | 88.0% | 86.1% | 88.9% | 84.6% | 88.5% | 85.5% | 84.1% |
| Foreign born persons, percent, 2007-2011 | 0.7% | 0.9% | 1.6% | 3.4% | 3.0% | 1.1% | 2.1% | 7.3% | 1.6% | 2.5% | 4.5% |
| Language other than English spoken at home, percent age 5+, 2007-2011 | 1.5% | 1.8% | 2.6% | 4.6% | 6.2% | 2.4% | 3.9% | 10.4% | 2.8% | 4.0% | 6.4% |
| High school graduate or higher, percent of persons age 25+, 2007-2011 | 70.1% | 78.6% | 82.7% | 85.1% | 75.3% | 79.0% | 79.2% | 78.5% | 72.6% | 80.4% | 83.2% |
| Bachelor's degree or higher, percent of persons age 25+, 2007-2011 | 10.7% | 15.7% | 20.4% | 28.2% | 11.7% | 12.4% | 14.8% | 15.7% | 8.1% | 18.4% | 23.0% |
| Veterans, 2007-2011 | 1614 | 5470 | 15315 | 11873 | 1736 | 5211 | 6114 | 5622 | 3544 | 56,499 | 501,865 |
| Mean travel time to work (minutes), workers age 16+, 2007-2011 | 26.7 | 22 | 20.9 | 19.8 | 24.7 | 24.3 | 23 | 21.2 | 27.8 | 22.1 | 24 |
| Per capita money income in the past 12 months (2011 dollars), 2007-2011 | $15,957 | $18,269 | $23,638 | $24,742 | $20,753 | $20,293 | $19,035 | $21,331 | $17,014 | $21,555 | $24,197 |
| Median household income, 2007-2011 | $32,159 | $32,148 | $40,672 | $42,104 | $35,265 | $38,795 | $36,310 | $39,604 | $28,563 | $36,007 | $43,989 |
| Persons below poverty level, percent, 2007-2011 | 23.4% | 22.0% | 16.6% | 17.3% | 20.7% | 18.9% | 21.6% | 17.7% | 26.9% | 18.9% | 16.9% |
| Land area in square miles, 2010 | 298 | 341 | 413 | 326 | 186 | 487 | 622 | 161 | 435 | 3,271 | 41,234.90 |
| Persons per square mile, 2010 | 81.1 | 168.3 | 379.4 | 376.7 | 98.4 | 116.7 | 110.6 | 388 | 82.1 | 287.9 | 153.9 |
| (a) Includes persons reporting only one race. | | | | | | | | | | | |
| (b) Hispanics may be of any race, so also are included in applicable race categories. | | | | | | | | | | | |
| FN: Footnote on this item for this area in place of data | | | | | | | | | | | |
| NA: Not available | | | | | | | | | | | |
| D: Suppressed to avoid disclosure of confidential information | | | | | | | | | | | |
| X: Not applicable | | | | | | | | | | | |
| S: Suppressed; does not meet publication standards | | | | | | | | | | | |
| Z: Value greater than zero but less than half unit of measure shown | | | | | | | | | | | |
| F: Fewer than 100 firms | | | | | | | | | | | |
| Source: US Census Bureau State & County QuickFacts | | | | | | | | | | | |

This service area represents approximately 10% of Tennessee's population. Compared to the State, this service area has:

- A higher percentage of Caucasians
- Lower average income

Both of these demographic statistics indicate a higher opiate addiction rates:

- Using opioid-related emergency room visits as a marker, Caucasians are 43% more likely that African-Americans to abuse opiates on a per-capita basis.[31]
- The link between poverty and substance abuse is well established, particularly in the

---

[31] Center for Behavioral Health Statistics and Quality, SAMHSA

SUPPLEEMENTAL- # 1

March 25, 2013
12:15pm

Appalachian region.[32]

b. Describe the special needs of the service area population, including health disparities, the accessibility to consumers, particularly the elderly, women, racial and ethnic minorities, and low-income groups. Document how the business plans of the facility will take into consideration the special needs of the service area population.

The most apparent disparity for our proposed service area is the lack of treatment, as the table below shows. There are 6 Combined Metropolitan Statistical Areas (CMSA) in Tennessee. CMSAs are combinations of Metropolitan and Micropolitan Statistical Areas.

| CMSA | POPULATION | Number of NRMTF's |
|---|---|---|
| Nashville-Davidson-Murfreesboro-Columbia, TN | 1,533,406 | 2 |
| Memphis | 1,274,704 | 3 |
| Knoxville-Sevierville-La Follette, TN | 1,010,978 | 2 |
| Chattanooga-Cleveland-Athens, TN-GA | 658,201 | 5[33] |
| JOHNSON CITY-KINGSPORT-BRISTOL (TRI-CITIES), TN-VA | 493,587 | 0 |
| Jackson-Humboldt, TN | 160,398 | 1 |
| Dyersburg (not a CMSA) | 37,886 | 1 |
| Paris (not a CMSA) | 31,837 | 1 |
| Savannah, TN (not a CMSA) | 6,917 | 1 |
| | Total | 16 |

It is impossible to talk about disparities in accessibilities when there are no service providers. For the patients that travel hundreds of miles for treatment, this challenge is exacerbated with poverty, and for the elderly and women who must stay home to take care of a family.

In providing a local treatment option, our proposed facility will remove the most significant barrier to treatment for everyone affected – geographic distance - a barrier that is even greater for the poor, women and elderly.

---

[32] Appalachian Regional Commission Report, 2008

[33] This figure includes one Tennessee NRMTF plus 4 "border play" facilities in Georgia

**5. Describe the existing or certified services, including approved but unimplemented CONs, of similar institutions in the service area. Include utilization and/or occupancy trends for each of the most recent three years of data available for this type of project. Be certain to list each institution and its utilization and/or occupancy individually. Inpatient bed projects must include the following data: admissions or discharges, patient days, and occupancy. Other projects should use the most appropriate measures, e.g., cases, procedures, visits, admissions, etc.**

There are no NRMTF service providers in our proposed service area. Applicant requested Central Registry data to calculate utilization rates of existing NRMTF's in Tennessee and to learn how many current patients from the proposed service area are using other clinics. Tennessee Department of Mental and Substance Abuse Services informed applicant that it would no longer provide such data because of policy change. The need for the proposed service area has been documented in Sections B1, Section C General Criteria, Need, and in Question 1 of this Section. Our projected utilization is in our response to No. 6 below.

**6. Provide applicable utilization and/or occupancy statistics for your institution for each of the past three (3) years and the projected annual utilization for each of the two (2) years following completion of the project. Additionally, provide the details regarding the methodology used to project utilization. The methodology must include detailed calculations or documentation from referral sources, and identification of all assumptions.**

Since our facility would be new, we have no history. We took two approaches to project our utilization. The first was to examine the number of patients from the Northeast Tennessee /service area were in treatment in the nearest clinics (North Carolina and Tennessee), and make estimates on how many would transfer to a center that was 100-200 miles closer round-trip. The second way was to apply per capita statistics on patients in treatment from Tennessee and apply them to our projected service area. Both approaches yield a similar number of projected patients. We averaged the results. Our projected utilization, and associated calculations, assumptions and sources are shown in the table below.

- **Method One: Transfer Method**

| End of Year | End of Year Patients | End of Year Facility Utilization | Methodology | Patient assumptions | Utilization assumptions | Source |
|---|---|---|---|---|---|---|
| 1 | 918 | 51% | 50% of the Tri-Cities patients currently traveling to Asheville (1,400) and 80% traveling to Knoxville would transfer; 10% taper off/release | 1 shift operation; admissions 3 days per week; variance granted for operating hours | 1 counselor per 50 patients; 200 sq. feet of space plus overhead per counselor; 7,000 feet of office space | Ownership of Asheville area clinics; interview with Knoxville Program Directors; CARF, Federal and State regulations |
| 2 | 1208 | 69% | 25% of Year 1 patients taper off/released; admit 10 new patients per week | | | Experience owning 9 other clinics |

- **Method Two: Tennessee Per-Capita Method**

| End of Year | End of Year Patients | End of Year Facility Utilization | Methodology | Patient assumptions | Utilization assumptions | Source |
|---|---|---|---|---|---|---|
| 1 | 850 | 49% | Use the per-capita rate of admissions (189 per 100,000) from the 2009 Tn State Registry (with projected growth) and apply it to the service area population. Assume 75% of these patients are admitted in the first year. | 1 shift operation; admissions 3 days per week; variance granted for operating hours | 1 counselor per 50 patients; 200 sq. feet of space plus overhead per counselor; 7,000 feet of office space | Ownership of Asheville area clinics; TN Dept. of Mental Health; interview with Knoxville Program Directors; CARF, Federal and State regulations |
| 2 | 1134 | 63% | Remaining 25% of per-capita patients are admitted. | | | Experience owning 9 other clinics |

ECONOMIC FEASABILITY

1.      Provide the cost of the project by completing the Project Costs Chart on the following page. Justify the cost of the project.

- All projects should have a project cost of at least $3,000 on Line F. (Minimum CON Filing Fee). CON filing fee should be calculated from Line D. (See Application Instructions for Filing Fee)

- The cost of any lease (building, land, and/or equipment) should be based on fair market value or the total amount of the lease payments over the initial term of the lease, whichever is greater. Note: This applies to all equipment leases including by procedure or "per click" arrangements. The methodology used to determine the total lease cost for a "per click" arrangement must include, at a minimum, the projected procedures, the "per click" rate and the term of the lease.

- The cost for fixed and moveable equipment includes, but is not necessarily limited to, maintenance agreements covering the expected useful life of the equipment; federal, state, and local taxes and other government assessments; and installation charges, excluding capital expenditures for physical plant renovation or in-wall shielding, which should be included under construction costs or incorporated in a facility lease.

- For projects that include new construction, modification, and/or renovation; documentation must be provided from a contractor and/or architect that support the estimated construction costs.

See pages that follow.

Applicant provides the following footnotes to accompany the Project Cost Chart:

Line A.2. Legal, administrative and consultant fees include CARF accreditation and materials

Line B1. Facility costs include the monthly leasing and common area maintenance fees for a five year lease at an average of $5,333 per month

Line C4. Includes the operating losses that must be financed during the time between when the facility opens until it becomes cashflow positive.

A.    Construction and equipment acquired by purchase:

|  | | |
|---|---|---|
| 1. | Architectural and Engineering Fees | $25,000 |
| 2. | Legal, Administrative (Excluding CON Filing Fee), Consultant Fees | 30,000 |
| 3. | Acquisition of Site | |
| 4. | Preparation of Site | 160,000 |
| 5. | Construction Costs | |
| 6. | Contingency Fund | |
| 7. | Fixed Equipment (Not included in Construction Contract) | |
| 8. | Moveable Equipment (List all equipment over $50,000) | 23,500 |
| 9. | Other (Specify) Office furniture, computers, etc. | 20,000 |

B.    Acquisition by gift, donation, or lease:

|  | | |
|---|---|---|
| 1. | Facility (inclusive of building and land) | $320,000 |
| 2. | Building only | |
| 3. | Land only | |
| 4. | Equipment (Specify)_____ | |
| 5. | Other (Specify) Patient software | 8,500 |

C.    Financing Costs and Fees:

|  | | |
|---|---|---|
| 1. | Interim Financing | |
| 2. | Underwriting Costs | |
| 3. | Reserve for One Year's Debt Service | |
| 4. | Other (Specify) Operating loss carry | $80,000 |

D.    Estimated Project Cost          $667,000
(A+B+C)

                                        $3,000
E.    CON Filing Fee
F.    Total Estimated Project Cost
      (D+E)

                            TOTAL    $670,000

## PROJECTED DATA CHART
2013 MAR 28  AM 10 19

Give information for the two (2) years following the completion of this proposal. The fiscal year begins in _January__ (Month).

|  |  | Year 2014_ | Year_2015_ |
|---|---|---|---|
| A. | Utilization Data (Specify unit of measure) | 530 avg. pts._ | 1,056 avg. pts. |
| B. | Revenue from Services to Patients |  |  |
| 1. | Inpatient Services |  |  |
| 2. | Outpatient Services | $1,782,14__ | $3,903,715 |
| 3. | Emergency Services | | |
| 4. | Other Operating Revenue (Specify)_____ | | |
|  | **Gross Operating Revenue** | $1,782,144 | $3,903,715 |
| C. | Deductions from Gross Operating Revenue |  |  |
| 1. | Contractual Adjustments | $_____ | $_____ |
| 2. | Provision for Charity Care | __35,643 | _78,074_ |
| 3. | Provisions for Bad Debt | __17,821__ | _39,037___ |
|  | **Total Deductions** | $_53,464_ | $_117,111_ |
| **NET OPERATING REVENUE** | | $1,728,680 | $3,786,604_ |
| D. | Operating Expenses |  |  |
| 1. | Salaries and Wages | $780,000 | $1,573,135 |
| 2. | Physician's Salaries and Wages | _144,000_ | _144,000_ |
| 3. | Supplies | _579,750_ | _767,972_ |
| 4. | Taxes | ___5,092_ | _435,719_ |
| 5. | Depreciation | __25,000_ | __25,000___ |
| 6. | Rent | __67,200_ | __67,200___ |
| 7. | Interest, other than Capital | | |

30

8. Management Fees:

2013 MAR 28 AM 10 20

   a. Fees to Affiliates      _____     _____

   b. Fees to Non-Affiliates    _____     _____

9. Other Expenses – Specify on Page 32     _120,000     _120,000_

   **Total Operating Expenses**      $1,721,042_    $3,133,026_

E. Other Revenue (Expenses) -- Net (Specify)_____    $_____     $_____

**NET OPERATING INCOME (LOSS)**      $7,638____    $653,578__

F. Capital Expenditures

   1. Retirement of Principal        $_____     $80,000_

   2. Interest                    _____     __8,000___

   **Total Capital Expenditures**      $_____     $88,000_

**NET OPERATING INCOME (LOSS)**

**LESS CAPITAL EXPENDITURES**      $7,638____    $565,578__

HISTORICAL DATA CHART-OTHER EXPENSES

2013 MAR 28  AM 10 20

| OTHER EXPENSES CATEGORIES | Year_NA_ | Year_NA_ | Year_NA__ |
|---|---|---|---|
| 1. | $ _____ | $ _____ | $ _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |
| 4. | _____ | _____ | _____ |
| 5. | _____ | _____ | _____ |
| 6. | _____ | _____ | _____ |
| 7. | _____ | _____ | _____ |
| **Total Other Expenses** | $ _____ | $ _____ | $ _____ |

PROJECTED DATA CHART-OTHER EXPENSES

| OTHER EXPENSES CATEGORIES | Year_2014_ | Year_2015 |
|---|---|---|
| 1. Utilities | $24,000_ | $24,000_ |
| 2. Insurance | _54,000__ | _54,000 |
| 3. Travel and other | _42,000_ | _42,000_ |
| 4. | _____ | _____ |
| 5. | _____ | _____ |
| 6. | _____ | _____ |
| 7. | _____ | _____ |
| **Total Other Expenses** | $120,000__ | $120,000_ |

2. Identify the funding sources for this project.

2013 MAR 25 PM 12 07

Please check the applicable item(s) below and briefly summarize how the project will be financed. *(Documentation for the type of funding MUST be inserted at the end of the application, in the correct alpha/numeric order and identified as Attachment C, Economic Feasibility-2.)*

☐ A. Commercial loan—Letter from lending institution or guarantor stating favorable initial contact, proposed loan amount, expected interest rates, anticipated term of the loan, and any restrictions or conditions;

☐ B. Tax-exempt bonds--Copy of preliminary resolution or a letter from the issuing authority stating favorable initial contact and a conditional agreement from an underwriter or investment banker to proceed with the issuance;

☐ C. General obligation bonds—Copy of resolution from issuing authority or minutes from the appropriate meeting.

☐ D. Grants—Notification of intent form for grant application or notice of grant award; or

☑ E. Cash Reserves—Appropriate documentation from Chief Financial Officer.

☐ F. Other—Identify and document funding from all other sources.

Cash Reserves of the Applicant. See Attachment C, Economic Feasibility-2.

**3. Discuss and document the reasonableness of the proposed project costs. If applicable, compare the cost per square foot of construction to similar projects recently approved by the Health Services and Development Agency.**

These costs were developed with the Applicant's experience of having opened 9 NRMTFs in 4 states. In every case, the projects involve standard work elements:

- Adding and modifying offices, including wall construction and moving, adding electrical, phones, cable and security, reconfiguring heating and air conditioning systems, etc.

- Adding workrooms unique to NRMTFs such as dosing windows, pharmacy, and payment/check-in areas

- Outfitting the offices with desks, computers, phones, etc.

- Installing patient and accounting software systems unique to NRMTFs

**4. Complete Historical and Projected Data Charts on the following two pages--Do not modify the Charts provided or submit Chart substitutions! Historical Data Chart represents revenue and expense information for the last three (3) years for which complete data is available for the institution. Projected Data Chart requests information for the two (2) years following the completion of this proposal. Projected Data Chart should reflect revenue**

and expense projections for the Proposal Only (i.e., if the application is for additional beds, include anticipated revenue from the proposed beds only, not from all beds in the facility).

See page that follows

Notes to Project Data Chart:

- CARF accreditation and material costs are included in Other Expenses
- Of the 530 patients during the first year, Applicant's assumptions for initial treatment are:
  - o Methadone:                          73%, or 387
  - o Buprenorphine-based treatment:      25%, or 133
  - o Abstinence-based treatment:          2%, or 10
- Applicant was asked to provide Historical Data Chart for the last three years for a center in Asheville, NC. Applicant is a currently a shareholder of the company and not an officer or member of management, and as such does not have access to this information.

## HISTORICAL DATA CHART

2013 MAR 25 PM 12 07

Give information for the last *three (3)* years for which complete data are available for the facility or agency. The fiscal year begins in _____ (Month).

| | | Year | Year | Year |
|---|---|---|---|---|
| A. | Utilization Data (Specify unit of measure) | N/A | N/A | N/A |
| B. | Revenue from Services to Patients | | | |
| | 1. Inpatient Services | $ | $ | $ |
| | 2. Outpatient Services | | | |
| | 3. Emergency Services | | | |
| | 4. Other Operating Revenue (Specify)_____ | | | |
| | **Gross Operating Revenue** | $ | $ | $ |
| C. | Deductions from Gross Operating Revenue | | | |
| | 1. Contractual Adjustments | $ | $ | $ |
| | 2. Provision for Charity Care | | | |
| | 3. Provisions for Bad Debt | | | |
| | **Total Deductions** | $ | $ | $ |
| **NET OPERATING REVENUE** | | $ | $ | $ |
| D. | Operating Expenses | | | |
| | 1. Salaries and Wages | $ | $ | $ |
| | 2. Physician's Salaries and Wages | | | |
| | 3. Supplies | | | |
| | 4. Taxes | | | |
| | 5. Depreciation | | | |
| | 6. Rent | | | |
| | 7. Interest, other than Capital | | | |
| | 8. Other Expenses (Specify) _____ | | | |
| | **Total Operating Expenses** | $ | $ | $ |
| E. | Other Revenue (Expenses) – Net (Specify) | $ | $ | $ |
| **NET OPERATING INCOME (LOSS)** | | $ | $ | $ |
| F. | Capital Expenditures | | | |
| | 1. Retirement of Principal | $ | $ | $ |
| | 2. Interest | | | |
| | **Total Capital Expenditures** | $ | $ | $ |
| **NET OPERATING INCOME (LOSS) LESS CAPITAL EXPENDITURES** | | $ | $ | $ |

35

5. Please identify the project's average gross charge, average deduction from operating revenue, and average net charge.

| | | |
|---|---|---|
| Patients (average during year) | 530 | 1,056 |
| Average gross charge (revenue per year) | $3,363 | $3,697 |
| Average deduction from operating revenue | $101 | $111 |
| Average net charge | $3,262 | $3,586 |

6. A. Please provide the current and proposed charge schedules for the proposal. Discuss any adjustment to current charges that will result from the implementation of the proposal. Additionally, describe the anticipated revenue from the proposed project and the impact on existing patient charges.

Since this is a new operation, Applicant submits planned charges.

| Service | Proposed Charge |
|---|---|
| Intake assessment | $50 |
| Methadone Fee | $10 per day |
| Buprenorphine/Suboxone Fee | $200 per month plus medication cost |
| Guest dosing | $20 per day |
| Drug screens, passed | $0, included in medication |
| Drug screens, failed | $25 |
| Counseling | $0, included in fees above |
| Annual Health & Physical | $0, included in fees above |

March 25, 2013
12:15pm

6.    B. Compare the proposed charges to those of similar facilities in the service area/adjoining service areas, or to proposed charges of projects recently approved by the Health Services and Development Agency. If applicable, compare the proposed charges of the project to the current Medicare allowable fee schedule by common procedure terminology (CPT) code(s).

