# EXHIBIT 1

3-TR
3-Administrative
Record

Vol. I

THE CHANCERY COURT
DAVIDSON COUNTY, TENNESSEE

HONORABLE CAROL L. MCCOY, CHANCELLOR

CRISTI E. SCOTT, CLERK AND MASTER

RECEIVED
APR 2 0 2015
By _____

FILED
MAY 26 2015
Clerk of the Courts

TRI-CITIES HOLDINGS LLC d/b/a TREX TREATMENT CENTER
Petitioner/Appellant

VOLUME 1 of 3

| CERTIFIED TRANSCRIPT OF Cause | Appearance No. 14-650-II CHANCERY COURT | Vs<br>No. M2015-00058-COA-R3-CV<br>COURT OF APPEALS<br>TRANSMITTED ON:<br>April 20, 2015 | Execution No. SUPREME COURT | APPEALED TO Next Term, 20 |

TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY
Respondent/Appellee

Rick Piliponis, #16249
THE HIGGINS FIRM
525 Fourth Avenue South
Nashville TN 37210
(615) 353-0930

James A. Dunlap, Jr.
310 Windsor Gate Cove NE
Atlanta GA 30342
(404-354-2363)

*Attorney for Petitioner/Appellant Tri-Cities Holdings LLC, d/b/a Trex Treatment Center*

Sue A. Sheldon, #15295
Sara Sedgwick, #4336
Senior Counsel
Office of the Attorney General
P.O. Box 20207
Nashville TN 37202
(615) 741-2640

*Attorney for Respondent/Appellee Tennessee Health Services and Development Agency*

STATE OF TENNESSEE)

COUNTY OF DAVIDSON)

In the Chancery Court, Part II in which TRI-CITIES

HOLDINGS LLC d/b/a TREX TREATMENT

CENTER is the Petitioner and TENNESSEE

HEALTH SERVICES AND DEVELOPMENT

AGENCY is the Respondent, Rule No. 14-650-II,

the following proceedings were had:

Tri-Cities Holdings, LLC
v. 14-650-II
Tennessee Health Services and
Development Agency
Court of Appeals
Chancellor McCoy
M2015-00058

## INDEX

## PAPERS FILED IN THE TRIAL COURT

## VOLUME I

Appeal of Order Revoking Permission to Appear *Pro Hac Vice* . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Exhibit 1 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
(Letter to Judge Summers from James A. Dunlap, Jr. dated March 12, 2014)

Exhibit 2 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
(Order Revoking Permission to Appear *Pro Hac Vice*)

Exhibit 3 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
(Petitioner's Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice*)

Exhibit 4 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
(Letter to Judge Summers from James A. Dunlap, Jr. dated July 29, 2013)

Exhibit 5 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
(Letter to Judge Summers from James A. Dunlap, Jr. dated April 8, 2014)

Exhibit 6 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
(Petitioner's Motion for Reconsideration of Order Revoking Permission to Appeal
Pro Hac Vice)

Exhibit 7 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
(Order Denying the Motion for Reconsideration)

Affidavit of James A. Dunlap, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Exhibit to Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
(Letter from Supreme Court of Georgia)

Respondent's Notice of File Administrative Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Agreed Scheduling Order filed July 11, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

## VOLUME II

Respondent's Notice of Filing Supplemental Administrative Record . . . . . . . . . . . . . . . . . . . . 147

Supplemental Administrative Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Respondent's Brief on Judicial Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Plaintiff's Notice of Intention to Rely on Initial Filings to Serve as Brief . . . . . . . . . . . . . . . 179

Exhibit A to Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181
(Appeal of Order Revoking Permission to Appear *Pro Hac Vice*)

## VOLUME III - beginning with page 300

Petitioner's Reply Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Chancellor's Memorandum and Order filed December 10, 2014 . . . . . . . . . . . . . . . . . . . . . . . 338

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366

Appeal Bond for Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368

Certificate of Clerk and Master . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369

**Rick Piliponis, #16249**
**THE HIGGINS FIRM**
**525 Fourth Avenue South**
**Nashville TN 37210**
**(615) 353-0930**

**James A. Dunlap, Jr.**
**310 Windsor Gate Cove NE**
**Atlanta GA 30342**
**(404-354-2363)**

     *Attorney for Petitioner/Appellant Tri-Cities Holdings LLC, d/b/a Trex Treatment Center*

Sue A. Sheldon, #15295
Sara Sedgwick, #4336
Senior Counsel
Office of the Attorney General
P.O. Box 20207
Nashville TN 37202
(615) 741-2640

*Attorney for Respondent/Appellee Tennessee Health Services and Development Agency*

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

# 14-650-II

|  |  |  |
|---|---|---|
| In Re: Tri-Cities Holdings LLC | ) | DOCKET NO. 25.00-122076J |
| d/b/a Trex Treatment Center | ) | CON No. CN1303-005D |
|  | ) |  |
|  | ) |  |

## APPEAL OF ORDER REVOKING
## PERMISSION TO APPEAR *PRO HAC VICE*

James A. Dunlap Jr., Esq.
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

James S. Higgins, Esq. BPR # 16142
Rick Piliponis, Esq. BPR # 16249
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# Contents

Standard of Review ................................................................................................ 3

Statement of Facts ................................................................................................. 3

A.   The Administrative Hearing Officers's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect. ......... 3

B.   The Administrative Hearing Officer's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect. .................................................................... 6

C.   Mr. Dunlap never misled the Administrative Hearing Officer when he indicated his opinion was that there were no "new developments" in the case. ............................... 8

Argument and Citation of Authority ................................................................. 11

A.   The Administrative Hearing Officer should not retaliate against Mr. Dunlap because he, in good faith, advised the Administrative Hearing Officer that it is subject to the ADA and that the Administrative Hearing Officer bears certain responsibilities under the ADA ................................................................................ 11

B.   Mr. Dunlap asserts that the ADA applies to the Administrative Hearing Officer and *supreme* federal law places upon the Administrative Hearing Officer an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON. ...................................................................................................................... 12

C.   The Administrative Hearing Officer should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law. .............................................................................................. 14

D.   Assuming, *arguendo*, that the Administrative Hearing Officer was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Administrative Hearing Officer on the status of the federal case, if any misunderstanding did occur. .......... 16

E.   In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge." .................................................... 16

F.   In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings." ..................................................................................... 18

G.   Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee." ............................................................................... 18

Conclusion .......................................................................................................... 18

2

Plaintiffs Tri-Cities Holdings LLC ("TCH""), Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby appeals the Administrative Hearing Officer's Order Revoking Permission to Appear *Pro Hac Vice* of James A Dunlap Jr. and states as follows:

## Standard of Review

The Court may reverse or modify the Administrative Hearing Officer's decision if the rights of the Petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

    (1)    In violation of constitutional or statutory provisions;

    (2)    In excess of the statutory authority of the agency;

    (3)    Made upon unlawful procedure;

    (4)    Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

    (5)    Unsupported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. Section 4-5-322.

## Statement of Facts

### A. The Administrative Hearing Officers's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect.

First and foremost, in paragraph 1 of its Conclusions of Law, p. 9, the Administrative Hearing Officer Judge D. Kim Summers makes a *sua sponte*, damning allegation against Mr.

3

Dunlap that he did not disclose the dismissal on ripeness grounds of the *Tri-Cities I*[1] case and that

he concealed that the federal court was subject to a stay in deference of the administrative

proceeding, holding:

> "He [Mr. Dunlap] <u>never</u> disclosed to this tribunal that <u>the federal litigation had
> previously been dismissed for lack of ripeness</u> or that <u>it was now, itself, subject to a
> stay in deference to the administrative proceedings</u>."

*March 14, 2014 Order, p. 9.* Both of these allegations are extremely serious and, presumably,

under the right factual scenario, could carry the penalty of disbarment. The Administrative

Hearing Officer made this Conclusion of Law, and barred Mr. Dunlap as counsel from this

proceeding, <u>without even notifying Mr. Dunlap of the finding beforehand or asking Mr. Dunlap to</u>

<u>respond</u>.

Of course, *Tri-Cities I* was the previous action filed in federal court after Johnson City

denied TCH's application for rezoning to establish an Opiate Treatment Program in Johnson City.

Even before TCH filed its administrative appeal, *Tri-Cities I* had been dismissed by the federal

court <u>without prejudice</u>, allowing the plaintiffs in that action to refile the action, which they did.

All issues in *Tri-Cities I* were maintained in *Tri-Cities II*[2] along with additional claims against

HSDA arising from the denial of the Certificate of Need. Although there is no transcript of several

telephone conference calls with Judge Summers and HSDA's counsel in the case, Mr. Dunlap

recalls painstakingly recounting the history of the litigation and the application of the ADA in the

administrative appeal. He believes that it would have been virtually impossible that--at least once--

---

[1] *Tri-Cities Holdings LLC et al. v. City of Johnson City et al.*, Case No. 2:13-CV-108 (E.D. Tenn).

[2] *Tri-Cities Holdings LLC et al. v. HSDA et al.*, Case No. 2:13-CV-305 (E.D. Tenn).

4

during these calls that he would not have mentioned the *Tri-Cities I* case—though it had been dismissed without prejudice, all claims in it had been re-alleged in the refiled *Tri-Cities II* and that *Tri-Cities I* was irrelevant for all practical purposes in the administrative appeal.

In addition, the allegation that Mr. Dunlap failed to disclose *Tri-Cities I* is patently incorrect based on the record. On July 29, 2013, Mr. Dunlap sent what he thought was a complete copy of the Tri-Cities II Complaint to Judge Summers along with his letter ("I'm attaching a copy of the federal complaint"). This was done to assist Judge Summers in understanding the issues in the federal action. The Complaint clearly and unambiguously identifies *Tri-Cities I* and its outcome:

> *Tri-Cities Holdings et al. v. Johnson City et al.*, Case No. 13-cv-108 (E.D. Tenn. 2013)(case dismissed without prejudice on ripeness grounds).

See Tri-Cities I, Doc. 1, p. 32, n. 67 (emphasis added). Furthermore, the Complaint in *Tri-Cities II* clearly and unambiguously references evidence and testimony from *Tri-Cities I* multiple times. Judge Summers claims that she only received four pages of the Complaint. But she never mentioned receiving an incomplete copy until after she alleged Mr. Dunlap had *concealed Tri-Cities I*. Mr. Dunlap fairly assumed that Judge Summers had a complete copy and would have enough interest in the case to read the Complaint. There was no concealment by Mr. Dunlap. It is undisputed that the *Tri-Cities II* Complaint which clearly and unambiguously references, including the court, caption, and a specific and fairly crafted parenthetical reference that Tri-Cities I was "dismissed without prejudice on ripeness grounds." *Id.* Thus, Mr. Dunlap has disclosed the nature and outcome of *Tri Cities I.* Therefore, the grounds for revoking Mr. Dunlap's *Pro Hac Vice* admission based on any alleged concealment is clearly not applicable in this case.

Assuming *arguendo* that Tri-Cities I was not disclosed to Judge Summers by any party,

5

Mr. Dunlap had no *obligation* to disclose *Tri-Cities I.* That case was over. It had been dismissed

without prejudice allowing all issues to be raised in a new proceeding. All claims in *Tri-Cities I*

had been refiled and were presenting pending in *Tri-Cities II.* The dismissed and no-longer-

pending *Tri-Cities I* was *completely irrelevant* to the administrative proceedings. The

administrative appeal involved the denial of TCH's application for a Certificate of Need. *Tri-

Cities I* did not involve any claims arising from the denial of the Certificate of Need. *Tri-Cities I*

did not involve any claims arising in the administrative proceeding against HSDA. HSDA was not

even a party to *Tri-Cities I.* It is undisputed that Mr. Dunlap disclosed the pending *relevant*

federal case *at all times,* beginning with his first correspondence with the Administrative Hearing

Officer in July, 2013. See Exhibit 1 (beginning with the caption of the letter). In sum, Mr. Dunlap

did not commit misconduct, and therefore should not be punished, for not disclosing an irrelevant,

federal action dismissed before the administrative appeal was even filed.

**B. The Administrative Hearing Officer's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect.**

The Administrative Hearing Officer makes, in her *sua sponte* Order without notice or

opportunity for the Petitioner to advise or counter the arguments of the Administrative Hearing

Officer, a finding of fact in its basis to revoke Mr. Dunlap's *Pro Hac Vice* admission that he

concealed to the Administrative Hearing Officer that the federal court "was now, itself, subject to a

stay in deference to the administrative proceeding." The Administrative Hearing Officer further

finds that Mr. Dunlap had engaged in such concealment that is, under the right circumstances,

worthy of disbarment.

The federal case is not and never has been stayed "subject to a stay in deference to the

6

administrative proceeding". The Magistrate's December 20, 2013 Order [Doc. 135] (Exhibit 2)

was on a motion to stay discovery. ("The Motion to Stay Discovery, Doc. 100, is

GRANTED....").[3]

The Magistrate's January 2, 2014 Order stayed the case specifically to give Defendants

more time to respond to Plaintiffs' Motion for Summary Judgment. See *Tri-Cities II*, Doc. 150

(Exhibit 3). The Order giving Defendants additional time to respond was subject to being lifted at

"a moment's notice:"

> By motion filed as document 139, the defendants have filed <u>a motion for additional</u> <u>time to respond to the plaintiffs' motion for partial summary judgment.</u> Their motion is GRANTED only to the following extent.
>
> If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. <u>If, however, the district</u> <u>judge denies the motion to stay the case, the stay of discovery will be lifted as of</u> <u>that moment,</u> [1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

Therefore, there is not, and never has been, any stay in the federal court "in deference to the

administrative proceedings," <u>because it was never stayed on that basis.</u> These orders never stayed

the federal court in some kind of suspended mode pending a decision on the administrative appeal.

The factual premise is false. Therefore, the Administrative Hearing Officer's *sua sponte* finding

related to Mr. Dunlap's fraud or concealment of *Tri-Cities I* and an alleged stay of the federal

action "in deference to the administrative proceeding" is unsupported.

---

[3] "As a part of the discussion in the Magistrate's Order, the Administrative Hearing Officer said, "The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals." December 10, 2013 Order [Doc. 135]. But such *dicta* in an order granting a stay in discovery cannot be interpreted to operate as stay of the federal action pending an outcome of the administrative proceeding.

7

### C. Mr. Dunlap never misled the Administrative Hearing Officer when he indicated his opinion was that there were no "new developments" in the case.

Petitioner *respectfully* disputes that Mr. Dunlap committed any misconduct when he responded to a January 8, 2014 inquiry "that there were no new developments" because the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action. By that statement, Mr. Dunlap intended to represent that there had been no decision by the federal court either way on these motions. This was entirely correct. Mr. Dunlap interpreted the Administrative Hearing Officer's continuing inaction in the proceeding, enacted multiple times, that the Administrative Hearing Officer was waiting for the federal court to decide the dispositive motions, whenever that would occur. Additionally, HSDA was fully aware of Mr. Dunlap's opinion (being copied simultaneously on emails to Judge Summers). HSDA could challenge Mr. Dunlap's opinion at any time. HSDA never did.

There was no "new development," as far as Mr. Dunlap could tell (and HSDA apparently agreed), in so far as the federal court was proceeding , in a prompt and expeditious matter, to make a decision on the various motions which potentially would render the administrative proceeding moot. In fact, on that same day, HSDA attorney Jim Christoffersen offered his own opinion of the federal case, contrary to Mr. Dunlap's, there were in fact "new developments" and "indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary." " Mr. Christoffersen, being General Counsel for HSDSA, was fairly perceived, by Mr. Dunlap and the Administrative Hearing Officer, to be in constant contact, and updated by, with HSDA's attorney Sue Sheldon and Sara Sedgewick as to what was going on in the federal case. Mr. Christoffersen apparently has immediate access to federal court filings. Indeed, he appears to send them to the Administrative Hearing Officer within minutes of

8

filing in the federal case (for example, as Mr. Christoffersen did when he received and forwarded the federal court's request for a status report on March 11, 2014). Mr. Christoffersen's "new developments" update never materialized. Above all, there was never any intent on Mr. Dunlap's part to misrepresent the status of the federal action.

In any event, the federal court order staying discovery [Doc. 135] was clearly inconsequential from the standpoint that Plaintiffs' Motion for Summary Judgment and the Defendants' Motions to Dismiss did not rely on any disputed facts on issues. Plaintiffs' motion rested on, for example, Johnson City's and HSDA's blatantly illegal zoning ordinance and notice rule, where there was no factual dispute. The Defendants' Motions to Dismiss did not rely on any disputed issues. So the motions in federal court were poised for prompt decision with or without discovery. HSDA apparently agreed with Mr. Dunlap because this was never brought to the attention of the Administrative Hearing Officer around the January 10, 2014 telephone conference.

The administrative proceeding had been delayed several times before the scheduled January 10, 2014 telephone conference with the Administrative Hearing Officer. Any of the inconsequential orders of the federal court – an order suspending discovery that would in no way stop the federal court from deciding the pending motions, and an order giving as little as 30 days additional time for The Defendants to respond to Plaintiffs' Motion for Summary Judgment --- do not upset in any way the Administrative Hearing Officer's long-past decision to simply wait for the federal court. In that respect there were no "new developments." It is highly unlikely that the Administrative Hearing Officer would have, all of a sudden, decided to schedule a full-blown final hearing simply because the federal court had given the Defendants an additional thirty days or so to respond to Plaintiffs' Motion for Summary Judgment.

9

Any additional time the federal court had given the Defendants to respond to Plaintiffs' Motion for Summary Judgment was, in accordance with its terms, expected to be for a *reasonable time* (i.e., a reasonably *short and most likely very short time*) and, therefore, should not cause unreasonable delay in the consideration of the pending Motion for Summary Judgment and the Motions to Dismiss. HSDA, through its counsel, apparently agreed with Mr. Dunlap and did not mention it. The statement there were "no new developments: was certainly subject to a contrary opinion of HSDA, HSDA being a party to the federal court action; however HSDA, by not articulating any contrary opinion, apparently agreed with Mr. Dunlap.

On January 8, 2014, HSDA's General Counsel and presiding attorney, apparently had no different opinion than Mr. Dunlap. He did not advise the Administrative Hearing Officer on "any new developments" either. HSDA did not, and could not, reasonably qualify its opinion by claiming either lack of knowledge of the status of the federal case any reliance solely upon Mr. Dunlap for the status of the federal case. To the contrary, HSDA implicitly and explicitly represented to the Administrative Hearing Officer, and to Mr. Dunlap, that it was knowledgeable of the status of the federal case and that there were "no new developments" Because none were offered.

Furthermore, HSDA's attorneys read the December 10, 2013 Magistrate's Order and HSDA's attorneys obviously felt there was nothing to advise regarding the status of the administrative proceeding because they did exactly what Mr. Dunlap did. HSDA was a party to the federal case and the administrative proceeding, HSDA had access to all court proceedings and filings, and HSDA was free to object to Mr. Dunlap's opinion that there were no "new developments" at any time. HSDA could have moved for a hearing date to be set based on

10

whatever "new developments" they felt were relevant. Mr. Dunlap provided the Administrative
Hearing Officer with the exact same information that HSDA was giving the Administrative
Hearing Officer.

Petitioner filed a Motion for Reconsideration. See Exhibit 6. The Administrative Hearing
Officer denied the motion. See Exhibit 7.

**Argument and Citation of Authority**

The Court should reverse the Administrative Hearing Officer's decision because the rights
of the Petitioner have been prejudiced and because the administrative findings, inferences,
conclusions and/or decisions are in (a) violation of constitutional or statutory provisions, (b)
arbitrary or capricious and characterized by abuse of discretion and (c) clearly unwarranted
exercise of discretion; and (d) are unsupported by evidence that is both substantial and material in
the light of the entire record.

A. **The Administrative Hearing Officer should not retaliate against Mr. Dunlap because
he, in good faith, advised the Administrative Hearing Officer that it is subject to the
ADA and that the Administrative Hearing Officer bears certain responsibilities under
the ADA.**

Petitioner certainly intended no affront the Administrative Hearing Officer when advising
that she is subject to the ADA. This is a fact. Mr. Dunlap would be failing to represent his client
diligently and effectively unless he did what he did: (1) Advise the Administrative Hearing Officer
of the application of the ADA, (2) advise the Administrative Hearing Officer of its duties under the
ADA; and (3) advise the Administrative Hearing Officer of his potential adverse position of being
a plaintiff in an action against the Administrative Hearing Officer or that the Administrative
Hearing Officer would be subject to a potential DOJ enforcement action if it violated the ADA. In

11

fact, Mr. Dunlap would be violating his duties to this client if he had not advanced these positions in this case.

Petitioner denies the finding that Mr. Dunlap showed "contempt for the proceeding" at Conclusions of Law, para. 6. On the contrary, Petitioner would welcome a full and frank discussion of the issues in the case and the opportunity to be heard on these issues. Mr. Dunlap asserted in good faith that Johnson City and HSDA are attempting to have the Administrative Hearing Officer somehow "exorcise" their ADA violations in this case -- which this Administrative Hearing Officer cannot do. This is in clear accordance with federal law. Further, the federal court is the most appropriate forum in the case and that this Administrative Hearing Officer should naturally defer to the federal court on issues of interpretation of federal law such as those raised herein. The use of forceful prose in making these points in not intended to be disrespectful.

It is obvious that the Administrative Procedures Division – like all Tennessee state agencies--is subject to the ADA. The Administrative Hearing Officer should not retaliate against Mr. Dunlap for fairly asserting his clients' ADA rights.

**B. Mr. Dunlap asserts that the ADA applies to the Administrative Hearing Officer and *supreme* federal law places upon the Administrative Hearing Officer an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON.**

Petitioner *respectfully (as always)* asserts that Mr. Dunlap would be violating his duties to his client if he failed to assert his clients' ADA rights in this regard. Simultaneously, Mr. Dunlap owes a duty of candor to the Administrative Hearing Officer (Rule 3.3 of Rules of Professional Responsibility) and to his clients. He should not be sanctioned for attempting to properly achieve this balance.

12

As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [3]. Mr. Dunlap had a clear duty to zealously advance his clients' interests in what amounts to a civil rights action. It is undisputed that his individual clients are facing almost daily threat of death or serious injury while being forced to drive hundreds of miles from the Johnson City area to standard of care treatment facilities in North Carolina. Mr. Dunlap's sitting silent, or engaging in mouse-like behavior to avoid "offending the Administrative Hearing Officer," would have clearly violated this duty of zealous representation.

> In the nature of law practice, however, conflicting responsibilities are encountered. <u>Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an ethical person while earning a satisfactory living.</u> The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these Rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules. <u>These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests,</u> within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [10] (emphasis added). Thus, Mr. Dunlap, like all petitioners asserting rights against States and State agencies, faces an unavoidable conflict providing zealous representation within the bounds of the law. He has not failed to properly balance these duties.

Further, the Rules of Professional Conduct specifically allow a lawyer to be a zealous advocate when the opposing party is well-represented by counsel. The Rules provide:

> A lawyer's responsibilities as a representative of clients, an officer of the legal system, and a public citizen are usually harmonious. Thus, when an opposing party

13

is well represented, a lawyer can be a zealous advocate on behalf of a client and at the same time assume that justice is being done.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [9] (emphasis added). Surely HSDA, and the Administrative Hearing Officer, are "well-represented." The Rules of Professional Conduct implicitly require Mr. Dunlap to be a "zealous advocate" for his client's rights without the threat of facing banishment from the process without a hearing or opportunity to be heard. Zealous advocacy involves making the Administrative Hearing Officer aware, in frank terms, that is has duties under the ADA.

**C. The Administrative Hearing Officer should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law.**

The Administrative Hearing Officer should not retaliate against Mr. Dunlap for pointing out, in a respectful manner, and simultaneously providing voluminous legal authority, that the Administrative Hearing Officer could be in violation of federal law. HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[4] In this case, in Mr. Dunlap's good faith opinion, HSDA and Johnson City are

---

[4] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening,* 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.,* 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory procedural requirements themselves violate the FHAA; the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is

14

trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's blatant violations federal law.

Mr. Dunlap, in courteous fashion, has made multiple attempts to outline for the Administrative Hearing Officer the scope and effect of the ADA and its possible implications on this administrative proceeding. First, on July 28, 2013, in courteous fashion, Mr. Dunlap set forth the ADA the legal requirement for all state agencies to attempt a reasonable modification to allow TCH to locate its clinic in Johnson City. See Exhibit 1. Second, on July 29, 2013, Mr. Dunlap requested such a reasonable modification. See Exhibit 4. Third, on March 12, 2014, Mr. Dunlap outlined the federal law, with voluminous citations, and made a request for a reasonable modification in a letter. See Exhibit 5. Fourth, on March 12, 2014, again in courteous fashion, Mr. Dunlap outlined federal law and made a request for a reasonable modification in Petitioner's Objection to the Motion to Set Hearing and Demand for Reasonable Modification. See Exhibit 6.

More than four times, Mr. Dunlap presented his well-researched position (including voluminous legal citations and copying opposing counsel) to the Administrative Hearing Officer. Mr. Dunlap is not taking a frivolous position. Mr. Dunlap's duty to his clients and to the Administrative Hearing Officer obligates him to make the Administrative Hearing Officer fully aware of the ADA and that Administrative Hearing Officer would likely run afoul of federal law if she takes certain steps. Mr. Dunlap should not be sanctioned for simply *and respectfully* making

---

facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,* 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See, e.g., *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 573 n.4 (2d Cir. 2003).

15

the Administrative Hearing Officer aware it might be violating federal law.

**D. Even assuming *arguendo* that the Administrative Hearing Officer was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Administrative Hearing Officer on the status of the federal case, if any misunderstanding did occur.**

Mr. Dunlap did not fail to advise that that the federal court was *deferring* to the

administrative proceeding because that was never the case. Mr. Dunlap did not interpret the

statements in the Magistrate's December 10, 2013 Order regarding the administrative proceeding

as anything more than *dicta*. Petitioner respectfully submits that, in any event, this *dicta* would be

contrary to federal law that does not require TCH to pursue administrative remedies before filing

an ADA Title II action.[5]

**E. In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge."**

Petitioner respectfully represents that advising the Administrative Hearing Officer on

applicable federal law and the Administrative Hearing Officer's responsibility thereunder does not

---

[5] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion requirement); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding, under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990) (same).

16

constitute "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tennessee Code Ann. § 39-14-112. Advising the Administrative Hearing Officer of federal law, while copying opposing counsel, does not amount to improper influence or coercion.

Rule 3.3 of the Tennessee Rules of Professional Conduct requires "candor toward the tribunal." In this respect, Mr. Dunlap has fulfilled his duty and in no way has breached his duty. Mr. Dunlap, supported by substantial legal authority that he has shared with the Administrative Hearing Officer (copying opposing counsel at all times) in well-researched letters and filings, simply pointed out to the Administrative Hearing Officer that she may be subject to the ADA and that his clients' positions had become adverse to the Administrative Hearing Officer from a legal perspective. To fail to do so would have violated this rule, rather than honoring it.

Rule 3.4 of the Tennessee Rules of Professional Conduct requires "fairness to opposing party and counsel." In this regard, Petitioner submits that Mr. Dunlap has not violated this provision in any respect. Mr. Dunlap has always conducted himself with view to fairness toward the other side in this matter. Opposing party and counsel have been copied on every correspondence with the Administrative Hearing Officer and obviously they are a party to the underlying federal action.

Rule 8.4 of the Tennessee Rules of Professional Conduct describe to a wide range of potential misconduct generally described as "dishonesty, fraud, deceit, or misrepresentation." As set forth herein, Petitioner submits that in no way has Mr. Dunlap violated Rule 8.4. At all times, Mr. Dunlap has been completely forthright with the Administrative Hearing Officer and in no way has committed any "dishonesty, fraud, deceit, or misrepresentation."

17

**F. In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."**

Petitioner respectfully disputes that Mr. Dunlap "expressed contempt for this tribunal and these administrative proceedings resulting in no apparent purpose for his continued participation. On the contrary, Mr. Dunlap's thoroughly-researched position, expressed in good faith, that the ADA applies to this Administrative Hearing Officer and that the Administrative Hearing Officer has certain obligations under federal law serves merely to advise the Administrative Hearing Officer of Petitioner's position. Mr. Dunlap would be violating his duty, <u>to his client and to this Administrative Hearing Officer</u>, by remaining silent if he, in good faith, believed that this Administrative Hearing Officer was violating federal law.

**G. Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."**

Petitioner respectfully submits that, in fact, Mr. Dunlap has appropriately fulfilled his duties <u>both</u> to his clients and to this Administrative Hearing Officer. He has done so by respectfully, but firmly and forthrightly, explained his clients' adverse position with this Administrative Hearing Officer related to the ADA. Simply laying this position out to the Administrative Hearing Officer in a respectful manner is completely appropriate and in no way violates any Rule of Professional Responsibility or state law. Mr. Dunlap should not be retaliated against for fulfilling his duty of candor to the Administrative Hearing Officer.

**Conclusion**

(a) Petitioner *respectfully (as always)* denies each and every allegation of misconduct, violation of Rules of Professional Conduct, or violation of law, by Mr. Dunlap

18

contained in the Administrative Hearing Officer's March 14, 2014 Order.

(b) Petitioner *respectfully (as always)* asks this Court to rescind the Administrative Hearing Officer's March 14, 2014 Order and otherwise find this Order null and void and contrary to Tennessee and federal law.

(c) Finally, that this Court order that Mr. Dunlap be allowed to represent TCH in the administrative proceeding.

Dated: April 29, 2014

Rick Piliponis, Esq. BPR # 16249
James S. Higgins, Esq. BPR # 16142
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

James A. Dunlap Jr., Esq.
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

Counsel for Petitioner

19

# CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2014, a copy of the foregoing document(s) was served

by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

/s/ Richard D. Piliponis
Richard D. Piliponis

20

# EXHIBIT 1

**Law Offices**
**James A. Dunlap Jr. & Associates LLC**
**310 Windsor Gate Cove NE**
**Atlanta, Georgia 30342**

Phone: (404) 354-2363                                                          E-mail:
Fax: (404) 745-0195                                              jim@jamesdunlaplaw.com

March 12, 2014

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:    Tri-Cities Holdings LLC d/b/a Trex Treatment Center
       CON #1303-005D
       Docket No.: T.B.A.

Dear Judge Summers:

    I wanted to outline further my position regarding the previous requests I have made upon you regarding TCH's rights under the Americans with Disabilities Act in this appeal.

    The Administrative Procedures Division, Tennessee Department of State, is subject to Title II of the Americans with Disabilities Act.[1] *Respectfully,* I submit that this imposes upon you an *affirmative duty* to provide a reasonable modification to TCH

---

[1] "The [Tennessee] Department Americans with Disabilities Act (ADA) Coordinators ensure state government's compliance with the Americans with Disabilities Act as amended by the Americans with Disabilities Act Amendments Act (ADAAA). They assist with reasonable accommodation issues in state employment and program access for state services and programs and help agencies and employees resolve access and accommodation issues. Please contact your agency's ADA Coordinator if you need more information or have any questions about a reasonable accommodation." State of Tennessee Employee Handbook, p. 10. (emphasis added).

to allow the Certificate of Need to be issued in this case and before any final hearing is held.[2]

The Attorney General of the United States, at the instruction of Congress,[3] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[4]   .

As you know, I have made several requests to you for a reasonable modification under the ADA.[5] I *respectfully* submit that you and the Administrative Procedures Division have an affirmative duty to provide a reasonable modification to TCH to obtain its Certificate of Need. This responsibility is different from your consideration of normal "non-ADA" administrative appeal.

Because your duty under the ADA is *affirmative*, it is not incumbent upon me to take the initiative to fashion a remedy. Rather, it is your duty. However, this modification might specifically involve a reasonable lowering of the requirements of "need, economic feasibility, or orderly development" in accordance with the criteria for issuance of a Certificate of Need. Although given the undisputed evidence that this area suffers the worst drug overdose death and infant mortality rate in the nation, satisfaction of the "need" criteria is relatively straightforward. In addition, there is undisputed evidence of widespread suffering and havoc related to the daily long-distance driving of between 500 and 1,000 opiate-addicted, ADA-disabled people to have to get standard of care Methadone Maintenance Treatment at an Opiate

---

[2] *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002) (holding that entities have standing to sue under the ADA as being discriminated against "because of their known association with an individual with a disability")(citations).

[3] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." Id. § 12134(b).

[4] 28 C.F.R. § 35.130(b)(7).

[5] James Dunlap letters to Judge Summers, July 28, 2013 and July 29, 2013. Petitioner's Motion for Reasonable Modification dated March 10, 2013.

Treatment Programs in North Carolina. I would submit that on the issues of economic feasibility and orderly development, such a clinic would easily satisfy any requirement, given that there is no such clinic within fifty (50) miles in any direction and the need is so great.

In this regard, I would *respectfully* request that you immediately indicate your willingness to discuss a reasonable modification (by telephone is fine) and that we schedule a conference (again telephone is fine) to *specifically to address the reasonable modification request*—before a full-blown hearing is scheduled.

Finally, I would hope that you would not be hurried or pressured in any way to schedule a final hearing in this case. Rather, it my clients' position that it is appropriate for the pending federal case to resolve <u>before</u> a final hearing in this case.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:    Jim Christoffersen, General Counsel HSDA (via email)

# EXHIBIT 2



**State of Tennessee**
## Department of State
Administrative Procedures Division
312 Rosa L. Parks Avenue
8ᵗʰ Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472



March 14, 2014

James B. Christoffersen, Esq.
Deputy General Counsel
Tennessee Health Services &
    Development Agency
Frost Building, 3ʳᵈ Floor
161 Rosa L. Parks Boulevard
Nashville, Tennessee 37243

James Dunlap, Jr., Esq.
James A. Dunlap, Jr. & Associates
310 Windsor Gate Cove, N.E.
Atlanta, GA 30342

Tennessee Board of Professional Responsibility
10 Cadillac Drive, Suite #220
Brentwood, TN 37027

Rick Piliponis, Esq.
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue South
Nashville, TN 37201-2002


RE:     In the Matter of:   Tri-Cities Holdings, LLC d/b/a Tres Treatment Center
                            Docket No. 25.00-122076


Enclosed is an Order rendered in connection with the above-styled case.



Administrative Procedures Division
Tennessee Department of State



/aem
Enclosure

*The Department of State is an equal opportunity, equal access, affirmative action employer*

IN THE MATTER OF:

TRI-CITIES HOLDINGS, LLC
d/b/a TREX TREATMENT CENTER

DOCKET NO: 25.00-122076J

CON Application No. CN1303-005D

## ORDER REVOKING PERMISSION TO APPEAR *PRO HAC VICE*

This matter is before the undersigned Administrative Judge to reconsider the *pro hac vice* application of attorney James Dunlap, Jr., licensed to practice law in the State of Georgia. Based upon the following Findings of Facts and Conclusions of Law, Mr. Dunlap's permission to appear *pro hac vice* in this matter is hereby revoked.

## FINDINGS OF FACT

1.      An appeal of the denial of a Certificate of Need (CON) for Tri-Cities Holdings, LLC, d/b/a Trex Treatment Center (Tri-Cities) was filed with the Secretary of State's Administrative Procedures Division on July 19, 2013.

2.      On July 29, 2013, attorney for Tri-Cities, Mr. James Dunlap, Jr., filed a letter with the Administrative Procedures Division requesting that the administrative appeal of the CON denial be stayed pending resolution of a related federal court action.

3.      On July 30, 2013, Mr. Dunlap, filed a Motion for Admission Pro Hac Vice. This Motion was granted by Order dated August 2, 2013.

4.      Conference calls were held with the Parties on July 31, 2013, and September 5, 2013. Mr. Dunlap and his local counsel Mr. Rick Piliponis of Nashville, Tennessee, participated in the calls on behalf of Tri-Cities. Attorney Jim Christoffersen participated on behalf of the Tennessee Health Services and Development Agency (HSDA).

5.     During the September 5, 2013 conference call, Mr. Dunlap indicated that the issues being addressed in federal court would resolve the CON appeal and, again, requested that the administrative proceedings be stayed until a decision was made by the federal court on a pending motion for summary judgment which, according, to Mr. Dunlap, would be very shortly forthcoming.

6.     Based upon Mr. Dunlap's representations, the request for stay of the administrative proceedings was granted, over the objections of Mr. Christoffersen.

7.     Another conference call was scheduled for November 5, 2013, at which time neither Party had anything new to report.

8.     Another conference call was scheduled for January 10, 2014.  On January 8, 2014, an email inquiry about any new developments in the federal litigation was sent to Counsel for the Parties.  Mr. Dunlap responded that there were no new developments as the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action.  Mr. Christoffersen indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary.  Based on the representations of Counsel, the January 10, 2014 conference call was cancelled.

9.     No further update was provided by either Party until a Motion to Set for Hearing was filed on behalf of HSDA on March 7, 2014.  Included with the Motion was a December 10, 2013 Order issued by Magistrate Judge Dennis Inman of the United States District Court of the Eastern District of Tennessee.

10.     In the Order, Judge Inman provided the following history of the federal litigation – the case was first filed in April 2013 in the United States District Court for the Eastern District of Tennessee and was dismissed without prejudice on June 12, 2013, for lack of ripeness because

2

the administrative CON appeal had not yet been decided. The case was then filed by Tri-Cities in the United States District Court for the Middle District of Tennessee and was then transferred by the Judge back to the Eastern District. Discovery in that litigation has now been stayed, and a Motion to Stay the entire case is under consideration, again, to allow for resolution of the administrative proceedings.

11.    Judge Inman's Order states that, notwithstanding the dismissal with prejudice, "it is the law of this case that the plaintiffs [Tri-Cities] must procure, or at least attempt to procure, certain administrative remedies."

12.    Judge Inman expressed surprise that the CON appeal had been delayed at the request of Tri-Cities after having professed a need for an expeditious resolution.

13.    A response to the Motion to Set was provided by Mr. Dunlap on March 10, 2014, in which he, again, objected to setting the administrative matter for hearing prior to the resolution of the federal court litigation but also demanded a modification of the HSDA rules so that Tri-Cities may be granted a CON, apparently, without the formality of a hearing.

14.    In his Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act, Mr. Dunlap made the following statements –

> In addition, if this tribunal does "take HSDA's bait" and takes any action to decide this appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing, Petitioner respectfully indicates that it will have no choice but to join Your Honor, in an official capacity, and this tribunal, as defendants in the pending federal court action.

> Finally, Petitioner respectfully submits that, under the ADA, Your Honor and this tribunal are required to offer Petitioner a reasonable modification to allow the CON to be issued. Petition (sic) respectfully submits that Your Honor's and this tribunal's continuing failure to do this creates a cause of action that Petitioner may bring against Your Honor, and the tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents in an ADA enforcement action.

3

[T]his administrative appeal process amounts to a scheme or artifice to violate the ADA.

15.    Mr. Dunlap provided no information about the current status of the federal litigation.

## APPLICABLE LAW

1.    Rule 19 of the Tennessee Supreme Court provides the following requirements with respect to attorneys not licensed to practice law in Tennessee –

A lawyer not licensed to practice law in Tennessee, licensed in another United States jurisdiction, and who resides outside Tennessee shall be permitted to appear pro hac vice, file pleadings, motions, briefs, and other papers and to fully participate in a particular proceeding before a trial or appellate court of Tennessee, or in a contested case proceeding before a state department, commission, board, or agency (hereinafter "agency"), if the lawyer complies with the following conditions:

(a)    A lawyer not licensed to practice law in Tennessee and who resides outside Tennessee is eligible for admission pro hac vice in a particular proceeding pending before a court or agency of the State of Tennessee:

(1)    if the lawyer is licensed, in good standing, and admitted to practice before the court of last resort in another state or territory of the United States or the District of Columbia in which the lawyer maintains a residence or an office for the practice of law;

(2)    if the lawyer is in good standing in all other jurisdictions in which the lawyer is licensed to practice law; and

(3)    if the lawyer has been retained by a client to appear in the proceeding pending before that court or agency.

(b) In its discretion, a state court or agency may, in a particular proceeding pending before it, deny a lawyer's motion to appear pro hac vice only where:

(1)    the applicant's conduct as a lawyer, including conduct in proceedings in Tennessee in which the applicant has appeared pro hac vice and conduct in other jurisdictions in which the lawyer has practiced, raises reasonable doubt that the lawyer will comply with the Tennessee Rules of Professional Conduct and other rules and law governing the conduct of lawyers who appear before the courts and agencies of the State of Tennessee; or

4

(2)    the applicant has engaged in such frequent appearances as to constitute regular practice in this state.

In any proceeding in which a state court or agency denies a lawyer's motion to appear pro hac vice, the court or agency shall set forth findings of fact and conclusions of law that constitute the grounds for its action. In addition, the court or agency shall send a copy of the order denying the motion to the Board of Professional Responsibility of the Supreme Court of Tennessee.

(c)    A lawyer admitted pro hac vice under this Rule may not continue to so appear unless all requirements of the Rule continue to be met. Admission granted under this Rule may be revoked by the court or agency granting such admission upon appropriate notice to the lawyer and upon an affirmative finding by the court or agency that the lawyer has ceased to satisfy the requirements of this Rule. In any proceeding in which a court or agency revokes an admission pro hac vice, the court or agency shall set forth findings of fact and conclusions of law that constitute the grounds for its action; in addition, the court or agency shall send a copy of the order revoking the admission pro hac vice to the Board of Professional Responsibility of the Supreme Court of Tennessee.

(d)    A lawyer seeking admission under this Rule shall file a motion in the court or agency before which the lawyer seeks to appear not later than the first occasion on which the lawyer files any pleading or paper with the court or agency or otherwise personally appears. In support of the motion, the lawyer shall file with the court or agency a certificate of good standing from the court of last resort of the licensing jurisdiction in which the lawyer principally practices and an affidavit by the lawyer containing the following information:

(1)    the lawyer's full name, residence address, office address, any registration or identifying number associated with the lawyer's licensure in each jurisdiction in which the lawyer is licensed, the full name or style of the case in which the lawyer seeks to appear, and the name of the client or clients the lawyer seeks to represent;

(2)    the jurisdictions in which the lawyer is or has been licensed to practice law, with dates of admission, and any other courts before which the lawyer has been or is generally admitted to practice (including, for example, membership in the bar of a United States District Court), with dates of admission, and a statement by the lawyer that the lawyer is in good standing in all other jurisdictions in which the lawyer is licensed to practice law;

(3)    the full name or style of each case in which the lawyer has been admitted or sought to be admitted pro hac vice in any court or agency of the State of Tennessee within the preceding three years, the date of any such

5

admission or the date of any such motion that was filed but not granted, and the status of any such case in which the lawyer was admitted;

(4)     a statement concerning whether the lawyer has been denied admission pro hac vice or has had an admission pro hac vice revoked by any court in any jurisdiction and, if so, a full description of the circumstances, including the full name or style of the case;

(5)     a statement concerning whether the lawyer has ever been disciplined or sanctioned by the Board of Professional Responsibility of the Supreme Court of Tennessee, by any similar lawyer disciplinary agency in any jurisdiction, or by any similar lawyer disciplinary authority (including, for example, any United States District Court), and, if so, a full description of the circumstances, including the full name or style of the matter;

(6)     a statement concerning whether any disciplinary action or investigation concerning the lawyer's conduct is pending before the Board of Professional Responsibility of the Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any jurisdiction, or before any similar lawyer disciplinary authority (including, for example, any United States District Court), and, if so, a full description of the circumstances, including the full name or style of the matter;

(7)     a statement that the lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court or agency before which the lawyer seeks to practice;

(8)     a statement by the lawyer that the lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts or agencies of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee;

(9)     the name, address, telephone number, and Board of Professional Responsibility's registration number of a lawyer with whom the lawyer is associated in accordance with Section (g) of this Rule;

(10)    a statement that the lawyer has paid all fees required by this Rule in connection with the motion for admission;

(11)    at the option of the lawyer, any other information supporting the lawyer's admission; and

6

(12) a statement indicating service of the motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee.

(e) A lawyer who seeks or is granted admission under this Rule shall be subject to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts and agencies of Tennessee in any matter arising out of the lawyer's conduct in the proceeding.

(f) At or before the time the lawyer files a motion for admission and supporting papers under this Rule with the court or agency before which the lawyer seeks admission, the lawyer shall file with the Board of Professional Responsibility of the Supreme Court of Tennessee a copy of the motion and supporting papers filed under this Rule and shall pay to the Board a fee in an amount the total of which equals the fees required of Tennessee lawyers under Tennessee Supreme Court Rule 9, Section 20.1, Tennessee Supreme Court Rule 25, Section 2.01, and Tennessee Supreme Court Rule 33.01(C). This fee shall be used for purposes set forth in these respective Rules, and the Board of Professional Responsibility shall collect and remit the appropriate portion of any such fee to the Tennessee Lawyers' Fund for Client Protection and the Tennessee Lawyers Assistance Program. No applicant for admission under this Rule shall be required to pay more than one total fee in any one calendar year. All fees under this Rule shall be waived if the lawyer will not charge an attorney's fee in the proceeding; in such cases, however, the lawyer still must comply with the filing requirement of this paragraph.

(g) A motion for admission pro hac vice under this Rule shall not be granted unless the lawyer is associated in the proceeding with a lawyer licensed to practice law in Tennessee, in good standing, admitted to practice before the Supreme Court of Tennessee, and who resides in and maintains an office in Tennessee. Both the Tennessee lawyer and the lawyer appearing pro hac vice shall sign all pleadings, motions, and other papers filed or served in the proceeding; the Tennessee lawyer, or another Tennessee lawyer acting on behalf of the first Tennessee lawyer at his or her request, shall personally appear for all court or agency proceedings, including all proceedings conducted pursuant to the authority of the court or agency, unless excused by the court or agency. The court or agency may establish conditions relating to the participation of associated counsel in an order granting admission under this Rule or otherwise.

(h) A trial or intermediate appellate court's denial of a motion to appear pro hac vice pursuant to paragraph (b), or a trial or intermediate appellate court's revocation of admission pro hac vice pursuant to paragraph (c), may be appealed pursuant to Rule 10, Tenn. R. App. P. An agency's denial of a motion to appear pro hac vice pursuant to paragraph (b), or an agency's revocation of admission pro hac vice pursuant to paragraph (c), may be appealed by filing a petition for judicial review pursuant to Tenn. Code Ann. § 4-5-322. A lawyer whose

7

admission pro hac vice is denied or revoked by the Supreme Court of Tennessee may seek a rehearing on that issue pursuant to Rule 39, Tenn. R. App. P.

2.    Rule 3.3 of the Tennessee Rules of Professional Conduct specifies the following with respect to candor towards the Tribunal –

(a)    A lawyer shall not knowingly:
(1)    make a false statement of fact or law to a tribunal; or . . . . . .

3.    Rule 3.5 of the Tennessee Rules of Professional Conduct provides the following prohibition –

A lawyer shall not:

(a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law;

4.    Tenn. Code Ann. § 39-14-112 defines Extortion as follows -

(a) A person commits extortion who uses coercion upon another person with the intent to:

(1) Obtain property, services, any advantage or immunity; or

(2) Restrict unlawfully another's freedom of action.

5.    Rule 8.4 of the Tennessee Rules of Professional Conduct provides the following with respect to misconduct –

It is professional misconduct for a lawyer to:

(a)    violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b)    commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
(c)    engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;
(d)    engage in conduct that is prejudicial to the administration of justice;
(e)    state or imply an ability to influence a tribunal or a governmental agency or official on grounds unrelated to the merits of, or the procedures governing, the matter under consideration;

8

(f)    knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law; or

(g)    knowingly fail to comply with a final court order entered in a proceeding in which the lawyer is a party, unless the lawyer is unable to comply with the order or is seeking in good faith to determine the validity, scope, meaning, or application of the law upon which the order is based.

## CONCLUSIONS OF LAW

1.    From the outset, Mr. Dunlap requested a stay of this administrative proceeding on behalf of Tri-Cities until after the related federal court action was resolved. He never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings.

2.    Notwithstanding the recent indication from the federal court that the CON appeal should be resolved before the federal issues are addressed, Mr. Dunlap still insists that the stay of these proceedings should remain in place, and has threatened to join the Administrative Judge and this tribunal in the federal court action should the stay of the administrative proceedings be lifted and the CON appeal be set for hearing.

3.    In addition, Mr. Dunlap is now demanding that this tribunal grant the requested modifications of HSDA rules and the disputed CON even though the HSDA's obligation to provide this relief is yet to be determined, either by this tribunal or in the federal courts. Mr. Dunlap's demand includes an unveiled threat that the Administrative Judge and the tribunal will face an ADA enforcement action by the Department of Justice should the Administrative Judge fail to provide the requested relief.

4.    Mr. Dunlap has misrepresented to this tribunal the status of the federal litigation and has used this misrepresentation to attempt to coerce a decision by this tribunal in favor of his client without the benefit of the administrative hearing, which he demands must remain stayed.

9

5.   Mr. Dunlap's coercion and misrepresentations are a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tenn. Code Ann. § 39-14-112.

6.   Mr. Dunlap has expressed contempt for this tribunal and these administrative proceedings, thus, there is no apparent purpose for his continued participation.

7.   Mr. Dunlap's actions have unnecessarily impeded a resolution of the CON appeal and have breached the conditions on which he was granted *pro hac vice* admission to practice law in Tennessee. In accordance with Rule 19(c), Mr. Dunlap's permission to appear in this matter *pro hac vice* is appropriately and necessarily revoked.

**IT IS THEREFORE ORDERED** that the permission to appear in this matter *pro hac vice* previously granted to James Dunlap, Jr., Esq., is hereby revoked. As required by Rule 19(c), a copy of this Order will be sent to the Board of Professional Responsibility of the Supreme Court of Tennessee. Mr. Piliponis will main counsel of record to represent the interests of Tri-Cities in this matter.

All other matters are reserved.

It is so ORDERED, entered and effective this the 14th day of March 2014.

KIM SUMMERS
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

10

36

# EXHIBIT 3

# BEFORE THE
## TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY

Tri-Cities Holdings LLC )
d/b/a Trex Treatment Center )
)                      DOCKET NO. T.B.A.
)                      CON No. CN1303-005D
)

## PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKING PERMISSION TO APPEAR *PRO HAC VICE*



Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# Contents

Argument and Citation of Authority .................................................................................. 3

 A. The Court's Conclusion of Law that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect. ............................................ 3

 B. The Court's allegation that Mr. Dunlap concealed that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect .................. 5

 C. Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case. .............................................................................. 7

 D. The Court should not retaliate against Mr. Dunlap because he advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA. ............. 10

 E. Petitioner *at all times respectfully* asserts that the ADA applies to the Court, a state agency, and *supreme* federal law places upon the Court an obligation to provide TCH with a reasonable modification of its rules to allow the issuance of a CON. ................................... 11

 F. The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law. ............................... 13

 G. Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur. ................... 14

 H. In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge." ......................................................... 15

 I. In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings." ..................................................................................... 16

 J. Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and he has not breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee." ............................................................................... 17

Conclusion ............................................................................................................ 17

Case 2:14-cv-00233-JRG-MCLC Document 69-1 Filed 12/04/16 Page 48 of 396 PageID #: 1745

39

Plaintiffs Tri-Cities Holdings LLC ("TCH""), Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby files this Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice* of James A Dunlap Jr. and states as follows:

## Argument and Citation of Authority

Firstly, Petitioner respectfully asks the Court to withdraw its March 14, 2014 Order until a hearing on these allegations can be scheduled. The Court's Order was issued *sua sponte* without any notice or opportunity for Petitioner or Petitioner's attorney to read, respond, test, or confront the factual or legal sufficiency of the Order's Findings of Fact or Conclusions of Law. Suddenly ejecting Petitioner's counsel from this case *without a hearing* causes severe prejudice to Petitioner's case and ability to protect its rights. Until such time as this Court allows Petitioner to challenge these findings with argument, evidence, and testimony, Petitioner asks that Mr. Dunlap be reinstated into the case.

### A. The Court's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect.

First and foremost, in paragraph 1 of its Conclusions of Law, p. 9, this Court makes, *sua sponte*, a conclusion of law against Mr. Dunlap that he did not disclose the dismissal on ripeness grounds of the *Tri-Cities I* [1] case and that he concealed that the federal court was subject to a stay in deference of the administrative proceeding, holding:

> "He never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings."

_____

[1] *Tri-Cities Holdings LLC et al. v. City of Johnson City et al.*, Case No. 2:13-CV-108 (E.D. Tenn).

3

*March 14, 2014 Order, p. 9.* Both of these allegations are extremely serious and, presumably, under the right factual scenario, could carry the penalty of disbarment. The Court made this Conclusion of Law, and barred Mr. Dunlap as counsel from this proceeding, without providing Mr. Dunlap notice of the finding beforehand or asking Mr. Dunlap to respond.

Of course, *Tri-Cities I* was the previous action filed in federal court after Johnson City denied TCH's application for rezoning to establish an Opiate Treatment Program in Johnson City. Even before TCH filed its administrative appeal, *Tri-Cities I* had been dismissed by the federal court <u>without prejudice</u>, allowing the plaintiffs in that action to refile the action, which they did. All issues in *Tri-Cities I* were maintained in *Tri-Cities II*[2] along, importantly here, with additional claims against HSDA arising from the denial of the Certificate of Need.

First, the allegation that Mr. Dunlap failed to disclose *Tri-Cities I* is patently incorrect. On July 29, 2013, Mr. Dunlap sent a copy of the Tri-Cities II Complaint to Judge Summers along with his letter ("I'm attaching a copy of the federal complaint"). This was done to assist Judge Summers in understanding the issues in the federal action. The Complaint clearly and unambiguously identifies *Tri-Cities I* and its dismissal without prejudice on ripeness grounds:

> ***Tri-Cities Holdings et al. v. Johnson City et al.***, **Case No. 13-cv-108 (E.D. Tenn. 2013)(<u>case dismissed without prejudice on ripeness grounds</u>).**

See Tri-Cities I, Doc. 1, p. 32, n. 67 (emphasis added). Furthermore, the Complaint in *Tri-Cities II* clearly and unambiguously references evidence and testimony from *Tri-Cities I* multiple times.

There was no concealment by Mr. Dunlap. It is undisputed that he gave this Court a copy of the *Tri-Cities II* Complaint which clearly and unambiguously references, including the court,

---

[2] *Tri-Cities Holdings LLC et al. v. HSDA et al.*, Case No. 2:13-CV-305 (E.D. Tenn).

4

caption, and a specific and fairly crafted parenthetical reference that Tri-Cities I was "dismissed without prejudice on ripeness grounds." *Id.* Thus, Mr. Dunlap has disclosed the nature and outcome of *Tri Cities I.* Therefore, the grounds for revoking Mr. Dunlap's *Pro Hac Vice* admission based on any alleged concealment is clearly not applicable in this case.

In any event, Mr. Dunlap had no *obligation* to disclose *Tri-Cities I.* That case was over. It had been dismissed without prejudice allowing all issues to be raised in a new proceeding. Despite not having an obligation to disclose a dismissed case to the Court, the existence of *Tri Cities I* was fully disclosed to the Court in writing as part of the underlying refiled Complaint. The Court cannot claim that it was unaware of *Tri Cities I* because it has written notice of the action. Further, the dismissed and no-longer-pending *Tri-Cities I* was *completely irrelevant* to these administrative proceedings. This administrative appeal involves the denial of TCH's application for a Certificate of Need. *Tri-Cities I* did not involve any claims arising from the denial of the Certificate of Need. *Tri-Cities I* did not involve any claims arising in the administrative proceeding against HSDA. HSDA was not even a party to *Tri-Cities I.* It is undisputed that Mr. Dunlap disclosed the pending *relevant* federal case *at all times,* beginning with his first correspondence with the Court in July, 2013. See Exhibit 1 (beginning with the caption of the letter). In sum, Mr. Dunlap did not commit misconduct, and therefore should not be punished, for not disclosing an irrelevant, dismissed prior proceeding to this Court.

**B. The Court's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect.**

The Court makes, in its *sua sponte* Order without notice or opportunity for the Petitioner to advise or counter the arguments of the Court, a conclusion of law in its basis to revoke Mr.

A2

Dunlap's *Pro Hac Vice* admission that he concealed to the Court that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding." This is incorrect.

The federal case is not and never has been "subject to a stay in deference to the administrative proceeding". The Magistrate's December 20, 2013 Order [Doc. 135] (Exhibit 2) was on a motion to stay discovery. ("The Motion to Stay Discovery, Doc. 100, is GRANTED....").[3]

The Magistrate's January 2, 2014 Order stayed the case specifically to give Defendants more time to respond to Plaintiffs' Motion for Summary Judgment. See *Tri-Cities II*, Doc. 150 (Exhibit 3). The Order giving Defendants additional time to respond was subject to being lifted at "a moment's notice:"

> By motion filed as document 139, the defendants have filed <u>a motion for additional time to respond to the plaintiffs' motion for partial summary judgment</u>. Their motion is GRANTED only to the following extent.
>
> If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. <u>If, however, the district judge denies the motion to stay the case, the stay of discovery will be lifted as of that moment,</u> [1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

Therefore, there is not, and never has been, any stay in the federal court "in deference to the administrative proceedings," <u>because it was never stayed on that basis</u>. These orders never stayed the federal court in some kind of suspended mode pending a decision on the administrative appeal.

---

[3] "As a part of the discussion in the Magistrate's Order, the Court said, "The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals." December 10, 2013 Order [Doc. 135]. But such *dicta* in an order granting a <u>stay in discovery</u> cannot be interpreted to operate as stay of the federal action pending an outcome of the administrative proceeding.

6

The factual premise is false.  Therefore, the Court's *sua sponte* finding related to Mr. Dunlap's fraud or concealment of *Tri-Cities I* and an alleged stay of the federal court "in deference to the administrative proceeding" is unsupported.

### C. Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case.

Petitioner disputes that Mr. Dunlap committed any misconduct when he responded to a January 8, 2014 inquiry "that there were no new developments" because the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action.   By that statement, Mr. Dunlap intended to represent that there had been no decision by the federal court either way on these motions.  This was entirely correct.  Mr. Dunlap interpreted the Court's continuing stays in its proceedings, enacted multiple times, that this Court was waiting for the federal court to decide the dispositive motions, whenever that would occur.  Additionally, HSDA was fully aware of Mr. Dunlap's opinion (being copied simultaneously on emails to Judge Summers).  HSDA could challenge Mr. Dunlap's opinion at any time.  HSDA never did.

There was no "new development," as far as Mr. Dunlap could tell (and HSDA apparently agreed), in so far as the federal court was proceeding , in a prompt and expeditious matter, to make a decision on the various motions which potentially would render the administrative proceeding moot.  In fact, on that same day, HSDA , through counsel, offered its own opinion of the federal case, contrary to Mr. Dunlap's, there were in fact "new developments" and "indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary."  "  Mr. Christoffersen, being General Counsel for HSDA, was fairly perceived, by Mr. Dunlap and this Court, to be in constant contact with, and updated by, HSDA's attorney Sue Sheldon and Sara Sedgewick as to what was going on in the federal case.

7

Counsel for HSDA in this action obviously has immediate access to federal court filings. Indeed, he appears to send them to this Court within minutes of filing in the federal case (for example, as Mr. Christoffersen did when he received and forwarded the federal court's request for a status report on March 11, 2014). Any "new developments" update as it was represented to this court by HSDA through counsel never materialized. Above all, there was never any intent on Mr. Dunlap's part to misrepresent the status of the federal action. From the outset, Mr. Dunlap has always asked that the administrative appeal be stayed pending a resolution of the federal case—and he's told that to both this Court and the federal court without fail.

In any event, the federal court order staying discovery [Doc. 135] was clearly inconsequential from the standpoint that Plaintiffs' Motion for Summary Judgment and the Defendants' Motions to Dismiss did not rely on any disputed facts on issues. Plaintiffs' motion rested on, for example, Johnson City's and HSDA's blatantly illegal zoning ordinance and notice rule, where there was no factual dispute. The Defendants' Motions to Dismiss did not rely on any disputed issues. So the motions in federal court were poised for prompt decision with or without discovery. HSDA apparently agreed with Mr. Dunlap because this was never brought to the attention of the Court on or after the January 10, 2014 telephone conference.

The administrative proceeding had been stayed several times before the scheduled January 10, 2014 telephone conference with the Court. Neither Mr. Dunlap nor HSDA, through its counsel, objected to a continuing delay in the administrative proceeding to allow time for the federal court to make a decision on the pending motions. The decision to allow the federal court to consider dispositive motions is further well-grounded in principles of judicial economy. Any of the inconsequential orders of the federal court – an order suspending discovery that would in no

8

way stop the federal court from deciding the pending motions, and an order giving as little as 30 days additional time for The Defendants to respond to Plaintiffs' Motion for Summary Judgment --- do not upset in any way this Court's long-past decision to simply wait for the federal court. In that respect there were no "new developments." It is highly unlikely that this Court would have, all of a sudden, decided to schedule a full-blown final hearing simply because the federal court had given the Defendants an additional thirty days or so to respond to Plaintiffs' Motion for Summary Judgment or stayed discovery in the underlying federal action.

Any additional time the federal court had given the Defendants to respond to Plaintiffs' Motion for Summary Judgment was, in accordance with its terms, expected to be for a *reasonable time* (i.e., a reasonably *short and most likely very short time*) and, therefore, should not cause unreasonable delay in the consideration of the pending Motion for Summary Judgment and the Motions to Dismiss. HSDA, through its counsel, apparently agreed with Mr. Dunlap and did not mention it. The statement there were "no new developments" was certainly subject to a contrary opinion of HSDA, HSDA being a party to the federal court action; however HSDA, by not articulating any contrary opinion, apparently agreed with Mr. Dunlap. Certainly, HSDA did not offer any new developments when faced with the exact same inquiry from this court.

HSDA did not offer any opinion on new developments in the federal case, and could not reasonably qualify its opinion by claiming either lack of knowledge of the status of the federal case or any reliance solely upon Mr. Dunlap for the status of the federal case. To the contrary, HSDA implicitly and explicitly represented to the Court, and to Mr. Dunlap, that it was knowledgeable of the status of the federal case and that there were "no new developments" because none were offered.

9

Furthermore, HSDA's attorneys read the December 10, 2013 Magistrate's Order and

HSDA's attorneys obviously felt there was nothing to advise regarding the status of the

administrative proceeding because they did exactly what Mr. Dunlap did. HSDA was a party to

the federal case and the administrative proceeding, HSDA had access to all court proceedings and

filings, and HSDA was free to object to Mr. Dunlap's opinion that there were no "new

developments" at any time. HSDA could have moved for a hearing date to be set based on

whatever "new developments" they felt were relevant. Mr. Dunlap provided the Court with the

exact same information that HSDA was giving the court.

**D. The Court should not retaliate against Mr. Dunlap because he, in good faith, advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA.**

Petitioner certainly intended no affront the Court when advising it that it is subject to the

ADA. This is simply petitioner's position. Mr. Dunlap would be failing to represent his client

diligently and effectively unless he did what he did: (1) Advise the Court of the application of the

ADA, (2) advise the Court of its duties under the ADA; and (3) advise the Court of his potential

adverse position of being a plaintiff in an action against the Court or that the Court would be

subject to a potential DOJ enforcement action if it violated the ADA. In fact, Mr. Dunlap would be

violating his duties to this client if he had not advanced these positions in this case.

Petitioner denies the finding that Mr. Dunlap showed "contempt for the proceeding" at

Conclusions of Law, para. 6. On the contrary, Petitioner would welcome a full and frank

discussion of the issues in the case and the opportunity to be heard on these issues. Mr. Dunlap

asserted in good faith that Johnson City and HSDA are attempting to have this Court somehow

"exorcise" their ADA violations in this case -- which this Court cannot do. This is in clear

accordance with federal law. Further, the federal court is the most appropriate forum in the case and that this Court should naturally defer to the federal court on issues of interpretation of federal law such as those raised herein. The use of forceful prose in making these points in not intended to be disrespectful and clearly cannot be coercion. The Court is well aware of the law and cannot claim that the Petitioner's interpretation of the law and their belief of possible liability is somehow a threat to the Court. The court is not a layperson relying upon the Petitioner's attorney to determine their liability.

It is obvious that the Administrative Procedures Division    like all Tennessee state agencies--is subject to the ADA. This Court should not retaliate against Mr. Dunlap for fairly asserting his clients' ADA rights.

**E. Mr. Dunlap asserts that the ADA applies to the Court, a state agency, and *supreme federal law* places upon the Court an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON.**

Petitioner *respectfully (as always)* asserts that Mr. Dunlap would be violating his duties to his client if he failed to assert his clients' ADA rights in this regard. Simultaneously, Mr. Dunlap owes a duty of candor to this Court (Rule 3.3 of Rules of Professional Responsibility) _and_ to his clients. He should not be sanctioned for attempting to properly achieve this balance.

As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [3]. Mr. Dunlap had a clear duty to zealously advance his clients' interests in what amounts to a civil rights action. It is undisputed that his individual clients are facing almost daily threat of death or serious injury while being forced to drive hundreds of miles from the Johnson City area to standard of care treatment facilities in North Carolina. Mr. Dunlap's sitting silent, or

engaging in mouse-like behavior to avoid "offending the Court," would have clearly violated this duty of zealous representation.

> In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an ethical person while earning a satisfactory living. The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these Rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules. These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests, within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [10] (emphasis added). Thus, Mr. Dunlap, like all petitioners asserting rights against States and State agencies, faces an unavoidable conflict providing zealous representation within the bounds of the law. He has not failed to properly balance these duties.

Further, the Rules of Professional Conduct specifically contemplate a lawyer to be a zealous advocate for his client when the opposing party is well-represented by counsel. The Rules provide:

> A lawyer's responsibilities as a representative of clients, an officer of the legal system, and a public citizen are usually harmonious. Thus, when an opposing party is well represented, a lawyer can be a zealous advocate on behalf of a client and at the same time assume that justice is being done.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [9] (emphasis added). Surely HSDA, and the Court, are "well-represented." The Rules of Professional Conduct implicitly require Mr. Dunlap to be a "zealous advocate" for his client's rights without the threat of facing banishment from the process without a hearing or

12

opportunity to be heard. Zealous advocacy involves making the Court aware, in frank terms, that it has duties under the ADA.

## F. The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law.

The Court should not retaliate against Mr. Dunlap for pointing out to the Court, and simultaneously providing voluminous legal authority, that the Court could be in violation of federal law. The Court has the ability to discern whether it believes this to be an accurate statement of the law. It continues to be petitioner's position that HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[4] In this case, in Mr. Dunlap's good faith opinion, supported by existing caselaw, HSDA and Johnson City are trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's alleged violations of federal law.

---

[4] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening*, 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.*, 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory procedural requirements themselves violate the FHAA; the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See, e.g., *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003).

13

Mr. Dunlap, in courteous fashion, has made multiple attempts to outline for the Court the scope and effect of the ADA and its possible implications on this administrative proceeding. First, on July 28, 2013, Mr. Dunlap set forth the ADA the legal requirement for all state agencies to attempt a reasonable modification to allow TCH to locate its clinic in Johnson City. See Exhibit 1. Second, on July 29, 2013, Mr. Dunlap requested such a reasonable modification. See Exhibit 4. Third, on March 12, 2014, Mr. Dunlap outlined the federal law, with voluminous citations, and made a request for a reasonable modification in a letter. See Exhibit 5. Fourth, on March 12, 2014, again in courteous fashion, Mr. Dunlap outlined federal law and made a request for a reasonable modification in Petitioner's Objection to the Motion to Set Hearing and Demand for Reasonable Modification. See Exhibit 6.

More than four times, Mr. Dunlap presented his well-researched position (including voluminous legal citations and copying opposing counsel) to this Court. Mr. Dunlap is not taking a frivolous position. Mr. Dunlap's duty to his clients and to this Court obligates him to make the Court fully aware of the ADA and that Court would likely run afoul of federal law if it takes certain steps. Mr. Dunlap should not be sanctioned for simply *and respectfully* making the Court aware it might be violating federal law.

G. **Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur.**

Mr. Dunlap did not fail to advise that that the federal court was *deferring* to the administrative proceeding because that was never the case. Mr. Dunlap did not interpret the statements in the Magistrate's December 10, 2013 Order regarding the administrative proceeding

14

as ever imposing a stay on the proceeding to allow this administrative appeal to proceed. Petitioner respectfully submits that, in any event, this holding would be contrary to federal law that does not require TCH to pursue administrative remedies before filing an ADA Title II action.[5]

### H. In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge."

Petitioner respectfully represents that advising the Court on applicable federal law and the Court's responsibility thereunder does not constitute "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tennessee Code Ann. § 39-14-112. Advising the Court of federal law, while copying opposing counsel, does not amount to improper influence or coercion.

Rule 3.3 of the Tennessee Rules of Professional Conduct requires "candor toward the tribunal." In this respect, Mr. Dunlap has fulfilled his duty and in no way has breached his duty. Mr. Dunlap, supported by substantial legal authority that he has shared with the Court (copying opposing counsel at all times) in well-researched letters and filings, simply pointed out to the Court

---

[5] *Zimmer v. State of Ore. Dept. of Justice,* 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.,* 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion requirement); *Cable v. Dept. of Develop. Svcs.,* 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.,* 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.,* 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.,* 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio,* 882 F.2d 1012, 1015 (6th Cir. 1989) (holding, under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.,* 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir. 1990) (same).

15

that it may be subject to the ADA and that his clients' positions had become adverse to the Court from a legal perspective. To fail to do so would have violated this rule, rather than honoring it.

Rule 3.4 of the Tennessee Rules of Professional Conduct requires "fairness to opposing party and counsel." In this regard, Petitioner submits that Mr. Dunlap has not violated this provision in any respect. Mr. Dunlap has always conducted himself with view to fairness toward the other side in this matter. Opposing party and counsel have been copied on every correspondence with the Court and obviously they are a party to the underlying federal action.

Rule 8.4 of the Tennessee Rules of Professional Conduct describe to a wide range of potential misconduct generally described as "dishonesty, fraud, deceit, or misrepresentation." As set forth herein, Petitioner submits that in no way has Mr. Dunlap violated Rule 8.4. At all times, Mr. Dunlap has been completely forthright with this Court and in no way has committed any "dishonesty, fraud, deceit, or misrepresentation."

## I. In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."

Petitioner respectfully disputes that Mr. Dunlap "expressed contempt for this tribunal and these administrative proceedings resulting in no apparent purpose for his continued participation." On the contrary, Mr. Dunlap's thoroughly-researched position, expressed in good faith, that the ADA applies to this Court and that this Court has certain obligations under federal law serves merely to advise the Court of Petitioner's position. Mr. Dunlap would be violating his duty, to his client and to this Court, by remaining silent if he, in good faith, believed that this Court was violating federal law.

**J. Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."**

Petitioner respectfully submits that, in fact, Mr. Dunlap has appropriately fulfilled his duties <u>both</u> to his clients and to this Court. He has done so by respectfully, but firmly and forthrightly, explaining his clients' adverse position with this Court related to the ADA. Simply laying this position out to the Court in a respectful manner is completely appropriate and in no way violates any Rule of Professional Responsibility or state law. Mr. Dunlap should not be retaliated against for fulfilling his duty of candor to the Court.

Conclusion

(a) Petitioner *respectfully (as always)* denies each and every allegation of misconduct, violation of Rules of Professional Conduct, or violation of law, by Mr. Dunlap contained in the Court's March 14, 2014 Order.

(b) Petitioner *respectfully (as always)* asks the Court to rescind its March 14, 2014 Order and otherwise withdraw said Order.

(c) Finally, Petitioner *respectfully (as always)* asserts that Mr. Dunlap is a competent and careful attorney, appropriately cognizant of his duties <u>both</u> to his clients and this Court, and that Mr. Dunlap should be allowed to represent TCH in this administrative proceeding.

Dated: March 21, 2014

_____
Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201

17

Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

18

55

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2014, a copy of the foregoing document(s) was served by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

Richard D. Piliponis

## AFFIDAVIT OF JAMES A. DUNLAP JR.

STATE OF GEORGIA
COUNTY OF FULTON

I, JAMES A. DUNLAP JR., after first being duly sworn, state under oath that I am over age of 18 years of age, that I am legally competent to testify, and that this Affidavit is based on my personal knowledge.

1.    The facts contained in the foregoing PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKINGPERMISSION TO APPEAR PRO HAC VICE are true and correct to the best of my knowledge, information, and belief.

Further the Affiant sayeth naught.

_____
James A. Dunlap Jr.

Sworn to and subscribed before me, a Notary
Public, this the _20_ day of _MArch_,
20_14_, witness my hand at office in the
County of ___Fulton___,
State of Georgia.

_____
NOTARY PUBLIC
My commission expires _12 / 27_ , _2014_

21

# EXHIBIT 4

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

July 29, 2013

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243



Re:     Tri-Cities Holdings LLC d/b/a Trex Treatment Center
        CON #1303-005D
        Docket No.: T.B.A.

        Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and
        Development Agency, et al.
        United States District Court (M.D. Tenn.)
        Case No. 3:13-cv-669

Dear Judge Summers:

        Since Mr. Christoffersen refused to consent to a stay of the administrative
appeal in his letter dated today, I would respectfully move for you to stay this
administrative appeal process pending resolution of the federal court action. The
administrative appeal claims are included as pendant claims in Counts 13 and 14 in
the federal complaint. I'm attaching a copy of the federal complaint.

        Mr. Christoffersen contends there is a requirement for TCH to exhaust its
administrative remedies before pursuing the federal action. However, I would note
that federal courts clearly hold there is no need to exhaust administrative remedies to
bring a claim under the ADA or the Rehabilitation Act.[1] I would also again note that

---

[1] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates
Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp.
Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion); *Cable v. Dept. of Develop. Svcs.*,
973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA);
*Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia
Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993).
*See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding,

federal law is supreme and controlling over any and all state law or rules of procedure and in no way relieves the State of Tennessee, HSDA, or Johnson City from their affirmatives duties to comply with the ADA and the Rehabilitation Act and which they are clearly in violation of at present.[2]

Again, the present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the Proposed Service Area every three days). By copy of this letter I am again respectfully asking you, HSDA, and Johnson City to provide a reasonable modification under the ADA and the Rehabilitation Act to allow TCH to locate its OTP clinic in Johnson City.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:     Jim Christoffersen, General Counsel HSDA (via email)
        Erick Herrin, City Attorney for Johnson City, TN (via email)

---

under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.,* 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir. 1990) (same).
[2] *Tennessee v. Lane,* 541 U.S. 509 (2004).

# EXHIBIT 5

# Law Offices
## James A. Dunlap Jr. & Associates LLC
### 310 Windsor Gate Cove NE
### Atlanta, Georgia 30342

Phone: (404) 354-2363             E-mail:
Fax: (404) 745-0195                    jim@jamesdunlaplaw.com

April 8, 2014

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243



Re: **Tri-Cities Holdings LLC d/b/a Trex Treatment Center
CON #1303-005D
Docket No.: T.B.A.**

**Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and
Development Agency, et al.
United States District Court (M.D. Tenn.)
Case No. 3:13-cv-669**

Dear Judge Summers:

Since Mr. Christoffersen refused to consent to a stay of the administrative appeal in his letter dated today, I would respectfully move for you to stay this administrative appeal process pending resolution of the federal court action. The administrative appeal claims are included as pendant claims in Counts 13 and 14 in the federal complaint. I'm attaching a copy of the federal complaint.

Mr. Christoffersen contends there is a requirement for TCH to exhaust its administrative remedies before pursuing the federal action. However, I would note that federal courts clearly hold there is no need to exhaust administrative remedies to bring a claim under the ADA or the Rehabilitation Act.[1] I would also again note that

---
[1] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding,

federal law is supreme and controlling over any and all state law or rules of procedure and in no way relieves the State of Tennessee, HSDA, or Johnson City from their affirmatives duties to comply with the ADA and the Rehabilitation Act and which they are clearly in violation of at present.[2]

Again, the present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the Proposed Service Area every three days). By copy of this letter I am again respectfully asking you, HSDA, and Johnson City to provide a reasonable modification under the ADA and the Rehabilitation Act to allow TCH to locate its OTP clinic in Johnson City.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:    Jim Christoffersen, General Counsel HSDA (via email)
       Erick Herrin, City Attorney for Johnson City, TN (via email)

---

under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990) (same).
[2] *Tennessee v. Lane*, 541 U.S. 509 (2004).

# EXHIBIT 6

# BEFORE THE
## TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY

| | |
|---|---|
| Tri-Cities Holdings LLC )<br>d/b/a Trex Treatment Center )<br>              )<br>_____ )<br>              ) | **DOCKET NO. T.B.A.**<br>**CON No. CN1303-005D** |

## PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKING PERMISSION TO APPEAR *PRO HAC VICE*



Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# Contents

Argument and Citation of Authority ....................................................................3

    A.    The Court's Conclusion of Law that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect. ........................3

    B.    The Court's allegation that Mr. Dunlap concealed that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect...........................5

    C.    Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case. ....................................................................7

    D.    The Court should not retaliate against Mr. Dunlap because he advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA. .............10

    E.    Petitioner *at all times respectfully* asserts that the ADA applies to the Court, a state agency, and *supreme* federal law places upon the Court an obligation to provide TCH with a reasonable modification of its rules to allow the issuance of a CON. .............11

    F.    The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law....................13

    G.    Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur. ....................14

    H.    In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge." ....................................................................15

    I.    In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."....................................................................16

    J.    Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and he has not breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."....................................................................17

Conclusion....................................................................17

2

Plaintiffs Tri-Cities Holdings LLC ("TCH"'), Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby files this Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice* of James A Dunlap Jr. and states as follows:

**Argument and Citation of Authority**

Firstly, Petitioner respectfully asks the Court to withdraw its March 14, 2014 Order until a hearing on these allegations can be scheduled. The Court's Order was issued *sua sponte* without any notice or opportunity for Petitioner or Petitioner's attorney to read, respond, test, or confront the factual or legal sufficiency of the Order's Findings of Fact or Conclusions of Law. Suddenly ejecting Petitioner's counsel from this case *without a hearing* causes severe prejudice to Petitioner's case and ability to protect its rights. Until such time as this Court allows Petitioner to challenge these findings with argument, evidence, and testimony, Petitioner asks that Mr. Dunlap be reinstated into the case.

### A. The Court's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect.

First and foremost, in paragraph 1 of its Conclusions of Law, p. 9, this Court makes, *sua sponte,* a conclusion of law against Mr. Dunlap that he did not disclose the dismissal on ripeness grounds of the *Tri-Cities I* [1] case and that he concealed that the federal court was subject to a stay in deference of the administrative proceeding, holding:

> "He never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings."

---

[1] *Tri-Cities Holdings LLC et al. v. City of Johnson City et al.*, Case No. 2:13-CV-108 (E.D. Tenn).

3

*March 14, 2014 Order, p. 9.* Both of these allegations are extremely serious and, presumably, under the right factual scenario, could carry the penalty of disbarment. The Court made this Conclusion of Law, and barred Mr. Dunlap as counsel from this proceeding, without providing Mr. Dunlap notice of the finding beforehand or asking Mr. Dunlap to respond.

Of course, *Tri-Cities I* was the previous action filed in federal court after Johnson City denied TCH's application for rezoning to establish an Opiate Treatment Program in Johnson City. Even before TCH filed its administrative appeal, *Tri-Cities I* had been dismissed by the federal court <u>without prejudice</u>, allowing the plaintiffs in that action to refile the action, which they did. All issues in *Tri-Cities I* were maintained in *Tri-Cities II*[2] along, importantly here, with additional claims against HSDA arising from the denial of the Certificate of Need.

First, the allegation that Mr. Dunlap failed to disclose *Tri-Cities I* is patently incorrect. On July 29, 2013, Mr. Dunlap sent a copy of the Tri-Cities II Complaint to Judge Summers along with his letter ("I'm attaching a copy of the federal complaint"). This was done to assist Judge Summers in understanding the issues in the federal action. The Complaint clearly and unambiguously identifies *Tri-Cities I* and its dismissal without prejudice on ripeness grounds:

> **Tri-Cities Holdings et al. v. Johnson City et al., Case No. 13-cv-108 (E.D. Tenn.**
> **2013)(case dismissed without prejudice on ripeness grounds).**

See Tri-Cities I, Doc. 1, p. 32, n. 67 (emphasis added). Furthermore, the Complaint in *Tri-Cities II* clearly and unambiguously references evidence and testimony from *Tri-Cities I* multiple times.

There was no concealment by Mr. Dunlap. It is undisputed that he gave this Court a copy of the *Tri-Cities II* Complaint which clearly and unambiguously references, including the court,

---

[2] *Tri-Cities Holdings LLC et al. v. HSDA et al.*, Case No. 2:13-CV-305 (E.D. Tenn).

caption, and a specific and fairly crafted parenthetical reference that Tri-Cities I was "dismissed without prejudice on ripeness grounds." *Id.* Thus, Mr. Dunlap has disclosed the nature and outcome of *Tri Cities I.* Therefore, the grounds for revoking Mr. Dunlap's *Pro Hac Vice* admission based on any alleged concealment is clearly not applicable in this case.

In any event, Mr. Dunlap had no *obligation* to disclose *Tri-Cities I.* That case was over. It had been dismissed without prejudice allowing all issues to be raised in a new proceeding. Despite not having an obligation to disclose a dismissed case to the Court, the existence of *Tri Cities I* was fully disclosed to the Court in writing as part of the underlying refiled Complaint. The Court cannot claim that it was unaware of *Tri Cities I* because it has written notice of the action. Further, the dismissed and no-longer-pending *Tri-Cities I* was *completely irrelevant* to these administrative proceedings. This administrative appeal involves the denial of TCH's application for a Certificate of Need. *Tri-Cities I* did not involve any claims arising from the denial of the Certificate of Need. *Tri-Cities I* did not involve any claims arising in the administrative proceeding against HSDA. HSDA was not even a party to *Tri-Cities I.* It is undisputed that Mr. Dunlap disclosed the pending *relevant* federal case *at all times,* beginning with his first correspondence with the Court in July, 2013. See Exhibit 1 (beginning with the caption of the letter). In sum, Mr. Dunlap did not commit misconduct, and therefore should not be punished, for not disclosing an irrelevant, dismissed prior proceeding to this Court.

**B. The Court's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect.**

The Court makes, in its *sua sponte* Order without notice or opportunity for the Petitioner to advise or counter the arguments of the Court, a conclusion of law in its basis to revoke Mr.

Dunlap's *Pro Hac Vice* admission that he concealed to the Court that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding." This is incorrect.

The federal case is not and never has been "subject to a stay in deference to the administrative proceeding". The Magistrate's December 20, 2013 Order [Doc. 135] (Exhibit 2) was on a motion to stay discovery. ("The Motion to Stay Discovery, Doc. 100, is GRANTED....").[3]

The Magistrate's January 2, 2014 Order stayed the case specifically to give Defendants more time to respond to Plaintiffs' Motion for Summary Judgment. See *Tri-Cities II*, Doc. 150 (Exhibit 3). The Order giving Defendants additional time to respond was subject to being lifted at "a moment's notice:"

> By motion filed as document 139, the defendants have filed <u>a motion for additional time to respond to the plaintiffs' motion for partial summary judgment</u>. Their motion is GRANTED only to the following extent.

> If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. <u>If, however, the district judge denies the motion to stay the case, the stay of discovery will be lifted as of that moment,</u>[1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

> Therefore, there is not, and never has been, any stay in the federal court "in deference to the administrative proceedings," <u>because it was never stayed on that basis</u>. These orders never stayed the federal court in some kind of suspended mode pending a decision on the administrative appeal.

---

[3] "As a part of the discussion in the Magistrate's Order, the Court said, "The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals." December 10, 2013 Order [Doc. 135]. But such *dicta* in an order granting a <u>stay in discovery</u> cannot be interpreted to operate as stay of the federal action pending an outcome of the administrative proceeding.

6

The factual premise is false. Therefore, the Court's *sua sponte* finding related to Mr. Dunlap's fraud or concealment of *Tri-Cities I* and an alleged stay of the federal court "in deference to the administrative proceeding" is unsupported.

### C. Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case.

Petitioner disputes that Mr. Dunlap committed any misconduct when he responded to a January 8, 2014 inquiry "that there were no new developments" because the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action. By that statement, Mr. Dunlap intended to represent that there had been no decision by the federal court either way on these motions. This was entirely correct. Mr. Dunlap interpreted the Court's continuing stays in its proceedings, enacted multiple times, that this Court was waiting for the federal court to decide the dispositive motions, whenever that would occur. Additionally, HSDA was fully aware of Mr. Dunlap's opinion (being copied simultaneously on emails to Judge Summers). HSDA could challenge Mr. Dunlap's opinion at any time. HSDA never did.

There was no "new development," as far as Mr. Dunlap could tell (and HSDA apparently agreed), in so far as the federal court was proceeding , in a prompt and expeditious matter, to make a decision on the various motions which potentially would render the administrative proceeding moot. In fact, on that same day, HSDA , through counsel, offered its own opinion of the federal case, contrary to Mr. Dunlap's, there were in fact "new developments" and "indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary." " Mr. Christoffersen, being General Counsel for HSDA, was fairly perceived, by Mr. Dunlap and this Court, to be in constant contact with, and updated by, HSDA's attorney Sue Sheldon and Sara Sedgewick as to what was going on in the federal case.

7

Counsel for HSDA in this action obviously has immediate access to federal court filings. Indeed, he appears to send them to this Court within minutes of filing in the federal case (for example, as Mr. Christoffersen did when he received and forwarded the federal court's request for a status report on March 11, 2014). Any "new developments" update as it was represented to this court by HSDA through counsel never materialized. Above all, there was never any intent on Mr. Dunlap's part to misrepresent the status of the federal action. From the outset, Mr. Dunlap has always asked that the administrative appeal be stayed pending a resolution of the federal case—and he's told that to both this Court and the federal court without fail.

In any event, the federal court order staying discovery [Doc. 135] was clearly inconsequential from the standpoint that Plaintiffs' Motion for Summary Judgment and the Defendants' Motions to Dismiss did not rely on any disputed facts on issues. Plaintiffs' motion rested on, for example, Johnson City's and HSDA's blatantly illegal zoning ordinance and notice rule, where there was no factual dispute. The Defendants' Motions to Dismiss did not rely on any disputed issues. So the motions in federal court were poised for prompt decision with or without discovery. HSDA apparently agreed with Mr. Dunlap because this was never brought to the attention of the Court on or after the January 10, 2014 telephone conference.

The administrative proceeding had been stayed several times before the scheduled January 10, 2014 telephone conference with the Court. Neither Mr. Dunlap nor HSDA, through its counsel, objected to a continuing delay in the administrative proceeding to allow time for the federal court to make a decision on the pending motions. The decision to allow the federal court to consider dispositive motions is further well-grounded in principles of judicial economy. Any of the inconsequential orders of the federal court – an order suspending discovery that would in no

8

way stop the federal court from deciding the pending motions, and an order giving as little as 30 days additional time for The Defendants to respond to Plaintiffs' Motion for Summary Judgment --- do not upset in any way this Court's long-past decision to simply wait for the federal court. In that respect there were no "new developments." It is highly unlikely that this Court would have, all of a sudden, decided to schedule a full-blown final hearing simply because the federal court had given the Defendants an additional thirty days or so to respond to Plaintiffs' Motion for Summary Judgment or stayed discovery in the underlying federal action.

Any additional time the federal court had given the Defendants to respond to Plaintiffs' Motion for Summary Judgment was, in accordance with its terms, expected to be for a *reasonable time* (i.e., a reasonably *short and most likely very short time*) and, therefore, should not cause unreasonable delay in the consideration of the pending Motion for Summary Judgment and the Motions to Dismiss. HSDA, through its counsel, apparently agreed with Mr. Dunlap and did not mention it. The statement there were "no new developments" was certainly subject to a contrary opinion of HSDA, HSDA being a party to the federal court action; however HSDA, by not articulating any contrary opinion, apparently agreed with Mr. Dunlap. Certainly, HSDA did not offer any new developments when faced with the exact same inquiry from this court.

HSDA did not offer any opinion on new developments in the federal case, and could not reasonably qualify its opinion by claiming either lack of knowledge of the status of the federal case or any reliance solely upon Mr. Dunlap for the status of the federal case. To the contrary, HSDA implicitly and explicitly represented to the Court, and to Mr. Dunlap, that it was knowledgeable of the status of the federal case and that there were "no new developments" because none were offered.

9

Furthermore, HSDA's attorneys read the December 10, 2013 Magistrate's Order and HSDA's attorneys obviously felt there was nothing to advise regarding the status of the administrative proceeding because they did exactly what Mr. Dunlap did. HSDA was a party to the federal case and the administrative proceeding, HSDA had access to all court proceedings and filings, and HSDA was free to object to Mr. Dunlap's opinion that there were no "new developments" at any time. HSDA could have moved for a hearing date to be set based on whatever "new developments" they felt were relevant. Mr. Dunlap provided the Court with the exact same information that HSDA was giving the court.

**D. The Court should not retaliate against Mr. Dunlap because he, in good faith, advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA.**

Petitioner certainly intended no affront the Court when advising it that it is subject to the ADA. This is simply petitioner's position. Mr. Dunlap would be failing to represent his client diligently and effectively unless he did what he did: (1) Advise the Court of the application of the ADA, (2) advise the Court of its duties under the ADA; and (3) advise the Court of his potential adverse position of being a plaintiff in an action against the Court or that the Court would be subject to a potential DOJ enforcement action if it violated the ADA. In fact, Mr. Dunlap would be violating his duties to this client if he had not advanced these positions in this case.

Petitioner denies the finding that Mr. Dunlap showed "contempt for the proceeding" at Conclusions of Law, para. 6. On the contrary, Petitioner would welcome a full and frank discussion of the issues in the case and the opportunity to be heard on these issues. Mr. Dunlap asserted in good faith that Johnson City and HSDA are attempting to have this Court somehow "exorcise" their ADA violations in this case -- which this Court cannot do. This is in clear

10

accordance with federal law. Further, the federal court is the most appropriate forum in the case and that this Court should naturally defer to the federal court on issues of interpretation of federal law such as those raised herein. The use of forceful prose in making these points in not intended to be disrespectful and clearly cannot be coercion. The Court is well aware of the law and cannot claim that the Petitioner's interpretation of the law and their belief of possible liability is somehow a threat to the Court. The court is not a layperson relying upon the Petitioner's attorney to determine their liability.

It is obvious that the Administrative Procedures Division – like all Tennessee state agencies--is subject to the ADA. This Court should not retaliate against Mr. Dunlap for fairly asserting his clients' ADA rights.

**E. Mr. Dunlap asserts that the ADA applies to the Court, a state agency, and *supreme* federal law places upon the Court an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON.**

Petitioner *respectfully (as always)* asserts that Mr. Dunlap would be violating his duties to his client if he failed to assert his clients' ADA rights in this regard. Simultaneously, Mr. Dunlap owes a duty of candor to this Court (Rule 3.3 of Rules of Professional Responsibility) and to his clients. He should not be sanctioned for attempting to properly achieve this balance.

> As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [3]. Mr. Dunlap had a clear duty to zealously advance his clients' interests in what amounts to a civil rights action. It is undisputed that his individual clients are facing almost daily threat of death or serious injury while being forced to drive hundreds of miles from the Johnson City area to standard of care treatment facilities in North Carolina. Mr. Dunlap's sitting silent, or

11

engaging in mouse-like behavior to avoid "offending the Court," would have clearly violated this duty of zealous representation.

> In the nature of law practice, however, conflicting responsibilities are encountered. <u>Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an ethical person while earning a satisfactory living.</u> The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these Rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules. <u>These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests,</u> within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [10] (emphasis added). Thus, Mr. Dunlap, like all petitioners asserting rights against States and State agencies, faces an unavoidable conflict providing zealous representation within the bounds of the law. He has not failed to properly balance these duties.

Further, the Rules of Professional Conduct specifically contemplate a lawyer to be a zealous advocate for his client when the opposing party is well-represented by counsel. The Rules provide:

> A lawyer's responsibilities as a representative of clients, an officer of the legal system, and a public citizen are usually harmonious. Thus, when an opposing party is well represented, a lawyer can be a <u>zealous advocate</u> on behalf of a client and at the same time assume that justice is being done.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [9] (emphasis added). Surely HSDA, and the Court, are "well-represented." The Rules of Professional Conduct implicitly require Mr. Dunlap to be a "zealous advocate" for his client's rights without the threat of facing banishment from the process without a hearing or

12

opportunity to be heard. Zealous advocacy involves making the Court aware, in frank terms, that it has duties under the ADA.

### F. The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law.

The Court should not retaliate against Mr. Dunlap for pointing out to the Court, and simultaneously providing voluminous legal authority, that the Court could be in violation of federal law. The Court has the ability to discern whether it believes this to be an accurate statement of the law. It continues to be petitioner's position that HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[4] In this case, in Mr. Dunlap's good faith opinion, supported by existing caselaw, HSDA and Johnson City are trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's alleged violations of federal law.

---

[4] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening*, 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.*, 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory procedural requirements themselves violate the FHAA; the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See, e.g., *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003).

13

Mr. Dunlap, in courteous fashion, has made multiple attempts to outline for the Court the scope and effect of the ADA and its possible implications on this administrative proceeding. First, on July 28, 2013, Mr. Dunlap set forth the ADA the legal requirement for all state agencies to attempt a reasonable modification to allow TCH to locate its clinic in Johnson City. See Exhibit 1. Second, on July 29, 2013, Mr. Dunlap requested such a reasonable modification. See Exhibit 4. Third, on March 12, 2014, Mr. Dunlap outlined the federal law, with voluminous citations, and made a request for a reasonable modification in a letter. See Exhibit 5. Fourth, on March 12, 2014, again in courteous fashion, Mr. Dunlap outlined federal law and made a request for a reasonable modification in Petitioner's Objection to the Motion to Set Hearing and Demand for Reasonable Modification. See Exhibit 6.

More than four times, Mr. Dunlap presented his well-researched position (including voluminous legal citations and copying opposing counsel) to this Court. Mr. Dunlap is not taking a frivolous position. Mr. Dunlap's duty to his clients and to this Court obligates him to make the Court fully aware of the ADA and that Court would likely run afoul of federal law if it takes certain steps. Mr. Dunlap should not be sanctioned for simply *and respectfully* making the Court aware it might be violating federal law.

**G. Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur.**

Mr. Dunlap did not fail to advise that that the federal court was *deferring* to the administrative proceeding because that was never the case. Mr. Dunlap did not interpret the statements in the Magistrate's December 10, 2013 Order regarding the administrative proceeding

14

as ever imposing a stay on the proceeding to allow this administrative appeal to proceed. Petitioner

respectfully submits that, in any event, this holding would be contrary to federal law that does not

require TCH to pursue administrative remedies before filing an ADA Title II action.[5]

### H. In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge."

Petitioner respectfully represents that advising the Court on applicable federal law and the

Court's responsibility thereunder does not constitute "coercion and misrepresentation" and "a

flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the

Tennessee Rules of Professional Conduct, as well as Tennessee Code Ann. § 39-14-112. Advising

the Court of federal law, while copying opposing counsel, does not amount to improper influence

or coercion.

Rule 3.3 of the Tennessee Rules of Professional Conduct requires "candor toward the

tribunal." In this respect, Mr. Dunlap has fulfilled his duty and in no way has breached his duty.

Mr. Dunlap, supported by substantial legal authority that he has shared with the Court (copying

opposing counsel at all times) in well-researched letters and filings, simply pointed out to the Court

---

[5] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion requirement); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding, under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990) (same).

15

that it may be subject to the ADA and that his clients' positions had become adverse to the Court from a legal perspective. To fail to do so would have violated this rule, rather than honoring it.

Rule 3.4 of the Tennessee Rules of Professional Conduct requires "fairness to opposing party and counsel." In this regard, Petitioner submits that Mr. Dunlap has not violated this provision in any respect. Mr. Dunlap has always conducted himself with view to fairness toward the other side in this matter. Opposing party and counsel have been copied on every correspondence with the Court and obviously they are a party to the underlying federal action.

Rule 8.4 of the Tennessee Rules of Professional Conduct describe to a wide range of potential misconduct generally described as "dishonesty, fraud, deceit, or misrepresentation." As set forth herein, Petitioner submits that in no way has Mr. Dunlap violated Rule 8.4. At all times, Mr. Dunlap has been completely forthright with this Court and in no way has committed any "dishonesty, fraud, deceit, or misrepresentation."

**I. In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."**

Petitioner respectfully disputes that Mr. Dunlap "expressed contempt for this tribunal and these administrative proceedings resulting in no apparent purpose for his continued participation." On the contrary, Mr. Dunlap's thoroughly-researched position, expressed in good faith, that the ADA applies to this Court and that this Court has certain obligations under federal law serves merely to advise the Court of Petitioner's position. Mr. Dunlap would be violating his duty, to his client and to this Court, by remaining silent if he, in good faith, believed that this Court was violating federal law.

16

**J. Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."**

Petitioner respectfully submits that, in fact, Mr. Dunlap has appropriately fulfilled his

duties <u>both</u> to his clients and to this Court. He has done so by respectfully, but firmly and

forthrightly, explaining his clients' adverse position with this Court related to the ADA. Simply

laying this position out to the Court in a respectful manner is completely appropriate and in no way

violates any Rule of Professional Responsibility or state law. Mr. Dunlap should not be retaliated

against for fulfilling his duty of candor to the Court.

**Conclusion**

(a) Petitioner *respectfully (as always)* denies each and every allegation of misconduct,

   violation of Rules of Professional Conduct, or violation of law, by Mr. Dunlap

   contained in the Court's March 14, 2014 Order.

(b) Petitioner *respectfully (as always)* asks the Court to rescind its March 14, 2014 Order

   and otherwise withdraw said Order.

(c) Finally, Petitioner *respectfully (as always)* asserts that Mr. Dunlap is a competent and

   careful attorney, appropriately cognizant of his duties <u>both</u> to his clients and this Court,

   and that Mr. Dunlap should be allowed to represent TCH in this administrative

   proceeding.

Dated: March 21, 2014

Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201

17

Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com


Counsel for Petitioner

18

AFFIDAVIT OF JAMES A. DUNLAP JR.

STATE OF GEORGIA
COUNTY OF FULTON

I, JAMES A. DUNLAP JR., after first being duly sworn, state under oath that I am over age of 18 years of age, that I am legally competent to testify, and that this Affidavit is based on my personal knowledge.

1.     The facts contained in the foregoing PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKINGPERMISSION TO APPEAR PRO HAC VICE are true and correct to the best of my knowledge, information, and belief.

Further the Affiant sayeth naught.

_____
James A. Dunlap Jr.

Sworn to and subscribed before me, a Notary
Public, this the _30_ day of _MARch_ ,
20_14_ , witness my hand at office in the
County of _Fulton_ .
State of Georgia.

_____
NOTARY PUBLIC

My commission expires _12 / 27_ , _2014_

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2014, a copy of the foregoing document(s) was served by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

Richard D. Piliponis

84

# EXHIBIT 1

(TO MOTION TO RECONSIDER)

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

July 28, 2013

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:     Tri-Cities Holdings LLC d/b/a Trex Treatment Center
        CON #1303-005D
        Docket No.: T.B.A.

        Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and
        Development Agency, et al.
        United States District Court (M.D. Tenn.)
        Case No. 3:13-cv-669

Dear Judge Summers:

I represent Tri-Cities Holdings LLC d/b/a Trex Treatment Center ("TCH"), the above-captioned applicant. In addition, I also represent eight (8) residents of the Johnson City, Tennessee area who are addicted to opiates and who are recognized as disabled under federal law, including the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehabilitation Act")("Individual Clients").[1]

Presently, an army of at least 500 disabled persons including pregnant women--and probably more than 1,000—are having to get up as early as 1-4AM and drive 100+ miles, as often as daily, to receive doctor-prescribed, standard of care, life-saving medication that is not available within 50 miles of Johnson City.[2] New patients trying

---

[1] *Mx Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir., 2002)(finding opiate-addicted individuals are disabled under the ADA) (citations).

[2] These facts were outlined in the CON application, at the June 26, 2013 CON hearing, and letters I sent to HSDA on June 18, 2013 and June 28, 2013 asking for a reasonable modification under the ADA and the Rehabilitation Act.

to save their lives from opiate addiction must undertake this drive every day for the first 90 days of treatment. Only a sadist could consider this situation acceptable.

Presently, it is undisputed that hundreds of pregnant women are presenting themselves to Johnson City area clinics and emergency rooms each year for treatment of opiate-addiction.[3] Unquestionably, MMT treatment is the standard of care for opiate-addicted pregnant women.[4] But despite the clear and present danger to these women and their babies, standard of care MMT treatment is nowhere to be found for fifty miles in any direction of Johnson City.

Instead, the Johnson City political leadership—with self-interested encouragement from an entrenched medical establishment favoring non-standard of care physician's office-based buprenorphine treatment, is forcing opiate-addicted pregnant women to drive long distances to North Carolina OTP clinics for standard of care treatment. This is in spite of the fact that buprenorphine-based treatments carries a significantly higher risk of inducing opiate withdrawal syndrome in some pregnant women. This is a reaction that can kill their baby. Indeed, in 2013, Mountain States Health Alliance warned area doctors of the danger of buprenorphine-based treatments with pregnant women and noted that MMT is the standard of care.[5]

TCH's proposed clinic will allow my Individual Clients--along with hundreds of other similarly disabled area residents which include pregnant women – to have access to doctor-prescribed, life-saving, "standard of care"[6] methadone maintenance treatment (MMT) for the first time in the proposed service area.

Presently, this standard of care, life-saving treatment is available only in distant out-of-state clinics (primarily in North Carolina) offering standard of care treatment more than 100 miles roundtrip, over potentially dangerous mountain roads in all

---

[3] "Women Warned Not To Use Two Drugs Around Pregnancy," *Johnson City Press*, March 22, 2012 (130 opiate-addicted pregnant women presented themselves for treatment in one recent seven month period).
[4] American College of Obstetricians and Gynecologists (2012) ("The current standard of care for pregnant women with opioid dependence is referral for opioid-assisted therapy with methadone."); Journal of the American Medical Association, April 30, 2012 ("Methadone is the recommended treatment for opioid dependence during pregnancy."); New England Journal of Medicine 363;24 (nejm.org) December 9, 2010 ("The standard of care for opiate addiction during pregnancy is methadone maintenance and psychiatric care."); National Institute of Health (NIH) Consensus Panel (1998)("Methadone is the standard of care in pregnant women with opioid addiction."); National Institute on Drug Abuse (2012)("Methadone has been the standard of care for the past 40 years for opioid-dependent pregnant women.")
[5] *"Women Warned Not To Use Two Drugs Around Pregnancy," Johnson City Press, March 22, 2012.*
[6] The term "standard of care" treatment is generally recognized as treatment that is accepted by medical experts as a proper treatment for a certain type of disease and that is widely used by healthcare professionals. Standard of care is also called "best practice," "standard medical care," and "standard therapy. National Cancer Institute at the National Institute of Health (http://www.cancer.gov/dictionary?cdrid=346525).

weather conditions, from many parts of the proposed service area. At present, MMT standard of care treatment is available at approximately 1,300 clinics across the United States <u>and at least twelve other OTP clinics in other parts of Tennessee</u>. The standard of care for many opiate-addicted persons, and unquestionably for pregnant women, is Methadone Maintenance Treatment ("MMT") that TCH seeks to provide and which is presently unavailable anywhere in the Proposed Service Area.

It's undisputed that there is a "migration" of 400-500 recovering opiate-addicted patients in the Johnson City area who now are being forced to drive more than 100 miles roundtrip, as often as daily, to distant OTP clinics in North Carolina which offer the nearest available of standard of care MMT. These ADA-disabled persons are being exhausted by having to wake up at between 1AM-4AM and embark on these marathon journeys on dangerous mountain roads. Clearly, people are dying because of this exhausted army of disabled people driving on East Tennessee roads as often as daily.[7] At least one 22-year old woman from Jonesborough died as a result of a collision with an exhausted disabled person having gotten up at 4AM and driven 120+ miles to and from an OTP in North Carolina—toxicology reports indicated methadone was not involved, just the exhaustion from these marathon treks that patient was required to take to get her medication.

Distance is also unquestionably a barrier to treatment so these great distances to treatment lowers treatment rates among recovering addicts. Indeed, Tennessee's own Department of Mental Health and Substance Abuse Services found that retention rates fall in half when patients drive reaches 60 miles one way.[8] So probably another 1,000 to 2,000 disabled people have just given up and gone back to pain pills or heroin to "treat" their addiction.

Therefore, TCH, and my individual clients again request that your office provide TCH a reasonable modification or accommodation under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("RA") to allow TCH to obtain a Certificate of Need and allow it to establish an Opiate Treatment Program (OTP) in Johnson City, Tennessee as requested in its CON application which will allow persons recognized as disabled under the ADA and the RA to have reasonable access to standard of care treatment for their disability.

---

[7] "Judge Wants to Look Up Law Before Accepting Plea in Vehicular Homicide Case," *Johnson City Press*, June 29, 2013 (Johnson City area woman woke up at 4AM, drove 100 miles roundtrip to North Carolina OTP clinic for standard of care MMT treatment, then drove home, took husband to work, then fell asleep at wheel, crossed center lane, and hit and killed 22-year old Jonesborough woman. Police said blood test results showed exhaustion, not MMT treatment, was to blame).

[8] Tennessee Department of Health, Methadone Task Force Report (2001).

Therefore, on behalf of my clients, I would ask you to provide my clients with a reasonable modification of any and all applicable state and local rules and regulations as required under the ADA and the Rehabilitation Act from your office, and any other applicable agency of the State of Tennessee, to allow TCH to locate its Opiate Treatment Program at 4 Wesley Court, or elsewhere, in Johnson City, Tennessee.

The Attorney General of the United States, at the instruction of Congress,[9] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[10]

This duty to reasonably accommodate is an *affirmative* duty and federal law is *supreme* to any and all Tennessee laws and rules.[11] Accordingly, the Supreme Court declared that Title II imposes an "obligation to accommodate," or a "reasonable modification requirement."[12]

As directed by Congress, the Attorney General issued regulations implementing title II, which are based on regulations issued under section 504 of the Rehabilitation Act.[13] The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[14] The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ."[15]

---

[9] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." *Id.* § 12134(b).

[10] 28 C.F.R. § 35.130(b)(7).

[11] *Tennessee v. Lane*, 541 U.S. 509 (2004).

[12] *Id. at* 532–33; *see also Alexander v. Choate*, 469 U.S. 287, 301 (1995)(suggesting Rehabilitation Act requires "meaningful access" and "reasonable accommodations"); *accord, Ability Center, Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir., 2004) ("Title II targets more than intentional discrimination....")

[13] See 42 U.S.C. § 12134(a); 28 C.F.R. § 35.190(a); Executive Order 12250, 45 Fed. Reg. 72995 (1980), reprinted in 42 U.S.C. § 2000d-1.

[14] 28 C.F.R. § 35.130(d) (the "integration mandate").

[15] 28 C.F.R. Pt. 35, App. A (2010) (addressing § 35.130).

In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities. The Supreme Court held that public entities are required to provide community-based services to persons with disabilities when (a) such services are appropriate; (b) the affected persons do not oppose community-based treatment; and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity.[16]

Failure to make a reasonable modification is separate theory of liability under Title II and its implementing regulations. See 28 C.F.R. § 35.130(b) (7). Pursuant to this regulation, federal courts hold that a "failure to accommodate is an independent basis for liability under the ADA."[17] To comply with the ADA's integration mandate, public entities must reasonably modify their policies, procedures or practices when necessary to avoid discrimination.[18] The obligation to make reasonable modifications may be excused only where the public entity demonstrates that the requested modifications would "fundamentally alter" its service system.[19]

In this case, not only did HSDA and Johnson City fail to provide a reasonable accommodation, they failed to even *attempt* one. This is clearly a violation of the ADA and the Rehabilitation Act. By consciously denying disabled persons access to doctor-prescribed, standard of care treatment for their disability, HSDA and Johnson City is attempting to eliminate "undesirable" disabled persons from the community.

In this case, evidence shows that HSDA and Johnson City intentionally disregarded the plaintiffs' rights. In the alternative, at a bare minimum, HSDA and

---

[16] *Olmstead v. L.C.*, 527 U.S. at 607.
[17] *Sak v. City of Aurelia*, 832 F.Supp.2d 1026 (N.D. Iowa 2011), *citing Wisconsin Community Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006), *Frame v. City of Arlington*, 657 F.3d 215, 231 (5th Cir.2011) (noting that Title II does more than prohibit disability discrimination by a public entity, because it "imposes an 'obligation to accommodate,' or a 'reasonable modification requirement,' " but expressing no opinion "as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination, a form of disparate impact discrimination, or something else entirely"); *Pena v. Bexar County, Texas*, 726 F.Supp.2d 675, 683 (W. D. Tex. 2010) (Title II of the ADA "imposes upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals") (citing *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir.2005)).
[18] 28 C.F.R. § 35.130(b)(7).
[19] Id.; *see also Olmstead*, 527 U.S. at 604-07.

Johnson City were consciously indifferent to the plaintiffs' claims amounting to intentional discrimination in violation of the ADA and the Rehabilitation Act.[20]

Under the ADA, a state or local law is "facially discriminatory"[21] if it subjects drug treatment programs to more restrictive standards than other comparable facilities.[22] Such a law violates the ADA unless the treatment program can be shown to pose a direct threat or significant risk to the health or safety of others.[23] Johnson City's Zoning Ordinance restricting methadone clinics is facially discriminatory because: (1) methadone clinics are subjected to more restrictive zoning standards than comparable medical facilities; and (2) individuals seeking treatment at methadone clinics do not pose a direct threat to the health or safety of others that would justify more burdensome treatment.

Three different circuits – including the Sixth Circuit--have held that restrictions on addiction treatment programs were facially discriminatory because they did not apply equally to comparable programs for people without disabilities. In *MX Group, Inc. v. City of Covington,* the city would not permit the plaintiff to locate a methadone

---

[20] *Duvall v. Cnty. of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.2001) ( "To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant.... We now determine that the deliberate indifference standard applies." (citations and footnote omitted)). In *Duvall,* the Ninth Circuit held that intentional discrimination can be shown by establishing "deliberate indifference" by the defendant. *Id.* The Duvall court further explained that "[d]eliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon the likelihood." *Id.* at 1139.

[21] "'[F]acial' challenges to regulation[s] are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 736 n.10 (1997); see also *Cnty. Concrete Corp. v. Township of Roxbury,* 442 F.3d 159, 164 (3d Cir. 2006)(citations).

[22] *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 304-05 (3d Cir. 2007); *MX Group,* 293 F.3d at 344-45; *Bay Area,* 179 F.3d at 733-34; see also *First Step, Inc. v. City of New London,* 247 F. Supp. 2d 135 (D. Conn. 2003)*Habit Mgmt. v. City of Lynn,* 235 F. Supp. 2d 28, 29 (D. Mass. 2002). It should be noted that facial discrimination is a type of intentional discrimination claim and can serve as proof of discriminatory intent. *Larkin v. Mich. Dep't of Social Servs.,* 89 F.3d 285, 289 (6th Cir. 1996); *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1500-01 (10th Cir. 1995); First Step, Inc., 247 F. Supp. 2d at 150-51; Hispanic Counseling Ctr., 237 F. Supp. 2d at 292-93; Sunrise Dev., Inc. v. Town of Huntington, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999).

[23] *New Directions,* 490 F.3d at 306-07; *Bay Area,* 179 F.3d at 737; *Habit Management v. City of Lynn,* 235 F.Supp.2d 28, 29 (D. Mass. 2002). In determining whether a program poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.
28 C.F.R. pt. 35 app. A, Section 35.104 (2009); 28 C.F.R. § 35.139 (eff. Mar. 15, 2011).

clinic, in response to community opposition.[24] The city then adopted an amendment to the zoning code limiting the number of addiction treatment facilities to one facility for every 20,000 persons in the city, which completely foreclosed the plaintiff's opportunity to locate in the city.[25] The district court entered judgment for the plaintiff following a bench trial. The Sixth Circuit affirmed the district court's judgment and agreed that the ordinance was facially discriminatory.[26] Thus, the Sixth Circuit concluded that the district court correctly found that the city's decision to amend the zoning code to prevent the plaintiff from operating anywhere in the city violated the ADA.[27]

In *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293 (3d Cir. 2007), the plaintiff sought to locate a methadone clinic.[28] The city denied a permit to the plaintiff, relying on a Pennsylvania statute that prohibited addiction treatment clinics from locating within 500 feet of a school, playground, park, residential area, child-care facility, or place of worship, except by approval of the locality's governing body.[29] The Third Circuit held that the Pennsylvania statute "facially singles out methadone clinics, and thereby methadone patients, for different treatment, thereby rendering the statute facially discriminatory" under the ADA.[30]

In *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725 (9th Cir. 1999), the operator and patients of a methadone clinic sued the City of Antioch after it adopted an ordinance prohibiting methadone clinics from locating within 500 feet of any residential property.[31] The Ninth Circuit concluded that the ordinance was facially discriminatory and a *per se* violation of title II of the ADA, 42 USC § 12132, because it subjected methadone clinics, but not other medical clinics, to a spacing limitation.[32]

HSDA's own rules clear violate the ADA and the Rehabilitation Act. Federal courts that find discriminatory notice requirements, like HSDA's requirement for methadone clinics[33], and only such clinics, to notify local politicians of a CON

---

[24] 293 F.3d at 329-330.
[25] *Id.* at 330-31.
[26] *Id.* at 328, 344-45.
[27] *Id.*
[28] 490 F.3d at 296-97.
[29] *Id.* at 298-99.
[30] *Id.* at 304.
[31] 179 F.3d at 727-28.
[32] *Id.* at 734-35.
[33] Tenn. Code§ Section 68-11-1607(c)(3) provides: "Within ten (10) days of the filing of an application for a nonresidential substitution-based treatment center for opiate addiction with the agency, the applicant shall send a notice to the county mayor of the county in which the facility is proposed to be

application. This is plainly intended to galvanize local opposition to an OTP's CON application. Federal courts have uniformly found such requirements to violate the ADA. In *Potomac Group Home v. Montgomery County, Md.*, the court declared that notice provisions that "galvanize" opposition are repugnant to federal law:

> This requirement is equally as offensive as would be a rule that a minority family must give notification and invite comment before moving into a predominantly white neighborhood. The obvious result of these notifications to neighbors is the antithesis of the professed "integration" goal of defendants. Indeed, notices of this sort galvanize neighbors in their opposition to the homes.

*Potomac Group Home v. Montgomery County, Md.*, 823 F.Supp. 1285, 1296 (D. Md. 1993). HSDA's clearly illegal requirement to notify local politicians when we applied for the clinic provides the lever to engage the federal court to provide equitable relief in forcing the issuance of the CON. HSDA also clearly failed to offer a reasonable modification of its rules to allow the CON to be issued. Indeed, the panel split 6-2 and denied the CON so very little, if anything, needs to be done by HSDA to issue the CON.

The present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the area every three days) and I would ask you and your office to take immediate action to rectify this dire situation and allow TCH's OTP standard of care program to locate in Johnson City and exist such clinics do in other parts of Tennessee.

Finally, I would request that the above-captioned administrative appeal be stayed while the federal case is pending. The administrative appeal claims are included as pendant claims in Counts 13 and 14 in the federal complaint.

---

located, the member of the house of representatives and the senator of the general assembly representing the district in which the facility is proposed to be located, and to the mayor of the municipality, if the facility is proposed to be located within the corporate boundaries of a municipality, by certified mail, return receipt requested, informing such officials that an application for a nonresidential s facility has been filed with the agency by the applicant. All applications, original and simultaneous review, shall not enter the next review cycle, unless filed with the agency within such time as to assure that such application is deemed complete in accordance with the rules of the agency."

Sincerely,

James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:    Jim Christoffersen, General Counsel HSDA (via email)

       Erick Herrin, City Attorney for Johnson City, TN (via email)

# EXHIBIT 2

## (TO MOTION TO RECONSIDER)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| TRI-CITIES HOLDINGS, LLC, ET AL., | ) | |
| | ) | |
| v. | ) | NO. 2:13-CV-305 |
| | ) | |
| TENNESSEE HEALTH SERVICES and | ) | |
| DEVELOPMENT AGENCY, ET AL. | ) | |

## O R D E R

The defendants have filed a Motion to Stay, Doc. 98, and a Second Motion to Stay

Discovery, Doc. 100. These motions have been referred to the Magistrate Judge pursuant

to 28 U.S.C. 636 and the Standing Order of this Court. A hearing was held on December 10,

2013.

This issue is far more complicated than it should be and, to be blunt, it has been

complicated by the plaintiffs' actions.

The plaintiffs filed their first suit in this Court in April 2013, No. 2:13-CV-108, "Tri-

Cities I." The defendants filed a motion to dismiss the suit because the issues were not yet

"ripe." The district judge agreed, and he dismissed the case without prejudice on June 12,

2013.[1]

Rather than asking Judge Greer to reconsider his decision, or appealing the matter to

the court of appeals, the plaintiffs filed an essentially identical suit in the Middle District of

---

[1] 2:13-CV-108, Doc. 45.

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 1 of 6   PageID #: 3843
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 108 of 396   PageID #: 1805

96

Tennessee, "Tri-Cities II."[2]  Ultimately, District Judge Haynes of the Middle District transferred the case back to this court on the basis that the Eastern District was the correct venue.

The various defendants, including the Tennessee Health Services and Development Agency, have filed motions to dismiss this suit, at least one basis of which is ripeness.

In an attempt to justify the filing of Tri-Cities II in the Middle District of Tennessee, plaintiffs' counsel says that he did so only because of threats of physical violence directed against the plaintiffs in this district, and his concern about "local animus against opiate-addicted persons" in any jury pool that would be drawn from this district.

In support of his argument, plaintiffs' counsel referred to various exhibits which were not attached to his brief, nor did counsel advise the court where those exhibits could be found in the record.  With a great deal of difficulty, two of those exhibits were ultimately located as exhibits to document 45; the other exhibits have yet to be found.  With respect to the two exhibits that were located, they do not begin to support plaintiffs' argument that they refiled their suit in the Middle District of Tennessee because of threats of physical violence.  Indeed, counsel's argument treads perilously close to being offensive.  "Exhibit PP"[3] is a portion of a "blog" on the internet that has some uncomplimentary things to say about Mr. Kester's

---

[2] Plaintiffs did name an additional defendant to Tri-Cities II, the Tennessee Health Services and Development Agency, but that did not change the basic complexion of the case.

[3] Document 45-6.

2

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 2 of 6   PageID #: 3844
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 109 of 396   PageID #: 1806

97

motive in attempting to open a methadone clinic in Johnson City: "This isn't about addiction treatment. It is about Kester expanding a lucrative for profit company from a never-ending addict base." Then the same blog entry ends with this: "There is a very old fashioned method of getting an undesirable out of town and Kester now deserves that method."

This magistrate judge is unsure what that "old fashioned method" might be, but it is a safe guess that it is probably being ridden out of town on a rail. Regardless, it is a blog, and the internet unfortunately provides a forum for people to share not only their knowledge, but also their ignorance and prejudices. Suffice it to say that this magistrate judge has seen *far worse* internet comments regarding cases pending in the Eastern District of Tennessee, and judicial life nevertheless went on. And, to look at it logically, Mr. Kester will still be Mr. Kester regardless of where this suit is tried. Refiling the suit in Nashville would not have eliminated any of the claimed potential for violence, since the end result of the litigation, wherever filed, still would take place in Johnson City.

Plaintiffs further argue that the jury pool in the Northeastern Division of this Court manifests a general animus toward drug addicts. By the "jury pool," plaintiffs' attorneys can only mean the citizenry of the Northeastern Division, since it is they who would comprise that jury pool. The exhibits referred to in plaintiffs' response which purportedly demonstrates the animus do not exist; at least, the Court could not find them.

Further, assuming there are people who do harbor animus against drug addicts, there is no reason to believe a jury pool from the Middle District of Tennessee would be any more "enlightened" or sophisticated. Also, plaintiffs' response completely ignores the fact that the

3

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 3 of 6   PageID #: 3845
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 110 of 396   PageID #: 1807

98

jury pool will come from a ten-county area, some of it far removed from the Johnson City geographical area, and it also ignores the role the district judge ultimately will play in seating dispassionate and objectively-minded jurors.

To get to the point: plaintiffs' response was a transparent attempt to explain away rather obvious judge-shopping. Plaintiffs' actions in refiling Tri-Cities II in the Middle District of Tennessee on the heels of the dismissal of Tri-Cities I, even if not a sanctionable contempt, certainly manifested a contemptuous attitude toward this Court's earlier decision.

Plaintiffs' counsel stated during oral argument that he came across a "significant body of authorities" which would have convinced Judge Greer that his decision in Tri-Cities I was erroneous. This argument, however, actually corroborates the conclusion of this magistrate judge that plaintiffs' counsel was forum-shopping, since he admittedly had those authorities in plenty of time to file a motion for reconsideration before District Judge Greer. But, rather than do that, he chose to file an entirely new suit in the Middle District of Tennessee.

In response to the defendants' Motion to Stay Discovery, the plaintiffs argue that these same defendants, while the case was pending in the Middle District of Tennessee, not only stipulated that a Rule 26 discovery conference had occurred, they also professed an urgent need to proceed with discovery. Plaintiffs' assertion in that regard precipitated a rather vigorous reply from the defendants, supported by the declarations of their respective attorneys, in which they flatly asserted that there was no such stipulation, and that they never expressed any need, urgent or otherwise, to proceed with discovery.

"Swearing matches" between opposing attorneys in a lawsuit is the bane of any

4

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 4 of 6   PageID #: 3846
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 111 of 396   PageID #: 1808

99

judicial officer, but in this particular case the record and various documents support the assertions of defendants' attorneys. This Court is forced to conclude that plaintiffs' counsel has been more than a bit loose with his interpretation of what occurred while this case was pending before the Middle District of Tennessee.

Tri-Cities I was dismissed, and the plaintiffs eschewed any appeal of Judge Greer's memorandum opinion and order.[4] It became a final order. Thus, the issues framed by the Motion to Stay and the Motion to Stay Discovery must be considered in light of principles of *res judicata:*

> The doctrine of res judicata bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. *Hampton vs. Tennessee Truck Sales Inc.* 993 SW 2nd 643, 645 (Tenn. App. 1999).

The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals.

Defendants' Motion to Stay the Case actually is an alternative to their motion for an outright dismissal without prejudice on the same basis that they moved successfully to have Tri-Cities I dismissed, *viz.*, lack of ripeness. This Court often is presented with motions to stay discovery, etc., until the court rules upon a pending motion to dismiss. Due to the heavy criminal docket of this court, it lately has been the practice to deny such motions to stay discovery in an effort to keep abreast of the civil docket. But this case is an exception.

---

[4] 2:13-CV-108, Doc. 45.

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 5 of 6   PageID #: 3847
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 112 of 396   PageID #: 1809

100

Plaintiffs' blatant forum-shopping to avoid this court's ruling in Tri-Cities I admittedly has been taken into account in the court's decision. But more important is the fact that it is reasonable to conclude that the district judge will not change his opinion that plaintiffs must attempt to procure a certificate of need, and a license from the Tennessee Health Services Agency, before this Court can entertain their suit.

Plaintiffs' application for a certificate of need has been denied, and an appeal of that denial is now pending before a state administrative law judge. During argument, the court was quite surprised to learn that an administrative law judge has delayed considering the appeal of that denial based upon plaintiffs' counsel's representation to her that he intended to ask this court to stay, i.e., enjoin, any action by her. That would seem to be contrary to plaintiffs' professed need for a quick resolution to this litigation.

The Motion to Stay Discovery, Doc. 100, is GRANTED, and it will remain in effect until the court has ruled upon Johnson City's Motion to Stay the entire case.

Since the Motion to Stay the case, Doc. 98, is an alternative to defendants' Motion to Dismiss, the resolution of that motion necessarily is DEFERRED to the district judge.

SO ORDERED:

_____s/ Dennis H. Inman_____
United States Magistrate Judge

6

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 6 of 6   PageID #: 3848
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 113 of 396   PageID #: 1810

101

# EXHIBIT 3

(TO MOTION TO RECONSIDER)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

TRI-CITIES HOLDINGS, LLC, ET AL.,   )
                                    )
v.                                  )          NO. 2:13-CV-305
                                    )
TENNESSEE HEALTH SERVICES and       )
DEVELOPMENT AGENCY, ET AL.          )

## O R D E R

By motion filed as document 139, the defendants have filed a motion for additional time to respond to the plaintiffs' motion for partial summary judgment. Their motion is GRANTED only to the following extent:

If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. If, however, the district judge denies the motion to stay the case, the stay of discovery will be lifted as of that moment, [1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

SO ORDERED:

       s/ Dennis H. Inman
United States Magistrate Judge

---

[1] See, order, doc. 135.

Case 2:13-cv-00305-JRG-DHI   Document 150   Filed 01/02/14   Page 1 of 1   PageID #: 4391
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 115 of 396   PageID #: 1812

103

# EXHIBIT 4

## (TO MOTION TO RECONSIDER)

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

July 29, 2013

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:     Tri-Cities Holdings LLC d/b/a Trex Treatment Center
        CON #1303-005D
        Docket No.: T.B.A.

        Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and
        Development Agency, et al.
        United States District Court (M.D. Tenn.)
        Case No. 3:13-cv-669

Dear Judge Summers:

Since Mr. Christoffersen refused to consent to a stay of the administrative appeal in his letter dated today, I would respectfully move for you to stay this administrative appeal process pending resolution of the federal court action. The administrative appeal claims are included as pendant claims in Counts 13 and 14 in the federal complaint. I'm attaching a copy of the federal complaint.

Mr. Christoffersen contends there is a requirement for TCH to exhaust its administrative remedies before pursuing the federal action. However, I would note that federal courts clearly hold there is no need to exhaust administrative remedies to bring a claim under the ADA or the Rehabilitation Act.[1] I would also again note that

---

[1] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding,

federal law is supreme and controlling over any and all state law or rules of procedure and in no way relieves the State of Tennessee, HSDA, or Johnson City from their affirmatives duties to comply with the ADA and the Rehabilitation Act and which they are clearly in violation of at present.[2]

Again, the present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the Proposed Service Area every three days). By copy of this letter I am again respectfully asking you, HSDA, and Johnson City to provide a reasonable modification under the ADA and the Rehabilitation Act to allow TCH to locate its OTP clinic in Johnson City.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:    Jim Christoffersen, General Counsel HSDA (via email)
       Erick Herrin, City Attorney for Johnson City, TN (via email)

---

under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.,* 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir. 1990) (same).
[2] *Tennessee v. Lane,* 541 U.S. 509 (2004).

# EXHIBIT 5

## (TO MOTION TO RECONSIDER)

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

March 12, 2014

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:     Tri-Cities Holdings LLC d/b/a Trex Treatment Center
        CON #1303-005D
        Docket No.: T.B.A.

Dear Judge Summers:

I wanted to outline further my position regarding the previous requests I have made upon you regarding TCH's rights under the Americans with Disabilities Act in this appeal.

The Administrative Procedures Division, Tennessee Department of State, is subject to Title II of the Americans with Disabilities Act.[1] *Respectfully,* I submit that this imposes upon you an *affirmative duty* to provide a reasonable modification to TCH

---

[1] "The [Tennessee] Department Americans with Disabilities Act (ADA) Coordinators ensure state government's compliance with the Americans with Disabilities Act as amended by the Americans with Disabilities Act Amendments Act (ADAAA). They assist with reasonable accommodation issues in state employment and program access for state services and programs and help agencies and employees resolve access and accommodation issues. Please contact your agency's ADA Coordinator if you need more information or have any questions about a reasonable accommodation." State of Tennessee Employee Handbook, p. 10. (emphasis added).

to allow the Certificate of Need to be issued in this case and before any final hearing is held.[2]

The Attorney General of the United States, at the instruction of Congress,[3] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[4]

As you know, I have made several requests to you for a reasonable modification under the ADA.[5] I *respectfully* submit that you and the Administrative Procedures Division have an affirmative duty to provide a reasonable modification to TCH to obtain its Certificate of Need. This responsibility is different from your consideration of normal "non-ADA" administrative appeal.

Because your duty under the ADA is *affirmative*, it is not incumbent upon me to take the initiative to fashion a remedy. Rather, it is your duty. However, this modification might specifically involve a reasonable lowering of the requirements of "need, economic feasibility, or orderly development" in accordance with the criteria for issuance of a Certificate of Need. Although given the undisputed evidence that this area suffers the worst drug overdose death and infant mortality rate in the nation, satisfaction of the "need" criteria is relatively straightforward. In addition, there is undisputed evidence of widespread suffering and havoc related to the daily long-distance driving of between 500 and 1,000 opiate-addicted, ADA-disabled people to have to get standard of care Methadone Maintenance Treatment at an Opiate

---

[2] *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002) (holding that entities have standing to sue under the ADA as being discriminated against "because of their known association with an individual with a disability")(citations).

[3] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." Id. § 12134(b).

[4] 28 C.F.R. § 35.130(b)(7).

[5] James Dunlap letters to Judge Summers, July 28, 2013 and July 29, 2013. Petitioner's Motion for Reasonable Modification dated March 10, 2013.

Treatment Programs in North Carolina. I would submit that on the issues of economic feasibility and orderly development, such a clinic would easily satisfy any requirement, given that there is no such clinic within fifty (50) miles in any direction and the need is so great.

In this regard, I would *respectfully* request that you immediately indicate your willingness to discuss a reasonable modification (by telephone is fine) and that we schedule a conference (again telephone is fine) to *specifically to address the reasonable modification request*—before a full-blown hearing is scheduled.

Finally, I would hope that you would not be hurried or pressured in any way to schedule a final hearing in this case. Rather, it my clients' position that it is appropriate for the pending federal case to resolve <u>before</u> a final hearing in this case.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:    Jim Christoffersen, General Counsel HSDA (via email)

# EXHIBIT 6

## (TO MOTION TO RECONSIDER)

| | |
|---|---|
| Tri-Cities Holdings LLC<br>d/b/a Trex Treatment Center | )<br>)<br>)   DOCKET NO. T.B.A.<br>)   CON No. CN1303-005D<br>) |

### PETITIONER'S OBJECTION TO MOTION TO SET HEARING
### AND DEMAND FOR REASONABLE MODIFICATION
### UNDER THE AMERICANS WITH DISABILITIES ACT

James A. Dunlap Jr. & Assoc. LLC
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

James S. Higgins, Esq. BPR # 16142
Rick Piliponis, Esq. BPR # 16249
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# Contents

Summary of Argument ..................................................................................................... 3

Statement of Fact ........................................................................................................... 4

I.     HSDA's Notice Rule blatantly violates the ADA. ............................................ 7

II.    HSDA blatantly violated the ADA failing to offer TCH a reasonable modification to TCH to allow it to locate its clinic in Johnson City. ................ 7

III.   The United States Department of Justice is on the verge of hitting HSDA and Johnson City with an ADA enforcement action. ........................................ 8

IV.   HSDA and Johnson City's policies have created a slaughterhouse of drug overdose death and infant mortality in the Johnson City area. ........................ 9

      A.    Right now, from 500 to more than 1,000 opiate-addicted, ADA-disabled residents of the Johnson City area -- including pregnant women--are being forced to drive 100+ miles or more over dangerous mountain roads (as often as daily and in the dark to allow time to get to work) to OTP clinics in North Carolina. ....................... 12

      B.    Johnson City and HSDA's illegal rules are taking a deadly toll on bystanders being needlessly killed by some of more than 1,000 opiate-addicted people having to drive 100+ miles per day for MMT treatment throughout northeast Tennessee. ........................................ 13

      C.    Johnson City and HSDA's illegal rules are taking a potentially deadly toll on pregnant women and infants in northeast Tennessee. ........... 14

V.    Johnson City and HSDA's blatant violations of the ADA that have persisted for over a decade and are part of a widespread effort among local governments in northeast Tennessee to violate federal law. ..................................... 15

VI.   On top of a leading drug overdose death rate and infant mortality that place the Johnson City area at the absolute bottom of nation in public health, an epidemic of heroin is now crashing down upon Johnson City, like many places in America, that will make these already grotesque death statistics pale in comparison to what soon awaits this community........................................ 17

VII.  Petitioner respectfully submits that this administrative appeal process amounts to a scheme or artifice to violate the ADA. ............................................... 20

Conclusion ..................................................................................................................... 21

2

Plaintiffs Tri-Cities Holdings LLC ("TCH""), Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby files this Objection to Motion to Set Hearing, and Demand for Reasonable Modification Under the Americans with Disabilities Act, and states as follows:

## Summary of Argument

In filing its Motion to Set Hearing, HSDA is attempting to make this tribunal the "fixer" by illegally providing HSDA cover in what amounts to its blatant violations of the Americans with Disabilities Act ("ADA"). HSDA is facing a virtually certain loss in federal court (at the trial level or, if not there, then on appeal to the Sixth Circuit) for its blatant violations of the ADA both for its blatantly illegal Notice Rule and also its gross failure in its *affirmative duty* to provide a reasonable modification to its rules to allow TCH's clinic to obtain a Certificate of Need. HSDA also faces a pending investigation, and a seemingly imminent enforcement action against it, by the United States Department of Justice. Petitioner suggests that HSDA would love nothing more than have this tribunal "enter the fight," create a diversion, and take the heat off HSDA and somehow "fix" HSDA's unfixable position.

As a matter of long-settled federal law, HSDA and Johnson City are liable to TCH under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., ("ADA"). *Mx Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)(arbitrary distance requirements virtually identical to Johnson City's ordinance are a violation of the ADA); *Potomac Group Home v. Montgomery County*, Md., 823 F. Supp. 1285 (D. Md. 1993)(notice provisions which galvanize local opposition, virtually identical to HSDA's Notice Rule, violate the ADA).

Further, both HSDA and Johnson City blatantly failed in their *affirmative duties* to offer

3

TCH a reasonable modification to locate the clinic in Johnson City.

In addition, if this tribunal does "take HSDA's bait" and takes any action to decide this appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing, Petitioner respectfully indicates that it will have no choice but to join Your Honor, in an official capacity, and this tribunal, as defendants in the pending federal court action.

Finally, Petitioner respectfully submits that, under the ADA, Your Honor and this tribunal are required to offer Petitioner a reasonable modification to allow the CON to be issued. Petition respectfully submits that Your Honor's and this tribunal's continuing failure to do this creates a cause of action that Petitioner may bring against Your Honor, and the tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents in an ADA enforcement action.

Thus, this tribunal should decline to be HSDA's and Johnson City's "fixer," despite their desperate attempts to create a non-existent "escape hatch" for their blatant violations of federal law and the penalties likely soon to be imposed against them for these violations.

### Statement of Fact

Tragically, over the last decade, HSDA and Johnson City officials have presided over what amounts to the biggest slaughterhouse of drug overdose deaths and infant mortality in the United States. Over the last decade --and absent fundamental change will be a never-ending condition -- one to two Johnson City area residents drop dead from a drug overdose every three days.[1] That's 100-200 dead per year and between 1,000 and 2,000 dead over the next decade. A

---

[1] This estimate is based on the fact that three people die every day in Tennessee from a drug overdose (more than 1,200 annually) and TCH's proposed service area surrounding Johnson City comprises approximately 10% of the state population. So 10% of three deaths a day is

4

thousand died over the last decade in this area. This is the biggest drug overdose and infant death slaughterhouse in the nation—higher even that the nation's capital of drug overdose and infant death—West Virginia.

Even more depressing than Johnson City's war-zone-level drug overdose death rate -- if that's possible – is the fact that the Johnson City area has a <u>higher white non-Latino infant mortality rate than any state in the union.</u> Sadly, but almost certainly at least in part because of the denial of access to standard of care treatment, the Johnson City area suffers the <u>highest non-Latino white infant mortality rate in the United States</u>—higher even than West Virginia-- the heretofore non-Latino white infant death capital of America.[2] Many third world countries have drastically lower infant mortality rates than the Johnson City area.[3] A baby in Carter County, Tennessee has essentially the same survival odds as one in Botswana, Africa![4] The grim figures are below.

| Geographic Area | Non-Latino White Infant Mortality per 1,000 Births |
|---|---|
| Carter County, TN | 9.8 |
| **Washington County, TN** | **8.5** |
| Unicoi County, TN | 7.7 |
| West Virginia | 7.5 |
| **Average of TN Counties with MMT** | **4.4** |

approximately one death every three days. This rate is most likely higher than West Virginia, the drug overdose death capital of America.

[2] "Chronic Disease Heath Profile Regions and Counties" Tennessee Department of Health (2011); Infant Mortality Rates, 2007-2009, The Henry J. Kaiser Family Foundation (kff.org).

[3] *Id.*

[4] CIA World Factbook (2013), https://www.cia.gov/library/publications/the-world-factbook/rankorder/2091rank.html (Botswana suffers an estimated 9.9 deaths per thousand births. Sri Lanka, Saint Kitts and Nevis, Uruguay, Saint Maarten, Costa Rica, Cyprus, Nauru, Ukraine, Macedonia, Latvia, Puerto Rico, Kuwait, Chile, and even Russia, have lower infant mortality rates than the Johnson City area.).

5

<u>MMT is unquestionably the standard of care for opiate-addicted pregnant women</u>.[5]
Despite this obvious fact, a fact that any competent medical provider realizes, and in the face of
below-third-world infant death rates in the Johnson City area, hundreds of opiate-addicted pregnant
women presenting themselves for treatment in the Johnson City area <u>are being illegally denied
standard of care MMT treatment for their disability</u>.   In fact, in a comically tragic situation, even
Johnson City's own large hospital group, Mountain States Health Alliance, declared in a 2012
warning letter to more than 100 doctors in the area <u>not to prescribe sub-standard of care Suboxone</u>
and that "<u>Methadone is the recommended medication used for detoxification during pregnancy</u>."[6]
Yet, despite this obvious and pathetic lack of standard of care treatment, Johnson City and HSDA
plod forward and continue to illegally block access by pregnant women to standard of care
treatment.

     The Johnson City area's public health statistic related to opiate addiction are all
horrible—almost uniformly the worst in the nation and way below many third world countries.

---

[5] In 2012, the American College of Obstetricians and Gynecologists declared in a formal
published opinion that <u>MMT is the standard of care for opiate addicted pregnant women</u>: "Opioid
use is not uncommon in pregnancy.... <u>The current standard of care for pregnant women with
opioid dependence is referral for opioid-assisted therapy with methadone</u>.... Abrupt
discontinuation of opioids in an opioid-dependent pregnant woman can result in preterm labor,
fetal distress, or fetal [death]." "Opioid Abuse, Dependence, And Addiction In Pregnancy,"
American College of Obstetricians and Gynecologists Committee Opinion No. 524
(2012)(emphasis added). On or about April 30, 2012, the Journal of the American Medical
Association declared: "[M]ethadone is the recommended treatment for opioid dependence during
pregnancy." On December 9, 2010, New England Journal of Medicine declared: "[T]he standard
of care for opiate addiction during pregnancy is methadone maintenance and psychiatric care."[5]  In
1998, a National Institute of Health (NIH) Consensus Panel declared: "[M]ethadone is the
standard of care in pregnant women with opioid addiction." In 2012, the National Institute on
Drug Abuse declared: "[M]ethadone has been the standard of care for the past 40 years for opioid
dependent pregnant women."
[6] "Women Warned Not to Take Two Drugs Around Pregnancy," *Johnson City Press*,
March 22, 2012. (http://www.johnsoncitypress.com/article/99175)

6

One would think that common sense would *at least not actively block* standard of care treatment for opiate addiction into the area that is the biggest slaughterhouse of opiate overdose death and infant mortality in the United States. But logic is often scarce in local and state politics. This scenario, sadly, is all too common. In similar fashion, Pakistani villagers recently attacked UN workers bringing standard of care vaccine to areas ravaged by polio.[7] Like HSDA, the Pakistani villagers apparently believed there was "no need" for standard of care treatment in the area.

## I. HSDA's Notice Rule blatantly violates the ADA.

HSDA's "Notice Rule"[8] requires only clinics serving opiate-addicted persons who are disabled under the ADA (and no one else) to perform cumbersome procedures to provide notice to local and state political leaders which galvanizes opposition only to efforts to treat the disabled. Clinics serving non-disabled persons have no such burden. Federal courts resoundingly reject such discriminatory notice provisions. *Potomac Group Home v. Montgomery County, Md.*, 823 F.Supp. 1285 (D. Md. 1993). Thus, HSDA is facing a sure loser on this issue.

## II. HSDA blatantly violated the ADA failing to offer TCH a reasonable modification to TCH to allow it to locate its clinic in Johnson City.

HSDA also failed to make any attempt -- required under the ADA-- at a reasonable modification of its rules to allow TCH to obtain a Certificate of Need.

Furthermore, the Attorney General of the United States, at the instruction of

---

[7]Polio Vaccination Teams Attacked By Pakistani Militants, London Telegraph, March 1, 2014 (http://www.telegraph.co.uk/news/worldnews/asia/pakistan/10669840/Polio-vaccination-teams-attacked-by-Pakistani-militants.html).
[8] T. C. A. § 68-11-1607(c)(3).

7

118

Congress,[9] has issued an implementing regulation that outlines the affirmative duty of a public entity to accommodate reasonably the needs of the disabled. Federal courts have interpreted this duty to reasonably accommodate is an *affirmative* duty[10] and declared that Title II imposes an "obligation to accommodate," or a "reasonable modification requirement."[11]

Misery loves company and HSDA would surely love this tribunal to try to extricate HSDA from the legal swamp it has created for itself. However, this tribunal is unable to do this and, at a minimum, would just succeed in bringing further liability upon itself and become a named defendant in the federal action. Petitioner respectfully suggests this would be an unwise and costly step for the tribunal and certainly violate principles of judicial economy at the very minimum.

III.    **The United States Department of Justice is on the verge of hitting HSDA and Johnson City with an ADA enforcement action.**

HSDA and Johnson City already under investigation by the DOJ for violations of the ADA in this case—with penalties for violations starting at $50,000 *for the first violation* and *$100,000 for each additional violation*.[12]    On Petitioner's information and belief, more than forty complaints have been lodged by Tennessee residents with DOJ regarding these ADA violations,

---

[9] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." *Id.* § 12134(b).

[10] *Tennessee v. Lane*, 541 U.S. 509 (2004); *Popovich v. Cuyahoga*, 227 F.3d 627, 638 (6th Cir., 2000)("There is no statutory exception to Title II's duty to accommodate....").

[11] *Id. at* 532–33; *see also Alexander v. Choate*, 469 U.S. 287, 301 (1995)(suggesting Rehabilitation Act requires "meaningful access" and "reasonable accommodations"); *accord, Ability Center, Toledo v. City of Sandusky*, 385 U.S. 901, 908 (6th Cir., 2004) ("Title II targets more than intentional discrimination....").

[12] 42 U.S. Code § 12188(2)(C)(1) and (2).

8

and many more complaints filed nationally. The DOJ investigation began in June 2013. Although moving at the typical pace of government, it would seem virtually impossible that DOJ would give HSDA and Johnson City a "free pass" on their blatant, horrific violations of the ADA that are indisputably killing so many people (opiate-addicted and innocent bystanders such as 22-year old newlywed Misty Briggs) and causing such havoc and widespread suffering. The DOJ severely punished local governments in similar cases.[13] This horrific and disgraceful situation which has persisted for more than a decade before more lives are lost and so these ridiculously blatant violations of the ADA can be at least partially ameliorated in this area of widespread flouting of the ADA.

Even more disturbing, HSDA and Johnson City's violations of the ADA amount to *de facto* policy to expel "undesirable" disabled persons from the region. News organizations and advocacy groups across America, like the National Association of Medically Assisted Recovery, are looking on in horror as this northeast Tennessee death chamber is exacerbated by discrimination so blatant the bad actors are even willing to allow to innocents to be killed (i.e., 22-year old newlywed Misty Briggs) rather than change the policy.

IV. **HSDA and Johnson City's policies have created a slaughterhouse of drug overdose death and infant mortality in the Johnson City area.**

Since at least since 2003, Johnson City (aided by HSDA's illegal Certificate of Need procedures[14]) has employed a blatant illegal zoning ordinance, treating opiate-addicted

---

[13] *United States v. Baltimore*, (U.S. Dist. Maryland)(09 CV 1049), United States v. City of Ansonia, CT, settlement signed March 30, 2012.
[14] HSDA's notice procedures that apply only to opiate treatment facilities effectively galvanize local resistance to methadone clinics. These type rules have been rejected by federal courts nationwide as being in violation of ADA. *Potomac Group Home v. Montgomery County*,

9

person like sub-humans unfit to receive medical treatment near "normal" Johnson City residents, to actively block standard of care Methadone Maintenance Treatment ("MMT") treatment. With tragic, mind-boggling irony, at the same time the Johnson City area is the most opiate-soaked in the United States.[15] A U.S. Attorney recently described Johnson City as the "epicenter" of the national opiate-addiction crisis.[16] Most likely, more than 100 oxycodone pills are being prescribed per year for every Johnson City area resident over 12 years of age![17] The Johnson City area faces a drug overdose death rate higher than any state in the union. More than 1,000 Johnson City area residents have died of overdoses over just the last decade and another 2,000 will likely die in the coming decade! There is no place in America when an Opiate Treatment Program is more needed than here.

---

*Md.*, 823 F.Supp. 1285 (D. Md., 1993).

[15] Tennessee Department of Mental Health and Substance Abuse Services ("TDMHSAS") statistics show northeast Tennessee has more than twice the statewide rate of drug overdose emergency room visits. Assuming emergency room visits correlate to drug overdose death rates— a fair assumption--northeast Tennessee would have twice the statewide death rate, putting northeast Tennessee drug overdose death rate higher than that West Virginia -- the nation's drug overdose death capital. Governor's Public Safety Action Plan, TDMHSAS Commissioner Doug Varney, December 6, 2012.

[16] One of the presenters was Booth Goodwin, U.S. Attorney for the Southern District of West Virginia. "Prescription drug abuse is absolutely the biggest crime problem, the biggest public health problem in my district," Goodwin said. "This is a very big issue for all of our districts. **If you took a pin and put it in Johnson City and drew a 500-mile radius around it, you would be right in the middle of a prescription drug crisis.**" "Regional Summit Tackles Prescription Drug Abuse," Johnson City Press, September 25, 2013. (http://www.johnsoncitypress.com/article/111294/regional-summit-tackles-prescription-drug-abuse).

[17] In 2010, there were 272 million Hydrocodone pills prescribed in Tennessee, which is enough to supply 51 doses to every man, woman and child over the age of 12 in the state. "Hyrdocodone, Oxycodone, Oxycontin are highly abused and extremely addictive," says U.S. attorney for East Tennessee Bill Killan. WCYB, Bristol, VA. September 25, 2013. ("Knox County, Sullivan County, and Washington County are the most severe counties in the per capita uses for substance abuse.").

10

Despite Johnson City being a slaughterhouse of sky-high drug overdose deaths and below-third-world infant mortality, Johnson City and HSDA have conspired to block MMT--a treatment overwhelmingly recognized in the United States, and around the world, as standard of care treatment for opiate addiction.[18] In fact, MMT clinics have been shown to reduce drug overdose death rates by ten fold.[19] Almost certainly, the impact of standard of care MMT being available here would be positive in an area so cruelly stricken by opiate addiction.

The idea of intentionally blocking standard of care MMT treatment in an area so riven with death and suffering from opiate addiction is mind boggling. If one to two people were dying of smallpox every three days in Johnson City, wouldn't there be calls to make smallpox vaccine available closer than 50 miles away in North Carolina? Would HSDA be stopping a smallpox clinic from opening? The questions answer themselves but for one difference---in this case the victims are primarily, but not exclusively by any means, opiate-addicted persons who are subject to loathing and hatred by locals. This plays into local and state politics—regardless of the astronomical death and human suffering this causes.

Despite this public health crisis having raged for more than a decade, and the

---

[18] Specifically, the following health organizations have described MMT as either "the standard of care," "the most effective treatment," or "an effective treatment" for opiate addiction: National Institute of Health (NIH.gov); National Institute on Drug Abuse (NIDA.gov). 2; U.S. Substance Abuse & Mental Health Services Administration (SAMHSA.gov); Center for Disease Control (www.cdc.gov); The World Health Organization (WHO.org); The New England Journal of Medicine (JAMAnetwork.org); Journal of the American Medical Association (AMA-assn.org); American College of Obstetricians and Gynecologists (acog.gov); HHS.gov.

[19] "*Opiate-Dependent Patients On A Waiting List For Methadone Maintenance Treatment Are At High Risk For Mortality Until Treatment Entry.*" J Addict Med. 2013 May-Jun;7(3):177-82. (The mortality rate (available among 583) during the 2 years on the waiting list was higher (5.0/100 person years) for the 225 non admitted applicants than for the 358 admitted (0.42/100 person years, $P < 0.0005$) and those who were admitted with no delay before 2002 (2.1/100 person years). )

11

painfully obvious need for MMT in this area, Johnson City and HSDA cling to blatantly illegal rules which prevent Opiate Treatment Programs bringing standard of care MMT to opiate-addicted persons clearly disabled under the ADA. This is despite evidence showing that MMT arguably could have saved a significant number of lives out of the 1,000 killed from drug overdoses in the Johnson City area over the last decade.

> **A.** **Right now, from 500 to more than 1,000 opiate-addicted, ADA-disabled residents of the Johnson City area -- including pregnant women--are being forced to drive 100+ miles or more over dangerous mountain roads (as often as daily and in the dark to allow time to get to work) to OTP clinics in North Carolina.**

For years, based upon a policy that could only be cheered by grave diggers and casket makers, Johnson City and HSDA have forced *at least* 500,[20] but likely more than 1,000, area residents to drive 100+ miles round trip, in all hours of the night, and as often as daily, to obtain standard of care MMT. This mass movement of people has been referred to by HSDA staff as a "migration." Johnson City and HSDA scoff at the unprecedented slaughter and suffering endured these hundreds of disabled Americans as "nonsense." But where in America are more disabled people being subjected to discrimination, death, and widespread suffering on a greater scale than here?

This fiasco of death and illegality is something that HSDA and Johnson City would dearly love to have this tribunal dive into and start running cover for them. Petitioner respectfully suggests that it would highly unwise to do so.

---

[20]Spencer Clark, MSW, ACSW, NC Department of Health and Human Services Director of Operations and Clinical Services Community Policy Management Section, Division of Mental Health, Developmental Disabilit ies and Substance Abuse Services, June 24, 2013 email to Kathy Ostertag (http ://www. ncdhhs.qov)..

**B.**      **Johnson City and HSDA's illegal rules are taking a deadly toll on bystanders being needlessly killed by some of more than 1,000 opiate-addicted people having to drive 100+ miles per day for MMT treatment throughout northeast Tennessee.**

This disastrous situation has already resulted in at least one Jonesborough newlywed being killed by one of this army of exhausted patients seeking MMT treatment in other states.[21] In addition, a survey of local newspapers reveals a runaway epidemic of traffic deaths being caused by drivers under the influence of opiates--essentially an opiate-fueled "Demolition Derby" because so many people are not getting effective treatment that MMT can provide.[22] In fact, over the last decade, more than 1,000 Johnson City area residents have died of drug overdoses and an <u>estimated 50 to100 more Johnson City area residents have died just since the filing of the</u>

---

[21] A 22-year old Jonesborough resident, Misty Briggs, was killed in a head-on collision with 26-year old Johnson City resident Rachel Proffitt, one of the 500-1000 exhausted drives plying the roads of northeast Tennessee, as often as daily, in the middle of the night, to get standard of care MMT treatment from clinics in North Carolina. The day of the fatal collision, Mr. Proffitt fell asleep at the wheel while having to, as often as daily, wake up at 4AM, drive 60+ miles to Ashville for MMT treatment, then drive 60+ miles back to Johnson City, then drive her husband to work, then drive herself to work. Toxicology tests showed exhaustion, not methadone, was the cause of the fatal collision. "Judge Wants To Look Up Law Before Accepting Plea In Vehicular Homicide Case," *Johnson City Press*, June 29, 2013.

[22] "Local Man Indicted in 2010 Traffic Death," *Johnson City Press*, November 18, 2013 **(man killed by driver on oxycodone)**; "Toxicology Report Needed In Case," Johnson City Press, August 17, 2013 **(man killed by driver on narcotics)**; "Driver Arrested After Dumping Pills At Scene Of Rollover Crash In Kingsport," November 3, 2011 **(rollover crash, man charged with possession of narcotics)**; "Rogersville Woman Facing Drug, Traffic Charges After Allegedly Nearly Wrecking Sheriff," July 8, 2012 **(woman arrested on opiates after narrowly avoiding head-on collision with sheriff)**; "Near crash results in drug arrest," *Kingsport Times News*, May 24th, 2011 **(woman on opiates arrested after near collision with police cruiser)**; "Kingsport Police Seize Drugs From Man Slumped Over Steering Wheel," *Kingsport Times News*, February 28th, 2011 **(man slumped over steering wheel found with [presumably opiate] pills)**; Kingsport "Woman Arrested For DUI Following Wreck With Child In Car," Kingsport Times News, January 13th, 2011 **(woman on opiates with 7-year old child in car collides with truck)**; "East Tenn. Drunk Driver Who Crashed And Killed 2 While On The Way To Serve Jail Time For Prior DUI Gets 10 Years," *Kingsport Times News*, September 21, 2010 **(longtime drug and alcohol addict kills two in collision on way to serve jail time for prior offense)**.

13

plaintiffs' complaint in the federal action.

### C. Johnson City and HSDA's illegal rules are taking a potentially deadly toll on pregnant women and infants in northeast Tennessee.

The toll on pregnant women in the on Johnson City area is astounding. Despite hundreds of opiate-addicted pregnant women presenting themselves for treatment to Johnson City area medical offices each year,[23] the undisputed standard of care treatment for pregnant women is fifty miles away in any direction. The Defendants effectively force pregnant women to either (1) drive 9,000 miles in the first 90 days of MMT treatment[24] or (2) take risky, relatively-untried buprenorphine (Suboxone or Subutex), that has about double the relapse rate, that can throw them into withdrawal and kill their baby, and that Mountain States Health Alliance already warned area doctors not to prescribe:

> **If you are pregnant, trying to get pregnant or not using birth control, don't take Subutex or Suboxone, for the sake of your unborn child.** And if you are a physician, don't continue to prescribe those drugs containing buprenorphine to anyone who is pregnant.[25]

Significantly, Tennessee counties with MMT clinics only average only about 4.4 deaths per thousand births. That's half the infant mortality rate of many northeast Tennessee counties without MMT clinics.[26] It logically follows that offering standard of care treatment to pregnant women would lead to lower infant mortality rates than areas that deny pregnant women

---

[23] "Women Warned Not To Use Two Drugs [Suboxone and Subutex] Around Pregnancy," *Johnson City Press*, March 22nd, 2012
[24] State rules allow only one take home dose per week in the first ninety (90) days of MMT treatment. So new patients living in Johnson City have to drive approximately 9,000 miles in the first ninety days to get to a clinic in North Carolina.
[25] *Id.*
[26] Madison, Hamilton, Davidson , Hardin, Maury, Davidson, Dyer, Knox, and Shelby counties.

14

standard of care treatment. Unborn and newborns are bearing an unfair burden in the Johnson City and HSDA's war on the disabled. Just reducing the Johnson City area infant mortality rate to the average of a Tennessee county with MMT treatment would save an average of 27 babies' lives per year.[27]

## V. Johnson City and HSDA's blatant violations of the ADA that have persisted for over a decade and are part of a widespread effort among local governments in northeast Tennessee to violate federal law.

In northeast Tennessee, many local governments are enacting blatantly illegal local ordinances that violate the ADA and discriminate against the disabled – in open disregard of federal law. In the midst of this slaughter that is dwarfing almost every epidemic in the history of the United States short of the Influenza Pandemic of 1918[28]--northeast Tennessee has become an enclave of widespread discrimination against opiate-addicted, disabled Americans in clear violation of federal law. Arbitrary distance restrictions on drug treatment clinics have been rejected by every federal court in the United States as violating the ADA. Yet, despite this clear and settled federal law, Carter County, Washington County, Johnson City, Unicoi, Kingsport, Bristol, and Rogersville (on December 10, 2013), have passed blatantly illegal ordinances that

---

[27] In the U.S., pregnant women have been estimated to be 1% of the general population at any point in time. U.S. Center for Disease Control (2013). The Proposed Service Area is approximated 650,000. Therefore, 6,500 pregnancies occur in this area per year. So reducing the infant mortality rate in the Proposed Service Area from Washington County's 8.5 to the average 4.4 deaths per thousand births where MMT clinics exist would avoid approximately 26.7 additional infant deaths per year.

[28] The 1918 Great Influenza Pandemic killed an estimated 675,000 Americans. http://wwwnc.cdc.gov/eid/article/12/1/05-0979_article.htm. Opiate-addiction is killing about 38,000 Americans per year, and has been raging for a least a decade. http://www.drugwarfacts.org/cms/Causes_of_Death#sthash.uMmGwTVC.dpbs. So in another decade, opiate-addiction will have most likely killed more Americans than the Great Influenza Pandemic of 1918.

include arbitrary distance requirements on drug treatment clinics.[29]  The Eastern District of

Tennessee has become an "ADA-free zone" where disabled Americans are being discriminated

against at will -- right under the nose of the federal court.  Such a widespread flouting of federal

law is counterproductive both for the disabled Americans in the area being discriminated against,

and in need of protection from the federal court, but also such conduct sends the clear message of

blatant disrespect for federal law.  Hopefully, the federal court's or DOJ's prompt action can help

quell this this "open season" on disabled Americans declared by local governments in this area.

Sadly, Johnson City and HSDA appear politically handcuffed to do anything in this case other than

oppose the clinic.  They are waiting for a federal court or DOJ to act to correct this situation while

providing Johnson City and HSDA with political cover.

Further delay only costs lives and allows a blatantly illegal ordinance and rule—

effectively modern-day Nuremberg Laws--to remain on the books.  Delay effectively dignifies

these laws that have no place in modern America.  Delay encourages other Tennessee communities

to mimic Johnson City and HSDA's blatantly illegal rules and conduct, as Rogersville, Tennessee

did in December, 2013.[30]

---

[29] Washington County Zoning Code Section 616.4.3 (no drug treatment clinic within 2,000 of a school, day care facility, park, church, synagogue, mosque, mortuary, amusement facility, or hospital., etc.);  Carter County Zoning Code Section 609.1.11 (no drug treatment clinic within 2,000 feet of a school, etc.);  Bristol Zoning Ordinance Section 502 (no methadone clinic located within one thousand (1000) feet of a school (public or private) or day care center);  Kingsport Zoning Ordinance Section 114-199 (no clinic within 1,000 feet of a school, day care, facility, park, church, synagogue, mosque, mortuary or hospital);  Rogersville Zoning Ordinance Section 12-10-13-1 (no drug treatment clinic within 1,000 feet of a school, day care facility, park, church, synagogue, mosque, mortuary or hospital);  Town of Unicoi Zoning Ordinances Section 710.4 (no methadone clinic within 1,000 feet of a school, day care facility, park, church, synagogue, mosque, mortuary or hospital).

[30] Rogersville, TN Zoning Ordinance Section 12-10-13-1 (no drug treatment clinic within

16

**VI.** **On top of the nation's worst drug overdose death rate and infant mortality rate, a heroin epidemic is now crashing down upon Johnson City that will make its already-grotesque drug and infant death statistics pale in comparison to what soon awaits this community.**

Opiate addiction--particularly heroin--is growing by the day in the Johnson City area.[31] Already, the Johnson City area has the highest drug overdose death rate and the highest infant mortality rate in the nation.[32] It's not getting better, it's getting worse.[33] And it's about to be hit by a "heroin tsunami" that is already battering communities up and down the East Coast.

On top of an existing opiate-based public health catastrophe, a "heroin tsunami" is now beginning to hit the Johnson City area -- whether we like it or not. First, large numbers opiate addicted persons are being forced out of "pill mills" under a new federal regulatory and prosecutorial crackdown. But shutting down a "pill mill" only compounds the problem. Once an addict is cut off from his supply of opioids—the only alternative is either painful and possibly fatal withdrawal, or, as most do, moving to illegal sources of pain pills or heroin.

---

1,000 feet of a school, day care facility, park, church, synagogue, mosque, mortuary or hospital) was enacted on December 10, 2013.

[31] "Heroin Making a Comeback in East Tennessee," Local 8 News, Knoxville, TN, May 17, 2012, http://www.local8now.com/news/headlines/Heroin_making_a_comeback_across_East_Tennessee_151953835.html; Knoxville Police Indict 19 People In Heroin Drug Ring, WATE Channel 6, Mar 22, 2013, http://www.wate.com/story/21769200/knoxville-police-indict-19-people-in-heroin-drug-ring.

[32] The Johnson City area is the most opiate-plagued in the United States with, most likely, more than 100 oxycodone pills being prescribed per year for every Johnson City area resident over 12 years of age. Two to three Johnson City area residents are dropping dead of a drug overdose every three days. The Johnson City area faces a drug overdose death rate higher than any state in the union. More than 1,000 Johnson City area residents have died of overdoses over just the last decade and another 1,000 will die in the coming decade! There is no place in America when an Opiate Treatment Program is more needed than here.

[33] Tennessee Mental Health and Substance Abuse Services Commissioner E. Douglas Varney Presentation, December 6, 2012 (northeast Tennessee drug addiction rate apparently twice that of rest of state).

Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 140 of 396   PageID #: 1837

128

Second, heroin is shockingly cheap--only costing about $10 a dose which is sold in "bags."[34] --much cheaper than Suboxone which runs from $16-22 per day.[35] Methadone runs about $12-$15 per day. Despite this low cost, heroin profits can be enormous[36]—so the incentive to sell it is enormous and never-ending. Of course, heroin is what killed Academy Award Winner Philip Seymour Hoffman just last month.[37] Heroin production has also been mechanized by global drug cartels, making it available almost everywhere.[38] Most of the heroin sold in the United States is smuggled in through Mexico and then "cut" and distributed in tiny bags in apartments in larger cities than can produce 100,000 bags of heroin a day or more. Heroin is now so ubiquitous in Tennessee, "you can get heroin like ordering a pizza."[39] Recently, one heroin dealer found it convenient to work in McDonalds' and deliver heroin in Happy Meals to customers using a code phrase "I'd like to order a toy"[40]

---

[34] "A Complicated Actor, Actor Phillip Seymor Hoffman in his Last Days," New York Times, February 6, 2014, http://www.nytimes.com/2014/02/06/nyregion/a-complicated-actor-philip-seymour-hoffman-in-his-last-days.html.

[35] On Plaintiffs' information and belief, this is the approximated price a of 16mg dose of Suboxone at CVS Pharmacy (information from Georgia Suboxone seller Reckitt Benckiser sales rep). Methadone runs about $12 per day at NC clinics.

[36] "Heroin costs $2,600/kilo in Pakistan, but can be sold on the streets of America for $130,000/kilo (retail).... No agriculture based commodities industry in the world operates on the same price differentials as cocaine and heroin, while requiring relatively little in the way of expertise." *Frontine* (2014)(pbs.org)(http://www.pbs.org/wgbh/pages/frontline/shows/drugs/special/math.html).

[37] *Id.*

[38] "U.S. Efforts Fail to Curtail Trade in Afghan Opium," *New York Times*, May 26, 2012, http://www.nytimes.com/2012/05/27/world/asia/drug-traffic-remains-as-us-nears-afghanistan-exit.html?pagewanted=all.

[39] "Heroin Use On Rise In Rural Areas," *The Tennessean*, February 3, 2014 ("The way that it seems in Nashville, it's like ordering a pizza,' says chief medical officer of Cumberland Heights treatment center.")

[40] "Pa. Happy Meal Heroin Suspect 'Crushed' by Charges," *New York Times*, February 11, 2014.

In January, 2014, the Governor of Vermont declared a "full blown heroin epidemic" in his state and devoted essentially his entire State of State Address to the subject of the heroin epidemic in Vermont.[41]

In February, 2014, the Governor of Maine devoted a large part of his State of the State address to the "troubling [heroin] epidemic... tearing at the social fabric of our communities."[42]

On March 10, 2014, the United States Attorney General declared a "heroin overdose public health crisis."[43]

Thus, unless Tennesseans are somehow genetically different than residents of Vermont and Maine—and people living in every other place in America--the heroin epidemic is in the process of exploding here as well. In that case, shouldn't standard of care methods for treating heroin addiction be available? The Defendants' confidence that the heroin epidemic now upon them can be handled in the Norman Rockwell-like settings of small doctors' offices is sadly misplaced. It's failed everywhere else--certainly in the face of Johnson City's catastrophic drug overdose death and infant mortality figures—so why is it going to suddenly start working now? As Albert Einstein once famously remarked, "[t]he definition of insanity is doing the same thing, over and over, but expecting a different result."

---

[41] Governor Shumlin Annual State of the State Address, January 8, 2014 (http://governor.vermont.gov/newsroom-state-of-state-speech-2013). Notably, Opiate Treatment Programs are a key part of Vermont's response to the heroin epidemic.
[42] Governor Paul LePage Annual State of the State Address, February 4, 2014 (https://www.mpbn.net/News/StateoftheStateAddress.aspx).
[43] "Heroin overdoses pose 'urgent public health crisis,' US attorney general says," Fox News, March 10, 2014 (http://www.foxnews.com/health/2014/03/10/heroin-overdoses-pose-urgent-public-health-crisis-us-attorney-general-says/?intcmp=obnetwork).

It is undisputed that an Opiate Treatment Program offers the strongest, most comprehensive response to wide-spread addiction to opioids as it provides standard of care methadone, testing services, and counseling services to deal with hard-core addiction—heroin addicts and multiple relapse patients.[44] In contract, office-based doctors writing Suboxone subscriptions are not equipped to deal with hardcore heroin users—with risks of relapse on Suboxone almost twice the rate of methadone.[45] An office-based doctor usually has no facilities to combat diversion to illegal uses, and no institutionalized testing and professional counseling resources that are required by law at an Opiate Treatment Program.

## VII. Petitioner respectfully submits that this administrative appeal process amounts to a scheme or artifice to violate the ADA.

HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[46] Procedural "halls of mirrors" designed

---

[44] National Institute of Drug Addiction International Program, Questions and Answers About Methadone, Part B-1, p. 1, (2014)(http://www.drugabuse.gov/sites/default/files/pdf/partb.pdf (citations).
[45] "Neonatal Abstinence Syndrome after Methadone or Buprenorphine Exposure," N Engl J Med 363, December 9, 2010 (Treatment was discontinued by 16 of the 89 pregnant women in the methadone group (18%) and 28 of the 86 pregnant women in the buprenorphine group (33%)). Plaintiffs suggest "discontinued" is a euphemism for relapse and return to illegal opiates. Unquestionably, relapse exposes the fetus to much greater risk of death. So Suboxone exposes fetuses to almost double the rate of relapse and death.
[46] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening*, 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.*, 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory

to violate civil rights is an old game. For example, in the "Jim Crow" South, many states enacted "literacy tests" to deprive blacks of voting rights while attempting to appear "neutral."[47] In this case, HSDA and Johnson City are trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's blatant violations federal law. Judgment day is coming for HSDA and Johnson City. This tribunal cannot, and should not, get in the way of this process.

## Conclusion

Petitioner respectfully asks this tribunal to decline to set a hearing date in this case. Petitioner also asks tribunal to fulfill its *affirmative duty* to provide TCH a reasonable modification to its rules to allow TCH to obtain its Certificate of Need as requested.

Dated: March 11, 2014

/s/James A. Dunlap Jr., Esq.
James A. Dunlap Jr. & Assoc. LLC
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

---

procedural requirements themselves violate the FHAA; the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,* 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See, e.g., *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 573 n.4 (2d Cir. 2003).
[47] Civil Rights Museum (2014)(http://www.crmvet.org/info/lithome.htm).

21

James S. Higgins, Esq. BPR # 16142
Rick Piliponis, Esq. BPR # 16249
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 145 of 396   PageID #: 1842

133

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2014, a copy of the foregoing document(s) was served by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

/s/James A. Dunlap Jr., Esq.
James A. Dunlap Jr., Esq.

# EXHIBIT 7

**BEFORE THE TENNESSEE HEALTH SERVICES
AND DEVELOPMENT AGENCY**

IN THE MATTER OF:

TRI-CITIES HOLDINGS, LLC
d/b/a TREX TREATMENT CENTER

DOCKET NO: 25.00-122076J

CON Application No. CN1303003

ORDER DENYING THE MOTION FOR RECONSIDERATION

On March 14, 2014, an order was issued in this matter revoking Mr. Dunlap's permission to appear in this matter *Pro Hac Vice*. On March 24, 2014, a Motion for Reconsideration of this Order was filed on behalf of Mr. Dunlap. In addressing this Motion, a few points of clarification are needed.

The Petitioner's Motion for Reconsideration mistakenly states that the Order Revoking Permission to Appear *Pro Hac Vice* was entered as a response to Mr. Dunlap's March 12, 2014 letter. This letter, first sent to the undersigned Administrative Judge on March 12, 2014, as an attachment to an email, contends that the Americans with Disabilities Act (ADA) requires this tribunal to provide a reasonable modification by granting, *sua sponte*, the Petitioner's requested relief without the necessity of a hearing. This letter was not filed with the Administrative Procedures Division (APD) of the Secretary of State's Office as a part of the official technical or considered by the Administrative Judge until it was filed on March 24, 2014, as an exhibit to the Motion for Reconsideration. Mr. Dunlap's permission to appear *Pro Hac Vice* was actually revoked on account of the Petitioner's Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act, filed on March 12, 2014, in which Mr. Dunlap makes an unveiled threat to initiate litigation against this tribunal should it decline to make a ruling in his favor.

The Motion for Reconsideration contends that a copy of the Tri-Cities II Complaint [initially filed in the Middle District and then transferred back to the Eastern District] was previously provided to the Administrative Judge and that the Complaint referenced dismissal of Tri-Cities I [filed in the Eastern District and dismissed without prejudice]. A thorough review of the technical record reveals that only

four pages of the Tri-Cities II Complaint were filed with APD and that nowhere in these four pages is there a reference to Tri-Cities I.[1] The relevance of both Tri-Cities I and Tri-Cities II to these administrative proceedings is the indication from the federal court of its preference for completion of the administrative proceedings prior to commencement of the federal litigation. No such relevant part of the federal complaint has ever been filed with APD.

As stated in the March 14, 2014 Order, "subject to a stay in deference to the administrative proceedings" does not mean that the proceedings had, in fact, been stayed but that a stay of the federal proceedings was being contemplated to allow for completion of the administrative proceedings, as indicated in the federal Court's December 10, 2013 Order. It is this rather pertinent information regarding the status of the federal proceedings that had not been provided by Mr. Dunlap when requesting that the stay remain in place.

The Motion provides no authority to support the contention that a tribunal, such as the APD, must grant the relief requested without a hearing on the merits or be in automatic violation of the ADA. The suspension of due process cannot be considered a reasonable modification of APD rules as the Motion contends. Thus, advancing this position under the threat of legal action far exceeds simply pointing out to the tribunal its obligations under the law and potential penalties for noncompliance.

As specified above, no basis has been provided for granting the Motion for Reconsideration; therefore, the Motion is hereby **DENIED**.

All other matters are reserved.

It is so **ORDERED**, entered and effective this the 21 day of 2014.

KIM SUMMERS
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

---

[1] The four pages of the Complaint that were filed include the 3-page Table of Contents for the, apparent, purpose of demonstrating that the denial of the CON had been included as an issue in the federal complaint.

2

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
TWENTIETH JUDICIAL DISTRICT

AFFIDAVIT OF  James A. Dunlap Jr.
_____
*(Pro Hac Vice Applicant)*

Before me, the undersigned, personally appeared  James A. Dunlap Jr.
_____
*(Pro Hac Vice Applicant)*

(1)  My full name is:  James A. Dunlap Jr.

My residence address is:  310 Windsor Gate Cove NE, Atlanta, GA 30342

My firm name is:  James A. Dunlap Jr. & Associates LLC

My office address is:  310 Windsor Gate Cove NE, Atlanta, GA 30342

Other jurisdictions licensed & registration/identifying numbers are:

Georgia--Georgia State Bar No. 003280

Full name or style of case in which I seek to appear:

In Re: Tri-Cities Holdings LLC d/b/a Trex Treatment Center
DOCKET NO. 25.00-122076J, CON No. CN1303-005D
Davidson County Chancery Court.  *Case No. 14-650-11*

Name of the client or clients I seek to represent:

Tri-Cities Holdings LLC

(2)  The jurisdiction(s) in which licensed to practice law, with date(s) of admission:

Georgia, 1988

Any other courts in which admitted to practice, with date(s) of admission:

United States District Court, Northern District of Georgia 1989

Statement of good standing in all other jurisdictions in which applicant is licensed to

practice law:

Georgia

(3) Full name or style of each case in which applicant was previously admitted or sought to
be admitted *pro hac vice* in any trial or appellate court of Tennessee within the preceding
three years, date of any such admission or the date of any such motion that was filed but
not granted, and the status of any such case in which not admitted:

Tri-Cities Holdings LLC v. Johnson City, 2:2013-cv-00108 (E.D. Tenn. 2013)
Tri-Cities Holdings LLC v. HSDA 2:2013-cv-00305 (E.D. Tenn. 2013)
Tri-Cities Holdings LLC v. HSDA 3:2013-cv-00669 (M.D. Tenn. 2013)

(4) Statement concerning whether the applicant lawyer has previously been denied admission
*pro hac vice* or has had an admission *pro hac vice* revoked by any court in any
jurisdiction and, if so, a full description of the circumstances, including the full name or
style of the case:

In Re: Tri-Cities Holdings LLC d/b/a Trex Treatment Center
DOCKET NO. 25.00-122076J, CON No. CN1303-005D, Tenn. Administrative Procedures
Division, Appeal of Denial of Certificate of Need before the Tennessee Health Services and
Development Agency.
Revocation of pro hac vice petition is the subject matter of this appeal. This is the
only petition that applicant has ever had revoked.

(5) Statement concerning whether the applicant lawyer has ever been disciplined or
sanctioned by the Board of Professional Responsibility of the Supreme Court of
Tennessee, by any similar lawyer disciplinary agency in any jurisdiction, or by any
similar lawyer disciplinary authority and, if so, a full description of the circumstances,
including the full name or style of the matter:

Applicant has never been disciplined or sanctioned by the Board of Professional
Responsibility of the Supreme Court of Tennessee, by any similar lawyer disciplinary
agency in any jurisdiction, or by any similar lawyer disciplinary authority.

(6) Statement concerning whether any disciplinary or investigation concerning the applicant
lawyer's conduct is pending before the Board of Professional Responsibility of the
Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any

jurisdiction, or before any similar lawyer disciplinary authority and, if so, a full description of the circumstances, including the full name or style of the matter:

There is no disciplinary or investigation concerning the applicant lawyer's conduct is pending before the Board of Professional Responsibility of the Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any jurisdiction, or before any similar lawyer disciplinary authority, other than the present revocation of applicant's pro hac vice petition which may be subject to present investigation by Board of Professional Responsibility, but applicant has received no correspondence regarding such process.

(7) Statement that the applicant lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court before which the lawyer seeks to practice:

The applicant lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court before which the lawyer seeks to practice.

(8) Statement that the applicant lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee:

The applicant lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee.

(9) Tennessee lawyer with whom the applicant lawyer is associated:

Name: Rick Pilliponis, Esq.

Address: 116 Third Avenue, South, Nashville, Tennessee 37201

(615) 353-0930

Telephone No.: _____ TN Bar No.: BPR # 16249

(10) Statement that the applicant lawyer has paid all fees required by this Rule in connection with the motion for admission:

The applicant lawyer has paid all fees required by this Rule in connection with the motion for admission.

(11) At the option of the applicant lawyer, any other information supporting the lawyer's admission:

(12) Statement indicating service of the *pro hac vice* motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee:

Applicant has served the pro hac vice motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee.

(13) A certificate of good standing from the court of last resort of the licensing jurisdiction in which the applicant principally practices, or resides, is attached as an Exhibit to this affidavit and incorporated herein.

I declare under penalty of perjury that the foregoing is true and correct.

_____
*Pro Hac Vice* Applicant

Sworn to and subscribed before me this __1__ day of __May__, 20_14_.

_____
Notary Public

My commission expires: __March 18, 2018__



**HUGH P. THOMPSON, CHIEF JUSTICE**
**P. HARRIS HINES, PRESIDING JUSTICE**
**ROBERT BENHAM**
**CAROL W. HUNSTEIN**
**HAROLD D. MELTON**
**DAVID E. NAHMIAS**
**KEITH R. BLACKWELL**
        **JUSTICES**

## Supreme Court
## State of Georgia
### STATE JUDICIAL BUILDING
### Atlanta 30334

May 1, 2014



I hereby certify that James A. Dunlap, Jr., Esq., was admitted on the 18th day of

September, 1989, as a member of the bar of the Supreme Court of Georgia, the highest

court of this State; and, since that date he has been and is now a member of this bar in

good standing, as appears from the records and files in this office.

Witness my signature and the seal of this Court

hereto affixed the day and year first above written.

*Therese S Barnes* , Clerk

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
PART II

TRI-CITIES HOLDINGS LLC, d/b/a Trex    )
Treatment Center,                       )
                                        )
          Petitioner,                   )      No. 14-650-II
                                        )
v.                                      )
                                        )
TENNESSEE HEALTH SERVICES AND           )
DEVELOPMENT AGENCY,                     )
                                        )
          Respondent.                   )

---

## NOTICE OF FILING ADMINISTRATIVE RECORD

---

Pursuant to Tenn. Code Ann. § 4-5-322(d), the respondent Tennessee Health Services and

Development Agency, by and through the Attorney General, hereby gives notice of the filing of

the administrative record in this interlocutory judicial review action that has been brought by the

Petitioner under Tenn. Sup. Ct. R. 19(h) and Tenn. Code Ann. § 4-5-322(a)(1). The administrative

record consists of the technical record of the contested case proceedings relevant to the issues on

judicial review, and consists of three (3) bound volumes.

Filed this 23rd day of June, 2014.

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General and Reporter

SUE A. SHELDON (BPR # 015295)
Senior Counsel
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 38202
(615) 741-2640

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded by email and by first-class U.S. mail, postage pre-paid, to:

James A. Dunlap Jr., Esq.
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
jim@jamesdunlaplaw.com

James S. Higgins, Esq.
Rick Piliponis, Esq.
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South

on this 23rd day of June, 2014.

Sue A. Sheldon

SUE A. SHELDON

2

RECEIVED
JUL - 8 2014
Dav. Co. Chancery Court

| | |
|---|---|
| TRI-CITIES HOLDINGS LLC, d/b/a Trex Treatment Center, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) ) ) |
| TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY, | ) ) ) |
| Respondent. | ) ) |

No. 14-650-II

*NF*

2014 JUL 11 PM 12:33 FILED

---

## AGREED SCHEDULING ORDER

In consultation with the Court's calendar clerk, the parties have agreed that the schedule for the remaining briefing in this judicial review action and the hearing on oral argument should be as follows:

1) The deadline for Respondent to file its brief is July 24, 2014;

2) The deadline for Petitioner to file its optional reply brief, if any, is July 28, 2014; and

3) The matter is set for oral argument on July 30, 2014 at 1:30 p.m. Central Time.

IT IS SO ORDERED.

_____
CAROL L. McCOY
Chancellor

**AGREED AND APPROVED FOR ENTRY:**

*Sue A. Sheldon*

SUE A. SHELDON (BPR No. 15295)
Senior Counsel
Office of the Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-2640
Email: sue.sheldon@ag.tn.gov
Counsel for Respondent

*Rick Piliponis* by *Sue Sheldon* ( w/ permission )

Rick Piliponis, Esq. (BPR No. 16249)
THE HIGGINS FIRM
525 Fourth Avenue, South
Nashville, Tennessee 37210
(615) 353-0930
Email: rdp@higginsfirm.com

James A. Dunlap Jr., Esq.
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
Email: jim@jamesdunlaplaw.com
Counsel for Petitioner

2

# THE CHANCERY COURT
## DAVIDSON COUNTY, TENNESSEE

### HONORABLE CAROL L. MCCOY, CHANCELLOR

### CRISTI E. SCOTT, CLERK AND MASTER

**TRI-CITIES HOLDINGS LLC d/b/a TREX TREATMENT CENTER**
Petitioner/Appellant

FILED

MAY 26 2015

Clerk of the Courts

**VOLUME 2 of 3**

| CERTIFIED | | | |
|---|---|---|---|
| **TRANSCRIPT** | Appearance No. 14-650-II **CHANCERY COURT** | Vs | Execution No. **SUPREME COURT** | **APPEALED** |

CERTIFIED

TRANSCRIPT

OF

Cause

Appearance No. 14-650-II
CHANCERY COURT

Vs

No. M2015-00058-COA-R3-CV

COURT OF APPEALS

TRANSMITTED ON:

April 20, 2015

Execution No.
SUPREME COURT

APPEALED

TO

Next Term,

20

## TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY
Respondent/Appellee

Rick Piliponis, #16249
THE HIGGINS FIRM
525 Fourth Avenue South
Nashville TN 37210
(615) 353-0930

James A. Dunlap, Jr.
310 Windsor Gate Cove NE
Atlanta GA 30342
(404-354-2363)

*Attorney for Petitioner/Appellant Tri-Cities Holdings LLC, d/b/a Trex Treatment Center*

Sue A. Sheldon, #15295
Sara Sedgwick, #4336
Senior Counsel
Office of the Attorney General
P.O. Box 20207
Nashville TN 37202
(615) 741-2640

*Attorney for Respondent/Appellee Tennessee Health Services and Development Agency*

STATE OF TENNESSEE)

COUNTY OF DAVIDSON)

In the Chancery Court, Part II in which TRI-CITIES

HOLDINGS LLC d/b/a TREX TREATMENT

CENTER is the Petitioner and TENNESSEE

HEALTH SERVICES AND DEVELOPMENT

AGENCY is the Respondent, Rule No. 14-650-II,

the following proceedings were had:

Tri-Cities Holdings, LLC
v. 14-650-II
Tennessee Health Services and
Development Agency
Court of Appeals
Chancellor McCoy
M2015-00058

## INDEX

## PAPERS FILED IN THE TRIAL COURT

## VOLUME I

Appeal of Order Revoking Permission to Appear *Pro Hac Vice* . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Exhibit 1 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
(Letter to Judge Summers from James A. Dunlap, Jr. dated March 12, 2014)

Exhibit 2 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
(Order Revoking Permission to Appear *Pro Hac Vice*)

Exhibit 3 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
(Petitioner's Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice*)

Exhibit 4 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
(Letter to Judge Summers from James A. Dunlap, Jr. dated July 29, 2013)

Exhibit 5 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
(Letter to Judge Summers from James A. Dunlap, Jr. dated April 8, 2014)

Exhibit 6 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
(Petitioner's Motion for Reconsideration of Order Revoking Permission to Appeal
Pro Hac Vice)

Exhibit 7 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
(Order Denying the Motion for Reconsideration)

Affidavit of James A. Dunlap, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Exhibit to Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
(Letter from Supreme Court of Georgia)

Respondent's Notice of File Administrative Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Agreed Scheduling Order filed July 11, 2014 ....................................... 145

## VOLUME II

Respondent's Notice of Filing Supplemental Administrative Record .................... 147

Supplemental Administrative Record ............................................. 149

Respondent's Brief on Judicial Review ........................................... 154

Plaintiff's Notice of Intention to Rely on Initial Filings to Serve as Brief ................ 179

Exhibit A to Notice .......................................................... 181
(Appeal of Order Revoking Permission to Appear *Pro Hac Vice*)

## VOLUME III - beginning with page 300

Petitioner's Reply Brief ....................................................... 318

Chancellor's Memorandum and Order filed December 10, 2014 ...................... 338

Notice of Appeal ........................................................... 366

Appeal Bond for Costs ....................................................... 368

Certificate of Clerk and Master ................................................ 369

**Rick Piliponis, #16249**
**THE HIGGINS FIRM**
**525 Fourth Avenue South**
**Nashville TN 37210**
**(615) 353-0930**

**James A. Dunlap, Jr.**
**310 Windsor Gate Cove NE**
**Atlanta GA 30342**
**(404-354-2363)**

> *Attorney for Petitioner/Appellant Tri-Cities Holdings LLC, d/b/a Trex Treatment Center*

Sue A. Sheldon, #15295
Sara Sedgwick, #4336
Senior Counsel
Office of the Attorney General
P.O. Box 20207
Nashville TN 37202
(615) 741-2640

*Attorney for Respondent/Appellee Tennessee Health Services and Development Agency*

# IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
## PART II

FILED
2014 JUL 24 PM 4: 12
CLERK
DAVIDSON CO. CHANCERY CT
J.C & M

TRI-CITIES HOLDINGS LLC, d/b/a Trex
Treatment Center,

    Petitioner,

v.

TENNESSEE HEALTH SERVICES AND
DEVELOPMENT AGENCY,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)

No. 14-650-II

---

## NOTICE OF FILING SUPPLEMENTAL ADMINISTRATIVE RECORD

---

Pursuant to Tenn. Code Ann. § 4-5-322(d), the respondent Tennessee Health Services and Development Agency, by and through the Attorney General, hereby gives notice of the filing of the supplemental administrative record in this interlocutory judicial review action that has been brought by the Petitioner under Tenn. Sup. Ct. R. 19(h) and Tenn. Code Ann. § 4-5-322(a)(1). The supplemental administrative record consists of additional, later-filed documents in the technical record of the contested case proceedings relevant to the issues on judicial review, and consists of five (5) pages.

Filed this 24th day of July, 2014.

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General and Reporter

_(signature)_

SUE A. SHELDON (BPR # 015295)
Senior Counsel
SARA E. SEDGWICK (BPR # 4336)
Senior Counsel
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-2640

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded

by email and by first-class U.S. mail, postage pre-paid, to:

James A. Dunlap Jr., Esq.
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
jim@jamesdunlaplaw.com

James S. Higgins, Esq.
Rick Piliponis, Esq.
Higgins, Himmelberg & Piliponis, PLLC
525 Fourth Avenue, South
Nashville, Tennessee 37210

on this 24th day of July, 2014.

_(signature)_

SUE A. SHELDON

2



**State of Tennessee**
## Department of State
Administrative Procedures Division
312 Rosa L. Parks Avenue
8th Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472



July 2, 2014

James B. Christoffersen, Esq.
Deputy General Counsel
Tennessee Health Services &
   Development Agency
Frost Building, 3rd Floor
161 Rosa L. Parks Boulevard
Nashville, Tennessee 37243

Rick Piliponis, Esq.
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue South
Nashville, TN 37201-2002

RE:    In the Matter of:   Tri-Cities Holdings, LLC d/b/a Tres Treatment Center
                           Docket No. 25.00-122076

Enclosed is an Order rendered in connection with the above-styled case.

Administrative Procedures Division
Tennessee Department of State

/aem
Enclosure

*The Department of State is an equal opportunity, equal access, affirmative action employer*

*FILED*

*2014 JUL 24 PM 4: 12*

IN THE MATTER OF:

TRI-CITIES HOLDINGS, LLC
d/b/a TREX TREATMENT CENTER

DAVIDSON CO...

DOCKET NO: 25.00-122076J.

CON Application No. CN1303-095D

## ORDER OF RECUSAL

On March 7, 2014, the Health Services and Development Agency ("HSDA") filed a motion requesting

the undersigned judge to set this matter for hearing. On March 12, 2014, the Petitioner, Tri-Cities Holdings,

LLC d/b/a Trex Treatment Center ("Tri-Cities") filed its *Objection to Motion to Set Hearing and Demand for*

*Reasonable Modification Under the Americans with Disabilities Act* ("Petitioner's Objection"). The Petitioner's

Objection included the following admonition to the undersigned judge:

> In addition, if this tribunal does "take HSDA's bait" and takes any action to decide this
> appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing,
> Petitioner respectfully indicates that it will have no choice but to join Your Honor, in an official
> capacity, and this tribunal, as defendants in the pending federal court action.

> Finally, Petitioner respectfully submits, that under the ADA, Your Honor and this
> tribunal are required to offer Petitioner a reasonable modification to allow the CON to be
> issued. Petition [sic] respectfully submits that Your Honor's and this tribunal's continuing
> failure to do this creates a cause of action that Petitioner may bring against Your Honor, and the
> tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents
> in an ADA enforcement action.[1]

Through the above statements, the Petitioner specifically and unequivocally stated that a civil action in federal

court would be commenced against the undersigned judge should the undersigned judge decline to make a ruling

in favor of the Petitioner without a hearing.

On March 14, 2014, the undersigned judge issued an *Order Granting Motion to Set for Hearing*, which

scheduled the hearing in this matter to begin on July 29, 2014. On May 21, 2014, the Petitioner commenced a

civil action in United States District Court for the Middle District of Tennessee, Case No. 3:14-cv-01197,

against the undersigned administrative judge, the Administrative Procedures Division of the Tennessee

---

[1] *Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act*
(March 12, 2014) p. 4. (Emphasis in original.)

Department of State, and the Tennessee Secretary of State. In that federal lawsuit, the Petitioner alleges that the undersigned judge, through her rulings in this proceeding, has retaliated against the Petitioner and has intentionally violated the Americans with Disabilities Act, for which the Petitioner is seeking monetary and injunctive relief.

Canon 3(E)(1) of the Tennessee Code of Judicial Conduct[2] requires a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, . . ." By filing a federal lawsuit against the undersigned judge who has been called upon in this matter to decide intricate and controversial issues, the Petitioner has created an unfortunate scenario wherein the impartiality of the undersigned judge could be called into question.

Based on the foregoing and in accordance with Canon 3(E)(1) of the Tennessee Code of Judicial Conduct, the undersigned Administrative Judge hereby recuses herself from any further involvement in these administrative proceedings.

It is so **ORDERED**, entered and effective this the ___2nd___ day of ___July___, 2014.


D. Kim Summers
D. KIM SUMMERS
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

---

[2] Administrative Law Judges are subject to Canons 1 through 4 of the Tennessee Code of Judicial Conduct pursuant to Tenn. Comp. R & Regs. 1360-04-01-.20.

FILED

**BEFORE THE TENNESSEE HEALTH SERVICES**
**AND DEVELOPMENT AGENCY**

2014 JUL 26 PH 4: 12

CLERK & M.
DAVIDSON CO. CHANCERY CT.

IN THE MATTER OF:

TRI-CITIES HOLDINGS, LLC
d/b/a TREX TREATMENT CENTER

DOCKET NO: 25.00-122076J

CON Application No. CN1303-005D

## ORDER TRANSFERRING CASE
## AND SETTING STATUS CONFEENCE

On July 2, 2014, an *Order of Recusal* was issued wherein Administrative Judge D. Kim Summers recused herself from further involvement in this matter. This case is hereby transferred to Administrative Judge Thomas G. Stovall to preside over these administrative proceedings. Further, a Status Conference Call is hereby set in this matter for **Tuesday, July 8, 2014 at 9:30 a.m. Central Time**. The parties will set up a conference call line and provide to Judge Stovall as soon as practicable the telephone number he can call to convene the Status Conference at that date and time. Judge Stovall's telephone number and electronic mail address are: (615) 741-0518 and Tom.Stovall@tn.gov.

**It is so Ordered, entered and effective this the** 2nd **day of** July , 2014.

*J. Richard Collier*
J. RICHARD COLLIER
CHIEF ADMINISTRATIVE JUDGE
DIRECTOR, ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

FILED

2014 JUL 24 PM 4: 12

CLERK & MASTER
DAVIDSON CO. CHANCERY CT

# BEFORE THE TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) DOCKET NO. 25.00-122078.1 |
| TRI-CITIES HOLDINGS, LLC | ) CON No. CN1303-005D |
| d/b/a TREX TREATMENT CENTER | ) |

---

## ORDER OF CONTINUANCE

---

A pre-hearing telephone conference was held in this matter on July 8, 2014. During that conference, the Administrative Law Judge continued the hearing of this matter to allow the Davidson County Chancery Court the opportunity to rule on Petitioner's Interlocutory Appeal seeking the reinstatement of James A. Dunlap, Jr.'s permission to appear *pro hac vice* in this matter. Counsel for the parties were given until July 10, 2014 to consult with their clients and witnesses about availability for hearing dates. The parties have agreed upon everyone's availability for September 2 – 5, 2014.

WHEREFORE, the contested case hearing shall begin at 9:00 a.m. Central Time on Tuesday, September 2, 2014 and continue, if needed, through September 5, 2014. Counsel for the Health Services and Development Agency will secure a hearing location on or before August 1, 2014.

All other matters are reserved.

It is so ORDERED, this the 18th day of July, 2008.

THOMAS G. STOVALL,
ADMINISTRATIVE JUDGE

# IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

TRI-CITIES HOLDINGS LLC, d/b/a Trex ) 
Treatment Center, )

      Petitioner, )    No. 14-650-II

v. )

TENNESSEE HEALTH SERVICES AND )
DEVELOPMENT AGENCY, )

      Respondent. )

---

## RESPONDENT'S BRIEF ON JUDICIAL REVIEW

---

The respondent Tennessee Health Services and Development Agency

("HSDA"), by and through the Attorney General, hereby files its brief on judicial

review and would respectfully show to this Honorable Court the following:

### INTRODUCTION

This petition for judicial review under Tenn. Code Ann. § 4-5-322 and pursuant

to Tenn. Sup. Ct. Rule 19(h) concerns a Georgia attorney, James A. Dunlap, Jr., who

was admitted to practice *pro hac vice* in the above pending administrative matter

before D. Kim Summers, Administrative Law Judge, to represent his client, Tri-Cities

Holdings LLC ("TCH") in the contested case proceedings. Judge Summers later

revoked Mr. Dunlap's *pro hac vice* admission for his misrepresentations and failure

to disclose important information regarding a related federal court action; his

"expressed contempt" for the tribunal and for the administrative proceedings; his

"flagrant attempt to improperly influence a judge"; his unnecessary impeding of the resolution of the administrative matter; his breach of the conditions on which he was granted *pro hac vice* admission; and his "coercion" and "unveiled threat" to sue her (and the tribunal) if she did not grant the relief he sought, apparently *without any contested case hearing being held.* Mr. Dunlap also threatened Judge Summers with anticipated litigation which (according to Mr. Dunlap) could be filed against Judge Summers and the tribunal by the Department of Justice. (Adm. T.R., Vol. 2, pp. 166-175; 179, 195).[1]

In fact, Mr. Dunlap did sue Judge Summers, Secretary of State Tre Hargett, the Administrative Procedures Division of the Secretary of State's Office, and the Tennessee Department of Mental Health and Substance Abuse Services ("DMHSAS") and its commissioner in the federal District Court, Middle Division.[2] In his lawsuit, Mr. Dunlap alleges that Judge Summers, through her rulings in the administrative proceeding, retaliated against Mr. Dunlap's client and intentionally violated the Americans with Disabilities Act, for which he seeks monetary and injunctive relief. This lawsuit forced Judge Summers' subsequent recusal and interfered with and delayed resolution of the administrative matter. (Supp. T.R., pp. 1-5).

Judge Summers' action in revoking Mr. Dunlap's *pro hac vice* admission to practice in this State was justified in fact and warranted in law, does not violate any

---

[1] The administrative technical record in this matter consists of three volumes and a Supplemental Administrative Record. It will be referred to as "Adm. T.R., Vol. ___, p. ___," and "Supp. T.R., p.____."

[2] As of this date, the undersigned is not aware of any action having been filed by the DOJ against Judge Summers or the tribunal, nor that the HSDA has received any communication whatsoever from the DOJ about this matter.

2

statutory or constitutional requirements, is neither arbitrary and capricious nor unsupported by substantial and material evidence, and comports with the requirements of Tenn. Sup. Ct. Rule 19. The revocation of Mr. Dunlap's *pro hac vice* admission to practice must stand.

### FACTUAL AND PROCEDURAL BACKGROUND INFORMATION

This is the fifth related action filed by the Plaintiffs (Petitioner in this matter), three of which have been filed in the federal district courts. Each such federal lawsuit (and the pending administrative action out of which this judicial review action arose) seeks to obtain the state and municipal certificates, licenses and permits that are required by law before opening a Nonresidential Substitution-based Treatment Center for Opiate Addiction (also referred to as an Opioid Treatment Program, "OTP") in Johnson City, Tennessee.[3] Two of these lawsuits are pending in the Eastern District of Tennessee, Northeastern Division (and also on appeal in the Sixth Circuit Court of Appeals); the lawsuit against Judge Summers and other defendants, which was filed in the Middle District of Tennessee, now has also been transferred to the Eastern District of Tennessee, Northeastern Division.

Plaintiffs' first related lawsuit was filed on or about April 19, 2013 under the Americans With Disabilities Act and Section 504 of the Rehabilitation Act in the Eastern District before District Court Judge J. Ronnie Greer as Case No. 2:13-cv-108

---

[3] Mr. Dunlap's client in the administrative contested case proceeding is petitioner Tri-Cities Holdings d/b/a Trex Treatment Center ("TCH"), which is a Georgia limited-liability company that seeks to obtain a Certificate of Need ("CON") in order to establish the OTP; the additional plaintiffs in the pending lawsuits, denominated as Jane Does and John Does, assert that they are opiate-addicted residents of the greater Johnson City area.

3

("Tri-Cities I"). That lawsuit was filed against Johnson City governmental entities. Judge Greer dismissed it without prejudice as unripe because Plaintiff Tri-Cities Holdings, LLC ("TCH") had not yet obtained a Certificate of Need ("CON") from the Tennessee Health Services Development Agency ("HSDA") pursuant to Tenn. Code Ann. § 68-11-1607, and also because it had not obtained a license from the Tennessee Department of Mental Health and Substance Abuse Services ("DMHSAS") pursuant to Tenn. Code Ann. §§ 33-2-405 and 33-2-406. Before dismissing the lawsuit, Judge Greer conducted an all-day evidentiary hearing at TCH's request. His order stated that he was ready to rule on the legal issues presented in the Plaintiffs' Complaint if and when the case became ripe. (Adm. T.R., Vol. 3, pp. 269-274). Plaintiffs did not appeal that Order, which became the law of the case. (Adm. T.R., Vol. 3, p. 273).

Despite Judge Greer's Order, Plaintiffs filed their second related lawsuit ("Tri-Cities II") on or about July 8, 2013, in the Middle District before District Court Judge William Haynes, Jr. against the Johnson City Defendants and against the HSDA – again under the Americans With Disabilities Act and Section 504 of the Rehabilitation Act – as Case No. 3:13-cv-669. The Johnson City Defendants filed a motion for change of venue, to which the HSDA gave notice that it did not object. On November 13, 2013, the action was transferred to the Eastern District of Tennessee for further proceedings.

Since that time, Tri-Cities II has proceeded before Judge Greer as Case No. 2:13-cv-305. Judge Greer granted Plaintiffs leave to amend their complaint to add as defendants the members of the Health Services and Development Agency and the

HSDA's Executive Director, in their official capacities. Subsequently, federal Magistrate Dennis H. Inman, referring to Judge Greer's earlier Order in *Tri-Cities I*, impugned "[p]laintiffs' blatant forum-shopping to avoid this court's ruling in Tri-Cities I" and ruled that "it is reasonable to conclude that the district judge will not change his opinion that plaintiffs must attempt to procure a certificate of need, and a license . . . before this Court can entertain their suit." That Order further reflects that "[d]uring argument, the court was quite surprised to learn that an administrative law judge has delayed considering the appeal of that denial based on plaintiffs' counsel's representation to her that he intended to ask this court to stay, i.e., enjoin, any action by her." Magistrate Inman concluded that "[t]hat would seem to be contrary to plaintiffs' professed need for a quick resolution of this litigation." (Adm. T.R., Vol. 3, pp. 269-274). He added, "Plaintiffs' actions in refiling Tri-Cities II in the Middle District of Tennessee on the heels of the dismissal of Tri-Cities I, even if not a sanctionable contempt, certainly manifested a contemptuous attitude toward this Court's earlier decision." (Adm. T.R., Vol 3, p. 272).

Mr. Dunlap failed to notify Judge Summers, even as he objected to setting the administrative proceeding for hearing, concerning the federal court's "preference for completion of the administrative proceedings prior to commencement of the federal litigation." (Adm. T. R., Vol. 1, pp. 2-3). According to Judge Summers, "[n]o such relevant part of the federal complaint has ever been filed with APD." *Id.* In fact, Mr. Dunlap submitted only four pages of the Tri-Cities II complaint for inclusion in the administrative record. (Adm. T.R., Vol. 3, pp. 291-294). Yet even if Mr. Dunlap

5

had submitted an entire copy of the complaint in that case, the footnote he refers to on page 32 (n. 67) of that document is itself misleading, since it merely refers to Plaintiffs' first federal action having been "dismissed without prejudice on ripeness grounds." (Adm. T.R., Vol. 3, p. 330). Nowhere in the administrative record (or in the above footnote, which also does not appear in the record) has Mr. Dunlap ever explained the federal district court's *reason* for holding that the matter was not yet ripe — which was the fact that the necessary certificate of need and license had not been obtained. *Tri-Cities Holdings LLC v. City of Johnson City*, No. 2:13-CV-108, 2013 WL 2635337, (U.S. Dist. Ct., E.D. Tenn. 2013) (copy attached).

Plaintiffs have now filed a third related federal district court lawsuit in the Middle District of Tennessee,[4] again suing under the Americans With Disabilities Act and Section 504 of the Rehabilitation Act, naming as defendants Judge Summers and her employers, the Administrative Procedures Division of the Tennessee Department of State and the Tennessee Secretary of State as Case No. 3:14-cv-01197. (Supp. T.R., pp. 2-3).[5] This most recent federal lawsuit also challenges the Administrative Judge's revocation of Plaintiffs' Georgia counsel's admission *pro hac vice* in the pending administrative contested case proceeding, even as this Chancery Court challenge to that revocation still remains pending.

---

[4] As is mentioned above, this third federal district court action now has been transferred to the Eastern District of Tennessee, Northeastern Division.

[5] Plaintiffs have also sued the Tennessee Department of Mental Health and Substance Abuse Services and its Commissioner as a result of DMHSAS' issuance of a statutorily-required report, analysis and recommendation (under Tenn. Code Ann. § 68-11-1608) concerning TCH's CON application.

6

Also pending is the underlying State administrative appeal (under Tenn. Code Ann. § 68-11-1610) of the HSDA's initial June 2013 denial of TCH's request for a CON. The administrative appeal was scheduled for a contested case hearing on July 29, 2014 before Judge Kim Summers. However, due to TCH's appeal to this Court concerning Judge Summers' revocation of Mr. Dunlap's admission *pro hac vice* admission (and Judge Summers' recusal due to the fact that Plaintiffs have now made good on their threat to sue her in federal court) the contested case hearing has been continued to September 2-5, 2014 before Judge Thomas G. Stovall. (Supp. T.R., p. 5).

Although Mr. Dunlap filed his appeal of the decision of the Tennessee Health Services and Development Agency ("HSDA") on July 19, 2013, he never sought to set the contested case for hearing and, even in view of the District Court's clear and stated preference for early resolution of the administrative matter as a condition precedent to proceeding with his lawsuit(s) in the Eastern District, Mr. Dunlap nevertheless requested that the existing stay[6] of the administrative proceedings (which he had sought and obtained over the HSDA's objection) remain in place. (Adm. T.R., Vol. 1, pp. 2-3; Vol. 3, pp. 275-276).

After the HSDA filed its Motion to Set for Hearing on March 7, 2014, Mr. Dunlap responded by objecting to the Motion to Set and by demanding that Judge Summers immediately grant his client the sought-after CON, apparently *without conducting a hearing* — or else he would sue her under the Americans With Disabilities Act. In fact, Mr. Dunlap wrote, in "Petitioner's Objection to Motion to Set

---

[6] The record refers to such stay as the matter being "held in abeyance."

Hearing and Demand for Reasonable Modification Under the Americans With Disabilities Act," that the administrative appeal process itself "amounts to a scheme or artifice to violate the ADA." He wrote further that the HSDA's Motion to Set for Hearing was "attempting to make this tribunal the 'fixer' by illegally providing HSDA cover in what amounts to its blatant violations of the [ADA]." (Adm. T.R., Vol. 2, p.178). Furthermore, Mr. Dunlap's filing directly threatened Judge Summers and the tribunal by writing that "if this tribunal does 'take HSDA's bait' and takes any action to decide this appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing, Petitioner respectfully indicates that it will have no choice but to join Your Honor, in an official capacity, and this tribunal, as defendants in the pending federal court action." (Adm. T.R., Vol. 2, p. 179) (emphasis in original). Mr. Dunlap's filing continued:

> Procedural "halls of mirrors" designed to violate civil rights is an old game. For example, in the "Jim Crow" South, many states enacted "literacy tests" to deprive blacks of voting rights while attempting to appear "neutral." In this case, HSDA and Johnson City are trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's blatant violations [of] federal law. Judgment day is coming for HSDA and Johnson City. This tribunal cannot, and should not, get in the way of this process.

(Adm. T.R., Vol. 2, pp. 195-196).

On March 14, 2014, Judge Summers responded to what she considered to be Mr. Dunlap's threatening, extortionate and contemptuous filing by revoking his permission to appear *pro hac vice* in the matter before her. (Adm. T.R., Vol. 2, pp. 166-175). In doing so, Judge Summers made findings of fact and conclusions of law

8

based upon what Mr. Dunlap had filed in the *context* of his objection to a motion to set the contested case hearing. (Adm. T.R., Vol. 2, pp. 166-175; 176-198). Those findings of fact were as follows:

1. On July 29, 2013, attorney for Tri-Cities, Mr. James Dunlap, Jr., filed a letter with the Administrative Procedures Division requesting that the administrative appeal of the CON denial be stayed pending resolution of a related federal court action.

2. On July 30, 2013, Mr. Dunlap filed a Motion for Admission *Pro Hac Vice*. This Motion was granted by Order dated August 2, 2013.

3. Conference calls were held with the parties on July 31, 2013, and September 5, 2013. Mr. Dunlap and his local counsel Mr. Rick Piliponis of Nashville, Tennessee, participated in the calls on behalf of [TCH]. Attorney Jim Christoffersen [HSDA General Counsel] participated on behalf of the [HSDA].

4. During the September 5, 2013 conference call, Mr. Dunlap indicated that the issues being addressed in federal court would resolve the CON appeal and, again, requested that the administrative proceedings be stayed until a decision was made by the federal court on a pending motion for summary judgment which, according to Mr. Dunlap, would be very shortly forthcoming.

5. Based upon Mr. Dunlap's representations, the request for stay of the administrative proceedings was granted, over the objections of Mr. Christoffersen.

6. Another conference call was scheduled for November 5, 2013, at which time neither Party had anything new to report.

7. Another conference call was scheduled for January 10, 2014. On January 8, 2014, an email inquiry about any new developments in the federal litigation was sent to Counsel for the Parties. Mr. Dunlap responded that there were no new developments as the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action. Mr. Christoffersen indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary. Based on the representations of Counsel, the January 10, 2014 conference call was cancelled.

8. No further update was provided by either Party until a Motion to Set for Hearing was filed on behalf of HSDA on March 7, 2014. Included with the

9

Motion was a December 10, 2013 Order issued by Magistrate Judge Dennis Inman of the United States District Court of the Eastern District of Tennessee.

9. In the Order, Judge Inman provided the following history of the federal litigation – the case was first filed in April 2013 in the United States District Court for the Eastern District of Tennessee and was dismissed without prejudice on June 12, 2013, for lack of ripeness because the administrative CON appeal had not yet been decided. The case was then filed by Tri-Cities in the United States District Court for the Middle District of Tennessee and was then transferred by the Judge back to the Eastern District. Discovery in that litigation has now been stayed, and a Motion to Stay the entire case is under consideration, again, to allow for resolution of the administrative proceedings.

10. Judge Inman's Order states that, notwithstanding the dismissal with prejudice, "it is the law of this case that the plaintiffs [Tri-Cities] must procure, or at least attempt to procure, certain administrative remedies."

11. Judge Inman expressed surprise that the CON appeal had been delayed at the request of Tri-Cities after having professed a need for an expeditious resolution.

12. A response to the Motion to Set was provided by Mr. Dunlap on March 10, 2014, in which he, again, objected to setting the administrative matter for hearing prior to the resolution of the federal court litigation but also demanded a modification of the HSDA rules so that Tri-Cities may be granted a CON, apparently, without the formality of a hearing.

13. In his Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act, Mr. Dunlap made the following statements –

In addition, if this tribunal does "take HSDA's bait" and takes any action to decide this appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing, Petitioner respectfully indicates that it will have no choice but to join Your Honor, in an official capacity, and this tribunal, as defendants in the pending federal court action.

Finally, Petitioner respectfully submits that, under the ADA, Your Honor and this tribunal are required to offer Petitioner a reasonable modification to allow the CON to be issued. Petition (sic) respectfully submits that Your Honor's and this tribunal's continuing failure to do this creates a cause of action that Petitioner may bring against Your

10

Honor, and the tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents in an ADA enforcement action. [T]his administrative appeal process amounts to a scheme or artifice to violate the ADA.

14. Mr. Dunlap provided no information about the current status of the federal litigation.

(Adm. T.R., Vol. 2, pp. 166-169).

Citing Tenn. Sup. Ct. R. 19, Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of

Professional Conduct, and Tenn. Code Ann. § 39-14-112, the Administrative Judge

then determined to revoke Mr. Dunlap's *pro hac vice* admission upon the following

conclusions of law:

1. From the outset, Mr. Dunlap requested a stay of this administrative proceeding on behalf of Tri-Cities until after the related federal court action was resolved. He never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings.

2. Notwithstanding the recent indication from the federal court that the CON appeal should be resolved before the federal issues are addressed, Mr. Dunlap still insists that the stay of these proceedings should remain in place, and has threatened to join the Administrative Judge and this tribunal in the federal court action should the stay of the administrative proceedings be lifted and the CON appeal be set for hearing.

3. In addition, Mr. Dunlap is now demanding that this tribunal grant the requested modifications of HSDA rules and the disputed CON even though the HSDA's obligation to provide this relief is yet to be determined, either by this tribunal or in the federal courts. Mr. Dunlap's demand includes an unveiled threat that the Administrative Judge and the tribunal will face an ADA enforcement action by the Department of Justice should the Administrative Judge fail to provide the requested relief.

4. Mr. Dunlap has misrepresented to this tribunal the status of the federal litigation and has used this misrepresentation to attempt to coerce a decision by this tribunal in favor of his client without the benefit of the administrative hearing, which he demands must remain stayed.

11

5. Mr. Dunlap's coercion and misrepresentations are a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tenn. Code Ann. § 39-14-112.

6. Mr. Dunlap has expressed contempt for this tribunal and these administrative proceedings, thus, there is no apparent purpose for his continued participation.

7. Mr. Dunlap's actions have unnecessarily impeded a resolution of the CON appeal and have breached the conditions on which he was granted *pro hac vice* admission to practice law in Tennessee. In accordance with Rule 19(c), Mr. Dunlap's permission to appear in this matter *pro hac vice* is appropriately and necessarily revoked.

(Adm. T.R., Vol. 2, pp. 174-175).

On March 24, 2014, Mr. Dunlap filed "Petitioner's Motion to Recuse D. Kim Summers," and "Petitioner's Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice*," in which he disavowed that he was guilty of the acts for which his *pro hac vice* admission had been revoked. (Adm. T.R., Vol. 1, pp. 6-94; Vol. 2, pp. 96-165).

In denying the Motion for Reconsideration, Judge Summers clarified that her action was precipitated specifically and solely by "Petitioner's Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act," (Adm. T.R. Vol. 2, pp. 96-165; Vol. 1, pp. 2-3), and *not* as a response to Mr. Dunlap's March 12, 2014 letter, since that letter was not considered by Judge Summers until it was exhibited to the Motion for Reconsideration. (Adm. T.R., Vol. 1, pp. 2-3; Vol. 2, pp. 96-195). Instead, the revocation was based on the statements contained in the Objection to Motion to Set that Mr. Dunlap filed on March 13, 2014. (Adm. T.R., Vol. 1, pp. 2-3; Vol. 2, pp. 176-198). Judge Summers also indicated that

12

the "relevance of both Tri-Cities I and Tri-Cities II to these administrative proceedings is the indication from the federal courts of its preference for completion of the administrative proceedings prior to commencement of the federal litigation," and added that "[n]o such relevant part of the federal complaint has ever been filed with APD." Judge Summers continued: "The Motion [for Reconsideration] provides no authority to support the contention that a tribunal, such as the APD, must grant the relief requested without a hearing on the merits or be in automatic violation of the ADA." Judge Summers concluded that "advancing this position under the threat of legal action far exceeds simply pointing out to the tribunal its obligations under the law and potential penalties for noncompliance." (Adm. T.R., Vol. 1, pp. 2-3).

Judge Summers also denied Petitioner's [first] Motion to Recuse, noting that the record "clearly shows that these proceedings have been stayed for eight months, over the objection of the State, <u>at the request of Mr. Dunlap</u>, who has maintained that the issues under the ADA must first be addressed by the federal court action." Judge Summers noted further that the revocation of Mr. Dunlap's permission to appear *pro hac vice* was "the result of Mr. Dunlap's threats and unprofessional conduct, not bias or retaliation." (Adm. T.R., Vol. 1, pp. 4-5) (emphasis in original).

Judge Summers scheduled the administrative hearing to begin on July 29, 2014. However, after Plaintiffs acted upon their threats and filed the above lawsuit against Judge Summers and the APD, Mr. Dunlap filed "Petitioner's Second Motion to Recuse Judge D. Kim Summers," which invoked his recently filed lawsuit against her and accused her of bias and pretextual retaliation under the ADA, claiming that

Judge Summers "is a party to a civil rights action that she has brought upon herself by violating federal and state law." (Adm. T.R., Vol. 3, pp. 322-338). Judge Summers then recused herself, citing Canon 3(E)(1) of the Tennessee Code of Judicial Conduct. In so doing, Judge Summers stated that "[b]y filing a federal lawsuit against the undersigned judge who has been called upon in this matter to decide intricate and controversial issues, the Petitioner has created an unfortunate scenario wherein the impartiality of the undersigned judge could be called into question." (Supp. T.R., pp. 2-3).

As a result of Administrative Judge Summers' recusal, former Chief Administrative Judge Thomas Stovall has been appointed to preside over the administrative contested case hearing. He has ordered a continuance of the July 29, 2014 hearing to allow for the Chancery Court appeal; the contested case hearing has been rescheduled to begin on September 2, 2014. (Supp. T.R., pp. 4-5).

## STANDARD OF REVIEW

In judicial review under the Uniform Administrative Procedures Act, the court is limited to determining whether the rights of the petitioner have been prejudiced because the administrative findings and conclusions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence which is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

Moreover, "*[n]o agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision.*" Tenn. Code Ann. § 4-5-322(i). (Emphasis added).

Review in this Court is not *de novo*, but is confined to the record made before the agency. *Metro. Gov't of Nashville and Davidson Cty. v. Shacklett*, 554 S.W.2d 601, 604 (Tenn. 1977). The decision of a state agency is not arbitrary and capricious if there is any rational basis for the conclusions. *MobileComm of Tenn., Inc. v. Tenn. Public Serv. Comm'n*, 876 S.W.2d 101, 104 (Tenn. App. 1993) (citation omitted). Judicial review of an administrative decision is exhausted when a rational basis for the decision is found. *Blue Ridge Transp. Co .v. Pentecost*, 208 Tenn. 94, 100, 343 S.W.2d 903, 906 (1961). Factual issues must be reviewed upon a standard of

substantial and material evidence. *Humana of Tenn. v. Tenn. Health Facilities Comm'n*, 551 S.W.2d 664, 667 (Tenn. 1977). Substantial and material evidence is such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration. *Clay Cnty. Manor, Inc. v. State*, 849 S.W.2d 755, 759 (Tenn. 1993); *S. Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984). This standard "requires something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn. App. 1999). The reviewing court must accord appropriate judicial deference to agency fact-finding; it is not permitted to reweigh the evidence. *See Humana of Tenn.*, 551 S.W.2d at 667; *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. App. 1988). In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Tenn. Code Ann. § 4-5-322(h) (5); *Southern Ry., supra.* An agency's decision can be supported by substantial and material evidence even if the evidence could support another conclusion. *Hughes v. Bd. of Comm'rs*, 204 Tenn. 298, 305, 319 S.W.2d 481, 484 (1958); *Estate of Street v. State Bd. of Equalization*, 812 S.W.2d 583, 585 (Tenn. App. 1990). The agency decision must stand if supported by substantial and material evidence. *C.F. Indus. v. Tenn. Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980).

The appropriate remedy is peculiarly within the discretion of the agency. *McClellan v. Bd. of Regents*, 921 S.W.2d 684, 693 (Tenn. 1996). Further, if grounds exist to affirm the procedures employed, the facts found, and the conclusions reached, the court should not interfere with the sanctions imposed by the board of an agency. *Id.* The United States Supreme Court has held that the applicable standard of review in such cases involves the fundamental principle that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy, "'the relation of remedy to policy is peculiarly a matter for administrative competence.'" *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 93 S. Ct.1455, 36 L.Ed.2d (1973) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90,112, 67 S.Ct. 133, 91 L.Ed. 103 (1946)). Determination of a sanction to be applied by an administrative agency, if within bounds of its lawful authority, is subject to very limited judicial review. Once the trial court has confirmed the violation of the statutes and regulations, the court's only task is to examine the sanction imposed in light of the administrative record in order to judge whether the agency properly applied the regulations, *i.e.*, whether the sanction is "unwarranted in law" or "without justification in fact." *Woodard v. United States*, 725 F.2d 1072, 1077 (6th Cir. 1984) (*See Butz*, 411 U.S. at 185-189).

## ARGUMENT

**JUDGE SUMMERS' REVOCATION OF ATTORNEY JAMES A. DUNLAP, JR.'S *PRO HAC VICE* ADMISSION TO PRACTICE IN TENNESSEE WAS JUSTIFIED IN FACT AND WARRANTED IN LAW, AND SHOULD BE AFFIRMED**

Administrative Judge D. Kim Summers revoked Mr. Dunlap's *pro hac vice* admission to practice in Tennessee after he filed a threatening, extortionate and contemptuous objection to a motion to set the hearing in the pending administrative proceeding. Judge Summers also based her decision on Mr. Dunlap's misleading statements in connection with related federal litigation. The sanction that Judge Summers imposed, while she was sitting for the Tennessee Health Services and Development Agency, clearly was justified in fact and warranted in law. This Court should affirm Judge Summers' sanction.

**I.     Judge Summers' Revocation of Mr. Dunlap's *Pro Hac Vice* Admission to Practice in Tennessee Comports with All Relevant Statutory and Constitutional Requirements and Tenn. Sup. Ct. Rule 19**

Attorneys may be admitted to practice *pro hac vice* if they meet the standards and qualifications set out in Tenn. Sup. Ct. R. 19. That rule also permits, in its discretion, a state court or agency to deny a lawyer's motion to appear *pro hac vice* in a particular proceeding before it, but only under certain circumstances as are set out in the above rule. However, this case does not concern a denial of permission to practice *pro hac vice* before a State agency; rather, it concerns an Administrative Law Judge's revocation of that privilege. Tenn. Sup. Ct. R. 19(c) provides that "[a] lawyer admitted pro hac vice under this Rule may not continue to so appear unless all

18

requirements of the Rule continue to be met." Furthermore, "[a]dmission granted under this Rule may be revoked by the court or agency granting such admission upon appropriate notice to the lawyer and upon an affirmative finding by the court or agency that the lawyer has ceased to satisfy the requirements of this Rule." The Rule provides further that "[i]n any proceeding in which a court or agency revokes an admission pro hac vice, the court or agency shall set forth findings of fact and conclusions of law that constitute the grounds for its action." The Rule also provides that, "in addition, the court or agency shall send a copy of the order revoking the admission pro hac vice to the Board of Professional Responsibility of the Supreme Court of Tennessee."

The above recitation of facts in the record demonstrates that Mr. Dunlap ceased to satisfy the requirements of the Rule. He threatened to sue Judge Summers unless she gave his client the sought-after CON, without benefit of a hearing. In fact, he did sue Judge Summers, asserting bias and retaliation. He has requested that the federal court restore his *pro hac vice* admission before the administrative tribunal, even though this case still is properly pending before this Court pursuant to Tenn. Sup. Ct. R. 19(h). He also threatened Judge Summers and the tribunal with a non-existent impending prosecution by the DOJ. Essentially, Mr. Dunlap sought to extort from Judge Summers the ultimate relief of the granting of a CON that was before her in the contested case proceeding, in violation of Tenn. Code Ann. § 39-14-112. Furthermore, Mr. Dunlap violated Rules 3.3 (knowingly making false statement of fact or law to a tribunal); 3.5 (seeking to influence a judge by means prohibited by

law); and 8.4 (engaging in professional misconduct as described in the rule) of the Tennessee Rules of Professional Conduct. (Adm. T.R., Vol. 2, pp. 173-174). By his own conduct, as is evidenced in the administrative record and described above, Mr. Dunlap ceased to satisfy the requirements of Tenn. Sup. Ct. R. 19 and the above rules. Therefore Judge Summers' revocation of his *pro hac vice* admission was entirely justified in fact and warranted in law. The revocation should be upheld.

Furthermore, any suggestion that Judge Summers was biased against Mr. Dunlap is wholly without merit. Other than his own statements concerning his perception of Judge Summers' bias against him, nothing whatsoever in the record supports Mr. Dunlap's view. "Adverse rulings by a trial court are not usually sufficient grounds to establish bias." *Keisling v. Keisling*, 92 S.W.3d 374, 380 (Tenn. 2002); *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994).

Instead, Judge Summers explained the specific grounds for her action, including the rationale for her decision, and conscientiously applied the law to the facts in both her Order Revoking Permission to Appear Pro Hac Vice and in her Order Denying the Motion for Reconsideration. (Adm. T.R., Vol. 2, pp. 166-175; Vol. 1, pp. 2-3).

Mr. Dunlap also suggests that Judge Summers failed to give him the requisite notice before revoking his *pro hac vice* admission. However, Tenn. Sup. Ct. R. 19 (c) requires only "appropriate notice." Presumably, this means appropriate notice *under the circumstances* and in the context of the case: "Admission granted under this Rule may be revoked by the court or agency granting such admission upon

appropriate notice to the lawyer and upon an affirmative finding by the court or agency that the lawyer has ceased to satisfy the requirements of this Rule." Mr. Dunlap filed his inflammatory Objection to Motion to Set in response to a motion by the State's attorney to set the contested case hearing. (Adm. T.R., Vol. 2, pp. 176-274). In his filing, Mr. Dunlap's threat to sue Judge Summers if he did not receive a favorable ruling in the case without the benefit of a contested case hearing was clear and unmistakable. (Adm. T.R., Vol. 2, pp. 176-198). His filing speaks for itself, and in this context it was not unreasonable for Judge Summers to take action based on Mr. Dunlap's written statements. In fact, it is somewhat ironical that, while Mr. Dunlap himself threatened to sue Judge Summers if his client did not receive a CON without benefit of a hearing, he now complains that Judge Summers should have afforded him a hearing before revoking his *pro hac vice* admission. Regardless, Mr. Dunlap was in fact afforded an opportunity to be heard, in two respects: first, he filed a lengthy Motion for Reconsideration, setting out his views concerning his conduct as to why he thought his *pro hac vice* admission should not have been revoked. Judge Summers considered his Motion for Reconsideration before she denied the motion and upheld the earlier revocation. In her Order, Judge Summers wrote:

> The Motion provides no authority to support the contention that a tribunal, such the APD, must grant the relief requested without a hearing on the merits or be in automatic violation of the ADA. The suspension of due process cannot be considered a reasonable modification of APD rules as the Motion contends. Thus, advancing this position under the threat of legal action far exceeds simply pointing out to the tribunal its obligations under the law and potential penalties for noncompliance.

(Adm. T.R., Vol. 1, pp. 2-3).

Second, Mr. Dunlap had the opportunity to file this Petition for Judicial Review under Tenn. Sup. Ct. R. 19 (h), and he has availed himself of that opportunity. Thus, even if the notice provided to him originally was not "appropriate" under Rule 19, any such procedural defect now has been amply cured, both by his filing of the Motion for Reconsideration and by this Petition for Judicial Review. In fact, Mr. Dunlap had appropriate notice of Judge Summers' revocation of his *pro hac vice* admission, and he has twice exercised his opportunity to be heard.

II.  **Judge Summers' Revocation of Mr. Dunlap's *Pro Hac Vice* Admission to Practice in Tennessee is Not Arbitrary or Capricious, But Instead is Supported By Substantial and Material Evidence in the Light of the Entire Record**

The undersigned already has described in detail the substantial and material evidence in the record that supports Judge Summers' decision to revoke Mr. Dunlap's *pro hac vice* admission. Such substantial and material evidence in the record also evidences the fact that Judge Summers' decision was not arbitrary and capricious. Relevant case law supports sanctions against an attorney's license when the attorney's conduct has been egregious, particularly toward the tribunal. In *Galbreath v. Bd. of Prof'l Responsibility*, 121 S.W.3d 660, 666-667 (Tenn. 2003), the Tennessee Supreme Court upheld the Board of Professional Responsibility's thirty-day suspension of Mr. Galbreath's law license. Noting that Mr. Galbreath had filed at least three lawsuits in federal court against current and former chief justices of the Tennessee Supreme Court for their alleged failure to appoint him to sit as a retired judge, the court wrote:

Perhaps most egregious was Galbreath's conduct toward the Chief Justice. In one chapter of a continuing saga of Galbreath's attempts to force Chief Justice Anderson to assign him judicial duties, Galbreath suggested that if the Chief Justice did not assign him as requested, he would file a complaint against the Chief Justice and discuss the matter during a radio talk show of which Galbreath was the host. Galbreath's use of threats and intimidation designed to force the Chief Justice to perform a purely discretionary act evinces a persistent resolve to undermine and to bend the justice system to his will. In so doing, he has inflicted grievous injury upon the judicial process and upon the office of the Chief Justice. The injury caused by this conduct alone justifies suspension.

In some respects, Mr. Dunlap's conduct is not unlike that of Mr. Galbreath. By leveling unsupported charges of bias and retaliation against Judge Summers, and then by actually suing her in federal District Court, Mr. Dunlap has gone far beyond the use of unwise semantics or mere harsh language directed toward the tribunal. Instead, Mr. Dunlap has acted on his views about Judge Summers (which views are entirely unsupported by the record) and has inflicted harm upon the judicial system by disrupting the orderly administration of justice. Specific to this case, he has caused a delay in the administration of justice — first by misleading Judge Summers about the nature of Judge Greer's ruling and its impact on the contested case proceeding, next by disrupting the administrative process by delaying the case at his own request, and then by causing a further delay by threatening Judge Summers with legal action if she did not rule in his favor on the merits without a contested case hearing. Finally, Mr. Dunlap breached the administrative process by suing Judge Summers based on alleged causes of action that, in light of the administrative record, have no basis in law or fact.

This Court should affirm Judge Summers' decision because it is based on substantial and material evidence in the light of the entire record. In *Hoover v. Bd. of Prof'l Responsibility*, 395 S.W.3d 95, 103 (Tenn. 2012), the Tennessee Supreme Court held, with respect to its review of an attorney's sanctioning: "In particular, this Court will not reverse the decision of a hearing panel so long as the evidence 'furnishes a reasonably sound factual basis for the decision being reviewed.'" (citations omitted). Furthermore, the Supreme Court in *Hoover* invoked ABA Standard 7.1 in determining whether disbarment is an appropriate sanction: "Disbarment is also 'generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to the client, the public, or the legal system.'" *Hoover*, 395 S.W.3d at 106. It is the HSDA's position that this is precisely the sort of conduct that Mr. Dunlap displayed: he knowingly engaged in unprofessional conduct with the intent to summarily obtain a CON for his client, without a contested case hearing. More important, Mr. Dunlap's conduct (particularly his threat to sue Judge Summers, and his implementation of his threat by then suing her in federal district court when she did not summarily grant his client a decision on the merits) has caused potentially serious injury to the legal system. Especially since the sanction of revocation of Mr. Dunlap's *pro hac vice* admission comports with the ABA's standard for disbarment, Judge Summers' sanction was not arbitrary or capricious.

## CONCLUSION

For the reasons described above, the HSDA respectfully requests that this Honorable Court affirm Judge Summers' revocation of Mr. Dunlap's *pro hac vice* admission, and dismiss this Petition for Judicial Review.

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General and Reporter

SARA E. SEDGWICK (BPR# 4336)
Senior Counsel
Health Care Division
Attorney for Tennessee Health Services and
Development Agency
P. O. Box 20207
Nashville, Tennessee 37202
(615) 532-2589

SUE A. SHELDON (BPR # 015295)
Senior Counsel
Attorney for Tennessee Health Services and
Development Agency
P.O. Box 20207
Nashville, Tennessee 38202
(615) 741-2640

25

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded

by email and by first-class U.S. mail, postage pre-paid, to:

James A. Dunlap Jr., Esq.
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
jim@jamesdunlaplaw.com

James S. Higgins, Esq.
Rick Piliponis, Esq.
Higgins, Himmelberg & Piliponis, PLLC
525 Fourth Avenue, South
Nashville, Tennessee 37210

on this $\underline{24^{th}}$ day of July, 2014.


SARA E. SEDGWICK

## IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| Tri-Cities Holdings, LLC, et al., | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No: 14-650-II |
| | ) Docket No.: 25.00-122076J |
| Tennessee Health Services and | ) CON No.: CN1303-005D |
| Development Agency, et al., | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S NOTICE OF INTENTION TO RELY ON INITIAL FILINGS TO SERVE AS BRIEF

Comes now the Plaintiff, Tri-Cities Holdings, LLC, by and through counsel, pursuant to Rule 7.1 of the Local Rules of the United States District Court for the Eastern District of Tennessee, and hereby gives notice that Plaintiff intends to adopt and rely upon its initial filings to serve as Plaintiff's brief for purposes of consideration in this appeal. The filings upon which Plaintiff intends to rely—Petitioner's Appeal of Order Revoking Permission to Appear *Pro Hac Vice* and Exhibits—are attached hereto as Exhibit A. In support, Plaintiff would state that counsel for the Defendants does not oppose Plaintiff's intention to rely upon the aforementioned filings as its brief.

WHEREFORE, Plaintiff hereby gives notice that it intends to adopt and rely upon its initial filings to serve as Plaintiff's brief for purposes of this appeal.

Respectfully Submitted,

_James Dunlap_ with permission by _Jenn Travis_  
James A. Dunlap, Jr., Georgia State Bar No. 003280  #32473
James A. Dunlap Jr. & Associates, LLC
310 Windsor Gate Cove NE
Atlanta, GA 30342
(404) 354-2363

_Jim Higgins_ with permission by _Jenn Travis_  
James S. Higgins, BPR No. 16142  #32473
The Higgins Firm, PLLC
525 Fourth Avenue South
Nashville, TN 37210
(615) 353-0930

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was sent via U.S. Mail this 24th day of July, 2014 to the following:

Sue A. Sheldon, Senior Counsel
**Office of the Tennessee Attorney General**
P.O. Box 20207
Nashville, TN 37202

Jim Christoffersen, General Counsel
**Tennessee Health Services and**
**Development Agency**
Andrew Jackson Bldg., 9th Floor
502 Deaderick St.
Nashville, TN 37243

Sara Elizabeth Sedgwick
**Tennessee Attorney General's Office**
PO Box 20207
Nashville, TN 37202-0207

_James Dunlap_ with permission by _Jenn Travis_  
James A. Dunlap Jr.  #32473

2

FILED

2014 JUL 28 PM 3:07

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
D.C. & M.

# IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

In Re: Tri-Cities Holdings LLC
d/b/a Trex Treatment Center

)
)
)
)
)

Case No. 14-0550-II
DOCKET NO. 25.00-122076J
CON No. CN1303-005D

## APPEAL OF ORDER REVOKING
## PERMISSION TO APPEAR *PRO HAC VICE*

James A. Dunlap Jr., Esq.
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

James S. Higgins, Esq. BPR # 16142
Rick Piliponis, Esq. BPR # 16249
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner



# Contents

**Standard of Review** ........................................................................................... 3

**Statement of Facts** .......................................................................................... 3

A.    The Administrative Hearing Officers's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect. ......... 3

B.    The Administrative Hearing Officer's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect. .................................................................. 6

C.    Mr. Dunlap never misled the Administrative Hearing Officer when he indicated his opinion was that there were no "new developments" in the case. ............................... 8

**Argument and Citation of Authority** ........................................................... 11

A.    The Administrative Hearing Officer should not retaliate against Mr. Dunlap because he, in good faith, advised the Administrative Hearing Officer that it is subject to the ADA and that the Administrative Hearing Officer bears certain responsibilities under the ADA.................................................................................. 11

B.    Mr. Dunlap asserts that the ADA applies to the Administrative Hearing Officer and *supreme* federal law places upon the Administrative Hearing Officer an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON. ....................................................................................................................... 12

C.    The Administrative Hearing Officer should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law..................................................................................................... 14

D.    Assuming, *arguendo*, that the Administrative Hearing Officer was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Administrative Hearing Officer on the status of the federal case, if any misunderstanding did occur........... 16

E.    In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge." ................................................ 16

F.    In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."................................................................................... 18

G.    Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee." ................................................................................ 18

**Conclusion** .................................................................................................... 18

Plaintiffs Tri-Cities Holdings LLC ("TCH""), Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby appeals the Administrative Hearing Officer's Order Revoking Permission to Appear *Pro Hac Vice* of James A Dunlap Jr. and states as follows:

## Standard of Review

The Court may reverse or modify the Administrative Hearing Officer's decision if the rights of the Petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1)     In violation of constitutional or statutory provisions;

(2)     In excess of the statutory authority of the agency;

(3)     Made upon unlawful procedure;

(4)     Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)     Unsupported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. Section 4-5-322.

## Statement of Facts

**A. The Administrative Hearing Officers's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect.**

First and foremost, in paragraph 1 of its Conclusions of Law, p. 9, the Administrative Hearing Officer Judge D. Kim Summers makes a *sua sponte*, damning allegation against Mr.

3

Dunlap that he did not disclose the dismissal on ripeness grounds of the *Tri-Cities I* [1] case and that he concealed that the federal court was subject to a stay in deference of the administrative proceeding, holding:

> "He [Mr. Dunlap] never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings."

*March 14, 2014 Order, p. 9.* Both of these allegations are extremely serious and, presumably, under the right factual scenario, could carry the penalty of disbarment. The Administrative Hearing Officer made this Conclusion of Law, and barred Mr. Dunlap as counsel from this proceeding, without even notifying Mr. Dunlap of the finding beforehand or asking Mr. Dunlap to respond.

Of course, *Tri-Cities I* was the previous action filed in federal court after Johnson City denied TCH's application for rezoning to establish an Opiate Treatment Program in Johnson City. Even before TCH filed its administrative appeal, *Tri-Cities I* had been dismissed by the federal court without prejudice, allowing the plaintiffs in that action to refile the action, which they did. All issues in *Tri-Cities I* were maintained in *Tri-Cities II* [2] along with additional claims against HSDA arising from the denial of the Certificate of Need. Although there is no transcript of several telephone conference calls with Judge Summers and HSDA's counsel in the case, Mr. Dunlap recalls painstakingly recounting the history of the litigation and the application of the ADA in the administrative appeal. He believes that it would have been virtually impossible that--at least once--

---

[1] *Tri-Cities Holdings LLC et al. v. City of Johnson City et al.*, Case No. 2:13-CV-108 (E.D. Tenn).
[2] *Tri-Cities Holdings LLC et al. v. HSDA et al.*, Case No. 2:13-CV-305 (E.D. Tenn).

4

during these calls that he would not have mentioned the *Tri-Cities I* case—though it had been dismissed without prejudice, all claims in it had been re-alleged in the refiled *Tri-Cities II* and that *Tri-Cities I* was irrelevant for all practical purposes in the administrative appeal.

In addition, the allegation that Mr. Dunlap failed to disclose *Tri-Cities I* is patently incorrect based on the record. On July 29, 2013, Mr. Dunlap sent what he thought was a complete copy of the Tri-Cities II Complaint to Judge Summers along with his letter ("I'm attaching a copy of the federal complaint"). This was done to assist Judge Summers in understanding the issues in the federal action. The Complaint clearly and unambiguously identifies *Tri-Cities I* and its outcome:

> ***Tri-Cities Holdings et al. v. Johnson City et al.*, Case No. 13-cv-108 (E.D. Tenn. 2013)(case dismissed without prejudice on ripeness grounds).**

See Tri-Cities I, Doc. 1, p. 32, n. 67 (emphasis added). Furthermore, the Complaint in *Tri-Cities II* clearly and unambiguously references evidence and testimony from *Tri-Cities I* multiple times. Judge Summers claims that she only received four pages of the Complaint. But she never mentioned receiving an incomplete copy until after she alleged Mr. Dunlap had *concealed Tri-Cities I*. Mr. Dunlap fairly assumed that Judge Summers had a complete copy and would have enough interest in the case to read the Complaint. There was no concealment by Mr. Dunlap. It is undisputed that the *Tri-Cities II* Complaint which clearly and unambiguously references, including the court, caption, and a specific and fairly crafted parenthetical reference that Tri-Cities I was "dismissed without prejudice on ripeness grounds." *Id.* Thus, Mr. Dunlap has disclosed the nature and outcome of *Tri Cities I*. Therefore, the grounds for revoking Mr. Dunlap's *Pro Hac Vice* admission based on any alleged concealment is clearly not applicable in this case.

Assuming *arguendo* that Tri-Cities I was not disclosed to Judge Summers by any party,

Mr. Dunlap had no *obligation* to disclose *Tri-Cities I*. That case was over. It had been dismissed without prejudice allowing all issues to be raised in a new proceeding. All claims in *Tri-Cities I* had been refiled and were presenting pending in *Tri-Cities II*. The dismissed and no-longer-pending *Tri-Cities I* was *completely irrelevant* to the administrative proceedings. The administrative appeal involved the denial of TCH's application for a Certificate of Need. *Tri-Cities I* did not involve any claims arising from the denial of the Certificate of Need. *Tri-Cities I* did not involve any claims arising in the administrative proceeding against HSDA. HSDA was not even a party to *Tri-Cities I*. It is undisputed that Mr. Dunlap disclosed the pending *relevant* federal case *at all times,* beginning with his first correspondence with the Administrative Hearing Officer in July, 2013. See Exhibit 1 (beginning with the caption of the letter). In sum, Mr. Dunlap did not commit misconduct, and therefore should not be punished, for not disclosing an irrelevant, federal action dismissed before the administrative appeal was even filed.

**B. The Administrative Hearing Officer's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect.**

The Administrative Hearing Officer makes, in her *sua sponte* Order without notice or opportunity for the Petitioner to advise or counter the arguments of the Administrative Hearing Officer, a finding of fact in its basis to revoke Mr. Dunlap's *Pro Hac Vice* admission that he concealed to the Administrative Hearing Officer that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding." The Administrative Hearing Officer further finds that Mr. Dunlap had engaged in such concealment that is, under the right circumstances, worthy of disbarment.

The federal case is not and never has been stayed "subject to a stay in deference to the

6

administrative proceeding". The Magistrate's December 20, 2013 Order [Doc. 135] (Exhibit 2) was on a motion to stay discovery. ("The Motion to Stay Discovery, Doc. 100, is GRANTED....").[3]

The Magistrate's January 2, 2014 Order stayed the case specifically to give Defendants more time to respond to Plaintiffs' Motion for Summary Judgment. See *Tri-Cities II*, Doc. 150 (Exhibit 3). The Order giving Defendants additional time to respond was subject to being lifted at "a moment's notice:"

> By motion filed as document 139, the defendants have filed a motion for additional time to respond to the plaintiffs' motion for partial summary judgment. Their motion is GRANTED only to the following extent.
>
> If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. If, however, the district judge denies the motion to stay the case, the stay of discovery will be lifted as of that moment, [1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

Therefore, there is not, and never has been, any stay in the federal court "in deference to the administrative proceedings," because it was never stayed on that basis. These orders never stayed the federal court in some kind of suspended mode pending a decision on the administrative appeal. The factual premise is false. Therefore, the Administrative Hearing Officer's *sua sponte* finding related to Mr. Dunlap's fraud or concealment of *Tri-Cities I* and an alleged stay of the federal action "in deference to the administrative proceeding" is unsupported.

---

[3] "As a part of the discussion in the Magistrate's Order, the Administrative Hearing Officer said, "The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals." December 10, 2013 Order [Doc. 135]. But such *dicta* in an order granting a stay in discovery cannot be interpreted to operate as stay of the federal action pending an outcome of the administrative proceeding.

7

**C. Mr. Dunlap never misled the Administrative Hearing Officer when he indicated his opinion was that there were no "new developments" in the case.**

Petitioner *respectfully* disputes that Mr. Dunlap committed any misconduct when he responded to a January 8, 2014 inquiry "that there were no new developments" because the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action. By that statement, Mr. Dunlap intended to represent that there had been no decision by the federal court either way on these motions. This was entirely correct. Mr. Dunlap interpreted the Administrative Hearing Officer's continuing inaction in the proceeding, enacted multiple times, that the Administrative Hearing Officer was waiting for the federal court to decide the dispositive motions, whenever that would occur. Additionally, HSDA was fully aware of Mr. Dunlap's opinion (being copied simultaneously on emails to Judge Summers). HSDA could challenge Mr. Dunlap's opinion at any time. HSDA never did.

There was no "new development," as far as Mr. Dunlap could tell (and HSDA apparently agreed), in so far as the federal court was proceeding , in a prompt and expeditious matter, to make a decision on the various motions which potentially would render the administrative proceeding moot. In fact, on that same day, HSDA attorney Jim Christoffersen offered his own opinion of the federal case, contrary to Mr. Dunlap's, there were in fact "new developments" and "indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary." " Mr. Christoffersen, being General Counsel for HSDSA, was fairly perceived, by Mr. Dunlap and the Administrative Hearing Officer, to be in constant contact, and updated by, with HSDA's attorney Sue Sheldon and Sara Sedgewick as to what was going on in the federal case. Mr. Christoffersen apparently has immediate access to federal court filings. Indeed, he appears to send them to the Administrative Hearing Officer within minutes of

8

filing in the federal case (for example, as Mr. Christoffersen did when he received and forwarded the federal court's request for a status report on March 11, 2014). Mr. Christoffersen's "new developments" update never materialized. Above all, there was never any intent on Mr. Dunlap's part to misrepresent the status of the federal action.

In any event, the federal court order staying discovery [Doc. 135] was <u>clearly inconsequential</u> from the standpoint that Plaintiffs' Motion for Summary Judgment and the Defendants' Motions to Dismiss did not rely on any disputed facts on issues. Plaintiffs' motion rested on, for example, Johnson City's and HSDA's blatantly illegal zoning ordinance and notice rule, where there was no factual dispute. The Defendants' Motions to Dismiss did not rely on any disputed issues. So the motions in federal court were poised for prompt decision <u>with or without discovery</u>. HSDA apparently agreed with Mr. Dunlap because this was never brought to the attention of the Administrative Hearing Officer around the January 10, 2014 telephone conference.

The administrative proceeding had been delayed several times before the scheduled January 10, 2014 telephone conference with the Administrative Hearing Officer. Any of the inconsequential orders of the federal court – an order suspending discovery that would in no way stop the federal court from deciding the pending motions, and an order giving as little as 30 days additional time for The Defendants to respond to Plaintiffs' Motion for Summary Judgment --- do not upset in any way the Administrative Hearing Officer's long-past decision to simply wait for the federal court. In that respect there were no "new developments." It is highly unlikely that the Administrative Hearing Officer would have, all of a sudden, decided to schedule a full-blown final hearing simply because the federal court had given the Defendants an additional thirty days or so to respond to Plaintiffs' Motion for Summary Judgment.

9

Any additional time the federal court had given the Defendants to respond to Plaintiffs' Motion for Summary Judgment was, in accordance with its terms, expected to be for a *reasonable time* (i.e., a reasonably *short and most likely very short time*) and, therefore, should not cause unreasonable delay in the consideration of the pending Motion for Summary Judgment and the Motions to Dismiss. HSDA, through its counsel, apparently agreed with Mr. Dunlap and did not mention it. The statement there were "no new developments: was certainly subject to a contrary opinion of HSDA, HSDA being a party to the federal court action; however HSDA, by not articulating any contrary opinion, apparently agreed with Mr. Dunlap.

On January 8, 2014, HSDA's General Counsel and presiding attorney, apparently had no different opinion than Mr. Dunlap. He did not advise the Administrative Hearing Officer on "any new developments" either. HSDA did not, and could not, reasonably qualify its opinion by claiming either lack of knowledge of the status of the federal case any reliance solely upon Mr. Dunlap for the status of the federal case. To the contrary, HSDA implicitly and explicitly represented to the Administrative Hearing Officer, and to Mr. Dunlap, that it was knowledgeable of the status of the federal case and that there were "no new developments" Because none were offered.

Furthermore, HSDA's attorneys read the December 10, 2013 Magistrate's Order and HSDA's attorneys obviously felt there was nothing to advise regarding the status of the administrative proceeding because they did exactly what Mr. Dunlap did. HSDA was a party to the federal case and the administrative proceeding, HSDA had access to all court proceedings and filings, and HSDA was free to object to Mr. Dunlap's opinion that there were no "new developments" at any time. HSDA could have moved for a hearing date to be set based on

10

whatever "new developments" they felt were relevant. Mr. Dunlap provided the Administrative

Hearing Officer with the exact same information that HSDA was giving the Administrative

Hearing Officer.

Petitioner filed a Motion for Reconsideration. See Exhibit 6. The Administrative Hearing

Officer denied the motion. See Exhibit 7.

## Argument and Citation of Authority

The Court should reverse the Administrative Hearing Officer's decision because the rights

of the Petitioner have been prejudiced and because the administrative findings, inferences,

conclusions and/or decisions are in (a) violation of constitutional or statutory provisions, (b)

arbitrary or capricious and characterized by abuse of discretion and (c) clearly unwarranted

exercise of discretion; and (d) are unsupported by evidence that is both substantial and material in

the light of the entire record.

### A. The Administrative Hearing Officer should not retaliate against Mr. Dunlap because he, in good faith, advised the Administrative Hearing Officer that it is subject to the ADA and that the Administrative Hearing Officer bears certain responsibilities under the ADA.

Petitioner certainly intended no affront the Administrative Hearing Officer when advising

that she is subject to the ADA. This is a fact. Mr. Dunlap would be failing to represent his client

diligently and effectively unless he did what he did: (1) Advise the Administrative Hearing Officer

of the application of the ADA, (2) advise the Administrative Hearing Officer of its duties under the

ADA; and (3) advise the Administrative Hearing Officer of his potential adverse position of being

a plaintiff in an action against the Administrative Hearing Officer or that the Administrative

Hearing Officer would be subject to a potential DOJ enforcement action if it violated the ADA. In

11

fact, Mr. Dunlap would be violating his duties to this client if he had not advanced these positions in this case.

Petitioner denies the finding that Mr. Dunlap showed "contempt for the proceeding" at Conclusions of Law, para. 6. On the contrary, Petitioner would welcome a full and frank discussion of the issues in the case and the opportunity to be heard on these issues. Mr. Dunlap asserted in good faith that Johnson City and HSDA are attempting to have the Administrative Hearing Officer somehow "exorcise" their ADA violations in this case -- which this Administrative Hearing Officer cannot do. This is in clear accordance with federal law. Further, the federal court is the most appropriate forum in the case and that this Administrative Hearing Officer should naturally defer to the federal court on issues of interpretation of federal law such as those raised herein. The use of forceful prose in making these points in not intended to be disrespectful.

It is obvious that the Administrative Procedures Division – like all Tennessee state agencies--is subject to the ADA. The Administrative Hearing Officer should not retaliate against Mr. Dunlap for fairly asserting his clients' ADA rights.

**B. Mr. Dunlap asserts that the ADA applies to the Administrative Hearing Officer and *supreme* federal law places upon the Administrative Hearing Officer an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON.**

Petitioner *respectfully (as always)* asserts that Mr. Dunlap would be violating his duties to his client if he failed to assert his clients' ADA rights in this regard. Simultaneously, Mr. Dunlap owes a duty of candor to the Administrative Hearing Officer (Rule 3.3 of Rules of Professional Responsibility) and to his clients. He should not be sanctioned for attempting to properly achieve this balance.

12

> As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [3]. Mr. Dunlap had a clear duty to zealously advance his clients' interests in what amounts to a civil rights action. It is undisputed that his individual clients are facing almost daily threat of death or serious injury while being forced to drive hundreds of miles from the Johnson City area to standard of care treatment facilities in North Carolina. Mr. Dunlap's sitting silent, or engaging in mouse-like behavior to avoid "offending the Administrative Hearing Officer," would have clearly violated this duty of zealous representation.

> In the nature of law practice, however, conflicting responsibilities are encountered. <u>Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an ethical person while earning a satisfactory living.</u> The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these Rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules. <u>These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests,</u> within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [10] (emphasis added). Thus, Mr. Dunlap, like all petitioners asserting rights against States and State agencies, faces an unavoidable conflict providing zealous representation within the bounds of the law. He has not failed to properly balance these duties.

Further, the Rules of Professional Conduct specifically allow a lawyer to be a zealous advocate when the opposing party is well-represented by counsel. The Rules provide:

> A lawyer's responsibilities as a representative of clients, an officer of the legal system, and a public citizen are usually harmonious. Thus, when an opposing party

13

is well represented, a lawyer can be a <u>zealous advocate</u> on behalf of a client and at the same time assume that justice is being done.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [9] (emphasis added). Surely HSDA, and the Administrative Hearing Officer, are "well-represented." The Rules of Professional Conduct implicitly require Mr. Dunlap to be a "zealous advocate" for his client's rights without the threat of facing banishment from the process without a hearing or opportunity to be heard. Zealous advocacy involves making the Administrative Hearing Officer aware, in frank terms, that is has duties under the ADA.

**C. The Administrative Hearing Officer should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law.**

The Administrative Hearing Officer should not retaliate against Mr. Dunlap for pointing out, in a respectful manner, and simultaneously providing voluminous legal authority, that the Administrative Hearing Officer could be in violation of federal law. HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[4] In this case, in Mr. Dunlap's good faith opinion, HSDA and Johnson City are

---

[4] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening,* 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.*, 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory procedural requirements themselves violate the FHAA; the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is

14

trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's blatant violations federal law.

Mr. Dunlap, in courteous fashion, has made multiple attempts to outline for the Administrative Hearing Officer the scope and effect of the ADA and its possible implications on this administrative proceeding. First, on July 28, 2013, in courteous fashion, Mr. Dunlap set forth the ADA the legal requirement for all state agencies to attempt a reasonable modification to allow TCH to locate its clinic in Johnson City. See Exhibit 1. Second, on July 29, 2013, Mr. Dunlap requested such a reasonable modification. See Exhibit 4. Third, on March 12, 2014, Mr. Dunlap outlined the federal law, with voluminous citations, and made a request for a reasonable modification in a letter. See Exhibit 5. Fourth, on March 12, 2014, again in courteous fashion, Mr. Dunlap outlined federal law and made a request for a reasonable modification in Petitioner's Objection to the Motion to Set Hearing and Demand for Reasonable Modification. See Exhibit 6.

More than four times, Mr. Dunlap presented his well-researched position (including voluminous legal citations and copying opposing counsel) to the Administrative Hearing Officer. Mr. Dunlap is not taking a frivolous position. Mr. Dunlap's duty to his clients and to the Administrative Hearing Officer obligates him to make the Administrative Hearing Officer fully aware of the ADA and that Administrative Hearing Officer would likely run afoul of federal law if she takes certain steps. Mr. Dunlap should not be sanctioned for simply *and respectfully* making

---

facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,* 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See, e.g., *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 573 n.4 (2d Cir. 2003).

15

the Administrative Hearing Officer aware it might be violating federal law.

**D. Even assuming *arguendo* that the Administrative Hearing Officer was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Administrative Hearing Officer on the status of the federal case, if any misunderstanding did occur.**

Mr. Dunlap did not fail to advise that that the federal court was *deferring* to the administrative proceeding because that was never the case. Mr. Dunlap did not interpret the statements in the Magistrate's December 10, 2013 Order regarding the administrative proceeding as anything more than *dicta*. Petitioner respectfully submits that, in any event, this *dicta* would be contrary to federal law that does not require TCH to pursue administrative remedies before filing an ADA Title II action.[5]

**E. In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge."**

Petitioner respectfully represents that advising the Administrative Hearing Officer on applicable federal law and the Administrative Hearing Officer's responsibility thereunder does not

---

[5] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion requirement); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). See also *Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding, under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990) (same).

16

constitute "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tennessee Code Ann. § 39-14-112. Advising the Administrative Hearing Officer of federal law, while copying opposing counsel, does not amount to improper influence or coercion.

Rule 3.3 of the Tennessee Rules of Professional Conduct requires "candor toward the tribunal." In this respect, Mr. Dunlap has fulfilled his duty and in no way has breached his duty. Mr. Dunlap, supported by substantial legal authority that he has shared with the Administrative Hearing Officer (copying opposing counsel at all times) in well-researched letters and filings, simply pointed out to the Administrative Hearing Officer that she may be subject to the ADA and that his clients' positions had become adverse to the Administrative Hearing Officer from a legal perspective. To fail to do so would have violated this rule, rather than honoring it.

Rule 3.4 of the Tennessee Rules of Professional Conduct requires "fairness to opposing party and counsel." In this regard, Petitioner submits that Mr. Dunlap has not violated this provision in any respect. Mr. Dunlap has always conducted himself with view to fairness toward the other side in this matter. Opposing party and counsel have been copied on every correspondence with the Administrative Hearing Officer and obviously they are a party to the underlying federal action.

Rule 8.4 of the Tennessee Rules of Professional Conduct describe to a wide range of potential misconduct generally described as "dishonesty, fraud, deceit, or misrepresentation." As set forth herein, Petitioner submits that in no way has Mr. Dunlap violated Rule 8.4. At all times, Mr. Dunlap has been completely forthright with the Administrative Hearing Officer and in no way has committed any "dishonesty, fraud, deceit, or misrepresentation."

17

**F. In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."**

Petitioner respectfully disputes that Mr. Dunlap "expressed contempt for this tribunal and these administrative proceedings resulting in no apparent purpose for his continued participation. On the contrary, Mr. Dunlap's thoroughly-researched position, expressed in good faith, that the ADA applies to this Administrative Hearing Officer and that the Administrative Hearing Officer has certain obligations under federal law serves merely to advise the Administrative Hearing Officer of Petitioner's position. Mr. Dunlap would be violating his duty, to his client and to this Administrative Hearing Officer, by remaining silent if he, in good faith, believed that this Administrative Hearing Officer was violating federal law.

**G. Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."**

Petitioner respectfully submits that, in fact, Mr. Dunlap has appropriately fulfilled his duties both to his clients and to this Administrative Hearing Officer. He has done so by respectfully, but firmly and forthrightly, explained his clients' adverse position with this Administrative Hearing Officer related to the ADA. Simply laying this position out to the Administrative Hearing Officer in a respectful manner is completely appropriate and in no way violates any Rule of Professional Responsibility or state law. Mr. Dunlap should not be retaliated against for fulfilling his duty of candor to the Administrative Hearing Officer.

## Conclusion

(a) Petitioner *respectfully (as always)* denies each and every allegation of misconduct, violation of Rules of Professional Conduct, or violation of law, by Mr. Dunlap

18

contained in the Administrative Hearing Officer's March 14, 2014 Order.

(b) Petitioner *respectfully (as always)* asks this Court to rescind the Administrative Hearing Officer's March 14, 2014 Order and otherwise find this Order null and void and contrary to Tennessee and federal law.

(c) Finally, that this Court order that Mr. Dunlap be allowed to represent TCH in the administrative proceeding.

Dated: April 29, 2014

**s/ Rick Piliponis**
Rick Piliponis, Esq. BPR # 16249
James S. Higgins, Esq. BPR # 16142
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

James A. Dunlap Jr., Esq.
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

Counsel for Petitioner

19

# CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2014, a copy of the foregoing document(s) was served by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

/s/ Richard D. Piliponis
Richard D. Piliponis

# EXHIBIT 1

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

March 12, 2014

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:    Tri-Cities Holdings LLC d/b/a Trex Treatment Center
       CON #1303-005D
       Docket No.: T.B.A.

Dear Judge Summers:

I wanted to outline further my position regarding the previous requests I have made upon you regarding TCH's rights under the Americans with Disabilities Act in this appeal.

The Administrative Procedures Division, Tennessee Department of State, is subject to Title II of the Americans with Disabilities Act.[1] *Respectfully,* I submit that this imposes upon you an *affirmative duty* to provide a reasonable modification to TCH

---

[1] "The [Tennessee] Department Americans with Disabilities Act (ADA) Coordinators ensure state government's compliance with the Americans with Disabilities Act as amended by the Americans with Disabilities Act Amendments Act (ADAAA). They assist with reasonable accommodation issues in state employment and program access for state services and programs and help agencies and employees resolve access and accommodation issues. Please contact your agency's ADA Coordinator if you need more information or have any questions about a reasonable accommodation." State of Tennessee Employee Handbook, p. 10. (emphasis added).

to allow the Certificate of Need to be issued in this case and before any final hearing is held.[2]

The Attorney General of the United States, at the instruction of Congress,[3] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[4]

As you know, I have made several requests to you for a reasonable modification under the ADA.[5] I *respectfully* submit that you and the Administrative Procedures Division have an affirmative duty to provide a reasonable modification to TCH to obtain its Certificate of Need. This responsibility is different from your consideration of normal "non-ADA" administrative appeal.

Because your duty under the ADA is *affirmative*, it is not incumbent upon me to take the initiative to fashion a remedy. Rather, it is your duty. However, this modification might specifically involve a reasonable lowering of the requirements of "need, economic feasibility, or orderly development" in accordance with the criteria for issuance of a Certificate of Need. Although given the undisputed evidence that this area suffers the worst drug overdose death and infant mortality rate in the nation, satisfaction of the "need" criteria is relatively straightforward. In addition, there is undisputed evidence of widespread suffering and havoc related to the daily long-distance driving of between 500 and 1,000 opiate-addicted, ADA-disabled people to have to get standard of care Methadone Maintenance Treatment at an Opiate

---

[2] *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002) (holding that entities have standing to sue under the ADA as being discriminated against "because of their known association with an individual with a disability")(citations).

[3] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." Id. § 12134(b).

[4] 28 C.F.R. § 35.130(b)(7).

[5] James Dunlap letters to Judge Summers, July 28, 2013 and July 29, 2013. Petitioner's Motion for Reasonable Modification dated March 10, 2013.

Treatment Programs in North Carolina.   I would submit that on the issues of economic feasibility and orderly development, such a clinic would easily satisfy any requirement, given that there is no such clinic within fifty (50) miles in any direction and the need is so great.

In this regard, I would *respectfully* request that you immediately indicate your willingness to discuss a reasonable modification (by telephone is fine) and that we schedule a conference (again telephone is fine) to *specifically to address the reasonable modification request*—before a full-blown hearing is scheduled.

Finally, I would hope that you would not be hurried or pressured in any way to schedule a final hearing in this case.  Rather, it my clients' position that it is appropriate for the pending federal case to resolve before a final hearing in this case.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:    Jim Christoffersen, General Counsel HSDA (via email)

# EXHIBIT 2



**State of Tennessee**
**Department of State**
Administrative Procedures Division
312 Rosa L. Parks Avenue
8ᵗʰ Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472

March 14, 2014

James B. Christoffersen, Esq.
Deputy General Counsel
Tennessee Health Services &
    Development Agency
Frost Building, 3ʳᵈ Floor
161 Rosa L. Parks Boulevard
Nashville, Tennessee 37243

Rick Piliponis, Esq.
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue South
Nashville, TN 37201-2002

James Dunlap, Jr., Esq.
James A. Dunlap, Jr. & Associates
310 Windsor Gate Cove, N.E.
Atlanta, GA 30342

Tennessee Board of Professional Responsibility
10 Cadillac Drive, Suite #220
Brentwood, TN 37027

RE:     In the Matter of:  Tri-Cities Holdings, LLC d/b/a Tres Treatment Center
                            Docket No. 25.00-122076

Enclosed is an Order rendered in connection with the above-styled case.

Administrative Procedures Division
Tennessee Department of State

/aem
Enclosure

The Department of State is an equal opportunity, equal access, affirmative action employer

IN THE MATTER OF:

TRI-CITIES HOLDINGS, LLC
d/b/a TREX TREATMENT CENTER

DOCKET NO: 25.00-122076J

CON Application No. CN1303-005D

## ORDER REVOKING PERMISSION TO APPEAR *PRO HAC VICE*

This matter is before the undersigned Administrative Judge to reconsider the *pro hac vice* application of attorney James Dunlap, Jr., licensed to practice law in the State of Georgia. Based upon the following Findings of Facts and Conclusions of Law, Mr. Dunlap's permission to appear *pro hac vice* in this matter is hereby revoked.

### FINDINGS OF FACT

1.    An appeal of the denial of a Certificate of Need (CON) for Tri-Cities Holdings, LLC, d/b/a Trex Treatment Center (Tri-Cities) was filed with the Secretary of State's Administrative Procedures Division on July 19, 2013.

2.    On July 29, 2013, attorney for Tri-Cities, Mr. James Dunlap, Jr., filed a letter with the Administrative Procedures Division requesting that the administrative appeal of the CON denial be stayed pending resolution of a related federal court action.

3.    On July 30, 2013, Mr. Dunlap, filed a Motion for Admission Pro Hac Vice. This Motion was granted by Order dated August 2, 2013.

4.    Conference calls were held with the Parties on July 31, 2013, and September 5, 2013. Mr. Dunlap and his local counsel Mr. Rick Piliponis of Nashville, Tennessee, participated in the calls on behalf of Tri-Cities. Attorney Jim Christoffersen participated on behalf of the Tennessee Health Services and Development Agency (HSDA).

5. During the September 5, 2013 conference call, Mr. Dunlap indicated that the issues being addressed in federal court would resolve the CON appeal and, again, requested that the administrative proceedings be stayed until a decision was made by the federal court on a pending motion for summary judgment which, according, to Mr. Dunlap, would be very shortly forthcoming.

6. Based upon Mr. Dunlap's representations, the request for stay of the administrative proceedings was granted, over the objections of Mr. Christoffersen.

7. Another conference call was scheduled for November 5, 2013, at which time neither Party had anything new to report.

8. Another conference call was scheduled for January 10, 2014. On January 8, 2014, an email inquiry about any new developments in the federal litigation was sent to Counsel for the Parties. Mr. Dunlap responded that there were no new developments as the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action. Mr. Christoffersen indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary. Based on the representations of Counsel, the January 10, 2014 conference call was cancelled.

9. No further update was provided by either Party until a Motion to Set for Hearing was filed on behalf of HSDA on March 7, 2014. Included with the Motion was a December 10, 2013 Order issued by Magistrate Judge Dennis Inman of the United States District Court of the Eastern District of Tennessee.

10. In the Order, Judge Inman provided the following history of the federal litigation – the case was first filed in April 2013 in the United States District Court for the Eastern District of Tennessee and was dismissed without prejudice on June 12, 2013, for lack of ripeness because

2

the administrative CON appeal had not yet been decided. The case was then filed by Tri-Cities in the United States District Court for the Middle District of Tennessee and was then transferred by the Judge back to the Eastern District. Discovery in that litigation has now been stayed, and a Motion to Stay the entire case is under consideration, again, to allow for resolution of the administrative proceedings.

11.     Judge Inman's Order states that, notwithstanding the dismissal with prejudice, "it is the law of this case that the plaintiffs [Tri-Cities] must procure, or at least attempt to procure, certain administrative remedies."

12.     Judge Inman expressed surprise that the CON appeal had been delayed at the request of Tri-Cities after having professed a need for an expeditious resolution.

13.     A response to the Motion to Set was provided by Mr. Dunlap on March 10, 2014, in which he, again, objected to setting the administrative matter for hearing prior to the resolution of the federal court litigation but also demanded a modification of the HSDA rules so that Tri-Cities may be granted a CON, apparently, without the formality of a hearing.

14.     In his Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act, Mr. Dunlap made the following statements –

> In addition, if this tribunal does "take HSDA's bait" and takes any action to decide this appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing, Petitioner respectfully indicates that it will have no choice but to join Your Honor, in an official capacity, and this tribunal, as defendants in the pending federal court action.

> Finally, Petitioner respectfully submits that, under the ADA, Your Honor and this tribunal are required to offer Petitioner a reasonable modification to allow the CON to be issued. Petition (sic) respectfully submits that Your Honor's and this tribunal's continuing failure to do this creates a cause of action that Petitioner may bring against Your Honor, and the tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents in an ADA enforcement action.

3

[T]his administrative appeal process amounts to a scheme or artifice to violate the ADA.

15.     Mr. Dunlap provided no information about the current status of the federal litigation.

## APPLICABLE LAW

1.     Rule 19 of the Tennessee Supreme Court provides the following requirements with respect to attorneys not licensed to practice law in Tennessee –

> A lawyer not licensed to practice law in Tennessee, licensed in another United States jurisdiction, and who resides outside Tennessee shall be permitted to appear pro hac vice, file pleadings, motions, briefs, and other papers and to fully participate in a particular proceeding before a trial or appellate court of Tennessee, or in a contested case proceeding before a state department, commission, board, or agency (hereinafter "agency"), if the lawyer complies with the following conditions:
>
> (a)     A lawyer not licensed to practice law in Tennessee and who resides outside Tennessee is eligible for admission pro hac vice in a particular proceeding pending before a court or agency of the State of Tennessee:
>
> (1)     if the lawyer is licensed, in good standing, and admitted to practice before the court of last resort in another state or territory of the United States or the District of Columbia in which the lawyer maintains a residence or an office for the practice of law;
>
> (2)     if the lawyer is in good standing in all other jurisdictions in which the lawyer is licensed to practice law; and
>
> (3)     if the lawyer has been retained by a client to appear in the proceeding pending before that court or agency.
>
> (b) In its discretion, a state court or agency may, in a particular proceeding pending before it, deny a lawyer's motion to appear pro hac vice only where:
>
> (1)     the applicant's conduct as a lawyer, including conduct in proceedings in Tennessee in which the applicant has appeared pro hac vice and conduct in other jurisdictions in which the lawyer has practiced, raises reasonable doubt that the lawyer will comply with the Tennessee Rules of Professional Conduct and other rules and law governing the conduct of lawyers who appear before the courts and agencies of the State of Tennessee; or

4

(2)   the applicant has engaged in such frequent appearances as to constitute regular practice in this state.

In any proceeding in which a state court or agency denies a lawyer's motion to appear pro hac vice, the court or agency shall set forth findings of fact and conclusions of law that constitute the grounds for its action. In addition, the court or agency shall send a copy of the order denying the motion to the Board of Professional Responsibility of the Supreme Court of Tennessee.

(c)   A lawyer admitted pro hac vice under this Rule may not continue to so appear unless all requirements of the Rule continue to be met. Admission granted under this Rule may be revoked by the court or agency granting such admission upon appropriate notice to the lawyer and upon an affirmative finding by the court or agency that the lawyer has ceased to satisfy the requirements of this Rule. In any proceeding in which a court or agency revokes an admission pro hac vice, the court or agency shall set forth findings of fact and conclusions of law that constitute the grounds for its action; in addition, the court or agency shall send a copy of the order revoking the admission pro hac vice to the Board of Professional Responsibility of the Supreme Court of Tennessee.

(d)   A lawyer seeking admission under this Rule shall file a motion in the court or agency before which the lawyer seeks to appear not later than the first occasion on which the lawyer files any pleading or paper with the court or agency or otherwise personally appears. In support of the motion, the lawyer shall file with the court or agency a certificate of good standing from the court of last resort of the licensing jurisdiction in which the lawyer principally practices and an affidavit by the lawyer containing the following information:

(1)   the lawyer's full name, residence address, office address, any registration or identifying number associated with the lawyer's licensure in each jurisdiction in which the lawyer is licensed, the full name or style of the case in which the lawyer seeks to appear, and the name of the client or clients the lawyer seeks to represent;

(2)   the jurisdictions in which the lawyer is or has been licensed to practice law, with dates of admission, and any other courts before which the lawyer has been or is generally admitted to practice (including, for example, membership in the bar of a United States District Court), with dates of admission, and a statement by the lawyer that the lawyer is in good standing in all other jurisdictions in which the lawyer is licensed to practice law;

(3)   the full name or style of each case in which the lawyer has been admitted or sought to be admitted pro hac vice in any court or agency of the State of Tennessee within the preceding three years, the date of any such

5

admission or the date of any such motion that was filed but not granted, and the status of any such case in which the lawyer was admitted;

(4) a statement concerning whether the lawyer has been denied admission pro hac vice or has had an admission pro hac vice revoked by any court in any jurisdiction and, if so, a full description of the circumstances, including the full name or style of the case;

(5) a statement concerning whether the lawyer has ever been disciplined or sanctioned by the Board of Professional Responsibility of the Supreme Court of Tennessee, by any similar lawyer disciplinary agency in any jurisdiction, or by any similar lawyer disciplinary authority (including, for example, any United States District Court), and, if so, a full description of the circumstances, including the full name or style of the matter;

(6) a statement concerning whether any disciplinary action or investigation concerning the lawyer's conduct is pending before the Board of Professional Responsibility of the Supreme Court of Tennessee, before any similar lawyer disciplinary agency in any jurisdiction, or before any similar lawyer disciplinary authority (including, for example, any United States District Court), and, if so, a full description of the circumstances, including the full name or style of the matter;

(7) a statement that the lawyer is familiar with the Tennessee Rules of Professional Conduct and the rules governing the proceedings of the court or agency before which the lawyer seeks to practice;

(8) a statement by the lawyer that the lawyer consents to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts or agencies of Tennessee in any matter arising out of the lawyer's conduct in the proceeding and that the lawyer agrees to be bound by the Tennessee Rules of Professional Conduct and any other rules of conduct applicable to lawyers generally admitted in Tennessee;

(9) the name, address, telephone number, and Board of Professional Responsibility's registration number of a lawyer with whom the lawyer is associated in accordance with Section (g) of this Rule;

(10) a statement that the lawyer has paid all fees required by this Rule in connection with the motion for admission;

(11) at the option of the lawyer, any other information supporting the lawyer's admission; and

6

(12)    a statement indicating service of the motion and all associated papers upon all counsel of record in the proceeding and upon the Board of Professional Responsibility of the Supreme Court of Tennessee.

(e)    A lawyer who seeks or is granted admission under this Rule shall be subject to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts and agencies of Tennessee in any matter arising out of the lawyer's conduct in the proceeding.

(f)    At or before the time the lawyer files a motion for admission and supporting papers under this Rule with the court or agency before which the lawyer seeks admission, the lawyer shall file with the Board of Professional Responsibility of the Supreme Court of Tennessee a copy of the motion and supporting papers filed under this Rule and shall pay to the Board a fee in an amount the total of which equals the fees required of Tennessee lawyers under Tennessee Supreme Court Rule 9, Section 20.1, Tennessee Supreme Court Rule 25, Section 2.01, and Tennessee Supreme Court Rule 33.01(C). This fee shall be used for purposes set forth in these respective Rules, and the Board of Professional Responsibility shall collect and remit the appropriate portion of any such fee to the Tennessee Lawyers' Fund for Client Protection and the Tennessee Lawyers Assistance Program. No applicant for admission under this Rule shall be required to pay more than one total fee in any one calendar year. All fees under this Rule shall be waived if the lawyer will not charge an attorney's fee in the proceeding; in such cases, however, the lawyer still must comply with the filing requirement of this paragraph.

(g)    A motion for admission pro hac vice under this Rule shall not be granted unless the lawyer is associated in the proceeding with a lawyer licensed to practice law in Tennessee, in good standing, admitted to practice before the Supreme Court of Tennessee, and who resides in and maintains an office in Tennessee. Both the Tennessee lawyer and the lawyer appearing pro hac vice shall sign all pleadings, motions, and other papers filed or served in the proceeding; the Tennessee lawyer, or another Tennessee lawyer acting on behalf of the first Tennessee lawyer at his or her request, shall personally appear for all court or agency proceedings, including all proceedings conducted pursuant to the authority of the court or agency, unless excused by the court or agency. The court or agency may establish conditions relating to the participation of associated counsel in an order granting admission under this Rule or otherwise.

(h)    A trial or intermediate appellate court's denial of a motion to appear pro hac vice pursuant to paragraph (b), or a trial or intermediate appellate court's revocation of admission pro hac vice pursuant to paragraph (c), may be appealed pursuant to Rule 10, Tenn. R. App. P. An agency's denial of a motion to appear pro hac vice pursuant to paragraph (b), or an agency's revocation of admission pro hac vice pursuant to paragraph (c), may be appealed by filing a petition for judicial review pursuant to Tenn. Code Ann. § 4-5-322. A lawyer whose

7

admission pro hac vice is denied or revoked by the Supreme Court of Tennessee may seek a rehearing on that issue pursuant to Rule 39, Tenn. R. App. P.

2. Rule 3.3 of the Tennessee Rules of Professional Conduct specifies the following with respect to candor towards the Tribunal –

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal; or . . . . . .

3. Rule 3.5 of the Tennessee Rules of Professional Conduct provides the following prohibition –

A lawyer shall not:

(a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law;

4. Tenn. Code Ann. § 39-14-112 defines Extortion as follows -

(a) A person commits extortion who uses coercion upon another person with the intent to:

(1) Obtain property, services, any advantage or immunity; or

(2) Restrict unlawfully another's freedom of action.

5. Rule 8.4 of the Tennessee Rules of Professional Conduct provides the following with respect to misconduct –

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence a tribunal or a governmental agency or official on grounds unrelated to the merits of, or the procedures governing, the matter under consideration;

8

(f)     knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law; or

(g)     knowingly fail to comply with a final court order entered in a proceeding in which the lawyer is a party, unless the lawyer is unable to comply with the order or is seeking in good faith to determine the validity, scope, meaning, or application of the law upon which the order is based.

## CONCLUSIONS OF LAW

1.      From the outset, Mr. Dunlap requested a stay of this administrative proceeding on behalf of Tri-Cities until after the related federal court action was resolved. He never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings.

2.      Notwithstanding the recent indication from the federal court that the CON appeal should be resolved before the federal issues are addressed, Mr. Dunlap still insists that the stay of these proceedings should remain in place, and has threatened to join the Administrative Judge and this tribunal in the federal court action should the stay of the administrative proceedings be lifted and the CON appeal be set for hearing.

3.      In addition, Mr. Dunlap is now demanding that this tribunal grant the requested modifications of HSDA rules and the disputed CON even though the HSDA's obligation to provide this relief is yet to be determined, either by this tribunal or in the federal courts. Mr. Dunlap's demand includes an unveiled threat that the Administrative Judge and the tribunal will face an ADA enforcement action by the Department of Justice should the Administrative Judge fail to provide the requested relief.

4.      Mr. Dunlap has misrepresented to this tribunal the status of the federal litigation and has used this misrepresentation to attempt to coerce a decision by this tribunal in favor of his client without the benefit of the administrative hearing, which he demands must remain stayed.

9

5. Mr. Dunlap's coercion and misrepresentations are a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tenn. Code Ann. § 39-14-112.

6. Mr. Dunlap has expressed contempt for this tribunal and these administrative proceedings, thus, there is no apparent purpose for his continued participation.

7. Mr. Dunlap's actions have unnecessarily impeded a resolution of the CON appeal and have breached the conditions on which he was granted *pro hac vice* admission to practice law in Tennessee. In accordance with Rule 19(c), Mr. Dunlap's permission to appear in this matter *pro hac vice* is appropriately and necessarily revoked.

**IT IS THEREFORE ORDERED** that the permission to appear in this matter *pro hac vice* previously granted to James Dunlap, Jr., Esq., is hereby revoked. As required by Rule 19(c), a copy of this Order will be sent to the Board of Professional Responsibility of the Supreme Court of Tennessee. Mr. Piliponis will main counsel of record to represent the interests of Tri-Cities in this matter.

All other matters are reserved.

It is so ORDERED, entered and effective this the 14th day of March, 2014.

KIM SUMMERS
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

10

# EXHIBIT 3

BEFORE THE
TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY

Tri-Cities Holdings LLC      )
d/b/a Trex Treatment Center   )    DOCKET NO. T.B.A.
                                  )    CON No. CN1303-005D
_____  )
                                  )


# PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKING PERMISSION TO APPEAR *PRO HAC VICE*

Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# Contents

Argument and Citation of Authority ................................................................................3

    A.    The Court's Conclusion of Law that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect. ......................................................3

    B.    The Court's allegation that Mr. Dunlap concealed that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect...........................5

    C.    Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case. ..........................................................................7

    D.    The Court should not retaliate against Mr. Dunlap because he advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA. ..............10

    E.    Petitioner *at all times respectfully* asserts that the ADA applies to the Court, a state agency, and *supreme* federal law places upon the Court an obligation to provide TCH with a reasonable modification of its rules to allow the issuance of a CON. ..............................................11

    F.    The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law........................................13

    G.    Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur. ...................................14

    H.    In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge." .....................................................................15

    I.    In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."............................................................................................16

    J.    Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and he has not breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."...............................................................................................17

Conclusion.......................................................................................................17

Plaintiffs Tri-Cities Holdings LLC ("TCH""). Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby files this Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice* of James A Dunlap Jr. and states as follows:

## Argument and Citation of Authority

Firstly, Petitioner respectfully asks the Court to withdraw its March 14, 2014 Order until a hearing on these allegations can be scheduled. The Court's Order was issued *sua sponte* without any notice or opportunity for Petitioner or Petitioner's attorney to read, respond, test, or confront the factual or legal sufficiency of the Order's Findings of Fact or Conclusions of Law. Suddenly ejecting Petitioner's counsel from this case *without a hearing* causes severe prejudice to Petitioner's case and ability to protect its rights. Until such time as this Court allows Petitioner to challenge these findings with argument, evidence, and testimony, Petitioner asks that Mr. Dunlap be reinstated into the case.

**A. The Court's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect.**

First and foremost, in paragraph 1 of its Conclusions of Law, p. 9, this Court makes, *sua sponte*, a conclusion of law against Mr. Dunlap that he did not disclose the dismissal on ripeness grounds of the *Tri-Cities I* [1] case and that he concealed that the federal court was subject to a stay in deference of the administrative proceeding, holding:

> "He never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings."

---

[1] *Tri-Cities Holdings LLC et al. v. City of Johnson City et al.*, Case No. 2:13-CV-108 (E.D. Tenn).

3

*March 14, 2014 Order, p. 9.* Both of these allegations are extremely serious and, presumably, under the right factual scenario, could carry the penalty of disbarment. The Court made this Conclusion of Law, and barred Mr. Dunlap as counsel from this proceeding, without providing Mr. Dunlap notice of the finding beforehand or asking Mr. Dunlap to respond.

Of course, *Tri-Cities I* was the previous action filed in federal court after Johnson City denied TCH's application for rezoning to establish an Opiate Treatment Program in Johnson City. Even before TCH filed its administrative appeal, *Tri-Cities I* had been dismissed by the federal court without prejudice, allowing the plaintiffs in that action to refile the action, which they did. All issues in *Tri-Cities I* were maintained in *Tri-Cities II*[2] along. importantly here. with additional claims against HSDA arising from the denial of the Certificate of Need.

First, the allegation that Mr. Dunlap failed to disclose *Tri-Cities I* is patently incorrect. On July 29, 2013, Mr. Dunlap sent a copy of the Tri-Cities II Complaint to Judge Summers along with his letter ("I'm attaching a copy of the federal complaint"). This was done to assist Judge Summers in understanding the issues in the federal action. The Complaint clearly and unambiguously identifies *Tri-Cities I* and its dismissal without prejudice on ripeness grounds:

> **Tri-Cities Holdings et al. v. Johnson City et al., Case No. 13-cv-108 (E.D. Tenn. 2013)(case dismissed without prejudice on ripeness grounds).**

See Tri-Cities I, Doc. 1, p. 32, n. 67 (emphasis added). Furthermore, the Complaint in *Tri-Cities II* clearly and unambiguously references evidence and testimony from *Tri-Cities I* multiple times.

There was no concealment by Mr. Dunlap. It is undisputed that he gave this Court a copy of the *Tri-Cities II* Complaint which clearly and unambiguously references. including the court.

---

[2] *Tri-Cities Holdings LLC et al v. HSDA et al., Case No. 2:13-CV-305 (E.D. Tenn).*

4

caption, and a specific and fairly crafted parenthetical reference that Tri-Cities I was "dismissed without prejudice on ripeness grounds." *Id.* Thus, Mr. Dunlap has disclosed the nature and outcome of *Tri Cities I.* Therefore, the grounds for revoking Mr. Dunlap's *Pro Hac Vice* admission based on any alleged concealment is clearly not applicable in this case.

In any event, Mr. Dunlap had no *obligation* to disclose *Tri-Cities I.* That case was over. It had been dismissed without prejudice allowing all issues to be raised in a new proceeding. Despite not having an obligation to disclose a dismissed case to the Court, the existence of *Tri Cities I* was fully disclosed to the Court in writing as part of the underlying refiled Complaint. The Court cannot claim that it was unaware of *Tri Cities I* because it has written notice of the action. Further, the dismissed and no-longer-pending *Tri Cities I* was *completely irrelevant* to these administrative proceedings. This administrative appeal involves the denial of TCH's application for a Certificate of Need. *Tri-Cities I* did not involve any claims arising from the denial of the Certificate of Need. *Tri-Cities I* did not involve any claims arising in the administrative proceeding against HSDA. HSDA was not even a party to *Tri-Cities I.* It is undisputed that Mr. Dunlap disclosed the pending *relevant* federal case *at all times*, beginning with his first correspondence with the Court in July, 2013. See Exhibit 1 (beginning with the caption of the letter). In sum, Mr. Dunlap did not commit misconduct, and therefore should not be punished, for not disclosing an irrelevant, dismissed prior proceeding to this Court.

**B. The Court's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect.**

The Court makes, in its *sua sponte* Order without notice or opportunity for the Petitioner to advise or counter the arguments of the Court, a conclusion of law in its basis to revoke Mr.

Dunlap's *Pro Hac Vice* admission that he concealed to the Court that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding." This is incorrect.

The federal case is not and never has been "subject to a stay in deference to the administrative proceeding". The Magistrate's December 20, 2013 Order [Doc. 135] (Exhibit 2) was on a motion to stay discovery. ("The Motion to Stay Discovery, Doc. 100, is GRANTED....").[3]

The Magistrate's January 2, 2014 Order stayed the case specifically to give Defendants more time to respond to Plaintiffs' Motion for Summary Judgment. See *Tri-Cities II*, Doc. 150 (Exhibit 3). The Order giving Defendants additional time to respond was subject to being lifted at "a moment's notice:"

> By motion filed as document 139, the defendants have filed <u>a motion for additional time to respond to the plaintiffs' motion for partial summary judgment</u>. Their motion is GRANTED only to the following extent.

> If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. <u>If, however, the district judge denies the motion to stay the case, the stay of discovery will be lifted as of that moment,</u> [1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

Therefore, there is not, and never has been, any stay in the federal court "in deference to the administrative proceedings," <u>because it was never stayed on that basis</u>. These orders never stayed the federal court in some kind of suspended mode pending a decision on the administrative appeal.

---

[3] "As a part of the discussion in the Magistrate's Order, the Court said, "The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals." December 10, 2013 Order [Doc. 135]. But such *dicta* in an order granting a <u>stay in discovery</u> cannot be interpreted to operate as stay of the federal action pending an outcome of the administrative proceeding.

6

The factual premise is false. Therefore, the Court's *sua sponte* finding related to Mr. Dunlap's fraud or concealment of *Tri-Cities I* and an alleged stay of the federal court "in deference to the administrative proceeding" is unsupported.

## C. Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case.

Petitioner disputes that Mr. Dunlap committed any misconduct when he responded to a January 8, 2014 inquiry "that there were no new developments" because the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action. By that statement, Mr. Dunlap intended to represent that there had been no decision by the federal court either way on these motions. This was entirely correct. Mr. Dunlap interpreted the Court's continuing stays in its proceedings, enacted multiple times, that this Court was waiting for the federal court to decide the dispositive motions, whenever that would occur. Additionally, HSDA was fully aware of Mr. Dunlap's opinion (being copied simultaneously on emails to Judge Summers). HSDA could challenge Mr. Dunlap's opinion at any time. HSDA never did.

There was no "new development," as far as Mr. Dunlap could tell (and HSDA apparently agreed), in so far as the federal court was proceeding, in a prompt and expeditious matter, to make a decision on the various motions which potentially would render the administrative proceeding moot. In fact, on that same day, HSDA, through counsel, offered its own opinion of the federal case, contrary to Mr. Dunlap's, there were in fact "new developments" and "indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary." " Mr. Christoffersen, being General Counsel for HSDA, was fairly perceived, by Mr. Dunlap and this Court, to be in constant contact with, and updated by, HSDA's attorney Sue Sheldon and Sara Sedgewick as to what was going on in the federal case.

7

Counsel for HSDA in this action obviously has immediate access to federal court filings. Indeed, he appears to send them to this Court within minutes of filing in the federal case (for example, as Mr. Christoffersen did when he received and forwarded the federal court's request for a status report on March 11, 2014). Any "new developments" update as it was represented to this court by HSDA through counsel never materialized. Above all, there was never any intent on Mr. Dunlap's part to misrepresent the status of the federal action. From the outset, Mr. Dunlap has always asked that the administrative appeal be stayed pending a resolution of the federal case—and he's told that to both this Court and the federal court without fail.

In any event, the federal court order staying discovery [Doc. 135] was <u>clearly inconsequential</u> from the standpoint that Plaintiffs' Motion for Summary Judgment and the Defendants' Motions to Dismiss did not rely on any disputed facts on issues. Plaintiffs' motion rested on, for example, Johnson City's and HSDA's blatantly illegal zoning ordinance and notice rule, where there was no factual dispute. The Defendants' Motions to Dismiss did not rely on any disputed issues. So the motions in federal court were poised for prompt decision <u>with or without discovery</u>. HSDA apparently agreed with Mr. Dunlap because this was never brought to the attention of the Court on or after the January 10, 2014 telephone conference.

The administrative proceeding had been stayed several times before the scheduled January 10, 2014 telephone conference with the Court. Neither Mr. Dunlap nor HSDA, through its counsel, objected to a continuing delay in the administrative proceeding to allow time for the federal court to make a decision on the pending motions. The decision to allow the federal court to consider dispositive motions is further well-grounded in principles of judicial economy. Any of the inconsequential orders of the federal court – an order suspending discovery that would in no

8

way stop the federal court from deciding the pending motions, and an order giving as little as 30 days additional time for The Defendants to respond to Plaintiffs' Motion for Summary Judgment --- do not upset in any way this Court's long-past decision to simply wait for the federal court. In that respect there were no "new developments." It is highly unlikely that this Court would have, all of a sudden, decided to schedule a full-blown final hearing simply because the federal court had given the Defendants an additional thirty days or so to respond to Plaintiffs' Motion for Summary Judgment or stayed discovery in the underlying federal action.

Any additional time the federal court had given the Defendants to respond to Plaintiffs' Motion for Summary Judgment was, in accordance with its terms, expected to be for a *reasonable time* (i.e., a reasonably *short and most likely very short time*) and, therefore, should not cause unreasonable delay in the consideration of the pending Motion for Summary Judgment and the Motions to Dismiss. HSDA, through its counsel, apparently agreed with Mr. Dunlap and did not mention it. The statement there were "no new developments" was certainly subject to a contrary opinion of HSDA, HSDA being a party to the federal court action; however HSDA, by not articulating any contrary opinion, apparently agreed with Mr. Dunlap. Certainly, HSDA did not offer any new developments when faced with the exact same inquiry from this court.

HSDA did not offer any opinion on new developments in the federal case, and could not reasonably qualify its opinion by claiming either lack of knowledge of the status of the federal case or any reliance solely upon Mr. Dunlap for the status of the federal case. To the contrary, HSDA implicitly and explicitly represented to the Court, and to Mr. Dunlap, that it was knowledgeable of the status of the federal case and that there were "no new developments" because none were offered.

9

Furthermore, HSDA's attorneys read the December 10, 2013 Magistrate's Order and HSDA's attorneys obviously felt there was nothing to advise regarding the status of the administrative proceeding because they did exactly what Mr. Dunlap did. HSDA was a party to the federal case and the administrative proceeding, HSDA had access to all court proceedings and filings, and HSDA was free to object to Mr. Dunlap's opinion that there were no "new developments" at any time. HSDA could have moved for a hearing date to be set based on whatever "new developments" they felt were relevant. Mr. Dunlap provided the Court with the exact same information that HSDA was giving the court.

**D. The Court should not retaliate against Mr. Dunlap because he, in good faith, advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA.**

Petitioner certainly intended no affront the Court when advising it that it is subject to the ADA. This is simply petitioner's position. Mr. Dunlap would be failing to represent his client diligently and effectively unless he did what he did: (1) Advise the Court of the application of the ADA, (2) advise the Court of its duties under the ADA; and (3) advise the Court of his potential adverse position of being a plaintiff in an action against the Court or that the Court would be subject to a potential DOJ enforcement action if it violated the ADA. In fact, Mr. Dunlap would be violating his duties to this client if he had not advanced these positions in this case.

Petitioner denies the finding that Mr. Dunlap showed "contempt for the proceeding" at Conclusions of Law, para. 6. On the contrary, Petitioner would welcome a full and frank discussion of the issues in the case and the opportunity to be heard on these issues. Mr. Dunlap asserted in good faith that Johnson City and HSDA are attempting to have this Court somehow "exorcise" their ADA violations in this case -- which this Court cannot do. This is in clear

10

accordance with federal law. Further, the federal court is the most appropriate forum in the case and that this Court should naturally defer to the federal court on issues of interpretation of federal law such as those raised herein. The use of forceful prose in making these points in not intended to be disrespectful and clearly cannot be coercion. The Court is well aware of the law and cannot claim that the Petitioner's interpretation of the law and their belief of possible liability is somehow a threat to the Court. The court is not a layperson relying upon the Petitioner's attorney to determine their liability.

It is obvious that the Administrative Procedures Division like all Tennessee state agencies--is subject to the ADA. This Court should not retaliate against Mr. Dunlap for fairly asserting his clients' ADA rights.

**E. Mr. Dunlap asserts that the ADA applies to the Court, a state agency, and *supreme federal law* places upon the Court an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON.**

Petitioner *respectfully (as always)* asserts that Mr. Dunlap would be violating his duties to his client if he failed to assert his clients' ADA rights in this regard. Simultaneously, Mr. Dunlap owes a duty of candor to this Court (Rule 3.3 of Rules of Professional Responsibility) and to his clients. He should not be sanctioned for attempting to properly achieve this balance.

> As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [3]. Mr. Dunlap had a clear duty to zealously advance his clients' interests in what amounts to a civil rights action. It is undisputed that his individual clients are facing almost daily threat of death or serious injury while being forced to drive hundreds of miles from the Johnson City area to standard of care treatment facilities in North Carolina. Mr. Dunlap's sitting silent, or

11

engaging in mouse-like behavior to avoid "offending the Court," would have clearly violated this

duty of zealous representation.

> In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an ethical person while earning a satisfactory living. The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these Rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules. These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests, within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's

Responsibilities [10] (emphasis added). Thus, Mr. Dunlap, like all petitioners asserting rights

against States and State agencies, faces an unavoidable conflict providing zealous representation

within the bounds of the law. He has not failed to properly balance these duties.

> Further, the Rules of Professional Conduct specifically contemplate a lawyer to be a

zealous advocate for his client when the opposing party is well-represented by counsel. The Rules

provide:

> A lawyer's responsibilities as a representative of clients, an officer of the legal system, and a public citizen are usually harmonious. Thus, when an opposing party is well represented, a lawyer can be a zealous advocate on behalf of a client and at the same time assume that justice is being done.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's

Responsibilities [9] (emphasis added). Surely HSDA, and the Court, are "well-represented." The

Rules of Professional Conduct implicitly require Mr. Dunlap to be a "zealous advocate" for his

client's rights without the threat of facing banishment from the process without a hearing or

12

opportunity to be heard. Zealous advocacy involves making the Court aware, in frank terms, that it has duties under the ADA.

## F. The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law.

The Court should not retaliate against Mr. Dunlap for pointing out to the Court, and simultaneously providing voluminous legal authority, that the Court could be in violation of federal law. The Court has the ability to discern whether it believes this to be an accurate statement of the law. It continues to be petitioner's position that HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[4] In this case, in Mr. Dunlap's good faith opinion, supported by existing caselaw, HSDA and Johnson City are trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's alleged violations of federal law.

---

[4] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening*, 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.*, 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory procedural requirements themselves violate the FHAA: the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See. e.g., *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565. 573 n.4 (2d Cir. 2003).

13

Mr. Dunlap, in courteous fashion, has made multiple attempts to outline for the Court the scope and effect of the ADA and its possible implications on this administrative proceeding. First, on July 28, 2013, Mr. Dunlap set forth the ADA the legal requirement for all state agencies to attempt a reasonable modification to allow TCH to locate its clinic in Johnson City. See Exhibit 1. Second, on July 29, 2013, Mr. Dunlap requested such a reasonable modification. See Exhibit 4. Third, on March 12, 2014, Mr. Dunlap outlined the federal law, with voluminous citations, and made a request for a reasonable modification in a letter. See Exhibit 5. Fourth, on March 12, 2014, again in courteous fashion, Mr. Dunlap outlined federal law and made a request for a reasonable modification in Petitioner's Objection to the Motion to Set Hearing and Demand for Reasonable Modification. See Exhibit 6.

More than four times, Mr. Dunlap presented his well-researched position (including voluminous legal citations and copying opposing counsel) to this Court. Mr. Dunlap is not taking a frivolous position. Mr. Dunlap's duty to his clients and to this Court obligates him to make the Court fully aware of the ADA and that Court would likely run afoul of federal law if it takes certain steps. Mr. Dunlap should not be sanctioned for simply *and respectfully* making the Court aware it might be violating federal law.

G. **Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur.**

Mr. Dunlap did not fail to advise that that the federal court was *deferring* to the administrative proceeding because that was never the case. Mr. Dunlap did not interpret the statements in the Magistrate's December 10, 2013 Order regarding the administrative proceeding

14

as ever imposing a stay on the proceeding to allow this administrative appeal to proceed. Petitioner respectfully submits that, in any event, this holding would be contrary to federal law that does not require TCH to pursue administrative remedies before filing an ADA Title II action.[5]

## H. In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge."

Petitioner respectfully represents that advising the Court on applicable federal law and the Court's responsibility thereunder does not constitute "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tennessee Code Ann. § 39-14-112. Advising the Court of federal law, while copying opposing counsel, does not amount to improper influence or coercion.

Rule 3.3 of the Tennessee Rules of Professional Conduct requires "candor toward the tribunal." In this respect, Mr. Dunlap has fulfilled his duty and in no way has breached his duty. Mr. Dunlap, supported by substantial legal authority that he has shared with the Court (copying opposing counsel at all times) in well-researched letters and filings, simply pointed out to the Court

---

[5] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion requirement); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding, under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990) (same).

that it may be subject to the ADA and that his clients' positions had become adverse to the Court from a legal perspective. To fail to do so would have violated this rule, rather than honoring it.

Rule 3.4 of the Tennessee Rules of Professional Conduct requires "fairness to opposing party and counsel." In this regard, Petitioner submits that Mr. Dunlap has not violated this provision in any respect. Mr. Dunlap has always conducted himself with view to fairness toward the other side in this matter. Opposing party and counsel have been copied on every correspondence with the Court and obviously they are a party to the underlying federal action.

Rule 8.4 of the Tennessee Rules of Professional Conduct describe to a wide range of potential misconduct generally described as "dishonesty, fraud, deceit, or misrepresentation." As set forth herein, Petitioner submits that in no way has Mr. Dunlap violated Rule 8.4. At all times, Mr. Dunlap has been completely forthright with this Court and in no way has committed any "dishonesty, fraud, deceit, or misrepresentation."

I. **In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."**

Petitioner respectfully disputes that Mr. Dunlap "expressed contempt for this tribunal and these administrative proceedings resulting in no apparent purpose for his continued participation." On the contrary, Mr. Dunlap's thoroughly-researched position, expressed in good faith, that the ADA applies to this Court and that this Court has certain obligations under federal law serves merely to advise the Court of Petitioner's position. Mr. Dunlap would be violating his duty, to his client and to this Court, by remaining silent if he, in good faith, believed that this Court was violating federal law.

16

**J. Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."**

Petitioner respectfully submits that, in fact, Mr. Dunlap has appropriately fulfilled his duties both to his clients and to this Court. He has done so by respectfully, but firmly and forthrightly, explaining his clients' adverse position with this Court related to the ADA. Simply laying this position out to the Court in a respectful manner is completely appropriate and in no way violates any Rule of Professional Responsibility or state law. Mr. Dunlap should not be retaliated against for fulfilling his duty of candor to the Court.

## Conclusion

(a) Petitioner *respectfully (as always)* denies each and every allegation of misconduct, violation of Rules of Professional Conduct, or violation of law, by Mr. Dunlap contained in the Court's March 14, 2014 Order.

(b) Petitioner *respectfully (as always)* asks the Court to rescind its March 14, 2014 Order and otherwise withdraw said Order.

(c) Finally, Petitioner *respectfully (as always)* asserts that Mr. Dunlap is a competent and careful attorney, appropriately cognizant of his duties both to his clients and this Court, and that Mr. Dunlap should be allowed to represent TCH in this administrative proceeding.

Dated: March 21, 2014

_____
Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201

17

Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com


Counsel for Petitioner

18

AFFIDAVIT OF JAMES A. DUNLAP JR.

STATE OF GEORGIA
COUNTY OF FULTON

I, JAMES A. DUNLAP JR., after first being duly sworn, state under oath that I am over age of 18 years of age, that I am legally competent to testify, and that this Affidavit is based on my personal knowledge.

1.      The facts contained in the foregoing PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKINGPERMISSION TO APPEAR PRO HAC VICE are true and correct to the best of my knowledge, information, and belief.

Further the Affiant sayeth naught.

_James A. Dunlap Jr._

Sworn to and subscribed before me, a Notary
Public, this the _20_ day of _MARch_,
20_14_, witness my hand at office in the
County of _Fulton_,
State of Georgia.

NOTARY PUBLIC

My commission expires _12/27_, _2014_.

21

# CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2014, a copy of the foregoing document(s) was served by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

_____
Richard D. Piliponis

# EXHIBIT 4

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

July 29, 2013

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:    **Tri-Cities Holdings LLC d/b/a Trex Treatment Center**
       **CON #1303-005D**
       **Docket No.: T.B.A.**

       **Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and
Development Agency, et al.**
       **United States District Court (M.D. Tenn.)**
       **Case No. 3:13-cv-669**

Dear Judge Summers:

Since Mr. Christoffersen refused to consent to a stay of the administrative appeal in his letter dated today, I would respectfully move for you to stay this administrative appeal process pending resolution of the federal court action. The administrative appeal claims are included as pendant claims in Counts 13 and 14 in the federal complaint. I'm attaching a copy of the federal complaint.

Mr. Christoffersen contends there is a requirement for TCH to exhaust its administrative remedies before pursuing the federal action. However, I would note that federal courts clearly hold there is no need to exhaust administrative remedies to bring a claim under the ADA or the Rehabilitation Act.[1] I would also again note that

---

[1] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297. 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding,

federal law is supreme and controlling over any and all state law or rules of procedure and in no way relieves the State of Tennessee, HSDA, or Johnson City from their affirmatives duties to comply with the ADA and the Rehabilitation Act and which they are clearly in violation of at present.[2]

Again, the present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the Proposed Service Area every three days). By copy of this letter I am again respectfully asking you, HSDA, and Johnson City to provide a reasonable modification under the ADA and the Rehabilitation Act to allow TCH to locate its OTP clinic in Johnson City.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:   Jim Christoffersen, General Counsel HSDA (via email)
      Erick Herrin, City Attorney for Johnson City, TN (via email)

---

under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.,* 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir. 1990) (same).
[2] *Tennessee v. Lane,* 541 U.S. 509 (2004).

# EXHIBIT 5

**Law Offices**
**James A. Dunlap Jr. & Associates LLC**
**310 Windsor Gate Cove NE**
**Atlanta, Georgia 30342**

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

April 8, 2014

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:     **Tri-Cities Holdings LLC d/b/a Trex Treatment Center**
**CON #1303-005D**
**Docket No.: T.B.A.**

**Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and**
**Development Agency, et al.**
**United States District Court (M.D. Tenn.)**
**Case No. 3:13-cv-669**

Dear Judge Summers:

Since Mr. Christoffersen refused to consent to a stay of the administrative appeal in his letter dated today, I would respectfully move for you to stay this administrative appeal process pending resolution of the federal court action. The administrative appeal claims are included as pendant claims in Counts 13 and 14 in the federal complaint. I'm attaching a copy of the federal complaint.

Mr. Christoffersen contends there is a requirement for TCH to exhaust its administrative remedies before pursuing the federal action. However, I would note that federal courts clearly hold there is no need to exhaust administrative remedies to bring a claim under the ADA or the Rehabilitation Act.[1] I would also again note that

---

[1] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding,

federal law is supreme and controlling over any and all state law or rules of procedure and in no way relieves the State of Tennessee, HSDA, or Johnson City from their affirmatives duties to comply with the ADA and the Rehabilitation Act and which they are clearly in violation of at present.[2]

Again, the present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the Proposed Service Area every three days). By copy of this letter I am again respectfully asking you, HSDA, and Johnson City to provide a reasonable modification under the ADA and the Rehabilitation Act to allow TCH to locate its OTP clinic in Johnson City.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:   Jim Christoffersen, General Counsel HSDA (via email)
      Erick Herrin, City Attorney for Johnson City, TN (via email)

---

under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.,* 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir. 1990) (same).
[2] *Tennessee v. Lane,* 541 U.S. 509 (2004).

# EXHIBIT 6

| | | |
|---|---|---|
| **Tri-Cities Holdings LLC** | ) | |
| **d/b/a Trex Treatment Center** | ) | **DOCKET NO. T.B.A.** |
| | ) | **CON No. CN1303-005D** |
| | ) | |
| | ) | |

## PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKING PERMISSION TO APPEAR *PRO HAC VICE*

Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# Contents

Argument and Citation of Authority .................................................................................3

A.     The Court's Conclusion of Law that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect. ......................................3

B.     The Court's allegation that Mr. Dunlap concealed that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect............................5

C.     Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case. .................................................................................7

D.     The Court should not retaliate against Mr. Dunlap because he advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA..............10

E.     Petitioner *at all times respectfully* asserts that the ADA applies to the Court, a state agency, and *supreme* federal law places upon the Court an obligation to provide TCH with a reasonable modification of its rules to allow the issuance of a CON. ...........................................11

F.     The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law......................................13

G.     Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur. ...................................14

H.     In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge." ...............................................................15

I.     In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."...............................................................................................16

J.     Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and he has not breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."......................................................................................17

Conclusion............................................................................................................17

Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 268 of 396   PageID #: 1965

246

Plaintiffs Tri-Cities Holdings LLC ("TCH"""), Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby files this Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice* of James A Dunlap Jr. and states as follows:

### Argument and Citation of Authority

Firstly, Petitioner respectfully asks the Court to withdraw its March 14, 2014 Order until a hearing on these allegations can be scheduled. The Court's Order was issued *sua sponte* without any notice or opportunity for Petitioner or Petitioner's attorney to read, respond, test, or confront the factual or legal sufficiency of the Order's Findings of Fact or Conclusions of Law. Suddenly ejecting Petitioner's counsel from this case *without a hearing* causes severe prejudice to Petitioner's case and ability to protect its rights. Until such time as this Court allows Petitioner to challenge these findings with argument, evidence, and testimony, Petitioner asks that Mr. Dunlap be reinstated into the case.

### A. The Court's allegation that Mr. Dunlap intentionally and fraudulently concealed the existence and outcome of *Tri-Cities I* is incorrect.

First and foremost, in paragraph 1 of its Conclusions of Law, p. 9, this Court makes, *sua sponte,* a conclusion of law against Mr. Dunlap that he did not disclose the dismissal on ripeness grounds of the *Tri-Cities I* [1] case and that he concealed that the federal court was subject to a stay in deference of the administrative proceeding, holding:

> "He never disclosed to this tribunal that the federal litigation had previously been dismissed for lack of ripeness or that it was now, itself, subject to a stay in deference to the administrative proceedings."

---

[1] *Tri-Cities Holdings LLC et al. v. City of Johnson City et al.,* Case No. 2:13-CV-108 (E.D. Tenn).

3

*March 14, 2014 Order, p. 9.* Both of these allegations are extremely serious and, presumably, under the right factual scenario, could carry the penalty of disbarment. The Court made this Conclusion of Law, and barred Mr. Dunlap as counsel from this proceeding, without providing Mr. Dunlap notice of the finding beforehand or asking Mr. Dunlap to respond.

Of course, *Tri-Cities I* was the previous action filed in federal court after Johnson City denied TCH's application for rezoning to establish an Opiate Treatment Program in Johnson City. Even before TCH filed its administrative appeal, *Tri-Cities I* had been dismissed by the federal court without prejudice, allowing the plaintiffs in that action to refile the action, which they did. All issues in *Tri-Cities I* were maintained in *Tri-Cities II*[2] along, importantly here, with additional claims against HSDA arising from the denial of the Certificate of Need.

First, the allegation that Mr. Dunlap failed to disclose *Tri-Cities I* is patently incorrect. On July 29, 2013, Mr. Dunlap sent a copy of the Tri-Cities II Complaint to Judge Summers along with his letter ("I'm attaching a copy of the federal complaint"). This was done to assist Judge Summers in understanding the issues in the federal action. The Complaint clearly and unambiguously identifies *Tri-Cities I* and its dismissal without prejudice on ripeness grounds:

> **Tri-Cities Holdings et al. v. Johnson City et al., Case No. 13-cv-108 (E.D. Tenn. 2013)(case dismissed without prejudice on ripeness grounds).**

See Tri-Cities I, Doc. 1, p. 32, n. 67 (emphasis added). Furthermore, the Complaint in *Tri-Cities II* clearly and unambiguously references evidence and testimony from *Tri-Cities I* multiple times.

There was no concealment by Mr. Dunlap. It is undisputed that he gave this Court a copy of the *Tri-Cities II* Complaint which clearly and unambiguously references, including the court,

---

[2] *Tri-Cities Holdings LLC et al. v. HSDA et al.,* Case No. 2:13-CV-305 (E.D. Tenn).

4

caption, and a specific and fairly crafted parenthetical reference that Tri-Cities I was "dismissed without prejudice on ripeness grounds." *Id.* Thus, Mr. Dunlap has disclosed the nature and outcome of *Tri Cities I.* Therefore, the grounds for revoking Mr. Dunlap's *Pro Hac Vice* admission based on any alleged concealment is clearly not applicable in this case.

In any event, Mr. Dunlap had no *obligation* to disclose *Tri-Cities I.* That case was over. It had been dismissed without prejudice allowing all issues to be raised in a new proceeding. Despite not having an obligation to disclose a dismissed case to the Court, the existence of *Tri Cities I* was fully disclosed to the Court in writing as part of the underlying refiled Complaint. The Court cannot claim that it was unaware of *Tri Cities I* because it has written notice of the action. Further, the dismissed and no-longer-pending *Tri-Cities I* was *completely irrelevant* to these administrative proceedings. This administrative appeal involves the denial of TCH's application for a Certificate of Need. *Tri-Cities I* did not involve any claims arising from the denial of the Certificate of Need. *Tri-Cities I* did not involve any claims arising in the administrative proceeding against HSDA. HSDA was not even a party to *Tri-Cities I.* It is undisputed that Mr. Dunlap disclosed the pending *relevant* federal case *at all times,* beginning with his first correspondence with the Court in July, 2013. See Exhibit 1 (beginning with the caption of the letter). In sum, Mr. Dunlap did not commit misconduct, and therefore should not be punished, for not disclosing an irrelevant, dismissed prior proceeding to this Court.

**B. The Court's allegation that Mr. Dunlap concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" is incorrect.**

The Court makes, in its *sua sponte* Order without notice or opportunity for the Petitioner to advise or counter the arguments of the Court, a conclusion of law in its basis to revoke Mr.

5

Dunlap's *Pro Hac Vice* admission that he concealed to the Court that the federal court "was now, itself, subject to a stay in deference to the administrative proceeding." This is incorrect.

The federal case is not and never has been "subject to a stay in deference to the administrative proceeding". The Magistrate's December 20, 2013 Order [Doc. 135] (Exhibit 2) was on a motion to stay discovery. ("The Motion to Stay Discovery, Doc. 100, is GRANTED....").[3]

The Magistrate's January 2, 2014 Order stayed the case specifically to give Defendants more time to respond to Plaintiffs' Motion for Summary Judgment. See *Tri-Cities II*, Doc. 150 (Exhibit 3). The Order giving Defendants additional time to respond was subject to being lifted at "a moment's notice:"

> By motion filed as document 139, the defendants have filed <u>a motion for additional time to respond to the plaintiffs' motion for partial summary judgment</u>. Their motion is GRANTED only to the following extent.
>
> If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. <u>If, however, the district judge denies the motion to stay the case, the stay of discovery will be lifted as of that moment,</u> [1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

Therefore, there is not, and never has been, any stay in the federal court "in deference to the administrative proceedings," <u>because it was never stayed on that basis</u>. These orders never stayed the federal court in some kind of suspended mode pending a decision on the administrative appeal.

---

[3] "As a part of the discussion in the Magistrate's Order, the Court said, "The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals." December 10, 2013 Order [Doc. 135]. But such *dicta* in an order granting a <u>stay in discovery</u> cannot be interpreted to operate as stay of the federal action pending an outcome of the administrative proceeding.

6

The factual premise is false. Therefore, the Court's *sua sponte* finding related to Mr. Dunlap's fraud or concealment of *Tri-Cities I* and an alleged stay of the federal court "in deference to the administrative proceeding" is unsupported.

### C. Mr. Dunlap never misled this Court when he indicated his opinion was that there were no "new developments" in the case.

Petitioner disputes that Mr. Dunlap committed any misconduct when he responded to a January 8, 2014 inquiry "that there were no new developments" because the Motion for Summary Judgment and Motions to Dismiss were still pending in the federal court action. By that statement, Mr. Dunlap intended to represent that there had been no decision by the federal court either way on these motions. This was entirely correct. Mr. Dunlap interpreted the Court's continuing stays in its proceedings, enacted multiple times, that this Court was waiting for the federal court to decide the dispositive motions, whenever that would occur. Additionally, HSDA was fully aware of Mr. Dunlap's opinion (being copied simultaneously on emails to Judge Summers). HSDA could challenge Mr. Dunlap's opinion at any time. HSDA never did.

There was no "new development," as far as Mr. Dunlap could tell (and HSDA apparently agreed), in so far as the federal court was proceeding , in a prompt and expeditious matter, to make a decision on the various motions which potentially would render the administrative proceeding moot. In fact, on that same day, HSDA , through counsel, offered its own opinion of the federal case, contrary to Mr. Dunlap's, there were in fact "new developments" and "indicated that he would be filing something to explain the new developments and that the scheduled pre-hearing conference would not be necessary." " Mr. Christoffersen, being General Counsel for HSDA, was fairly perceived, by Mr. Dunlap and this Court, to be in constant contact with, and updated by, HSDA's attorney Sue Sheldon and Sara Sedgewick as to what was going on in the federal case.

7

Counsel for HSDA in this action obviously has immediate access to federal court filings. Indeed, he appears to send them to this Court within minutes of filing in the federal case (for example, as Mr. Christoffersen did when he received and forwarded the federal court's request for a status report on March 11, 2014). Any "new developments" update as it was represented to this court by HSDA through counsel never materialized. Above all, there was never any intent on Mr. Dunlap's part to misrepresent the status of the federal action. From the outset, Mr. Dunlap has always asked that the administrative appeal be stayed pending a resolution of the federal case—and he's told that to both this Court and the federal court without fail.

In any event, the federal court order staying discovery [Doc. 135] was <u>clearly inconsequential</u> from the standpoint that Plaintiffs' Motion for Summary Judgment and the Defendants' Motions to Dismiss did not rely on any disputed facts on issues. Plaintiffs' motion rested on, for example, Johnson City's and HSDA's blatantly illegal zoning ordinance and notice rule, where there was no factual dispute. The Defendants' Motions to Dismiss did not rely on any disputed issues. So the motions in federal court were poised for prompt decision <u>with or without discovery</u>. HSDA apparently agreed with Mr. Dunlap because this was never brought to the attention of the Court on or after the January 10, 2014 telephone conference.

The administrative proceeding had been stayed several times before the scheduled January 10, 2014 telephone conference with the Court. Neither Mr. Dunlap nor HSDA, through its counsel, objected to a continuing delay in the administrative proceeding to allow time for the federal court to make a decision on the pending motions. The decision to allow the federal court to consider dispositive motions is further well-grounded in principles of judicial economy. Any of the inconsequential orders of the federal court – an order suspending discovery that would in no

way stop the federal court from deciding the pending motions, and an order giving as little as 30 days additional time for The Defendants to respond to Plaintiffs' Motion for Summary Judgment -- - do not upset in any way this Court's long-past decision to simply wait for the federal court. In that respect there were no "new developments." It is highly unlikely that this Court would have, all of a sudden, decided to schedule a full-blown final hearing simply because the federal court had given the Defendants an additional thirty days or so to respond to Plaintiffs' Motion for Summary Judgment or stayed discovery in the underlying federal action.

Any additional time the federal court had given the Defendants to respond to Plaintiffs' Motion for Summary Judgment was, in accordance with its terms, expected to be for a *reasonable time* (i.e., a reasonably *short and most likely very short time*) and, therefore, should not cause unreasonable delay in the consideration of the pending Motion for Summary Judgment and the Motions to Dismiss. HSDA, through its counsel, apparently agreed with Mr. Dunlap and did not mention it. The statement there were "no new developments" was certainly subject to a contrary opinion of HSDA, HSDA being a party to the federal court action; however HSDA, by not articulating any contrary opinion, apparently agreed with Mr. Dunlap. Certainly, HSDA did not offer any new developments when faced with the exact same inquiry from this court.

HSDA did not offer any opinion on new developments in the federal case, and could not reasonably qualify its opinion by claiming either lack of knowledge of the status of the federal case or any reliance solely upon Mr. Dunlap for the status of the federal case. To the contrary, HSDA implicitly and explicitly represented to the Court, and to Mr. Dunlap, that it was knowledgeable of the status of the federal case and that there were "no new developments" because none were offered.

Furthermore, HSDA's attorneys read the December 10, 2013 Magistrate's Order and

HSDA's attorneys obviously felt there was nothing to advise regarding the status of the

administrative proceeding because they did exactly what Mr. Dunlap did. HSDA was a party to

the federal case and the administrative proceeding, HSDA had access to all court proceedings and

filings, and HSDA was free to object to Mr. Dunlap's opinion that there were no "new

developments" at any time. HSDA could have moved for a hearing date to be set based on

whatever "new developments" they felt were relevant. Mr. Dunlap provided the Court with the

exact same information that HSDA was giving the court.

**D. The Court should not retaliate against Mr. Dunlap because he, in good faith, advised the Court that it is subject to the ADA and that the Court bears certain responsibilities under the ADA.**

Petitioner certainly intended no affront the Court when advising it that it is subject to the

ADA. This is simply petitioner's position. Mr. Dunlap would be failing to represent his client

diligently and effectively unless he did what he did: (1) Advise the Court of the application of the

ADA, (2) advise the Court of its duties under the ADA; and (3) advise the Court of his potential

adverse position of being a plaintiff in an action against the Court or that the Court would be

subject to a potential DOJ enforcement action if it violated the ADA. In fact, Mr. Dunlap would be

violating his duties to this client if he had not advanced these positions in this case.

Petitioner denies the finding that Mr. Dunlap showed "contempt for the proceeding" at

Conclusions of Law, para. 6. On the contrary, Petitioner would welcome a full and frank

discussion of the issues in the case and the opportunity to be heard on these issues. Mr. Dunlap

asserted in good faith that Johnson City and HSDA are attempting to have this Court somehow

"exorcise" their ADA violations in this case -- which this Court cannot do. This is in clear

10

accordance with federal law. Further, the federal court is the most appropriate forum in the case and that this Court should naturally defer to the federal court on issues of interpretation of federal law such as those raised herein. The use of forceful prose in making these points in not intended to be disrespectful and clearly cannot be coercion. The Court is well aware of the law and cannot claim that the Petitioner's interpretation of the law and their belief of possible liability is somehow a threat to the Court. The court is not a layperson relying upon the Petitioner's attorney to determine their liability.

It is obvious that the Administrative Procedures Division – like all Tennessee state agencies--is subject to the ADA. This Court should not retaliate against Mr. Dunlap for fairly asserting his clients' ADA rights.

### E. Mr. Dunlap asserts that the ADA applies to the Court, a state agency, and *supreme* federal law places upon the Court an obligation to provide TCH with a reasonable modification of its rules allowing the issuance of a CON.

Petitioner *respectfully (as always)* asserts that Mr. Dunlap would be violating his duties to his client if he failed to assert his clients' ADA rights in this regard. Simultaneously, Mr. Dunlap owes a duty of candor to this Court (Rule 3.3 of Rules of Professional Responsibility) <u>and</u> to his clients. He should not be sanctioned for attempting to properly achieve this balance.

> As an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [3]. Mr. Dunlap had a clear duty to zealously advance his clients' interests in what amounts to a civil rights action. It is undisputed that his individual clients are facing almost daily threat of death or serious injury while being forced to drive hundreds of miles from the Johnson City area to standard of care treatment facilities in North Carolina. Mr. Dunlap's sitting silent, or

engaging in mouse-like behavior to avoid "offending the Court," would have clearly violated this duty of zealous representation.

> In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an ethical person while earning a satisfactory living. The Rules of Professional Conduct often prescribe terms for resolving such conflicts. Within the framework of these Rules, however, many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules. These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests, within the bounds of the law, while maintaining a professional, courteous, and civil attitude toward all persons involved in the legal system.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [10] (emphasis added). Thus, Mr. Dunlap, like all petitioners asserting rights against States and State agencies, faces an unavoidable conflict providing zealous representation within the bounds of the law. He has not failed to properly balance these duties.

Further, the Rules of Professional Conduct specifically contemplate a lawyer to be a zealous advocate for his client when the opposing party is well-represented by counsel. The Rules provide:

> A lawyer's responsibilities as a representative of clients, an officer of the legal system, and a public citizen are usually harmonious. Thus, when an opposing party is well represented, a lawyer can be a zealous advocate on behalf of a client and at the same time assume that justice is being done.

Tennessee Rules of Professional Conduct, Preamble and Scope, Preamble: A Lawyer's Responsibilities [9] (emphasis added). Surely HSDA, and the Court, are "well-represented." The Rules of Professional Conduct implicitly require Mr. Dunlap to be a "zealous advocate" for his client's rights without the threat of facing banishment from the process without a hearing or

12

opportunity to be heard. Zealous advocacy involves making the Court aware, in frank terms, that it has duties under the ADA.

### F. The Court should not retaliate against Mr. Dunlap because he made it aware it has certain duties under federal law and that it might be violating federal law.

The Court should not retaliate against Mr. Dunlap for pointing out to the Court, and simultaneously providing voluminous legal authority, that the Court could be in violation of federal law. The Court has the ability to discern whether it believes this to be an accurate statement of the law. It continues to be petitioner's position that HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[4] In this case, in Mr. Dunlap's good faith opinion, supported by existing caselaw, HSDA and Johnson City are trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's alleged violations of federal law.

---

[4] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening*, 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.*, 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory procedural requirements themselves violate the FHAA; the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See, e.g., *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003).

13

Mr. Dunlap, in courteous fashion, has made multiple attempts to outline for the Court the scope and effect of the ADA and its possible implications on this administrative proceeding. First, on July 28, 2013, Mr. Dunlap set forth the ADA the legal requirement for all state agencies to attempt a reasonable modification to allow TCH to locate its clinic in Johnson City. See Exhibit 1. Second, on July 29, 2013, Mr. Dunlap requested such a reasonable modification. See Exhibit 4. Third, on March 12, 2014, Mr. Dunlap outlined the federal law, with voluminous citations, and made a request for a reasonable modification in a letter. See Exhibit 5. Fourth, on March 12, 2014, again in courteous fashion, Mr. Dunlap outlined federal law and made a request for a reasonable modification in Petitioner's Objection to the Motion to Set Hearing and Demand for Reasonable Modification. See Exhibit 6.

More than four times, Mr. Dunlap presented his well-researched position (including voluminous legal citations and copying opposing counsel) to this Court. Mr. Dunlap is not taking a frivolous position. Mr. Dunlap's duty to his clients and to this Court obligates him to make the Court fully aware of the ADA and that Court would likely run afoul of federal law if it takes certain steps. Mr. Dunlap should not be sanctioned for simply *and respectfully* making the Court aware it might be violating federal law.

G. **Assuming, *arguendo*, that the Court was under any misapprehension about the status of the federal proceeding, Petitioner asserts that HSDA was a co-equal party in both this administrative appeal and in the federal proceeding and bears equal responsibility to correct the Court on the status of the federal case, if any misunderstanding did occur.**

Mr. Dunlap did not fail to advise that that the federal court was *deferring* to the administrative proceeding because that was never the case. Mr. Dunlap did not interpret the statements in the Magistrate's December 10, 2013 Order regarding the administrative proceeding

14

as ever imposing a stay on the proceeding to allow this administrative appeal to proceed. Petitioner respectfully submits that, in any event, this holding would be contrary to federal law that <u>does not require</u> TCH to pursue administrative remedies before filing an ADA Title II action.[5]

### H. In no way did Mr. Dunlap engage in "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge."

Petitioner respectfully represents that advising the Court on applicable federal law and the Court's responsibility thereunder does not constitute "coercion and misrepresentation" and "a flagrant attempt to improperly influence a judge in violation of Rules 3.3, 3.5, and 8.4 of the Tennessee Rules of Professional Conduct, as well as Tennessee Code Ann. § 39-14-112. Advising the Court of federal law, while copying opposing counsel, does not amount to improper influence or coercion.

Rule 3.3 of the Tennessee Rules of Professional Conduct <u>requires</u> "candor toward the tribunal." In this respect, Mr. Dunlap has fulfilled his duty and in no way has breached his duty. Mr. Dunlap, supported by substantial legal authority that he has shared with the Court (copying opposing counsel at all times) in well-researched letters and filings, simply pointed out to the Court

---

[5] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement); see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion requirement); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). *See also Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding, under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990) (same).

15

that it may be subject to the ADA and that his clients' positions had become adverse to the Court from a legal perspective. To fail to do so would have violated this rule, rather than honoring it.

Rule 3.4 of the Tennessee Rules of Professional Conduct requires "fairness to opposing party and counsel." In this regard, Petitioner submits that Mr. Dunlap has not violated this provision in any respect. Mr. Dunlap has always conducted himself with view to fairness toward the other side in this matter. Opposing party and counsel have been copied on every correspondence with the Court and obviously they are a party to the underlying federal action.

Rule 8.4 of the Tennessee Rules of Professional Conduct describe to a wide range of potential misconduct generally described as "dishonesty, fraud, deceit, or misrepresentation." As set forth herein, Petitioner submits that in no way has Mr. Dunlap violated Rule 8.4. At all times, Mr. Dunlap has been completely forthright with this Court and in no way has committed any "dishonesty, fraud, deceit, or misrepresentation."

I.  **In no way did Mr. Dunlap "express contempt for this tribunal and these administrative proceedings."**

Petitioner respectfully disputes that Mr. Dunlap "expressed contempt for this tribunal and these administrative proceedings resulting in no apparent purpose for his continued participation." On the contrary, Mr. Dunlap's thoroughly-researched position, expressed in good faith, that the ADA applies to this Court and that this Court has certain obligations under federal law serves merely to advise the Court of Petitioner's position. Mr. Dunlap would be violating his duty, to his client and to this Court, by remaining silent if he, in good faith, believed that this Court was violating federal law.

16

**J. Mr. Dunlap's actions at no time "unnecessarily impeded a resolution of the CON appeal and have breached the conditions that he was granted *pro hac vice* admission to practice law in Tennessee."**

Petitioner respectfully submits that, in fact, Mr. Dunlap has appropriately fulfilled his duties <u>both</u> to his clients and to this Court. He has done so by respectfully, but firmly and forthrightly, explaining his clients' adverse position with this Court related to the ADA. Simply laying this position out to the Court in a respectful manner is completely appropriate and in no way violates any Rule of Professional Responsibility or state law. Mr. Dunlap should not be retaliated against for fulfilling his duty of candor to the Court.

## Conclusion

(a) Petitioner *respectfully (as always)* denies each and every allegation of misconduct, violation of Rules of Professional Conduct, or violation of law, by Mr. Dunlap contained in the Court's March 14, 2014 Order.

(b) Petitioner *respectfully (as always)* asks the Court to rescind its March 14, 2014 Order and otherwise withdraw said Order.

(c) Finally, Petitioner *respectfully (as always)* asserts that Mr. Dunlap is a competent and careful attorney, appropriately cognizant of his duties <u>both</u> to his clients and this Court, and that Mr. Dunlap should be allowed to represent TCH in this administrative proceeding.

Dated: March 21, 2014

---
Rick Piliponis, Esq. BPR # 16249
The Higgins Firm, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201

17

Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

## AFFIDAVIT OF JAMES A. DUNLAP JR.

STATE OF GEORGIA
COUNTY OF FULTON

I, JAMES A. DUNLAP JR., after first being duly sworn, state under oath that I am over age of 18 years of age, that I am legally competent to testify, and that this Affidavit is based on my personal knowledge.

1.       The facts contained in the foregoing PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER REVOKINGPERMISSION TO APPEAR PRO HAC VICE are true and correct to the best of my knowledge, information, and belief.

Further the Affiant sayeth naught.

_____
James A. Dunlap Jr.

Sworn to and subscribed before me, a Notary
Public, this the _30_ day of _MARch_ ,
20_14_, witness my hand at office in the
County of _Fulton_ ,
State of Georgia.

_____
NOTARY PUBLIC

My commission expires _12 / 27_ , _2014_

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2014, a copy of the foregoing document(s) was served by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

Richard D. Piliponis

20

# EXHIBIT 1

(TO MOTION TO RECONSIDER)

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

July 28, 2013

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:     **Tri-Cities Holdings LLC d/b/a Trex Treatment Center**
        **CON #1303-005D**
        **Docket No.: T.B.A.**

        **Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and**
        **Development Agency, et al.**
        **United States District Court (M.D. Tenn.)**
        **Case No. 3:13-cv-669**

Dear Judge Summers:

     I represent Tri-Cities Holdings LLC d/b/a Trex Treatment Center ("TCH"), the above-captioned applicant. In addition, I also represent eight (8) residents of the Johnson City, Tennessee area who are addicted to opiates and who are recognized as disabled under federal law, including the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehabilitation Act")("Individual Clients").[1]

     Presently, an army of at least 500 disabled persons including pregnant women-- and probably more than 1,000—are having to get up as early as 1-4AM and drive 100+ miles, as often as daily, to receive doctor-prescribed, standard of care, life-saving medication that is not available within 50 miles of Johnson City.[2]  New patients trying

---

[1] *Mx Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir., 2002)(finding opiate-addicted individuals are disabled under the ADA) (citations).

[2] These facts were outlined in the CON application, at the June 26, 2013 CON hearing, and letters I sent to HSDA on June 18, 2013 and June 28, 2013 asking for a reasonable modification under the ADA and the Rehabilitation Act.

to save their lives from opiate addiction must undertake this drive every day for the first 90 days of treatment. Only a sadist could consider this situation acceptable.

Presently, it is undisputed that hundreds of pregnant women are presenting themselves to Johnson City area clinics and emergency rooms each year for treatment of opiate-addiction.[3] Unquestionably, MMT treatment is the standard of care for opiate-addicted pregnant women.[4] But despite the clear and present danger to these women and their babies, standard of care MMT treatment is nowhere to be found for fifty miles in any direction of Johnson City.

Instead, the Johnson City political leadership—with self-interested encouragement from an entrenched medical establishment favoring non-standard of care physician's office-based buprenorphine treatment, is forcing opiate-addicted pregnant women to drive long distances to North Carolina OTP clinics for standard of care treatment. This is in spite of the fact that buprenorphine-based treatments carries a significantly higher risk of inducing opiate withdrawal syndrome in some pregnant women. This is a reaction that can kill their baby. Indeed, in 2013, Mountain States Health Alliance warned area doctors of the danger of buprenorphine-based treatments with pregnant women and noted that MMT is the standard of care.[5]

TCH's proposed clinic will allow my Individual Clients--along with hundreds of other similarly disabled area residents which include pregnant women – to have access to doctor-prescribed, life-saving, "standard of care"[6] methadone maintenance treatment (MMT) for the first time in the proposed service area.

Presently, this standard of care, life-saving treatment is available only in distant out-of-state clinics (primarily in North Carolina) offering standard of care treatment more than 100 miles roundtrip, over potentially dangerous mountain roads in all

---

[3] "Women Warned Not To Use Two Drugs Around Pregnancy," *Johnson City Press*, March 22, 2012 (130 opiate-addicted pregnant women presented themselves for treatment in one recent seven month period).
[4] American College of Obstetricians and Gynecologists (2012) ("The current standard of care for pregnant women with opioid dependence is referral for opioid-assisted therapy with methadone."); Journal of the American Medical Association, April 30, 2012 ("Methadone is the recommended treatment for opioid dependence during pregnancy."); New England Journal of Medicine 363;24 (nejm.org) December 9, 2010 ("The standard of care for opiate addiction during pregnancy is methadone maintenance and psychiatric care."); National Institute of Health (NIH) Consensus Panel (1998)("Methadone is the standard of c are in pregnant women with opioid addiction."); National Institute on Drug Abuse (2012)("Methadone has been the standard of care for the past 40 years for opioid-dependent pregnant women.")
[5] *"Women Warned Not To Use Two Drugs Around Pregnancy," Johnson City Press, March 22, 2012.*
[6] The term "standard of care" treatment is generally recognized as treatment that is accepted by medical experts as a proper treatment for a certain type of disease and that is widely used by healthcare professionals. Standard of care is also called "best practice," "standard medical care," and "standard therapy. National Cancer Institute at the National Institute of Health (http://www.cancer.gov/dictionary?cdrid=346525).

weather conditions, from many parts of the proposed service area. At present, MMT standard of care treatment is available at approximately 1,300 clinics across the United States <u>and at least twelve other OTP clinics in other parts of Tennessee</u>. The standard of care for many opiate-addicted persons, and unquestionably for pregnant women, is Methadone Maintenance Treatment ("MMT") that TCH seeks to provide and which is presently unavailable anywhere in the Proposed Service Area.

It's undisputed that there is a "migration" of 400-500 recovering opiate-addicted patients in the Johnson City area who now are being forced to drive more than 100 miles roundtrip, as often as daily, to distant OTP clinics in North Carolina which offer the nearest available of standard of care MMT. These ADA-disabled persons are being exhausted by having to wake up at between 1AM-4AM and embark on these marathon journeys on dangerous mountain roads. Clearly, people are dying because of this exhausted army of disabled people driving on East Tennessee roads as often as daily.[7] At least one 22-year old woman from Jonesborough died as a result of a collision with an exhausted disabled person having gotten up at 4AM and driven 120+ miles to and from an OTP in North Carolina—toxicology reports indicated methadone was not involved, just the exhaustion from these marathon treks that patient was required to take to get her medication.

Distance is also unquestionably a barrier to treatment so these great distances to treatment lowers treatment rates among recovering addicts. Indeed, Tennessee's own Department of Mental Health and Substance Abuse Services found that retention rates fall in half when patients drive reaches 60 miles one way.[8] So probably another 1,000 to 2,000 disabled people have just given up and gone back to pain pills or heroin to "treat" their addiction.

Therefore, TCH, and my individual clients again request that your office provide TCH a reasonable modification or accommodation under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("RA") to allow TCH to obtain a Certificate of Need and allow it to establish an Opiate Treatment Program (OTP) in Johnson City, Tennessee as requested in its CON application which will allow persons recognized as disabled under the ADA and the RA to have reasonable access to standard of care treatment for their disability.

---

[7] "Judge Wants to Look Up Law Before Accepting Plea in Vehicular Homicide Case," *Johnson City Press,* June 29, 2013 (Johnson City area woman woke up at 4AM, drove 100 miles roundtrip to North Carolina OTP clinic for standard of care MMT treatment, then drove home, took husband to work, then fell asleep at wheel, crossed center lane, and hit and killed 22-year old Jonesborough woman. Police said blood test results showed exhaustion, not MMT treatment, was to blame).

[8] Tennessee Department of Health, Methadone Task Force Report (2001).

Therefore, on behalf of my clients, I would ask you to provide my clients with a reasonable modification of any and all applicable state and local rules and regulations as required under the ADA and the Rehabilitation Act from your office, and any other applicable agency of the State of Tennessee, to allow TCH to locate its Opiate Treatment Program at 4 Wesley Court, or elsewhere, in Johnson City, Tennessee.

The Attorney General of the United States, at the instruction of Congress,[9] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[10]

This duty to reasonably accommodate is an *affirmative* duty and federal law is *supreme* to any and all Tennessee laws and rules.[11] Accordingly, the Supreme Court declared that Title II imposes an "obligation to accommodate," or a "reasonable modification requirement."[12]

As directed by Congress, the Attorney General issued regulations implementing title II, which are based on regulations issued under section 504 of the Rehabilitation Act.[13] The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[14] The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ."[15]

---

[9] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." *Id.* § 12134(b).

[10] 28 C.F.R. § 35.130(b)(7).

[11] *Tennessee v. Lane*, 541 U.S. 509 (2004).

[12] *Id.* at 532–33; *see also Alexander v. Choate*, 469 U.S. 287, 301 (1995)(suggesting Rehabilitation Act requires "meaningful access" and "reasonable accommodations"); *accord, Ability Center, Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir., 2004) ("Title II targets more than intentional discrimination....")

[13] See 42 U.S.C. § 12134(a); 28 C.F.R. § 35.190(a); Executive Order 12250, 45 Fed. Reg. 72995 (1980), reprinted in 42 U.S.C. § 2000d-1.

[14] 28 C.F.R. § 35.130(d) (the "integration mandate").

[15] 28 C.F.R. Pt. 35, App. A (2010) (addressing § 35.130).

In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities. The Supreme Court held that public entities are required to provide community-based services to persons with disabilities when (a) such services are appropriate; (b) the affected persons do not oppose community-based treatment; and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity.[16]

Failure to make a reasonable modification is separate theory of liability under Title II and its implementing regulations. See 28 C.F.R. § 35.130(b) (7). Pursuant to this regulation, federal courts hold that a "failure to accommodate is an independent basis for liability under the ADA."[17] To comply with the ADA's integration mandate, public entities must reasonably modify their policies, procedures or practices when necessary to avoid discrimination.[18] The obligation to make reasonable modifications may be excused only where the public entity demonstrates that the requested modifications would "fundamentally alter" its service system.[19]

In this case, not only did HSDA and Johnson City fail to provide a reasonable accommodation, they failed to even *attempt* one. This is clearly a violation of the ADA and the Rehabilitation Act. By consciously denying disabled persons access to doctor-prescribed, standard of care treatment for their disability, HSDA and Johnson City is attempting to eliminate "undesirable" disabled persons from the community.

In this case, evidence shows that HSDA and Johnson City intentionally disregarded the plaintiffs' rights. In the alternative, at a bare minimum, HSDA and

---

[16] *Olmstead v. L.C.*, 527 U.S. at 607.

[17] *Sak v. City of Aurelia*, 832 F.Supp.2d 1026 (N.D. Iowa 2011), *citing Wisconsin Community Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006), *Frame v. City of Arlington*, 657 F.3d 215, 231 (5th Cir.2011) (noting that Title II does more than prohibit disability discrimination by a public entity, because it "imposes an 'obligation to accommodate,' or a 'reasonable modification requirement,' " but expressing no opinion "as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination, a form of disparate impact discrimination, or something else entirely"); *Pena v. Bexar County, Texas*, 726 F.Supp.2d 675, 683 (W. D. Tex. 2010) (Title II of the ADA "imposes upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals") (citing *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir.2005)).

[18] 28 C.F.R. § 35.130(b)(7).

[19] Id.; *see also Olmstead*, 527 U.S. at 604-07.

Johnson City were consciously indifferent to the plaintiffs' claims amounting to intentional discrimination in violation of the ADA and the Rehabilitation Act.[20]

Under the ADA, a state or local law is "facially discriminatory"[21] if it subjects drug treatment programs to more restrictive standards than other comparable facilities.[22] Such a law violates the ADA unless the treatment program can be shown to pose a direct threat or significant risk to the health or safety of others.[23] Johnson City's Zoning Ordinance restricting methadone clinics is facially discriminatory because: (1) methadone clinics are subjected to more restrictive zoning standards than comparable medical facilities; and (2) individuals seeking treatment at methadone clinics do not pose a direct threat to the health or safety of others that would justify more burdensome treatment.

Three different circuits – including the Sixth Circuit--have held that restrictions on addiction treatment programs were facially discriminatory because they did not apply equally to comparable programs for people without disabilities. In *MX Group, Inc. v. City of Covington*, the city would not permit the plaintiff to locate a methadone

---

[20]*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir.2001) ( "To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant.... We now determine that the deliberate indifference standard applies." (citations and footnote omitted)). In *Duvall*, the Ninth Circuit held that intentional discrimination can be shown by establishing "deliberate indifference" by the defendant. *Id.* The Duvall court further explained that "[d]eliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon the likelihood." *Id.* at 1139.

[21] "'[F]acial' challenges to regulation[s] are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997); see also *Cnty. Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006)(citations).

[22] *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 304-05 (3d Cir. 2007); *MX Group*, 293 F.3d at 344-45; *Bay Area*, 179 F.3d at 733-34; *see also First Step, Inc. v. City of New London*, 247 F. Supp. 2d 135 (D. Conn. 2003)*Habit Mgmt. v. City of Lynn*, 235 F. Supp. 2d 28, 29 (D. Mass. 2002). It should be noted that facial discrimination is a type of intentional discrimination claim and can serve as proof of discriminatory intent. *Larkin v. Mich. Dep't of Social Servs.*, 89 F.3d 285, 289 (6th Cir. 1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500-01 (10th Cir. 1995); First Step, Inc., 247 F. Supp. 2d at 150-51; Hispanic Counseling Ctr., 237 F. Supp. 2d at 292-93; Sunrise Dev., Inc. v. Town of Huntington, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999).

[23] *New Directions*, 490 F.3d at 306-07; *Bay Area*, 179 F.3d at 737; *Habit Management v. City of Lynn*, 235 F.Supp.2d 28, 29 (D. Mass. 2002). In determining whether a program poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.
28 C.F.R. pt. 35 app. A, Section 35.104 (2009); 28 C.F.R. § 35.139 (eff. Mar. 15, 2011).

clinic, in response to community opposition.[24] The city then adopted an amendment to the zoning code limiting the number of addiction treatment facilities to one facility for every 20,000 persons in the city, which completely foreclosed the plaintiff's opportunity to locate in the city.[25] The district court entered judgment for the plaintiff following a bench trial. The Sixth Circuit affirmed the district court's judgment and agreed that the ordinance was facially discriminatory.[26] Thus, the Sixth Circuit concluded that the district court correctly found that the city's decision to amend the zoning code to prevent the plaintiff from operating anywhere in the city violated the ADA.[27]

In *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293 (3d Cir. 2007), the plaintiff sought to locate a methadone clinic.[28] The city denied a permit to the plaintiff, relying on a Pennsylvania statute that prohibited addiction treatment clinics from locating within 500 feet of a school, playground, park, residential area, child-care facility, or place of worship, except by approval of the locality's governing body.[29] The Third Circuit held that the Pennsylvania statute "facially singles out methadone clinics, and thereby methadone patients, for different treatment, thereby rendering the statute facially discriminatory" under the ADA.[30]

In *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999), the operator and patients of a methadone clinic sued the City of Antioch after it adopted an ordinance prohibiting methadone clinics from locating within 500 feet of any residential property.[31] The Ninth Circuit concluded that the ordinance was facially discriminatory and a *per se* violation of title II of the ADA, 42 USC § 12132, because it subjected methadone clinics, but not other medical clinics, to a spacing limitation.[32]

HSDA's own rules clear violate the ADA and the Rehabilitation Act. Federal courts that find discriminatory notice requirements, like HSDA's requirement for methadone clinics[33], and only such clinics, to notify local politicians of a CON

---

[24] 293 F.3d at 329-330.

[25] *Id.* at 330-31.

[26] *Id.* at 328, 344-45.

[27] *Id.*

[28] 490 F.3d at 296-97.

[29] *Id.* at 298-99.

[30] *Id.* at 304.

[31] 179 F.3d at 727-28.

[32] *Id.* at 734-35.

[33] Tenn. Code§ Section 68-11-1607(c)(3) provides: "Within ten (10) days of the filing of an application for a nonresidential substitution-based treatment center for opiate addiction with the agency, the applicant shall send a notice to the county mayor of the county in which the facility is proposed to be

application. This is plainly intended to galvanize local opposition to an OTP's CON application. Federal courts have uniformly found such requirements to violate the ADA. In *Potomac Group Home v. Montgomery County, Md.,* the court declared that notice provisions that "galvanize" opposition are repugnant to federal law:

> This requirement is equally as offensive as would be a rule that a minority family must give notification and invite comment before moving into a predominantly white neighborhood. The obvious result of these notifications to neighbors is the antithesis of the professed "integration" goal of defendants. Indeed, notices of this sort galvanize neighbors in their opposition to the homes.

*Potomac Group Home v. Montgomery County, Md.,* 823 F.Supp. 1285, 1296 (D. Md. 1993). HSDA's clearly illegal requirement to notify local politicians when we applied for the clinic provides the lever to engage the federal court to provide equitable relief in forcing the issuance of the CON. HSDA also clearly failed to offer a reasonable modification of its rules to allow the CON to be issued. Indeed, the panel split 6-2 and denied the CON so very little, if anything, needs to be done by HSDA to issue the CON.

The present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the area every three days) and I would ask you and your office to take immediate action to rectify this dire situation and allow TCH's OTP standard of care program to locate in Johnson City and exist such clinics do in other parts of Tennessee.

Finally, I would request that the above-captioned administrative appeal be stayed while the federal case is pending. The administrative appeal claims are included as pendant claims in Counts 13 and 14 in the federal complaint.

---

located, the member of the house of representatives and the senator of the general assembly representing the district in which the facility is proposed to be located, and to the mayor of the municipality, if the facility is proposed to be located within the corporate boundaries of a municipality, by certified mail, return receipt requested, informing such officials that an application for a nonresidential s facility has been filed with the agency by the applicant. All applications, original and simultaneous review, shall not enter the next review cycle, unless filed with the agency within such time as to assure that such application is deemed complete in accordance with the rules of the agency."

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:    Jim Christoffersen, General Counsel HSDA (via email)
Erick Herrin, City Attorney for Johnson City, TN (via email)

# EXHIBIT 2

## (TO MOTION TO RECONSIDER)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

TRI-CITIES HOLDINGS, LLC, ET AL.,          )
                                           )
v.                                         )          NO. 2:13-CV-305
                                           )
TENNESSEE HEALTH SERVICES and              )
DEVELOPMENT AGENCY, ET AL.                 )
                                           )

## O R D E R

The defendants have filed a Motion to Stay, Doc. 98, and a Second Motion to Stay

Discovery, Doc. 100. These motions have been referred to the Magistrate Judge pursuant

to 28 U.S.C. 636 and the Standing Order of this Court. A hearing was held on December 10,

2013.

This issue is far more complicated than it should be and, to be blunt, it has been

complicated by the plaintiffs' actions.

The plaintiffs filed their first suit in this Court in April 2013, No. 2:13-CV-108, "Tri-

Cities I." The defendants filed a motion to dismiss the suit because the issues were not yet

"ripe." The district judge agreed, and he dismissed the case without prejudice on June 12,

2013.[1]

Rather than asking Judge Greer to reconsider his decision, or appealing the matter to

the court of appeals, the plaintiffs filed an essentially identical suit in the Middle District of

---

[1] 2:13-CV-108, Doc. 45.

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 1 of 6   PageID #: 3843
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 298 of 396   PageID #: 1995

276

Tennessee, "Tri-Cities II."[2]  Ultimately, District Judge Haynes of the Middle District transferred the case back to this court on the basis that the Eastern District was the correct venue.

The various defendants, including the Tennessee Health Services and Development Agency, have filed motions to dismiss this suit, at least one basis of which is ripeness.

In an attempt to justify the filing of Tri-Cities II in the Middle District of Tennessee, plaintiffs' counsel says that he did so only because of threats of physical violence directed against the plaintiffs in this district, and his concern about "local animus against opiate-addicted persons" in any jury pool that would be drawn from this district.

In support of his argument, plaintiffs' counsel referred to various exhibits which were not attached to his brief, nor did counsel advise the court where those exhibits could be found in the record.  With a great deal of difficulty, two of those exhibits were ultimately located as exhibits to document 45; the other exhibits have yet to be found.  With respect to the two exhibits that were located, they do not begin to support plaintiffs' argument that they refiled their suit in the Middle District of Tennessee because of threats of physical violence.  Indeed, counsel's argument treads perilously close to being offensive.  "Exhibit PP"[3] is a portion of a "blog" on the internet that has some uncomplimentary things to say about Mr. Kester's

---

[2] Plaintiffs did name an additional defendant to Tri-Cities II, the Tennessee Health Services and Development Agency, but that did not change the basic complexion of the case.

[3] Document 45-6.

2

Case 2:13-cv-00305-JRG-DHI  Document 135  Filed 12/10/13  Page 2 of 6  PageID #: 3844
Case 2:14-cv-00233-JRG-MCLC  Document 69-1  Filed 12/04/16  Page 299 of 396  PageID #: 1996

277

motive in attempting to open a methadone clinic in Johnson City: "This isn't about addiction treatment. It is about Kester expanding a lucrative for profit company from a never-ending addict base." Then the same blog entry ends with this: "There is a very old fashioned method of getting an undesirable out of town and Kester now deserves that method."

This magistrate judge is unsure what that "old fashioned method" might be, but it is a safe guess that it is probably being ridden out of town on a rail. Regardless, it is a blog, and the internet unfortunately provides a forum for people to share not only their knowledge, but also their ignorance and prejudices. Suffice it to say that this magistrate judge has seen *far worse* internet comments regarding cases pending in the Eastern District of Tennessee, and judicial life nevertheless went on. And, to look at it logically, Mr. Kester will still be Mr. Kester regardless of where this suit is tried. Refiling the suit in Nashville would not have eliminated any of the claimed potential for violence, since the end result of the litigation, wherever filed, still would take place in Johnson City.

Plaintiffs further argue that the jury pool in the Northeastern Division of this Court manifests a general animus toward drug addicts. By the "jury pool," plaintiffs' attorneys can only mean the citizenry of the Northeastern Division, since it is they who would comprise that jury pool. The exhibits referred to in plaintiffs' response which purportedly demonstrates the animus do not exist; at least, the Court could not find them.

Further, assuming there are people who do harbor animus against drug addicts, there is no reason to believe a jury pool from the Middle District of Tennessee would be any more "enlightened" or sophisticated. Also, plaintiffs' response completely ignores the fact that the

3

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 3 of 6   PageID #: 3845
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 300 of 396   PageID #: 1997

278

jury pool will come from a ten-county area, some of it far removed from the Johnson City geographical area, and it also ignores the role the district judge ultimately will play in seating dispassionate and objectively-minded jurors.

To get to the point: plaintiffs' response was a transparent attempt to explain away rather obvious judge-shopping. Plaintiffs' actions in refiling Tri-Cities II in the Middle District of Tennessee on the heels of the dismissal of Tri-Cities I, even if not a sanctionable contempt, certainly manifested a contemptuous attitude toward this Court's earlier decision.

Plaintiffs' counsel stated during oral argument that he came across a "significant body of authorities" which would have convinced Judge Greer that his decision in Tri-Cities I was erroneous. This argument, however, actually corroborates the conclusion of this magistrate judge that plaintiffs' counsel was forum-shopping, since he admittedly had those authorities in plenty of time to file a motion for reconsideration before District Judge Greer. But, rather than do that, he chose to file an entirely new suit in the Middle District of Tennessee.

In response to the defendants' Motion to Stay Discovery, the plaintiffs argue that these same defendants, while the case was pending in the Middle District of Tennessee, not only stipulated that a Rule 26 discovery conference had occurred, they also professed an urgent need to proceed with discovery. Plaintiffs' assertion in that regard precipitated a rather vigorous reply from the defendants, supported by the declarations of their respective attorneys, in which they flatly asserted that there was no such stipulation, and that they never expressed any need, urgent or otherwise, to proceed with discovery.

"Swearing matches" between opposing attorneys in a lawsuit is the bane of any

4

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 4 of 6   PageID #: 3846
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 301 of 396   PageID #: 1998

279

judicial officer, but in this particular case the record and various documents support the assertions of defendants' attorneys. This Court is forced to conclude that plaintiffs' counsel has been more than a bit loose with his interpretation of what occurred while this case was pending before the Middle District of Tennessee.

Tri-Cities I was dismissed, and the plaintiffs eschewed any appeal of Judge Greer's memorandum opinion and order.[4] It became a final order. Thus, the issues framed by the Motion to Stay and the Motion to Stay Discovery must be considered in light of principles of *res judicata:*

> The doctrine of res judicata bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. *Hampton vs. Tennessee Truck Sales Inc.* 993 SW 2nd 643, 645 (Tenn. App. 1999).

The fact that Tri-Cities I was dismissed "without prejudice" and therefore could be refiled does not alter the fact that it is the law of this case that the plaintiffs must procure, or at least attempt to procure, certain administrative approvals.

Defendants' Motion to Stay the Case actually is an alternative to their motion for an outright dismissal without prejudice on the same basis that they moved successfully to have Tri-Cities I dismissed, *viz.*, lack of ripeness. This Court often is presented with motions to stay discovery, etc., until the court rules upon a pending motion to dismiss. Due to the heavy criminal docket of this court, it lately has been the practice to deny such motions to stay discovery in an effort to keep abreast of the civil docket. But this case is an exception.

---

[4] 2:13-CV-108, Doc. 45.

Case 2:13-cv-00305-JRG-DHI   Document 135   Filed 12/10/13   Page 5 of 6   PageID #: 3847
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 302 of 396   PageID #: 1999

280

Plaintiffs' blatant forum-shopping to avoid this court's ruling in Tri-Cities I admittedly has been taken into account in the court's decision. But more important is the fact that it is reasonable to conclude that the district judge will not change his opinion that plaintiffs must attempt to procure a certificate of need, and a license from the Tennessee Health Services Agency, before this Court can entertain their suit.

Plaintiffs' application for a certificate of need has been denied, and an appeal of that denial is now pending before a state administrative law judge. During argument, the court was quite surprised to learn that an administrative law judge has delayed considering the appeal of that denial based upon plaintiffs' counsel's representation to her that he intended to ask this court to stay, i.e., enjoin, any action by her. That would seem to be contrary to plaintiffs' professed need for a quick resolution to this litigation.

The Motion to Stay Discovery, Doc. 100, is GRANTED, and it will remain in effect until the court has ruled upon Johnson City's Motion to Stay the entire case.

Since the Motion to Stay the case, Doc. 98, is an alternative to defendants' Motion to Dismiss, the resolution of that motion necessarily is DEFERRED to the district judge.

SO ORDERED:

                       <u>    s/ Dennis H. Inman    </u>
                       United States Magistrate Judge

# EXHIBIT 3

## (TO MOTION TO RECONSIDER)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

TRI-CITIES HOLDINGS, LLC, ET AL.,          )
                                           )
v.                                         )          NO. 2:13-CV-305
                                           )
TENNESSEE HEALTH SERVICES and              )
DEVELOPMENT AGENCY, ET AL.                 )

## O R D E R

By motion filed as document 139, the defendants have filed a motion for additional time to respond to the plaintiffs' motion for partial summary judgment. Their motion is GRANTED only to the following extent:

If the district judge grants the defendants' motion to stay the case, then the defendants' motion for additional time is effectively moot. If, however, the district judge denies the motion to stay the case, the stay of discovery will be lifted as of that moment, [1] and defendants will be allowed thirty days to obtain the discovery they seek and to file their response to the plaintiffs' motion for partial summary judgment.

SO ORDERED:

_____ s/ Dennis H. Inman _____
United States Magistrate Judge

---

[1] See, order, doc. 135.

Case 2:13-cv-00305-JRG-DHI   Document 150   Filed 01/02/14   Page 1 of 1   PageID #: 4391
Case 2:14-cv-00233-JRG-MCLC   Document 69-1   Filed 12/04/16   Page 305 of 396   PageID #: 2002

283

# EXHIBIT 4

## (TO MOTION TO RECONSIDER)

Law Offices
**James A. Dunlap Jr. & Associates LLC**
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

July 29, 2013

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:   **Tri-Cities Holdings LLC d/b/a Trex Treatment Center**
      **CON #1303-005D**
      **Docket No.: T.B.A.**

      **Tri-Cities Holdings LLC, et al. v. Tennessee Health Services and**
      **Development Agency, et al.**
      **United States District Court (M.D. Tenn.)**
      **Case No. 3:13-cv-669**

Dear Judge Summers:

Since Mr. Christoffersen refused to consent to a stay of the administrative appeal in his letter dated today, I would respectfully move for you to stay this administrative appeal process pending resolution of the federal court action. The administrative appeal claims are included as pendant claims in Counts 13 and 14 in the federal complaint. I'm attaching a copy of the federal complaint.

Mr. Christoffersen contends there is a requirement for TCH to exhaust its administrative remedies before pursuing the federal action. However, I would note that federal courts clearly hold there is no need to exhaust administrative remedies to bring a claim under the ADA or the Rehabilitation Act.[1] I would also again note that

---

[1] *Zimmer v. State of Ore. Dept. of Justice*, 170 F.3d 1169, 1177-78 (9th Cir. 1999) (title II incorporates Rehabilitation Act's provisions, including lack of exhaustion requirement);  see also *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 134 (D. Mass. 1998) (title II requires no exhaustion); *Cable v. Dept. of Develop. Svcs.*, 973 F. Supp. 937, 940 (C.D. Cal. 1997) (courts have consistently held no exhaustion under title II of ADA); *Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996); *Roe v. County Comm'n of Monongalia Cty.*, 926 F. Supp. 74, 77 (N.D.W.V. 1996); *Noland v. Wheatley, et al.*, 835 F. Supp. 476 at 482 (N.D. Ind. 1993). See also *Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1015 (6th Cir. 1989) (holding,

federal law is supreme and controlling over any and all state law or rules of procedure and in no way relieves the State of Tennessee, HSDA, or Johnson City from their affirmatives duties to comply with the ADA and the Rehabilitation Act and which they are clearly in violation of at present.[2]

Again, the present situation in Johnson City constitutes a public health catastrophe (with approximately one death from drug overdose occurring in the Proposed Service Area every three days). By copy of this letter I am again respectfully asking you, HSDA, and Johnson City to provide a reasonable modification under the ADA and the Rehabilitation Act to allow TCH to locate its OTP clinic in Johnson City.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd

Cc:   Jim Christoffersen, General Counsel HSDA (via email)
      Erick Herrin, City Attorney for Johnson City, TN (via email)

---

under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000, that litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court). Similarly, several Section 504 cases have held that persons need not exhaust administrative remedies. *See, e.g., Tuck v. HCA Health Servs. of Tenn., Inc.,* 7 F.3d 465, 471 (6th Cir. 1993) (exhaustion of federal administrative remedies is not required); *Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir. 1990) (same).

[2] *Tennessee v. Lane,* 541 U.S. 509 (2004).

# EXHIBIT 5

## (TO MOTION TO RECONSIDER)

Law Offices
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342

Phone: (404) 354-2363
Fax: (404) 745-0195

E-mail:
jim@jamesdunlaplaw.com

March 12, 2014

VIA EMAIL AND REGULAR MAIL

The Honorable Kim Summers
Administrative Judge
Administrative Procedures Division
Tennessee Department of State
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Ave. North, 8th Floor
Nashville, TN 37243

Re:  **Tri-Cities Holdings LLC d/b/a Trex Treatment Center**
     **CON #1303-005D**
     **Docket No.: T.B.A.**

Dear Judge Summers:

I wanted to outline further my position regarding the previous requests I have made upon you regarding TCH's rights under the Americans with Disabilities Act in this appeal.

The Administrative Procedures Division, Tennessee Department of State, is subject to Title II of the Americans with Disabilities Act.[1] *Respectfully,* I submit that this imposes upon you an *affirmative duty* to provide a reasonable modification to TCH

---

[1] "The [Tennessee] Department Americans with Disabilities Act (ADA) Coordinators ensure state government's compliance with the Americans with Disabilities Act as amended by the Americans with Disabilities Act Amendments Act (ADAAA). They assist with reasonable accommodation issues in state employment and program access for state services and programs and help agencies and employees resolve access and accommodation issues. Please contact your agency's ADA Coordinator if you need more information or have any questions about a reasonable accommodation." State of Tennessee Employee Handbook, p. 10. (emphasis added).

to allow the Certificate of Need to be issued in this case and before any final hearing is held.[2]

The Attorney General of the United States, at the instruction of Congress,[3] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[4]

As you know, I have made several requests to you for a reasonable modification under the ADA.[5] I *respectfully* submit that you and the Administrative Procedures Division have an affirmative duty to provide a reasonable modification to TCH to obtain its Certificate of Need. This responsibility is different from your consideration of normal "non-ADA" administrative appeal.

Because your duty under the ADA is *affirmative*, it is not incumbent upon me to take the initiative to fashion a remedy. Rather, it is your duty. However, this modification might specifically involve a reasonable lowering of the requirements of "need, economic feasibility, or orderly development" in accordance with the criteria for issuance of a Certificate of Need. Although given the undisputed evidence that this area suffers the worst drug overdose death and infant mortality rate in the nation, satisfaction of the "need" criteria is relatively straightforward. In addition, there is undisputed evidence of widespread suffering and havoc related to the daily long-distance driving of between 500 and 1,000 opiate-addicted, ADA-disabled people to have to get standard of care Methadone Maintenance Treatment at an Opiate

---

[2] *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002) (holding that entities have standing to sue under the ADA as being discriminated against "because of their known association with an individual with a disability")(citations).

[3] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." Id. § 12134(b).

[4] 28 C.F.R. § 35.130(b)(7).

[5] James Dunlap letters to Judge Summers, July 28, 2013 and July 29, 2013. Petitioner's Motion for Reasonable Modification dated March 10, 2013.

Treatment Programs in North Carolina. I would submit that on the issues of economic feasibility and orderly development, such a clinic would easily satisfy any requirement, given that there is no such clinic within fifty (50) miles in any direction and the need is so great.

In this regard, I would *respectfully* request that you immediately indicate your willingness to discuss a reasonable modification (by telephone is fine) and that we schedule a conference (again telephone is fine) to *specifically to address the reasonable modification request*—before a full-blown hearing is scheduled.

Finally, I would hope that you would not be hurried or pressured in any way to schedule a final hearing in this case. Rather, it my clients' position that it is appropriate for the pending federal case to resolve <u>before</u> a final hearing in this case.

Sincerely,
James A. Dunlap Jr. & Associates LLC

James A. Dunlap Jr.

JAD/jd
Cc:  Jim Christoffersen, General Counsel HSDA (via email)

# EXHIBIT 6

(TO MOTION TO RECONSIDER)

BEFORE THE
TENNESSEE HEALTH SERVICES AND DEVELOPMENTAGENCY

| | |
|---|---|
| Tri-Cities Holdings LLC )<br>d/b/a Trex Treatment Center ) | DOCKET NO. T.B.A.<br>CON No. CN1303-005D |

PETITIONER'S OBJECTION TO MOTION TO SET HEARING
AND DEMAND FOR REASONABLE MODIFICATION
UNDER THE AMERICANS WITH DISABILITIES ACT

James A. Dunlap Jr. & Assoc. LLC
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

James S. Higgins, Esq. BPR # 16142
Rick Piliponis, Esq. BPR # 16249
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# Contents

Summary of Argument ........................................................................................... 3

Statement of Fact ................................................................................................ 4

I.     HSDA's Notice Rule blatantly violates the ADA. ......................................... 7

II.    HSDA blatantly violated the ADA failing to offer TCH a reasonable
      modification to TCH to allow it to locate its clinic in Johnson City. ........... 7

III.    The United States Department of Justice is on the verge of hitting HSDA
      and Johnson City with an ADA enforcement action. .................................. 8

IV.    HSDA and Johnson City's policies have created a slaughterhouse of drug
      overdose death and infant mortality in the Johnson City area. ................... 9

        A.    Right now, from 500 to more than 1,000 opiate-addicted, ADA-
             disabled residents of the Johnson City area -- including pregnant
             women--are being forced to drive 100+ miles or more over
             dangerous mountain roads (as often as daily and in the dark to
             allow time to get to work) to OTP clinics in North Carolina. ............. 12

        B.    Johnson City and HSDA's illegal rules are taking a deadly toll on
             bystanders being needlessly killed by some of more than 1,000
             opiate-addicted people having to drive 100+ miles per day for
             MMT treatment throughout northeast Tennessee. ........................... 13

        C.    Johnson City and HSDA's illegal rules are taking a potentially
             deadly toll on pregnant women and infants in northeast Tennessee. .......... 14

V.    Johnson City and HSDA's blatant violations of the ADA that have persisted
      for over a decade and are part of a widespread effort among local
      governments in northeast Tennessee to violate federal law. ....................... 15

VI.    On top of a leading drug overdose death rate and infant mortality that place
      the Johnson City area at the absolute bottom of nation in public health, an
      epidemic of heroin is now crashing down upon Johnson City, like many
      places in America, that will make these already grotesque death statistics
      pale in comparison to what soon awaits this community. ........................ 17

VII.   Petitioner respectfully submits that this administrative appeal process
      amounts to a scheme or artifice to violate the ADA. ............................... 20

Conclusion .......................................................................................................... 21

2

Plaintiffs Tri-Cities Holdings LLC ("TCH"""), Petitioner in the above-captioned matter, by and through its undersigned counsel, hereby files this Objection to Motion to Set Hearing, and Demand for Reasonable Modification Under the Americans with Disabilities Act, and states as follows:

## Summary of Argument

In filing its Motion to Set Hearing, HSDA is attempting to make this tribunal the "fixer" by illegally providing HSDA cover in what amounts to its blatant violations of the Americans with Disabilities Act ("ADA"). HSDA is facing a virtually certain loss in federal court (at the trial level or, if not there, then on appeal to the Sixth Circuit) for its blatant violations of the ADA both for its blatantly illegal Notice Rule and also its gross failure in its *affirmative duty* to provide a reasonable modification to its rules to allow TCH's clinic to obtain a Certificate of Need. HSDA also faces a pending investigation, and a seemingly imminent enforcement action against it, by the United States Department of Justice. Petitioner suggests that HSDA would love nothing more than have this tribunal "enter the fight," create a diversion, and take the heat off HSDA and somehow "fix" HSDA's unfixable position.

As a matter of long-settled federal law, HSDA and Johnson City are liable to TCH under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., ("ADA"). *Mx Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)(arbitrary distance requirements virtually identical to Johnson City's ordinance are a violation of the ADA); *Potomac Group Home v. Montgomery County*, Md., 823 F. Supp. 1285 (D. Md. 1993)(notice provisions which galvanize local opposition, virtually identical to HSDA's Notice Rule, violate the ADA).

Further, both HSDA and Johnson City blatantly failed in their *affirmative duties* to offer

3

TCH a reasonable modification to locate the clinic in Johnson City.

In addition, if this tribunal does "take HSDA's bait" and takes any action to decide this appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing, Petitioner respectfully indicates that it will have no choice but to join Your Honor, in an official capacity, and this tribunal, as defendants in the pending federal court action.

Finally, Petitioner respectfully submits that, under the ADA, Your Honor and this tribunal are required to offer Petitioner a reasonable modification to allow the CON to be issued. Petition respectfully submits that Your Honor's and this tribunal's continuing failure to do this creates a cause of action that Petitioner may bring against Your Honor, and the tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents in an ADA enforcement action.

Thus, this tribunal should decline to be HSDA's and Johnson City's "fixer," despite their desperate attempts to create a non-existent "escape hatch" for their blatant violations of federal law and the penalties likely soon to be imposed against them for these violations.

## Statement of Fact

Tragically, over the last decade, HSDA and Johnson City officials have presided over what amounts to the biggest slaughterhouse of drug overdose deaths and infant mortality in the United States. Over the last decade --and absent fundamental change will be a never-ending condition -- one to two Johnson City area residents drop dead from a drug overdose every three days.[1] That's 100-200 dead per year and between 1,000 and 2,000 dead over the next decade. A

---

[1] This estimate is based on the fact that three people die every day in Tennessee from a drug overdose (more than 1,200 annually) and TCH's proposed service area surrounding Johnson City comprises approximately 10% of the state population. So 10% of three deaths a day is

4

thousand died over the last decade in this area. This is the biggest drug overdose and infant death slaughterhouse in the nation—higher even that the nation's capital of drug overdose and infant death—West Virginia.

Even more depressing than Johnson City's war-zone-level drug overdose death rate -- if that's possible – is the fact that the Johnson City area has a <u>higher white non-Latino infant mortality rate than any state in the union</u>. Sadly, but almost certainly at least in part because of the denial of access to standard of care treatment, the Johnson City area suffers the <u>highest non-Latino white infant mortality rate in the United States</u>—higher even than West Virginia-- the heretofore non-Latino white infant death capital of America.[2] Many third world countries have drastically lower infant mortality rates than the Johnson City area.[3] A baby in Carter County, Tennessee has essentially the same survival odds as one in Botswana, Africa![4] The grim figures are below.

| Geographic Area | Non-Latino White Infant Mortality per 1,000 Births |
|---|---|
| Carter County, TN | 9.8 |
| **Washington County, TN** | **8.5** |
| Unicoi County, TN | 7.7 |
| West Virginia | 7.5 |
| **Average of TN Counties with MMT** | **4.4** |

---

approximately one death every three days. This rate is most likely higher than West Virginia, the drug overdose death capital of America.

[2] "Chronic Disease Heath Profile Regions and Counties" Tennessee Department of Health (2011); Infant Mortality Rates, 2007-2009, The Henry J. Kaiser Family Foundation (kff.org).

[3] *Id.*

[4] CIA World Factbook (2013), https://www.cia.gov/library/publications/the-world-factbook/rankorder/2091rank.html (Botswana suffers an estimated 9.9 deaths per thousand births. Sri Lanka, Saint Kitts and Nevis, Uruguay, Saint Maarten, Costa Rica, Cyprus, Nauru, Ukraine, Macedonia, Latvia, Puerto Rico, Kuwait, Chile, and even Russia, have lower infant mortality rates than the Johnson City area.).

5

<u>MMT is unquestionably the standard of care for opiate-addicted pregnant women</u>. [5]

Despite this obvious fact, a fact that any competent medical provider realizes, and in the face of

below-third-world infant death rates in the Johnson City area, hundreds of opiate-addicted pregnant

women presenting themselves for treatment in the Johnson City area <u>are being illegally denied</u>

<u>standard of care MMT treatment for their disability</u>.   In fact, in a comically tragic situation, even

Johnson City's own large hospital group, Mountain States Health Alliance, declared in a 2012

warning letter to more than 100 doctors in the area <u>not to prescribe sub-standard of care Suboxone</u>

and that <u>"Methadone is the recommended medication used for detoxification during pregnancy."</u>[6]

Yet, despite this obvious and pathetic lack of standard of care treatment, Johnson City and HSDA

plod forward and continue to illegally block access by pregnant women to standard of care

treatment.

   The Johnson City area's public health statistic related to opiate addiction are all

horrible—almost uniformly the worst in the nation and way below many third world countries.

---

[5] In 2012, the American College of Obstetricians and Gynecologists declared in a formal
published opinion that <u>MMT is the standard of care for opiate addicted pregnant women</u>: "Opioid
use is not uncommon in pregnancy.... <u>The current standard of care for pregnant women with</u>
<u>opioid dependence is referral for opioid-assisted therapy with methadone</u>.... Abrupt
discontinuation of opioids in an opioid-dependent pregnant woman can result in preterm labor,
fetal distress, or fetal [death]." "Opioid Abuse, Dependence, And Addiction In Pregnancy,"
American College of Obstetricians and Gynecologists Committee Opinion No. 524
(2012)(emphasis added).  On or about April 30, 2012, the Journal of the American Medical
Association declared:  "[M]ethadone is the recommended treatment for opioid dependence during
pregnancy." On December 9, 2010, New England Journal of Medicine declared:  "[T]he standard
of care for opiate addiction during pregnancy is methadone maintenance and psychiatric care."[5]  In
1998, a National Institute of Health (NIH) Consensus Panel declared:  "[M]ethadone is the
standard of care in pregnant women with opioid addiction."  In 2012, the National Institute on
Drug Abuse declared:  "[M]ethadone has been the standard of care for the past 40 years for opioid
dependent pregnant women."
[6] "Women Warned Not to Take Two Drugs Around Pregnancy," *Johnson City Press*,
March 22, 2012. (http://www.johnsoncitypress.com/article/99175)

One would think that common sense would *at least not actively block* standard of care treatment for opiate addiction into the area that is the biggest slaughterhouse of opiate overdose death and infant mortality in the United States. But logic is often scarce in local and state politics. This scenario, sadly, is all too common. In similar fashion, Pakistani villagers recently attacked UN workers bringing standard of care vaccine to areas ravaged by polio.[7] Like HSDA, the Pakistani villagers apparently believed there was "no need" for standard of care treatment in the area.

## I. HSDA's Notice Rule blatantly violates the ADA.

HSDA's "Notice Rule"[8] requires only clinics serving opiate-addicted persons who are disabled under the ADA (and no one else) to perform cumbersome procedures to provide notice to local and state political leaders which galvanizes opposition only to efforts to treat the disabled. Clinics serving non-disabled persons have no such burden. Federal courts resoundingly reject such discriminatory notice provisions. *Potomac Group Home v. Montgomery County, Md.,* 823 F.Supp. 1285 (D. Md. 1993). Thus, HSDA is facing a sure loser on this issue.

## II. HSDA blatantly violated the ADA failing to offer TCH a reasonable modification to TCH to allow it to locate its clinic in Johnson City.

HSDA also failed to make any attempt -- required under the ADA-- at a reasonable modification of its rules to allow TCH to obtain a Certificate of Need.

Furthermore, the Attorney General of the United States, at the instruction of

---

[7] Polio Vaccination Teams Attacked By Pakistani Militants, London Telegraph, March 1, 2014 (http://www.telegraph.co.uk/news/worldnews/asia/pakistan/10669840/Polio-vaccination-teams-attacked-by-Pakistani-militants.html).

[8] T. C. A. § 68-11-1607(c)(3).

7

Congress,[9] has issued an implementing regulation that outlines the affirmative duty of a public entity to accommodate reasonably the needs of the disabled. Federal courts have interpreted this duty to reasonably accommodate is an *affirmative* duty[10] and declared that Title II imposes an "obligation to accommodate," or a "reasonable modification requirement."[11]

Misery loves company and HSDA would surely love this tribunal to try to extricate HSDA from the legal swamp it has created for itself. However, this tribunal is unable to do this and, at a minimum, would just succeed in bringing further liability upon itself and become a named defendant in the federal action. Petitioner <u>respectfully</u> suggests this would be an unwise and costly step for the tribunal and certainly violate principles of judicial economy at the very minimum.

### III. The United States Department of Justice is on the verge of hitting HSDA and Johnson City with an ADA enforcement action.

HSDA and Johnson City already under investigation by the DOJ for violations of the ADA in this case—with penalties for violations starting at $50,000 *for the first violation* and *$100,000 for each additional violation.*[12]   On Petitioner's information and belief, more than forty complaints have been lodged by Tennessee residents with DOJ regarding these ADA violations,

---

[9] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." *Id.* § 12134(b).

[10] *Tennessee v. Lane*, 541 U.S. 509 (2004); *Popovich v. Cuyahoga*, 227 F.3d 627, 638 (6th Cir., 2000)("There is no statutory exception to Title II's duty to accommodate….").

[11] *Id. at* 532–33; *see also Alexander v. Choate*, 469 U.S. 287, 301 (1995)(suggesting Rehabilitation Act requires "meaningful access" and "reasonable accommodations"); *accord, Ability Center, Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir., 2004) ("Title II targets more than intentional discrimination….").

[12] 42 U.S. Code § 12188(2)(C)(1) and (2).

8

VOL. III

# THE CHANCERY COURT
## DAVIDSON COUNTY, TENNESSEE

### HONORABLE CAROL L. MCCOY, CHANCELLOR

### CRISTI E. SCOTT, CLERK AND MASTER

### TRI-CITIES HOLDINGS LLC d/b/a TREX TREATMENT CENTER
Petitioner/Appellant

VOLUME 3 of 3

FILED
MAY 26 2015
Clerk of the Courts

| CERTIFIED TRANSCRIPT OF Cause | Appearance No. 14-650-II CHANCERY COURT | Vs<br>No. M2015-00058-COA-R3-CV<br>COURT OF APPEALS<br>TRANSMITTED ON:<br>April 20, 2015 | Execution on SUPREME COURT | APPEALED TO Next Term, 20 |

### TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY
Respondent/Appellee

Rick Piliponis, #16249
THE HIGGINS FIRM
525 Fourth Avenue South
Nashville TN 37210
(615) 353-0930

James A. Dunlap, Jr.
310 Windsor Gate Cove NE
Atlanta GA 30342
(404-354-2363)

*Attorney for Petitioner/Appellant Tri-Cities Holdings LLC, d/b/a Trex Treatment Center*

Sue A. Sheldon, #15295
Sara Sedgwick, #4336
Senior Counsel
Office of the Attorney General
P.O. Box 20207
Nashville TN 37202
(615) 741-2640

*Attorney for Respondent/Appellee Tennessee Health Services and Development Agency*

STATE OF TENNESSEE)

COUNTY OF DAVIDSON)

In the Chancery Court, Part II in which TRI-CITIES HOLDINGS LLC d/b/a TREX TREATMENT CENTER is the Petitioner and TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY is the Respondent, Rule No. 14-650-II, the following proceedings were had:

Tri-Cities Holdings, LLC
v. 14-650-II
Tennessee Health Services and
Development Agency
Court of Appeals
Chancellor McCoy
M2015-00058

## INDEX

## PAPERS FILED IN THE TRIAL COURT

## VOLUME I

Appeal of Order Revoking Permission to Appear *Pro Hac Vice* . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Exhibit 1 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
(Letter to Judge Summers from James A. Dunlap, Jr. dated March 12, 2014)

Exhibit 2 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
(Order Revoking Permission to Appear *Pro Hac Vice*)

Exhibit 3 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
(Petitioner's Motion for Reconsideration of Order Revoking Permission to Appear *Pro Hac Vice*)

Exhibit 4 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
(Letter to Judge Summers from James A. Dunlap, Jr. dated July 29, 2013)

Exhibit 5 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
(Letter to Judge Summers from James A. Dunlap, Jr. dated April 8, 2014)

Exhibit 6 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
(Petitioner's Motion for Reconsideration of Order Revoking Permission to Appeal
Pro Hac Vice)

Exhibit 7 to Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
(Order Denying the Motion for Reconsideration)

Affidavit of James A. Dunlap, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Exhibit to Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
(Letter from Supreme Court of Georgia)

Respondent's Notice of File Administrative Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Agreed Scheduling Order filed July 11, 2014 ...................................... 145


**VOLUME II**

Respondent's Notice of Filing Supplemental Administrative Record .................... 147

Supplemental Administrative Record .............................................. 149

Respondent's Brief on Judicial Review ........................................... 154

Plaintiff's Notice of Intention to Rely on Initial Filings to Serve as Brief ................ 179

Exhibit A to Notice ........................................................... 181
(Appeal of Order Revoking Permission to Appear *Pro Hac Vice*)


**VOLUME III - beginning with page 300**

Petitioner's Reply Brief ....................................................... 318

Chancellor's Memorandum and Order filed December 10, 2014 ....................... 338

Notice of Appeal ............................................................ 366

Appeal Bond for Costs ........................................................ 368

Certificate of Clerk and Master ................................................. 369

**Rick Piliponis, #16249**
**THE HIGGINS FIRM**
**525 Fourth Avenue South**
**Nashville TN 37210**
**(615) 353-0930**

**James A. Dunlap, Jr.**
**310 Windsor Gate Cove NE**
**Atlanta GA 30342**
**(404-354-2363)**

     *Attorney for Petitioner/Appellant Tri-Cities Holdings LLC, d/b/a Trex Treatment Center*

Sue A. Sheldon, #15295
Sara Sedgwick, #4336
Senior Counsel
Office of the Attorney General
P.O. Box 20207
Nashville TN 37202
(615) 741-2640

*Attorney for Respondent/Appellee Tennessee Health Services and Development Agency*

and many more complaints filed nationally. The DOJ investigation began in June 2013. Although moving at the typical pace of government, it would seem virtually impossible that DOJ would give HSDA and Johnson City a "free pass" on their blatant, horrific violations of the ADA that are indisputably killing so many people (opiate-addicted and innocent bystanders such as 22-year old newlywed Misty Briggs) and causing such havoc and widespread suffering. The DOJ severely punished local governments in similar cases.[13] This horrific and disgraceful situation which has persisted for more than a decade before more lives are lost and so these ridiculously blatant violations of the ADA can be at least partially ameliorated in this area of widespread flouting of the ADA.

Even more disturbing, HSDA and Johnson City's violations of the ADA amount to *de facto* policy to expel "undesirable" disabled persons from the region. News organizations and advocacy groups across America, like the National Association of Medically Assisted Recovery, are looking on in horror as this northeast Tennessee death chamber is exacerbated by discrimination so blatant the bad actors are even willing to allow to innocents to be killed (i.e., 22-year old newlywed Misty Briggs) rather than change the policy.

IV.    **HSDA and Johnson City's policies have created a slaughterhouse of drug overdose death and infant mortality in the Johnson City area.**

Since at least since 2003, Johnson City (aided by HSDA's illegal Certificate of Need procedures[14]) has employed a blatant illegal zoning ordinance, treating opiate-addicted

---

[13] *United States v. Baltimore*, (U.S. Dist. Maryland)(09 CV 1049), United States v. City of Ansonia, CT, settlement signed March 30, 2012.
[14] HSDA's notice procedures that apply only to opiate treatment facilities effectively galvanize local resistance to methadone clinics. These type rules have been rejected by federal courts nationwide as being in violation of ADA. *Potomac Group Home v. Montgomery County,*

9

300

person like sub-humans unfit to receive medical treatment near "normal" Johnson City residents, to actively block standard of care Methadone Maintenance Treatment ("MMT") treatment. With tragic, mind-boggling irony, at the same time the Johnson City area is the most opiate-soaked in the United States.[15] A U.S. Attorney recently described Johnson City as the "epicenter" of the national opiate-addiction crisis.[16] Most likely, more than 100 oxycodone pills are being prescribed per year for every Johnson City area resident over 12 years of age![17] The Johnson City area faces a drug overdose death rate higher than any state in the union. More than 1,000 Johnson City area residents have died of overdoses over just the last decade and another 2,000 will likely die in the coming decade! There is no place in America when an Opiate Treatment Program is more needed than here.

---

*Md.*, 823 F.Supp. 1285 (D. Md., 1993).

[15] Tennessee Department of Mental Health and Substance Abuse Services ("TDMHSAS") statistics show northeast Tennessee has more than twice the statewide rate of drug overdose emergency room visits. Assuming emergency room visits correlate to drug overdose death rates—a fair assumption--northeast Tennessee would have twice the statewide death rate, putting northeast Tennessee drug overdose death rate higher than that West Virginia -- the nation's drug overdose death capital. Governor's Public Safety Action Plan, TDMHSAS Commissioner Doug Varney, December 6, 2012.

[16] One of the presenters was Booth Goodwin, U.S. Attorney for the Southern District of West Virginia. "Prescription drug abuse is absolutely the biggest crime problem, the biggest public health problem in my district," Goodwin said. "This is a very big issue for all of our districts. **If you took a pin and put it in Johnson City and drew a 500-mile radius around it, you would be right in the middle of a prescription drug crisis.**" "Regional Summit Tackles Prescription Drug Abuse," Johnson City Press, September 25, 2013. (http://www.johnsoncitypress.com/article/111294/regional-summit-tackles-prescription-drug-abuse).

[17] In 2010, there were 272 million Hydrocodone pills prescribed in Tennessee, which is enough to supply 51 doses to every man, woman and child over the age of 12 in the state. "Hyrdocodone, Oxycodone, Oxycontin are highly abused and extremely addictive," says U.S. attorney for East Tennessee Bill Killan. WCYB, Bristol, VA. September 25, 2013. ("Knox County, Sullivan County, and Washington County are the most severe counties in the per capita uses for substance abuse.").

10

Despite Johnson City being a slaughterhouse of sky-high drug overdose deaths and below-third-world infant mortality, Johnson City and HSDA have conspired to block MMT--a treatment overwhelmingly recognized in the United States, and around the world, as standard of care treatment for opiate addiction.[18] In fact, MMT clinics have been shown to reduce drug overdose death rates by ten fold.[19] Almost certainly, the impact of standard of care MMT being available here would be positive in an area so cruelly stricken by opiate addiction.

The idea of intentionally blocking standard of care MMT treatment in an area so riven with death and suffering from opiate addiction is mind boggling. If one to two people were dying of smallpox every three days in Johnson City, wouldn't there be calls to make smallpox vaccine available closer than 50 miles away in North Carolina? Would HSDA be stopping a smallpox clinic from opening? The questions answer themselves but for one difference---in this case the victims are primarily, but not exclusively by any means, opiate-addicted persons who are subject to loathing and hatred by locals. This plays into local and state politics—regardless of the astronomical death and human suffering this causes.

Despite this public health crisis having raged for more than a decade, and the

---

[18] Specifically, the following health organizations have described MMT as either "the standard of care," "the most effective treatment," or "an effective treatment" for opiate addiction: National Institute of Health (NIH.gov); National Institute on Drug Abuse (NIDA.gov). 2; U.S. Substance Abuse & Mental Health Services Administration (SAMHSA.gov); Center for Disease Control (www.cdc.gov); The World Health Organization (WHO.org); The New England Journal of Medicine (JAMAnetwork.org); Journal of the American Medical Association (AMA-assn.org); American College of Obstetricians and Gynecologists (acog.org); HHS.gov.

[19] *"Opiate-Dependent Patients On A Waiting List For Methadone Maintenance Treatment Are At High Risk For Mortality Until Treatment Entry."* J Addict Med. 2013 May-Jun;7(3):177-82. (The mortality rate (available among 583) during the 2 years on the waiting list was higher (5.0/100 person years) for the 225 non admitted applicants than for the 358 admitted (0.42/100 person years, P < 0.0005) and those who were admitted with no delay before 2002 (2.1/100 person years). )

11

painfully obvious need for MMT in this area, Johnson City and HSDA cling to blatantly illegal rules which prevent Opiate Treatment Programs bringing standard of care MMT to opiate-addicted persons clearly disabled under the ADA. This is despite evidence showing that MMT arguably could have saved a significant number of lives out of the 1,000 killed from drug overdoses in the Johnson City area over the last decade.

A. **Right now, from 500 to more than 1,000 opiate-addicted, ADA-disabled residents of the Johnson City area -- including pregnant women--are being forced to drive 100+ miles or more over dangerous mountain roads (as often as daily and in the dark to allow time to get to work) to OTP clinics in North Carolina.**

For years, based upon a policy that could only be cheered by grave diggers and casket makers, Johnson City and HSDA have forced *at least* 500,[20] but likely more than 1,000, area residents to drive 100+ miles round trip, in all hours of the night, and as often as daily, to obtain standard of care MMT. This mass movement of people has been referred to by HSDA staff as a "migration." Johnson City and HSDA scoff at the unprecedented slaughter and suffering endured these hundreds of disabled Americans as "nonsense." But where in America are more disabled people being subjected to discrimination, death, and widespread suffering on a greater scale than here?

This fiasco of death and illegality is something that HSDA and Johnson City would dearly love to have this tribunal dive into and start running cover for them. Petitioner respectfully suggests that it would highly unwise to do so.

---

[20]Spencer Clark, MSW, ACSW, NC Department of Health and Human Services Director of Operations and Clinical Services Community Policy Management Section, Division of Mental Health, Developmental Disabilit ies and Substance Abuse Services, June 24, 2013 email to Kathy Ostertag (http ://www. ncdhhs.qov)..

12

**B.** Johnson City and HSDA's illegal rules are taking a deadly toll on bystanders being needlessly killed by some of more than 1,000 opiate-addicted people having to drive 100+ miles per day for MMT treatment throughout northeast Tennessee.

This disastrous situation has already resulted in at least one Jonesborough newlywed being killed by one of this army of exhausted patients seeking MMT treatment in other states.[21] In addition, a survey of local newspapers reveals a runaway epidemic of traffic deaths being caused by drivers under the influence of opiates--essentially an opiate-fueled "Demolition Derby" because so many people are not getting effective treatment that MMT can provide.[22] In fact, over the last decade, more than 1,000 Johnson City area residents have died of drug overdoses and an estimated 50 to100 more Johnson City area residents have died just since the filing of the

---

[21] A 22-year old Jonesborough resident, Misty Briggs, was killed in a head-on collision with 26-year old Johnson City resident Rachel Proffitt, one of the 500-1000 exhausted drives plying the roads of northeast Tennessee, as often as daily, in the middle of the night, to get standard of care MMT treatment from clinics in North Carolina. The day of the fatal collision, Mr. Proffitt fell asleep at the wheel while having to, as often as daily, wake up at 4AM, drive 60+ miles to Ashville for MMT treatment, then drive 60+ miles back to Johnson City, then drive her husband to work, then drive herself to work. Toxicology tests showed exhaustion, not methadone, was the cause of the fatal collision. "Judge Wants To Look Up Law Before Accepting Plea In Vehicular Homicide Case," *Johnson City Press*, June 29, 2013.

[22] "Local Man Indicted in 2010 Traffic Death," *Johnson City Press*, November 18, 2013 (**man killed by driver on oxycodone**); "Toxicology Report Needed In Case," Johnson City Press, August 17, 2013 (**man killed by driver on narcotics**); "Driver Arrested After Dumping Pills At Scene Of Rollover Crash In Kingsport," November 3, 2011 (**rollover crash, man charged with possession of narcotics**); "Rogersville Woman Facing Drug, Traffic Charges After Allegedly Nearly Wrecking Sheriff," July 8, 2012 (**woman arrested on opiates after narrowly avoiding head-on collision with sheriff**); "Near crash results in drug arrest," *Kingsport Times News*, May 24th, 2011 (**woman on opiates arrested after near collision with police cruiser**); "Kingsport Police Seize Drugs From Man Slumped Over Steering Wheel," *Kingsport Times News*, February 28th, 2011 (**man slumped over steering wheel found with [presumably opiate] pills**); Kingsport "Woman Arrested For DUI Following Wreck With Child In Car," Kingsport Times News, January 13th, 2011 (**woman on opiates with 7-year old child in car collides with truck**); "East Tenn. Drunk Driver Who Crashed And Killed 2 While On The Way To Serve Jail Time For Prior DUI Gets 10 Years," *Kingsport Times News*, September 21, 2010 (**longtime drug and alcohol addict kills two in collision on way to serve jail time for prior offense**).

13

304

plaintiffs' complaint in the federal action.

### C.    Johnson City and HSDA's illegal rules are taking a potentially deadly toll on pregnant women and infants in northeast Tennessee.

The toll on pregnant women in the on Johnson City area is astounding. Despite hundreds of opiate-addicted pregnant women presenting themselves for treatment to Johnson City area medical offices each year,[23] the undisputed standard of care treatment for pregnant women is fifty miles away in any direction. The Defendants effectively force pregnant women to either (1) drive 9,000 miles in the first 90 days of MMT treatment[24] or (2) take risky, relatively-untried buprenorphine (Suboxone or Subutex), that has about double the relapse rate, that can throw them into withdrawal and kill their baby, and that Mountain States Health Alliance already warned area doctors not to prescribe:

> **If you are pregnant, trying to get pregnant or not using birth control, don't take Subutex or Suboxone, for the sake of your unborn child.** And if you are a physician, don't continue to prescribe those drugs containing buprenorphine to anyone who is pregnant.[25]

Significantly, Tennessee counties with MMT clinics only average only about 4.4 deaths per thousand births. That's half the infant mortality rate of many northeast Tennessee counties without MMT clinics.[26] It logically follows that offering standard of care treatment to pregnant women would lead to lower infant mortality rates than areas that deny pregnant women

---

[23] "Women Warned Not To Use Two Drugs [Suboxone and Subutex] Around Pregnancy," *Johnson City Press*, March 22nd, 2012

[24] State rules allow only one take home dose per week in the first ninety (90) days of MMT treatment. So new patients living in Johnson City have to drive approximately 9,000 miles in the first ninety days to get to a clinic in North Carolina.

[25] *Id.*

[26] Madison, Hamilton, Davidson , Hardin, Maury, Davidson, Dyer, Knox, and Shelby counties.

14

standard of care treatment. Unborn and newborns are bearing an unfair burden in the Johnson City and HSDA's war on the disabled. Just reducing the Johnson City area infant mortality rate to the average of a Tennessee county with MMT treatment <u>would save an average of 27 babies' lives per year.</u>[27]

### V. Johnson City and HSDA's blatant violations of the ADA that have persisted for over a decade and are part of a widespread effort among local governments in northeast Tennessee to violate federal law.

In northeast Tennessee, many local governments are enacting blatantly illegal local ordinances that violate the ADA and discriminate against the disabled – in open disregard of federal law. In the midst of this slaughter that is dwarfing almost every epidemic in the history of the United States short of the Influenza Pandemic of 1918[28]--northeast Tennessee has become an enclave of widespread discrimination against opiate-addicted, disabled Americans in clear violation of federal law. Arbitrary distance restrictions on drug treatment clinics have been rejected by every federal court in the United States as violating the ADA. Yet, despite this clear and settled federal law, Carter County, Washington County, Johnson City, Unicoi, Kingsport, Bristol, and Rogersville (on December 10, 2013), have passed blatantly illegal ordinances that

_____

[27] In the U.S., pregnant women have been estimated to be 1% of the general population at any point in time. U.S. Center for Disease Control (2013). The Proposed Service Area is approximated 650,000. Therefore, 6,500 pregnancies occur in this area per year. So reducing the infant mortality rate in the Proposed Service Area from Washington County's 8.5 to the average 4.4 deaths per thousand births where MMT clinics exist would avoid approximately 26.7 additional infant deaths per year.

[28] The 1918 Great Influenza Pandemic killed an estimated 675,000 Americans. http://wwwnc.cdc.gov/eid/article/12/1/05-0979_article.htm. Opiate-addiction is killing about 38,000 Americans per year, and has been raging for a least a decade. http://www.drugwarfacts.org/cms/Causes_of_Death#sthash.uMmGwTVC.dpbs. So in another decade, opiate-addiction will have most likely killed more Americans than the Great Influenza Pandemic of 1918.

15

include arbitrary distance requirements on drug treatment clinics.[29]  The Eastern District of

Tennessee has become an "ADA-free zone" where disabled Americans are being discriminated

against at will -- right under the nose of the federal court.  Such a widespread flouting of federal

law is counterproductive both for the disabled Americans in the area being discriminated against,

and in need of protection from the federal court, but also such conduct sends the clear message of

blatant disrespect for federal law.  Hopefully, the federal court's or DOJ's prompt action can help

quell this this "open season" on disabled Americans declared by local governments in this area.

Sadly, Johnson City and HSDA appear politically handcuffed to do anything in this case other than

oppose the clinic.  They are waiting for a federal court or DOJ to act to correct this situation while

providing Johnson City and HSDA with political cover.

Further delay only costs lives and allows a blatantly illegal ordinance and rule—

effectively modern-day Nuremberg Laws--to remain on the books.  Delay effectively dignifies

these laws that have no place in modern America.  Delay encourages other Tennessee communities

to mimic Johnson City and HSDA's blatantly illegal rules and conduct, as Rogersville, Tennessee

did in December, 2013.[30]

---

[29] Washington County Zoning Code Section 616.4.3 (no drug treatment clinic within 2,000 of a school, day care facility, park, church, synagogue, mosque, mortuary, amusement facility, or hospital., etc.);  Carter County Zoning Code Section 609.1.11 (no drug treatment clinic within 2,000 feet of a school, etc.);  Bristol Zoning Ordinance Section 502 (no methadone clinic located within one thousand (1000) feet of a school (public or private) or day care center);  Kingsport Zoning Ordinance Section 114-199 (no clinic within 1,000 feet of a school, day care, facility, park, church, synagogue, mosque, mortuary or hospital);  Rogersville Zoning Ordinance Section 12-10-13-1 (no drug treatment clinic within 1,000 feet of a school, day care facility, park, church, synagogue, mosque, mortuary or hospital);  Town of Unicoi Zoning Ordinances Section 710.4 (no methadone clinic within 1,000 feet of a school, day care facility, park, church, synagogue, mosque, mortuary or hospital).
[30] Rogersville, TN Zoning Ordinance Section 12-10-13-1 (no drug treatment clinic within

16

### VI. On top of the nation's worst drug overdose death rate and infant mortality rate, a heroin epidemic is now crashing down upon Johnson City that will make its already-grotesque drug and infant death statistics pale in comparison to what soon awaits this community.

Opiate addiction--particularly heroin--is growing by the day in the Johnson City area.[31] Already, the Johnson City area has the highest drug overdose death rate and the highest infant mortality rate in the nation.[32] It's not getting better, it's getting worse.[33] And it's about to be hit by a "heroin tsunami" that is already battering communities up and down the East Coast.

On top of an existing opiate-based public health catastrophe, a "heroin tsunami" is now beginning to hit the Johnson City area -- whether we like it or not. First, large numbers opiate addicted persons are being forced out of "pill mills" under a new federal regulatory and prosecutorial crackdown. But shutting down a "pill mill" only compounds the problem. Once an addict is cut off from his supply of opioids—the only alternative is either painful and possibly fatal withdrawal, or, as most do, moving to illegal sources of pain pills or heroin.

---

1,000 feet of a school, day care facility, park, church, synagogue, mosque, mortuary or hospital) was enacted on December 10, 2013.

[31] "Heroin Making a Comeback in East Tennessee," Local 8 News, Knoxville, TN, May 17, 2012, http://www.local8now.com/news/headlines/Heroin_making_a_comeback_across_East_Tennessee _151953835.html; Knoxville Police Indict 19 People In Heroin Drug Ring, WATE Channel 6, Mar 22, 2013, http://www.wate.com/story/21769200/knoxville-police-indict-19-people-in-heroin-drug-ring.

[32] The Johnson City area is the most opiate-plagued in the United States with, most likely, more than 100 oxycodone pills being prescribed per year for every Johnson City area resident over 12 years of age. Two to three Johnson City area residents are dropping dead of a drug overdose every three days. The Johnson City area faces a drug overdose death rate higher than any state in the union. More than 1,000 Johnson City area residents have died of overdoses over just the last decade and another 1,000 will die in the coming decade! There is no place in America when an Opiate Treatment Program is more needed than here.

[33] Tennessee Mental Health and Substance Abuse Services Commissioner E. Douglas Varney Presentation, December 6, 2012 (northeast Tennessee drug addiction rate apparently twice that of rest of state).

308

Second, heroin is shockingly cheap--only costing about $10 a dose which is sold in "bags."[34] --much cheaper than Suboxone which runs from $16-22 per day.[35] Methadone runs about $12-$15 per day. Despite this low cost, heroin profits can be enormous[36]—so the incentive to sell it is enormous and never-ending. Of course, heroin is what killed Academy Award Winner Philip Seymour Hoffman just last month.[37] Heroin production has also been mechanized by global drug cartels, making it available almost everywhere.[38] Most of the heroin sold in the United States is smuggled in through Mexico and then "cut" and distributed in tiny bags in apartments in larger cities than can produce 100,000 bags of heroin a day or more. Heroin is now so ubiquitous in Tennessee, "you can get heroin like ordering a pizza."[39] Recently, one heroin dealer found it convenient to work in McDonalds' and deliver heroin in Happy Meals to customers using a code phrase "I'd like to order a toy"[40]

---

[34] "A Complicated Actor, Actor Phillip Seymor Hoffman in his Last Days," New York Times, February 6, 2014, http://www.nytimes.com/2014/02/06/nyregion/a-complicated-actor-philip-seymour-hoffman-in-his-last-days.html.

[35] On Plaintiffs' information and belief, this is the approximated price a of 16mg dose of Suboxone at CVS Pharmacy (information from Georgia Suboxone seller Reckitt Benckiser sales rep). Methadone runs about $12 per day at NC clinics.

[36] "Heroin costs $2,600/kilo in Pakistan, but can be sold on the streets of America for $130,000/kilo (retail).... No agriculture based commodities industry in the world operates on the same price differentials as cocaine and heroin, while requiring relatively little in the way of expertise." Frontine (2014)(pbs.org)(http://www.pbs.org/wgbh/pages/frontline/shows/drugs/special/math.html).

[37] Id.

[38] "U.S. Efforts Fail to Curtail Trade in Afghan Opium," New York Times, May 26, 2012, http://www.nytimes.com/2012/05/27/world/asia/drug-traffic-remains-as-us-nears-afghanistan-exit.html?pagewanted=all.

[39] "Heroin Use On Rise In Rural Areas," The Tennesseean, February 3, 2014 ("The way that it seems in Nashville, it's like ordering a pizza,' says chief medical officer of Cumberland Heights treatment center.")

[40] "Pa. Happy Meal Heroin Suspect 'Crushed' by Charges," New York Times, February 11, 2014.

18

In January, 2014, the Governor of Vermont declared a "full blown heroin epidemic" in his state and devoted essentially <u>his entire State of State Address to the subject of the heroin epidemic in Vermont.</u>[41]

In February, 2014, the Governor of Maine devoted a large part of his State of the State address to the "troubling [heroin] epidemic... tearing at the social fabric of our communities."[42]

On March 10, 2014, the United States Attorney General declared a "heroin overdose public health crisis." [43]

Thus, unless Tennesseans are somehow genetically different than residents of Vermont and Maine—and people living in every other place in America--the heroin epidemic is in the process of exploding here as well. In that case, shouldn't standard of care methods for treating heroin addiction be available? The Defendants' confidence that the heroin epidemic now upon them can be handled in the Norman Rockwell-like settings of small doctors' offices is sadly misplaced. It's failed everywhere else--certainly in the face of Johnson City's catastrophic drug overdose death and infant mortality figures—so why is it going to suddenly start working now? As Albert Einstein once famously remarked, "[t]he definition of insanity is doing the same thing, over and over, but expecting a different result."

---

[41] Governor Shumlin Annual State of the State Address, January 8, 2014 (http://governor.vermont.gov/newsroom-state-of-state-speech-2013). Notably, Opiate Treatment Programs are a key part of Vermont's response to the heroin epidemic.

[42] Governor Paul LePage Annual State of the State Address, February 4, 2014 (https://www.mpbn.net/News/StateoftheStateAddress.aspx).

[43] "Heroin overdoses pose 'urgent public health crisis,' US attorney general says," Fox News, March 10, 2014 (http://www.foxnews.com/health/2014/03/10/heroin-overdoses-pose-urgent-public-health-crisis-us-attorney-general-says/?intcmp=obnetwork).

It is undisputed that an Opiate Treatment Program offers the strongest, most comprehensive response to wide-spread addiction to opioids as it provides standard of care methadone, testing services, and counseling services to deal with hard-core addiction—heroin addicts and multiple relapse patients.[44] In contract, office-based doctors writing Suboxone subscriptions are not equipped to deal with hardcore heroin users—with risks of relapse on Suboxone almost twice the rate of methadone.[45] An office-based doctor usually has no facilities to combat diversion to illegal uses, and no institutionalized testing and professional counseling resources that are required by law at an Opiate Treatment Program.

VII.    **Petitioner respectfully submits that this administrative appeal process amounts to a scheme or artifice to violate the ADA.**

HSDA and Johnson City have repeatedly and blatantly violated the ADA. The ADA rejects any scheme or device to relieve these entities from their responsibilities under federal law. Thus, any contrived "appeals process" that creates the illusion of compliance with the ADA when, in fact, the ADA has been clearly violated, is in itself a violation of the ADA and will subject that tribunal to sanctions either from a federal court or DOJ.[46] Procedural "halls of mirrors" designed

---

[44] National Institute of Drug Addiction International Program, Questions and Answers About Methadone, Part B-1, p. 1, (2014)(http://www.drugabuse.gov/sites/default/files/pdf/partb.pdf (citations).

[45] "Neonatal Abstinence Syndrome after Methadone or Buprenorphine Exposure," N Engl J Med 363, December 9, 2010 (Treatment was discontinued by 16 of the 89 pregnant women in the methadone group (18%) and 28 of the 86 pregnant women in the buprenorphine group (33%)). Plaintiffs suggest "discontinued" is a euphemism for relapse and return to illegal opiates. Unquestionably, relapse exposes the fetus to much greater risk of death. So Suboxone exposes fetuses to almost double the rate of relapse and death.

[46] Procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening,* 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted); *Potomac Group Home Corp. v. Montgomery County, Md.,* 823 F. Supp. 1285, 1296-97 (D. Md. 1993) (discriminatory

20

to violate civil rights is an old game. For example, in the "Jim Crow" South, many states enacted "literacy tests" to deprive blacks of voting rights while attempting to appear "neutral."[47] In this case, HSDA and Johnson City are trying to get this tribunal to be their "fixer" and run political cover for their illegal acts. Clearly, if this tribunal were to make such an attempt, it would amount to aiding and abetting HSDA and Johnson City's blatant violations federal law. Judgment day is coming for HSDA and Johnson City. This tribunal cannot, and should not, get in the way of this process.

## Conclusion

Petitioner respectfully asks this tribunal to decline to set a hearing date in this case.

Petitioner also asks this tribunal to fulfill its *affirmative duty* to provide TCH a reasonable modification to its rules to allow TCH to obtain its Certificate of Need as requested.

Dated: March 11, 2014

/s/James A. Dunlap Jr., Esq.
James A. Dunlap Jr. & Assoc. LLC
Georgia State Bar No. 003280
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

---

procedural requirements themselves violate the FHAA; the requirement that a prospective provider of group home services to the elderly must notify neighbors and civic organizations of the type of disabilities of the persons who will live in the group home and must invite neighbors to comment is facially discriminatory); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,* 257 F. Supp. 2d 208, 223-24 (D.D.C. 2003) ($57 certificate of occupancy filing fee plus inspection requirement is sufficiently burdensome to violate the FHAA). Courts have often analyzed the ADA and the FHA in tandem, noting similarities between the statutes. See, e.g., *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 573 n.4 (2d Cir. 2003).

[47] Civil Rights Museum (2014)(http://www.crmvet.org/info/lithome.htm).

James S. Higgins, Esq. BPR # 16142
Rick Piliponis, Esq. BPR # 16249
Higgins, Himmelberg & Piliponis, PLLC
116 Third Avenue, South
Nashville, Tennessee 37201
Phone (615) 353-0930
Fax (615) 467-2443
rdp@higginsfirm.com

Counsel for Petitioner

# CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2014, a copy of the foregoing document(s) was served by regular U.S. Mail to the following.

Jim Christoffersen
General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg., 9th Fl.
502 Deaderick St.
Nashville, TN 37243

Sue A. Sheldon, Esq.
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207

/s/James A. Dunlap Jr., Esq.
James A. Dunlap Jr., Esq.

23

# EXHIBIT 7

**BEFORE THE TENNESSEE HEALTH SERVICES**
**AND DEVELOPMENT AGENCY**

| | |
|---|---|
| **IN THE MATTER OF:** | **DOCKET NO: 25.00-122076J** |
| **TRI-CITIES HOLDINGS, LLC** | |
| **d/b/a TREX TREATMENT CENTER** | **CON Application No. CN1303-005D** |

## ORDER DENYING THE MOTION FOR RECONSIDERATION

On March 14, 2014, an order was issued in this matter revoking Mr. Dunlap's permission to appear in this matter *Pro Hac Vice*. On March 24, 2014, a Motion for Reconsideration of this Order was filed on behalf of Mr. Dunlap. In addressing this Motion, a few points of clarification are needed.

The Petitioner's Motion for Reconsideration mistakenly states that the Order Revoking Permission to Appear *Pro Hac Vice* was entered as a response to Mr. Dunlap's March 12, 2014 letter. This letter, first sent to the undersigned Administrative Judge on March 12, 2014, as an attachment to an email, contends that the Americans with Disabilities Act (ADA) requires this tribunal to provide a reasonable modification by granting, *sua sponte*, the Petitioner's requested relief without the necessity of a hearing. This letter was not filed with the Administrative Procedures Division (APD) of the Secretary of State's Office as a part of the official technical or considered by the Administrative Judge until it was filed on March 24, 2014, as an exhibit to the Motion for Reconsideration. Mr. Dunlap's permission to appear *Pro Hac Vice* was actually revoked on account of the Petitioner's Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act, filed on March 12, 2014, in which Mr. Dunlap makes an unveiled threat to initiate litigation against this tribunal should it decline to make a ruling in his favor.

The Motion for Reconsideration contends that a copy of the Tri-Cities II Complaint [initially filed in the Middle District and then transferred back to the Eastern District] was previously provided to the Administrative Judge and that the Complaint referenced dismissal of Tri-Cities I [filed in the Eastern District and dismissed without prejudice]. A thorough review of the technical record reveals that only

four pages of the Tri-Cities II Complaint were filed with APD and that nowhere in these four pages is there a reference to Tri-Cities I.[1] The relevance of both Tri-Cities I and Tri-Cities II to these administrative proceedings is the indication from the federal court of its preference for completion of the administrative proceedings prior to commencement of the federal litigation. No such relevant part of the federal complaint has ever been filed with APD.

As stated in the March 14, 2014 Order, "subject to a stay in deference to the administrative proceedings" does not mean that the proceedings had, in fact, been stayed but that a stay of the federal proceedings was being contemplated to allow for completion of the administrative proceedings, as indicated in the federal Court's December 10, 2013 Order. It is this rather pertinent information regarding the status of the federal proceedings that had not been provided by Mr. Dunlap when requesting that the stay remain in place.

The Motion provides no authority to support the contention that a tribunal, such as the APD, must grant the relief requested without a hearing on the merits or be in automatic violation of the ADA. The suspension of due process cannot be considered a reasonable modification of APD rules as the Motion contends. Thus, advancing this position under the threat of legal action far exceeds simply pointing out to the tribunal its obligations under the law and potential penalties for noncompliance.

As specified above, no basis has been provided for granting the Motion for Reconsideration; therefore, the Motion is hereby **DENIED**.

All other matters are reserved.

It is so **ORDERED**, entered and effective this the 2ND day of APRIL, 2014.

KIM SUMMERS
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

---

[1] The four pages of the Complaint that were filed include the 3-page Table of Contents for the, apparent, purpose of demonstrating that the denial of the CON had been included as an issue in the federal complaint.

2

FILED

2014 JUL 28  PH 2: 42

Tri-Cities Holdings, LLC, et al.,          )

          Plaintiff,          )

vs.          )          Case No: 14-650-II

          )          Docket No.: 25.00-122076J
Tennessee Health Services and          )          CON No.: CN1303-005D
Development Agency, et al.,          )

          Defendants.          )

          )

          )

---

## PETITIONER'S REPLY BRIEF

---

Comes now the Plaintiff, Tri-Cities Holdings, LLC ("TCH"), by and through counsel, and files this its Reply Brief as follows:

### Introduction

This case arises from TCH's and Tennessee citizens' – among them Johnson City residents -- attempt to bring life-saving, doctor-prescribed, standard of care medical treatment for opiate-addiction to the Johnson City area for the first time in history. Tragically, the Johnson City area has arguably the highest rate of drug overdose deaths[1] and infant mortality[2] in the nation. The individual plaintiffs– among them Johnson City are residents of between 500 and 1,000 people -- are addicted to opiates and are attempting to save their lives, and lives of many of their neighbors, including pregnant women, by establishing an Opiate Treatment Program

---

[1] TDMHSAS Commissioner E. Douglas Varney, Governor's Safety Forum Presentation, Governor's Action Plan with Concentration on Prescription Drug Abuse, December 6, 2012.
[2] A baby in Carter County, Tennessee has essentially the same survival odds as one in Botswana, Africa. "Chronic Disease Heath Profile Regions and Counties" Tennessee Department of Health (2011); Infant Mortality Rates, 2007-2009, The Henry J. Kaiser Family Foundation (kff.org); CIA World Factbook (2013), https://www.cia.gov/library/publications/the-world-factbook/rankorder/2091rank.html.

("OTP") that provides the most-effective, life-saving, standard of care treatment for opiate addiction. This treatment will then be closer to them than the presently more than 100 miles roundtrip each of them must make, starting at 4AM in the morning in order to make to work on time, as often as daily, over dangerous mountain roads to the nearest clinics in North Carolina. This presently amounts to a forced drive of some 9,000 miles in the first ninety days and 20,000 miles in the first year of treatment.[3]

This army of hundreds of exhausted drivers coming to and from the Johnson City area to clinics in North Carolina in all hours of the night has resulted in at least one death. A 22-year old newlywed woman was killed in a head-on collision with an exhausted working mother fell asleep at the wheel having gotten up at 4AM to drive back and forth 120+ miles a North Carolina clinic—exhaustion, not methadone, was the cause of the crash.[4] Based on statewide figures, more than 100 Johnson City area residents die of drug overdoses every year--more than 1,000 in the last decade.[5] One Johnson City area resident drops dead every three days.[6] Remarkably, the standard of care treatment method that TCH is attempting to bring to Johnson City can reduce drug overdose deaths in a community by up to 100 percent.[7] Clearly, this case could be literally

---

[3] State and federal regulations allow only one take home dose per week in the first 90 days, two take home doses in the next 90 days, and so on.

[4] "Judge Wants To Look Up Law Before Accepting Plea In Vehicular Homicide Case," *Johnson City Press*, June 29, 2013.

[5] TDMHSAS figures (December 6, 2012).

[6] *Id.*

[7] "Heroin Overdoses Rare in Lebanon County, Thanks To Methadone Clinic," Lebanon Daily News, February 24, 2014, http://www.ldnews.com/local/ci_25058656/heroin-overdoses-rare-lebanon-county-thanks-methadone-clinic?source=email (from 12-15 overdoses deaths each year to zero); "Local Methadone Clinic Helps Reduce Rx Deaths," Wilkes Journal-Patriot, March 12, 2014, http://www.journalpatriot.com/news/article_dbd0f6e8-aa0c-11e3-8435-001a4bcf6878.html. (47 overdose deaths in 2009, the year the clinic was opened, declined to 13 in 2011. Increasing to 24 in 2012 (still a reduction of 48% over 2009). No figures for 2013 available.); "Opiate-Dependent Patients On A Waiting List For Methadone Maintenance Treatment Are At High Risk For Mortality Until Treatment Entry." J Addict Med. 2013 May-

2

"life and death" for the individual plaintiffs and hundreds of other residents of the Johnson City area. Judge Summers ejected TCH's counsel James Dunlap ("Mr. Dunlap") from the administrative appeal after Mr. Dunlap made demand to her under the ADA for reasonable modification to allow this OTP clinic to be established in Johnson City.

Mr. Dunlap was born and raised in Gainesville, Georgia. He graduated from Gainesville High School in 1980 where he was elected President of the Study Body, Princeton University in 1984, and the University of Georgia School of Law in 1988. While at law school, Mr. Dunlap served on the Georgia Law Review and was elected to the Student Honor Court. Mr. Dunlap is a fourth generation lawyer in his family (among five lawyers among his siblings' families). His career has been marked by significant contributions to the State Bar of Georgia, beginning in 1989 when he co-founded and served as officer of the Younger Lawyers Club of Athens, Georgia. Mr. Dunlap has supported numerous public charities over the years—including numerous contributions to the UGA School of Law and the North Georgia Community Foundation. His *pro bono* work varies from environmental non-profits to representing the disabled. During this time, his professional career has remained completely unblemished. He lives in Atlanta with his 17-year old son. These baseless allegations of misconduct, if sustained, will inflict tremendous damage on Mr. Dunlap's reputation and career—already, HSDA and Johnson City's lawyers have already begun trumpeting his troubles in this case to the federal

Jun;7(3):177-82. (The mortality rate (available among 583) during the 2 years on the waiting list was higher (5.0/100 person years) for the 225 non admitted applicants than for the 358 admitted (0.42/100 person years, P < 0.0005) and those who were admitted with no delay before 2002 (2.1/100 person years).

3

courts and the media in an attempt to undermine TCH's and the individual plaintiffs' civil rights case.[8]

## Summary of Argument

In its own brief, Respondent fails to controvert the following facts:

1.  Mr. Dunlap in no way intentionally concealed the existence of a case that was, in any event, completely irrelevant to the administrative appeal process ("*Tri-Cities I*"). HSDA's lawyers rightfully agreed with Mr. Dunlap and considered so case unimportant as to not disclose it either. In fact, Mr. Dunlap effectively disclosed *Tri-Cities I* because it was specifically referenced in *Tri-Cities II's* Complaint which Mr. Dunlap provided either an entire copy, or full citation to it, to Judge Summers in a letter.

2.  Mr. Dunlap never concealed that the federal court action was "stayed in deference to the administrative proceeding" because (a) the case <u>was never stayed in this manner</u> and (b) HSDA's lawyers made the exact same representations to Judge Summers as Mr. Dunlap did regarding the federal case. The fact is there was no concealment by anybody and the allegation is without support.

3.  Mr. Dunlap never intentionally concealed "any new developments" on January 10, 2014, because there were no material "new developments" at that time and (b) HSDA's

---

[8] In public comments, Johnson City's attorney Erick Herrin has already negatively compared Mr. Dunlap's reputation to a supposed person with a "good reputation" to the *Johnson City Press*, "Established Treatment Clinic Wants To Dispense Methadone In Johnson City," Johnson City Press http://www.johnsoncitypress.com/article/118867/out-with-new-in-with-old-established-treatment-clinic-wants-to-disperse-methadone#ixzz38hSMBiFV , July 15, 2014; "Methadone Clinic Lawsuit Exposes Addiction Struggle, The Tennessean, June 18, 2014, ("Based out of Atlanta, he was thrown off one case. Administrative Judge Kim Summers reported him to the Board of Professional Responsibility for what she described as a "flagrant attempt to improperly influence a judge.").

4

lawyers had the same access to the federal action as Mr. Dunlap and they apparently agreed with Mr. Dunlap because they disclosed no "new developments" either.

4.      Judge Summers' other allegations against Mr. Dunlap, which include, that Mr. Dunlap committed criminal extortion[9] -- a Class D felony carrying a twelve year prison term -- arise exclusively from TCH's and the individual plaintiffs' rightful ability to raise (even in forceful terms) their contentions related to the ADA's application and effect on the administrative proceeding. TCH's right to counsel should not be denied because its attorney raised these matters with the administrative law judge in a completely appropriate manner.

## Argument and Citation of Authority

I.      **Judge Summers' allegations of wrongdoing by Mr. Dunlap, including that Mr. Dunlap committed criminal extortion – a Class D felony – are without support.**

Remarkably, Judge Summers alleged -- among a panoply of alleged wrongdoing -- that Mr. Dunlap committed criminal extortion against her. (Adm. T.R., Vol. 2, pp. 175). ("Mr. Dunlap's coercion and misrepresentation is a flagrant attempt to violate ... Tenn. Code Ann. § 39-14-112."). Criminal extortion is a Class D felony and carries a criminal penalty of up to twelve years imprisonment. Tenn. Code Ann. § 40-35-111

Under Tennessee law, a person commits extortion when using "coercion" upon another person with the intent to: (1) obtain property, services, any advantage or immunity; or (2) restrict unlawfully another's freedom of action.[10] Under Tennessee law, "coercion" is defined as:

(A) Causing or threatening to cause bodily harm to any person, physically restraining or confining any person or threatening to physically restrain or confine any person;

---

[9] Judge Summers alleges Mr. Dunlap violated Tenn. Code Ann. § 39-14-112 (criminal extortion), Revocation Order, p. 10.
[10] *Id.*

5

(B) Exposing or threatening to expose any fact or information that, if revealed, would tend to subject a person to criminal or immigration proceedings, hatred, contempt or ridicule;

(C) Destroying, concealing, removing, confiscating or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of any person; or

(D) Providing a controlled substance, as defined in § 39-17-402, or a controlled substance analogue, as defined in § 39-17-454, to a person.

Tenn. Code Ann. § Tenn. Code 39-13-301.

Demanding a reasonable modification under the ADA, and discussing a well-founded potential civil action against a state administrative official if this is not provided, does not constitute criminal extortion. Obviously, Mr. Dunlap never (a) threatened physical violence against Judge Summers, (b) exposed her to criminal or immigration proceedings, hatred, contempt or ridicule, (c) destroyed, concealed or removed any passport or immigration document, or (d) provided Judge Summers with a controlled substance. Thus, Judge Summers' charge that Mr. Dunlap committed criminal is without merit.

## II. Mr. Dunlap was completely with his client's rights to call into question the entire administrative appeal process as violating the ADA, to demand a reasonable modification under the ADA, and to discuss the prospect of civil litigation if a reasonable modification was not provided.

It is settled federal law that procedural burdens and delays violate the ADA. *See Project Life, Inc. v. Glendening*, 139 F. Supp. 2d 703, 705-06 (D. Md. 2001) (a lengthy delay in granting a long-term lease, done for discriminatory reasons, violates the ADA, even if ultimately granted). HSDA has failed and refused to offer a reasonable modification to TCH to allow it to locate an Opiate Treatment Program in Johnson City. Yet TCH is forced to go through interminable administrative appeals lasting more than a year – again with HSDA, Summers, APD and other state agencies refusing any and all requests for a reasonable modification.

6

Thus, it is completely within TCH's rights to question this entire process as being violative of the ADA. In fact, Mr. Dunlap fairly uses his words in describing this illegal appeals process as an "artifice or scheme." Webster's Dictionary defines "artifice" as an "ingenious device or expedient"[11] and defines "scheme" as "an official plan or program of action."[12] In this case, TCH fairly contends HSDA, Summers, APD, and SOS are blatantly violating the ADA with an ingenious, but interminable, appeals processes.

### A. The ADA unquestionably applies to the administrative proceeding.

Tellingly, Respondent's brief conspicuously omits any admission that the Americans with Disabilities Act ("ADA") in any way applies to this case. The ADA is intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(1). Title II of the ADA applies to <u>all public entities and to anything a public entity does</u>. See 25 C.F.R. § 35.102.

The Attorney General of the United States, at the instruction of Congress,[13] has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled. The Title II regulation reads:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.[14]

---

[11] http://www.merriam-webster.com/dictionary/artifice.
[12] http://www.merriam-webster.com/dictionary/scheme.
[13] See 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part."). The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations ... applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." Id. § 12134(b).
[14] 28 C.F.R. § 35.130(b)(7).

7

Unquestionably, HSDA, Summers, APD, SOS, and TDMHSAS—like all state entities --
are subject to Title II of the Americans with Disabilities Act.[15]  This imposes upon them an
*affirmative duty* to provide a reasonable modification to TCH to allow the Certificate of Need to
be issued in this case.[16]  However, HSDA and the others involved apparently refuse to
acknowledge the existence of the ADA and its obligations that it places on them in this case.
Not once – not ever – has HSDA or Summers, APD, SOS -- or anybody -- made any effort
whatsoever, to provide a reasonable modification of their rules and regulations to TCH to allow
it to establish its OTP. This a clear violation of the ADA and subjects Summers, APD, SOS and
others to a federal lawsuit.  TCH and the individual plaintiffs (and not simply "Mr. Dunlap")
have continuously tried to get these state agencies to acknowledge and comply with federal law –
thus far without success. But that doesn't mean the claim doesn't exist or that TCH somehow
will not ultimately prevail in this regard.

   **B.  TCH's counsel has a right to fairly comment on the legality of the administrative
   proceeding in reference to the ADA.**

   TCH's counsel believes -- in good faith and certainly grounded in ample federal case law
-- that this *affirmative duty* entitles TCH to demand and receive *an attempt at reasonable
modification* by Summers, APD, SOS, HSDA, TMHSAS *prior to the final CON hearing*.  The
ADA does not require a claimant to run a gauntlet of administrative appeals before a state agency

---

[15] "The [Tennessee] Department Americans with Disabilities Act (ADA) Coordinators ensure
state government's compliance with the Americans with Disabilities Act as amended by the
Americans with Disabilities Act Amendments Act (ADAAA). They assist with reasonable
accommodation issues in state employment and program access for state services and programs
and help agencies and employees resolve access and accommodation issues. Please contact your
agency's ADA Coordinator if you need more information or have any questions about a
reasonable accommodation." State of Tennessee Employee Handbook, p. 10. (emphasis added).
[16] *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002) (holding that entities
have standing to sue under the ADA as being discriminated against "because of their known
association with an individual with a disability")(citations).

8

must provide a reasonable accommodation. Ultimately, accuracy of TCH's position under the ADA will be sorted out in the federal district and appellate courts, but TCH's attorney should not be punished for raising valid and well-researched concerns under the ADA. Mr. Dunlap's making a good faith demand on the tribunal should not subject him to a Stalinist-era-style excommunication from the proceeding.[17]

Summers appears to take particular umbrage at Mr. Dunlap's allegation that the administrative appeal process itself "amounts to a scheme or artifice to violate the ADA." (Adm. T.R., Vol. 2, pp. 169). Imagine that: A state agency engages in an administrative process that violates the ADA. This only happens hundreds of times across the United States every year. The U.S. Department of Justice's current ADA enforcement action web page is filled with links to approximately 100 recently-concluded enforcement actions finding Title II violations by state agencies.[18] And that's only the enforcement actions that DOJ brings. There are probably a hundred times as many violations of Title II of the ADA every year that are never prosecuted. The fact is that state agencies honor the ADA "more in the breach" all the time. Tennessee is not immune from this tendency. So aggressively challenging state procedures is completely appropriate and in the public interest under the ADA.

**III. TCH has the right to make HSDA and others aware of the possibility of imminent United States Department of Justice enforcement actions and a finding of HSDA liability by the Sixth Circuit Court of Appeals.**

---

[17] The administrative appeal has taken on a bizarre Kafka-like or Stalinist-era atmosphere where HSDA has become not only an impartial judge, but an active and aggressive litigation adversary against TCH in the administrative appeal process—serving voluminous discovery requests, objecting to TCH's requests, and its own counsel representing Judge Summers in the federal litigation. How HSDA can maintain roles both as adversary and fair and impartial judge is beyond the comprehension of TCH's counsel.

[18] http://www.ada.gov/enforce_current.htm.

9

The United States Department of Justice ("DOJ") routinely sues state entities for violations of the ADA related to discrimination against drug treatment facilities in cases almost identical is of no consequence to them. See *United States v. City of Ansonia*, CT, DOJ Complaint No. 204-14-150 (http://www.ada.gov/ansonia-sa.htm) )(discriminatory zoning against drug treatment center); *United States v. City of Baltimore*, Case No. 09 CV 1049 (D.C. Maryland)(discriminatory zoning against inpatient drug treatment center). This on top of a multitude of successful lawsuits by private plaintiffs asserting violations of the ADA related to drug treatment programs.[19] HSDA declares that "HSDA has [not] received any communication whatsoever from the DOJ about this matter." [Respondent Brief, p.2   n. 2 ]. But this is not evidence invulnerability from DOJ action or ADA liability.

### A. Right now, DOJ is investigating Johnson City and HSDA for violations of the ADA in this case.

The fact is that DOJ is presently investigating the City of Johnson City, Tennessee ("Johnson City") and HSDA for violations of the ADA arising from this case. DOJ is also monitoring this particular administrative appeal. Petitioner's counsel in good faith believes there is a significant chance that DOJ will initiate an enforcement action against Johnson and HSDA for their respective violations of the ADA in this case. In addition, Petitioner's counsel believes in good faith that there is a distinct possibility (though probably less likely than DOJ action against Johnson City and HSDA) that DOJ would also sue TDMHSAS and APD for their respective violations of the ADA in this case. Petitioner's counsel submits that if there is a significant possibility that Summers and APD were running afoul of the ADA, it would be his duty to advise them of the situation and potential liability that they face under federal law.

---

[19] *Mx Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir., 2002)(citations).

10

**B. Federal courts have struck down laws virtually identical to HSDA's Notice Rule as violating the ADA.**

A specific example of an ADA violation by HSDA is that, in addition to failing to ever even attempt a reasonable modification, HSDA faces significant liability under the ADA for its long-standing CON "Notice Rule" (Tenn. Code Ann. Section 68-11-1607(c)(3)). HSDA's Notice Rule imposes cumbersome notice requirements on opiate-addiction treatment facilities and only such facilities. Federal courts invoke the ADA to sanction notice provisions that operate to garner public opposition to those providing services to disabled residents. *Potomac Group Home v. Montgomery County, Md.*, 823 F. Supp. 1285 (D. Md., 1993)(rule designed to galvanize public opposition to center providing services to disabled person violates ADA). HSDA's Notice Rule clearly operates to galvanize public opposition to clinics serving the disabled and, thus, violates the ADA. TCH's is in the process of challenging HSDA's Notice Rule on appeal in *TCH et al. v. Johnson City et al.*, Case No. 14-5456 (6th Cir. 2014). Tellingly, HSDA did not even attempt to put forth a legal justification for this rule in its appellate brief before the United States Court of Appeals for the Sixth Circuit. (Appellee Brief, Doc. 35)(Note: Johnson City did not attempt a legal justification for its blatantly illegal zoning ordinance)(Doc. 31). Instead, HSDA put all its eggs in arguments that TCH's appeal should lose based on "res judicata" or "ripeness" principles—but the merits of plaintiffs' case were never challenged.

Even assuming *arguendo* that TCH's case fails in the Sixth Circuit, a DOJ enforcement action would face no ripeness or *res judicata* defense and HSDA, Summers, APD, SOS, and TDMHSAS all face penalties for violating the ADA of $75,000 for the first violation and $150,000 for subsequent violations.[20] TCH's and the individual plaintiffs' allegations that TCH is attempting to establish an Opiate Treatment Program in Johnson City for opiate-addicted

---

[20] See 28 CFR Part 36 (http://www.ada.gov/civil_penalties_2014.htm).

people invoke the protections of the ADA. See *Mx Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)(opiate-addicted persons are disabled and an entity attempting to establish an OTP serving them provides associational standing to invoke the ADA on their behalf).

### IV. Mr. Dunlap's discussion of ADA litigation was completely appropriate.

Judge Summers (and HSDA numerous times in its brief) erroneously conflates Mr. Dunlap's strident attempts to make Judge Summers aware of federal law and its implications in the administrative appeal as some sort of attack on her personally. This is a ridiculous assertion. At that time, Judge Summers was a state official overseeing TCH's administrative appeal process. At all times, Mr. Dunlap addressed his concerns and claims about the ADA and its application to the process to Judge Summers in her official capacity. At no time did Mr. Dunlap ever assert or imply that Judge Summers herself was somehow corrupt or engaging in intentional fraud of any kind. Mr. Dunlap was challenging the process itself—which is certainly fair game under the ADA.

Ms. Summers is by all appearances a fine person and Mr. Dunlap treated her with respect at all times during conference calls and in his letters and filings. It is beyond dispute that Judge Summers and Mr. Dunlap interacted civilly at all times. In its brief, HSDA apparently asserts that it, Ms. Summers, APD, and SOS are all infallible (making any and all lawsuits challenging their actions forever unnecessary). The judicial system cannot function unless an attorney can declare "the Emperor has no clothes!" when, in fact, HSDA, Ms. Summers, APD, and SOS may have committed error. At no time has Judge Summers acknowledged – to this day -- the existence, application, and implications of the ADA in this case. This is plainly contrary to federal law and Mr. Dunlap is fully entitled to bring this to her or any administrative law judge's attention in the most strident terms. "Good" people violate the ADA every day. Just because a

12

person is "good" doesn't mean they can be called to task for the violations. The stakes are simply too high not to allow this to be done.

**V.   Mr. Dunlap is entitled to ask for a reasonable modification which would allow the CON to be issued before the final hearing and asking for relief does not authorize Judge Summers to eject Mr. Dunlap from the case.**

Judge Summers took great offense to Mr. Dunlap asking that she meet to arrange a reasonable modification which, in Mr. Dunlap's well-supported opinion, is required by federal law to allow the CON to be issued before the final CON appeal hearing. Indeed, Judge Summers felt it important enough to reiterate it (though omitting the other allegations) in her recusal order. (Adm. T.R., Vol. 4, pp. 2-3).  If Judge Summers disagreed with Mr. Dunlap's interpretation of the ADA, she was completely free to say "no" and then Mr. Dunlap would seek whatever relief the ADA entitles his client to in federal court or elsewhere. But to summarily eject Mr. Dunlap from the case and allege he has committed a litany of wrongdoings—including felony criminal extortion – is an extreme and unauthorized overreaction.

**VI.   TCH's right to counsel trumps any erroneous personal offense Judge Summers took when TCH's counsel raised ADA concerns and made Judge Summers aware of her office's potential liability under the ADA.**

A party's right to counsel is well established in Tennessee law. The Uniform Rules of Procedure for Hearing Contested Cases before State Administrative Agencies specifically references a party's "right to counsel."  Tenn. Rules & Reg. 1360-04-01-.08(4). This right to counsel ensures effective representation of the rights of any party under both federal and state law.  In addition--and particularly in this case--Petitioner's choice of counsel is clearly the most knowledgeable of the all the complex facts and circumstances in this case.  Mr. Dunlap has accumulated extensive knowledge of the complex facts and applicable law over 18 months of representing Petitioner in the original Johnson City zoning request, the CON application and hearing, and multiple federal and state proceedings, including this one.  Mr. Dunlap is by far the

13

most familiar with more than 1,000 documents he has generated during these multiple proceedings. Petitioner will be severely prejudiced in the CON appeal hearing, including during opening statements, direct examination of Petitioner's witnesses, cross-examination of HSDA's witnesses, and closing arguments. Without doubt, Petitioner's choice of counsel – Mr. Dunlap -- will most effectively and expeditiously conduct the administrative appeal process and the CON final hearing. At a minimum, without Petitioner's choice of counsel, this process will proceed much more slowly and laboriously and will take much longer that would be required if Petitioner's choice of counsel is allowed to appear.

Additionally, Tennessee courts have cautioned that the courts should be loath to deny a party the lawyer of choice by disqualifying the lawyer.

> A trial court has a broad range of options available to insure that its proceedings are fair both in appearance and in fact. Disqualifying an attorney is the most drastic. It invariably causes delay, increases, costs, and deprives parties of counsel of their choice. Courts should, therefore, disqualify counsel with considerable reluctance and only where no practical alternative exists.

> In re Ellis, 822 S.W.2d at 605 (internal citations omitted); see also Whalley Dev. Corp. v. First Citizens Bancshares, Inc., 834 S.W.2d 328, 331-32 (Tenn. Ct. App. 1992) (noting that courts "should be reluctant to disqualify a litigant's counsel of choice and should grant disqualification motions sparingly"); Caudill v. Foley, M2000-01512-COA-R3-CV, 2001 Tenn. App. LEXIS 625, 2001 WL 950179, at *3 (Tenn. Ct. App. Aug. 21, 2001) (noting that "[c]ourts should . . . disqualify counsel with considerable reluctance and only when no other practical alternative exists")

> . . . .

> Finally, of the "options available [to trial courts] to insure that the proceedings are fair both in appearance and in fact . . . [d]isqualifying an attorney is the most drastic." In re Ellis, 822 S.W.2d at 605. Therefore, courts "should be reluctant to disqualify a litigant's counsel of choice," and should disqualify chosen counsel "only when no other practical alternative exists." Whalley Dev. Corp., 834 S.W.2d at 332; In re Ellis, 822 S.W.2d at 605.

14

**VII.** **Judge Summers (in her recusal order) and HSDA (in its brief) abandon previous reasons offered in support of the revocation order and, instead, offer *completely new and different* reasons that are equally without factual support.**

In her subsequent recusal order, Judge Summers <u>completely changes her reasoning</u> as to why she ejected Mr. Dunlap from the case. (Adm. T.R., Vol. 4, pp. 2-3). In the recusal order, Judge Summers abandons her prior allegations of concealment of a "stay," but then provides completely new reasoning that the "relevance of both Tri-Cities I <u>and Tri-Cities II</u> to these administrative proceedings is the indication from the from the federal courts of its preference for completion of the administrative proceedings prior to commencement of the federal litigation." *Id.* Judge Summers and HSDA find this "preference for completion" not in any order from the federal court but in *dicta* during colloquy of counsel with Magistrate Judge Inman. (Adm. T.R., Vol. 3, pp. 251-53). At this time, HSDA's lawyers <u>were in the courtroom with Mr. Dunlap</u> and they never picked up on what Judge Summers contends is a critical "preference for completion" either because they never reported it to Judge Summers either. Surely HSDA's lawyers would have picked up on any material "preference" if one existed. But, of course, they didn't because no discernable "preference" existed – certainly not in any federal court order. But, of course, HSDA commits no offense and only Mr. Dunlap is alleged to be at fault in this regard.

So Judge Summers' and HSDA's story has changed and now simply failing to disclose a "preference" in colloquy with the Magistrate amounts to grounds sufficient to ruin a lawyer's career and deny a party's choice of counsel? Of course not. The federal court disclosure of a vague "preference" in colloquy with counsel "preference" would be completely without legal effect (and probably even if set out in an order). In fact, this "preference" was never included in

15

any federal court order whatsoever at that time.[21] In fact, the federal court never stayed its action in deference to the administrative process and, ultimately, the court did not wait for the administrative appeal process to complete. So apparently there was never was much "preference" to begin with. On April 10, 2014, after the administrative appeal date was set for July, 2014, the district court did not wait and entered orders on TCH's motions for summary judgment and other appealable motions which have been appealed to the Sixth Circuit.

Judge Summers' and HSDA's newly-conceived and wholly new and conclusory allegations (now including *Tri-Cities II* for the first time) are unsupported on several grounds. Simply saying something is "relevant" is meaningless. How is *Tri-Cities I* relevant? Judge Summers never says even after having many months to presumably reading the Complaint and pleadings in the cases. The fact is that *Tri-Cities II* contains each and every claim TCH set forth in *Tri-Cities I*, plus the additional of claims against HSDA. It is undisputed that Mr. Dunlap gave Judge Summers the complete citation (and several pages of, if not an entire copy of the complaint) to *Tri-Cities II* way back in July, 2013. If Judge Summers had read *the Tri-Cities II* Complaint that she contends is so material to the case – so much so that Mr. Dunlap's career can be ruined by not disclosing it (but, of course, she finds no duty to disclose on HSDA's lawyers' part) -- she would have read at p. 32 of the Complaint where it explains that *Tri-Cities I* was **"dismissed without prejudice on ripeness grounds."**)

In her recusal order, Judge Summers -- and HSDA in its brief – abandon the March 14, 2014 allegation that Mr. Dunlap intentionally concealed that the federal court was "was now, itself, subject to a stay in deference to the administrative proceedings." (Adm. T.R., Vol. 2, pp.

---

[21] At a later date, April 10, 2014, the federal court issued orders dismissing claims against Johnson City, and dismissing some claims against HSDA, and included in *dicta* its "preference" for the administrative appeal to go forward. But this was long after Mr. Dunlap's *pro hac vice* petition was revoked. [Doc. 163, 164].

16

174). Judge Summers and HSDA back away from this allegation and never mention it again. Instead, this baseless allegation morphs to allege that Mr. Dunlap failed to disclose that the federal court's "preference for early resolution of the administrative matter as a condition precedent to proceeding with his lawsuit(s) in the Eastern District...." So Judge Summers' allegation of concealment of a "stay" -- serious enough to ruin Mr. Dunlap's career and get him disbarred – was completely abandoned in her follow-up order recusing herself from the case. (Adm. T.R., Vol. 4, pp. 2-3). HSDA also abandons the allegation of any federal court "stay" being concealed and adopts the new language of "preference for early resolution." (Respondent's Brief, p. 7). So the target keeps moving. Nowhere does HSDA address the fact that its own attorneys have co-equal duties of candor to the tribunal as Mr. Dunlap, and yet they supposedly committed the same alleged offenses as Mr. Dunlap in this case. But, of course, no foul by HSDA's lawyers. To Petitioner, it looks clearly like different rules apply to HSDA than to TCH's counsel.

Judge Summers and HSDA allege that "In denying the Motion for Reconsideration, Judge Summers clarified that her action was precipitated specifically and solely by "Petitioner's Objection to Motion to Set Hearing and Demand for Reasonable Modification Under the Americans with Disabilities Act," (Adm. T.R. Vol. 2, pp. 96-165; Vol. 1, pp. 2-3), and not as a response to Mr. Dunlap's March 12, 2014 letter, since that letter was not considered by Judge Summers until it was exhibited to the Motion for Reconsideration. (Adm. T.R., Vol. 1, pp. 2-3; Vol. 2, pp. 96-195). In fact, Mr. Dunlap had emailed Judge Summers the March 12, 2014 letter via email and she had presumably read it that day—a work day—and the email was apparently received to HSDA and TCH's co-counsel. So Mr. Dunlap's lengthy letter March 12, 2014 letter again requesting a reasonable modification was apparently received by Judge Summers before

17

her March 14, 2014 order ejecting Mr. Dunlap from the case. It's nonsensical to think Judge

Summers would receive an email from TCH's counsel, with a letter attached, and not read it two

days before she apparently intended to eject TCH's counsel from the proceeding.

**James Dunlap**

| | |
|---|---|
| **From:** | James Dunlap <jim@jamesdunlaplaw.com> |
| **Sent:** | Wednesday, March 12, 2014 1.25 PM |
| **To:** | D Kim Summers (D Kim Summers@tn gov) |
| **Cc:** | Jim Christoffersen; Rick Piliponis (rdp@hiqqinsfirm com) |
| **Subject:** | In re Tri-Cities Holdings |
| **Attachments:** | TCH HSDA Letter to Judge Summers 3 12 14 pdf |

Dear Judge Summers:

Please find a follow-up letter regarding my request for a reasonable modification under the ADA. Thank you. Jim.

James A. Dunlap Jr., Esq.
James A. Dunlap Jr. & Associates LLC
310 Windsor Gate Cove NE
Atlanta, Georgia 30342
404-354-2363
404-745-0195 (fax)
jim@jamesdunlaplaw.com

In fact, it is entirely likely that, around March 14, 2014, Judge Summers and HSDA

suddenly realized that the 180-day time limit to conduct a hearing had lapsed and – as humans

are wont to do -- they convinced themselves that this bureaucratic error should be blamed on the

evil Mr. Dunlap. Only at this point did Judge Summers' orders start using the word "stay" and

alleging that Mr. Dunlap's requests for "stays" had been granted. In fact, Mr. Dunlap's requests

for stays had never been granted. For the record, TCH asserts that it did ask for a stay in July,

2013 but Judge Summers denied the request. TCH only asked for another stay <u>after</u> the 180-day

time limit had expired, but again this was denied. No "stay" was ever entered in the

administrative appeal until after the 180-day time limit had expired.

### Conclusion

In conclusion, revocation of a *pro hac vice* petition is a radical and extreme measure that

threatens to trample essential rights to counsel deeply embedded in Tennessee state and

constitutional law and certainly violates the ADA.[22] This radical and extreme measure should only be invoked where there is clear evidence of attorney misconduct. In fact, in this case there exists nothing of the kind and TCH's counsel's *pro hac vice* petition should be reinstated. Mr. Dunlap is arguably "shrill" in his advocacy. But with Tennessee having suffered 10,000 drug overdose deaths over the last decade, and it expecting to suffer another 12,000 drug overdose deaths over the next decade, aren't strident voices needed to advocate for the rights of opiate-addicted persons?[23] Hopefully, one day, such voices will help to put an end to this human catastrophe.

This attempt to revoke Mr. Dunlap's *pro hac vice* petition is based on unfounded allegations that operation to ruin a lawyer's career without any basis whatsoever. Mr. Dunlap subcribes to the proverb that "a good reputation is more valuable than money." For more than 26 years, Mr. Dunlap has conducted his practice accordingly so as to earn an unblemished reputation. Reinstating Mr. Dunlap's *pro hac vice* petition will avert this unfair harm and allow an unblemished career to remain intact -- as it should.

WHEREFORE, TCH hereby prays that it's counsel's *pro hac vice* petition be reinstated.

---

[22] The ADA prohibits retaliation and coercion of any individual because such individual has opposed any act or practice made unlawful under the ADA. Specifically, 42 U.S. Code § 12203 reads as follows:

    42 U.S. Code § 12203 - Prohibition against retaliation and coercion
    (a) Retaliation
    No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
    (b) Interference, coercion, or intimidation
    It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

[23] TDMHSAS figures (December 6, 2012).

19

Respectfully Submitted,

James S. Higgins, BPR No. 16142
The Higgins Firm, PLLC
525 Fourth Avenue South
Nashville, TN 37210
(615) 353-0930

James A. Dunlap, Jr., Georgia State Bar No. 003280
James A. Dunlap Jr. & Associates, LLC
310 Windsor Gate Cove NE
Atlanta, GA 30342
(404) 354-2363

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was sent via U.S. Mail this 24th day of July, 2014 to the following:
28th

Sue A. Sheldon, Senior Counsel
**Office of the Tennessee Attorney General**
P.O. Box 20207
Nashville, TN 37202

Jim Christoffersen, General Counsel
**Tennessee Health Services and
Development Agency**
Andrew Jackson Bldg., 9th Floor
502 Deaderick St.
Nashville, TN 37243

Sara Elizabeth Sedgwick
**Tennessee Attorney General's Office**
PO Box 20207
Nashville, TN 37202-0207

James S. Higgins

20

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
TWENTIETH JUDICIAL DISTRICT, PART II

| | | |
|---|---|---|
| **TRI-CITIES HOLDINGS, LLC, et al.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **NO. 14-650-II** |
| | ) | **Docket NO. 25.00-122076I** |
| **TENNESSEE HEALTH SERVICES AND** | ) | **CON No.: CN1303-005D** |
| **DEVELOPMENT AGENCY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM and ORDER

James Dunlap ("Mr. Dunlap"), a licensed Georgia attorney and counsel for the Plaintiff, Tri-Cities Holdings, LLC ("Tri-Cities"), appeals the Order of Revocation of Permission to Appear *Pro Hac Vice* issued by Administrative Law Judge Kim Summers ("ALJ Summers"). ALJ Summers initially granted him permission to appear *pro hac vice* on behalf of Tri-Cities in an administrative hearing, but subsequently revoked her permission based upon Mr. Dunlap's conduct in the proceedings before her.

## PROCEDURAL HISTORY

By way of background, Mr. Dunlap represents business entities which seek to establish Opiate Treatment Program ("OTP") facilities in many communities throughout the United States. Purportedly, some communities deem these programs and the people they serve as undesirables and resist the establishment of the programs by (a) enacting zoning requirements to deny business or building permits or (b) rezoning the proposed real property to prevent the establishment of OTP facilities or (c) using other restrictive mechanisms to deny the building permits necessary to

1

construct OTP facilities.

In April, 2013, Mr. Dunlap, on behalf of Tri-Cities,[1] sued Johnson City officials for alleged

violations of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, and the

Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* in the U.S. District Court,

Eastern District of Tennessee in Case No. 2:13-cv-108, a case referred to as "Tri-Cities I."  On an

application for injunctive relief, U.S. District Judge J. Ronnie Greer determined that the issues were

not ripe for disposition and dismissed the Tri-Cities I complaint on June 12, 2013.  In his Order,

Judge Greer stated that

> Tri–Cities Holdings has applied for a Certificate of Need ("CON") for a "Non-residential Methadone Treatment Facility" ("methadone clinic") from the Tennessee Health Services and Development Agency (the "state agency"). The state agency is expected to consider the CON application on June 26, 2013.  After the CON is granted, Tri–Cities Holdings must apply for a license to operate its methadone clinic from the Tennessee Department of Health.  Tri–Cities Holdings alleges that Johnson City's refusal to grant zoning approval of its methadone clinic "is interfering with [Tri–Cities Holdings'] application for a CON" and "potentially interferes" with Tri–Cities Holdings' application for a license."

*Tri-Cities Holdings LLC v. City of Johnson City, Tenn.*, 2:13-CV-108, 2013 WL 2635337 (E.D. Tenn. June 12, 2013) (internal citations omitted).

He thoroughly explained that

> [s]ome understanding of the CON process in Tennessee is necessary to the resolution of the issue before the Court. The "Tennessee Health Services and Planning Act of 2002," Tenn. Code Ann. § 68–11–1601 *et seq.*, requires a CON granted by the state agency before a person/entity may initiate certain health care services, or construct, develop or establish certain health care institutions, including opiate addiction treatment provided through a nonresidential substitution-based treatment center for opiate addiction. Tenn. Code Ann. §§ 68–11–1607(a)(1) and (4), 1602(2) and (7)(A). A CON may not be granted "unless the action proposed in the application is necessary to provide needed health care in the area to be served, can be economically

---

[1.]  The Petitioner in the underlying administrative hearing is Tri-Cities Holdings d/b/a/ Trex Treatment Center ("TCH"), a Georgia limited-liability company, which sought a CON to establish the OTP facility.  In federal court, two additional Petitioners, John Doe and Jane Doe, asserted that they were opiate-addicted residents in the greater Johnson City area.

2

accomplished and maintained, and will contribute to the orderly development of adequate and effective health care facilities or services." Tenn. Code Ann. § 68–11–609(b). In making its determinations, the state agency uses "as guidelines the goals, objectives, criteria and standards in the state health plan." *Id.*

After an application for a CON is commenced, any health care institution opposed to the application must file written notice with the agency no later than fifteen days before the meeting at which the application is scheduled and any other person wishing to oppose the application must do so at or prior to the consideration of the application by the agency. Tenn. Code Ann. § 68–11–1607(c)(1)(A) and (B). As to any application for a methadone clinic, the statute explicitly grants local governing bodies the right to participate in the hearing and an opportunity to appear and express support or opposition to the granting of a CON. Support of local governing bodies is not a requirement for the granting of a CON by the state agency. Tenn. Code Ann. § 68–11–1624. After consideration of the application, it may be approved in whole or in part "upon any lawful conditions that the agency deems appropriate and enforceable on the grounds that those parts of the proposal appear to meet applicable criteria." Tenn. Code Ann. § 68–11–1609(a)(1). Any conditions placed on the CON shall also be made conditions of any corresponding license. Tenn. Code Ann. § 68–11–1609(a)(1)(A).

Within fifteen days of the approval or denial of the CON application, "any applicant, health care institution that filed a written objection ..., or any other person who objected to the application ... may petition the agency in writing" for a contested case hearing to be conducted in accordance with the Tennessee Uniform Administrative Procedures Act. *See* Tenn. Code Ann. § 4–5–101 *et seq.* A person aggrieved by a final decision in a contested case may then file a petition for review in the Chancery Court of Davidson County, Tennessee. Tenn. Code Ann. § 4–5–322(a)(1) and (b)(1)(A).

*Id.*

No appeal was taken from Judge Greer's Order of Dismissal; instead, on or about July 8, 2013, Mr. Dunlap filed a second related lawsuit on behalf of Tri-Cities (referred to as "Tri-Cities II") against the Johnson City officials and the Tennessee Health Services Development Agency ("HSDA") in the U.S. District Court for the Middle District of Tennessee, alleging the same statutory violations and seeking essentially the same relief. The Johnson City Defendants moved for change of venue and on November 13, 2013, U.S. District Judge William Haynes, Jr. transferred the case to

3

Judge Greer's court in East Tennessee under docket number 2:13-cv-305. The Defendants filed a Motion to Stay Discovery which was referred to U.S. Magistrate Dennis H. Inman. In his December 10, 2013 Order granting the Stay, Magistrate Inman stated that Judge Greer probably would not change his opinion that Tri-Cities was required to "attempt to procure a certificate of need, and a license. . . before this Court can entertain their suit," and that

> [t]he issue is far more complicated than it should be and, to be blunt, it has been complicated by the plaintiffs' actions. . . .

He recited the history of the Tri-Cities I lawsuit, the transfer of the Tri-Cities II lawsuit, and Mr. Dunlap's justification for refiling the Tri-Cities II lawsuit in Judge Haynes' court and concluded that Mr. Dunlap's stated rationale for the refiling of the lawsuit "was a transparent attempt to explain away rather obvious judge-shopping." Magistrate Inman stated that the refiling of the Tri-Cities II lawsuit on the heels of the dismissal of the Tri-Cities I lawsuit, "even if not a sanctionable contempt, certainly manifested a contemptuous attitude toward" Judge Greer's earlier decision. During the hearing, Magistrate Inman learned that Mr. Dunlap had appealed the denial of the Certificate of Need (CON) and was quite surprised

> to learn that an administrative law judge has delayed considering the appeal of that denial based upon plaintiffs' counsel's [Mr. Dunlap's] representation to her that he intended to ask this court to stay, i.e., enjoin, any action by her.

Magistrate Inman stated that Mr. Dunlap's intention to seek an administrative stay seemed contrary to Tri-Cities' professed need for a quick resolution to the litigation.

While the federal court proceedings were transpiring between April 2013 and December 2013, Mr. Dunlap applied to HSDA for a CON. On June 26, 2013, HSDA denied Tri-Cities' application for a CON. By letter dated July 2, 2013, Mr. Dunlap appealed HSDA's denial of Tri-Cities' application. By letter dated July 18, 2013, Mr. James B. Christofferson, General Counsel for

4

HSDA, filed a Contested Case Transmittal Form to the Secretary of State's office to institute the administrative appeal process.

By letter to the Administrative Procedures Division, dated July 25, 2013, Mr. Dunlap requested that his client be provided a reasonable modification of all state and local rules and regulations, citing the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("the Rehabilitation Act). He asked that his client be allowed to locate its OTP facility in Johnson City by issuing the CON without notice to the local officials. He also stated that he was going to ask the federal court to stay the administrative appeal while the federal lawsuit was pending.

In a letter to ALJ Summers dated July 28, 2013, Mr. Dunlap requested the same relief. The next day, July 29, 2013, Mr. Dunlap wrote a second letter to ALJ Summers, stating the Mr. Christofferson had refused to agree to a stay of the administrative appeal and requesting that she stay the appeal, pending resolution of the federal court action. He stated that he was attaching a copy of the federal complaint, but only the first four pages of the 75-page complaint filed in the U.S. District Court for Middle Tennessee (the Tri-Cities II lawsuit) were attached to his letter. Those pages included a title page and three pages of the Table of Contents, and did not contain any substantive information about Tri-Cities I.

ALJ Summers held a pre-hearing telephone conference with counsel on July 31, 2013. Mr. Dunlap requested that, before she set the matter for a hearing or address Mr. Dunlap's request for a stay, that she set another conference call for September 5, 2013 to discuss the status of the related federal litigation. ALJ Summers summarized these requests in her Order of August 2, 2013.

The ALJ's Second Scheduling Order dated September 5, 2013 reflects that the second pre-hearing telephone conference was held on September 5, 2013. In that conference call, Mr. Dunlap

5

again requested that the administrative hearing be held in abeyance, and that the parties discuss the status of the related-federal litigation in November, 2013. The ALJ's Third Scheduling Order, dated November 18, 2013 reflects that the third pre-hearing telephone conference was held on November 5, 2013. The ALJ's Order reflects that the status of the related federal litigation had not changed; the scheduling of the administrative hearing was again held in abeyance until a conference call on January 10, 2014.[2]

On January 8, 2014, ALJ Summers emailed all counsel and inquired if there were any new developments to report, as she had a scheduling conflict on January 10, 2014. Mr. Dunlap emailed

> No new developments. Motion for Summary Judgement and Motions to Dismiss
> are pending. I would suggest another 60 day stay in our matter. Thanks, Jim

Mr. Christofferson responded by email the next day, January 9, 2014, saying that there had been new developments, that he would file an explanation and until then, that a teleconference would serve little purpose. ALJ Summers emailed that his response sounded good and consequently, no conference call was held on January 10, 2014.

On March 7, 2014, Mr. Christofferson filed his Motion to Set For Hearing, and explained the new developments. He recounted his efforts to set the hearing in 2013, provided his version of the pre-conference telephone calls and stated that his client, HSDA, consistently resisted all requests to delay the hearing. In his Motion, Mr. Christofferson informed ALJ Summers that in July, 2013, Mr. Dunlap had told U.S. Magistrate Inman that the administrative appeal of the CON had been stayed for sixty days, waiting for direction from the federal court. Mr. Christofferson attached a copy of the federal court transcript in which, after comments from HSDA's counsel, U.S. Magistrate Inman

---

[2]. ALJ Summers' Order of November 18, 2013 erroneously set the conference call for January 10, 2013, instead of January 10, 2014.

6

inquired if

> [i]n other words, [the ALJ] is of the opinion that Mr. Dunlap communicated to her that he was basically going to ask this Court [U.S. District Court] to enjoin her?

Ms. Sheldon (counsel for HSDA): Yes, and that has not been done. She has been –

The Court: Could we do it?

Ms. Sheldon: I would hope not, Your Honor.

---

The Court: But, I use the word "could" advisedly. Do we have any authority to do that?

Ms. Sheldon: I do not believe so, Your Honor, certainly not under the *Younger v. Harris* doctrine. I am not a participant in both administrative proceedings, so I have not spoken directly with the Administrative Law Judge, but it is my understanding through the General Counsel for Health Services and Development Agency, who is a participant in those proceedings, that the Administrative Law Judge is currently scheduling status conferences, and seems to be awaiting something from the Federal Court.

---

Ms. Sheldon: In any event, the statutes governing those administrative proceedings do set out time frames for an Administrative Law Judge's consideration of an administrative case. The proceeding would have gone fairly expeditiously if it had not been stopped in its tracks for whatever reason at this point. But it is pending, and certainly the State hopes that it will proceed, and that there can be a quick disposition of the question whether TCH is entitled to a Certificate of Need.

On March 12, 2014, by email and letter to ALJ Summers, Mr. Dunlap repeated that the ALJ had an affirmative duty to allow the CON to be issued before any final hearing was held and he reiterated that the pending federal case had to be resolved before a final hearing on the administrative appeal.

The next day, on March 13, 2014, Mr. Dunlap filed his "Objection to Motion to Set Hearing and Demand for Reasonable Modification Under The Americans With Disabilities Act." He

7

demanded a reasonable modification under the ADA, stating in his Objection to Motion to Set Hearing that (a) HSDA faced a virtual certain loss in federal court, (b) long-settled federal law made HSDA and Johnson City liable to his clients for violating the ADA, (c) both defendants failed their affirmative duty to provide a reasonable modification to locate the clinic in Johnson City and (d) ALJ Summers was required to offer his client a reasonable modification and allow the CON to be issued without a hearing. He wrote that ALJ Summers' continuing failure to issue the CON without a hearing

> creates a cause of action that Petitioner (Tri-Cities) may bring against Your Honor, and the tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents in the ADA enforcement action.

Mr. Dunlap closed his pleadings by declaring that the administrative appeal process amounted to a scheme or artifice to violate the ADA, that the defendants were trying to get the tribunal to be their "fixer" and run political cover for their illegal acts and that if the tribunal (ALJ Summers) were to make such an attempt, it would amount to aiding and abetting the Defendants' blatant violations of federal law.

On March 14, 2014, ALJ Summers, *sua sponte*, reconsidered Mr. Dunlap's application to appear *pro hac vice* and revoked the permission previously granted. In doing so, she issued her findings of fact which outlined the history of the proceedings, examined Rule 19 and the requirements for an attorney to be admitted *pro hac vice*, and concluded that Mr. Dunlap's actions had breached the condition upon which he was granted *pro hac vice* admission to practice law in Tennessee. She cited to the Tennessee Code of Professional Conduct and Tenn. Code Ann. § 39-14-113 (Extortion).

In her conclusions, ALJ Summers stated that Mr. Dunlap had never disclosed to her that the

8

Tri-Cities I lawsuit had been dismissed for lack of ripeness or that the federal court proceedings had been stayed in deference to the administrative proceedings. She also noted that while the federal court had indicated that the CON appeal should be resolved before the federal issues were addressed, Mr. Dunlap insisted that the stay of the administrative appeal remain in place, warning that he might well join the ALJ[3] and the tribunal in the federal court action if the ALJ lifted the stay and set the CON appeal for hearing.

ALJ Summers also stated in her Order that Mr. Dunlap had misrepresented the status of the federal litigation to her and had used his misrepresentation in attempting to coerce a decision in his client's favor without participating in the administrative hearing, which he had demanded be stayed. She declared that his actions constituted a flagrant attempt to improperly influence a judge in violation of Tennessee Supreme Court Rules 3.3, 3.5 and 8.4, as well as in violation of Tenn. Code Ann. §39-14-112 (Extortion). She stated that Mr. Dunlap had expressed contempt for the tribunal and the administrative proceedings and thus, his continued participation served no purpose. She concluded that Mr. Dunlap's actions unnecessarily impeded a resolution of the CON appeal and breached the conditions on which he was granted *pro hac vice* admission

As a consequence of the Order revoking his *pro hac vice* status, on March 24, 2014, Mr. Dunlap moved for reconsideration of the Order revoking permission to appear *pro hac vice* and further moved that ALJ Summers recuse herself. On April 2, 2014, ALJ Summers denied both motions. In light of Mr. Dunlap's allegations of her bias and retaliation, ALJ Summers clarified that

---

[3.] According to HSDA's Response Brief, Mr. Dunlap filed a third related federal district court complaint in the Middle District of Tennessee under the ADA and §504 of the Rehabilitation Act, naming as defendants ALJ Summers and her employers, the Administrative Procedures Division of the Tennessee Department of State, and the Tennessee Secretary of State. This complaint also challenged the ALJ's revocation of Mr. Dunlap's admission *pro hac vice*, even though he is pursuing his challenge to the revocation in the Davidson County Chancery Court. The third federal court action has been transferred to the Eastern District Court of Tennessee, Northeastern Division. This lawsuit will be referenced as Tri-Cities III.

Mr. Dunlap's failure to provide relevant information about the federal court proceedings and his unprofessional conduct were the basis for her Revocation Order.

On May 1, 2014, Mr. Dunlap filed an Appeal of Order Revoking Permission to Appear *Pro Hac Vice* in the Chancery Court for Davidson County, Tennessee, Part II. After filing this Appeal, however, on June 3, 2014, Mr. Dunlap filed a Second Motion to Recuse ALJ Summers from the administrative appeal proceedings, stating that the facts showed the appearance of bias, actual bias, and irreparable conflicts of interest that rendered ALJ Summers incapable of serving as a neutral arbiter of the administrative appeal. The motion also stated that ALJ Summers was the defendant in the Tri-Cities III lawsuit and in the awkward position of standing in judgment of her own conduct and that of her employer. No ruling was made on this late filing.

On June 26, 2014, the Chancellor heard oral argument from the attorneys for Mr. Dunlap and for HSDA and took this appeal under advisement.

## ISSUES

Mr. Dunlap contends that the ALJ erred in finding that (1) he intentionally and fraudulently concealed the existence and outcome of federal litigation involving his client, Tri-Cities, (2) he concealed that the federal court action "was now, itself, subject to a stay in deference to the administrative proceeding" and (3) he misled the ALJ when he indicated that there were no "new developments" in the case. In his Reply Brief, Mr. Dunlap appears to raise a number of additional issues which will be addressed, but were not properly raised so as to allow HSDA an opportunity to respond.

10

## CONTROLLING AUTHORITY

In her Order revoking Mr. Dunlap's admission *pro hac vice*, ALJ Summers cited Rule 19 of the Tennessee Supreme Court Rules, which permits a lawyer not licensed to practice law in Tennessee to fully participate in contested case proceedings before a state department if the lawyer complies with certain conditions:

> A lawyer not licensed to practice law in Tennessee and who resides outside Tennessee is eligible for admission *pro hac vice* in a particular proceeding pending before a court or agency of the State of Tennessee:
> (1) if the lawyer is licensed, in good standing, and admitted to practice before the court of last resort in another state or territory of the United States or the District of Columbia in which the lawyer maintains a residence or an office for the practice of law;
> (2) if the lawyer is in good standing in all other jurisdictions in which the lawyer is licensed to practice law; and
> (3) if the lawyer has been retained by a client to appear in the proceeding pending before that court or agency.

Tenn. S. Ct. Rule 19(a).

Once admission has been granted, the Rules state that such admission may be revoked

> by the court or agency granting such admission *upon appropriate notice to the lawyer* and upon an affirmative finding by the court or agency that the lawyer has ceased to satisfy the requirements of this Rule. In any proceeding in which a court or agency revokes an admission *pro hac vice*, the court or agency shall set forth findings of fact and conclusions of law that constitute the grounds for its action; in addition, the court or agency shall send a copy of the order revoking the admission *pro hac vice* to the Board of Professional Responsibility of the Supreme Court of Tennessee.

Tenn. S. Ct. Rule 19 (c).

Rule 19 also provides that

> A lawyer who seeks or is granted admission under this Rule shall be subject to the disciplinary jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee and the courts and agencies of

11

Tennessee in any matter arising out of the lawyer's conduct in the proceeding.

Tenn. S. Ct. Rule 19(e).

The Rule also provides that an out-of-state lawyer may be denied admission if the applicant's conduct as a lawyer, in Tennessee or in other jurisdictions, raises reasonable doubt that the lawyer will comply with the Tennessee Rules of Professional Conduct. *Id.* at (b)(1).

ALJ Summers relied upon Rule 3.3 of the Tennessee Rules of Professional Conduct which requires the attorney to act with candor toward the Court.[4] She stated that Mr. Dunlap failed to comply with Rule 3.5, which states that a lawyer shall not seek to influence a judge by means prohibited by law.[5] ALJ Summers also found that Mr. Dunlap had violated Rule 8.5, which states that it is unprofessional misconduct for a lawyer to:

> (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
> (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;
> (d) engage in conduct that is prejudicial to the administration of justice;
> (e) state or imply an ability to influence a tribunal or a governmental agency or official on grounds unrelated to the merits of, or the procedures governing, the matter under consideration;

Tenn. S. Ct. Rule 8, RPC 8.4.

---

[4] **Candor Toward the Tribunal:** (a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal. Tenn. S. Ct. Rule 8, RPC 3.3(a)(1).

[5] **Impartiality and Decorum of the Tribunal:** A lawyer shall not:
(a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law. Tenn. S. Ct. Rule 8, RPC 3.5(a).

12

ALJ Summers also cited Tennessee's Extortion statute as controlling authority. That statute states

> (a) A person commits extortion who uses coercion upon another person with the intent to:
> (1) Obtain property, services, any advantage or immunity;
> (2) Restrict unlawfully another's freedom of action; or
> (3) Impair any entity, from the free exercise or enjoyment of any right or privilege secured by the Constitution of Tennessee, the United States Constitution or the laws of the state, in an effort to obtain something of value for any entity.
> (A) For purposes of this section, "something of value" includes, but is not limited to, a neutrality agreement, card check agreement, recognition, or other objective of a corporate campaign.
> (B) For purposes of this section, "corporate campaign" means any organized effort to unlawfully bring pressure on an entity, other than through collective bargaining, or any other activity protected by federal law.
> (b) It is an affirmative defense to prosecution for extortion that the person reasonably claimed:
> (1) Appropriate restitution or appropriate indemnification for harm done; or
> (2) Appropriate compensation for property or lawful services.
> (c) Extortion is a Class D felony

Tenn. Code Ann. § 39-14-112.

## STANDARD OF REVIEW

The Order revoking Mr. Dunlap's *pro hac vice* admission, while related to the underlying administrative hearing, is properly reviewed using the standards for disciplinary proceedings pertaining to the licensure of attorneys. The Tennessee Supreme Court, as the source of authority of the Board of Professional Responsibility and all of its functions, has the ultimate disciplinary authority pertaining to the licensure of attorneys. *Rayburn v. Bd. of Prof'l Responsibility*, 300 S.W.3d 654, 660 (Tenn. 2009); *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d 631, 640 (Tenn. 2008). The Tennessee Supreme Court has held that a trial court shall,

> [a]bsent allegations of irregularities in the procedure before the hearing panel, . . . review . . . the decision by the hearing panel ". . . on the transcript of the evidence

13

before the hearing panel and its findings and judgment." Tenn. S. Ct. R. 9, § 1.3; The trial court may reverse or modify a decision of the hearing panel only when the panel's findings, inferences, conclusions or decisions are

(1) in violation of constitutional or statutory provisions;
(2) in excess of the panel's jurisdiction;
(3) made upon unlawful procedure;
(4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. S. Ct. Rule 9, § 1.3. Moreover, the trial court "shall not substitute its judgment for that of the panel as to the weight of the evidence on questions of fact." In appeals from judgments of the trial courts, this Court reviews attorney disciplinary matters "upon the transcript of the record from the circuit or chancery court, which shall include the transcript of evidence before the hearing panel." Tenn. Sup. Ct. R. 9, § 1.3. Our standard of review on appeal is identical to that of the trial court and, in consequence, a reversal is warranted only when the panel's "findings, inferences, conclusions, or decisions" fall within one of the five circumstances enumerated in Rule 9, section 1.3 . In particular, this Court will not reverse the decision of a hearing panel so long as the evidence "furnishes a reasonably sound factual basis for the decision being reviewed."

*Hoover v. Bd. of Prof'l Responsibility of Supreme Court*, 395 S.W.3d 95, 102-03 (Tenn. 2012)(internal citation omitted).

ALJ Summers revoked Mr. Dunlap's *pro hac vice* status upon her findings that he had ceased to satisfy the requirements of the Rules of the Tennessee Supreme Court regarding the conduct of attorneys. The Court considers the authority set out above as the standard of review that should be used.

## DISCUSSION

Mr. Dunlap complained that ALJ Summers revoked his *pro hac vice* admission *sua sponte* in retaliation for asserting his client's rights. Mr. Dunlap took a position in his pleadings, and apparently in oral argument, that once his client was denied a CON, all governmental entities that

14

perpetuated any delay in the issuance of the CON were violating federal law, that is, the ADA and the Rehabilitation Act.

Despite his vehement advocacy of this position, Mr. Dunlap's client is required to exhaust its administrative remedies and allow the ALJ to determine if the denial of the CON was arbitrary or capricious. In his June 12, 2013 Order, U.S. District Judge Greer could not have been more explicit about completion of the administrative process and adherence to the exhaustion doctrine. Mr. Dunlap ignored Judge Greer's directive. Instead, Mr. Dunlap's pleadings are replete with alleged violations of federal law by various governmental entities, including ALJ Summers, because his client was denied a CON. Mr. Dunlap's summary of the facts and his opinion of the law are not controlling, a fact that he ignores, rejects or refuses to understand.

In this appeal, Mr. Dunlap claimed bad faith and ill motives on behalf of the Defendants as proven fact. He also has assumed that his clients are entitled to a CON, without a review of the reasons why the CON was denied. Mr. Dunlap's assertions are unsupported in the record before this Court – because no hearing was held before ALJ Summers. A hearing would have allowed the ALJ to determine if the denial was arbitrary. Thus, there is nothing in the administrative record to support Mr. Dunlap's allegations. If, indeed, Johnson City authorities were bad actors, that proof had to be properly introduced. Mere assertions that the rejection of the CON permit was in bad faith is conjecture, not evidence.

Second, Mr. Dunlap asserts that the federal law - the ADA and the Rehabilitation Act - place an obligation on ALJ Summers to provide his client with a reasonable modification of rules governing the issuance of a CON without an administrative hearing. Mr. Dunlap cited two federal cases for the proposition that a reasonable modification is required when a CON is not immediately

15

issued; a review of the two cases reflects that the federal courts undertake an examination to determine (1) whether the plaintiffs have demonstrated standing[6] to invoke the constitutional protections of the ADA and the Rehabilitation Act, (2) whether the plaintiffs have demonstrated that they qualify as disabled under either the ADA or the Rehabilitation Act, and (3) whether the plaintiffs have demonstrated (a) exhaustion of remedies, or (b) exhaustion of remedies would be futile, based on the record as a whole.

In the first case cited by Mr. Dunlap, *Mx Group, Inc. v. City of Covington*, 293 F.3d 326, 344 (6th Cir. 2002), the Plaintiff was initially issued a permit by the Defendant City's Zoning Administrator, but the City's Board of Adjustment revoked the permit after public hearings. The Plaintiff then filed suit in federal court without first seeking a text amendment to the ordinance or requesting a conditional use permit. After suit was filed, the Plaintiff applied for a permit to operate at a different location, which the City Zoning Administrator initially thought was zoned for such activity. The City's General Affairs Committee, however, amended the City's zoning code, completely foreclosing the Plaintiff's opportunity to locate in the City of Covington. In reviewing the exhaustion of remedies' requirement, U.S. Circuit Court Judge Gray stated that

> [w]hat is needed before litigation can proceed in a case such as this is that proceedings have reached some sort of an impasse and the position of the parties has been defined. We do not want to encourage litigation that is likely to be solved by further administrative action and we do not want to

---

6. One federal judge, in examining the Plaintiff's standing under the ADA, found that
the language of § 12188(a)(1), requiring "that a plaintiff actually be 'subjected to discrimination' or be 'about to be subjected' to it," did not permit a plaintiff encountering architectural barriers at one gas station to assert claims on behalf of others similarly situated with respect to 82 other gas stations that the plaintiff had not visited; Congress would have to speak with definite clarity if it meant to grant standing to a plaintiff with no particularized injury who wished to assert the rights of others not before the Court.

*Clark v. McDonald's Corp.*, 213 F.R.D. 198, 210 (D.N.J. 2003)(citing *Moreno v. G& M Oil Co.*, 88 F.Supp.2d 1116, 1117 (C.D. Cal. 2000)(internal citations omitted).

16

put barriers to litigation in front of litigants when it is obvious that the process down the administrative road would be a waste of time and money. We believe that finality, and not the requirement of exhaustion of remedies, is the appropriate determinant of when litigation may begin. By finality we mean that the actions of the city were such that further administrative action by [the plaintiff] would not be productive.

*MX Grp., Inc.* 293 F.3d at 343 (quoting *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362–63 (6th Cir. 1992).

Mr. Dunlap failed to introduce any evidence of similar circumstances or conduct by the Defendants to demonstrate that exhaustion of administrative remedies would be unproductive or futile. Thus, *Mx Grp. Inc.* is inapplicable.

In the second case, *Potomac Grp. Home Corp. v. Montgomery Cnty., Md.*, 823 F. Supp. 1285 (D. Md. 1993), a town imposed an extra hearing requirement on the Plaintiffs because the disabled clients associated with its organization were disabled. The matter was heard by the federal judge on cross motions for summary judgment. The Court looked to the testimony of city officials and evidence that the city's regulations required that notices be sent

> to provide neighbors and civic groups with a variety of information about the proposed group home including (1) the type of group home planned, (2) an identification of the type of "exceptional person" who will live there, and (3) the name of a contact person within the County Department of Health to whom questions or complaints about the proposed group home may be addressed.

*Id.* at 1289.

The Court found that no other County law or regulation imposed any similar requirement on a residence to be occupied by adult persons who did not have disabilities. *Id.* at 1289. Further, the federal court addressed the legality of the program-review-board hearing process and while the plaintiffs had not shown that the regulation was facially invalid, the Court concluded that plaintiffs made a strong showing of discriminatory effect because, like the neighbor-notification rule, the

17

program-review-board hearings were held under the challenged requirement only for residential facilities for the disabled. *Id.* at 1297.

Apparent in both cases was the evidentiary record that had been developed from the testimony of live witnesses, or depositions and/or affidavits, and the proceedings conducted before a tribunal to oversee the proper introduction of the facts. Mr. Dunlap failed to take these steps in the case before Magistrate Inman or ALJ Summers. Neither case assists this court in its review of Mr. Dunlap's conduct. More particularly, neither case justifies Mr. Dunlap's failure to exhaust the administrative remedies, or his failure to be forthright with ALJ Summers.

Without evidence and compelling legal authority, Mr. Dunlap stated that ALJ Summers retaliated against him for advising her (a) that she was subject to the ADA and (b) that she bore certain responsibilities under the ADA. He suggested that ALJ Summers should have deferred to the federal court on issues of interpretation of federal law and maintained that his use of "forceful prose" was not intended as disrespectful. Again, this Court reiterates that Mr. Dunlap represented to ALJ Summers that he intended to ask the federal court to stay the State administrative process while he pursued his action in federal court, while at the same time, he represented to the federal courts that he was awaiting the outcome of the State administrative proceedings. Mr. Dunlap quibbles with this characterization of the circumstances, but a review of the documents and the transcripts filed in this action support this conclusion. His conduct, his lack of candor with ALJ Summers, and his misrepresentation of his duplicative federal court filings[7] went beyond "forceful prose." Magistrate Inman characterized Mr. Dunlap's conduct as forum-shopping, a disfavored manipulation by an attorney in filing lawsuits to secure a favorable forum. This conduct is often sanctionable, in and of

18

itself, but it is not a specific ground upon which ALJ Summers revoked Mr. Dunlap's *pro hac vice* admission. His description of his own conduct as a zealous assertion of his client's ADA rights is grossly inaccurate and is more aptly described as duplicitous and bullying.

Mr. Dunlap's insistence that federal law mandates that his clients be given a CON as "an accommodation" without a hearing directly contradicts the very specific language in Judge Greer's Order regarding his client's obligation to exhaust administrative remedies. Mr. Dunlap's representation of the controlling legal authority was not accurate, but rather disingenuous. The cases[8] cited by Mr. Dunlap for the proposition that procedural burdens and delays violate the ADA are a far cry from the case before ALJ Summers, as she had no facts, no witnesses, no exhibits before her and had heard nothing regarding the Defendants' conduct except Mr. Dunlap's unsupported allegations.

When Mr. Dunlap sent ALJ Summers a letter dated July 29, 2013, requesting that the administrative appeal be stayed pending resolution of a related federal court action, ALJ Summers delayed setting the hearing. She reset the prehearing conference call for September 5, 2013 when

---

[7]. Mr. Dunlap's Tri-Cities I lawsuit differs from Tri-Cities II by adding HSDA as a defendant and updating the allegations to include the denial of the CON by HSDA, but the basic allegations remained identical.

[8]. Mr. Dunlap stated that in *Project Life, Inc.v. Glendening*, 139 F. Supp. 2d 703-705-06 (D. Md. 2001), federal law held that a lengthy delay of over three years in granting a long-term lease, done for discriminatory reasons, violated the ADA, even if the lease was ultimately granted. Here, the delay has been inflicted by Mr. Dunlap's procedural steps in seeking to continue indefinitely the administrative appeal of the CON decision and his forum-seeking filings in federal court. *Project Life* is also distinguishable on its facts. In that case, on a motion for summary judgment, the federal judge held that it was a question of fact whether leasing a berth to a residential facility for recovering substance abusers involved more than a reasonable accommodation. The federal jury took 15 days to hold for the non-profit plaintiff, but against the individual plaintiffs, and then, only granted the non-profit a $12.00 recovery.

Mr. Dunlap relies upon cases in which facts have properly been introduced, motives questioned before an impartial judge and a reasoned decision rendered. For instance, Mr. Dunlap cites *Potomac Group Home Corp. v. Montgomery County, Md.*, 823 F. Supp. 1285, 1296-97 (D. Md. 1993), which involved cross motions for partial summary judgment with a decision based upon numerous depositions, affidavits and exhibits. Eight years after *Potomac Group*, the federal courts held that based upon the plain language of the ADA, as well as precedent, the proper standard for determining a reasonable accommodation is to first inquire whether it is 1) reasonable and 2) necessary. *Pathways Psychosocial v. Town of Leonardtown, MD*, 133 F. Supp. 2d 772, 789 (D. Md. 2001). Mr. Dunlap has introduced no proof to determine the reasonableness of, or necessity for, an accommodation for his clients.

19

356

Mr. Dunlap again requested a stay until a summary judgment motion pending in federal court had been decided. ALJ Summers again granted his request to stay setting a date for the administrative hearing over the Defendant's objection. A subsequent pre-hearing conference call on November 5, 2013 reflected that neither party had anything to report.

When Magistrate Inman issued his Order on December 10, 2013, regarding Mr. Dunlap's second motion for a stay of discovery in federal court, he noted several serious concerns. First, he stated that the issue was more complicated than it should be and, "to be blunt, it has been complicated by the plaintiff's actions." Magistrate Inman stated that Mr. Dunlap had referred to various exhibits which were not attached to Mr. Dunlap's brief. Further, Mr. Dunlap had not advised the Magistrate where the exhibits could be found in the voluminous record. Magistrate Inman also referenced a dispute between counsel regarding Mr. Dunlap's assertion that he and opposing counsel had stipulated that a Rule 26 discovery conference had occurred; Magistrate Inman held that the record and various documents supported the assertion of the Defendant's counsel that there was no such stipulation and that the Defendants had never expressed any need, urgent or otherwise, to proceed with discovery. Magistrate Inman concluded that Judge Greer would not change his opinion that the Plaintiffs must attempt to procure a certificate of need before entertaining the Plaintiffs' lawsuit. He expressed his surprised to learn

> that an administrative law judge has delayed considering the appeal of [the CON] denial based upon plaintiffs' counsel's representation to her that he intended to ask this court to stay, i.e., enjoin, any action by her.

Magistrate Inman also made the troubling observation that Mr. Dunlap had engaged in blatant forum-shopping.

When ALJ Summers emailed counsel for both parties on January 8, 2014, she inquired about any new developments in the federal litigation. Mr. Dunlap emailed that there had been no new developments as the Motion for Summary Judgment and Motions to Dismiss were still pending in federal court and failed to inform her that Magistrate Inman had issued a ruling on December 8, 2013. HSDA's Counsel, Mr. Christofferson, emailed that he would file something to explain the new developments and that no pre-hearing conference was necessary.

On March 7, 2014, Mr. Christofferson filed a Motion to Set For Hearing and attached the December 10, 2013 Order issued by Magistrate Inman. On March 10, 2014, Mr. Dunlap filed an Objection to the Motion to Set, opposing any effort to set the administrative hearing prior to the resolution of the federal court litigation. He again demanded that ALJ Summers modify the HSDA's rules and grant Tri-Cities a CON, without a hearing. In making this demand, Mr. Dunlap stated that if ALJ Summers set the matter for a hearing, that is, took "HSDA's bait" and took any action to decide the administrative appeal before the federal courts had spoken, Mr. Dunlap would have no choice but to join ALJ Summers and the administrative tribunal as defendants in the pending federal action. He continued that her failure to offer his client a reasonable accommodation, that is, the CON, created a cause of action against ALJ Summers and the administrative tribunal.

Mr. Dunlap's statements to ALJ Summers were untrue. Judge Greer had ruled that his client had to exhaust its administrative remedies. Mr. Dunlap did not like that ruling. In his Opposition to the Motion to Set, Mr. Dunlap provided no information about the status of the federal litigation.[9]

---

[9] Mr. Dunlap did not tell ALJ Summers that the federal litigation in Tri-Cities I had been dismissed for lack of ripeness or that discovery in the subsequent federal court action in Tri-Cities II had been stayed in deference to the administrative proceedings before her.

21

Rather, Mr. Dunlap chose not to reveal the federal court ruling and to intentionally assert a legal position directly contrary to that federal court decision.

ALJ Summers learned of these circumstances when they were disclosed in Mr. Christofferson's pleadings. She read Mr. Dunlap's Objection and his unveiled threat. ALJ Summers concluded that Mr. Dunlap had failed to properly explain the status of his client's federal filings and had misled her in his repeated requests for delays.

ALJ Summer's conclusion that Mr. Dunlap misrepresented the status of the federal litigation and used the misrepresentation to attempt to coerce a decision from her in his client's favor without an administrative hearing is supported by the record. ALJ Summers stated that Mr. Dunlap's coercion and misrepresentations were a flagrant attempt to improperly influence her in violation of Rule 3.3, 3.5 and 8.3 of the Tennessee Rules of Professional Conduct as well as Tenn. Code Ann § 39-14-112.[10] In her Order, ALJ Summers found that Mr. Dunlap had expressed contempt for the tribunal and the administrative proceedings, had unnecessarily impeded a resolution of the CON appeal and had breached the conditions under which he had been granted *pro hac vice* admission to practice law in Tennessee. Her revocation of his *pro hac vice* admission is supported by substantial and material evidence.

Mr. Dunlap's arguments in his reply brief are without merit. He alleges that ALJ Summers would have known that the first federal lawsuit had been dismissed if she had read the filings that he had made.[11] Until March 10, 2014, ALJ Summers was unaware that Tri-Cities I, the first federal

---

[10]. The statute set out the elements that constitute the criminal act of extortion. Mr. Dunlap's unprofessional conduct violated the Tennessee Rules of Professional Conduct; however, this Court does not find that the facts in the record support a conclusion that Mr. Dunlap's actions constitute criminal conduct. In addition, Chancery Court is not the appropriate forum for such a determination.

[11]. Mr. Dunlap's letter of July 29, 2013 states that he attached a copy of the Tri-Cities II complaint. The record does not reflect that

22

lawsuit, had been dismissed without prejudice by Judge Greer in June, 2013. The filings made by

Mr. Dunlap did not contain information from which ALJ Summers could have gleaned the status of

that lawsuit; however, she inquired in January, 2014 as to any developments and Mr. Dunlap failed

to apprise her of the December 2013 ruling by Magistrate Inman, which would have set forth the

history of Mr. Dunlap's client's repetitive legal filings in federal court and the outcomes thereof.

Mr. Dunlap argued that he had the right to fairly comment on the legality of the

administrative proceedings in reference to the ADA. His right to comment is not in dispute; rather,

the dispute centers on his failure to be forthcoming and candid with ALJ Summers about the federal

court proceedings. In his reply brief, Mr. Dunlap states that ALJ Summers appeared to take umbrage

at his allegation that the administrative appeal process

> "amounts to a scheme or artifice to violate the ADA." . . . Imagine that: A state
> agency engages in an administrative process that violates the ADA. This only
> happens hundreds of times across the United States every year. The U.S. Department
> of Justice's current ADA enforcement action web page is filled with links to
> approximately 100 recently-concluded enforcement actions.

This sarcastic assertion does nothing to explain Mr. Dunlap's failure to properly disclose the status

of his client's federal litigation to ALJ Summers or his attempt to coerce ALJ Summers to issue the

CON without an administrative hearing. Similarly, his posturing that his client has the right to make

HSDA aware of imminent federal enforcement action serves only as a distraction, not an effective

explanation for his misrepresentations or attempt to coerce. As explained previously, the cases cited

---

this is accurate as only four pages were attached to his letter, none of which disclosed Tri-Cities I. He ignored that ALJ Summers was
not aware of the history of the Tri-Cities' proceedings, both I and II. Second, in his letter, Mr. Dunlap states that "federal courts
clearly hold that there is no need to exhaust administrative remedies." His duty to be candid with ALJ Summers required him to
disclose Judge Greer's dismissal of Tri-Cities I for failure to exhaust administrative remedies. Third, candor with the Court required
Mr. Dunlap to tell ALJ Summers that he had filed an almost identical lawsuit on behalf of Tri-Cities in federal court in the Middle
Section for Tennessee and further, to disclose when it was removed to the Eastern Section, none of which he did. His insinuation that
if ALJ Summer had read the Tri-Cities II Complaint in July 2013, she would have been apprised that Tri-Cities I was dismissed
without prejudice on ripeness grounds is not supported by the record.

23

by Mr. Dunlap for the proposition that federal courts have struck down laws that impose cumbersome notice requirements on opiate-addiction treatment facilities are of no assistance to him and provide no defense for his unprofessional conduct. Mr. Dunlap failed to introduce relevant and material facts about HSDA's notice requirement. This court has no evidence upon which to conclude that a federal judge might hold that HSDA's notice requirements violated federal law. Mr. Dunlap's argument ignores his own misrepresentations, and fails to explain his lack of candor or his attempts to coerce ALJ Summers.

In his reply brief, Mr. Dunlap characterizes his conduct as an appropriate attempt to discuss the ADA. However, his written statements were not attempts to make ALJ Summers aware of the federal law and its implications. Instead, he declared that "if" ALJ Summers took action, he would have no choice but to sue her in federal court. This language is not a discussion of the federal law, but a direct challenge to ALJ Summers' authority. Again, Mr. Dunlap failed to explain his misrepresentations, his lack of candor and his attempt to coerce the ALJ.

Mr. Dunlap criticized ALJ Summers' sanction as arbitrary and capricious. In *Hoover v. Bd. of Prof'l Responsibility*, 395 S.W.3d 95 (Tenn. 2012), the Tennessee Supreme Court considered the disbarment of a lawyer and invoked ABA Standard 7.1 to determine the appropriate sanction.

> Disbarment is also 'generally appropriate when a lawyer knowingly engages in conduct that is in violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to the client, the public, or the legal system.

*Id.* at 106 (quoting ABA Standards for Imposing Lawyer Sanctions 7.1).

Mr. Dunlap's attempt to secure the CON without a contested case hearing by threatening to sue ALJ Summers injected the potential for serious injury to the legal system. In light of his

24

conduct, ALJ Summers' revocation of his *pro hac vice* status was neither arbitrary nor capricious.

Mr. Dunlap repeatedly argued that his client was entitled to a CON before the final CON appeal hearing, a statement in direction contradiction to the law of the case. The reported cases that he cited are clearly distinguishable from the circumstances at hand. Mr. Dunlap was not entitled to assert reliance upon those cases to justify his own misconduct.

In his reply brief, Mr. Dunlap also asserted that his client is entitled to counsel of its own choosing. He stated that he has represented his client for more than 18 months, in the original zoning request, in the CON application and hearing, in multiple federal and state proceedings and in generating over 1,000 documents. While he asserts that he will effectively and expeditiously conduct the administrative appeal process and the CON final hearing, the technical records reflect the exact opposite and again, Mr. Dunlap failed to explain his lack of candor, misrepresentations and attempt to coerce ALJ Summers.

The record does not reflect that ALJ Summers acted from pique or from great offense. She granted Mr. Dunlap's request for a delay in setting a definitive date for the administrative hearing three times, over the objections of the Defendant's counsel. In doing so, ALJ Summers relied upon the statements made by Mr. Dunlap about the federal litigation, only to learn in the papers filed by Mr. Christofferson that Mr. Dunlap's statements were not accurate.

After she read the Motion to Set the Hearing and Mr. Dunlap's Opposition to The Motion to Set, ALJ Summers evaluated Mr. Dunlap's conduct and concluded that he had acted unprofessionally and was not entitled to retain his *pro hac vice* status. When asked to reconsider, ALJ Summers again reviewed Mr. Dunlap's conduct and his statements and found that his motion provided no authority for the proposition that she must issue the CON without a hearing on the

25

merits or be in automatic violation of the ADA. She stated that a reasonable accommodation did not entitle Tri-Cities to require that due process be suspended; she further held that Mr. Dunlap's advancing this position under threat of legal action far exceeded his self-serving description that he was merely pointing out her obligations under the law and potential penalties for noncompliance.

Despite being advised by the federal Judge and the federal magistrate that he needed to exhaust his administrative remedies, Mr. Dunlap repeatedly demanded that a CON issue without a hearing and asserted that ALJ Summers' failure to issue one forthwith constituted a violation of federal law. His actions were tantamount to harassment and an attempt to intimidate ALJ Summers. *See Bd. of Prof'l Responsibility of Supreme Court of Tennessee v. Slavin*, 145 S.W.3d 538, 545 (Tenn. 2004)(holding that Mr. Slavin's in-court remarks were not protected by the First Amendment).

To the extent that Mr. Dunlap argues that ALJ Summers failed to provide him the requisite notice before revoking his *pro hac vice* admission, Mr. Dunlap had adequate notice and an opportunity to be heard when he sought reconsideration. Tenn. S. Ct. R. 19 requires only "appropriate notice." In the brief in support of the revocation, Counsel for the Defendant states that it is

> somewhat ironical that, while Mr. Dunlap himself threatened to sue Judge Summers if his client did not receive the CON without benefit of a hearing, he now complains that Judge Summers should have afforded him a hearing before revoking his *pro hac vice* admission.

Nonetheless, Mr. Dunlap had an opportunity to be heard when he filed a Motion for Reconsideration. He raised a number of issues regarding ALJ Summer's Order and asserted numerous arguments in support of his position that she erred. Due consideration has been given to each issue and each

26

argument. He has had time to present his issues and arguments to a disinterested tribunal. Any delay in providing Mr. Dunlap with appropriate notice is harmless and thus, excusable in light of these circumstances.

No lawyer is entitled to use threats and intimidation to force a judge to perform a discretionary act and such conduct evinces a persistent resolve to undermine and to bend the justice system to that lawyer's will. *Galbreath v. Bd. of Prof'l Responsibility*, 121 S.W.3d 660, 666-667 (Tenn. 2003).[12] In so doing, the lawyer has inflicted grievous injury upon the judicial process. *Id.* Counsel for HDCA is correct that Mr. Dunlap's charges of bias and retaliation on the part of ALJ Summers and his subsequent act of suing her in federal court "go far beyond the use of unwise semantics or mere harsh language directed toward the tribunal." His conduct, e.g., misleading ALJ Summers, threating to sue her and joining her in the federal litigation, caused unwarranted delays in the administrative hearing and disrupted the orderly administration of justice. Mr. Dunlap took all of these actions without a sound basis in law, and certainly, without a foundation in fact. ALJ Summers had substantial and material evidence to revoke Mr. Dunlap's *pro hac vice* admission.

## CONCLUSION

The decision to revoke Mr. Dunlap's *pro hac vice* admission is upheld for the reasons set forth above. Costs are assessed against Mr. Dunlap.

IT IS SO ORDERED.

CHANCELLOR CAROL L. McCOY

---

[12] Unlike Mr. Galbreath's attempt to coerce a discretionary act, Mr. Dunlap attempted to coerce ALJ Summers to act *ultra vires.* The common denominator, though, is an attempt to coerce a judicial officer to use his or her office in an inappropriate manner.

27

cc:    Sue A. Sheldon, Senior Counsel
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202

Jim Christoffersen, General Counsel
Tennessee Health Services and Development Agency
Andrew Jackson Bldg. 9th Fl.
502 Deaderick Street
Nashville, TN 37243

Sara Elizabeth Sedgwick
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202

James A. Dunlap, Jr.
James A. Dunlap, Jr. & Associates, LLC
310 Windsor Gate Cove NE
Atlanta, GA 30342

James S. Higgins
The Higgins Firm, PLLC
525 Fourth Avenue South
Nashville, TN 37210

Ms. Sandy Garrett
Tennessee Board of Professional Responsibility
Suite 220
10 Cadillac Drive
Brentwood, TN 37027

U.S. District Court Judge J. Ronnie Greer
U.S. District Court for Eastern District for Tennessee
220 West Depot Street
Suite 405
Greenville, TN 37743

Chief U.S. Magistrate Dennis H. Inman
U.S. District Court for Eastern District of Tennessee
220 West Depot Street
Suite 306
Greenville, TN 37743

28

<u>NOTICE OF APPEAL</u>

**Style**   TRI-CITIES HOLDINGS LLC

v. TENNESSEE HEALTH SERVICES AND DEVELOPMENT AGENCY

**Notice**

Notice is given that   TRI-CITIES HOLDINGS LLC

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the final judgment(s) of the   Chancery   Court of   Davidson

[List the circuit, criminal, chancery or juvenile court]   [List the County]

County filed on   December 10, 2014   to the   Court of Appeals

[List the date(s) the final judgment(s) was filed in the trial court clerk's office]

[Name the Court of Appeals (civil), Court of Criminal Appeals (criminal), or Supreme Court (Workers' Compensation)]

**Additional Information**

**Type of Case** [Check the most appropriate item]

- [✓] Civil
- [ ] Criminal
- [ ] Post Conviction
- [ ] Workers's Compensation
- [ ] Death Penalty
- [ ] Parental Termination

- [ ] Habeas Corpus
- [ ] Juvenile
- [ ] Dependent and Neglect
- [ ] Other (Specify: _____ )

**Trial Court Number**   14-650-11

**Trial Court Judge**   Carol L. McCoy

**Civil Appeal Cost Bond** [Check the most appropriate item]

- [✓] Filed in trial court with copy attached
- [ ] Indigent with copy of indigency order or affidavit attached
- [ ] Cash bond filed in trial court with copy attached

CC: APPELLATE COURT

**Criminal Appeal Appearance Bond** [Check the most appropriate item]

☐ Order appointing counsel with copy attached
☐ Appearance bond with copy attached
☐ Incarcerated pending appeal

**TDOC Number** [Appellant is an inmate] _____

**List of Parties**

**Appellant:** Tri-Cities Holdings LLC     At trial:◉Plaintiff◯Defendant
Party's Address: 310 Windsor Gate Cove NE, Atlanta, Georgia 30342
Party's Telephone: 404-354-2363
Attorney's Name: Jim Higgins, Esq.     BPR#: 16142
Attorney's Address: ~~110 Third Avenue South~~ Nashville, Tennessee ~~37201~~     Phone: (615) 353-0930
525 Fourth Ave South,     37210

*\* Attach an additional sheet for each additional Appellant \**

**Appellee(s)**

**Appellee:** TENNESSEE HEALTH SERV. AND DEV. AGENCY  At trial:◯Plaintiff◉Defendant
Appellee's Address: Andrew Jackson Bldg. 9th Floor, 502 Deaderick Street Nashville, TN 37243
Attorney's Name: Sue Sheldon, Esq.     BPR#: 15295
Attorney's Address: P.O. Box 20207 Nashville, Tennessee 37202-0207     Phone: (615) 741-2640

*\* Attach an additional sheet for each additional Appellee \**

**CERTIFICATE OF SERVICE**

I, Jim Higgins _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties and/or their attorneys in this case in accordance with Rule 20 of the Tennessee Rules of Appellate Procedure on this the 5th day of January, 2015.

_____
[Signature of appellant or attorney
for appellant]

[Revised: 5-22-09]

## ↪ APPEAL BOND FOR COSTS ↩

I (we), __Tri-Cities Holdings LLC__,

**principal(s)/Appellant(s), and I (we),** __The Higgins Firm, PLLC__, the

**surety(ies)/Attorney,** bind myself/ourselves for the costs of appeal in:

__Tri-Cities Holdings LLC__

**vs.        Docket No.** __NO. 14-650-11__

__Tennessee Health Services and Development Agency__

_____, _or_
**PRINCIPAL/APPELLANT** (Signature)

Tri-Cities Holdings LLC                    **by** _____
**PRINCIPAL** (Print)                        **ATTORNEY** (Signature)

**PRINCIPAL'S ADDRESS:**
310 Windsor Gate Cove NE
Atlanta, Georgia  30342

**INDIVIDUAL PRINCIPAL(S) SSN OR DL NO.:** _____
**ENTITY PRINCIPAL(S) FED.TAX ID NO.:** _____
*(street address only; NO P.O. boxes; NO in care of principal's attorney)*
*(Social Security/Driver's License Numbers required for individual principal(s) per Tenn. Code Ann. § 25-1-108)*
●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

The Higgins Law Firm, PLLC     **by** _____ **SURETY**
(Print)                              (Signature)
Note: If you are signing as surety on behalf of a law firm, please print the name of the firm on the space provided.  If you are signing as an individual surety, please print your name.  If you sign as an individual surety, you are personally responsible for the costs should the principal fail to pay.

**SURETY'S ADDRESS:** _____ 525 4th Avenue South, Nashville, TN 37210

_____
*(street address only: NO P. O. boxes)*

**IF THE PRINCIPAL(S) PAY ALL COSTS OF APPEAL, THEN THIS OBLIGATION IS VOID.  IF PRINCIPAL(S) FAIL(S) TO PAY, THEN THE SURETY IS OBLIGATED TO PAY ALL COSTS OF APPEAL.**

**IF YOU DO NOT HAVE A SURETY TO SIGN YOUR BOND FOR COSTS:** A cash deposit of $1,000.00 is deemed sufficient instead of a surety bond, except as otherwise required by the trial court clerk and/or the Appellate Court Clerk.

A deposit of $_____ in cash has been made by _____
with _____ of the _____ court
clerk's office on the _____ day of _____, 200___.

**APPROVED:**

_____ **or** _____
**CLERK OF THE TRIAL COURT**         **CLERK OF THE APPELLATE COURT**

**Certificate of Appellate Record**

I, Cristi E.Scott, Clerk and Master of the Chancery Court of Davidson County, Tennessee, do hereby certify that the following items herewith transmitted to the Court of Appeals are originals or true and correct copies of all the papers on file in my office in the captioned case.

1. Technical record attached to the certificate consisting of 368 pages contained in three volumes.

2. Administrative Record bound in three volumes filed in my office on June 23, 2014 and authenticated by the Trial Judge or automatically authenticated under T.R.A.P. Rule 24(f).

This 20th day of April, 2015.

CRISTI SCOTT

Cristi Scott
Clerk and Master
Davidson County, Tennessee

TO THE COURT OF APPEALS
AT NASHVILLE, TENNESSEE

By _Vicki Barley_
Deputy Clerk and Master