# EXHIBIT 9

```
 1                    STATE OF TENNESSEE
          HEALTH SERVICES AND DEVELOPMENT AGENCY
 2

 3

 4

 5   _____

 6

 7             EXCERPT OF PROCEEDINGS

 8                August 24, 2016

 9   EAST TENNESSEE HEALTHCARE HOLDINGS, INC.

10                 CN1605-021

11

12   _____

13

               LEGISLATIVE PLAZA
14                  Room 12

15      Sixth Avenue North & Union Street

16           Nashville, Tennessee

17

18   _____

19

20

21               Prepared by:
             Ace Court Reporters
22              APRIL N. DANIEL
               License No. 141
23           Post Office Box 158395
          Nashville, Tennessee  37219
24              (615) 516-9921
            stenoquick82@gmail.com
25
```

*Ace Court Reporters - April N. Daniel, LCR*

```
 1              The East Tennessee Healthcare Holdings,

 2   Inc., CN1605-021 project was heard on Wednesday,

 3   August, 24, 2016, beginning at 1:07 p.m. at the

 4   Legislative Plaza, Sixth Avenue North & Union Street,

 5   Room 12, Nashville, Tennessee, before a quorum of the

 6   following board members:

 7   BOB DOOLITTLE, CHAIRMAN
     THOM MILLS, VICE-CHAIRMAN
 8   LISA JORDAN
     COREY RIDGWAY
 9   KEITH GAITHER
     TODD TAYLOR
10   PAUL KORTH
     MARTIN FLEMING, M.D.
11   JOE GRANDY

12   AGENCY STAFF PRESENT:

13   Melanie Hill, Executive Director

14   Mark Farber, Deputy Director

15   Mark Ausbrooks, Administrative Services Assistant III

16   Jim Christoffersen, General Counsel

17   Rhonda Finchum, Administrative Officer

18   Alecia Craighead, Statistical Analyst

19   Phillip Earhart, HSD Examiner

20

21

22

23   Court Reporter:      April N. Daniel, LCR
                          LCR No. 141
24                        Expires 6/30/2018

25
```

<u>P R O C E E D I N G S</u>

**EAST TENNESSEE HEALTHCARE HOLDINGS, INC.**
**CN1605-021**
**(Motion to Approve)**

MR. FARBER: East Tennessee Healthcare Holdings, Incorporated, Johnson City, Washington County, CN1605-021. This application is for the establishment of a nine residential substitution based treatment center for opiate addiction. The estimated project cost is $1,747,777. Mr. Ridgway will be recusing on this application.

With regards to opposition to this application, there are a number of residents of Gray, Tennessee, who are opposed to this application as is evident on the public hearing minutes that you received; and with the attachment to your agenda includes the list of opposition and, of course, the letters that you have received. There are some members of the opposition here today that plan to speak, Brian Davenport, the County Commissioner and a resident of Gray, Pam Davis, resident of Gray, Sharon Oliver, a resident of Gray, Debbie Wise, resident of Gray, Mark Larky, who's a County Commissioner and resident of Gray, and Danny Sells, also a resident of Gray.

MR. DOOLITTLE: Thank you, Mr. Farber. Mr. Christoffersen.

1          MR. CHRISTOFFERSEN:   Thank you,

2  Mr. Chairman.  I'd like to make a few comments to

3  hopefully offer some guidance to our new members and/or

4  members who are new to the Agency since we've last had

5  an application for one of these types of facilities.

6          In the past, I've offered some guidance

7  that I'm actually going to try and read almost word for

8  word of a prior transcript of one of these Agency

9  proceedings; and the reason why I do this is because a

10  lot of issues can come up or can be brought up by

11  people in support or opposition of these applications,

12  and I want to try and put the Agency's focus on what

13  its statutory charge is and what it needs to do in

14  these cases.  And that isn't to suggest whether you

15  approve or deny it but rather the lens through which

16  you should view the application when making that

17  determination.

18          This is not the first methadone

19  application for a Certificate of Need in the state of

20  Tennessee.  The Agency and its predecessors have heard

21  applications before, and there are currently, I

22  believe, 12 that are licensed in this state.  The state

23  of Tennessee is long recognized as is the Health

24  Services and Development Agency and its predecessor.

25  Lots of good people suffer from addiction to opiates.

```
 1    This is not about whether or not the problem exists or
 2    about whether having these folks in the community as
 3    desirable.  Any comments today that are geared toward
 4    that are really going to miss the mark as to what the
 5    decision is to be based on by law.  That isn't to
 6    dismiss any and all opposition to the project but just
 7    and try to steer you what is relevant to the law you're
 8    charged with enforcing.  This is about what treatment
 9    is best for these folks within the framework of
10    Tennessee law.
11            The decision needs to be guided by state
12    law as provided in 68-11-1609 of the Tennessee code or
13    what we used to call the three criteria, which is now
14    the four criteria, of need, economic feasibility,
15    contribution to the orderly development healthcare, and
16    now the new criterion, whether the proposed project
17    meets appropriate quality standards for the service to
18    be provided.  The statute also calls for the Agency to
19    be guided by the State Health Plan when making these
20    decisions which lays out additional criteria which is
21    what's either referred to as the Guidelines For Growth
22    or sometimes just the Guidelines.
23            The Davidson County Chancery Court has
24    held that an Agency follows the guidelines laid out in
25    the analysis by the reviewing Agency that can provide a
```

*Ace Court Reporters - April N. Daniel, LCR*

```
 1   basis for a decision.  It doesn't necessarily mean that
 2   it will, though, in all circumstances be the only
 3   decision you can make or necessarily be the decision.
 4   It's just there will be a lower level of scrutiny on
 5   any level appeals if that's done.  But if the Agency
 6   does make a decision outside the framework of that,
 7   good reason needs to be provided for doing so.  And as
 8   those of you who have been on the Agency have
 9   experienced, there are times when there's good reason
10   to make a decision outside of the guidelines of the
11   State Health Plan.  Just remember that if you have a
12   decision geared toward that, your motion should contain
13   good reason for doing so.
14              The Department of Mental Health and
15   Substance Abuse Services has staff here that is
16   available to answer any questions you may have about
17   their role, the role they've played in preparing the
18   report, and any questions you may have about the
19   services that are provided.  There may be comments made
20   in support or opposition to the application or you may
21   have come up with questions of your own from reading
22   the application, and they're here to try to answer any
23   questions that you may have.
24              Hopefully statements and inquiry today
25   will be limited to state law and the Agency's rules and
```

1  you won't get pulled in other directions which

2  sometimes ends up happening.  I'll be prepared to

3  perhaps step in if there's any possibility of running a

4  foul of any federal laws as well.

5              Under the Americans with Disabilities

6  Act, which is very comprehensive in what it requires of

7  people, technically patients who are addicted to

8  opiates but are seeking treatment or in treatment as

9  opposed to those who are not are considered disabled

10  under that law.  And since they are, the federal

11  government, not only does it regulate methadone so

12  strongly, but under the ADA, it also gets involved as

13  well.  So if anything comes up that bumps up against

14  that, I'll try to interrupt and steer folks into that

15  right direction.

16              If you have any questions, just please

17  let me know.

18              MR. DOOLITTLE:  Thank you,

19  Mr. Christoffersen.

20              Mr. Elrod, by prior agreement with the

21  staff, the applicant will have 30 minutes in the

22  aggregate to make its presentation, and we will give

23  equal time in the aggregate to the opposition.

24              MR. ELROD:  Thank you, Mr. Chairman and

25  members of the Agency.  And just by way of

1 clarification, we will save some time for rebuttal to
2 be a part of our 30 minutes.
3              MR. DOOLITTLE:  That'll be fine.
4              MR. ELROD:  I'm Dan Elrod.  I'm here
5 along with my colleague, Travis Swearingen, on behalf
6 of this applicant and this project.
7              The applicant is a joint venture owned
8 equally by Mountain States Health Alliance and East
9 Tennessee State University Research Foundation.
10 Mountain States Health Alliance is a nonprofit
11 healthcare system with facilities and services
12 throughout northeast Tennessee and southwest Virginia.
13 The East Tennessee State University Research
14 Foundation, as the name indicates, is affiliated with
15 East Tennessee State University.
16              This project is not like other
17 substitution-based treatment centers previously
18 considered by the Agency.  The facility proposed by
19 this application will be just one aspect of a
20 comprehensive recovery-based treatment program.  The
21 goal of this program is to provide opiate-addicted
22 patients a pathway to recovery.  For some patients,
23 methadone is an essential component of that recovery
24 process.
25              The facility will make available a full

```
 1   spectrum of therapeutic and recovery-based services

 2   through a contract with Frontier Health, the largest

 3   provider of outpatient mental health and substance

 4   abuse services in the region.  As will be explained in

 5   more detail, the project involves a unique

 6   collaboration of three major nonprofit organizations

 7   that have demonstrated their commitment to address

 8   opiate addiction epidemic that is so prevalent and so

 9   devastating in the region and to do so with the utmost

10   quality and care of patients in mind.

11            With regard to need of this project,

12   there are two compelling points to make initially:  One

13   is the prevalence of the opiate epidemic, and you've

14   already heard something about that this morning in an

15   earlier application.  Tennessee has the second highest

16   opiate prescription rate in the United States, and this

17   problem is particularly acute in northeast Tennessee,

18   Sullivan County, which is where Kingsport is, has the

19   highest hospital discharge per capita in Tennessee for

20   drug abuse and overdose.  Washington County has the

21   third highest.

22            As the Johnson City Press noted in a

23   recent editorial, "This region is ground zero for the

24   opiate problem in Tennessee."  So it's obvious that

25   ETSU has established its center for prescription drug
```

abuse prevention and treatment that you'll hear more
about in a few minutes.

The second point supporting need for this
project is the great difficulty that patients currently
experience -- excuse me just a minute. I need to get
my pointer, or my clicker. Thank you. I didn't come
fully armed.

The second point about the need for the
project is the difficulty the patients are facing now
getting access to methadone treatment services.
Methadone assisted therapy, as Mr. Christoffersen has
indicated, is a well-established effective model for
opiate addiction. There are 12 facilities licensed in
Tennessee in nine different cities, but there are none
in Tennessee east of Knoxville.

And this is the service area for the
facility, and the dot or the star is the proposed
location for the facility. And in the dark blue
counties, which is the primary service area, there are
no facilities that we propose like that in the area.
There are a significant number of physicians in this
area who are authorized to prescribe people
Buprenorphine, which is another substitution-based
medication commonly known as Suboxone, but there are
some patients who simply don't respond well to that.

1   So with those patients, they are at a great

2   disadvantage and have great burden in accessing

3   services.

4              This is another map.  This map actually

5   shows the locations of the methadone clinics available

6   in the area, and you can see they are a significant

7   distance.  Depending on where you live in the dark blue

8   counties, the closest facilities are either in

9   Knoxville, Weaverville, North Carolina, Boone,

10  North Carolina, or Cedar Bluff, Virginia.  For most

11  patients, the one-way drive time is 45 to 75 minutes to

12  access this service.

13             This project will meet the need for

14  better access to the methadone option and it do so in

15  the context of a comprehensive treatment program with a

16  full array of treatment services.  The project is

17  optimally located near the confluence of I-81 and I-26,

18  so it's accessible to patients throughout this region.