The comparative charge schedule is shown below:

| Service | Charge | Phone survey results, if available |
|---|---|---|
| Intake assessment | $50 | Waived at Asheville area clinics, $50 at Knoxville clinics and Galax, VA; $25 at Stepping Stone in Boone, NC |
| Methadone Fee | $10 per day | $16.14 at 2 clinics in Knoxville; $11 – $13 per day at Asheville clinics and Boone, NC; Galax, VA is $25 per day according to a 3/22 phone inquiry |
| Buprenorphine/Suboxone Fee | $200 per month plus medication cost | Asheville area clinics were full and not accepting new patients; Stepping Stone is $13-$21 per day depending on dosage; Galax, VA is $30 per day.<br><br>$400 per month plus medication cost at buprenorphine-private physician offices, without counseling, drug testing, STD/HIV/TB testing, diversion control, etc. |
| Guest dosing | $20 per day | $15 - $25 per day plus a one-time charge of $25 |

| Drug screens, passed | $0, included in medication | $0, included in medication |
|---|---|---|
| Drug screens, failed | $25 | $0 - $25 |
| Counseling | $0, included in fees above | $0, included in fees above at other NRMTFs<br><br>Either not available or on a referral basis at buprenorphine-approved private physician offices |
| Annual Health & Physical | $0, included in fees above | $0, included in fees above |

This is a new project, so there is no impact to previous charge schedules.

Based upon telephone surveys in February 2013, the proposed gross charge is approximately 20%-33% less than those charged by the nearest clinics in North Carolina and Tennessee (Crossroads in Weaverville, NC and DRD in Knoxville, TN). Based on phone interviews during March, 2013, the clinics in Knoxville charged approximately $16.30 per day and the clinics in Weaverville and Asheville, NC charge between $12 and $13 per day.

Since TennCare does not cover Methadone Clinic Services[34] for patients over 21 years of age and Medicare does not pay for methadone maintenance treatment, there is not a relevant comparable charge base.

**7.      Discuss how projected utilization rates will be sufficient to maintain cost-effectiveness.**

This project is scheduled to be cash flow positive within 180 days of opening. Any negative variances to this will be covered by Tri-Cities Holdings, LLC.

**8.      Discuss how financial viability will be ensured within two years; and demonstrate the availability of sufficient cash flow until financial viability is achieved.**

As shown in the Projected Data Chart, this project is projected to be cash flow positive in Year 1, and ongoing thereafter. The management of Tri-Cities Holdings, LLC has opened 9 similar NRMTFs in four states and has significant experience and an excellent track record of ensuring cash flow positive, viable and compliance NRMTFs. In the supporting document, a personal financial

---

[34] www.tn.gov/tenncare/forms/phar20050912.pdf

statement is included in Attachment C Economic Feasibility-10 for Steve Kester, Tri-Cities Holding's CEO, who will personally guarantee this project through fruition. All funds required to open and outfit this facility, and cover the operating loss during the first year, plus contingency, are secured.

9.      Discuss the project's participation in state and federal revenue programs including a description of the extent to which Medicare, TennCare/Medicaid, and medically indigent patients will be served by the project. In addition, report the estimated dollar amount of revenue and percentage of total project revenue anticipated from each of TennCare, Medicare, or other state and federal sources for the proposal's first year of operation.

The Applicant plans to utilize self-pay programs and does not plan to participate in State and federal programs such as TennCare or Medicare. If the healthcare environment shifts, such as universal coverage of NRMTFs services for qualified patients, the Applicant may revisit this decision. Because buprenorphine patients will comprise an estimated 25% of applicant's patient mix, the applicant cannot justify the investment of resources required to maintain compliance with TennCare. However, a call to TennCare Solutions (888-816-1680) indicated that TennCare patients can be reimbursed for approved medication and services upon individual submission of receipts.

10. Provide copies of the balance sheet and income statement from the most recent reporting period of the institution and the most recent audited financial statements with accompanying notes, if applicable. For new projects, provide financial information for the corporation, partnership, or principal parties involved with the project. Copies must be inserted at the end of the application, in the correct alpha-numeric order and labeled as Attachment C, Economic Feasibility-10.

The proposed facility and the company are new, so no historical data is available. Personal financial statements are included in Attachment C Economic Feasibility-10 for Tri-Cities Holding's CEO who is personally funding and guaranteeing this project.

11. Describe all alternatives to this project which were considered and discuss the advantages and disadvantages of each alternative including but not limited to:

a. A discussion regarding the availability of less costly, more effective, and/or more efficient alternative methods of providing the benefits intended by the proposal. If development of such alternatives is not practicable, the applicant should justify why not; including reasons as to why they were rejected.

There is no treatment in the proposed service area currently. Our proposal may appear to be more expenses than the status quo, i.e. no service. However, the State of Tennessee and many organizations have documented the cost of untreated persons significantly outweigh the cost of treatment, as measured by crime, broken families, loss or diminishment of employment, related health costs, and fatalities[35].

---

[35] tn.gov/mental/policy/presc_drug_abuse.shtml

# PLOT PLAN

61



**Date Created: 3/18/2013**

1.  Parcel size: 1.66 acres
2.  Building size: 8,208 square feet
3.  All construction will be inside the four exterior walls of the building.
4.  Names of streets, roads or highway that cross or border the site: Wesley Court

As for effectiveness of treatment, methadone maintenance treatment has proven the most effective treatment for opiate addiction, as studied by numerous agencies, including the Centers For Disease Control and the National Institute on Drug Abuse[36]. However, our proposed services also include buprenorphine-based treatment and abstinence-based services. The patient, together with his or her care team of doctors, nurses and counselors will decide the best treatment plan. In addition, we anticipate that patients will migrate between treatment services. For example, a patient may be stabilized with methadone, tapered down and switched to Suboxone, then transition to abstinence-based treatment, and finally be discharged after successful demonstrating the ability to lived independently without relapse.

Our estimate is that *initial* treatments will breakdown as follows:

- Methadone maintenance: 73%
- Buprenorphine-based treatment: 25%
- Abstinence treatment: 2%

Comparison of applicant's proposed services and inpatient treatment:

- Frontier Health/Magnolia Ridge Alcohol & Drug Residential Treatment
  900 Buffalo Street
  Johnson City, TN 37604
  www.frontierhealth.org
  COST: $6,000 per month (compared to applicant's $400/month outpatient)
  NOTE: 9-12 week waiting list.

- Comprehensive Community Services
  6145 Temple Star Road
  Kingsport, TN 37660
  ccstreatment.com
  COST: $5,600 per month (compared to applicant's $400/month outpatient)
  NOTE: 100+ patients on waiting list/Minimum four weeks until available.

**b. The applicant should document that consideration has been given to alternatives to new construction, e.g., modernization or sharing arrangements. It should be documented that superior alternatives have been implemented to the maximum extent practicable.**

The applicant reviewed more than 50 locations in the Tri-Cities area before selecting its proposed location. Beyond best meeting zoning requirements, the proposed facility was chosen because it was located in the biggest city of the proposed service area and therefore close to the maximum number of anticipated patients; it had ready highway access to all points within the proposed service area; and it required no new construction, only upfitting and modifications to an existing structure. Tri-Cities Holdings has balanced cost control with providing patients quality care and a healing environment.

---

[36] www.cdc.gov/idu/facts/methadonefin.pdf

ORDERLY DEVELOPMENT

**1.** **List all existing health care providers (e.g., hospitals, nursing homes, home care organizations, etc.), managed care organizations, alliances, and/or networks with which the applicant currently has or plans to have contractual and/or working relationships, e.g., transfer agreements, contractual agreements for health services.**

The applicant intends to have transfer relationships with all emergency hospitals in the Tri-Cities and surrounding area, including the Johnson City Medical Center and Wellmont Urgent Care; in Kingsport: Holston Valley Medical Center and Indian Path Primary Care; in Bristol: Bristol Regional; Union County Memorial in Erwin; Laughlin Memorial in Greeneville and Hawkins County Memorial in Rogersville.

**2.** **Describe the positive and/or negative effects of the proposal on the health care system. Please be sure to discuss any instances of duplication or competition arising from your proposal including a description of the effect the proposal will have on the utilization rates of existing providers in the service area of the project.**

This project will significantly improve the lives and financial well being to those people suffering from opiate addictions that cannot or will not drive hundreds of miles for the nearest treatment. In doing so, the communities of the proposed service area will benefit from less crime, more families intact, less work truancy, and less rates of HIV and hepatitis infections.

For those patients domiciled in the proposed service area who currently travel hundreds of miles for treatment, our proposed facility will help their finances (approximately $30 per day of treatment), allow them to spend more time with their families, seek new or better employment, and help keep them from relapsing.

Because of the epidemic levels of drug overdose deaths and prescribed pain medicine, Tennessee providers have experienced significant increases in enrollment[37], so this project is not expected to have any negative consequences to the current base of providers.

**3.** **Provide the current and/or anticipated staffing pattern for all employees providing patient care for the project. This can be reported using FTEs for these positions. Additionally, please compare the clinical staff salaries in the proposal to prevailing wage patterns in the service area as published by the Tennessee Department of Labor & Workforce Development and/or other documented sources.**

Our proposed facility will pay competitive wage and benefit packages for our staff. The staffing

---

[37] CDC reports overdose deaths have tripled since 1990 in http://www.cdc.gov/homeandrecreationalsafety/rxbrief/ and Tennessee reports a 250% increase from 2001 – 2010, the percentage of people identifying prescription opioids as their primary substance of abuse increased from 5% in 1999 to 23% in 2009 in http://tn.gov/mental/policy/persc_drug_docs/Prescription%20Drug%20Use%20in%20TN_2%203%202012_R2.pdf

levels and compensation levels are shown in the table below[38], ranked in the order of the number of staff patient care positions. This data was aided by the Tennessee Department of Labor and Workforce Development, 2012 Occupation Wage Report for the Johnson City Healthcare Industry. The compensation figures below are in-line with the Tennessee statistics.

| Position | Average number of fulltime staff, Year 1 | Average number of fulltime staff, Year 2 | Annual compensation Range, Entry - Senior | Tennessee Dept of Labor Range[39] |
|---|---|---|---|---|
| Substance Abuse Counselors | 12 | 22 | $22,000 - $30,000 | $25,661 – $34,666 |
| LPN Dosing Nurses | 2 | 4 | $27,000 - $37,000 | $27,512- $37,268 |
| Charge Nurse | 1 | 1 | $45,000 - $55,000 | $39,678- $64,293 |
| Charge Counselor | 1 | 1 | $35,000 - $40,000 | $31,651- $34,646 |
| Program Director | 1 | 1 | $70,000 - $110,000 | $78,220- $99,889 |
| Medical Director | Contract (part time) | Contract (part time) | $150,000 - $200,000 | $137,042- $225,926 |

A Security Guard is currently not planned. If the need arises, this position will be hired.

All personnel will satisfy State MINIMUM PROGRAM REQUIREMENTS FOR NON-RESIDENTIAL OPIOID TREATMENT PROGRAM FACILITIES, Staff Qualifications, Rule 0940-05-42-.29

Applicant has interviewed candidates for the Medical Director and a Program Director positions. Current candidates meet certification requirements. Because of the uncertainty with respect to approval and timing, offers cannot be extended and candidates do not wish to be identified.

**4.     Discuss the availability of and accessibility to human resources required by the proposal, including adequate professional staff, as per the Department of Health, the Department of Mental Health and Developmental Disabilities, and/or the Division of Mental Retardation Services licensing requirements.**

The applicant operates nine other facilities in four states and is aware of the difficulty of hiring in the healthcare market.

---

[38] http://www.tn.gov/labor-wfd/wages/2012/PAGE0144.HTM

[39] TN Dept of Labor & Workforce Dev, Div Emp Sec, R&S.

The applicant is aware of the licensing requirements of the State, including the staffing requirements.

Fortunately, Johnson City is home to one of the Country's best universities for nursing, medicine and social work: East Tennessee State University. In addition, the area has a vibrant medical community from which to recruit entry level and experienced professionals.

Hiring and keeping the right staff is always a challenge and the applicant is experienced and financed ready to meet the challenges.

5.      **Verify that the applicant has reviewed and understands all licensing certification as required by the State of Tennessee for medical/clinical staff. These include, without limitation, regulations concerning physician supervision, credentialing, admission privileges, quality assurance policies and programs, utilization review policies and programs, record keeping, and staff education.**

The applicant verifies this.

6.      **Discuss your health care institution's participation in the training of students in the areas of medicine, nursing, social work, etc. (e.g., internships, residencies, etc.).**

The applicant has significant experience working developing internships and other partnerships with local universities and professional societies. Applicant looks forward to establishing these ties with ETSU's undergraduate and graduate healthcare programs and Northeast State Community College's Social Work (A.A. Degree) program.

Internships and other partnerships must take into account the confidentiality, and sensitivity of the nature of a clinic of this type.

7.      **(a) Please verify, as applicable, that the applicant has reviewed and understands the licensure requirements of the Department of Health, the Department of Mental Health and Developmental Disabilities, the Division of Mental Retardation Services, and/or any applicable Medicare requirements.**

The applicant verifies this.

(b) **Provide the name of the entity from which the applicant has received or will receive licensure, certification, and/or accreditation.**

LICENSURE: Department of Mental Health and Substance Abuse Services, Office of Licensure

CERTIFICATION: Federal Certification from U.S. Health And Human Services, Division of Substance Abuse and Mental Health Services Administration (SAMHSA)

ACCREDITATION: Commission on Accreditation of Rehabilitation Facilities (CARF)

(c) If an existing institution, please describe the current standing with any licensing, certifying, or accrediting agency. Provide a copy of the current license of the facility.

Not Applicable (NA).

(d) For existing licensed providers, document that all deficiencies (if any) cited in the last licensure certification and inspection have been addressed through an approved plan of correction. Please include a copy of the most recent licensure/certification inspection with an approved plan of correction.

Not Applicable (NA). Applicant was asked to provide health survey results for centers in North Carolina. Applicant is a shareholder of the company that operates these centers, but is not an officer or member of management. As such, he has no access to these records.

8.    Document and explain any final orders or judgments entered in any state or country by a licensing agency or court against professional licenses held by the applicant or any entities or persons with more than a 5% ownership interest in the applicant. Such information is to be provided for licenses regardless of whether such license is currently held.

None.

9.    Identify and explain any final civil or criminal judgments for fraud or theft against any person or entity with more than a 5% ownership interest in the project.

None.

10.    If the proposal is approved, please discuss whether the applicant will provide the Tennessee Health Services and Development Agency and/or the reviewing agency information concerning the number of patients treated, the number and type of procedures performed, and other data as required.

Yes, subject to Federal HIPAA regulation

# PROOF OF PUBLICATION

## JOHNSON CITY PRESS

204 W. Main St., Johnson City, TN 37604

AFFIDAVIT OF PUBLICATION

AD# _1065011_

DATES: _3- 6- 2513_

STATE OF TENNESSEE

WASHINGTON COUNTY  SS

Richard Clark makes the oath that he is the Vice President of Advertising Inside Sales

of the JOHNSON CITY PRESS, a daily newspaper published in Johnson City, in said County and State, and that the advertisement was published in said newspaper for three (3) insertion(s) commencing on

_3- 6- 2013_ and ending on _3- 6- 2013_

_[signature: Richard Clark]_

Signature

Sworn to and subscribed before me this  _03_   _07_   _2013_

Month    Day    Year

In testimony whereof I have hereunto set my hand and seal this the day and year aforesaid.

_[Notary seal: JANICE J. REESER — NOTARY PUBLIC AT LARGE — WASHINGTON COUNTY TN]_

_[signature: Jan Reeser]_

JAN REESER

notary public

My commission expires: 03/03/2016

47

## NOTIFICATION OF INTENT TO APPLY FOR A
## CERTIFICATE OF NEED

This is to provide official notice to the Health Service and Development Agency and all interested parties, in accordance with T.C.A. 68-11-1601 et seq., and the Rules of the Health Service and Development Agency, that: Tri-cities Holding LLC with an ownership type of Limited Liability Company and to be managed by: Manager Steve Kester intends to file an application for a Certificate of Need Establishment of nonresidential substitution-based treatment center for opiate addiction offering methadone and buprenorphine which is designed to treat opiate addiction by preventing symptoms of withdrawal. In addition, we will offer individual counseling services and group therapy to help break the cycle of addiction and provide patients the life skills and resources to serve as productive members of their communities, families and employers. The location of the proposed project is 4 Wesley Court, Johnson City, Tennessee 37601. The project cost is estimated to be $ 670,000.

The anticipated date of filing the application is:   March 7, 2013.

The contact person for this project is Steve Kester Manager who may be reached at: Tri-Cities Holdings LLC  6555 Sugarloaf Parkway Suite 307-137 Duluth Georgia 30097 404-664-2616.  Upon written request by interested parties, an local Fact-Finding public hearing shall be conducted. Written requests for hearing should be sent to:

Health Services and Development Agency
The Frost Building Third Floor
161 Rosa L. Parks Boulevard
Nashville, Tennessee 37243

The published Letter of Intent must contain the following statement pursuant to T.C.A. 68-11-1607(c)(1).  (A) Any health care institution wishing to oppose a Certificate of Need application must file a written notice with the Health Services and Development Agency no later than Fifteen (15) days before the regularly scheduled Health Services and Development Agency meeting at which the application is originally scheduled; and (B) Any other person wishing to oppose the application must file written objection with the Health Services and Development Agency at or prior to the consideration of the application by the Agency.

48

**SUPPLEMENTAL- # 1**

**March 25, 2013**
**12:15pm**

Tennessee Code Annotated § 68-11-1609(c) provides that a Certificate of Need is valid for a period not to exceed three (3) years (for hospital projects) or two (2) years (for all other projects) from the date of its issuance and after such time shall expire; provided, that the Agency may, in granting the Certificate of Need, allow longer periods of validity for Certificates of Need for good cause shown. Subsequent to granting the Certificate of Need, the Agency may extend a Certificate of Need for a period upon application and good cause shown, accompanied by a non-refundable reasonable filing fee, as prescribed by rule. A Certificate of Need which has been extended shall expire at the end of the extended time period. The decision whether to grant such an extension is within the sole discretion of the Agency, and is not subject to review, reconsideration, or appeal.

1. Please complete the Project Completion Forecast Chart on the next page. If the project will be completed in multiple phases, please identify the anticipated completion date for each phase.

2. If the response to the preceding question *indicates that the applicant does not anticipate completing the project within the period of validity as defined in the preceding paragraph,* please state below any request for an extended schedule and document the "good cause" for such an extension.

**SUPPLEMENTAL- # 1**

**PROJECT COMPLETION FORECAST CHART**

March 25, 2013
12:15pm

Enter the Agency projected Initial Decision date, as published in T.C.A. § 68-11-1609(c): 6/13

Assuming the CON approval becomes the final agency action on that date; indicate the number of days **from the above agency decision date** to each phase of the completion forecast.

| Phase | DAYS REQUIRED | Anticipated Date (MONTH/YEAR) |
|---|---|---|
| 1. Architectural and engineering contract signed | 0 | 6/13 |
| 2. Construction documents approved by the Tennessee Department of Health | 60 | 8/13 |
| 3. Construction contract signed | 10 | 6/13 |
| 4. Building permit secured | 15 | 6/13 |
| 5. Site preparation completed | N/A | N/A |
| 6. Building construction commenced | 20 | 7/13 |
| 7. Construction 40% complete | 50 | 9/13 |
| 8. Construction 80% complete | 70 | 10/13 |
| 9. Construction 100% complete (approved for occupancy | 90 | 11/13 |
| 10. *Issuance of license | 150 | 1/14 |
| 11. *Initiation of service | 180 | 2/14 |
| 12. Final Architectural Certification of Payment | 210 | 3/14 |
| 13. Final Project Report Form (HF0055) | 270 | 5/14 |

* **For projects that do NOT involve construction or renovation: Please complete items 10 and 11 only.**

**Note: If litigation occurs, the completion forecast will be adjusted at the time of the final determination to reflect the actual issue date.**

# TABLE OF ATTACHMENTS

| | |
|---|---|
| Attachment A.4. Applicant Ownership Structure | 52 |
| Attachment A.6. Option to Lease Building | 55 |
| Attachment A.3 Operating Agreement and Certificate of Corporate Existence | 74 |
| Attachment A.4 Corporate Charter | 87 |
| Attachment A. 5 Resumes | 89 |
| Attachment B1 Supplemental Questions and Responses | 91 |
| Attachment B1 Local Providers | 101 |
| Attachment B1-List of Buprenorphine-Certified Private Physicians | 102 |
| Attachment B, Project Description, Item III. A. (Plot Plan) | 105 |
| Attachment B, Projection Description, Item III. A (Zoning Regulations) | 106 |
| Attachment B4 Referral Services | 110 |
| Attachment C, Need, 1a. (2008 Tennessee Department of Mental Health Registry Data) | 110A-G |
| Attachment C, Economic Feasibility, 3. (Construction Cost Estimate) | 111 |
| Attachment C, Economic Feasibility, Item 2. (Funding Sources) | 113 |
| Attachment C, Economic Feasibility 10. Financial Statements | 115 |
| Attachment C, Need, Item 3. Proposed Service Area | 118 |
| Letters of Support (To Date) | 122 |
| Notification Requirement | 130 |

# ATTACHMENTS

# Applicant Ownership Structure

# Attachment A.4.

Information for Section A, Item 4: Tri-Cities Holdings Ownership

| Name | Title | Membership Interest | Address |
|------|-------|---------------------|---------|
| Steven W. Kester | Manager | 50% | 2892 Darlington Run Duluth, GA 30097 |
| Leigh B. Dunlap | Member | 50% | 801 West Conway Drive NW, Atlanta, Georgia 30327 |

# Attachment A-5
## Management Biographies and Affiliations

Tri-Cities Holdings, LLC is owned equally between Steven W. Kester and Leigh B. Dunlap.