19  We acknowledge there's some resistance and concerns

20  have been raised by the location, and we'll address

21  that as the presentation and rebuttal goes on this

22  afternoon.

23             With regard to financial feasibility, the

24  project will be funded by Mountain States Health

25  Alliance cash reserves, and the resources of Mountain

1  States Health Alliance stand behind this project.  The
2  project will be profitable by the second year, as
3  indicated in the application.
4           The project's contribution to the orderly
5  development of healthcare as well as the demonstration
6  in terms of commitment to quality standards, all of
7  that's reflected in the many letters of support that
8  the Agency has received from healthcare providers,
9  addiction services advocates, other providers who are
10 currently seeing addictive patients in the area, law
11 enforcement, and other members of the community, and
12 perhaps most significantly is the report from the
13 Mental Health and Substance Abuse Services, which
14 establishes that this project frankly meets all the
15 criteria.
16          In terms of in order to understand better
17 the collaboration that's involved here as well as how
18 this project will, in fact, adhere to applicable
19 quality standards, now I'm going to ask representatives
20 from the three collaborating organizations to come
21 forward and make a few comments.  When they're done,
22 Mr. Chairman, that will complete our principle
23 application.  There is at least one other person here
24 not associated with us who would like to speak.  But
25 when Ms. White completes her comments, that will end

```
 1    our main presentation.  And we have a number of people
 2    here, obviously, to answer any questions submitted.
 3                MR. DOOLITTLE:  Okay.  And assuming you
 4    don't use the 30 minutes, you want to preserve the rest
 5    for rebuttal?
 6                MR. ELROD:  Yes, sir.
 7                MR. DOOLITTLE:  Okay.  Fine.  And the
 8    additional person who's not part of the application who
 9    wishes to speak, when they are done, you will speak.
10    Thank you.
11                MR. PACK:  Good afternoon.  My name is
12    Robert Pack.  I'm a professor and associate dean for
13    Academic Affairs at College of Public Health and East
14    Tennessee State University, and I'm the Director of the
15    Center For Prescription Drug Abuse Prevention and
16    Treatment.  I'm glad to be here today to speak with
17    you.
18                In our college, we host an active working
19    group on prescription drug abuse and misuse.  It has
20    about 150 members that are in the community and at the
21    university.  We have the common goal of reducing the
22    burden of addiction in our region.  And this year, the
23    working group proposed an established research center
24    for prescription drug abuse prevention and treatment
25    that actually includes a number of research projects
```

1   that are ongoing right now focused on prescribing,

2   dispensing, patient communication with prescribers and

3   dispensers, neonatal absent syndrome; we have projects

4   focused on the Naloxone distribution and workforce

5   health promotion, which we do in collaboration with

6   Washington County.

7           There are a number of different studies

8   ongoing from that working group, but what we really

9   lacked was, we lacked a treatment component to the

10  center, and so we began to imagine how we might partner

11  with clinical folks around; reached out to Mountain

12  States Health Alliance, and they agreed to be our

13  clinical care provider for, really, the fourth

14  quadrant, if you will, for what we're trying to get

15  moving with the center.  So our center has a lot of

16  folks that are already engaged with us.  We've been

17  going since about 2012, but approved this year.  The

18  community engagement is high, but this new clinical

19  treatment side is what we're here to discuss today.

20          I want to point out that for each of our

21  folks that are associated with the center that have

22  some proportion of time devoted to it, each one of

23  those people will be devoted to an evidence-based

24  intervention that will be implemented at different

25  points along the continuum of addiction.  So in this

1    example here, it's really the continuum of addiction in

2    the middle.  But there are very strong excellent

3    evidence-based studies, in fact in some cases, Cochrane

4    reviews, that point to the evidence for each one of

5    those blue boxes.

6                    So, for example, implementation of

7    primary prevention programs, the use of

8    medication-assistant treatment, which has a good

9    evidence-base overdose reversal within the lock zone.

10   All of these different things have to be used together

11   to push back against the problem of -- against the

12   epidemic of prescription drug abuse or opiate

13   addiction.  Any one of them alone is insufficient.

14                   So we're here to talk about the MAT, or

15   the methadone based therapy today, but it's only one of

16   the things that we're monitoring, evaluating, and

17   trying to implement in a systematic way in our region

18   through the center, and that's why we became affiliated

19   or wanted to become affiliated with Mountain States and

20   Frontier on this.  So that's just an orientation toward

21   our paradigm, if you will.

22                   This is, I think, important.  It is an

23   absolutely essential-needed component for our region,

24   and is one that if we don't do it, there will be a

25   for-profit provider that comes in right behind us.

1         MR. JESSEE:  Good afternoon.  My name is
2    Randy Jessee, and I'm the Senior Vice President for
3    Frontier Health Specialty Services division.  A little
4    bit about my background:  I have 36 years of alcohol
5    and drug treatment program development and provision,
6    management of services.  I am a resident of Gray,
7    Tennessee, myself.
8              Frontier Health has 56 years, basically,
9    of experience in substance abuse addiction treatment;
10   and as a nonprofit corporation, a continuum of care,
11   that includes both outpatient and residential treatment
12   services, detoxification services, case management, and
13   other ancillary services that go with those.  The
14   service area has eight counties of Region One of
15   northeast Tennessee and three counties in PD One,
16   Planning District One, in southwest Virginia.
17             Frontier Health in the last fiscal year
18   had 50,000 individual lives impacted in dealing with
19   clients, patients, and coming through our services.
20   There are 62 total facility sites; 42 of those are
21   major sites with adult and CNY children and youth
22   services connected with those, and of those 42, there
23   are 20 primary outpatient service areas and also
24   includes residential detoxification and rehabilitation
25   facilities for men and for women.

1          Frontier Health is accredited by the
2    Commission on Accreditation of Rehabilitation
3    Facilities -- that is CARF -- and they're certified as
4    enhanced co-occurring disorder services from Tennessee
5    Department of Mental Health and Substance Abuse
6    Services in the state of Tennessee.
7          In 2004, Frontier Health initiated
8    medication-assisted treatment in southwest Virginia
9    with a program using Buprenorphine products --
10   primarily Suboxone -- and that commences into today.
11   There are presently, I think, 45 particular patients at
12   those clinics in Jonesville and in Big Stone Gap.
13          In Tennessee, Suboxone services would
14   begin in November of 2016 based upon grant and support
15   funds from the Tennessee Department of Mental Health
16   and Substance Abuse Services.
17          Frontier Health is staffed by a number of
18   professionals.  The primary ones I will just list to
19   you now.  There are nine psychiatrists, there are
20   four Ph.D. psychologists, there are 15 advanced
21   practice nurses, there are 129 master's degree licensed
22   and license eligible therapists, there are 37 nurses of
23   RN and LPN capacity, and there are 165 case managers
24   serving individuals in our service area.
25          One of the key things designed in this

particular approach is the use of wrap-around services,
which are structured services and services of need of
any patient that would come through the facilities.
And those things include medication assistance, job
training and placement, housing assistance,
transportation, child care, and other kinds of needed
services for individuals as they go through treatment
or come out of treatment at discharge.  There's
seamless transfer of these individuals as they involve
in-services and coming out of services.  Their needs
are continuously assessed by treatment teams that
they're involved with while they're in the treatment
process at different facilities, and that's documented
in specific treatment plans, individualized treatment
plans as mandated by state requirements.

Case managers and therapists then make
sure that the actions connected with that treatment
plan are followed up and any needs that are provided as
needing to be enhanced within their episode of
treatment, that they're actually connected and then met
and confirmed that they participate in those processes.
Referrals to those services take place in the local
communities in those centers, as you can see, that are
around in the major towns and cities in the region.

And some of those also are connected

```
 1    right inside the facilities with case management
 2    services and with the therapist there while they're in
 3    treatment and setting folks up for a timely and
 4    appropriate discharge back into their community to
 5    resume.  Most of these individuals do require a more
 6    structured living practice and experience and support
 7    as they continue on in life of recovery.
 8                    And as such, some of the examples of some
 9    of those local services are state provided as well as
10    locally provided by smaller agencies or other agencies
11    in the community.  Some of those things that come from
12    the state directly are the safety-net services that are
13    provided through the Department of Mental Health and
14    Substance Abuse Services, TTS, which is an
15    after-hospitalization type referral service for needs
16    of individuals and a homeless service also as well for
17    those, and that's involved for both women and men.
18                    And, I guess, my last comment is that in
19    the process of delivering medication-assisted
20    treatment, there are usually two components to that;
21    and those two components consist of, one, the
22    medication administration, whatever that medication is,
23    and then recovery component.  Some of that recovery
24    component in this particular facility will occur at
25    that site, and other more extensive services in terms
```

1   of treatment will occur off site in community-based

2   facilities.  And recovery is a combination of

3   stabilization through the medication and also through

4   the recovery treatment process, which is conducted both

5   in individual group sessions also family sessions and

6   other significant services such as case management.

7             And as a whole, over time, Frontier

8   Health has had, I think, a significant impact in terms

9   of folks going through treatment, and approximately

10  66 percent of those individuals that are involved in

11  treatment through our facility on an annual basis

12  complete that treatment and go on back into the

13  community with support services to try to put their

14  lives back together.

15            The MHCA, Mental Health Corporation of

16  America, client reports also state that we had high

17  ratings through treatment of effectiveness and also

18  therapist effectiveness scores as well.

19            And that is all I have.  Thank you for

20  your time.

21            MR. DOOLITTLE:  Thank you, Dr. Jessee.

22            MS. WHITE:  Good afternoon.  I'm

23  Lindy White, Vice President within Mountain States

24  Health Alliance.  I currently serve as Chief Executive

25  Officer of two of our community hospitals in Washington

County, Tennessee; one of those being Woodridge Hospital, which is an 84-bed inpatient behavioral health hospital. I've been a leader within Mountain States for 15 years, and I am a current resident of Gray, Tennessee.

Of the 84 beds that I mentioned in our hospital, the largest unit within that hospital is a 26-bed unit that serves patients that are hospitalized for addiction and for co-occurring diagnoses. That includes over 1,700 hospitalized admissions per year. And as part of our commitment to the behavioral health service line, we at Mountain States Health Alliance also offer two programs to intensive outpatient therapy one of those that's dedicated to our patients suffering from addiction.

Already covered extremely well in the opening comments was the extent of the opiate addiction in our region, and the problem is complex. And that's why we are so excited as we came together with ETSU to put together a more comprehensive approach. Mountain States, as a healthcare system, we've been asked -- 13 hospitals and 29 counties.

We've been asked several times to consider a traditional methadone clinic and operation of one. We've deferred because we felt that model

1  traditional clinic was not at the good fit that we

2  needed in our region.  We did not feel that the depth

3  of service was not there to be comprehensive enough to

4  really start to tackle this complex issue.  Therefore,

5  the strength of this proposal in front of you today

6  lies with the collaboration of our project that we are

7  proposing.  ETSU, Mountain States Health Alliance, and

8  our friends and partners are already in services around

9  addiction with Frontier Health, as Mr. Jessee just

10  mentioned.