Steve Kester is 49 years old and a unit holder of Tri-Cities Holdings, and serves as the company's Chief Executive Officer.

Mr. Kester was the co-founder of Treatment Centers HoldCo, doing business as Crossroads Treatment Centers. He is currently a minority shareholder of Treatment Centers HoldCo and not active in the management of the company. The company operates 9 centers in the following states and cities: North Carolina: Asheville, Weaverville, and Greensboro; South Carolina: Greenville, Columbia and Seneca; Georgia: Ringgold and Suwanee; and Virginia: Danville.

Mr. Kester has spent his career building companies in healthcare, service industries, and consumer products.

Mr. Kester holds an MBA from the Wharton School and an Electrical Engineering Degree from Georgia Tech.

Mr. Kester is married with three children.

* * *

Leigh B. Dunlap attended the University of Southern California (1983-1987).

She has resided in Georgia for the past twenty years.

She is a professional screenplay writer.

She now serves in a volunteer position as president of the Georgia environmental non-profit advocacy group, Clean Earth Now, Inc.

Leigh B. Dunlap is a unit holder of Tri-Cities Holdings LLC and occupies no management position in the company.

SUPPLEMENTAL- # 1
March 25, 2013
12:15pm

# ATTACHMENT B I.
# SUPPLEMENTAL QUESTIONS
# AND RESPONSES

**Please clarify if Buprenorphine or Methadone will be prescribed for pain management, by a mid-level practitioners, or for the treatment of depression.**

No. Our proposed services are for the exclusive treatment of opioid addiction.

**What is the difference between Buprenorphine and Methadone in the treatment of opioid addiction? In your response, please discuss the method of administration, frequency, side effects, cost, etc.**

**The Drug Addiction Treatment Act (DATA) of 2000 allows qualified physicians who obtain a waiver from the federal government to prescribe and dispense two formulations of buprenorphine (subutex and suboxone) to treat opiate addiction. The SAMSHA (Substance Abuse and Mental Health Services Administration) Bupernorphine Physician and Treatment Program Locator web-site list thirty-two (32) physicians that are certified to dispense Bupernorhine in Johnson City, TN. Please discuss the waiver in terms of the training required by private physicians and facilities, the maximum caseloads, etc. In your response, please discuss if these physicians accept cash only from patients (including TennCare patients).**

Methadone maintenance treatment (MMT) is the most common and established form of opioid addiction treatment. It was developed in 1964 and has been used continuously since in the United States. In October 2002, the Food and Drug Administration (FDA) approved buprenorphine monotherapy product, Subutex®, and a buprenorphine/naloxone combination product, Suboxone®, for use in opioid addiction treatment. Still, other practitioners believe in abstinence-based treatment.

We believe the answer is that there is no single approach or medication that is right for everybody.

Opioid addiction medications and treatment continue to evolve. Our proposed services will include methadone, buprenorphine, and abstinence-based services. As new medications and treatment approaches come on the market, we will evaluate them. All patients are unique and different medications (or lack thereof) will be evaluated and customized care plans will be developed for each patient. Our pledge is to provide the best option for patients.

The biggest difference between the two is that buprenorphine is a *partial opiate agonist* (i.e. its effects are limited even when taken in large doses) but methadone is a full opiate agonist. The general (not absolute) implications of this are the following:

- Buprenorphine is harder to abuse so patients are more often allowed to take it home. Methadone can be more easily abused, so when patients first start treatment they need to travel to a clinic each day to take their medication. At

later stages of the treatment they are allowed take-home doses of methadone.
- For people with heavy opiate habits and serious addiction, buprenorphine cannot provide effective relief from withdrawal symptoms. Methadone works better for such individuals.
- Buprenorphine is generally less addictive than methadone.
- Withdrawal symptoms of a buprenorphine detox are generally less severe than methadone detox.
- The risk of a fatal overdose on buprenorphine is less than with methadone.

### The Drug Addiction Treatment Act of 2000 (DATA 2000)

This act enables *qualifying physicians* to receive a *waiver* from the special registration requirements in the Controlled Substances Act for the provision of medication-assisted opioid therapy. This waiver allows qualifying physicians to practice medication-assisted opioid addiction therapy with Schedule III, IV, or V narcotic medications specifically approved by the **Food and Drug Administration (FDA)**. On October 8, 2002 Subutex® (buprenorphine hydrochloride) and Suboxone® tablets (buprenorphine hydrochloride and naloxone hydrochloride) received FDA approval for the treatment of opioid addiction.

To receive a waiver to practice opioid addiction therapy with approved Schedule III, IV, or V narcotics a physician must notify the **Center for Substance Abuse Treatment (CSAT, a component of the Substance Abuse and Mental Health Services Administration)** of his or her intent to begin dispensing or prescribing this treatment. This Notification of Intent must be submitted to CSAT before the initial dispensing or prescribing of opioid therapy. The "waiver notification" section on this Site provides information on how to obtain and submit a Notification of Intent form. The Notification of Intent can be submitted on-line from this Web site, or via ground mail or fax.

The Notification of Intent must contain information on the physician's qualifying credentials (as defined below) and additional certifications including that the physician has the capacity to refer such addiction therapy patients for appropriate counseling and other non-pharmacologic therapies, and that the physician will not have more than 30 patients on such addiction therapy at any one time for the first year. (Note: The 30-patient limit is not affected by the number of a physician's practice locations. One year after the date on which the physician submitted the initial notification, the physician will be able to submit a second notification stating the need and intent to treat up to 100 patients.)

### The Drug Enforcement Administration (DEA)

The Drug Enforcement Administration (DEA) assigns the physician a special identification number. DEA regulations require this ID number to be included on all buprenorphine prescriptions for opioid addiction therapy, along with the physician's regular DEA registration number.

To qualify for a waiver under DATA 2000 a licensed physician (MD or DO) must meet any one or more of the following criteria:

- The physician holds a subspecialty board certification in addiction psychiatry from the American Board of Medical Specialties.
- The physician holds an addiction certification from the American Society of Addiction Medicine.
- The physician holds a subspecialty board certification in addiction medicine from the American Osteopathic Association.
- The physician has, with respect to the treatment and management of opioid-addicted patients, completed not less than eight hours of training (through classroom situations, seminars at professional society meetings, electronic communications, or otherwise) that is provided by the American Society of Addiction Medicine, the American Academy of Addiction Psychiatry, the American Medical Association, the American Osteopathic Association, the American Psychiatric Association, or any other organization that the Secretary determines is appropriate for purposes of this subclause.
- The physician has participated as an investigator in one or more clinical trials leading to the approval of a narcotic drug in schedule III, IV, or V for maintenance or detoxification treatment, as demonstrated by a statement submitted to the Secretary by the sponsor of such approved drug.
- The physician has such other training or experience as the State medical licensing board (of the State in which the physician will provide maintenance or detoxification treatment) considers to demonstrate the ability of the physician to treat and manage opioid-addicted patients.
- The physician has such other training or experience as the Secretary considers to demonstrate the ability of the physician to treat and manage opioid-addicted patients. Any criteria of the Secretary under this subclause shall be established by regulation. Any such criteria are effective only for 3 years after the date on which the criteria are promulgated, but may be extended for such additional discrete 3-year periods as the Secretary considers appropriate for purposes of this subclause. Such an extension of criteria may only be effectuated through a statement published in the Federal Register by the Secretary during the 30-day period preceding the end of the 3-year period involved.

Some, but not all, of the DATA2000 private physicians accepted TennCare. Of those that did not accept TennCare, some took private insurance, and others accepted self-pay methods only.

**Please explain what the controlled Substances Database is and how it relates to the proposed project.**
The CSMD (Controlled Substance Monitoring Database) was created by an act of the Tennessee legislature, to be administratively attached to the Tennessee Board of Pharmacy. The state statute that covers this database and its use is TCA 53-10-Part 3, Controlled Substance Monitoring Act of 2002. The Board of Pharmacy and the CSMD Advisory Committee establish, administer, maintain and direct the functioning of the database in accordance with this Part 3.

Pharmacies within the state of Tennessee are required to upload all schedule II-V prescriptions at least twice monthly[1].

---

[1] https://health.state.tn.us/boards/Controlledsubstance/index.shtml

For this project, this database was developed to ensure that NRMTF patients are not receiving medication from multiple NRMTFs, to help eliminate the possibility of abuse/overdose of methadone and/or buprenorphine.

**Please discuss alternative treatment options available in the community for opioid addiction. Please discuss the drug naltrexone for the treatment of opioid dependence. Please include in your response who can prescribe naltrexone and the oral daily form and the monthly injectable extended-released form (Vivitrol). Is Naltrexone available as treatment option in the proposed service area?**

The are no NRMTFs in the proposed service area. NRMTFs are the most common and established treatment options for opioid addiction in the U.S. There are 1,076 of these centers in the United States[2] and 12 in Tennessee[3].

The two most common alternatives to NRMTFs are buprenorphine-based treatment in private physician offices and behavioral therapies, such as abstinence-based treatment available in counseling centers. These options are generally available throughout the U.S., including Tennessee and the proposed service area.

NRMTFs are the most widely used treatment because they are the most successful and the most cost-effective when the scope of medications and services is accounted for.

It is illegal in the United States for a doctor to prescribe methadone for the purposes of treating addiction, unless he or she is working at an appropriately licensed NRMTF. Private physicians rarely offer counseling. Getting buprenorphine at a physician's office is often termed "dose and dash" because of the lack of counseling, drug testing, diversion monitoring, care planning, etc.

Abstinence-based therapies fail 92% of the time[4] because of the intense hardship and side effects of opiate withdraw. This is true for heroin users and many prescription pain pill users because the potency of prescription pain pills can match that of heroin. Using Morphine as the standard, the following drugs and their dosages injection are equal to getting the same amount of pain relief as 10 mgs of Morphine injection[5]:

1.5 mg hydromorphone (Dilaudid)........= 10 mg morphine

10 mg methadone (Dolophine)............= 10 mg morphine

---

[2] http://findtreatment.samhsa.gov/TreatmentLocator/faces/servicesSearch.jspx
[3] http://tn.gov/mental/A&D/A_D_docs/methadonelabeledclinics.pdf
[4]
http://www.kap.samhsa.gov/products/trainingcurriculums/pdfs/tip43_curriculum.pdf
[5] http://www.adhesions.org/forums/ADHESIONS.0002/0311.html

15 mg oxycodone (percocet, tylox)......= 10 mg morphine

2 mg levorphanol (Levo-Dromoran).......= 10 mg morphine

1 mg oxymorphone (Numorphan)...........= 10 mg morphine

5 mg Heroin............................= 10 mg morphine

75 mg meperdine (demerol)..............= 10 mg morphine

130 mg codeine.........................= 10 mg morphine

25 ug/hr Fentanyl......................= 10 mg morphine

Naltrexone is a non-opioid medication that is approved for the treatment of opioid dependence. Naltrexone is an opioid receptor antagonist; it binds to opioid receptors, but instead of activating the receptors, it effectively blocks them. Through this action, it prevents opioid receptors from being activated by agonist compounds, such as heroin or prescription pain killers, and is reported to reduce craving and prevent relapse. As opposed to other medications used for opioid dependence (methadone and buprenorphine), naltrexone can be prescribed by any individual who is licensed to prescribe medicine (e.g., physician, doctor of osteopathic medicine, physician assistant, and nurse practitioner), so it is available in the proposed service area. Both the oral daily form and the monthly injectable monthly extended-release form (Vivitrol®) are FDA approved for treatment of opioid dependence. Vivitrol® was approved by FDA for this indication in 2010[6].

In summary Naltrexone-based therapy is generally accepted for those that have overcome their addiction to opioids because it removes the reward (high) associated with opioids. However, the treatment generally does not adequately address the withdraw symptoms that addicts need.

**Please discuss the percentage of patients who have become completely drug free from methadone for significant periods of time.**

Patients who are most successful in medication-assisted treatment (MAT) with methadone stay in treatment for more than a year. Many patients need to continue treatment indefinitely, as is the case with any chronic medical condition.

Patients who stay in MAT with methadone for less than three months usually show little or no continued improvement. After several months in treatment, patients are stabilized on methadone. At that point, the use of illegal opioids drops by up to 80%. But leaving treatment after that carries substantial risks. Almost all patients who leave MAT and do not have further treatment of some sort eventually relapse, and risk having an overdose[7].

---

[6] http://www.dpt.samhsa.gov/medications/naltrexone.aspx
[7] Brown LS, et al. the interrelationships between length of stay, methadone dosage, and age at an urban opioid treatment program. Paper presented at: CPDD (College on Problems of Drug Dependence) 65th Annual Meeting; June 2004

Please list the location of methadone anonymous meetings in the applicant's service area. Please indicate if methadone anonymous meetings are planned in the proposed project service area.

A search of http://www.methadoneanonymous.org/ and http://www.methadonesupport.org/ showed no locations in the proposed service area. The Applicant pledges to work with patients towards their ultimate independence from addiction and associated treatment programs, including developing and supporting groups that aid in lifetime addiction recovery. Most people who seek MMT treatment got there by abusing opiates for years. Undoing the damage and giving patients the life skills to cope is not fast and is not easy.

**The applicant notes prescription medication abuse is higher in the Appalachian region than the rest of the United States. Please provide statistical information related to this statement.**

An excellent article was written on this very topic: "Prescription Drug Abuse and the Pill Pipeline in Appalachia", by Dr. Robert Pack. Dr. Pack is associate professor of community health and associate dean for academic affairs at East Tennessee State University's College of Public Health in Johnson City, TN. His report also references the Appalachian Regional Commission's 2008 study of drug use in the Appalachian Region.

The report showed that the Southern Appalachian Region, which includes the proposed service area, the misuse of prescription pain pills was 6.2% versus 5.9% outside of the Appalachian Region.

**What type of activities/meetings has your organization conducted to prepare and educate the public in the service area regarding this proposed application?**

The Applicant has talked to approximately 50 members of the community while looking for sites that best meet the facility and community needs. These include potential landlords, realtors, brokers, neighboring businesses, etc.

The applicant has talked to, or attempted to contact all local mayors, senators, emergency room leaders, and zoning officials.

The applicant has meet with three news outlets (one news paper and 2 TV stations) and has written editorials and conducted multiple interviews.

The applicant talked at length with Dr. Robert Pack, East Tennessee State University Professor in Johnson City, TN and author of, "Prescription Drug Abuse and the *Pill Pipeline in Appalachia*"

The applicant has talked to 4 faith-based organizations, and the VFW.

**What will be the scheduled hours of the proposed methadone facility?**

The initial proposed hours of operations will be 5:00 AM until noon seven days per week. It is anticipated that when the facility reaches approximately 500 patients, an afternoon program will be added from noon until 5PM.

# In-Patient Treatment Programs

|  | Taking New Patients | TennCare? | Cost/Month | Counseling? | Frequency |
|---|---|---|---|---|---|
| Frontier Health/Magnolia Ridge | 9-12 week waiting list. | Yes | $6,000 | Yes | $200/Day |
| 900 Buffalo Street |  |  |  |  |  |
| Johnson City, TN 37604 |  |  |  |  |  |
| www.frontierhealth.org |  |  |  |  |  |
| Comprehensive Community Services | 100+ waiting list/Minimum four weeks until available. | Yes | $5,600 | Yes | $200/Day |
| 6145 Temple Star Road |  |  |  |  |  |
| Kingsport, TN 37660 |  |  |  |  |  |
| ccstreatment.com |  |  |  |  |  |

# Buprenorphine-Certified Johnson City-Based Private Physicians

| Provider | Number | Accepting Patients? | TennCare? | Cost/Month | Waiting list? | Licensed counseling services? | How often must come? |
|---|---|---|---|---|---|---|---|
| Stephen R. Cirelli, M.D. | (423) 722-8446 | No |  |  |  |  |  |
| Watauga Medical Care |  |  |  |  |  |  |  |
| 501 East Watauga Avenue |  |  |  |  |  |  |  |
| Johnson City, TN 37601 |  |  |  |  |  |  |  |
| David Lionel Forester, M.D. | (423) 434-4677 | No |  |  |  |  |  |
| 209 East Unaka Avenue |  |  |  |  |  |  |  |
| Johnson City, TN 37601 |  |  |  |  |  |  |  |
| Stephen R. Cirelli, M.D. | (423) 722-4000 | Yes | No | $355 | No | No | Monthly |
| Medical Care Clinic |  |  |  |  |  |  |  |
| 105 Broyles Drive |  |  |  |  |  |  |  |
| Johnson City, TN 37601 |  |  |  |  |  |  |  |
| Jose L. Lopez-Romero | (423) 928-1393 | Yes | No | $400 | No | No | Monthly |
| 100 West Unaka Avenue |  |  |  |  |  |  |  |
| Suite 4 |  |  |  |  |  |  |  |
| Johnson City, TN 37601 |  |  |  |  |  |  |  |
| Jack A. Norden, M.D. | (423) 262-8633 | No* |  |  |  |  |  |
| 2406 Susannah Street |  |  |  |  |  |  |  |
| Johnson City, TN 37601 |  |  |  |  |  |  |  |
| Wayne P. Gilbert, M.D. | (423) 722-8446 | No |  |  |  |  |  |
| Watauga Family Practice |  |  |  |  |  |  |  |
| 501 East Watauga Ave. |  |  |  |  |  |  |  |
| Johnson City, TN 37601 |  |  |  |  |  |  |  |
| Aubrey Doyce McElroy, Jr. | (423) 262-8132 | Yes | No | $400 | No | No | Monthly |
| 3201 Bristol Highway |  |  |  |  |  |  |  |
| Suite 4 |  |  |  |  |  |  |  |

Johnson City, TN 37601

| | | | | | | |
|---|---|---|---|---|---|---|
| Edward Herschel Crutchfield, M.D.<br>105 Broyles Street<br>Johnson City, TN 37601 | (423) 946-3199 | Not a Working Line | | | | |
| Michael Sanders Wysor, M.D<br>Medical Care Walk In Clinic<br>105 Broyles Drive, Suite B<br>Johnson City, TN 37601 | (423) 722-4000 | Yes | No | $355 No | No | Monthly |
| Matthew Morgan Gangwer, M.D<br>401 East Main Street<br>Suite 3<br>Johnson City, TN 37601 | (706) 244-1390 | Left Message/Not an Office/Not a Local Number (Toccoa, GA number) | | | | |
| Stephen Douglas Loyd, M.D.<br>205 High Point Drive<br>Johnson City, TN 37601 | (423) 631-0732 | No* | | | | |
| Christine Anne Carrejo, M.D.<br>Watauga Family Practice<br>501 East Watauga Avenue<br>Johnson City, TN 37601 | (423) 722-8446 | No | | | | |
| Christine Anne Carrejo, M.D.<br>401 East Main Street<br>Johnson City, TN 37601 | (423) 929-2584 | No Drug Treatment Services--Referred Out to Another Doctor | | | | |
| Laura Vanini Grobovsky, M.D<br>501 East Watauga Avenue<br>Johnson City, TN 37601 | (423) 722-8446 | No | | | | |
| Martin P. Eason, M.D.<br>3114 Browns Mill Road<br>Johnson City, TN 37604 | (423) 631-0432 | Yes | No | $400 No | Yes | Monthly |
| Tracy Harrison Goen, M.D.<br>3114 Browns Mill Road<br>Johnson City, TN 37604 | (423) 631-0432 | Yes | No | $400 No | Yes | Monthly |
| Ray Wallace Mettetal, Jr., M.D<br>4113 Browns Mill Road<br>Johnson City, TN 37604 | (423) 631-0432 | Yes | No | $400 No | Yes | Monthly |
| Navneet Gupta, M.D.<br>101 Med Tech Parkway<br>Suite 200<br>Johnson City, TN 37604 | (423) 232-6120 | No Drug Treatment Services | | | | |
| William Alan Walker, M.D.<br>206 West Holston Avenue<br>Johnson City, TN 37604 | (423) 612-1950 | No Drug Treatment Services--Referred Out to Another Doctor | | | | |
| Michael Dandridge Tino, M.D.<br>Doctors Assisted Wellness<br>100 West Unaka Avenue, Suite #3,4,5 | (423) 928-1393 | Yes | No | $400 No | No | Monthly |