11          Our model is really a three-legged stool:

12  A regional clinical footprint already established well

13  in Tennessee and Virginia, an opportunity to obtain

14  research status so that we can continue to build best

15  practices to fight this terrible epidemic in our

16  region, and the connectivity of already

17  well-established healthcare services across the

18  continuum is the strength of this project.  Disease

19  management, housing instability, employment needs, all

20  of those, the three legs of this stool can meet.

21          In addition to our well-established

22  history in providing treatment for addiction, including

23  therapy and counseling services, we have made multiple

24  site visits as a commitment to this program.  This is a

25  new tool in our tool kit.  We understand that.  We have

spent months studying this and different site visits to
ensure that we can bring this comprehensive approach to
our community safely and with extreme quality of care
for our patients.

It is the broad continuum of care with
the project that we proposed. As part of that
continuum, we also know that our communities and our
residents are also the key stakeholders in this
project. We have engaged the community on several
occasions as far back as May in smaller work groups
with concerned citizens and local legislatures, and
we've also had several opportunities in much larger
group forums to hear their concerns, and we have heard
them and we have considered them.

Finding an ideal site for this project
has no doubt been the challenge. Collectively working
with the mayor and the concerned citizens of Washington
County, we've looked at 40 alternative sites seriously,
and together and collectively, the mayor brought forth
one of those, which we seriously considered. And that
particular alternative was in a much more heavily
congested area and was going to cost far more to
develop this project, including the construction of a
new building.

The unique model that we bring together

```
 1   as for profits today, obviously we're concerned about
 2   the financial feasibility.  But as part of this
 3   project, any profits and proceeds that come from this
 4   collective project together is going to go back on the
 5   front end part of the center to continue to fight and
 6   put together best practices for prevention and
 7   education.  That's another reason why we're concerned
 8   about the financial cost associated with the other
 9   site.
10                 With that, we feel like this
11   recovery-based addition treatment facility incorporates
12   medication assistance.  Yes, it's a new tool methadone
13   and a ray of treatment services.  But we do feel like
14   this is ultimately going to be a comprehensive approach
15   to really start to tackle this epidemic in our region,
16   and I ask you to consider a favorable response to this
17   unique comprehensive approach for the citizens of our
18   region to create a safer place for our families.  Thank
19   you.
20                 MR. DOOLITTLE:  Thank you, Ms. White.
21                 MS. COFFEE:  Good afternoon.  Thank you
22   for letting me speak.  My name is Rhonda Coffee.  I'm
23   here to today as a parent --
24                 MR. DOOLITTLE:  Ms. Coffee, let me just
25   make it clear; you are speaking independently of the
```

```
1   applicant?

2              MS. COFFEE:  Absolutely.

3              MR. DOOLITTLE:  Okay.  So just for

4   Mr. Elrod's entertainment, you have six additional

5   minutes on your rebuttal after opposition.

6              MR. ELROD:  Okay.  Thank you.  Your time

7   is not included.  Please go ahead.

8              MS. COFFEE:  Okay.  Thank you.  I'm here

9   as a parent.  This is a picture of my son when he was

10  three years old.  I didn't know when I took this

11  picture that he would grow up to be an addict.  None of

12  us know that.  We can't know that.  But David was more

13  than his addiction.  He earned a degree.  He was happy.

14  He was productive, but he was an addict.  He fought

15  hard to not be an addict.  One year ago, I lost him.

16  He succumbed, and he couldn't fight anymore, so now I

17  fight.

18              We considered this option, but it was far

19  away.  It was inconvenient.  He thought other methods

20  were better.  We had a lot of reasons we didn't

21  consider this method.  Now I read a lot about different

22  things that are good, and I know now that someone who

23  was chronic in the relapses, as he was, that this was a

24  good option for him.  And I know now that no one method

25  is the only method that every addict needs all the
```

Case 2:14-cv-00233-JRG-MCLC   Document 69-9   Filed 12/04/16   Page 26 of 84   PageID #: 2191

1  available options at their fingertips.  We need to make
2  their lives easier, not harder.  We don't need to make
3  people drive 75 minutes one way to get treatment.  We
4  need to give them the options at their fingertips so
5  they can get well, so they can live productive full
6  lives.  We need to help them, not push them down.  We
7  need to ease the stigma, and we need to help, not hurt.
8  This option works for some.  It won't work for
9  everyone, but it will work for some.  It does work for
10 some.  I am in contact with many that it works for.  I
11 have formed a support group, and some of those people
12 are in my support group.  It started out just being for
13 parents, but it's blossomed into a lot more.
14         So I work as an advocate now, and it's my
15 hope that I can speak for all of those that are afraid
16 to speak.  And so I'm speaking for those that didn't
17 have a voice to come here today that didn't have the
18 means, the method, who just didn't feel brave enough to
19 write a letter or speak out, but they need this.  They
20 are living in total hell every day and they get up and
21 they make that drive and then they come home and then
22 they go to work and they raise their families and they
23 need this.
24         So let's help them.  Let's make their
25 lives easier because addiction is a disease.  It's not

```
 1   a punishment.  It's a disease, and we can help be part
 2   of the cure in some form.  So let's remember we can't
 3   guarantee when we snap these pictures of our children
 4   that they won't be an addict.  I never dreamed that for
 5   my child.  He didn't dream it for his self.  And I
 6   certainly didn't dream that I would have to bury him
 7   30 years later.  So I ask you to take it to heart.
 8              MR. DOOLITTLE:  Thank you, Ms. Coffee,
 9   and we'd like to express our sympathy for your loss.
10   The opposition will now present.  You have been
11   promised an aggregate of 30 minutes and you can,
12   depending on the length of your comments, it's probably
13   easier if two or three of you line up over there and
14   we'll just work through it.
15              MR. CHRISTOFFERSEN:  If I can be so bold
16   to interrupt, since y'all aren't familiar with the
17   process, I just want to remind you that each one of
18   you, state your name as you begin to speak in the
19   microphone for the record.
20              MR. DAVENPORT:  My name is
21   Brian Davenport.  I'm a Washington County Commissioner
22   and a resident of Gray.  I'm here today to speak for
23   the area that I represent and also myself since this
24   facility is going to be just a couple of miles from my
25   home.  Again, and you will hear many times and you'll
```

see on the map, that this location is on the very far
edge, the outskirts of Johnson City, as far out as they
can put it.  A matter of fact, the residents are county
residents, they're not city.  There's no one that
lives -- and this is a residential area.  The people
that live hundreds of yards away have homes there.
There's new development there.  There's development
going on now, $300,000 houses, smaller homes, there's
also generational homes there, farm land and homes
that's been handed down from generation to generation.
Those people have a concern about this facility, and I
think it's something we should look at.

In thinking about there not being
citizens of Johnson City, what we have here -- we think
about taxation without representation.  What we have
here is implementation without representation.  So if
you would, think about that, please.  The safety issues
that we have, it's a very low crime rate.  Low crime
rate equals low presence in law enforcement.  There's
no need to patrol that area because we don't have needs
and issues for that at the current time.

We're concerned about, the data that's
been shown, about the traffic in that area.  The
traffic in that area is supposed to be, by the data
that's been shown, the high traffic area is from 4:00

*Ace Court Reporters - April N. Daniel, LCR*

28

Case 2:14-cv-00233-JRG-MCLC  Document 69-9  Filed 12/04/16  Page 29 of 84  PageID #:
2194

```
 1   to 6:00 in the evening.  1.3 miles away from this
 2   facility is a high school that has 1,350 students in
 3   it.  70 percent of those students are coming right in
 4   front of that methadone clinic.  If you think about
 5   that, that school adjourns at 2:40 in the afternoon.
 6   How could traffic time be between 4:00 and 6:00 when we
 7   have 1,350 students leaving that facility at 2:40?
 8   It's questions like that that we don't completely
 9   understand all the data because if one data set is not
10   correct, it makes you question the other data set, and
11   that's part of our concern.
12                Again, we have young drivers that's
13   driving to and from school right there.  To increase
14   that traffic flow -- I wish that I can tell you that
15   our students never text while they drive or they don't
16   do any of this distracted driving and they're always
17   focused on exactly what they're doing.  So if extra
18   traffic swerves in their way, they're going to be able
19   to react to that.  But we all know, and I can tell by
20   the expressions on your face, that's just not the
21   truth.  It's not how things work.  And our concern for
22   our children and our concern for our community is just
23   that simple.  This is not -- this location has those
24   concerns.
25                I wish I could tell you -- when I first
```

```
1    started out in first communications with this, I was
2    convinced -- I would have stood before you today and
3    said I believe in this facility, but not in my
4    community.  After educating and looking at myself and
5    talking to people, there is a need for something to be
6    done.  After looking at this, I don't think this is the
7    right thing to do and the people of Gray doesn't think
8    it's the right way to handle this problem.  Just
9    because we have a problem does not mean that this is
10   the answer to that problem.
11              And like I said, we think with other
12   facilities with the government, with the national
13   government, this is a Tennessee problem.  This is a
14   east Tennessee problem.  This is a problem of the
15   United States.  And we don't believe that this is the
16   right answer for this problem.  Thank you for your
17   time.
18              MR. DOOLITTLE:  Thank you, Mr. Davenport.
19              MS. DAVIS:  My name is Pamela Davis.  I
20   am a resident of Gray, but I'm also a physician
21   assistant and I work in holistic medicine.
22              MR. DOOLITTLE:  Could you speak up just a
23   little bit, please?  Thank you.
24              MS. DAVIS:  I want to thank you for
25   listening to our concerns because it has been weighing
```

very heavily on our hearts, and I thank Mr. Farber and
Mr. Christoffersen for coming out and listening to us.
When we talk about addiction, it crosses every part of
a person's life. I think most people are affected by
addiction. I think we've all seen it. I've seen it in
my family. I've seen heavily in my family, different
choices made, but it entails your body, your sole, and
your mind. And I think that if we're going to treat
the patient, we're going to have to treat all of those
components because just the addiction part is not going
to cut it.

So when I went through the 271 pages of
the Certificate of Need, there's a lot of talk about
wrap-around services. However, I could not find many
specific details. None of the auxiliary services will
be in the Gray area. Patients will have to leave the
Gray area and travel to Johnson City, which is going to
be a 25-minute commute for additional counseling,
therapy, care management sources, social needs and
employment basing housing. There's no public
transportation in our area. Taxi services is very
limited, and Uber is coming, but that's not going to
fit their pocket book.

There's nothing laid out in the plans as
the accountability for the patient. What is their

1  responsibility to this program?  How much therapy?

2  What is the goal of therapy?  Where is the therapy

3  located?  Is it group?  Individual?  Who's in charge?

4  And I couldn't find specifics.  I was also unable to

5  locate in there an application of new versus returning

6  patients, no estimation of duration of treatment, no

7  estimation of patient retention or attrition, no

8  information concerning compliance requirements or what

9  happens if they are not compliant, no information is

10  addressed concerning patients already in a treatment

11  program and transitioning over, or are they already on

12  Suboxone?  What if they don't want wrap-around

13  services?  What are the requirements of the patients?