Johnson City, TN 37604

| | | | | | | |
|---|---|---|---|---|---|---|
| Edgar Alan Ongtengco, M.D. | (423) 833-5547 | No Drug Treatment Services--Referred Out to Another Doctor | | | | |
| 2514 Wesley Street | | | | | | |
| Suite 101 | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| Robert David Reeves, M.D. | (423) 282-3379 | Yes | No | $400 No | No | Monthly |
| 926 West Oakland Avenue | | | | | | |
| Suite 222 | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| Jack R. Woodside, Jr., M.D. | (423) 439-6464 | No Drug Treatment Services | | | | |
| 917 West Walnut Street | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| Hetal K. Brahmbhatt, M.D. | (423) 975-5444 | Line Disconnected | | | | |
| 500 Longview Drive | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| John McClellan Miller, M.D. | (423) 282-5381 | Closed | | | | |
| 811 Wedgewood Road | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| Morgan Counseling Services | (423) 833-5547 | No Drug Treatment Services--Referred Out to Another Doctor | | | | |
| 412 West Unaka Street | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| Ralph Thomas Reach | (423) 631-0432 | Yes | No | $400 No | Yes | Monthly |
| 3114 Browns Mill Road | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| LeRoy Robert Osborne, D.O. | (423) 676-9015 | Yes | No | $400 No | No | Monthly |
| Morgan Counseling & Accociates | | | | | | |
| 214 West Unaka Avenue | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| James Wesley Denham, M.D. | (901) 210-5079 | No* | | | | |
| 1747 Skyline Drive | | | | | | |
| Unit 25 | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| William Edward Kyle, D.O. | (423) 631-0272 | Yes | No | $400 No | Yes | Monthly |
| 3114 Brownsmill Road | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| Jason John Della Vecchia, M.D. | (423) 232-5295 | Yes | No | $400 No | Yes | Monthly |
| Better Body Medicine | | | | | | |
| 600 North State Of Franklin Road | | | | | | |
| Johnson City, TN 37604 | | | | | | |
| Chambless Rand Johnston III, M.D. | (423) 232-5295 | Yes | No | $400 No | Yes | Monthly |
| 600 North State of Franklin Road | | | | | | |
| Suite 5 | | | | | | |
| Johnson City, TN 37604 | | | | | | |

Attachment B1 - Physicians Certified for Buprenorphine Treatment in proposed service area

| First Name | Last Name | Suffix | Address Line 1 | Address Line2 | City | State | Zip Code | Phone |
|---|---|---|---|---|---|---|---|---|
| Charles | Fulton | M.D. | Charles A. Fulton MD | 3763 Highway 11 West | Blountville | TN | 37617 | (423) 279-3860 |
| Mack | Hicks | M.D. | 3763 Highway 11W | | Blountville | TN | 37617 | (423) 279-3860 |
| Kevin | Catney | M.D. | Recovery Associates | 1627 Highway 11 West | Bristol | TN | 37620 | (423) 274-0100 |
| John | Barrowclough | M.D. | Appalachian Recovery Care, PLLC | 2726 West State Street | Bristol | TN | 37620 | (423) 758-6144 |
| Michael | Lady | | Pathway Medical Group | 113 Landmark Lane, Suite A | Bristol | TN | 37620 | (423) 573-7284 |
| Shawn | Nelson | M.D. | 3183 West State Street | Suite 1201 | Bristol | TN | 37620 | (423) 764-0987 |
| Matthew | Gangwer | M.D. | 1895 Highway 126 | | Bristol | TN | 37620 | (423) 232-0222 |
| Stephen | Wayne | M.D. | 3183 West State Street | Suite 1201 | Bristol | TN | 37620 | (423) 764-0987 |
| Joseph | Radawi | M.D. | Appalachian Recovery Care, PLLC | 2726 West State Street | Bristol | TN | 37620 | (423) 758-6744 |
| Marianne | Filka | M.D. | Pathway Medical Group | 113 Landmark Lane, Suite A | Bristol | TN | 37620 | (423) 573-7284 |
| Gary | Neal | M.D. | 260 Midway Medical Park | Suite 2G | Bristol | TN | 37620 | (423) 968-4444 |
| John | Bandeian | M.D. | 3169 West State Street | | Bristol | TN | 37620 | (423) 968-3891 |
| Charles | Wagner | M.D. | 337 Bluff City Highway | Bradley Building Ste 101 | Bristol | TN | 37620 | (423) 956-5028 |
| Borzou | Azima | M.D. | 1627 Highway 11 W | | Bristol | TN | 37620 | (423) 274-0100 |
| Linden | Fernando | | 2726 West State Street | | Bristol | TN | 37620 | (423) 758-6744 |
| Robert | Grindstaff | M.D. | Pathway Medical Group, Inc. | 113 Landmark Lane Suite A | Bristol | TN | 37620 | (423) 573-7284 |
| Douglas | Williams | M.D. | FirStep | 3183 West State Street, Suite 1201 | Bristol | TN | 37620 | (423) 764-2165 |
| Earl | Wilson | M.D. | 3183 West State Street | Suite 1201 | Bristol | TN | 37620 | (423) 764-0987 |
| Steven | Morgan | M.D. | 3183 West State Street | Suite 1201 | Bristol | TN | 37620 | (423) 764-0987 |
| Pyung | Suh | M.D. | 1729 Lynn Garden Drive | | Kingsport | TN | 37660 | (423) 288-0223 |
| Dana | Brown | | 208 Lynn Garden Drive | | Kingsport | TN | 37660 | (423) 247-8811 |
| Atif | Rasheed | M.D. | 1076 Rotherwood Drive | | Kingsport | TN | 37660 | (423) 963-4955 |
| Jonathan | Wireman | M.D. | 1901 Brookside Drive | Suite 101 | Kingsport | TN | 37660 | (866) 755-4258 |
| Bryan | Wood | M.D. | 1901 Brookside Drive | Suite 101 | Kingsport | TN | 37660 | (866) 755-4258 |
| John | Tasker | M.D. | 1303 East Center Street | | Kingsport | TN | 37660 | (423) 384-2820 |
| Arthur | Boyd | M.D. | 1901 Brookside Drive | Suite 101 | Kingsport | TN | 37660 | (866) 755-4258 |
| Peter | Bockhorst | M.D. | 201 Cassel Drive | | Kingsport | TN | 37660 | (423) 245-9600 |
| Michael | Martin | M.D. | 1936 Brookside Drive | Suite C | Kingsport | TN | 37660 | (423) 384-4026 |
| Sachdev | Somiah | M.D. | 1944 Brookside Drive | Suite 1 | Kingsport | TN | 37660 | (423) 245-2406 |
| Daniel | Dickerson | M.D. | 1901 Brookside Dr. Ste 101 | | Kingsport | TN | 37660 | (866) 755-4258 |
| Randall | Falconer | M.D. | Recovery Assist LLC | 1728 North Eastman Road | Kingsport | TN | 37660 | (423) 765-0089 |
| Charles | Herrin | M.D. | 2300 Pavilion Drive | | Kingsport | TN | 37660 | (423) 857-5571 |
| Jonathan | Lewis | M.D. | 4600 Fort Henry Drive | | Kingsport | TN | 37663 | (423) 224-3950 |
| David | Merrifield | Jr., M.D. | Family Recovery Associates | 1729 Lynn Garden Drive | Kingsport | TN | 37665 | (423) 288-0223 |
| Bendik | Clark | M.D. | 1729 Lynn Garden Drive | | Kingsport | TN | 37665 | (423) 288-0223 |
| Nicholas | Smith | M.D. | 124 Gray Station Road | Suite 1 | Gray | TN | 37615 | (423) 477-0600 |
| Bruce | Boggs | M.D. | 203 Gray Commons Circle | | Gray | TN | 37615 | (423) 477-0600 |
| Stephen | Cirelli | M.D. | Watauga Medical Care | 501 East Watauga Avenue | Johnson City | TN | 37601 | (423) 722-8446 |
| Stephen | Loyd | M.D. | 205 High Point Drive | | Johnson City | TN | 37601 | (423) 631-0732 |
| Laura | Grobovsky | M.D. | 501 East Watauga Avenue | | Johnson City | TN | 37601 | (423) 722-8446 |
| Christine | Carrejo | M.D. | Watauga Family Practice | 501 East Watauga Avenue | Johnson City | TN | 37601 | (423) 722-8446 |
| Cynthia | Partain | M.D. | 401 East Main Street | | Johnson City | TN | 37601 | (423) 929-2584 |
| Matthew | Gangwer | M.D. | 401 East Main Street | Suite 3 | Johnson City | TN | 37601 | (706) 244-1390 |
| David | Forester | M.D. | 209 East Unaka Avenue | | Johnson City | TN | 37601 | (423) 434-4677 |
| Michael | Wysor | M.D. | Medical Care Walk In Clinic | 105 Broyles Drive, Suite B | Johnson City | TN | 37601 | (423) 722-4000 |
| Stephen | Cirelli | M.D. | Medical Care Clinic | 105 Broyles Drive | Johnson City | TN | 37601 | (423) 722-4000 |
| Edward | Crutchfield | M.D. | 105 Broyles Street | | Johnson City | TN | 37601 | (423) 946-3199 |
| Jose | Lopez-Romero | | 100 Medical Avenue | Suite 4 | Johnson City | TN | 37601 | (423) 928-1393 |
| Aubrey | McElroy | Jr. | 3201 Bristol Highway | Suite 4 | Johnson City | TN | 37601 | (423) 262-8132 |
| Wayne | Gilbert | M.D. | Watauga Family Practice | 501 East Watauga Ave. | Johnson City | TN | 37601 | (423) 722-8446 |
| Jack | Norden | M.D. | 2406 Susannah Street | | Johnson City | TN | 37601 | (423) 262-8633 |
| Martin | Eason | M.D. | 3114 Browns Mill Road | | Johnson City | TN | 37604 | (423) 631-0432 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jason | Della Vecchia | M.D. | Better Body Medicine | 600 North State Of Franklin Road | Johnson City | TN | 37604 | (423) 232-5295 |
| Chambless | Johnston | Iii, M.D. | 600 North State of Franklin Road | Suite 5 | Johnson City | TN | 37604 | (423) 232-5295 |
| William | Kyle | D.O. | 3114 Brownsmill Road | | Johnson City | TN | 37604 | (423) 631-0272 |
| Tracy | Goen | M.D. | 3114 Browns Mill Road | | Johnson City | TN | 37604 | (423) 631-0432 |
| James | Denham | M.D. | 1747 Skyline Drive | Unit 25 | Johnson City | TN | 37604 | (901) 210-5079 |
| Ray | Mettetal | Jr., M.D. | 4113 Browns Mill Road | | Johnson City | TN | 37604 | (423) 631-0432 |
| LeRoy | Osborne | D.O. | Morgan Counseling & Accociates | 214 West Unaka Avenue | Johnson City | TN | 37604 | (423) 676-9015 |
| Navneet | Gupta | M.D. | 101 Med Tech Parkway | Suite 200 | Johnson City | TN | 37604 | (423) 232-6120 |
| Ralph | Reach | | 3114 Browns Mill Road | | Johnson City | TN | 37604 | (423) 631-0432 |
| William | Walker | M.D. | 206 West Holston Avenue | | Johnson City | TN | 37604 | (423) 612-1950 |
| Michael | Tino | M.D. | Doctors Assisted Wellness | 100 West Unaka Avenue, Suite #3,4,5 | Johnson City | TN | 37604 | (423) 928-1393 |
| Charles | Backus | Iii | Morgan Counseling Services | 412 West Unaka Street | Johnson City | TN | 37604 | (423) 833-5547 |
| John | Miller | M.D. | 811 Wedgewood Road | | Johnson City | TN | 37604 | (423) 282-5381 |
| Hetal | Brahmbhatt | M.D. | 500 Longview Drive | | Johnson City | TN | 37604 | (423) 975-5444 |
| Jack | Woodside | Jr., M.D. | 917 West Walnut Street | | Johnson City | TN | 37604 | (423) 439-6464 |
| Robert | Reeves | M.D. | 926 West Oakland Avenue | Suite 222 | Johnson City | TN | 37604 | (423) 282-3379 |
| Edgar | Ongtengco | M.D. | 2514 Wesley Street | Suite 101 | Johnson City | TN | 37604 | (423) 833-5547 |
| Juan | Rodriguez | M.D. | Mental Health Clinic, Dept. of Psychiatr | P.O. Box 4000, La Mont Street | Mountain Home | TN | 37684 | (423) 926-1171x7703 |
| David | Forester | M.D. | James H. Quillen VA Medical Center | P.O. Box 4000 116A | Mountain Home | TN | 37684 | (423) 926-1171x7150 |
| Donald | Henson | Jr. M.D. | James H. Quillen VA Medical Center | Dept. of Psych., 116-A, P.O. Box 4000 | Mountain Home | TN | 37684 | (423) 926-1171x2765 |
| Tony | Yost | M.D. | 184 Tamara Lane | | Greeneville | TN | 37743 | (423) 422-2126 |
| Elliott | Smith | Jr. | 1406 Tusculum Boulevard | Suite 2003 | Greeneville | TN | 37745 | (423) 636-0050 |
| George | Kehler | II | 65 Payne Road | | Mosheim | TN | 37818 | (423) 422-2126 |
| John | Shaw | M.D. | Recovery Associates of East Tennessee | 65 Payne Road | Mosheim | TN | 37818 | (423) 422-2126 |
| Robert | Locklear | M.D. | 68 Railroad Street | | Mosheim | TN | 37818 | (423) 450-0071 |
| Kevin | Catney | M.D. | Recovery Associates | 65 Payne Road | Mosheim | TN | 37818 | (423) 422-2126 |
| Paul | Jett | M.D. | 420 West Morris Boulevard | Suite 130 | Morristown | TN | 37813 | (423) 586-9796 |
| Dennis | Harris | M.D. | 420 West Morris Boulevard | Suite 130 | Morristown | TN | 37813 | (423) 587-9796 |
| Devon | Smith | M.D. | 1621 West Morris Boulevard | Suite A | Morristown | TN | 37813 | (423) 307-8088 |
| Michael | Chavin | M.D. | 1639 West Morris Boulevard | | Morristown | TN | 37814 | (423) 586-0341 |
| Daniel | Paul | M.D. | 138 Industrial Drive South | | Elizabethton | TN | 37643 | (423) 542-7007 |
| Edgar | Perry | M.D. | 401 HudsonDrive | Suite # 3 | Elizabethton | TN | 37643 | (423) 543-2721 |
| Scott | Caudle | | 1503 West Elk Avenue | Suite 1 | Elizabethton | TN | 37643 | (423) 543-8619 |
| Todd | Whitaker | M.D. | 3614 Unicoi Drive | | Unicoi | TN | 37692 | (423) 743-7151 |

Treatment Programs offering Buprenorphine Treatment

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Indian Path Medical Center | | | 2300 Pavilion Drive | | Kingsport | TN | 37660 | (423) 857-7000 |

# ATTACHMENT B3 A

**Washington County - Parcel: 038B B 006.00**



Building at
4 Wesley Court

Date Created: 3/18/2013

1.   Parcel size: 1.66 acres
2.   Building size: 8,208 square feet
3.   All construction will be inside the four
     exterior walls of the building.
4.   Names of streets, roads or highway that
     cross or border the site: Wesley Court

complete and ready for occupancy except for minor and incidental unpacking and assembly operations, location on jacks or other temporary or permanent foundations, connections to utilities, and the like. The following shall not be included in this definition:

A.    Travel trailers, pickup campers, motor homes, camping trailers, or other recreational vehicles.

B.    Manufactured modular housing which is designed to be set on a permanent foundation, and which meets the Standard Building Code Congress International.

MANUFACTURED HOME PARK:  A parcel or tract of land under single ownership which has been planned and improved for the placement of manufactured homes for dwelling purposes; provided that all manufactured home parks existing at the time of passage of this Code not meeting the minimum requirements established in Article VI, Section 6.11, shall be considered a nonconforming use, and further provided that one manufactured home on a separate lot, shall not be considered a nonconforming manufactured home park.

MAP:  The Flood Hazard Boundary Map (FHBM) or the Flood Insurance Rate Map (FIRM) for a community issued by the Agency.

MEAN SEA LEVEL: The average height of the sea for all stages of the tide.  It is used as a reference for establishing various elevations within the floodplain.  For purposes of the Floodplain Regulations, the term is synonymous with National Geodetic Vertical Datum (NGVD) or other datum, to which base flood elevations shown on the Flood Insurance Rate Map are referenced.

MEDICAL CLINIC:  Medical services for out-patients only.

METHADONE TREATMENT CLINIC:  A licensed facility for the counseling of patients and the distribution of methadone for outpatient, non-residential purposes only.

MOUNTING HEIGHT:  The vertical distance between the surface to be lighted and the center of the apparent light source of a luminaire.

NATIONAL GEODETIC VERTICAL DATUM (NGVD): As corrected in 1929, is a vertical control used as a reference for establishing varying elevations within the floodplain.

## 6.13 - MS-1 MEDICAL SERVICES DISTRICT

6.13.1     INTENT:
This district is intended to provide space for the harmonious development of medical facilities, services, and related support uses.  The Medical Services District is intended to be protected from encroachment by land uses adverse to the location, operation, and expansion of medical use development.

6.13.2     PERMITTED USES:
Within the MS-1 Medical Services District the following uses are permitted:

6.13.2.1   Apothecaries, drug stores, and pharmacies;

6.13.2.2   Artificial limb and brace, therapeutic establishments, including the manufacturing, wholesale, and retail sales of products;

6.13.2.3   Banks;

6.13.2.4   Barber and beauty shops;

6.13.2.5   Bookstores including card and gift shops;

6.13.2.6   Churches, including parish houses;

6.13.2.7   Clinics;

6.13.2.8   Day-care centers and adult day-care centers;

6.13.2.9   Florist shops;

6.13.2.10  General office uses and office buildings, including professional and governmental;

6.13.2.11  Group homes, subject to the requirements of Subsection 6.8.2.3;

6.13.2.12  Hospitals for the treatment of human ailments, including psychiatric hospitals;

6.13.2.13  Laboratories - medical, dental, optical, pharmaceutical and related;

6.13.2.14  Medical, surgical, and dental supply businesses, both wholesale and retail;

6.13.2.15  Municipal, county, state or federal buildings or land uses;

6.13.2.16   Motels and hotels;

6.13.2.17   Nursing homes, rest homes, and convalescent homes;

6.13.2.18   Parking garages;

6.13.2.19   Public utility stations;

6.13.2.20   Residential homes for the aged, subject to the requirements of Subsection 6.6.1.5;

6.13.2.21   Restaurants, including drive-in services;

6.13.2.22   Retail sales and service establishments pertaining to any medically oriented product or service;

6.13.2.23   Schools;

6.13.2.24   Single-family residences;

6.13.2.25   Accessory structures and uses, provided they are located in the rear yard and set back a minimum of seven and one-half (7 ½) feet from all property lines;

6.13.2.26   Alternative tower structures; and

6.13.2.27   Heliports subject to compliance with the most recent edition of Federal Aviation Administration Circular 150/5390-2A.

6.13.2.28   Beer serving/sales establishments


6.13.3   USES PERMITTED BY APPROVAL AS SPECIAL EXCEPTION:
The following uses are permitted when approved by the Board of Zoning Appeals as Special Exceptions as provided by Section 15.4:

6.13.3.1   Mortuary establishments, provided such establishments will not cause undue traffic congestion or create a traffic hazard;

6.13.3.2   Gasoline service stations, provided:
A.   Service stations' principal and accessory buildings shall not be constructed closer than forty (40) feet to any side or rear lot line nor closer than forty-five (45) feet to any street right-of-way;

B.     Gasoline pump islands shall not be located closer than thirty (30) feet to any street right-of-way line nor closer than forty (40) feet to any side or rear lot line which abuts an RO-1 or more restrictive zone but which does not abut a street right-of-way; and

C.     Canopies shall not be constructed closer than thirty (30) feet from any street right-of-way. (Since the Code states that variances may only be given when special conditions prevent the beneficial use of land, if a gasoline station may be constructed on a lot, the land has resulted in beneficial use; and, therefore, no waiver may be given permitting the canopy to extend closer than thirty (30) feet to the street right-of-way.)