14         There were no timelines for addressing

15  patients getting off methadone, but I do think that if

16  we're going to do a program -- and I agree; it's

17  needed.  There are issues that are important, and I

18  think not only does the program have a responsibility,

19  the patient has a responsibility.  And how do we get

20  them to engage in this and want to get better?  Some

21  people want to get better at addiction and some people

22  don't.  We've seen that.

23         It seems that everything is in the

24  developmental stage.  I didn't see much of an

25  organizational structure.  I went through -- on

page 54, the clinic is going to see 600 patients a day. This breaks down to 75 patients per hour. There will be two program physicians that's supposed to include physical exam, medical history, determine diagnosis, determine opiate dependants, ordering take-home privileges, discussing cases with team, issue emergency orders, and the onsite prescriber of services one hour per week for every 35 recipients. It works out to one minute seven seconds per patient. I do not know how that can be accomplished. You cannot give good care if it is that short.

Nurses will direct clinical care; and duties may include prescribing with supervision, charting notes, and facilitation and researching and administration. The last time I checked, nurses do not have a DEA number, and they are not able to prescribe medicine. So that would be a great concern. Who is going to be doing this? Who's going to be taking care of these needs?

We have heard several times from the petitioner that they would want to work with the community. The first time we learned about that was at the zoning commission just a few weeks ago, that they wanted to work with the community of Gray, so that was the first time we heard that. I would say they have a

1    lot of clinical resources.  We were told that.  Why are
2    we not utilizing those?  Why are we not utilizing what
3    is already present instead of putting in a clinic, take
4    what you have, and make the best of those uses?  And
5    why are we not talking to physicians and decreasing the
6    problem where it starts with prescribing?  Thank you.
7              MR. DOOLITTLE:  Thank you, Ms. Davis.
8              MS. OLIVER:  Good afternoon.  My name is
9    Sharon Oliver.  I'm a certified professional medical
10   coder.  I'm a medical auditor.  I have been in the
11   medical field since 1964, one year before Medicare was
12   put into place.  So the white hair justifies what I am
13   telling you, so I can prove it by that without my
14   driver's license.  I'm coming to you as not only on the
15   professional side, which Ms. Davis is the PA here.  I
16   am not as educated as the professors and the physicians
17   here.  But I did a lot of OJT, on-the-job training, as
18   a nurse for a pediatrician, family practice, practice
19   manager for 13 years, 10 years OB/GYN, and the last
20   12 years ETSU positions in the associate's department
21   of cardiology, so I've kind of been around.
22              But I want to talk to you as a mother, a
23   wife of 53 years, a mother of three, and a grandmother
24   of five.  The impact of the location, as we have been
25   addressed -- Brian addressed and all the students --

```
 1    we've got three elementary students within a couple of
 2    mile radius.  The high school a mile or so down the
 3    road.  There's five private schools within this
 4    two-mile radius.  Route 75 where the methadone clinic
 5    is proposed to be located is a little three-lane road
 6    with the third lane being the turn to go either way.
 7    No traffic light.  We're only maybe a half a mile or so
 8    from the interstate.  Yes, that's convenient for
 9    everybody.  But the cross-traffic and everything,
10    there's just not there.
11              The police say they can monitor it.  I
12    don't know.  Can they set out there from 5:00 in the
13    morning where people -- I have been in contact with
14    pharmacists, pharmacy techs, that -- you know, the
15    people camp out waiting for it to open.  When a new
16    doctor starts his practice -- and you can bank on it --
17    there's a new line of traffic setting out the door, and
18    we call them seekers in the medical field, seekers.
19    And that's what they're there for is to get that
20    prescription to go home with being a new doctor and not
21    knowing their history and all.  So in this minute and
22    seven seconds that we have per patient -- and that's
23    only for 600.  But a lot of places have 1,500 to 1,800
24    a day, Asheville and all.  So tell me how -- you know,
25    this is what the location -- the traffic pattern is
```

```
 1   just not there.
 2            And while I'll sympathize with the lady
 3   that lost her son, I'm a mother of an addict.  She'll
 4   soon be 50 years old.  She didn't become an addict
 5   until in her 30s after she had children of which the
 6   two we have adopted to save them.  Woodridge was
 7   wonderful in helping her get over this.  She has been
 8   clean now for about four years.  The potential to go
 9   back is always there.  Unfortunately, she didn't follow
10   my lead.  Mine was sour cream pound cake.  Hers had to
11   be something stronger.  She survived it, and she did it
12   through the determination that she wanted to; she knows
13   she needed to.  But death does not always mean that
14   you're six foot under.  It destroyed our family, it
15   did.  But I am so proud of her for being clean, and she
16   got the help in Johnson City to get clean.
17            So I just wanted to point those things
18   out to you as a mother and in the profession.  I've
19   seen it, you know.  I've seen it.  I've been on the
20   ground floor.  I've cleaned the bathrooms and wiped up
21   the vomit and stuff from people.  But we have -- our
22   facilities are -- Johnson City Medical Center is, like,
23   11 miles from there.  The gentleman here, I gave you a
24   handout here of the 12 facilities in Tennessee, and you
25   see that they are in a close proximity of medical
```

```
 1    treatment centers.

 2              Because when people take these

 3    medications and do these things to their bodies,

 4    respiratory distress, hypotension, systemic

 5    hypotension, we have cardiac arrest -- even though the

 6    ambulance is, you know, in the proximity of the

 7    building, we still got to get them, due to traffic and

 8    everything, 20, 25 minutes away where the care of the

 9    patient has always been in my focus.  I take care of my

10    doctor and my make sure the patients were taken care of

11    so he could, and that is so important.

12              When you stop breathing -- my father died

13    of cardiac arrest.  When you stop breathing, you're

14    done.  And we need to have this, and I'm not saying

15    that it's not a needed thing.  Please don't ever get me

16    wrong on that.  But it needs to be in a location to

17    where they can get the help in an acute distress

18    situation.  And in the area that is proposed, they are

19    too far away, just too far away, you know.

20              And this medicine and they have to do a

21    urinalysis and all of this every day.  One tablet of

22    methadone stays in the body for 59 hours, so they can

23    get however much their prescription, one or two pills,

24    whatever, and they get it every day.  They could take

25    one pill and still be determined positive the next day,
```

1  but yet they could be out selling the extras that they

2  don't need.  So these people are not dumb.  They're

3  smart.  They figured this system out and to get what

4  they want.

5              So I will close on that.  So I just

6  wanted you to know, I'm here to speak to you from the

7  heart with nothing else involved from me but from the

8  heart.  Thank you.

9              MR. DOOLITTLE:  Thank you, Ms. Oliver.

10             MS. WISE:  Hello.  My name is

11  Debbie Wise, and I'm a resident of Gray, Tennessee.  I

12  appreciate you-all taking the time to listen to our

13  concerns.

14             The first thing I wanted to mention to

15  you is, I'd like to briefly address a couple of issues

16  that the applicant made and the additional information

17  that they submitted to you on August 15th.  They talk

18  about our concerns related to the school location and

19  residential proximity to this proposed clinic.

20             The one thing that I would like to point

21  out is that based on the discussions that they have had

22  with other law enforcement officials with communities

23  where these clinics exist, they are comparing Gray,

24  Tennessee, which has a population of roughly 1,500.  It

25  is a census basis, so Gray has 1,500 census with no

1  local law enforcement there onsite.  We are being

2  compared to cities like Memphis with a population of

3  almost 650,000.  That's over 400 times the size of

4  Gray.  Knoxville has a census of around 179,000.

5  That's over almost 120 percent the size of Gray

6  community.  Columbia, a population of 35,000.

7  Dyersburg, 17,000.  Those are 12 to 25 percent the size

8  of Gray, Tennessee, with services and locations right

9  there that may be needed by the patients that would

10  come to the clinic.

11         The other thing that I would like to

12  point out, you have a map in front of you that shows

13  the boundaries of Johnson City, Tennessee, and the area

14  that has been annexed in past years.  The red triangle

15  represents where in Johnson City this clinic is going

16  to be located, and it is far away from the city of

17  Johnson City.  It's about 10 miles.  I travel it every

18  day going into Johnson City to work.  So I would just

19  like to point out that people that live in the city

20  expect things like this, but people who choose to live

21  in a rural community don't expect certain types of

22  services to be there and available.

23         Going onto the -- to the Certificate of

24  Need.  As I read through that, I do think it is a very

25  appropriate idea to have a nonprofit holistic treatment

center. However, my concern is that the applicant
doesn't have the experience or expertise in operating a
nonprofit substance abuse treatment center. They talk
about this being a new project. And while it's very
worthy, I would just like to point out that there's
many unanswered questions relating to how this is going
to transpire, how the clinic and ETSU are going to be
operate and be funded.

Throughout the CON, they elude to that
fact in many of the responses to the questions with
answers like, the project represents an opportunity to
develop something, a comprehensive model. An
innovative model will be created. The program is in
its developmental stage. We plan to engage some
external experts to supplement any knowledge gaps that
we have to operate this type of clinic.

So in the additional documentation that
they supplied on August 15th, they state that there's
no real data for the specific type of facility, so
there are questions that need to be answered. The
applicant also states in the supplemental information
provided Mountain States' long history of providing
inpatient and outpatient of treatment of alcohol and
drug abuse patients at Woodridge psychiatric hospital
is the basis for the expertise for operating the

1    proposed clinic.

2            So I think it's important to look at what

3    is the success rate that they have had in treating

4    patients specifically with opiate addictions, what are

5    the re-admission rates for those patients both from an

6    inpatient perspective and in their intensive outpatient

7    treatment centers that they have.

8            Also, regarding the financial data, they

9    state on page 50 that the patients will be charged $13

10   a day for treatment estimated to provide $3.6 million

11   in gross revenues by the second year with a net income

12   of 950,000, and that the positive income from that

13   would be re-invested into the large center, which is

14   ETSU's research facility, and then that this is

15   earmarked for ongoing research and evaluation to

16   identify additional evidence-based approaches.

17           You asked the question about the --

18   incorporate the -- regarding the incorporation of

19   additional components -- the clinical training, the

20   community education outreach, research -- and the

21   applicant states that it's not the intention to use the

22   $13 a day to support and subsidize those services, that

23   the center has obtained grants.  One of those grants is

24   scheduled to expire in March of 2018 to the tune of

25   about $2 million, and the other $3.5 million that they

refer to as being supporting this research and these
other components of the treatment are in the review
stage.  So they don't even have secured funding for
that $3.5 million.  So if that's the case, how do they
plan -- if those grants are not funded, how do they
plan to subsidize the additional components of
treatment?  Is it going to be this money going back
over there to fund the research and everything?

            And so I do think that it's a very worth
while cause, and as you can tell from their maps that
they put up earlier with all of the facilities that
they have throughout those counties, I see a great
opportunity for them to be innovative and take this to
the patients instead of making the patients come to
them in this rural community of Gray because where it's
located there, you still have a good 45 minute to an
hour drive from many of the places that people would
come to from those surrounding counties.  Thank you for
your time.

            MR. DOOLITTLE:  Thank you, Ms. Wise.

            MR. LARKY:  Good afternoon.  My name is
Mark Larky, and I live in Gray.  I also have the
privilege beginning my 11th year as a member of the
Washington County Commission and also a member of the
Washington County Planning Commission.  My comments

1    reflect the many fine views of the Gray community which

2    I proudly serve.  I will briefly provide remarks under

3    the three criteria in which you consider.