6.13.3.3     Tower Structures.

6.13.3.4     Methadone Treatment Clinic provided:

A.     The facility shall be fully licensed/certified by the appropriate regulating state agency;

B.     A certificate of need shall be obtained from the appropriate state agency prior to review by the Board of Zoning Appeals;

C.     The facility shall not be located within two hundred (200) feet of a school, day-care facility, or park as measured from property line to property line;

D.     The facility shall not be located within two hundred (200) feet of any establishment that sells either on-premise or off-premise alcoholic beverages as measured from property line to property line;

E.     The hours of operation shall be between 7:00 a.m. and 8:00 p.m.; and

F.     The facility shall be located on and primary access shall be from an arterial street.

6.13.3.5     Substance Abuse Treatment Facility provided:

A.     The facility shall be fully licensed/certified by the appropriate regulating state agency, if required;

Attachment B4 – Referral Services

| Service | Provider | Location | Subcontract or Referral? |
|---------|----------|----------|--------------------------|
| Psychiatry | Grace Pointe Counseling Center: Sullivan Rodney PhD | 2 Redbush Ct, Johnson City, TN 37601 | Referral |
| Comprehensive Medical Services | Johnson City Medical Center | 400 N State of Franklin Rd, Johnson City, TN 37604 | Referral |
| Vocational Placement | Tennessee Career Center | 2515 Wesley Street Johnson City, TN 37601 | Referral |
| Educational GED Assistance | Tennessee Career Center | 2515 Wesley Street Johnson City, TN 37601 | Referral |
| Family Planning | Agape Women's Services | 817 W Walnut St Ste 5A, Johnson City, TN 37604 | Referral |
| STD Testing | Express Testing | 402 Princeton Rd Suite B Johnson City, TN 37601 | Referral |
| Financial Counseling | Greater Eastern Credit Union | 2110 W Mountcastle Dr, Johnson City, TN 37604 | Referral |

ATTACHMENT C, NEED, 1a

2008 Tennessee Department of Mental Health

NRMTF Central Registry Data

~~108A~~

110A

TDMHDD METHADONE REGISTRY

CONSUMERS BY COUNTY OF RESIDENCE AND CLINIC CY2008

Patients served 01/01/2008 through 12/31/2008

4/27/2009

| | Davidson Co. Middle Tennessee Treatment | Dyer Co. Midsouth Treatment Center | Hamilton Co. Volunteer Treatment Center, Inc. | Hardin Co. Solutions of Savannah | Knox Co. DRD Knoxville Medical Clinic | Knox Co. DRD Knoxville Medical Clinic - Central | Madison Co. Jackson Professional Associates | Shelby Co. ADC Recovery and Counseling | Shelby Co. Memphis Center for Research and | Shelby Co. Raleigh Professional Associates |
|---|---|---|---|---|---|---|---|---|---|---|
| Anderson | | | 72 | | 74 | 81 | 2 | | 1 | |
| Bedford | 4 | 1 | 5 | | | | 1 | | | |
| Benton | 1 | | | 1 | | | 31 | | | |
| Bledsoe | | | 6 | | | | | | | |
| Blount | | | 88 | | 62 | 68 | | | | |
| Bradley | 1 | | 95 | | | 1 | 1 | | | |
| Campbell | | | 66 | | 77 | 78 | | | | |
| Cannon | 1 | | | | | | | | | |
| Carroll | 1 | | | 1 | | | 24 | | | |
| Carter | | | 4 | | 2 | 1 | | | | |
| Cheatham | 75 | | | | | | | | 2 | |
| Chester | | | | 4 | | | 42 | | 2 | |
| Claiborne | | | 20 | | 31 | 43 | | | | |
| Clay | 3 | | 2 | | | 2 | | | | |
| Cocke | | | 1 | | 10 | 12 | | | | |
| Coffee | 13 | | 13 | | | | 1 | | | |
| Crockett | | 2 | | | | | 9 | | 1 | |

98

1088
1188

Beginning April 2008 the Tennessee Department of Mental Health and Developmental Disabilities (TDMHDD) began collecting data regarding non-residential opioid treatment facilities (Facilities) in the State of Tennessee. This data is derived from information submitted by each Facility. TDMHDD can neither guarantee nor attest to the accuracy of any data submitted by or on behalf of the Facilities.

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 98 of 158   PageID #: 245

**TDMHDD METHADONE REGISTRY**

CONSUMERS BY COUNTY OF RESIDENCE AND CLINIC

Patients served 01/01/2008 through 12/31/2008

4/27/2009

| | Davidson Co. Middle Tennessee Treatment | Dyer Co. Midsouth Treatment Center | Hamilton Co. Volunteer Treatment Center, Inc. | Hardin Co. Solutions of Savannah | Knox Co. DRD Knoxville Medical Clinic | Knox Co. DRD Knoxville Medical Clinic - Central | Madison Co. Jackson Professional Associates | Shelby Co. ADC Recovery and Counseling | Shelby Co. Memphis Center for Research and | Shelby Co. Raleigh Professional Associates |
|---|---|---|---|---|---|---|---|---|---|---|
| Cumberland | 1 | | 12 | | | 1 | | | | |
| Davidson | 694 | | 9 | | | 1 | 6 | | | |
| Decatur | 1 | | | 5 | | | 6 | | | |
| DeKalb | 19 | | | | | | | | | |
| Dickson | 31 | | 1 | | | | 2 | | | |
| Dyer | | 87 | | | | | 62 | 3 | 3 | 1 |
| Fayette | 1 | 1 | 1 | | | | 2 | 8 | 6 | 6 |
| Fentress | 6 | | 6 | | | | | | | |
| Franklin | 1 | | 2 | | | 2 | | | | |
| Gibson | | 2 | | 1 | | | 25 | | | |
| Giles | 1 | | | | | | | | | |
| Grainger | | | 24 | | 24 | 47 | | | | |
| Greene | | | | | 2 | 8 | | | | |
| Grundy | | | 2 | | | | | | | |
| Hamblen | | | 14 | | 38 | 31 | | | | |
| Hamilton | 6 | | 382 | | 1 | 4 | | | | |
| Hancock | | | | | 17 | 2 | | | | |
| Hardeman | | | 1 | 1 | | | 19 | 2 | 3 | |

Beginning April 2008 the Tennessee Department of Mental Health and Developmental Disabilities (TDMHDD) began collecting data regarding non-residential opioid treatment facilities (Facilities) in the State of Tennessee. This data is derived from information submitted by each Facility. TDMHDD can neither guarantee nor attest to the accuracy of any data submitted by or on behalf of the Facilities.

**TDMHDD METHADONE REGISTRY**

**CONSUMERS BY COUNTY OF RESIDENCE AND CLINIC**

Patients served 01/01/2008 through 12/31/2008

4/27/2009

| | Davidson Co. Middle Tennessee Treatment | Dyer Co. Midsouth Treatment Center | Hamilton Co. Volunteer Treatment Center, Inc. | Hardin Co. Solutions of Savannah | Knox Co. DRD Knoxville Medical Clinic | Knox Co. DRD Knoxville Medical Clinic - Central | Madison Co. Jackson Professional Associates | Shelby Co. ADC Recovery and Counseling | Shelby Co. Memphis Center for Research and | Shelby Co. Raleigh Professional Associates |
|---|---|---|---|---|---|---|---|---|---|---|
| Hardin | | | | 254 | | | 29 | 1 | | 2 |
| Hawkins | 1 | | 2 | | 5 | 15 | | | | |
| Haywood | | | | | | | 3 | | 1 | 2 |
| Henderson | | | | 5 | | | 16 | | | |
| Henry | 2 | | | | | | 42 | | | |
| Hickman | 51 | | | 1 | | | 4 | | 2 | |
| Houston | 1 | | | | | | 1 | | | |
| Humphreys | 11 | | | | | | 6 | 1 | | |
| Jackson | 10 | | 1 | | | | | | | |
| Jefferson | | | 34 | | 47 | 39 | | 1 | 1 | |
| Johnson | 1 | | | | 1 | | | | | |
| Knox | 6 | | 246 | | 433 | 383 | 1 | | 2 | |
| Lake | 1 | 45 | | | | | 55 | | 1 | |
| Lauderdale | | 3 | | | | | 6 | | | 4 |
| Lawrence | 3 | | | 1 | | | | | | |
| Lewis | 15 | | | 1 | | | | | | |
| Lincoln | 1 | | | | | | | | | |
| Loudon | 1 | | 86 | | 15 | 21 | | | | |

Beginning April 2008 the Tennessee Department of Mental Health and Developmental Disabilities (TDMHDD) began collecting data regarding non-residential opioid treatment facilities (Facilities) in the State of Tennessee. This data is derived from information submitted by each Facility. TDMHDD can neither guarantee nor attest to the accuracy of any data submitted by or on behalf of the Facilities.

**TOMHDD METHADONE REGISTRY**

**CONSUMERS BY COUNTY OF RESIDENCE AND CLINIC**

Patients served 01/01/2008 through 12/31/2008                                          4/27/2009

| | Davidson Co. Middle Tennessee Treatment | Dyer Co. Midsouth Treatment Center | Hamilton Co. Volunteer Treatment Center, Inc. | Hardin Co. Solutions of Savannah | Knox Co. DRD Knoxville Medical Clinic | Knox Co. DRD Knoxville Medical Clinic - Central | Madison Co. Jackson Professional Associates | Shelby Co. ADC Recovery and Counseling | Shelby Co. Memphis Center for Research and | Shelby Co. Raleigh Professional Associates |
|---|---|---|---|---|---|---|---|---|---|---|
| Macon | 7 | | 1 | | | | | | | |
| Madison | 1 | 3 | | 3 | 1 | | 184 | 1 | 2 | 2 |
| Marion | | | 24 | | | | | | | |
| Marshall | 11 | | 1 | | | | | 1 | | |
| Maury | 42 | | 1 | | | 1 | | | | |
| McMinn | | | 69 | | 3 | | | | | |
| McNairy | 1 | | | 116 | | | | 57 | 1 | |
| Meigs | | | 22 | | | 1 | | | | |
| Monroe | | | 32 | | 2 | 2 | | | | |
| Montgomery | 22 | | 1 | | | 1 | | | | |
| Morgan | | | 21 | | 10 | 11 | | | | |
| Obion | 1 | 62 | | | | | | 71 | | 2 |
| OUT OF ST. | 164 | 9 | 236 | 125 | 28 | 29 | 44 | 175 | 287 | 66 |
| Overton | 18 | | 24 | | | | | 1 | | |
| Perry | | | 1 | 2 | | | | 1 | | |
| Pickett | 1 | | 7 | | | | | | | |
| Polk | | | 11 | | | 1 | | | | |
| Putnam | 23 | | 24 | | | | | | | |

Beginning April 2008 the Tennessee Department of Mental Health and Developmental Disabilities (TDMHDD) began collecting data regarding non-residential opioid treatment facilities (Facilities) in the State of Tennessee. This data is derived from information submitted by each Facility. TDMHDD can neither guarantee nor attest to the accuracy of any data submitted by or on behalf of the Facilities.

**TDMHDD METHADONE REGISTRY**

CONSUMERS BY COUNTY OF RESIDENCE AND CLINIC

Patients served 01/01/2008 through 12/31/2008

4/27/2009

| | Davidson Co. Middle Tennessee Treatment | Dyer Co. Midsouth Treatment Center | Hamilton Co. Volunteer Treatment Center, Inc. | Hardin Co. Solutions of Savannah | Knox Co. DRD Knoxville Medical Clinic | Knox Co. DRD Knoxville Medical Clinic - Central | Madison Co. Jackson Professional Associates | Shelby Co. ADC Recovery and Counseling | Shelby Co. Memphis Center for Research and | Shelby Co. Raleigh Professional Associates |
|---|---|---|---|---|---|---|---|---|---|---|
| Rhea | | | 25 | | | | | | | |
| Roane | 2 | | 121 | | 20 | 10 | 2 | | | |
| Robertson | 23 | 1 | | | | | 1 | | | |
| Rutherford | 145 | | | 1 | | 1 | 3 | | | |
| Scott | | | 7 | | 3 | 7 | | | | |
| Sequatchie | | | 8 | | | | | | | |
| Sevier | 2 | | 50 | | 101 | 83 | | | | |
| Shelby | 4 | 2 | | 2 | | 1 | 6 | 202 | 388 | 220 |
| Smith | 28 | | | | | | | 1 | | |
| Stewart | 2 | | | | | | | | | |
| Sullivan | | | 1 | | 10 | 8 | | | | |
| Sumner | 96 | | 1 | | | | | | | |
| Tipton | | 1 | | 1 | | | 2 | 5 | 22 | 18 |
| Trousdale | 2 | | | | | | | | | |
| Unicoi | | | 1 | | | 1 | | | 1 | |
| Union | | | 15 | | 27 | 22 | | | | |
| UNKNOWN | 18 | 2 | 35 | 9 | 13 | 13 | 11 | 6 | 16 | 2 |
| Van Buren | | | 4 | | | | | | | |

108F
9 of 11

Beginning April 2008 the Tennessee Department of Mental Health and Developmental Disabilities (TDMHDD) began collecting data regarding non-residential opioid treatment facilities (Facilities) in the State of Tennessee. This data is derived from information submitted by each Facility. TDMHDD can neither guarantee nor attest to the accuracy of any data submitted by or on behalf of the Facilities.

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 102 of 158   PageID #: 249

Patients served 01/01/2008 through 12/31/2008

4/27/2009

| | Davidson Co. Middle Tennessee Treatment | Dyer Co. Midsouth Treatment Center | Hamilton Co. Volunteer Treatment Center, Inc. | Hardin Co. Solutions of Savannah | Knox Co. DRD Knoxville Medical Clinic | Knox Co. DRD Knoxville Medical Clinic - Central | Madison Co. Jackson Professional Associates | Shelby Co. ADC Recovery and Counseling | Shelby Co. Memphis Center for Research and | Shelby Co. Raleigh Professional Associates |
|---|---|---|---|---|---|---|---|---|---|---|
| Warren | 4 | | 11 | | | | | | | |
| Washington | | | | | 4 | 2 | | | | |
| Wayne | 1 | | | 11 | | | | | | |
| Weakley | | 1 | | | | 1 | 14 | | | |
| White | 5 | | 13 | | | | | | | |
| Williamson | 100 | 2 | | | | | | 2 | | |
| Wilson | 102 | | 1 | | | 2 | | | | 1 |
| | | | | | | | | | | |
| Total | 1,789 | 224 | 1,963 | 545 | 1,063 | 1,035 | 795 | 408 | 741 | 326 |

103

1085
1106

Beginning April 2008 the Tennessee Department of Mental Health and Developmental Disabilities (TDMHDD) began collecting data regarding non-residential opioid treatment facilities (Facilities) in the State of Tennessee. This data is derived from information submitted by each Facility. TDMHDD can neither guarantee nor attest to the accuracy of any data submitted by or on behalf of the Facilities.

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 103 of 158   PageID #: 250

145 Enterprise Drive, Unit A
Cumming, GA 30040
678-300-6227

104
Attachment C, Economic Feasibility
(Construction Cost Estimate)

SUPPLEMENTAL- # 1
March 25, 2013
12:15pm

Budgetary Project Estimate for Tri-Cities Holdings, LLC
5 Wesley Court
Johnson City, TN

February 28, 2013

To:
Tri-City Holdings, LLC
c./o Steve Kester
6555 Sugarloaf Parkway
Duluth, GA 30097

Per your request, we have developed a budgetary estimate to renovate the property at 4 Wesley Court, Johnson City, TN.

The work to be done includes:

- Demolition of unused walls

- Build-out offices from existing walls

- Reconfigure HVAC

- Plumbing to exam room

- Add electrical and low voltage to offices

- Build 4 dosing windows

- Build payment window/check-in station

- Add 2 new offices

- Painting

- Travel and project management

All of our work will be permitted and done in conformance with local, State and Federal construction codes, standards and requirements, including the Americans With Disabilities Act. Specifically, we are aware of, and will conform to the latest American Institute of Architects Guidelines for Design and Construction of Hospitals and Health Care Facilities.

145 Enterprise Drive, Unit A
Cumming, GA 30040
678-300-6227

105

**SUPPLEMENTAL- # 1**
March 25, 2013
12:15pm

Total square footage affected: 8,000

Cost basis: $15-$20/square foot

Estimate: $120,000 - $160,000

This is NOT a firm quote. It is an budgetary estimate based upon similar work at comparable clinics.

Please call to schedule a detailed walk-through and firm quote.

Signed,

Robert Burke
President

# Attachment C.

# Economic Feasibility.10.

Facsimile



**Maxim Group LLC**
99 Sunnyside Blvd Ext.
Woodbury, NY 11797
Telephone (516) 393-8300
Facsimile (516) 364-1310
Website www.maximgrp.com

**To**  Steve Kesler

**Company**

**Fax No**  404-537-3780

**From**  Michael Fenton

**Date**  March 27, 2013

**No of Pages**  2
(including cover)

**Re**  Account Balance

**Message:**

Please see attached.
Your Balances as of March 27, 2013

**Name of IP: MICHAEL FENTON - (KESTER LP) - Michael#### - Balances - Customer view (Delayed)**

| Key Values | As of 03/27/2013 |
|---|---|
| Long Market Value[1]: | $788,250.41 |
| Short Market Value: | $0.00 |
| Securities Owed[2]: | $0.00 |
| Cash Mgmt Balance: | $0.00 |
| Cash: | $762,888.60 |
| Net Worth: | $1,551,139.01 |
| Total Annuity Value[3]: | $0.00 |
| Total Account Value: | $1,551,139.01 |
| Debit Interest Rate: | $0.00 |

| Funds Available/Due | As of 03/27/2013 |
|---|---|
| Funds Available for Withdrawal: | $762,888.60 |
| Funds Available to Trade: | $762,888.60 |
| Day Trade Buying Power(as of Previous Day): | $0.00 |
| Funds Due(as of Previous Day)[4]: | $0.00 |

[1]Long Market Value does not include options, commercial paper, annuities, precious metals, alternative investments and foreign currencies.

[2]'Securities Owed' is as of Previous Day.

[3]Annuity values are as of Previous Day and may fluctuate between 4:00AM (ET) and 6:00AM (ET) while data sources make updates.

[4]'Funds Due' is calculated as of the Previous Day. The Funds Due amount does not consider amounts due for purchases, sales or other transactions executed today.

Values computed based on quote data delayed per exchange agreement. NYSE and AMEX data delayed at least 15 minutes for NYSE, AMEX, NASDAQ, OTC, OTCBB and OPRA.

This report is a service from your Investment Professional, not a substitute for your account statements and confirmations. This report is prepared as of trade date rather than settlement date and may be prepared on a different date than your statement. This report uses information from sources that Pershing believes to be reliable, but Pershing cannot guarantee the accuracy of this information or the reliability of these sources. If you find discrepancies in this report, please contact your Investment Professional.
Prepared By (PNXMMFEN) at 03/27/2013 11:34

©NetX360, All Rights Reserved.

Steve,

Please see above, your account balance
at Maxim as of March 27, 2013

- M

MIKE FENTON, SVP
Maxim Group
212- 895- 3698

## Proposed Service Area



Proposed Service Area includes the counties that are those boxed
above, including Sullivan, Washington, Greene, Hamblen, Carter,
Hawkins, Cocke, Unicoi and Johnson. Washington, Carter, Johnson and
Unicoi counties form Methadone Service Area #1, Sullivan and Hawkins
county are in MSA #2, and Green, Cocke and Hamblen counties are in
MSA #3.