4            First of all, is this clinic located at

5    203 Gray Commons Circle needed?  I would begin by

6    saying that we all tend to provide and magnify data,

7    statistics, and studies that support the outcome that

8    we are seeking, and it appears to me that this is the

9    approach in the Certificate of Need by the petitioner.

10           In the CON, it states that Tri-Cities

11   Holdings, LLC, was denied an application at your

12   June 26, 2013, Agency meeting.  The application was for

13   the establishment of a nonresidential substitution

14   based treatment center for opiate addiction preventing

15   symptoms of withdrawal.  The estimated project cost was

16   projected to be $670,000.  Your reason for denial was

17   the following:

18           The application did not meet the

19   statutory criteria.  You stated that there was not a

20   need for this service as there were effective treatment

21   options available for opiate addiction in our area.  So

22   I submit to you that this board addressed the question

23   of need, and there have been no significant changes.

24   Can you hear me okay?

25           Secondly, can this proposed clinic be

economically accomplished and maintained?  Many have
said that the approval of this request or requests
similar is actually a license to print money.  I'm a
capitalist through and through, so I have absolutely no
problem with profitability.  This business will be
economically sound, which supports the reality that
anything less than the ideal location and model should
not be accepted by you as a board.  I strongly state
that this is not the best location for such a facility.
This was evidenced by the mayor of Washington County,
Mayor Eldridge, and Mr. Collier, the realtor for the
applicants and evaluation of 40 potential alternate
sites after a public hearing and the applicant realized
how much opposition there was.

      We never had opportunity to discuss other
sides prior to that.  Reasons stated to me for the
rejection of the many sites were supposed problems with
the investment amount and by some problems with the
Johnson City parking requirements and their zoning code
specifically for methadone clinics that were designed
to make locating these facilities difficult.  There
were more suitable sites submitted by Mayor Eldridge of
which some required no rezoning and ultimately were
rejected by the petitioner with the only rationale was
that it exceeds budget.

1          We contend that there are better

2     alternatives and you have a business with a

3     profitability that this one has, you should locate it

4     in a better location.  I would my business, and I think

5     you-all would as well.

6          Also, the CON states that the Gray

7     Commons is a plan multi-use commercial development site

8     envisioned by the city of Johnson City and Mountain

9     States Health Alliance as an economic development

10    driver for the Gray, Tennessee, community.  Well, they

11    are proceeding to fulfill their economic vision for

12    Gray by proposing to open a methadone clinic.  The

13    citizens of Gray certainly do not want our economic

14    vitality to be dependent upon the operation of a

15    methadone clinic, and I don't think you would in your

16    community either.  So we respectfully disagree with

17    their envision of the Gray community.

18          Lastly, will this proposed clinic

19    contribute to the orderly development of healthcare?

20    Well, when considering this question, many items affect

21    the term orderly development; perhaps none other, the

22    location which we just discussed.  Specifically the

23    methadone clinic's location in regards to compatibility

24    to the proposed surroundings and acceptance from the

25    community, therein lies a tremendous problem with the

1  question os orderly development in relation to this

2  proposed location by the petitioners.

3          If you'd allow me the privilege to

4  quickly share some information I believe will be of

5  interest to you in terms of our local zoning, because

6  they are not uniform throughout the state and some of

7  you may not be familiar with Johnson City and

8  Washington County.  The city, Johnson City, currently

9  has a zoning designation in conjunction with the

10 special exception from its board of zoning appeals to

11 accommodate nonresidential treatment facilities which

12 allow for the dispensing of methadone.

13         The city of Johnson City and the Johnson

14 City Planning Commission, in 2015, altered some of

15 these regulations in the MMS-1 zonings specifically to

16 ensure these facilities had areas to operate in if they

17 met certain criteria.  The proposed site in Gray is

18 zoned B-5 under the city's zoning designation.  That's

19 prohibiting methadone clinics.  There are zero MS-1

20 zonings in the Gray area, and the surrounding

21 properties of the proposed clinic are predominantly

22 county properties zoned R-1, which are residential, and

23 A-1, which is agricultural.

24         There are very few -- and I emphasize

25 "few" -- surrounding city zonings are B-5 business and

A-1 agricultural.  It's very important to note that the
2  nearest current MS-1 city zoning is on Knob Creak Road
3  in Johnson City, a significant distance from the Gray
4  site in the Gray community.
5         We would submit to you that this clinic
6  with its use is completely out of character for the
7  proposed site, and one city planning commissioner noted
8  in the Planning Commission that it appeared to him that
9  this case was spot zoning.  I quote that.
10        I haven't even began to discuss the
11  tremendous residual burden this will place on service
12  delivery to the extreme outlying area for Johnson City,
13  which will be substantially impacted and even spill
14  over into county services that would be affected
15  adversely.  Johnson City's own Chief of Police stated
16  at the Planning Commission meeting stated the clinics
17  in Knoxville, which he visited -- he said, I quote, not
18  close to residential areas in Knoxville, not close to
19  residential areas in Knoxville.  That's not my
20  statement.  That's the Police of Chief in Johnson City.
21  Friends, this location is surrounded by residential and
22  farm land.
23        In closing, I would like to return to the
24  denial of the Certificate of Need for this type clinic
25  in our area by this board in 2013.  There have been no

```
1    perceived or stated massive increase in the instance of

2    opiate addiction since 2013, nor has there been any

3    decrease in the availability of treatment for these

4    addiction problems since 2013.  Therefore, this board

5    -- your decision -- this board's decision in 2013 was

6    valid then and certainly remains valid today.  I

7    proudly stand here as a representative of the Gray

8    community and respectfully request to you to deny this

9    application in its present form with the address being

10   203 Gray Commons Circle as its desired location to

11   operate a methadone clinic.  Thank you very much.

12            MR. SELLS:  Mr. Chairman, I would

13   respectfully request an additional five or six minutes,

14   and we'd gladly agree to the petitioner having the

15   same.

16            MR. DOOLITTLE:  Yeah.  Thirty minutes has

17   been used up, so we do want to hear from you.  I would

18   encourage you to be concise.

19            MR. SELLS:  Mr. Chairman, members of the

20   committee, I am Danny Sells, and I am a 63-year

21   resident of Gray.  We appreciate the opportunity to

22   expression our strong opposition today to this proposed

23   methadone clinic right in our rural residential and

24   agricultural community.

25            First, I wish to thank the staff of the
```

```
 1    HSDA for coming to our community to let several dozen
 2    of our citizens express their opposition without
 3    traveling to Nashville today.  Mr. Farber and
 4    Mr. Christoffersen, we're very gracious, and the entire
 5    staff has been willing to assist whenever we had
 6    questions.
 7               As a continuation of my community's
 8    strong opposition, I wish to offer to HSDA a copy of
 9    our petition, which today numbers 2,073 residents of
10    Gray, folks that have children attending schools there
11    and many commuters that pass through Gray on Stone
12    Crest Drive by this site each day going to work.
13               Yes, there have been about 30 letters of
14    support largely from individuals in groups associated
15    with Mountain States Health Alliance.  They are largely
16    from a form letter or press release because most start
17    with a similar statement and list a commentary out of
18    statistics that is repeated in the application.  I will
19    point out no letter -- I will point out that no letter
20    I have seen yet indicate Gray as the best site for such
21    a facility.  Only one says that if it is not the best
22    site, then another site needs to be selected and
23    approved immediately.
24               Additionally, a letter from the District
25    Attorney General of Sullivan County support lends
```

support if nine bullet points are met.  Unfortunately,
almost every point is contradicted by the application
itself; and I assume that if the general were to read
the application, he would not support this clinic.

I would like to take a moment to show you
the map, and I will do that quickly.  I'm not sure if
this will actually -- it won't.  But several folks have
mentioned how far away Gray is actually from the city.
The lower portion toward the bottom is actually where
downtown Johnson City is, where the police department,
municipal and safety building is.  Gray is that strip
way at the top, and a little ways out is actually where
that facility is actually located.  The hospitals are
back into Johnson City itself, and that's just to
represent.

This map, I just felt, offered a real
good opportunity for you to see that this is a bit of
an anomaly that we are actually on the way outskirts of
Johnson City and not really even at the edge of Johnson
City.  Why is this important?  In the orderly
development of healthcare, a facility must have the
support structure to even have the possibility of being
successful.  Hospital and police services are 10 to 12
miles away and can be up to 25 to 30 minutes away even
in an emergency.  As others have stated, other such

facilities in Tennessee are located within the city
proper and within two miles of the hospital.  And as
demonstrated by this community, this type facility will
never be accepted even if forced, and no business is
ever successful located in a hostile environment.

The community is not without compassion
for those in need, but we know for certain this type of
business has no place in our rural residential and
agricultural community.

I would like to speak for a minute to the
application.  Mountain States is currently in the
middle of a massive merger with Wellmont to provide
medical services in east Tennessee and southwest
Virginia.  This is their main business and should have
their full attention.  Mountain States and East
Tennessee State University have, on numerous occasions,
stated both in public and to the press they are
proposing this methadone clinic because they were asked
by local elected officials.  With these statements and
the pending merger, why would any of us have any degree
of confidence they have a full commitment to running a
successful methadone clinic, a type of facility of
which they have no experience?

Additionally, I've read the application
numerous times and keep going back looking for more

explanation of what they are actually going to do at
this facility, and I have listened to their comments at
every meeting read every press release and only find
changing statements and contradictions. Their
responses mostly say "We will do that" or "Both of
these items will be covered." Basically, the idea of
just trust us. They say nice things like holistic,
innovative or national model, but without explanation,
those words are hollow.

Unfortunately, it just reads like another
full-profit clinic; and if they fail to make this
clinic more, then our community is left with the
nightmare it fears. Surely this orgulous body charged
with ensuring the appropriate delivery of healthcare in
Tennessee expects more than offered by this
application. I do believe these are good people with
good intentions. People I trust have good things to
say about Dr. Pack, Ms. White, and others. But this
application was rushed, by their own admission, and
unfortunately, it has never been approved.

Given the building national emphasis on
this addiction problem, one can see major shifts in
improvement beginning, which will quickly change the
approach to this problem. But I fear this application
is an old approach at the tail end of an old solution.

1  But the opportunity exists to utilize the excellent

2  resources available to them in the northeast Tennessee

3  area such as the ETSU College of Medicine, experienced

4  clinicians, the larger medical and educational

5  community, and to use a newly developed regional

6  healthcare organization through this merger to provide

7  reasonably accessible services and multiple medical

8  facilities across the entire northeast Tennessee and

9  southwest Virginia area.

10            The medical industry wants to treat this

11 as the medical issue and that it should be approached

12 in a medical setting.  This approach would

13 significantly reduce travel time for clients, reduce

14 public safety concern on our highways and communities,

15 and eliminate the stigma of using a facility not only

16 for treating addiction.  This is one approach, but the

17 resources are there to make this truly innovative,

18 treating the whole patient in a medical setting and

19 including those additional services to help that client

20 become drug free.