Attachment C. Need, Item 3. Proposed Service Area

SUPPLEMENTAL- # 1
March 25, 2013
12:15pm

# Attachment C 3.
## Tennessee Methadone Service Areas
### Jaunuary 2002



SUPPLEMENTAL- # 1
March 25, 2013
12:15pm

Possible Methadone Service Areas for NR Methadone Clinic Locations

| MSA # | County | Popn | RSA # | County | Popn |
|---|---|---|---|---|---|
| 1 | Washington | 107,200 | 13 | Hickman | 22300 |
| | Johnson | 17500 | | Perry | 7600 |
| | Carter | 56700 | | Wayne | 16800 |
| | Unicoi | 17700 | | Dickson | 43200 |
| | S/T | 199,100 | | Humphreys | 17900 |
| | | | | Houston | 8100 |
| 2 | Sullivan | 153,000 | | Hardin | 25600 |
| | Hawkins | 53500 | | Decatur | 11700 |
| | Hancock | 6800 | | Benton | 16500 |
| | S/T | 213,300 | | S/T | 169700 |
| 3 | Greene | 62900 | 14 | Montgomery | 134800 |
| | Cocke | 33600 | | Stewart | 12400 |
| | Hamblen | 58100 | | Cheatham | 35900 |
| | Jefferson | 44300 | | S/T | 183100 |
| | Grainger | 20700 | | | |
| | S/T | 219600 | 15 | Williamson | 126600 |
| 4 | Claiborne | 29900 | 16 | Sumner | 130400 |
| | Union | 17800 | | Robertson | 54400 |
| | Campbell | 39900 | | S/T | 184800 |
| | Scott | 21100 | | | |
| | Anderson | 71300 | 17 | Madison | 91800 |
| | S/T | 180000 | | McNairy | 24700 |
| | | | | Chester | 15600 |
| 5 | Sevier | 71200 | | Henderson | 25500 |
| | Blount | 105800 | | Hardeman | 28100 |
| | Monroe | 39000 | | S/T | 185700 |
| | S/T | 216000 | | | |
| | | | 18 | Weakley | 34900 |
| 6 | Cumberland | 46800 | | Henry | 31100 |
| | Morgan | 19800 | | Carroll | 29500 |
| | Roane | 51900 | | Gibson | 48200 |
| | Loudon | 39100 | | Obion | 32500 |
| | Fentress | 16600 | | Lake | 8000 |
| | Pickett | 4900 | | S/T | 184200 |
| | S/T | 179100 | | | |
| | | | 19 | Dyer | 37300 |
| 7 | Putnam | 62300 | | Lauderdale | 27100 |
| | Overton | 20100 | | Tipton | 51300 |
| | Jackson | 11000 | | Haywood | 19800 |
| | Warren | 38300 | | Crockett | 14500 |
| | | | | Fayette | 28800 |

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 111 of 158   PageID #: 258

| | | | | | | |
|---|---|---|---|---|---|---|
| | White | 23100 | | | S/T | 178800 |
| | Dekalb | 17400 | | | | |
| | Van Buren | 5500 | | | | |
| | S/T | 185700 | | | | |
| 8 | Bradley | 88000 | | | | |
| | Polk | 16100 | 20 | | Knox | 382000 |
| | McMinn | 49000 | 21 | | Hamilton | 307900 |
| | Meigs | 11100 | 22 | | Davidson | 569900 |
| | Rhea | 28400 | 23 | | Shelby | 897500 |
| | S/T | 192600 | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | Bledsoe | 12400 | | RSA | # Current PTs | Rate/100K |
| | Sequatchie | 11400 | | 1 | 55 | 27.6 |
| | Marion | 27800 | | 2 | 27 | 12.7 |
| | Grundy | 14300 | | 3 | 119 | 54.2 |
| | Franklin | 39300 | | 4 | 149 | 82.8 |
| | Coffee | 48000 | | 5 | 146 | 67.6 |
| | S/T | 153200 | | 6 | 196 | 109.4 |
| | | | | 7 | 153 | 82.4 |
| 10 | Rutherford | 182000 | | 8 | 77 | 40.0 |
| | Bedford | 37600 | | 9 | 45 | 29.4 |
| | Moore | 5700 | | 10 | 37 | 16.4 |
| | S/T | 225300 | | 11 | 32 | 21.8 |
| | | | | 12 | 62 | 29.8 |
| 11 | Wilson | 88800 | | 13 | 42 | 24.7 |
| | Macon | 20400 | | 14 | 30 | 16.4 |
| | Trousdale | 7300 | | 15 | 33 | 26.1 |
| | Cannon | 12800 | | 16 | 33 | 17.9 |
| | Smith | 17700 | | 17 | 53 | 28.5 |
| | S/T | 147000 | | 18 | 56 | 30.4 |
| | | | | 19 | 21 | 11.7 |
| 12 | Maury | 69500 | | 20 | 440 | 77.2 |
| | Marshall | 26800 | | 21 | 193 | 62.7 |
| | Lincoln | 31300 | | 22 | 375 | 65.8 |
| | Giles | 29400 | | 23 | 365 | 40.7 |
| | Lewis | 11400 | | Total | 2739 | 48.1 |
| | Lawrence | 39900 | | | | |
| | S/T | 208300 | | | 2845 no Zip | 50.0 |

| 67/100K | Pop'n | 152/100K |
|---|---|---|
| 100 | 150,000 | 228 |
| 134 | 200,000 | 304 |

# LETTERS OF SUPPORT
# (TO DATE)

March 17, 2013
8564 Horton Hwy.
Greeneville, TN  37745

2013 MAR 21  AM 9: 13

TO WHOM IT MAY CONCERN:  I have worked with young people for over thirty years dealing with their educational, emotional, and physical everyday problems.  For the majority of the young people I worked with, had used drugs or was using them on a daily basis to rid themselves of their physical and emotional pain.

Therefore, I firmly believe in a methadone clinic in the Johnson City area.  We, the community, and the young people, would truly benefit from it conception.

Thank-you so much,

Rosana M. Beyer BS,MA

To Whom This May Concern,

2013 MAR 20  AM 9: 07

My name is Kathy Ostertag, RN and I am writing in support of the Certificate of Need for an opiate treatment program (OTP) in Johnson City. I have no financial interest in the company trying to open the OTP.

I have worked at three OTPs in the Asheville, North Carolina area. In all three clinics, many of the patients come from the Tri Cities area and drive great distances, crossing the state line to get treatment. I believe that for every patient that made the trek, 2 or 3 did not. Distance and time are the leading barriers to getting treatment. You should worry about these people who don't get treatment. Statistically, 80% of addicts support their addiction through crime – theft, prostitution, forgery, etc.

Let me give you an example of a typical day in the life of a person/family in recovery who has made the brave choice to get help for their addiction: A young family living in the Johnson City area – one maybe both parents have struggled for years with addiction – but now they have hope – they have a place where they can get relief from the physical pain of addiction and the support of a staff of Nurses, Doctors, and highly qualified counselors to help them in this brave effort. Finally without the chain of addiction and the lifestyle that goes along with it – the father and mother now both have legitimate jobs are able to provide their families with a good and safe home – gained back the respect they had long ago lost for themselves. The one draw back is it is over an hour away on often dangerous roads in inclement weather. – So their day starts out with an alarm that rings at about 1:00 AM – they get up, get their kids up from a good nights sleep, place their sleeping children in the car for the long drive to Asheville – an hour or more away – arriving at about 3: 00 AM at the treatment program to wait for the clinic to open at 5:00 AM – they arrive so early to ensure a place at the front of the line, as there are so many others their that have made the same long trip from your area that day – to facilitate getting back home earlier. They enter the clinic, they usually see their counselor, get their medication and usually several times a month have a urine drug screen – all of this taking at least an hour. Now they drive back home arriving there around 7:00 AM – and now there day begins – just like yours and mine. They get ready for work – get the kids' fed and ready for school and/or day care – leave the house to have a productive day just like the rest of us. Except this family has already had a full day. Now multiply this by 1000 people/families in treatment – This facility is NEEDED.

Ask yourselves is it fair that the residents of the Johnson City area should have to endure such hardship in order to gain their lives back. These are members of our community that you and I work with everyday – side by side – families just like yours and mine – wanting a better life for themselves and there children – should it be so hard for them – ask yourself that. I can't tell you how many times I have heard the words "Kathy - This place has saved my life". As a health care professional I can tell you there is nothing better, or more rewarding to know that you have helped to improve the lives of others – this program will change **lives** in your community.

For those who do make the drive, many, like the family I describe above, are under great stress struggling with the finances and time to make the commute. Many drop out of treatment because they can't afford the gas, or have work or family commitments that conflict. Dropping out of treatment often means relapsing back to drugs.

Companies want to open in the Tri Cities area because there is a desperate need. I understand locals are concerned about crime and property values. I can tell you first hand after 12 years working in addiction treatment – these facilities are good neighbors – going un noticed in their locations – supporting out reach programs in the community with education and support of community programs – these substance abuse treatment programs SAVE lives and FAMILIES and in turn help SAVE our communities. Many studies have shown that the far greater risk is the LACK of treatment.

Approve the CON. Lower crime. Lower drug use. Less disease. Compassionate care.

Sincerely,

Kathy Ostertag, RN

To whom it may concern,

2013 MAR 21 AM 9: 13

Concerning the proposed methadone clinic in Johnson City.
I am in full support of it. Abstinence works in some people but not in others.
If you know you're going to get your daily dose you are more likely to be able to hold a job and live your life.
Prescription drug abuse is rampant in the area. Chasing that dose everyday is no fun.
Addiction knows no social or economic boundaries. It ranges from soccer moms to street junkies. No one wants to be a junkie and a clinic would provide them with a pathway to get clean without constantly trying to find drugs and come up with the money to buy them. That is where most of the crime comes in.
As far as crime around the clinic, that's what the police are for.
Please issue a certificate of need. The problems are just getting worse.

Thank you
*Ross Jackson*

Ross Jackson
PO Box 185
Chuckey, TN 37641

Joy Jackson

PO Box 185

· 2013 HDR 21  A1 9: 14

Chuckey, TN 37641

March 18, 2013

Health Services and Development

    Agency

The Frost Bldg. Third Floor

161 Rosa L. Parks Blvd.

Nashville, TN 37243

To Whom It May Concern:

As a citizen of Upper East Tennessee, I am writing in support of approval of a certificate of need for a methadone clinic in Johnson City.

Prescription drug and opiate addiction has become rampant in our area and is reflected in increased criminal activity, unemployment and the breakup of families.

No addict started out with the thought that he/she could become physically dependent on these drugs. No one wants to be a junkie. Many want to quit but do not know where to turn. A treatment clinic in our area could help many hundreds of addicts turn their lives around and once again be productive members of our society. They would be able to work and lead a normal life close to home. As it is now, addicts from the Tri-cities area must drive to Knoxville or Asheville, NC every day for treatment, which is nearly impossible while trying to hold down a job. Many will give up because of this limitation.

A methadone clinic in Johnson City would be a positive thing for this community and all of its citizens.

Thank you,

*Joy Jackson*

Joy Jackson

Tennessee Health Services And Development Agency
Melanie M. Hill, Executive Director
Frost Building, 3rd Floor
161 Rosa L. Parks Boulevard
Nashville, TN 37243

2013 MAR 21 AM 9: 14

March 11, 2013

Ms. Hill:

I am writing you in support of Tri-Cities Holding's Certificate of Need for an opiate treatment program in Johnson City, Tennessee.

I have the unique advantage of treating over 1,000 opiate-addicted patients both in an opiate treatment program and a private physician's office. I have medically supervised methadone, buprenorphine and abstinence-based services to treat those suffering from opiate addiction. I have no financial interest in Tri-Cities Holdings, nor am I a part of the staff or management.

There are several points I wish your Agency to know about treating those suffering from opiate addiction.

1. Physician-based practices that offer buprenorphine treatment are significantly disadvantaged relative to opiate treatment programs:
   a. These offices rarely provide counseling services, which are a critical component to treatment and a patient's ultimate path to independence
   b. Private doctor's office don't have the same requirements for drug testing, attendance and group therapy that are critical to ensure compliance and a patient's commitment
   c. The hours of operation of a doctor's office do not meet a patient's need to balance work and family commitments
   d. Addicts are co-mingled with the other patients in the office which creates shame and discomfort
   e. Staff at opiate treatment programs (nurses, counselors, doctors, etc.) are specifically trained and credentialed to treat the specific needs of those suffering from opiate addiction
   f. When compared to the cost and services of an opiate treatment program, doctors' offices are significantly over-priced

2. Johnson City is trading the perceived problems of a methadone clinic with the very real costs of opiate addiction. Distance plays a significant role in treatment. In my Atlanta-based practices, I frequently see patients who travel great distances because the community they live in does not want a clinic or is too small to support a clinic. As you know, patients who are just entering treatment must come every day. This is the precise time that they are most vulnerable to relapse, and this distance places a tremendous burden on them.

   Further, for every patient that travels far for treatment, he or she will tell you they know 2 or 3 addicts that want treatment, but cannot make the commitment of time or money associated with a long daily commute.

**SUPPLEMENTAL- # 1**

Untreated addicts commit crime to support their habit, leave their **March 25, 2013** families, get incarcerated, and clog emergency rooms. In keeping a clinic **12:15pm** out, Johnson City is inviting in many more problems.

3. Whatever the perceived problems of opiate treatment programs, Johnson City has exported them to the nearest communities that will support treatment. Does this seem like the right thing to do?

4. The perceived problems of opiate treatment programs are just that, perceived. There are nearly 1,300 of these clinics in the US. If they were as bad as the Johnson City officials have made them out to be, do you think they would be tolerated? The fact is, these clinics open and operate with a whimper, not a bang. The worst problems are parking and smoking, which pale in comparison to theft, prostitution, HIV, and broken families.

5. Most of the opposition that I have read is from uninformed people who perpetuate myths. Have you heard from former patients, staff or neighboring businesses? Asheville has five of these clinics, yet it's a wonderful city.

6. Speaking of myths, here are some doozies: "Methadone is just trading one drug for another. Addicts should just co cold turkey." Less than 10% of opiate addicts can withdraw "cold turkey" without relapse. Many pain pills are just as addictive as heroin and substantial research has shown that abstinence–based withdraw is far less successful than medication–based treatment.

7. Johnson City's problems may get worse. "Pain mills" and other diversion operations are being successfully identified and shut down. That's the good news. However, if pain pills addicts have no treatment, they will likely turn to heroin, which has become cheaper and easier to obtain in most communities.

I encourage you to take an objective review of the facts. Doing so will lead you to the decision that this project is best for the community.

Sincerely,

J. David Lentz III, MD
GEORGIA MEDICAL ASSOCIATES PC
2121 Fountain Drive
Suite A
Snellville, GA 30078

# NOTIFICATION REQUIREMENT

# Tri-Cities Holdings LLC

d/b/a Trex Treatment Center
6555 Sugarloaf Parkway Suite 307-137
Duluth, GA 30097

Phone: 404-664-2616

E-mail:
swkester@gmail.com

March 5, 2013

<u>VIA CERTIFIED MAIL/RETURN RECEIPT REQUESTED</u>

Rep. James (Micah) Van Huss
R-Jonesborough District 6
301 6th Avenue North
Suite 23 Legislative Plaza
Nashville, Tennessee 37243

Mayor Dan Eldridge
Washington County Mayor's Office
103 W. Main St.
Jonesborough, Tennessee 37659

Senator Rusty Crowe
R-Johnson City District 3
301 6th Avenue North
Suite 8 Legislative Plaza
Nashville, Tennessee 37243

Mayor Jeff Banyas
Municipal & Safety Building
601 E. Main Street
Johnson City, Tennessee 37601

Gentlemen:

In accordance with Tenn. Code Ann. Section 68-11-1607, please be advised that
an application for a nonresidential methadone treatment facility to be located at 4
Wesley Court, Johnson City, TN 37601 has been filed with the Tennessee Health
Services and Development Agency by Tri-Cities Holdings LLC d/b/a Trex Treatment
Center.

Sincerely,
Tri-Cities Holdings LLC

Steve Kester, Manager.

SWK/jd



**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

7179 1000 1649 1689 7354

NASHVILLE TN 37243

| | | |
|---|---|---|
| Postage | $ $0.46 | $0.46 |
| Certified Fee | $3.10 | $3.10 |
| Return Receipt Fee (Endorsement Required) | $2.55 | $2.55 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | $0.00 |
| Total Postage & Fees | $ $6.11 | $6.11 |

Postmark Here
MAR 5 2013
HOWELL MILL BRANCH ATLANTA GA 30318

*Sent To* Rep. James (Micah) Van Huss
301 6th Avenue North
Suite 23 Legislative Plaza
*Street, Apt. No.;* Nashville, TN 37243
*or PO Box No.*
*City, State, Zip+4*

Code: TCH/Van Huss

PS Form 3800, August 2006          See Reverse for Instructions



**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

7191 0001 6491 6897 5338
JOHNSON CITY TN 37601

| | | | |
|---|---|---|---|
| Postage | $ | $0.46 | $0.46 |
| Certified Fee | | $3.10 | $3.10 |
| Return Receipt Fee (Endorsement Required) | | $2.55 | $2.55 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | $0.00 |
| Total Postage & Fees | $ | $6.11 | $6.11 |

Postmark Here

MAR 5 2013

*Sent To* Mayor Jeff Banyas
Municipal & Safety Building
601 E. Main Street

*Street, Apt. No.;*
*or PO Box No.*
*City, State, Zip+4* Johnson City, TN 37601

Code: TCH/Banyas

PS Form 3800, August 2006    See Reverse for Instructions



**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

JONESBOROUGH, TN 37659

711 1000164 156897567

| | | |
|---|---|---|
| Postage | $ | $0.46 |
| Certified Fee | $3.10 | $3.10 |
| Return Receipt Fee (Endorsement Required) | $2.55 | $2.55 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | $0.00 |
| Total Postage & Fees | $ | $6.11 |

Postmark Here

MAR 5 2013

HOWELL MILL BRANCH ATLANTA, GA 30327

Sent To     Mayor Dan Eldridge

Street, Apt. No.;    Washington County Mayor's Office
or PO Box No.       103 W. Main Street
City, State, Zip+4   Jonesborough, TN 37659

PS Form 3800, August 2006    See Reverse for Instructions

Code: TCH/Eldridge



**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

NASHVILLE TN 37243

| | | | |
|---|---|---|---|
| Postage | $ | $0.46 | $0.46 | 0014 |
| Certified Fee | | $3.10 | $3.10 |
| Return Receipt Fee (Endorsement Required) | | $2.55 | $2.55 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | $0.00 |
| Total Postage & Fees | $ | $6.11 | $6.11 |

Postmark Here

MAR 5 2013

USPS

Sent To — Senator Rusty Crowe
301 6th Avenue North
Suite 8 Legislative Plaza
Street, Apt. No.; Nashville, TN 37243
or PO Box No.
City, State, Zip+4

Code: TCH/Crowe

PS Form 3800, August 2006     See Reverse for Instructions

| Certified Number | Sender | Recipient | Date Mailed | Delivery Status |
|---|---|---|---|---|
| 71791000164916897354 | | Rep. James (Micah) Van Huss, 301 6th Avenue North, Suite 23 Legislative Plaza, Nashville, TN, 37243<br>Code: TCH/Van Huss | 2/28/2013 | Delivered<br>March 07, 2013<br>**GREEN CARD SIGNED** |
| 71791000164916897422 | | Senator Rusty Crowe, 301 6th Avenue North, Suite 8 Legislative Plaza, Nashville, TN, 37243<br>Code: TCH/Crowe | 2/28/2013 | Delivered<br>March 07, 2013<br>**GREEN CARD SIGNED** |
| 71791000164916897538 | | Mayor Jeff Banyas, Municipal & Safety Building, 601 E. Main Street, Johnson City, TN, 37601<br>Code: TCH/Banyas | 2/28/2013 | Delivered<br>March 08, 2013<br>**GREEN CARD SIGNED** |
| 71791000164916897569 | | Mayor Dan Eldridge, Washington County Mayor's Office, 103 W. Main Street, Jonesborough, TN, 37659<br>Code: TCH/Eldridge | 2/28/2013 | Delivered<br>March 08, 2013<br>**GREEN CARD SIGNED** |

# ARTICLES

## AFFIDAVIT

2013 MAR 25 PM 12 10

STATE OF GEORGIA

COUNTY OF FULTON

NAME OF FACILITY:     TRI-CITIES HOLDINGS LLC
                      4 WESLEY COURT
                      JOHNSON CITY, TENNESSEE

I, STEVE KESTER, after first being duly sworn, state under oath that I am the applicant named in this Certificate of Need application or the lawful agent thereof, that I have reviewed all of the supplemental information submitted herewith, and that it is true, accurate, and complete.

$SL\ \omega. K_\sim \perp$ /MANAGER

Signature/Title

Sworn to and subscribed before me, a Notary Public, this the $\underline{25}$ day of $\underline{March}$ 20 $\underline{13}$ witness my hand at office in the County of $\underline{Fulton}$ , State of Georgia.

NOTARY PUBLIC

My commission expires $\underline{03/27/14}$ ,

HF-0043

Revised 7/02

# COPY-

# SUPPLEMENTAL-2

## Tri-Cities Holdings, LLC

## CN1303-005

Law Offices
James A. Dunlap Jr. & Associates LLC
801 West Conway Drive NW
Atlanta, Georgia 30327

2013 MAR 28  AM 9: 02

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

March 27, 2013

**VIA FEDERAL EXPRESS**

Phillip Earhart
Tennessee Health Services And Development Agency
Frost Building, 3rd Floor
161 Rosa L. Parks Boulevard
Nashville, TN 37243

Re:     **Application for Certificate of Need**
        **Applicant: Tri-Cities Holdings LLC**

Dear Phillip:

Please find enclosed an original and two copies supplement information for the Application for Certificate of Need by Tri-Cities Holdings LLC.

Please contact me if you have any questions or if I may be of assistance.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd
Enclosures

Tri Cities Holdings, LLC
6555 Sugarloaf Parkway
Suite 307-137
Duluth, GA 30097
404-664-2616

2013 MAR 28 AM 9: 02

March 27, 2013

Phillip Earhart
Health Services Development Examiner
Health Services & Development Agency
161 Rosa Parks Boulevard
Nashville, TN 37203

RE:     Certificate of Need Application CN1303-005
        Tri-Cities Holdings, LLC

Dear Mr. Earhart:

Thank you for reviewing our revised application and we are pleased to respond to your remaining questions.

We have listed your questions in **bold** and typed our response immediately following. We have also included the following attachments:

- Revised Page 22
- Project Costs Chart (should go after page 29, and be page numbered 29A)
- Revised Financial Resources documentation, should replace pages 113 and 114 and again on pages116 and 117
- Projected Data Chart (confirms pages 30, 31 and 32; page 36 should be deleted)
- Executed Affidavit

1.  **Section A, Applicant Profile, Item 6**

    **TennCare covers the drug buprenorphine for treatment of opiate addiction. The medication, medical services and transportation to providers are a covered TennCare benefit. With this in mind, please clarify the reason why you are not planning to accept TennCare for suboxone patients. What incentive does a TennCare patient have to come to the proposed clinic to receive buprenorphine when their medications and transportation services may be paid by TennCare by going to a private provider who prescribes suboxone who is already located in the proposed service area?**

    **Response:** None of the 12 opiate treatment programs in Tennessee currently accept TennCare based on a 3/25/2013 telephone survey. The Applicant is not planning on accepting TennCare for the following reasons:
    - The investment in personnel and systems, the on-going compliance and audit requirements, and the risk of penalties for non-compliance do not warrant the added revenue
    - Based on the Applicant's experience, there are additional risks associated with comingling TennCare patients with self-pay patients (arguments, humiliation, etc.) such that is not worth implementing TennCare

Pertaining to the reasons a patient would chose our facility over a private provider, the **9:00 am** Applicant states:

- Most private providers are general family practices and do not have the expertise or focus our program would offer.
- Most private providers do not offer early morning hours that accommodate work, school and family obligations.
- Most private providers do not offer counseling or group meetings in their office, which our program would offer.
- Most private providers do not drug test, implement drug diversion control, test for HIV, TB, etc., which our program would offer.