21            We plead with you to send this

22 application back to the starting point where a better

23 approach can be developed that we will match the

24 challenge existing in northeast Tennessee and southwest

25 Virginia.  We deserve better, and they are capable of

```
 1    providing a better approach.  Thank you, Mr. Chairman.

 2              MR. DOOLITTLE:  Thank you, Mr. Sells.  We

 3    have rebuttal by Mr. Elrod, and you have at least

 4    11 minutes if you feel you need that.

 5              MR. ELROD:  Mr. Chairman, this is

 6    Dan Elrod, and I'm actually going to try to not use all

 7    of that because I know the Agency has been through a

 8    lot already.

 9              First, in regard to -- I mean, I don't

10    want to weigh too much into the location because I

11    understand that the Agency is not a land-use body.

12    You've heard a lot about the location, so I want to say

13    a few things about that.  One is just -- I mean, this

14    site is a commercial site.  It's an office building on

15    38 acres, and so it's not like just stuck in the middle

16    of a subdivision.  It is on 38 acres in an existing

17    office building.

18              With regard to safety and how that -- in

19    terms of proximity to emergency facilities, it's right

20    next door to a fire hall with EMTs, and it's half a

21    mile from an EMS station.  So the idea that somehow the

22    patients are going to be stranded out there without

23    access to emergency services is just not the case

24    because of the proximity of emergency care right there

25    at it.
```

1    The Johnson City Planning Commission

2 recently took this site up as a matter to consider, and

3 a report was rendered to the Planning Commission by

4 this department within Johnson City Government about

5 the safety issues, et cetera, and has already been

6 eluded to.  The Chief of Police in Johnson City spoke

7 to officials, law enforcement officials, in Memphis,

8 Knoxville, Columbia, and Dyersburg.  There were little,

9 if any, crime spillage from this clinic's sites in

10 [inaudible].

11    I also make the point that there was some

12 opposition in some location of the clinics, but the

13 concerns have not come to pass; and we suggest that

14 will also be the experience here because that's been

15 the experience in other places in Tennessee, and it's

16 just not an issue.  We passed out today, I think, an

17 article from the Knoxville News Sentinel, which

18 coincidentally, the Knoxville Police Chief once again

19 re-iterated that these do not create any kind of

20 additional crime in the vicinity.

21    I think it is important to clarify one

22 thing about the patient load, and comments have been

23 made about how can you possibly, you know, see that

24 many patients with the staff you're talking about?  And

25 just to clarify, the number of patients that are

```
 1   identified in the projections are the number of
 2   enrolled patients.  That's different from the number of
 3   patients who will be seen every day because as a course
 4   of treatment evolves, patients come less and less
 5   often.  So the number of patients there every day is
 6   significantly less than the number of enrolled
 7   patients.  And so that, I think, addresses the concerns
 8   about staffing.  You can't just do that math that was
 9   done by the opposition to come up with those numbers.
10           The other concerns addressed in terms of
11   the operation of the facility are, in fact, addressed
12   by licensing standards and licensing requirements.
13   These facilities are licensed by the Department of
14   Mental Health of Substance Abuse Services.  There are
15   multiple pages of licensing standards that have to be
16   adhered to in order to maintain a license.  In addition
17   to that, there are federal requirements that have to be
18   adhered to.  So in terms of the dispensing, looking
19   after patients, the care plan, the follow-up on
20   patients, what you do with a patient if a patient is
21   not compliant, all of that is addressed by state and
22   federal requirements.
23           One other thing about the traffic while
24   I'm on the location -- I meant to make this other
25   point.  The same Planning Commission -- and this
```

1    department did this work with the Planning Commission
2    -- looked at traffic, evaluated traffic volumes along
3    the roads, et cetera, included that the anticipated
4    traffic characteristics of the proposed clinic will
5    have no significant impact.  So traffic is not a
6    problem by the body that's in charge of studying that.
7              There's some criticism in the application
8    because there's not full development of all the
9    additional services that would be provided in this
10   project.  I think Dr. Jessee actually did a great job
11   of summarizing all those services are, which they
12   already have in place, but you can't fully develop that
13   in a proposal until you have approval to proceed.  You
14   can't -- that would not be good stewardship of
15   nonprofit dollars to spend a lot of money to fully
16   flesh out this clinic unless it's approved.  So this is
17   the first step towards that; and Mountain States, ETSU,
18   and Frontier are committed to do this and use our
19   resources to make it happen in the appropriate way.
20             One clarification about the additional
21   services:  As Dr. Jessee explained, some additional
22   counseling-type rehabilitation recovery-based services
23   will be provided in the clinic itself.  There's a
24   standard amount of services that have to be provided in
25   a clinic.  But the more robust recovery-based services

1  will be provided through Frontier at its disbursed

2  locations throughout, and they cover all the counties

3  that are in this primary service area.  And so the

4  patients who access the more elaborate and more focused

5  counseling services will actually do that closer to

6  where they actually live as opposed to all coming to

7  the site in Gray for all of that.

8              With regard to the 2013 application, I

9  don't think I need to tell the Agency because the

10  Agency has told me this a number of times, that every

11  application rests on its own merits and the action on

12  one application does not establish any precedent as

13  regard to another application.  And on that point, this

14  project before you today is far different from what you

15  considered in 2013.  It did not involve this

16  collaboration and the access to the full array of

17  services that are proposed in this application.

18              We hope we have fully addressed all the

19  questions the Agency might have, but I suspect we have

20  not, so I'm going to be quiet now.  And we have a

21  number of people here to answer any questions the

22  Agency may have.

23              MR. DOOLITTLE:  Thank you, Mr. Elrod.  It

24  is time for questions from members.

25              MR. CHRISTOFFERSEN:  Mr. Chairman, may I

```
 1   before --

 2              MR. DOOLITTLE:  I messed up again.

 3              MR. CHRISTOFFERSEN:  May I say something?

 4   I don't normally jump in so much for good reason, but I

 5   did want to point out for the members, as questions, on

 6   very specific bit of guidance is, I'd suggest staying

 7   away from the issue of zoning specifically because

 8   Johnson City's zoning ordinance is currently being

 9   challenged in federal court, and so therefore we don't

10   have any evidence that anything having to do with

11   Johnson City's zoning will preclude this project being

12   completed.  So I just wanted to recommend that since

13   it's in federal court, we just leave that be.

14              MR. DOOLITTLE:  Thank you,

15   Mr. Christoffersen.  Questions for members?  Mr. Mills.

16              MR. MILLS:  Okay.  This is a question for

17   the applicant.  Ms. White, I believe you said you live

18   in Gray?  You need to come to the podium, please.

19              MS. WHITE:  Yes, sir.  I live -- I'm a

20   current resident with my family in Gray.

21              MR. AUSBROOKS:  State your name.

22              MR. MILLS:  Okay.

23              MS. WHITE:  Lindy White.  I'm sorry.

24   Lindy White.

25              MR. MILLS:  Help me understand.  I mean,
```

```
 1   I've heard it's a two-lane road.  I've heard it's a

 2   three-lane road with a turn lane.  You are a half mile

 3   off the interstate.  Can you give me a little more

 4   insight?  I mean, is it heavily trafficked?

 5              MS. WHITE:  Sure, sure.

 6              MR. MILLS:  I mean, school traffic in the

 7   morning and school traffic in the afternoon?  Because

 8   I've heard the population in Gray is 1,500, but there's

 9   1,500 at the high school, I think, or close to it.  So

10   I'm getting confused on some numbers.

11              MS. WHITE:  Well, I think really -- one

12   really, really important point here in regards to the

13   traffic patterns in Gray is that we currently just most

14   recently have had kind of a robust development and

15   construction phase of the on-and-off that you mentioned

16   on I-26.  So it, through that construction development

17   project, has certainly addressed any issues with the

18   on-and-off as it relates to the interstate.

19              And so I do have a son at Daniel Boone

20   High School, which is one of the schools referenced

21   here.  And of a 15-year-old, I'm still a mother who

22   drops him off every morning, and it's a very

23   well-developed road, double lines.  And if you could

24   see a picture of this facility, the facility, while on

25   that main two-lane road, as you're coming towards the
```

1   schools that were referenced here earlier -- very, very
2   nice developed road, side shoulders.  And our current
3   facility actually sets a good distance off the road.
4   It's not setting right on the shoulder of the road.  In
5   fact, if you blink, you would miss it.  So with that, I
6   would say that dropping my child off at 7:15 in the
7   morning is no issue.  And, certainly, as you-all may or
8   may not know with this proposed project, there's really
9   three periods of time where there could be an increase
10  in traffic patterns.  And typically, again, our project
11  are going to serve those patients that are working.
12          Typically, there's a burst.  There will
13  be a burst of traffic from probably the 5:00 to 7:00
14  period of time before patients go to work.  Likely,
15  probably the second period of time, based on the
16  studies that we've done with one of the larger
17  operators of these sites, would be just before lunch,
18  again, while the schools are in session; and then most
19  likely right after lunch, before we close at 3:00 p.m.,
20  which would be before, you know, before the traffic and
21  congestion starts.
22          School there at Daniel Boone High School
23  does release at 2:45.  Typically, before my car pulls
24  out on the site after the bells ring is 3:00 p.m.  I
25  usually typically if I'm the one picking him up, which

1    is rare, 3:30, you know, really before I get back home

2    to my resident, which is just a few miles from Gray.

3    So very well-developed right off the interstate, a

4    development construction project to address those

5    concerns.

6                   And, again, I think one major plan I want

7    to point out, if you look at the site that we were

8    asked to consider, which we did, and you compare the

9    residential dwellings of that location on Oakland in

10   the middle of Johnson City to the site that we're

11   proposing in Gray, the number of residential dwelling's

12   a half mile and the Oakland site is 719.  The actual

13   number of residential dwellings, again, which does

14   obviously contribute to the traffic concerns in Gray

15   Commons is 217.

16                   So the proposed site in Johnson City

17   double, and if you look at the residential dwellings a

18   mile, it's almost triple.  So, again, just speaking

19   about the traffic patterns personally, I feel like --

20   and, again, the independent studies had been done, we

21   would not be asking to locate this site if we didn't

22   feel like the traffic patterns and the roads could

23   adequately and safely deal with additional traffic

24   associated with our project.