However, if a private provider provided the services, hours and operation, and expertise listed above, and accepted TennCare, a TennCare patient seeking buprenorphine treatment would have no reason to use our facility.

2. **Section A, Applicant Profile, Item 12.**

**Please clarify if methadone treatment is offered as part of the TennCare benefit package for patients ages 18-20 years of age. The response in the first supplemental response was unclear.**

**Response:** Applicant sources the following quotation from TennCare Quick Guide May 2012, p. 9 and 12.

"Methadone Clinic Services – Not Covered, except for children under age 21. [Rules 1200-13-13-.04, 1200-13-14-.10, 1200-13-14-.04, & 1200-13-14-.10]." Source: TennCare Quick Guide May 2012, p. 9 (http://www.tn.gov/tenncare/forms/quickguide.pdf). This indicates that methadone treatment and buprenorphine is covered for 18-20 year olds.

*"Pharmacy Non-Covered Items.* The following items are Not Covered, except for children under age 21 or as otherwise noted below…"

"Generic buprenorphine, Subutex (buprenorphine), and Suboxone (buprenorphine/naloxone) in dosage amounts that exceed sixteen milligrams (16 mg) per day for a period of up to six months (which for a pregnant enrollee shall not begin until the enrollee is no longer pregnant), or eight milligrams (8 mg) per day at the end of a six-month period." Source: TennCare Quick Guide May 2012, p. 12 (http://www.tn.gov/tenncare/forms/quickguide.pdf).

**The applicant stated in the supplemental response "applicant will provide documentation to allow patients to make claims to TennCare". Please discuss this process.**

**Response**: Applicant placed another call to TennCare Solutions at 1-800-878-3192. The representative confirmed that out-of-network claims may be reimbursable. The process explained to the Applicant was that the TennCare member would call this number, answer some questions from TennCare Solutions, and a reimbursement amount, if any, would be determined. The TennCare member would then be given instructions by TennCare Solutions to submit the claim for reimbursement, subject to review by TennCare Solutions. Applicant will provide a sales receipt for all medication and services to allow patients to submit a claim to TennCare but this will be up to the patient to make any and all claims—if in fact reimbursement is available. Applicant will not

March 27, 2013
Page 3

134

SUPPLEMENTAL- # 2
March 28, 2013
9:00 am

offer any warranty or representation about TennCare coverage as to any item of service or medication. Applicant does not intend to make claims on behalf of any patient to TennCare.

3. **Section B, Project Description, Item 1**

   **Public Chapter 363 of the Acts of the 2001 General Assembly Methadone Treatment Facilities created Methadone Service Areas (MSAs) on the assumption the closer one lives to a treatment program, the greater likelihood of participation. The rate of participation is nearly twice as high for those living in or near a county that houses a methadone program (59.0/100,000) than the rate for those that live 60 miles or more from a program (32.2/100,000). Please indicate if all population of the proposed service area lives within 60 miles of the proposed project location. If not, what is the percentage that does?**

   **Response**: Applicant estimates that 90% of the proposed service area's population is within 60 miles based on using Google directions and the shortest time driving option. The calculations and assumptions are shown below.

| Demographic | Population, 2011 estimate | Estimated % within 60 miles | Population within 60 miles | Comment |
|---|---|---|---|---|
| Sullivan | 157,419 | 100% | 157,419 | Entire county is within 60 miles |
| Washington | 124,353 | 100% | 124,353 | Entire county is within 60 miles |
| Greene | 69,339 | 100% | 69,339 | Entire county is within 60 miles |
| Hamblen | 63,062 | 58% | 36,786 | Half of Morristown and areas northeast are less than 60 miles |
| Carter | 57,185 | 100% | 57,185 | Entire county is within 60 miles |
| Hawkins | 56,671 | 98% | 55,538 | Only the lowest southwest portion of the county is greater than 60 miles |
| Cocke | 35,544 | 10% | 3,554 | Small population off of exit 12 on I81 is less than 60 miles |
| Unicoi | 18,280 | 100% | 18,280 | Entire county is within 60 miles |
| Johnson | 18,231 | 100% | 18,231 | Entire county is within 60 miles |
| Total for service area | 600,084 | 90% | 540,685 | |

   **The applicant was requested to contact the Department of Mental Health Methadone Authority, Attention Ira Lacey (615-552-7802) to discuss how the**

March 27, 2013
Page 4

135

**SUPPLEMENTAL- # 2**

**March 28, 2013**
**9:00 am**

applicant's plans will interact with the DMHDD Methadone Authority's statewide plan. Did the applicant make contact, and if so, please discuss.

**Response:** The Applicant talked to Mr. Ira Lacy on March 27, 2013. Mr. Lacy understands our position that the opiate abuse and addiction issues in northeast Tennessee warrant attention, and he confirmed there was no comparable treatment in the proposed service area to the treatment services we are proposing. Mr. Lacy explained the licensing and Central Registry procedures.

Further, Applicant's Managing Member had a substantive meeting on March 25, 2013 with the following representatives from the Tennessee Department of Mental Health and Substance Abuse Services (TDMHSAS): Commissioner Doug Varney, Deputy Commissioner Marie Williams, Director of Licensure Cynthia Tyler, and Director of Legislation Kurt Hippel.

Applicant characterizes the meeting as very positive and potential grounds of agreement were as follows:

- The severe problems of opiate abuse in Tennessee and the proposed service area
- That no opiate treatment programs exist in the proposed service area and many adults drive great distances to get these treatment services in Asheville, Knoxville, Boone, NC and Galax, VA
- Distance is a barrier to treatment
- Applicant's Manager shared his history with proposed treatment services and the vision of TCH to implement these services in the proposed service area.

**The scheduled hours of 5:00 AM until noon seven days per week is noted on page 98 of the application. However, on page 109 the Johnson City Zoning Regulations for methadone facilities states "the hours of operation shall be between 7:00 a.m. and 8:00 p.m." Please clarify.**

**Response:** Applicant has requested a zoning variance from Johnson City to accommodate these hours.

**Also, the Johnson City Zoning Regulations states, "the facility shall be located on and primary access shall be from an arterial street." How does the applicant intend to address this zoning regulation while the proposed site is located on a cul-de-sac?**

**Response:** Applicant has requested Johnson City grant the Board of Zoning Appeals the authority to grant this arterial road variance. Applicant looked at over 50 cites within the Tri-Cities area and felt that the proposed site best met the needs of the community and patients relative to patient access, traffic, visibility, and distance from schools, daycare, parks.

**The types of businesses that surround the proposed methadone project are noted. Are these businesses in support of the proposed project?**

**Response:** There are two other businesses located on Wesley Court, CK Supply and Thomas Construction, both related to construction. Applicant contacted and briefed the landlord/owner of one of the business and this individual voiced no opposition. The landlord of Applicant's proposed property knows the owner/landlord of the other business and has briefed that individual, and this individual has voice no opposition to date. The Applicant would characterize their responses as neutral.

March 27, 2013
Page 5

136

**SUPPLEMENTAL- # 2**
**March 28, 2013**
9:00 am

**The size and capacity of the parking lot consisting of 68 spaces is noted. Please clarify if the applicant already owns the space to add 100 parking spaces and street level parking.**

**Response**: The combined parking between 68 on-site which are owned by applicant's landlord can be supplemented at least 12 spaces on the property that can simply have lines painted for standard parking spaces (two on the south side of the building, and ten on the north side. This would make a total of 80 spaces. There are an estimated additional 20 unmarked spaces in front and back of the facility that is on property owned by applicant's landlord. Applicant's ratio of patients to parking spaces after year two would still remain below the ratio of several other existing Tennessee OTPs as shown below.

| Tennessee Treatment Program | Patients[1] | Parking spots | Parking spots per patient |
|---|---|---|---|
| Hamilton Co./Volunteer | 1963 | 80 | 24.5 |
| Davidson Co./Middle Tenn | 1789 | 89 | 20.1 |
| DRD Knoxville | 1063 | 70 | 15.2 |
| TCH Johnson City – End of Year 2 | **1208** | **80** | **15.1** |
| Solutions of Savannah | 545 | 46 | 11.8 |
| TCH Johnson City – End of Year 1 | **918** | **80** | **11.4** |
| DRD Knoxville Central | 1035 | 97 | 10.7 |
| Jackson Professional Associates | 795 | 102 | 7.8 |
| Shelby Memphis | 741 | 110 | 6.7 |
| Shelby Co./ADC | 408 | 75 | 5.4 |
| Shelby Raleigh | 326 | 60 | 5.4 |
| Dyer Co.Midsouth | 224 | 50 | 4.5 |

**What is the timeframe for this project and proposed cost? Is this cost included in the projected data chart?**

The Applicant does not feel parking will be an issue, and no costs are reflected in the Projected Data Chart to remedy a parking problem.

**4. Section C, Need, Item 1. (Service Specific Criteria-Any)**

Please respond to the section labeled "Relationship to Existing Applicable Plans" in *Tennessee's Health: Guidelines for Growth, Criteria and Standards for Certificate of Need, 2000 Edition*; Non- Residential Methadone Treatment Facilities, Criteria and Standards. Please list each criterion separately and provide a response to each criterion separately immediately following the criterion statement, stating how the proposed project will address/relate to each criterion.

**On page 20 of the application the applicant estimates the economic savings to the State to be $765 per patient per month based on studies in the states of Washington and Tennessee. This study appears to only pertain to Medicaid patients. Did the applicant apply this study to all patients? Please clarify, expand and discuss.**

[1] Note: 2008 Tennessee Registry Data

March 27, 2013
Page 6

137

**SUPPLEMENTAL- # 2**

**March 28, 2013**

**9:00 am**

**Response:** Applicant estimates that 30%-50% of patients are Medicaid-eligible based on the populations at other clinics in which Applicant's Manager is a part owner. This would reduce the total cited on Page 20 accordingly. However, in the report *"Prescription Drug Abuse In Tennessee"* conducted by the Tennessee Department of Health, the study states that the State-funded costs of children of parents who are substance abusers entering state custody and juvenile justice State custody total $57 million annually. This figure includes all substance abuse, not just opiates, but a) opioid have become the #1 abused drug (as measured by treatment admissions) and has also passed alcohol and b) this does not include any State-funded adult medical costs[2].

**The applicant refers to Attachment C1-A, Tennessee Methadone Service Areas" in responding to service area specific criteria on page 22 of the application. The attachment the applicant is referring to is Attachment C.3. Please revise and submit a revised page 22.**

**Response:** Applicant apologizes for the oversight. See Attachment Revised Page 22, with the correct reference.

**5. Section C, Economic Feasibility, Item 1 (Project Costs Chart)**

**The applicant did not resubmit a Project Costs Chart for the revised supplemental submission. Please submit.**

**Response:** Applicant apologizes for the oversight. See Attachment Project Costs Chart, which should go after page 29, and be page numbered 29A

**6. Section C, Economic Feasibility, Item 2**

**A fax under separate cover documenting financial resources is noted. However, for appropriate documentation please provide a letter from a banking institution, Certified Public Account, etc. that demonstrates financial resources and/or reserves to implement the proposed project.**

**Response:** Applicant submits Attachment Revised Financial Resources from the brokerage account under the control of the Applicant's Manager for purposes of financially securing this project.

**7. Section C, Economic Feasibility, Item 4 (Projected Data Chart)**

**There are two Projected Data Charts with two different financial outcomes in Year Two of the proposed project. Please submit the Projected Data Chart (that includes management fee fields) the applicant intends to attach to this proposed project.**

**Response:** Applicant apologizes for placing the previous Projected Data Chart in the document in addition to the revised Projected Data Chart. See Attachment Projected Data Chart for the correct Projected Data Chart. The previous Projected Data Chart (page 36) can be deleted.

**8. Orderly Development Item 1**

---

2

http://tn.gov/mental/policy/persc_drug_docs/Prescription%20Drug%20Use%20in%20TN_2%203%202012_R2.pdf

**The applicant states, "because of the epidemic levels of prescription medication abuse, 9:00 am Tennessee providers have experienced increases in enrollment." Please provide statistics to back this statement.**

**Response:** *"The Centers for Disease Control and Prevention has classified prescription drug abuse as an epidemic".*[3] In the Tennessee Department of Health report entitled *"Prescription Drug Abuse In Tennessee"*, on page 14, Tennessee indicates that opioid abuse in Tennessee is materially higher than in the United States, as measured by primary drug abused. Further, the National Survey on Drug Use and Health, 2007-2008 states *"In 2007-2008, Tennessee ranked first among all states for past-year non-medical use of pain relievers among persons age 26 or older."* on page 1.[4] On page 2, the same report shows a map of the United States and Tennessee is color-coded with the highest percentage of non-medical use of prescription pain relievers. The Applicant contends that if the CDC indicates the problem is an epidemic in the United States, and if Tennessee ranks first among all states in abuse, it is an epidemic in Tennessee.

### 9. Section C, Orderly Development, Item 6.B

**The applicant's methadone fee of $10.00 per day appears to be considerably less than other surveyed clinics amounts of $11-$13, $16.14 and $25.00. Please clarify.**

**Response:** This information is correct. Applicant sees tremendous benefit to lowering the barriers to treatment, and cost is a major factor. The Applicant's intent is to offer this rate for a time of 6 months to two years, depending on patient census. In the Applicant's Manager's other clinics in which he owns a partial interest, theses clinics had tremendous results "getting the word out" and breaking down barrier to treatment by offering treatment for $1 per day for periods of six months to over a year.

### 10. Notification Requirements

**Please provide a copy of each signed certified mail delivery green card that was sent to public officials in accordance to Tennessee Code Annotated 68-11-1607(c)(3).**

**Response**: The letters to all required persons were sent on or about March 5, 2013 and shown on page 131. The letters were received as shown in the electronic receipt provided on page 136 with tracking numbers. Applicant's attorney used LaserSubstrates, a web-based service to print and track certified letters (https://www.printcertifiedmail.com). The Green Cards have not been returned by the Postal Service yet.

Also included is our signed Affidavit.

Sincerely,

Steven W. Kester
Managing Member
Tri Cities Holdings, LLC

---

[3] Direct quote from: http://www.whitehouse.gov/ondcp/prescription-drug-abuse
[4] http://www.whitehouse.gov/sites/default/files/docs/state_profile_-_tennessee.pdf

**AFFIDAVIT**

2013 MAR 28  AM 9: 02

STATE OF GEORGIA

COUNTY OF GWINNETT

NAME OF FACILITY: _TRI CITIES HOLDINGS LLC

I, _STEVEN W. KESTER__, after first being duly sworn, state under oath that I am the applicant named in this Certificate of Need application or the lawful agent thereof, that I have reviewed all of the supplemental information submitted herewith, and that it is true, accurate, and complete.

_____
Signature/Title

Sworn to and subscribed before me, a Notary Public, this the _27_ day of _March_, 20_13_, witness my hand at office in the County of Gwinnett, State of Georgia.

_____
NOTARY PUBLIC

My commission expires _Jan. 4._ , _2016_.

HF-0043

Revised 7/02



Response to

Public Chapter 363
of the
Acts of the 2001 General Assembly

Methadone Treatment Facilities

Report prepared by

Tennessee Department of Health
in Consultation with the
Methadone Task Force,
Health Care Facilities Commission and
Board for Licensing Health Care Facilities

## TABLE OF CONTENTS

**Page Numbers**

Scope of Report...................................................................................... 1

Report Process...................................................................................... 2

Background............................................................................................ 3
       National Concerns....................................................................... 3
       Tennessee Problems.................................................................... 4
       Tennessee Regulatory Oversite................................................... 4

Findings of Fact..................................................................................... 6

Summary................................................................................................ 8

Recommendations................................................................................. 10

Exhibits.................................................................................................. 15
(Note: Exhibits are not available for downloading.)

## SCOPE OF REPORT

Due to the increased attention in the placement of methadone treatment facilities and the need for these facilities, the General Assembly charged the Commissioner of Health to conduct a study of methadone treatment facilities and report back to the House Health and Human Resources Committee and the Senate General Welfare, Health and Human Resources Committee on or before January 1, 2002.

Public Chapter 363 of the Acts of the 2001 General Assembly directs the Commissioner of Health to study issues relating to the need for and location of non-residential treatment facilities in the Certificate of Need process in consultation with the Health Facilities Commission and the Board for Licensing Health Care Facilities.

This report will contain reviews conducted of current federal and state regulations of methadone treatment facilities, state oversite of Tennessee facilities, literature on national concerns, regulations from other states, and reports from the Tennessee Board of Pharmacy.

To the extent possible, recommendations will be based on a thorough review of all data, nationally accepted facts, and practice standards of methadone facilities.

This report includes recommendations to current regulations utilized by state survey agencies and *Guidelines for Growth* used by the Health Facilities Commission in making decisions about need.

**REPORT PROCESS**

This study was conducted in monthly meetings with committee members being appointed by the Commissioner of Health. Monthly meetings were conducted on September 27, 2001, October 23, 2001, November 13, 2001, and December 18, 2001. A membership list is attached in the exhibits.

Task force members and Health Facilities Commission members were given an opportunity to review the draft report in order to make comments and suggestions prior to finalizing the report.

Some members expressed concerns about the proposed rule changes dealing with:

1)      Observed testing and
2)      Diversion Control Plan

These comments are attached in exhibits. **(Note: Exhibits are not available for downloading.)**

## BACKGROUND

### National Concerns

The November 1997 *National Institutes of Health Consensus Statement, Effective Medical Treatment of Opiate Addiction* estimated that only 115,000 of the total 600,000 estimated opiate-dependent persons in the U.S. were in methadone maintenance treatment (MMT) programs. The Consensus Statement reported that, "MMT is effective in reducing illicit opiate drug use, in reducing crime, in enhancing social productivity, and in reducing the spread of viral diseases such as AIDS and hepatitis." Although a totally drug-free state would be preferable, most opiate-dependent persons, according to research, cannot achieve and maintain this worthy target. MMT, as a substitute for a drug-free state, does reduce drug use, decrease criminal activity, provide an opportunity for employment and significantly improve quality of life for patients.

Opiate use has clear and well-defined health, employment and criminal consequences according to the Consensus Statement. The total financial costs of untreated opiate dependence to the individual, family and society was estimated at $20 billion by the NIH in its Consensus Statement. Numerous studies throughout the world have demonstrated that participation in MMT leads to significant reductions of illegal opiate use as well as other illicit drugs.

The mortality rate for opiate-dependent persons in methadone treatment programs is 30% of the mortality rate for those not participating in treatment. Persons who are not participating in MMT have higher incidence rates of bacterial infections, tuberculosis, hepatitis B and C, AIDS and other sexually transmitted diseases and alcohol abuse. Health care costs alone were estimated in the 1997 Consensus Statement to amount to $1.2 billion for opiate dependence.

Opiate use has an adverse impact upon employment and an individual's contribution to society. Since users spend an inordinate amount of time in finding and taking the drug, maintaining employment is often difficult. Many users look to public assistance to support themselves and their families. Studies have demonstrated, however, that MMT patients earn incomes that are double those of opiate users not in treatment.

Opiate use often leads users to criminal behavior. Stealing is the most common offense. The Consensus Statement reports that more than 95% of opiate users reported committing crimes in span of an 11-year period when they were using opiates. Numerous studies have demonstrated that "effective treatment of opiate dependence markedly reduces the rates of criminal activity."

Many persons associate dependency solely on heroin use. Too often, legally prescribed controlled substances, including opiates such as hydrocodone and morphine, are diverted for illegal use. In fact, the February 2001 edition of the *Psychiatric Times* reported that a national Substance Abuse and Mental Health Services Administration (SAMHSA) survey indicated that approximately 3.9 million Americans currently use prescription-type psychotherapeutic drugs for nonmedical reasons, almost twice as many as the 2.1 million who use heroin, cocaine and/or crack cocaine.

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 144 of 158   PageID #: 291

The NIH Consensus Statement addresses many of the misconceptions and stigmas associated with opiate dependence and methadone treatment programs. NIH urges that "vigorous and effective leadership is needed to inform the public that dependence is a **medical disorder** (emphasis added) that can be effectively treated with significant benefits for the patient and society."

**Tennessee Problems**

No public health data exist which accurately depicts the extent or severity of opiate addiction in Tennessee. Extrapolating the NIH estimates to Tennessee provides as reasonable an approach as any, resulting in estimates that 12,000 or more Tennesseans are opiate dependent. In December 2001, less than 3,000 persons were actively participating in non-residential treatment programs in the state which represents only a fraction of the state's estimated opiate users.