25                   MR. MILLS:  In regards to a local law

```
 1   enforcement, I assume it's governed by Johnson City or
 2   Washington County?
 3                MS. WHITE:  Yes, the City of Johnson
 4   City.
 5                MR. MILLS:  Okay.  Okay.
 6                MS. WHITE:  And there's also been an
 7   independent study by the Chief of Police of Johnson
 8   City who also weighed in on that, and you should have
 9   that probably available in front of you.
10                MR. MILLS:  Okay.  And, you know, I
11   understand you're going to ramp up on these
12   60 patients.  Is that going to be like an average
13   census population on an annual basis?
14                MS. WHITE:  Yes, sir.  So when the first
15   year that was referenced earlier, 650 -- an important
16   point here -- that is the number of patients enrolled
17   by the end of that first year, and we will ramp up
18   certainly to that number.  That is not the number of
19   patients seen on a daily basis.  The numbers are less
20   than that as patients progress through their treatment
21   plans.  So it's very, very important that -- you know,
22   we estimated Dr. Jessee, who's much more of an expert
23   on that piece as far as counseling and case
24   management -- he's much more of an expert on that.
25                When we looked at the studies -- and we
```

```
 1   looked at, you know, approximate examples.  We feel
 2   firm and stand firm on the fact that our staffing
 3   models as compared -- and we have researched with
 4   multiple other clinics, that we have amble medical
 5   licensed counselors as part of our project to deal with
 6   this patient population.  We're anticipating somewhere
 7   between 240, 275 patients daily once the first year
 8   gets ramped up to the 650 enrolled.  That's a very,
 9   very important point.
10              MR. MILLS:  And I think for the citizens,
11   security is a concern.  And from what I read -- if
12   you'll just confirm this in the application -- I didn't
13   earmark what Bates stamp number it was.  But you're
14   going to have security onsite during the business
15   hours; is that correct?
16              MS. WHITE:  Absolutely.  We're going to
17   have at a minimum two officers onsite during the hours
18   of operation.  And in addition to that, as you-all can
19   imagine with our 13 hospitals and pharmacies we run
20   every day, we'll also have 24/7 monitored security
21   surveillance in addition to the onsite officers that
22   will be onsite when the clinics open seven days a week.
23              MR. MILLS:  So if someone showed up at
24   4:00 to get in line on Monday morning, they would be
25   under surveillance?
```

```
 1              MS. WHITE:  Absolutely.  Yes, sir.
 2   Monitored surveillance, absolutely.
 3              MR. MILLS:  And then one of the things
 4   that has been mentioned over and over and over again --
 5   and I'm not convinced of this, so I would like for you
 6   to speak to it.  I'm not sure how often the clients who
 7   would treat need emergent care when they walk in your
 8   facility or care that they can't be transported within
 9   a reasonable amount of time.  Because, you know, that
10   area of Tri-Cities, there's a lot of rural area in
11   order to get to a hospital not just, you know, 11 miles
12   down the road.
13              So do you have any statistics or
14   experience or history regarding how many -- percent --
15   would need emergent care when they presented in the
16   facility?
17              MS. WHITE:  So a couple of things.  We
18   kind of addressed that on a three-legged stool.  A
19   couple things we've done, which Dan addressed earlier
20   in regards to the medical personnel that are available
21   around the site.  Not to mention that we'll have a
22   medical director and licensed medical folks will be
23   onsite at our when it's operational.  There will not be
24   a moment when someone's not there that's not licensed
25   to deal with a medical emergency.
```

1            In addition to that, we have worked

2    closely with one of the largest operators of

3    recovery-based treatment centers in the nation.  They

4    have 38 sites, and I've been in close contact with

5    their operator.  They site that emergent medical

6    reactions related to this medication assisted therapy

7    has not been a problem at any of their 38 sites.  Now

8    granted, this is much like -- and the way I would frame

9    this up and the way it would look to you-all if you-all

10   were to walk into our clinic would be this is going to

11   be much like your visit to your family practice

12   physician.  We operate many outpatient practices within

13   Mountain States Health Alliance and we, of course, want

14   to have the appropriate medical equipment and personnel

15   there ready and able to take care of any medical

16   emergency.

17            So those two legs of the stool, we stand

18   committed to that in addition to err research because

19   we don't -- this is a new -- this is a new tool in our

20   tool kit.  Research demonstrates that medical emergent

21   reactions to this type of treatment is not common, and

22   we will have the available folks there in and around,

23   as we spoke to, to deal with any medical situation and

24   to get them to the closest medical facility which based

25   on -- which is my other community hospital located in

*Ace Court Reporters - April N. Daniel, LCR*

```
 1    Johnson City, which is about nine miles away.  So we

 2    feel very, very comfortable that we can provide a safe

 3    model with this type of treatment in Gray.

 4              MR. MILLS:  That's all I have,

 5    Mr. Chairman.  Thank you.

 6              MR. DOOLITTLE:  Thank you, Mr. Mills.

 7    Other questions?  Ms. Jordan.

 8              MS. JORDAN:  Is there a goal as part of

 9    the comprehensive plan of care to whine patients off of

10    methadone or what -- I think that has been a concern in

11    the past that --

12              MS. WHITE:  Yes, ma'am.

13              MS. JORDAN:  -- there's just a

14    substitution of one -- an addiction to one drug to

15    another.  So my question is, what is the goal here?

16              MS. WHITE:  So let me firmly say the goal

17    of this clinic is certainly recovery, and the end goal

18    in sight is abstinence eventually with our patients.

19    We feel the not for profit brings that to the table

20    with a commitment to have a recovery-based

21    abstinence-based program.  Now, granted, as was noted

22    earlier, every individual patient is different.  Some

23    will get there in a year.  Some will get there in

24    multiple years, but we are committed to that model, you

25    know.
```

```
 1              I just want to emphasize that our model
 2    is different for that reason.  Our patients will have
 3    the goal of recovery and abstinence as a goal.
 4    Methadone, too -- and, again, I'm not the expert.  I'm
 5    not the clinician in the room, but methadone can be
 6    easily tapered one milligram at a time.  And so that
 7    will be, you know, obviously up to the medical director
 8    and the physician.  But methadone honestly can be
 9    tapered very easily as a medication-assisted therapy,
10    and that would be the goal is to taper our patients as
11    would be medical assessed and deem necessary.
12              MS. JORDAN:  Okay.  A couple of other
13    questions, just some issues that were raised by the
14    opposition.  I believe it was Ms. Oliver suggested that
15    there's certainly opportunity for people to get
16    medication that they don't necessarily need and then
17    sell it on the street.  What type of safeguards are in
18    place, or is this -- talk to me about that.  What's
19    your response to that?
20              MS. WHITE:  I'm going to let
21    Dr. Jessee -- is that okay?
22              MS. JORDAN:  Yes.
23              MS. WHITE:  One thing I will say, it is
24    very well-defined in the state regulations as far as
25    the diversion plan, and we would certainly have at in
```

1    our clinic.  I'll let Dr. Jessee expand on the details.
2                 DR. JESSEE:  Randy Jessee.  The dosing
3    process with methadone is very prescribed.  The initial
4    dose can be no more than 30 milligrams, is written as
5    an order by a physician after that physician has
6    conducted a physical exam and the history process with
7    that particular client.  And that can take up to an
8    hour and 25 or 30 minutes in order to do that.  That
9    first dose is not administered until that physician is
10   ready to do that, and then that initial 30 milligram
11   dose is administered.
12                Then a time frame of anywhere between
13   three and four days happens and as a person that's
14   coming in every day, only the physician can change that
15   milligram that was previously given.  And so if the
16   first day was a 30 and the second day was at 35 and
17   then the fourth day was at 40, then that process is
18   always done and administered by the order of the
19   physician.  So the physician has to see that and make
20   that determination.  A nurse cannot do that.  Another
21   clinician or therapist cannot do that.  Nobody else in
22   the facility can do that.
23                They're prescribed rules and regulations
24   for the diversion of any medication.  All medication in
25   a methadone facility has to be locked in a safe and

1    monitored in double fashion with cameras and other
2    safety devices on the safe itself.  Every day there's
3    double counts of all medication.  And the process over
4    time for a patient to receive any take-home is, I
5    believe, at this point the regulations -- I don't have
6    it right in front of me.  But the regulations do
7    prescribe that you have to be in treatment --
8    stabilized in treatment at least one year before you
9    get -- and on an emergency basis approved by the
10   physician, then only one day take-home could be given
11   to an individual on a Sunday.
12            MS. JORDAN:  Okay.  So do I understand
13   correctly that in most -- because I'm not a clinician.
14   This is not my area of expertise.  So people actually
15   receive the medication and take it at the clinic?
16            DR. JESSEE:  Yes.  It's all done onsite.
17   Nobody walks out with the medication unless they have
18   progressed beyond the point where -- now, there's some
19   people that will do that over extended periods of time.
20   They have to be very stable individuals --
21   stabilized -- on the medication stabilized in the
22   recovery -- in the therapy part of it and, you know,
23   presenting themselves as, you know, citizens.
24            MS. JORDAN:  Okay.  That's helpful.  And
25   then, Dr. Jessee, I don't know if this is a question

```
 1    for you or someone else.  I believe Ms. Wise was the
 2    one who raised a question about future funding of the
 3    various wrap-around services.  Maybe a question that
 4    that hadn't been finalized.  Can someone address that?
 5                  DR. JESSEE:  Sure.
 6                  MR. PACK:  Hi.  Robert Pack, ETSU.  It's
 7    important to recognize that there are multiple sources
 8    of funding for any of our staff.  It could be state
 9    funding.  For example, I'm paid largely through state
10    dollars and grant dollars.  It could be clinicians, you
11    know, make money through a practice plan or something
12    like that.  So there are multiple sources of funding.
13    We even have some donations that have funded some
14    Naloxone distribution.  So there are multiple sources
15    of funds and staffing.
16                  And for our research program, we have
17    multiple grants under review, you know, in any given
18    year.  Unfortunately, our three-and-a-half
19    million-dollar project probably won't be funded.  We
20    got our score, which was just outside the funding
21    range.  It's unfortunate, but we were encouraged to
22    actually go back in for that particular award as with a
23    slight modified proposal, which we intend to do.
24                  That's specific to our research program,
25    and that grant was actually to do a rural addictions
```

```
 1    network which was to grow basically the quality and
 2    scale of access to medications to treatment in rural
 3    areas using providers that already exist there, so
 4    we're actually trying to enhance the quality because
 5    there is a fair amount of Buprenorphine diversion
 6    that's happening and we were trying to get people
 7    engaged with a high quality of care through that
 8    proposal.  But it's not pertinent to this application
 9    as part of our larger set of activities that we have
10    ongoing at any given time.  And there are a number of
11    others.  It could be a research project on pharmacists,
12    for example, or an education program, things of that
13    nature.
14            MS. JORDAN:  Okay.  Thank you.
15            MR. PACK:  Does that help?
16            MS. JORDAN:  Yes.  Thank you.
17            MR. PACK:  Okay.  Now, comprehensive
18    services, the wrap-around services, are more clinical.
19    Those are actually with Frontier and Mountain States.
20            MS. JORDAN:  All right.  Thank you.
21            MR. PACK:  Sure.
22            MR. DOOLITTLE:  Thanks, Ms. Jordan.
23    Other questions?
24            (None noted.)
25            MR. DOOLITTLE:  Seeing none.  Summation.
```

1    Would someone from the opposition -- you have an

 2    opportunity to speak for three minutes summarizing your

 3    position.  Mr. Sells.

 4              MR. SELLS:  Danny Sells.  Mr. Chairman, I

 5    request an hour.  You know, in summary and to respond

 6    to a couple of things that is important, I think, to

 7    understand why we have so much concern about this

 8    application and whether it's very thorough.

 9              Actually, Mr. Jessee contradicts

10    Ms. White when it comes to the patients and the amount

11    of time that they're going to be there and whether

12    there's going to be 650 every day or 1,000 every day,

13    not to even include the fact that year three, they

14    start providing Buprenorphine or Suboxone, which will

15    increase the number of patients.  You know, my

16    understanding was it was less than a year that they

17    could actually start taking it home, but I'm not a

18    clinician or trained in it.  I just can understand what

19    I read.

20              The concern is too that even though this

21    isn't developed, there are being many grants request

22    proposals written.  Every grant proposal I've ever

23    written requires some pretty specific details for what

24    you're going to be doing, and I would anticipate that

25    this application ought to provide more detail than what

1     is being provided here.