Generally, the closer one lives to a treatment program, the greater likelihood of participation. The current rate of participation is nearly twice as high for persons living in or close to one of the five counties (Shelby, Davidson, Knox, Hamilton and Madison) that house programs, 59.0/100,000 than the rate for those that live 60 miles or more from a program, 32.2/100,000.

The relatively few number of programs in the state that are available to opiate-dependent persons also contributes to low participation rates. Although the number of programs in other Southeastern states varies widely, Tennessee's six programs yields a rate of just 1.1 programs/one million population, less than one-half the 2.4/one million rate of the other states.

As is true around the country, substance abuse probably cannot be attributed solely to illegal substances in this state. Although Tennessee does not maintain a system for capturing data on the number of prescriptions filled, vendors in Tennessee cite the state as one of the top five in the country for purchase of Hydrocodone, Cocaine and Meperidine, all controlled substances that are easily diverted for illegal use.

**Tennessee Regulatory Oversight**

Tennessee Code Annotated requires that a vendor wanting to open a methadone treatment program must first receive a Certificate of Need from the Tennessee Health Facilities Commission and then be licensed by the Department of Health as a non-residential methadone treatment facility. Unfortunately, the *Guidelines for Growth* that have been developed do not provide concrete, objective criteria that can be used to adequately determine the appropriateness of awarding a Certificate of Need.

The regulatory oversight of Methadone Treatment Facilities began in 1988 by the Tennessee Department of Mental Health. In March, 1994 that oversight was transferred to the Department of Health, Health Care Facilities. Rules and regulation were amended by the Department in August, 1999 with encouragement and support of the General Assembly.

Currently there are 6 clinics operating in Tennessee in the following counties: Shelby, Davidson, Knox, Hamilton and Madison. Each clinic is surveyed annually and as necessary when complaints are filed.

For the past 2 years an average of 2 deficiencies have been sited per survey and consist of:

No Individual Treatment Record
Client history and treatment plans not reviewed every 90 days
No documentation of staff training for STD/HIV Training
Admission screening test not done – TB test, and pregnancy test for females
No annual justification for continued treatment
No evidence of annual physical
Urine drug screens not conducted on new clients
No physician's signature on medication order changes

There have been 3 complaints filed in the past two years.

## FINDINGS OF FACT

During the review of the vast amount of materials and interviewing of individuals, the following facts were formulated and agreed upon by the panel:

❖ Businesses that establish programs require a general population of at least 100,000 persons from which to draw potential clients. This figure is believed to generate 67 clients on average. Private businesses normally will not establish a program unless a minimum caseload of 60 patients is available.

❖ The closer one lives to a treatment program, the greater likelihood of participation as based on current participation in Tennessee Methadone Treatment facilities–

> 59.0/100,000 population participate in programs 60 miles or less
> 32.2/100,000 population participate in programs over 60 miles

❖ The NIH Consensus Statement of November, 1997 estimated that only 115,000 of the total 600,000 estimated opiate-dependent persons in the U.S. were in methadone maintenance treatment programs.

❖ Applying the NIH 1997 Consensus statement estimates of approximately 20% of opiate-dependent persons to Tennessee Census data, the number of potential clients could be as high as 12,300 within the state indicating only a fraction of the opiate users in the state are currently participating in methadone treatment programs.

❖ The financial costs of untreated opiate dependence to the individual, family and society was estimated at $20 billion by the NIH in its Consensus Statement.

❖ Opiate use has clear and well-defined health consequences. The mortality rate for opiate-dependent persons in methadone treatment programs is 30% lower than for dependent persons not participating in treatment. Numerous studies have demonstrated that participation in methadone maintenance treatment programs (MMT) leads to significant reductions of illegal opiate use as well as other illicit drugs.

❖ Since no data exists otherwise, it was presumed that the prevalence of opium-dependence was similar throughout the state.

❖ From a public policy standpoint, placing persons in a nonresidential methadone treatment program is preferable than allowing persons to remain addicted to heroin or other opiates.

❖ All Tennesseans who are eligible for and choose to participate in nonresidential methadone treatment should have reasonable geographic access to a program.

❖ Access should allow participants to develop a life that could include full employment and meaningful contributions to society.

❖ The number of reported methadone treatment facilities per SAMHSA in neighboring states varies widely:

| STATE | # | Rate/one million population |
|---|---|---|
| Alabama | 17 | 3.8 |
| Arkansas | 3 | 1.1 |
| Georgia | 24 | 2.9 |
| Kentucky | 15 | 3.7 |
| Mississippi | 2 | .7 |
| Missouri | 12 | 2.1 |
| North Carolina | 18 | 2.7 |
| Tennessee | 6 | 1.1 |
| Virginia | 14 | 2.3 |

## SUMMARY

In response to Public Chapter 363 of the Acts of 2001, the Commissioner of Health assembled a Methadone Task Force comprised of persons interested and involved in the subject of Methadone Maintenance Treatment (MMT). This task force held several meetings between September 1, 2001 and December 21, 2001 and examined a vast array of information related to Methadone programs, both in Tennessee and throughout the country. Many items that were considered by the group are attached to this report as exhibits.

New federal regulations for MMT were implemented on March 19, 2001. The task force examined the differences in existing Tennessee regulations and the new federal regulations in an effort to determine what changes were needed to the state's regulations for Non Residential Narcotic Treatment Facilities in order to assure compliance and compatibility with the new federal guidelines. In addition to reviewing the new federal regulations, the group reviewed other state regulations for comparison as well. Suggestions and comments were solicited from the methadone industry, methadone treatment specialists and the Department's Bureau of Alcohol and Drug Abuse Services for input on recommendations that would best serve to protect the public health, safety and welfare of the citizens of Tennessee.

Information from the state's Central Registry of Methadone patients in treatment was compiled, analyzed and studied by members of the group. Both the number and participation rate of active patients in treatment per county of residence was determined. Distance was a strong predictor of participation rates. Assuring that all Tennesseans who wish to participate in MMT have reasonable access to a program was used as justification for planning purposes of the proposal to designate 23 Methadone Service Areas (MSA) within the state. An MSA is a county or constellation of contiguous counties in the state that comprise a sufficient general population making it likely that a minimum number of opiate dependent persons reside in the MSA who wish treatment and could support a program. This minimum population foundation was balanced with the need to establish geographic boundaries such that patients living within the MSA would reside within less than an hour drive one-way to a treatment program if the program were established in the heart of the MSA. Refer to exhibit #6 for proposed MSAs.

The Tennessee Board of Pharmacy provided to the panel the DEA's Retail Drug Distribution by Zip Code report for Tennessee. This detailed report showed what prescription drugs were being shipped to various areas of the state. Also provided to the group was the information that revealed Tennessee's ranking in the purchasing of legally prescribed drugs. This report revealed Tennessee in the top five nationally for the purchase of Cocaine, Hydrocodone, and Meperidine (Demerol), each of which can be readily converted to illicit use that contributes to the high rate of opiate dependency in the state.

Although the current Guidelines for Growth were adopted by the Department and the Health Planning Commission in 2001, they still remain vague and lack the specificity as needed to support the philosophy of directing the delivery of health care services for methadone treatment. The group reviewed the current criteria and standards used for assisting the Health Facilities Commission in decisions concerning certificate of need application and felt improvements should be made.

Incorporating the concept of the Methadone Service Areas (MSAs), adding distance in travel time to existing programs and the impact on employment opportunities would strengthen the quality of the information submitted to the Commission when agencies request a Certificate of Need (CON). More comprehensive information would contribute to better decisions relating to need, economic feasibility, and orderly contribution to development of adequate and effective methadone treatment programs and assist the Department and the Health Facilities Commission in determining the appropriateness of issuing a CON.

# RECOMMENDATIONS

As a result of these efforts the Task Force is issuing recommendations within this report relating both to proposed rules changes and changes to the Guidelines for Growth. These recommendations follow in the papers titled "Proposed Rule Amendments to Chapter 1200-8-21 Non-Residential Narcotic Treatment Facilities" and "Guidelines for Growth Proposed Amendments".

*Recommendations of the Methadone Task Force*
December 2001

**Proposed Rule Amendments to Chapter 1200-8-21**
**Non- Residential Narcotic Treatment Facilities**

**1200-8-21-.01 Definitions.**
**Recommendation**: Add the following definitions:
1. Counseling Session. Therapeutic discussion between client(s) and a facility counselor for a period of no less than thirty (30) minutes designed to address client addiction issues or coping strategies and treatment plans.
**Rationale:** *Establishes a minimum standard for a counseling session*
2. Observed Testing. Testing conducted and witnessed by a facility staff person to ensure against falsification or tampering of results of a drug screen.
**Rationale:** *Clarification of testing procedure.*
3. Random Testing. Drug screens conducted by the facility that lack a definite pattern of who and when clients are selected for testing; indiscriminate testing.
**Rationale:** *Clarification of current regulatory language.*
4. Relapse. The failure of a client to maintain abstinence from illicit drug use verified through drug screen.
**Rationale:** *To clarify proposed amended language.*

**1200-8-21-.02 Licensing Procedures**.
**Recommendation:** Propose amending the following:
1200-8-21-0.2(2)(a). Delete … "rules of the FDA…" and replace with "…rules of SAMSHA (Substance Abuse and Mental Health Services Administration)…"

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 151 of 158   PageID #: 298

**Rationale:** *This change allows Tennessee's regulations to be aligned with those guidelines from the Federal agency, as they have been in the past.*

## 1200-8-21-.04 Administration.

**Recommendation:** Propose amending the following:

1. 1200-8-21-.04(4)(f) Counselors. Delete current language and replace with the following: There must be sufficient group and individual counseling available to meet the needs of the client population. At a minimum, the following counseling schedule shall be followed:
    - (i) During 1st 90 days of treatment, counseling session(s) shall take place at least one time a week;
    - (ii) During 2nd 90 days of treatment, counseling session(s) shall take place at least three (3) times per month;
    - (iii) During the 3rd 90 days of treatment, counseling session(s) shall take place at least two (2) times per month;
    - (iv) For subsequent 90 day periods of treatment, counseling session(s) shall take place as needed or indicated in the client's treatment plan, but no less frequent than monthly as long as the client is compliant;
    - (v) If the client experiences a relapse, his/her individualized treatment plan must document evidence of intensified services provided. Such evidence may include, but is not limited to, increase in individual or group counseling session(s) and/or a reduction in the client's take home privileges.

**Rationale:** *A specific counselor to client ratio has proven to be a difficult item to measure and does not dictate the quality of counseling provided. This change is directed at establishing the minimum standard and reflects the Federal change to accreditation rather than regulation. This should allow more flexibility for the clinics to establish quality counseling programs that achieve the desired outcomes necessitated for accreditation.*

2. 1200-8-21-.04(21). Hours of Operation. Propose amending the following:

Delete the third sentence that states, "In order to accommodate clients who are not receiving take-home medication, facilities must be open for dispensing seven days per week."

Replace with: Any patient in comprehensive maintenance treatment may receive a single take-home dose for each day that the clinic is closed for business, including Sundays and State and Federal holidays, not to exceed two (2) consecutive days.

**Rationale:** *Would potentially result in improved client compliance and an orderly provision of services.*

3. 1200-8-21-.04, (f) 24.

Propose adding the following language:

A Diversion Control Plan shall be in place at each clinic. The Diversion Control Plan must contain, at a minimum, the following:
    - (i) The Diversion Control Plan shall apply to all clients receiving take home medication.
    - (ii) It will include a random call back program with mandatory compliance. This call back must be in addition to the regular schedule of clinic visits.

(iii)    Each client receiving take-home medications must be called back at a minimum of once per 3 months.

(iv)    Upon call back a client must report to the clinic within 24 hours of notification, with all take home medications.  The quantity and integrity of packaging shall be verified.  One dose must be replaced and sent for analysis to verify strength and contents.

(v)    The facility shall maintain individual callback results in the client record.

(vi)    The facility must maintain a current log of all callbacks with the results of compliance.

**Rationale:** *Methadone diversion is always a concern both from the clinic standpoint and  in the community in which it is located.  This rule establishes minimum standards and requires each facility to develop callback plans for diversion control. .*

### 1200-8-21-.05 Admissions, Discharges and Transfers.

**Recommendation:** Propose to amend the following:

1.  1200-8-21-.05(4)(a) Amend third sentence to read, "Within 72 hours of admission **or discharge**, the facility shall initiate a clearance inquiry by submitting to the approved central registry the name, date of birth, anticipated date of admission **or discharge**…"

**Rationale:** *In order for the Central Registry to remain current in information, the SNA must be notified of discharges as well as admissions.*

2.  Add the following language: The facility shall ensure that clients are instructed in the proper storage and security of take-home medications after they leave the facility.

**Rationale:**  *To provide for the safe storage and handling of take-home medications to protect general welfare of the public.*

### 1200-8-21-.06 Basic Services.

1.    1200-8-21-.06(5)(h).

**Recommendation**: Add the following language:

Each clients' individualized treatment plan must include the counseling needs, including both group and individual counseling sessions as indicated by evaluation of the client's length of time in the program, drug screening results, progress notes, and social environment. The treatment plan must be reviewed at least every six (6) months.

2.    1200-8-21-.06(8)(a). Drug Screens. Delete the word Urine.

**Rationale***: This will allow the use of alternative drug screening at the discretion of the clinic. There are alternative tests available such as saliva and hair that are less invasive for the client, less opportunity for dilution/contamination. Currently they are prohibited from use in Tennessee because this regulation only recognizes urine drug screening*

3. 1200-8-21-.06(9)(c)Take Home Doses. Amend by adding … "methadone **and LAAM**"

**Rationale:** *This allows Tennessee regulations to be in conformity with the Federal Regulations.*

### 4. **1200-8-21-.06 (9) (c )**

**Recommendation:** Propose amending the following:

… "rules of the FDA…" and replace with "…rules of SAMSHA (Substance Abuse and Mental Health Services Administration)…"

**Rationale:** *This change allows Tennessee's regulations to be aligned with those guidelines from the Federal agency, as they have been in the past.*

**Guidelines for Growth-proposed amendments**

1. Need determinations for non-residential methadone treatment facilities shall strongly consider the Methadone Service Area. [Methadone Service Areas (MSAs) are designated for planning purposes to assist the state agencies in determining the appropriateness of issuing a Certificate of Need. These MSAs were developed in response to assumptions developed by a committee established in response to Public Health Chapter 363 of the Acts of 2001.]

   Designation of MSAs was patterned, in concept, after the use of Rational Service Areas by the Department of Health in helping identify underserved health resource shortage areas in Tennessee. An MSA is a county or constellation of contiguous counties in the state that comprise a sufficient general population making it likely that a minimum number of opiate dependent persons reside in the MSA who wish treatment and could support a program. This population foundation was balanced with the need to establish geographic boundaries such that patients living within the MSA would reside within less than an hour drive one-way to a treatment program if it were established in the heart of the MSA. Assumptions that guided determination of MSAs:
   - Generally, the closer one lives to a treatment program, the greater likelihood of participation. The rate of participation is nearly twice as high for persons living in or close to one of the five counties that house programs, 59.0/100,000 than the rate for those that live 60 miles or more from a program, 32.2/100,000
   - Businesses that establish programs require a general population of no less than 100,000 persons from which to draw potential clients. This figure is believed to generate 67 clients on average. Private businesses normally will not establish a program unless a minimum caseload of 60 patients is available.
   - In order to assure a sufficient population base in each MSA to support a treatment program, boundaries of MSAs were drawn to include a general population of 200,000. (Identification of MSAs with less population, e.g. 150,000, led to some areas with barely sufficient population to support a program; more than 200,000 would perpetuate distance barriers to existing programs.)

2. Decisions should be predicated upon improving access to programs that will increase patient compliance and reduce dropout rates and recidivism.

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 154 of 158   PageID #: 301

3. Access determinations should include the distance in miles and approximate travel time to the nearest existing programs. Consideration should be given to the quality of life improvements and employment opportunities available if programs were geographically accessible.

4. Strong consideration should be given to an applicant in a multi-county MSA without an existing program if Need, Economic Feasibility and Contribution to Orderly Development are met.

5. Simultaneous review CON applications for programs in the same MSA or a CON application in an MSA where at least one program already exists should demonstrate:
    -Current and potential caseloads
    -Estimated current unmet needs
    -Prospects for long-term viability if multiple programs are approved
    -Experience of the applicant in other locations (in- or out-of-state)

6. The applicant shall provide documentation on any agency in- or out-of-state with which the applicant has legal interest in or is involved in a management role.

7. The Department of Health's application review (TCA 68-11-107) will include recommendations from the State Methadone Authority. Both the Department and the Commission shall consider the State Methadone Authority's quarterly Tracking Report (description of patient census by county of residence).

## Exhibits
**(Note:  Exhibits are not available for downloading.)**

**Exhibit 1**      Committee Members
**Exhibit 2**      Public Chapter 363
**Exhibit 3**      Non Residential Narcotic Treatment Facility Outcome/Performance Data
                      1997, 1998, 1999 & 2000
**Exhibit 4**      Methadone Registry
**Exhibit 5**      County 2000 Population
**Exhibit 6**      Possible Methadone Service Areas for NR Methadone Clinic Locations
**Exhibit 7**      Map
**Exhibit 8**      Non-Residential Methadone Treatment Facilities (NRMTF)
**Exhibit 9**      Federal  State
**Exhibit 10**    Chapter 1200-8-21 Rules for Alcohol and Other Drugs of Abuse Non-Residential
                      Narcotic Treatment Facilities
**Exhibit 11**    Federal Register
**Exhibit 12**    Retail Drug Distribution
**Exhibit 13**    1999 Highlights
**Exhibit 14**    Certificate of Need and Rule Revision Recommendations
**Exhibit 15**    Volunteer Treatment Center, Inc.

G6022004/BHLR

Case 2:14-cv-00233-JRG-MCLC   Document 15-2   Filed 06/09/14   Page 156 of 158   PageID #: 303

# Tennessee Opioid Treatment Clinics



○ ONE LOCATION   ● TWO LOCATIONS   ● THREE LOCATIONS

Shelby (Memphis)
ADC Recovery & Counseling Center
3041 Getwell, Suite 101
Memphis, TN 38118
(901) 375-1050
Hours of Operation M-F 5a-1:30p; Sat 6a-9a
Dosing Hours M-F 5:30a-11a; Sat 6a-9a

Memphis Center for Research & Addiction
1270 Madison Ave
Memphis, TN 38104
(901) 722-9420
Hours of Operation M-F 5:45a-2p; Sat 6a-9a
Dosing Hours M-F 5:45a-1p; Sat 6a-9a

Raleigh Professional Associates
2960-B Austin Peay Hwy
Memphis, TN 38128
(901) 372-7878
Hours of Operation M-F 5a-1p; Sat 6a-2p
Dosing Hours M-F 5a-9a; Sat 6a-10a

Dyer (Dyersburg)
Midsouth Treatment Center
640 Hwy 51 Bypass 3, Suite M
Dyersburg, TN 38024
(731) 285-6535
Hours of Operation M-Sat 5a-11a
Dosing Hours M-F 5a-11a; Sat 6a-10a

Madison (Jackson)
Jackson Professional Associates
1869 Hwy 45 Bypass, Suite 5
Jackson, TN 38305
(731) 660-0880
Hours of Operation M-F 5a-1p; Sat 6a-2p
Dosing Hours M-F 5a-1p; Sat 6a-2p

Henry (Paris)
Paris Professional Associates
2555 East Wood Street
Paris, TN 38242
(731) 641-4545
Hours of Operation M-Sat 5a-1p
Dosing Hours M-Sat 5a-1p

Hardin (Savannah)
Solutions of Savannah
85 Harrison Street
Savannah, TN 38372
(731) 925-2767
Hours of Operation M-Sat 5:30a-12p
Dosing Hours M-F 5:30a-11a; Sat 6a-9a

Maury (Columbia)
Recovery of Columbia
1202 South James Campbell Blvd.
Columbia, TN 38401
(931) 381-0020
Hours of Operation M-Sat 5:30a-11a
Dosing Hours M-F 5:30-11a; Sat 6a-9a

Davidson (Nashville)
Middle Tennessee Treatment Center
2410 Charlotte Avenue
Nashville, TN 37203
(615) 321-2575
Hours of Operation M-Sat 6a-1p
Dosing Hours M-F 6a-1p; Sat 6a-9a

Hamilton (Chattanooga)
Volunteer Treatment Center, Inc.
2347 Rossville Blvd
Chattanooga, TN 37408
(423) 265-3122
Hours of Operation M-Sat 5:30a-2p
Dosing Hours M-F 5:30a-12:30p; Sat 5:30-11a

Knox (Knoxville)
DRD Knoxville Medical Clinic-Central
412 Citico Street
Knoxville, TN 37921
(865) 522-0661
Hours of Operation M-Sat 5:30a-2:30p
Dosing Hours 5:30a-11p; Sat 6a-9a

DRD Knoxville Medical Clinic-Bernard
626 Bernard Avenue
Knoxville, TN 37921
(865) 522-0161
Hours of Operation M-Sat 5:30a-2:30p
Dosing Hours M-F 5:30a-11a; Sat 6a-9a