2              The time of service -- we've been told

3     pretty well all over the board as to what time the

4     services would be provided, and another set of times

5     were indicated here today.

6              I will say that Gray is a census

7     designated area.  The population in Gray in the 2010

8     census was 1,222.  We are probably in the neighborhood

9     of 1,500 today.  The area surrounding our community, in

10    this little thin strip that I pointed out over here, if

11    you literally walk across Highway 75 or Suncrest Drive

12    from the clinic itself, it's only about 100 feet off of

13    that highway.  You are literally in the county.  It is

14    surrounded by county.  Yes, there's 36 acres that

15    actually Mountain States owns, but there's all of this

16    county around it and very confusing jurisdiction on who

17    actually responds.

18             Even in some of the hearings we've been

19    in, there has been concerns between jurisdiction,

20    between county and city, between simple things such as

21    an accident in some areas.  I'd also mention that

22    Ms. White actually lives on the opposite side of

23    Interstate 26 over on Free Hill.  That is not the side

24    of the interstate that this particular clinic is

25    proposed to be on.  Those of us who live on that side,

1  the side where this clinic is proposed to be,

2  understand exactly how it is trying to get out on that

3  highway at 7:00 to 7:30 in the morning upwards to 8:00

4  or 8:30.  You very often -- I did just last Friday had

5  to go the opposite direction of the way I was going to

6  go because as far as I could see, there was no brake

7  for me to get into the traffic, so I had to take an

8  alternate route.  I understand that maybe when she gets

9  in the traffic, it's not a real problem getting her

10 student to Daniel Boone.  But for us that travel that

11 road daily whether it's to work or whatever else, it is

12 a clearly different situation for those of us that live

13 on that side of the interstate.

14             I will also say, too, that we are not

15 specifically concerned about crime or how people act

16 onsite.

17             MR. DOOLITTLE:  Mr. Sells, your three

18 minutes --

19             MR. SELLS:  We are concerned about how

20 people act when they leave and who has the jurisdiction

21 to help our community with that once that occurs.

22 Thank you.

23             MR. DOOLITTLE:  Thank you for your

24 comments.  Mr. Elrod, three minutes to you.

25             MR. ELROD:  Thank you, Mr. Chairman and

members of the Agency.  Dan Elrod on behalf of the
applicant.  Just one quick point about the traffic,
part of the report done for the Planning Commission
basically said, for comparison purposes, "The proposed
clinic would generate approximately half the traffic of
a typical fast food restaurant or one-fifth of the
traffic generated by a coffee/doughnut shop during the
AM period," so this is not a significant generator of
traffic.

          The other thing I'm going to do really in
my summary is simply quote from the report by the
Department of Mental Health on this project.  "One, the
need for residential opiate treatment program is part
of a comprehensive approach to opiate abuse and
dependents in the proposed region has been reasonably
established.

          Two, the proposed project appears to be
economically feasible.  Proposed staffing meets or
exceeds licensure requirements and proposed salaries
are consistent with the market rates.

          Three, the application for a
nonresidential opiate treatment program as part of a
nonprofit corporation operating a center with a
comprehensive approach to prevention and treatment of
drug abuse would contribute to the orderly development

of healthcare in the state of Tennessee.  As proposed,
the nonprofit East Tennessee Holdings, Inc., would
combine the established healthcare delivery
organization Mountain States Health Alliance with the
academic and clinical expertise of East Tennessee State
University of which the OTP would be one service.

The proposed partnership with Frontier
Health would establish the important relationship with
an existing provider of comprehensive community mental
health and substance abuse services and improve access
to a range of substance abuse treatment to Tennesseans
in this region struggling with opiate abuse and
dependents.  I think the Department of Mental Health
summarizes it better than I can.  We urge the Agency to
favorably act on this application.

MR. DOOLITTLE:  Thank you, Mr. Elrod.
It's time for discussion by members.  Mr. Mills.

MR. MILLS:  Well, you know, it's not
always easy to have to address those that are opposed,
but I think that -- with the collaborative efforts of
all three entities, I think that they have done a great
job in doing studying and researching and continue to
do so if approved to find a more innovative approach to
a solution if there ever is a solution.  So I do plan
on supporting this application.

1          MR. DOOLITTLE:  Thank you, Mr. Mills.

2     Dr. Fleming.

3          DR. FLEMING:  I would echo Mr. Mills'

4     comments.  From a physician's perspective, the question

5     of does it meet the criteria for need is almost comical

6     in our state.  I mean, we're so far off the charts in

7     need.  This is a drop in the bucket, but I think it's

8     an excellent drop in the bucket, and it's a way forward

9     that we'll do something more creative and more

10    innovative and I really applaud the efforts.

11          I need a little clarification.  You say

12    not to mention zoning and now I'm going to do it just

13    for clarification though.  If somebody changes the

14    zoning on this applicant that's being questioned, so if

15    we approve this and the zoning gets reversed, then our

16    approval doesn't matter?  I just need clarification how

17    that works.

18          MR. CHRISTOFFERSEN:  Normally in

19    Certificate of Need applications, the Agency and its

20    staff, before even deeming an application complete,

21    requires site control.  That's why we have contracts.

22    That's why zoning needs to be either in line or look

23    good or what have you.  But given that, A, it looks

24    like they're on the right track to begin with to have

25    zoning approved.  But even if it weren't approved,

*Ace Court Reporters - April N. Daniel, LCR*

```
 1   since the zoning ordinance for the City of Johnson City
 2   is under appeal in federal court and there's nothing
 3   definitive from the federal court yet, I suggest just
 4   not even factor in zoning.
 5              DR. FLEMING:  To move ahead as if it's
 6   not a problem?
 7              MR. CHRISTOFFERSEN:  Exactly.  And if it
 8   gets stopped in its tracks, it gets stopped in its
 9   tracks but not by us.
10              MR. DOOLITTLE:  Anything else,
11   Dr. Fleming?
12              DR. FLEMING:  No.
13              MR. DOOLITTLE:  Okay.  Other comments?
14   Ms. Jordan?
15              MS. JORDAN:  No.
16              MR. DOOLITTLE:  Anybody else?
17              (None noted.)
18              MR. DOOLITTLE:  Seeing no additional
19   comments, we would look for a motion.  You're smiling,
20   Ms. Jordan.
21              MS. JORDAN:  Mr. Mills has his hand
22   raised, but I'll do it if you want me to.
23              MR. DOOLITTLE:  Mr. Mills.
24              MR. MILLS:  In regards to East Tennessee
25   Healthcare Holdings, CN1605-021, for the establishment
```

*Ace Court Reporters - April N. Daniel, LCR*

1  of a nonresidential substitution treatment center for

2  opiate addiction, I make the motion to approve this

3  application based on the following criteria being met:

4  Orderly development of healthcare. There

5  are no opiate treatment programs in the eight-county

6  service area. The closest OTP is in Knoxville over

7  100 miles away and in North Carolina 45 miles away.

8  This program will reduce prescription drug use and drug

9  abuse in the area. This program will provide the

10  needed education, outreach, research, treatment, and

11  evaluation in partnership with the ETSU research

12  foundation. It will provide needed education for

13  students and interns training in the medical field.

14  It is located within one mile off of I-26

15  in Gray providing ease of access to patients in the

16  eight-county service area. They will be using

17  evidence-based therapies to reduce the dependency of

18  drug addiction.

19  Regarding need, this project will prevent

20  the need for patients to have the burden and hardship

21  of traveling outside the service area to receive needed

22  treatments. It satisfies the need for an innovative

23  approach for prevention and drug dependency

24  populations. With an estimated patient census of 650

25  in year one and 1,050 in year two, it will provide

1  convenience for these patients to be within closer

2  proximity to where they live.

3            This project by design will provide more

4  efficient high quality of care with their collaborative

5  efforts in partnering with East Tennessee State

6  University foundation.  With the upper east Tennessee

7  among the highest in the state for struggles with

8  heroin, morphine, and prescription opiates, this

9  project will serve the need to reduce these

10  dependencies.

11            Regarding economic feasibility, this

12  project will be funded from the cash reserves of

13  Mountain States Health Alliance, as stated by the

14  Senior VP and CFO.  This project is projected to be

15  profitable in year two.

16            Compliance with the appropriate standards

17  of healthcare/quality care.  If approved, the applicant

18  will seek accreditation from CARF, C-A-R-F, the

19  Commission of Accreditation of Rehabilitation

20  Facilities.  If approved, they will seek credentialing

21  and licensing from the Tennessee Department of Mental

22  Health and Developmental Disabilities; and if approved,

23  they will seek accreditation from the opioid treatment

24  program by the Substance Abuse and Mental Health

25  Services administrator.

```
 1                    For these reasons, Mr. Chairman, I move
 2     that we approve this application.
 3                    MR. DOOLITTLE:  That is a valid motion.
 4     Do I see a second?  Dr. Fleming.  Would you call the
 5     role, please?
 6                    MR. AUSBROOKS:  Jordan?
 7                    MS. JORDAN:  Yes.
 8                    MR. AUSBROOKS:  Gaither?
 9                    MR. GAITHER:  Yes.
10                    MR. AUSBROOKS:  Mills?
11                    MR. MILLS:  Yes.
12                    MR. AUSBROOKS:  Taylor?
13                    MR. TAYLOR:  Yes.
14                    MR. AUSBROOKS:  Korth?
15                    MR. KORTH:  Yes.
16                    MR. AUSBROOKS:  Fleming?
17                    DR. FLEMING:  Yes.
18                    MR. AUSBROOKS:  Grandy?
19                    MR. GRANDY:  Yes.
20                    MR. AUSBROOKS:  Doolittle?
21                    MR. DOOLITTLE:  Yes.
22                    MR. AUSBROOKS:  Eight "yes."
23                    MR. DOOLITTLE:  The motion passes.  The
24     CON is granted.  Thank you-all.
25                    (End of excerpt.)
```

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF TENNESSEE )
                        )
 3   COUNTY OF WILSON   )

 4         I, APRIL DANIEL, Licensed Court Reporter in

 5   and for the State of Tennessee,

 6         DO HEREBY CERTIFY the foregoing transcript of

 7   proceedings was taken at the time and place set forth

 8   in the caption thereof; the witness therein was duly

 9   sworn on oath to testify the truth; the proceedings

10   were stenographically reported by me in shorthand; and

11   the foregoing transcript of proceedings constitutes a

12   true and correct transcript of said proceedings to the

13   best of my ability.

14         I FURTHER CERTIFY I am not a relative or

15   employee or attorney or counsel of any of the parties

16   hereto, nor a relative or employee of such attorney or

17   counsel, nor do I have any interest, financial or

18   otherwise, in the outcome or events of this action.

19         IN WITNESS WHEREOF, I have hereunto affixed

20   my signature this 31st day of August, 2016, at Lebanon,

21   Wilson County, Tennessee.

22

23                        _____
                          April Daniel
24                        License No. 141
                          Expires:  June 30, 2018
25
```

*Ace Court Reporters - April N. Daniel, LCR*